UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------X
UNITED STATES OF AMERICA,

                Plaintiff,             **Docket No.: 18-CV-9293-BRM-TJB**

    -against-

THE REAL PROPERTIES KNOWN AS

50 RIVERSIDE BOULEVARD, UNIT 21B
NEW YORK, NEW YORK ;

2 RIVER TERRACE, UNIT 12J
NEW YORK, NEW YORK;

40 BROAD STREET, UNIT 20FG
NEW YORK, NEW YORK ; and

18 AND 19 COLTS GAIT LANE
COLTS NECK, NEW JERSEY

              Defendants *in rem*.
-------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S MOTION TO DISMISS COMPLAINT FOR FORFEITURE *IN REM*

Timothy C. Parlatore, Esq.
*Counsel for Petitioners*
221 River Street, 9th Floor
Hoboken, NJ 07030
212-679-6312
timothy.parlatore@parlatorelawgroup.com

## PRELIMINARY STATEMENT

Plaintiff has filed a complaint for *in rem* forfeiture of the Defendant properties based on a deeply flawed investigation and an assertion of claims, which the Plaintiff lacks the jurisdiction to advance.  Plaintiff has failed to properly state a cause of action that would permit it to forfeit any of the Defendant properties.  Moreover, much of Plaintiff's complaint relies upon email communications that were obtained in violation of the law, many of which also constitute attorney-client privileged communications.  Plaintiff's reliance upon these stolen emails and brazen quoting of attorney-client communications should be sanctioned by dismissal of this action or, at a minimum, disqualification of Plaintiff's counsel and the return of the stolen property.

Plaintiff seeks forfeiture of four properties on a theory that they represent the proceeds of illegal activity, to wit securities fraud and money laundering. However, the factual basis provided by Plaintiff, if true, clearly demonstrates that three out of these four properties were purchased or refinanced prior to any alleged violation of U.S. law.  The complaint therefore fails to state a cause of action against these three defendant properties and should be dismissed.  Moreover, the complaint fails to state a plausible cause of action against the fourth defendant property, as the documents referenced by Plaintiff demonstrate that no fraud was committed.

Plaintiff alleges a pattern of misconduct by Paul Parmar ("Parmar") related to

1

his conduct as CEO of Constellation Healthcare Technologies, LLC ("CHT"), a company that was being publicly traded on the London Stock Exchange Alternative Investment Market ("AIM"). Specifically, Plaintiff alleges that Parmar, and his co-defendants, orchestrated several secondary offerings on the AIM that were made to fund acquisitions of new subsidiaries, but that these subsidiaries either do not exist or were overstated in their revenue. Plaintiff then alleges that Parmar presented false information to Chinh Chu, Truc To, and other members of CC Capital, as part of a transaction to take CHT private.

Plaintiff alleges that the funds from these secondary offerings were used to purchase, or refinance the mortgage, of three of the four defendant properties. However, even if Plaintiff's allegations were true, Plaintiff has failed to state a legally cognizable claim against these three properties under the laws of the United States of America, as this activity related to a London stock exchange with investors in London, not the United States.

The complaint should also be dismissed against the fourth defendant property, as the complaint fails to plead factual allegations sufficient to satisfy the heightened pleading requirements of a plausible cause of action for fraud. Rather, Plaintiff presents an incomplete and misleading[1] description of the materials

---

[1] Movant is not accusing Plaintiff's counsel of intentional misrepresentation, but rather an incomplete investigation, as it appears that Plaintiff has primarily relied on the forensic accounting report prepared at the behest of Chinh Chu, the true architect

provided during the due diligence process by cherry-picking a few select documents that are irreconcilably inconsistent volume of accurate data that was provided in due diligence.  However, an examination of the actual due diligence materials quickly demolishes any false notion that the representatives of CC Capital were deceived.

## STATEMENT OF FACTS

### Background of CHT

Parmar and other investors acquired Orion Healthcorp, Inc. ("Orion") in June 2013.  Orion is a medical billing, collections, and practice management service company, which became a subsidiary of CHT.  As CEO of CHT, Parmar grew the company over the next several years through an aggressive growth strategy of acquiring smaller service providers and making them subsidiaries of Orion.  The value of these acquisitions to CHT is primarily in their customer lists and relationships, as these medical practices would then be serviced by the main CHT platform.

CHT grew through these acquisitions and went public on the London Stock Exchange's Alternative Investment Market ("AIM") to help raise money to fund the acquisitions.  At that time, Orion held eight subsidiary companies and continued with an aggressive acquisition and growth strategy.  Most of the shares were held by

---

of a brazen and elaborate fraud, who has intentionally misled the Government into believing that he is a victim.

various entities, which Parmar managed and controlled (the "Parmar entities").

By the time Parmar wanted to take CHT back private, it had grown to 14 operational subsidiaries, along with several holding companies and Special Purpose Acquisition Companies ("SPAC")[2].

## Secondary Offerings

As outlined in the complaint, three of these SPACs were Northstar First Health, LLC ("Northstar"), Phoenix Health, LLC ("Phoenix"), and MDRX Medical Billing, LLC ("MDRX"). All three had been formed for the purpose of acquiring new subsidiaries using raise ups on the AIM exchange. While these raise ups were successful, the acquisitions did not go exactly according to plan and two of these SPACs, Phoenix and MDRX. remained empty shells.[3]

Plaintiff alleges that CHT announced the acquisition of Northstar on September 16, 2015 for $18 million and that Northstar had an annual revenue of $7.9 million and EBITDA of $1.9 million. In reality, Northstar was a SPAC that had

---

[2] These were not publicly traded SPACs, which would require registration with the SEC, but rather shell companies formed as subsidiaries of CHT, which were intended to be filled with new subsidiaries once acquired. A casual review of the organizational chart of CHT quickly reveals that none of the subsidiaries are directly owned by CHT or Orion, but rather all have shell companies that were formed and then filled upon the merger closing. The only two subsidiaries on the chart that do not fit this pattern are MDRX and Phoenix.

[3] Plaintiff has alleged that Defendants provided false information, in the form of press releases and financial statements, indicating that these empty shells were actual acquisitions. For the limited purpose of this motion, these allegations are presumed to be true.

been filled with Vachette Business Services, LLC ("Vachette").

Plaintiff alleges that CHT announced the acquisition of Phoenix on September 18, 2015 for $14 million and that Phoenix had an annual revenue of $9.8 million. In reality Phoenix was a SPAC that was never filled. Instead of filling Phoenix with acquisitions, as planned, CHT instead acquired Allegiance Consulting Associates, LLC ("ACA") and Allegiance Billing & Consulting, LLC ("ABC") and placed them into another SPAC that was created called VEGA Medical Professionals, LLC ("VEGA").[4]

ACA and ABC actually had a much higher revenue than the Phoenix claimed revenue. When combined with the performance of Vachette, these three acquisitions actually performed better than the claimed performances of Northstar and Phoenix.

Plaintiff alleges that, on December 11, 2015, CHT announced a secondary offering of shares, which was intended to be used to acquire MDRX. Plaintiff alleges that on February 10, 2016, CHT issued a press release announcing the acquisition of MDRX for $28 million but made no representations about the revenue or EBITDA of MDRX. In reality, MDRX was also a SPAC that was never filled.

Instead of MDRX or "Company M," the actual company that was being acquired by CHT was called New York Network Management, LLC ("NYNM").

---

[4] A copy of the VEGA press release is annexed hereto at Exhibit "A." As with most acquisitions, this press release refers to the acquisition in the name of the shell or SPAC, VEGA, rather than the actual companies acquired, ACA and ABC.

NYNM's performance would significantly outpace the MDRX claims and was the acquisition that was intended to fill the MDRX shell. Although this deal was set to close in 2016, the acquisition was delayed, at the behest of Chinh Chu, until after the closing of the go private, at which point it was put into a different shell, NYNM Acquisition, LLC.

On information and belief, Chinh Chu may have wanted the NYNM acquisition to be delayed to keep the CHT enterprise value down for the go private transaction, as well as to ensure that MDRX remained an empty shell for his later activities.

### The Go Private Transaction

As described in great detail, with significant supporting documentation in Parmar's motion to dismiss, which was filed in *S.E.C. v. Parmar,* 18-cv-9284-MCA-MAH (the "SEC Litigation"), Chinh Chu and his due diligence team on behalf of CC Capital were provided with significant access to all of the accurate information and data on CHT's financial condition and were fully aware of what they were investing in.[5]

CC Capital's due diligence began with a review of audited financials of CHT. Later, CC Capital hired Truc To of KPMG to head the due diligence efforts. Chinh

---

[5] A copy of this motion is annexed hereto at exhibits "B" and "C" and is incorporated by reference, rather than by repeating all of the factual materials herein.

Chu and Truc To were give access to all of CHT's data, including a proprietary software platform, Pegasus, to ensure that they were reviewing accurate data. This data showed that an accurate enterprise value for CHT was over $500 million, a price that Chinh Chu and CC Capital was unwilling to pay.

Chinh Chu and Truc To manipulated the process in an effort to purchase CHT for a significantly discounted rate of $300 million. As all of the normal safeguards were bypassed, such as a fairness opinion and a legitimate go-shop period, Chinh Chu ultimately gave the members of the Special Committee indemnification agreements to ensure that they would approve his unreasonable terms.

On January 31, 2017, the going private transaction closed, with CC Capital gaining a 51% stake in CHT.

## After Closing[6]

After the fact, in an effort to get rid of Parmar and steal 100% ownership of the company, Chinh Chu created a pretext to pretend that information had been falsely presented during the due diligence phase. He used this pretext to force Parmar out, file a fraudulent bankruptcy for CHT, and deceive the SEC and DOJ into filing charges against Parmar.

Essential to Chinh Chu's corrupt plan was to ensure that the KPMG due

---

[6] The facts after the closing are relevant to the Court's determination of sanctions for the illegal use of Parmar's stolen emails and should not be misconstrued as presenting matters outside the pleadings on the Rule 12(b)(6) branch of this motion.

diligence team did not spill the beans about their findings.  Immediately after closing, Chinh Chu moved to hire Truc To as the CFO of CHT.  Chinh Chu rewarded Truc To's dishonest work as the head of KPMG's due diligence team by offering him a compensation package greater than that of the CEO.

In furtherance of his scheme, Chinh Chu then illegally accessed and misappropriated Parmar's private emails.  He then provided these feloniously obtained emails to Plaintiff's counsel, who quotes from them liberally in the complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims and accept all the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 314 (3d Cir. 2010).

To survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted

unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id*.; *see also Iqbal,* 556 U.S. at 678-79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (*quoting Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings... However, an exception to the general rule is that a 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.' *In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410, 1426 (3d Cir. 1997). "[A] court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.,* 7 F.3d 357, 368 n.9 (3d Cir. 1993) (*quoting Pension Benefit Guar. Corp. v. White Consol. Indus*., 998 F.2d 1192, 1196 (3d Cir. 1993)). A court may also consider "any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.,* 452 F.3d 256, 260 (3d Cir. 2006) (*quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure* § 1357 (3d ed. 2004)).

## ARGUMENT

### 1. Plaintiff Has Failed to State a "Scheme or Artifice to Defraud"

Glaringly absent from the pleadings is any theory of a scheme or artifice to defraud related to the value of CHT.  It is axiomatic that a scheme to defraud must anticipate some intended harm to the victim, such as the purchase of an asset worth

less than the victim was led to believe.  Contrarily where, as here, the victim purchases an asset for less than its actual value, Plaintiff fails to properly plead a scheme to defraud.

While Plaintiff speaks generally about how Parmar allegedly employed "a variety of fraudulent methods designed to grossly inflate the value of Company A and trick the Private Investment Firm and others into believing that Company A was worth substantially more than its actual value," (*Complaint* ¶11) Plaintiff fails to allege any facts to support this theory and conspicuously declines to make any attempt to plead what the "actual value" of CHT was.

Plaintiff alleges that "the co-conspirators caused the Private Investment Firm and others to value Company A at over $300 million." *Complaint* ¶13.  Not only does Plaintiff fail to allege what the actual value of CHT is, they incredibly don't even include a non-specific allegation that it is worth less than $300 million, or that the $300 million value was false or inflated.  Instead of addressing the total enterprise value, Plaintiff focuses on the value of three of CHT's many subsidiaries, which are alleged to have inflated values.  Plaintiff's failure to then connect these allegedly inflated subsidiaries to the total enterprise value is fatal to their claim.

On information and belief, Plaintiff's failure to address the total enterprise value is not simply an oversight, but rather a recognition that there is absolutely zero evidence to support the notion that the total enterprise value is anything less than the

$300 million that the Private Investment Firm valued it at.  Actually, as set forth in great detail in the motion papers filed in the SEC Litigation, the due diligence documents relied upon by both the SEC and Plaintiff here demonstrate that the actual total enterprise value of CHT was significantly greater than $300 million.

As outlined in *United States v. Starr*, 816 F.2d 94, 98, (2nd Cir. 1987):

> Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."

*Id., quoting United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2nd Cir. 1970).

## 2. Plaintiff Has Failed to Sufficiently Plead Fraudulent Misrepresentations

Independent of the standard applicable to Rule 12(b)(6) motions, Fed. R. Civ. P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This particularity requirement has been rigorously applied in securities fraud cases. *In re Burlington*, 114 F.3d at 1417. As such, plaintiffs asserting securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999) (*quoting DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). "Although Rule 9(b) falls short

of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller*, 311 F.3d at 216 (*quoting In re Nice Sys., Ltd. Secs. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).

In addition to Rule 9(b), plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of 15 U.S.C. §§ 78u-4(b)(1), (b)(2), which "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller*, 311 F.3d at 217. It requires any securities fraud claim brought under the 1934 Act to:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed. 8Link to the text of the note

15 U.S.C. §78u-4(b)(1). If this requirement is not met, "the court shall . . . dismiss the complaint." 15 U.S.C. §78u-4(b)(3)(A).

Here, Plaintiff has utterly failed to allege any specific representations by Parmar and his alleged co-conspirators to the Private Investment Firm.  Instead, Plaintiff generally states:

> During the due diligence phase of the Go-Private Transaction, the Private Investment Firm was interested in seeing revenue and earnings data supporting Company A's organic growth rate. In this regard, during the due diligence, the co-conspirators sent the Private Investment Firm information concerning customer

revenue for the Operating Company, among other entities.

*Complaint* ¶49.

Rather than outline any specific allegedly misleading statements communicated to the Private Investment Firm, Plaintiff instead chooses to quote from the illegally obtained emails between the alleged co-conspirators.

Plaintiff's failure to plead any specific fraudulent statements is fatal to Plaintiff's claims. However, this is not a simple drafting error that could be remedied through an amended pleading, as the evidence that Parmar provided the Private Investment Firm with true and accurate data during the due diligence process is overwhelming.

### 3. Even if Plaintiff's Claims Are Permitted to Stand, All Claims Against Three of the Four Defendant Properties Must Be Dismissed

Even if this Court were to allow Plaintiff's deeply flawed claims regarding the alleged go-private fraud to stand, the proceeds from that alleged fraud could only possibly have been used to acquire one of the Defendant Properties, 50 Riverside. Plaintiff has correctly alleged that the other three properties were purchased, or refinanced, prior to the closing of the go-private transaction on January 31, 2017, and therefor can't possibly represent the proceeds of illegal activity:

In paragraphs 90 through 120, Plaintiff outlines their theory as to how funds from the allegedly fraudulent secondary stock offerings were used to purchase and/or retain ownership over the Defendant Properties as 2 River Terrace, 18 Colts

Gait Lane and 40 Broad Street.  Yet, even if these allegations were true[7], Plaintiff has failed to plead what, if any, criminal statutes have been violated which would give Plaintiff standing or jurisdiction to commence a forfeiture proceeding.

As the Supreme Court made clear in *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247 (2010), charges of securities fraud may be brought "only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* At 273.

It is undisputed that these allegedly fraudulent secondary stock offerings were conducted on the London Stock Exchange, AIM (*Complaint* ¶10), an undisputable foreign stock exchange, with all of the sales occurring in the United Kingdom, not the United States, with the proceeds being deposited into Finncap Limited, a British investment banking firm. *Complaint* 83-84, 105.

Courts have previously considered whether activities on the London Stock Exchange are prosecutable in US Courts and have found that there must be some additional nexus to the United States that is not present here. *See, e.g. United States v. Mandell*, 752 F.3d 544, 549 (2nd Cir. 2014)(finding jurisdiction for transactions on the AIM where purchase applications and payments were made to a company in

---

[7] Plaintiff's allegations regarding the transactions on the Mortgage at Colts Gait Lane are demonstrably false and clearly the product of false information provided to Plaintiff by Chinh Chu, rather than a thorough investigation.  However, for the limited purpose of this motion, these false allegations are presumed true.

the United States, as opposed to Finncap); *In re Royal Bank of Scot. Group PLC Sec. Litig.*, 765 F. Supp. 2d 327, 337 (S.D.N.Y. 2011)(dismissing claims where the purchasers of stock traded on the London Stock Exchange were U.S. citizens who made the decision to trade while located in the United States.  In contrast, the purchasers in the case at bar were all in the United Kingdom); *In re BP P.L.C., Sec. Litig.*, 843 F. Supp. 2d 712 (S.D.T.X. 2012)(rejecting similar argument regarding citizenship and location of buyers in the United States).

Therefore, Plaintiff's First Claim for Forfeiture, which is grounded in violations of United States securities fraud statutes can only be applied to the go-private transaction, not the secondary stock offerings.

Similarly, Plaintiff's Second Claim for Forfeiture is based on the theory of money laundering, in violation of 18 U.S.C. §§1956, 1957.  However, as outlined by Plaintiff, these statutes require that the money be derived from "specified unlawful activity."  Plaintiff identifies this "specified unlawful activity" as being the same inapplicable statutes as in the First Claim for Forfeiture. *Complaint* ¶8.

Thus, pursuant to the Supreme Court's holding in *Morrison,* Plaintiff's claims against the three Defendant Properties that were purchased or retained using funds from the secondary offerings must be dismissed.

Another surprising omission by Plaintiff is any attempt to differentiate the wire transfers used to purchase these properties and any other expenses or financial

obligations of CHT.  During the relevant time period, CHT took in over a billion dollars in collections into the same operating account that the proceeds of the secondary offerings were deposited.  CHT also had financial obligations to Parmar, as CEO, as well as the companies that he owned or controlled, which made up the majority shareholders of the corporation.

Plaintiff's overly simplistic attempt to trace the path of the proceeds completely ignores both the revenues of CHT, as well as the legitimate financial obligations of CHT.  Without pleading any detail regarding the financial obligations of CHT to Parmar, or entities he owned or controlled, Plaintiff cannot show whether the payments alleged were in the ordinary course of business, were excessive, or were actually less than what was due and owing.  Plaintiff has therefore failed to make a plausible showing that the proceeds of any illegal activity was used to purchase or retain ownership of any of the Defendant properties.

### 4. Plaintiff Should Be Sanctioned with Dismissal or Disqualification for Their Brazenly Improper Use of Illegally Obtained Emails and Violations of the Attorney-Client Privilege.

Finally, Claimants move that this case be dismissed, or, in the alternative, for an evidentiary exclusion and disqualification of Plaintiff's counsel, for their patently improper use of stolen emails and their review and subsequent publication of attorney-client privileged communications.

18 U.S.C. §2701 makes it a crime to either access without authorization, or

exceed an authorization to access stored communications, such as emails. Here, Chinh Chu, Truc To, and others at CHT and CC Capital violated this provision by illegally accessing the email communications stored at the domain of constellationhealthgroup.com. This domain, and the associated email accounts, were registered and owned by Parmar, not CHT or CC Capital. Instead, all CHT employees used email addresses at the domain name of orionhealthcorp.com.

Chinh Chu and Truc To were fully aware that their access and use of these stored communications was unlawful, as this was communicated to them, through counsel, after it was discovered that they had misappropriated the domain for themselves. On October 12, 2017, John Altorelli, attorney for Chinh Chu and CC Capital responded to a cease and desist letter by stating that the domain and emails would "remain in a 'frozen' state until an appropriate determination can be made as to the history, ownership, custody and the like." Altorelli further promised that, if the parties couldn't agree on the legalities, they would "seek judicial assistance."

On information and belief, Altorelli's email was an intentional misrepresentation, designed to fraudulently prevent Parmar from filing any legal action to prevent Chinh Chu, Truc To and CC Capital from continuing their illegal conduct. No judicial assistance was ever sought and Chinh Chu, Truc To and CC Capital continued to access, review and use the stolen emails in a flagrant and willful violation of both federal and state criminal statutes.

Stunningly, these parties then provided the stolen email communications to Plaintiff's counsel who chose to ignore the criminal conduct of Chinh Chu, Truc To and CC Capital and, instead, use the criminally obtained emails for Plaintiff's benefit by publishing the contents in this complaint.

The complaint at bar quotes extensively and unapologetically from these emails including, stunningly, communications that are clearly protected by the attorney-client privilege.

Plaintiff's outrageous and unethical use and publication of criminally obtained emails and attorney-client privileged communications should not be permitted to stand unanswered and the Court should exercise its inherent authority to sanction this conduct.

As the Court in *Lynn v. Gateway Unified Sch. Dist.*, 2011 U.S. Dist. LEXIS 143282, *14, 2011 WL 6182348 (E.D.C.A. 2011) explained:

> When a party wrongfully obtains documents outside the normal discovery process, a number of different types of sanctions are available. These include dismissal of the action, the compelled return of all documents, restrictions regarding the use of the documents at trial, disqualification of counsel and monetary sanctions. Courts have considerable discretion in choosing the appropriate sanction under its inherent authority and may, for example, dismiss claims, enter default judgment, and award attorney's fees and costs.

*Id.* At *14, *citing United States v. Shaffer Equip. Co*., 11 F.3d 450, 461-62 (4th Cir.1993); *Fayemi v. Hambrecht & Quist, Inc*., 174 F.R.D. 319, 324-27

(S.D.N.Y.1997); *Glynn v. EDO Corp.*, 2010 U.S. Dist. LEXIS 86013, 2010 WL 3294347 (D.Md.2010).

The Court in *Lynn* examined a very similar situation to the case at bar, where Plaintiff's counsel was in receipt of 39,312 emails, which were illegally stolen from the defendant.  The Court reasoned that Plaintiff's counsel was in possession of stolen property, in violation of California Penal Code 496 and 502 in disqualifying counsel and prohibiting Plaintiff from introducing "any evidence, including cross-examining any witnesses, about the contents of these emails."

"A court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the misconduct." *Am. Unites for Kids v. Lyon*, 2015 U.S. Dist. LEXIS 171614, *26, *quoting Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997).

In the case at bar, it is unquestionable that Plaintiff's counsel is in receipt of stolen property, Parmar's stored electronic communications.  It is unclear whether this conduct was willful and knowing, or if Chinh Chu, Truc To, and others made materially false representations to Plaintiff's counsel to falsely convince them that the emails were properly obtained.  In determining the appropriate sanction, movants respectfully request that the Court conduct a hearing to take testimony on the circumstances under which Plaintiff came into possession of this stolen property.

20

Under 18 U.S.C. §2315, the requisite mental state for receipt of stolen property can be proven by showing knowledge that the property is stolen or willful blindness to that fact.

Even in the unlikely event that this Court finds that Plaintiff's counsel's receipt and review of the stolen emails was not unlawful, sanctions are still appropriate because many of the emails quoted are clearly protected under the attorney-client privilege. *Josephson v. Marshall*, 2001 U.S. Dist. LEXIS 10049, 2001 WL 815517, *2 (S.D.N.Y. July 19, 2001) (holding that where documents were obtained outside the normal discovery process but not wrongfully, ordinary attorney-client privilege analysis applies).

Plaintiff's use of stolen emails and quotations to attorney-client privileged communications should not be countenanced by this Court.  Dismissal, evidentiary preclusion, or disqualification are appropriate.

## CONCLUSION

For all the reasons stated herein, Defendant respectfully requests that this Court issue an Order dismissing this case and disqualifying Plaintiff's Counsel, together with such other and further relief as the Court deems appropriate.

Dated:     August 25, 2018
           Hoboken, New Jersey


Respectfully submitted,

Timothy C. Parlatore, Esq.
*Attorney for the Claimants*
221 River Street, 9th Floor
Hoboken, New Jersey 10006
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com