UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
---------------------------------------------------------X
U.S. SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiffs,                 **Docket No.: 18-CV-9284-MCA-MAH**

      -against-                         **NOTICE OF MOTION**

PAUL PARMAR, et. al.

                            Defendants.
---------------------------------------------------------X

PLEASE TAKE NOTICE, that upon the annexed Declaration of Timothy C. Parlatore, and the associated Memorandum of Law, the Defendant PAUL PARMAR shall move the Court, at a time and date to be set by the Court, for an order:

1. Pursuant to Fed.R.Civ.P. 12(b)(6), dismissing the Complaint for failure to state a plausible cause of action;

2. Pursuant to Fed.R.Civ.P. 12(b)(7) and 19, dismissing the Complaint for failure to join two necessary parties, Chinh Chu and Truc To; and

3. Such other and further relief as the Court deems appropriate.

                                 Respectfully submitted,

Timothy C. Parlatore, Esq.
*Counsel for Defendant Paul Parmar*
221 River Street, 9th Floor
Hoboken, NJ 07030
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------X
U.S. SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiffs,          **Docket No.: 18-CV-9284-MCA-MAH**

    -against-                  **DECLARATION IN SUPPORT
                                          OF MOTION**

PAUL PARMAR, et al.

                Defendants.
-----------------------------------------------X
**STATE OF NEW JERSEY**    )
                             ) **SS.:**
**COUNTY OF HUDSON**    )

      **TIMOTHY C. PARLATORE**, a lawyer admitted to practice before this Court, declares the following allegations under the penalties of perjury:

    1.      I represent the Defendant, Paul Parmar and submit this Affirmation in Support of Defendant's Motion to Dismiss.

    2.      This Affirmation is based on information and belief, the source of that information, and the basis for that belief being an examination of the various papers filed as part of this proceeding, related proceedings, publicly available information, and my independent investigation of this matter.

## PRELIMINARY STATEMENT

    3.      This case involves claims by the U.S. Securities and Exchange Commission ("SEC") of securities fraud by the Defendant, Paul Parmar and the co-

defendants, against Investor-1, a private investment firm based in New York City. The factual allegations in the complaint focus on the events leading up to Investor-1's acquisition of a controlling interest in Constellation Healthcare Technologies, Inc. ("CHT"), through a "go-private transaction" to convert CHT from a publicly traded company to a private entity. At the time, CHT was being publicly traded on the London Stock Exchange's Alternative Investment Market ("AIM").

4.    As discussed more fully in the associated Memorandum of Law, Defendant argues that the allegations of fraud pleaded in the complaint fail to meet the pleading standards of plausibility, especially once the Court considers the additional documents that Plaintiff incorporated by reference, but declined to quote specifically in the complaint. Defendant also argues that the overwhelming evidence establishes that the fraud was perpetrated by at least two individuals, who were not named as defendants – Chinh Chu and Truc To. The purpose of this Declaration is to provide the Court with the necessary facts and supporting documents relevant to these two issues.

## STATEMENT OF FACTS

### Background of CHT

5.    As outlined in the complaint, in June 2013 Parmar and other investors acquired Orion Healthcorp, Inc. ("Orion"), a medical billing, collections and practice

management service company.  Orion was later merged into CHT.  Parmar served as CEO of CHT.

6.    Parmar's vision for CHT was to provide physician back office services, including billing and collections.  While this industry is traditionally populated by smaller "mom and pop" service companies, Parmar saw an opportunity to create a much larger corporation that could provide much better service at a lower price.  He developed CHT into a sophisticated platform to provide these services.

7.    Although CHT's platform was the best and most efficient in the industry, CHT struggled to gain new physician customers because of the difficulty in persuading independent practicing physicians to leave their existing service providers.  Parmar decided that the best way to grow CHT's business was by implementing a strategy of acquiring smaller service providers.  The value of these acquisitions to CHT is mainly in their customer lists and relationships, as CHT would service these medical practices on their main platform.

8.    As CHT grew through these acquisitions, CHT went public on the AIM to help raise money to fund the acquisitions.  At that time, Orion held eight subsidiary companies and continued with an aggressive acquisition and growth strategy.  Most of the shares were held by various entities, which Parmar managed and controlled.

9.     When Investor-1 wanted to acquire CHT, it had grown to 14 operational subsidiaries, along with several holding companies and Special Purpose Acquisition Companies ("SPAC").   Of these, two SPACs, MDRX Medical Billing, LLC, ("MDRX"), and Phoenix Health, LLC ("Phoenix"), had been formed to acquire new subsidiaries using raise ups on the AIM exchange.  Unfortunately, while these two raise ups were successful, the acquisitions were not, and the SPACs remained empty shells.[1]

**Investor-1 Seeks to Acquire CHT**

10.     Chinh Chu is the senior managing director and founder of CC Capital[2]. Before launching CC Capital, Chinh Chu spent 25 years working at Blackstone, focusing on building its Private Equity business.  Fashioning himself as a "master deal maker," Chinh Chu closed some significant deals on his way to becoming a billionaire and purchased an apartment that takes up two floors of Trump World Tower and a large yacht.

---

[1] Plaintiff has alleged that Defendants provided false information, in the form of press releases and financial statements, showing that these empty shells were actual acquisitions.  For the limited purpose of this motion, these allegations are presumed to be true.

[2] The complaint is unclear on what entity Investor-1 is, but it appears that Investor-1 may be an investor that Chinh Chu and CC Capital brought to the CHT deal or, may even be CC Capital itself.  Because of this ambiguity, the terms CC Capital and Investor-1 are being used interchangeably here.

11.     Parmar and Chinh Chu first met in September 2015 on Chinh Chu's yacht.  They were introduced through mutual friends.  At the time, Parmar was considering taking CHT off the AIM through a going private transaction.   In February 2016, Parmar and Chinh Chu began discussing having CC Capital bid on CHT.  Chu first reviewed public data of CHT and, on April 5, 2016, Defendant Parmar emailed Chu the audited financials from 2013, 2014, and 2015, as well as a consolidated spreadsheet.[3]

12.     After reviewing these disclosures, Parmar and Chu met for breakfast to discuss the proposed transaction.  Chu was considering submitting a bid of £1.92/share, but wanted Parmar personally to contribute $10 million cash, in addition to the equity of CHT owned by entities controlled or managed by Parmar, towards the purchase.

### The First Independent Committee

Soon thereafter, Investor-1 submitted a formal bid of £1.91/share.  When Investor-1's bid was presented to the board of CHT, the board advised that if Parmar intended to contribute to the bid, he would be recused from all bid evaluation discussions, as he is part of the buying group.  Parmar agreed to this recusal.  From approximately April 2016 going forward, Parmar was removed from the decision-

---

[3] A copy of these emails and attachments are annexed hereto at Exhibits "A" and "B."

making process on CHT's side of the negotiations and the board formed an independent committee to evaluate all bids. CHT hired Duff & Phelps Corp. ("D&P") to perform an independent evaluation to write a fairness opinion, as required by 17 CFR §229.1014.

13. At Chinh Chu's direction, Investor-1 hired KPMG to perform the due diligence on the acquisition of CHT. Chinh Chu directed the hiring of then-KPMG partner Truc To to head the due diligence efforts. A fellow Vietnamese immigrant, Truc To was Chinh Chu's go-to person at KPMG to perform due diligence for his acquisitions. Based in Atlanta, Georgia, whenever Truc To travelled to New York to perform work for Chinh Chu, he would stay as a guest in Chinh Chu's home, where Chinh Chu would lavish him with VIP treatment.

14. On August 17, 2016, D&P submitted their initial report, entitled "Discussion Materials Prepared for the Special Committee of the Board of Directors.[4] This report contains several errors or omissions which effectively resulted in an undervaluation of CHT:

    a. On Page 5, the analysis of the "Total Enterprise Value" lists $28.3 million of debt in the form of loans, but these loans had already been repaid. At Chinh Chu's direction, these loans were repaid on July 11, 2016, to avoid a potential audit by the lender,

---

[4] A copy of this report is annexed hereto at Exhibit "C."

6

but left on the valuation report as debts resulting in a diminution of the enterprise value. On information and belief, this error may have been influenced by Chinh Chu, as he wrote in an email to Parmar "Let's chat when you are free. I have an idea regarding the loan."[5] This email was sent on July 14, 2016, three days after the loans were paid off.

b. On page 7, in a chart entitled "Historical and Projected Financial Performance," D&P outlined the annual revenues, growth and EBITDA for CHT from 2012 to the present, with projections through 2021. Although CHT had shown significant growth from 2013 through 2016, the projections for future growth were set extraordinarily low, at 1.2% projected annual growth, rather than the 35-50% ordinarily expected from a growth company.

c. The 2017 projected revenue was an artificially low $140.4 million.

d. CHT was acquiring Allegiance Consulting Associates, LLC ("ACA") and Allegiance Billing & Consulting, LLC ("ABC") using internal cash. This acquisition, which closed in September 2016, expanded the

---

[5] A copy of this email is annexed hereto at Exhibit "D."

revenue of CHT, and thus also increased the value of CHT, but was omitted from the D&P report.

e. CHT was acquiring NYNM, which also would have expanded the projected revenue to CHT, but was also not included. Ultimately, this acquisition was delayed until after the closing of the go-private at Chinh Chu's direction.

15. The D&P report showed that the value of CHT was far greater than Investor-1 was willing to pay:

a. On page 12, D&P provided their valuation ranges using several different valuation methods on a chart, annotating Investor-1's bid with a red line, well below any calculated valuation range. Investor-1's bid of £2.11/share was over 25% less than the lowest end of the valuation range using the discounted cash flow method of £2.83.[6]

b. Because Investor-1's offer was so far below any price on which D&P could issue a fairness opinion, they suggested many alternative buyers on pages 21-27.

---

[6] Although these numbers were unacceptable at the time, the offer would have become even less palatable as time went on, because of the decreasing exchange rate of British Pounds to Dollars.

16.     On August 23, 2016, the Special Committee held a telephone conference to discuss the D&P report.  Parmar was present briefly in the beginning to present his views, but was then excused from the deliberations, as he was a member of the buyers group.  The committee discussed the matter with D&P and "that the Proposal was not fair based on the standalone value of the Corporation as reflected in management's forecasts and that Mr. Feuer should reiterate to the buyer group that the Proposal remains too low and that the Committee would not approve a transaction at the price of the current Proposal."[7]

17.     Later, Parmar met with Chu, to explain that the deal could not go forward unless the price increased substantially.  Chu explained that he will withdraw Investor-1's bid, at which point, Parmar would dissolve the independent committee and terminate the advisors, only to form a new committee with new advisors upon the submission of a later bid.

18.     Shortly thereafter, Investor-1 withdrew its offer.  As CHT officially had no bids to evaluate, Parmar followed Chinh Chu's instructions and dissolved the independent committee and terminated D&P[8] and Kirkland & Ellis their counsel.

---

[7] A copy of the meeting minutes is annexed hereto at Exhibit "E."

[8] A copy of the email from Committee Chair Mark Feuer to terminate Duff & Phelps is annexed hereto at Exhibit "F."

On September 12, 2016, he emailed Chinh Chu, saying that he "wanted to inform you both and [Investor-1] that Special Committee was disbanded."[9]

19.     The next day, September 13, 2016, at Chinh Chu's direction, Parmar forwarded a copy of the D&P report by emailing it to Andrew Barnett, an analyst at Investor-1.[10]

## The Second Independent Committee

20.     With the first independent committee dissolved, Chinh Chu directed Parmar to representatives from SunTrust Robinson Humphrey ("SunTrust"), to produce a valuation that he said would allow the deal to go forward with a fairness opinion reflecting the discounted price. Chinh Chu arranged for Parmar to be introduced to Tarun Mehta ("Mehta"), an executive from SunTrust, to meet Parmar at his home and review the D&P report.  After review, Mehta said that he saw no issues with presenting a new report with a valuation in the range that Chu desired.

21.     On September 14, 2016, Parmar emailed Mehta to inform him that CHT had received a bid from Investor-1 and to inquire whether SunTrust was interested in being hired as the independent advisor and providing a fairness opinion.  Parmar was sure to identify Investor-1 as being run by Chinh Chu.  Mehta responded within 20 minutes that SunTrust was interested, and, in his response, he revealed that he

---

[9] A copy of this email is annexed hereto at Exhibit "G."
[10] A copy of this email is annexed hereto at Exhibit "H."

knew much more about the proposed deal than Parmar had disclosed in his introductory email, by noting that Parmar was an "interested party" and so SunTrust must deal directly with the Special Committee.[11] CHT retained SunTrust the next day, September 15, 2016.

22.    Shortly after retaining SunTrust, Mehta called Parmar to explain that SunTrust will be unable to provide a fairness report in the low range that Chinh Chu desired because Mehta knew what the D&P estimates were and the fact that this estimate did not account for either the repaid loan or the ABC/ACA acquisitions

23.    SunTrust resigned on September 26, 2016.[12]

24.    To push the deal through without a fairness opinion, Chu revised the offer to include a full release and indemnity for the Special Committee and all of its board members.    This indemnity, part of the merger agreement documents, indemnified the members of the Special Committee if they were sued by shareholders for breaching their fiduciary duties.

25.    The Special Committee approved the deal on November 24, 2016, with CHT Holdco, LLC purchasing CHT at a price of $2.93/share in cash, plus $0.43/share in promissory notes, for about $309.4 million for the entire company. The deal was to be financed up to $145 million by Bank of America Merrill Lynch,

---

[11] A copy of this email exchange is annexed hereto at Exhibit "I."
[12] A copy of this email is annexed hereto at Exhibit "J."

with the remainder being paid in cash by Investor-1 and equity from several CHT shareholder entities controlled by Parmar.

### The Due Diligence Process

26.    Simultaneous with all the above described transactions, Truc To of KPMG was conducting due diligence on the deal.  Through his due diligence, there were several documents produced which show that Chinh Chu and Truc To had actual knowledge that the empty shells had no assets, revenue or employees.

27.    On July 21, 2016, Chinh Chu and the team at CC Capital and McKinsey were given a demonstration and access to PARCS, CHT's proprietary internal database management software system used to bridge different processes and accurately track all data, collections and fees.[13]  All the data in PARCS is accurate and was available to Chinh Chu and Truc To throughout the due diligence process.[14]

28.    On or about mid-August 2017, Truc To sent CHT a request for detailed collections data.  Truc To then sent another request for all data on two randomly selected months, December 2015 and June 2016, to perform an in depth audit.  On August 25, 2017, Melodie Kraljev, head of operations for Orion, sent Truc To the

---

[13] Before this meeting, Arvind Walia sent Doug Newton the meeting information and information slides that would be presented.  A copy of this email and the attached slides is annexed hereto at Exhibit "K."

[14] A copy of the McKinsey report is annexed hereto at Exhibit "L."

requested data from the selected months.[15]  As the empty shells had no collections data, none was provided.

29.     The total collections from these spreadsheets was $177,702,244.31 for December 2015 and $134,498,514.52 for June 2016.  As CHT's contracts with the various medical offices provided for 2-7.5% of these collections, with a companywide average of about 5%, this results in monthly revenues to CHT of $8,885,112.22 for December 2015[16] and $6,724,925.73 for June 2016.

30.     After CHT provided complete and accurate data to Truc To and KPMG, they had actual knowledge that the annual revenue of CHT was less than $100 million.[17]

31.     After this, Truc To and his team asked many follow up questions to verify the data, but never asked about the lack of any data from MDRX and Phoenix.

32.     Several other indications Truc To and Chinh Chu knew that the empty shells were indeed empty:

---

[15] A copy of this email is annexed hereto at Exhibit "M."  The attachments are not being filed, as a pdf file would be 17,850 pages.  As Plaintiff already has this file, as part of their investigation, they will not dispute the characterizations of this spreadsheet.  If necessary, Defendant can provide a copy of the spreadsheet to the Court by email.

[16] In the medical billing industry, collections are always higher later in the year, as patients go to the doctors more readily after meeting their deductible.

This number is not inconsistent with the 2017 projected revenue in the Duff & Phelps report, as these numbers were based on the anticipated acquisitions of NYNM and NACO.

a. CHT provided payroll records on every subsidiary except the empty shells.

b. CHT provided lease documents and other information on the physical offices of every subsidiary except the empty shells.[18]

c. CHT provided tax returns and other tax filings on every subsidiary except the empty shells.

33.    On August 5, 2016, Chinh Chu met with Arvind Walia, CEO of Orion, and Melodie Kraljev to discuss the operations of CHT and all subsidiaries. During this meeting, Arvind Walia informed Chinh Chu that, as CEO, he has no knowledge of Phoenix or MDRX, as these subsidiaries of Orion had never been put under his control.

34.    Despite many requests, Chinh Chu never permitted Parmar to review the final KPMG report.

### Bank of America Financing

35.    Separately, Chinh Chu interfaced directly with Bank of America ("BofA") to obtain financing for the deal. BofA sent commitment letters, as early as August 9, 2016 committing to provide up to $120 million principle financing and

---

[18] This point should have been even more glaring to the highly experienced and highly paid team from KPMG, as a simple google search for the address listed for MDRX, 166 High Street, Akron Ohio does not even exist. The closest address, 166 S. High Street, is Akron's City Hall, where the mayor's office is.

another $15 million revolving credit facility.[19]  These commitment letters were issued before KPMG had made any significant progress on the due diligence and without BofA conducting any due diligence of its own. BofA never communicated with Parmar, or any other member of CHT.  This lack of communication is especially curious, considering that the commitment letters made clear that BofA intended for CHT to be the borrower, not Invester-1.

36.     In the five months following this initial commitment letter, BofA never requested an audit, made no effort to conduct any due diligence, and had no communications with Parmar or anyone else at CHT.

37.     On information and belief, this extraordinary lack of inquiry, and BofA's willingness to lend such a significant sum of money to an entity with which they never communicated was because of a secret deal that Chinh Chu had negotiated with BofA.

38.     On November 16, 2016, Doug Newton ("Newton"), Senior Managing Director at CC Capital, sent an email, saying "Head of Lev Fin at BoA requested a call with Chinh this evening – we are unsure re: what, but our thought is to get from Chinh another face to face commitment of support of our deal / diligence – will keep you posted."  In this email, Newton may have revealed that BofA was not doing any audit or due diligence on the CHT deal because they were relying solely on the verbal

---

[19] A copy of this letter is annexed hereto at Exhibit "N."

assurances of Chinh Chu.  On information and belief, Chinh Chu knew, consciously avoided or was reckless in not knowing, that these assurances were false, based on Chinh Chu and Truc To's actual knowledge of the true financial condition of CHT.

### Go Shop Period

39.    Early in the process, the special committee began to express concerns over the fairness opinion process and, protecting themselves from potential claims that they were violating their fiduciary duty by accepting Investor-1's unreasonably low offer.  The committee wanted to add a "go-shop" period to the transaction, to ensure that they were getting the best offer on the market.

40.    Chinh Chu agreed to the go shop provision, but immediately set about controlling the terms to ensure that no legitimate competing bids could be presented. He emailed the Committee on July 19, 2016, saying:

> We understand and agree with the point that you made regarding the Board's fiduciary responsibility.  Regarding this point, we would be amenable to a 4 week "Go-Shop" period post the execution of the Purchase Agreement (terms of such Go-Shop to be contained in the signed transaction) -- enables the company to entertain other potential offers for Constellation.  As you may appreciate, we would not be amenable to the company initiating a market check prior to us executing a transaction – if the Company pursues a market check, we will stop our work and withdraw our offer at that time.  The rationale is that a Go Shop enables the Board to exercise its fiduciary duty and a market check will be very disruptive to the Company as the company barely has the bandwidth to handle our diligence.
>
> Deals are based on momentum and we do not want to put

the deal at risk with lengthy delays. We are incurring millions of dollars of expense as part of our due diligence process and welcome expeditious progress in reaching a conclusion to our process.[20]

41.     After the Duff & Phelps report revealed the inadequacy of Investor-1's offer, the Special Committee, advised by attorneys at Kirkland & Ellis, wanted to perform a market check. Chinh Chu countered with a "modified market check." He first sent his proposal to Parmar on August 23, 2016,[21] before refining it to send to the Special Committee on August 25, 2016.[22]

42.     On September 6, 2016, Chinh Chu pushed for an answer to his proposed "modified market check" and attorneys from Kirkland & Ellis confirmed that it had been rejected by the Special Committee.[23]

43.     Attorneys from Kirkland & Ellis, counsel to the Special Committee, objected to Chinh Chu's extraordinary demands and explained that it would not be a legitimate go shop, as the rules had been set up to dissuade anyone from submitting a legitimate bid. This is why Kirkland & Ellis was terminated along with Duff & Phelps.

44.     While a "go shop" period ordinarily allows a public company to seek out better offers before going private, here, Chu then set the "go shop" period to

---

[20] A copy of this email is annexed hereto at Exhibit "O."
[21] A copy of this email is annexed hereto at Exhibit "P."
[22] A copy of this email is annexed hereto at Exhibit "Q."
[23] A copy of this email is annexed hereto at Exhibit "R."

ensure that no other buyer could outbid him. A breakup fee of $20 million was set, to be paid to Investor-1, if CHT accepted any other offer and Investor-1 was given the right to counter any competing bids. This put Investor-1 in a protected position, as any other bidder would have to beat Investor-1 by over $20 million. For example, if another party bid $400 million, Investor-1's counter would only need to exceed $380 million. Finally, an extraordinarily short period of 30-days was set, insufficient for any other bidders to complete any of the research required to submit a competent bid.

45.     Even under these conditions, CHT received much higher offers from two credible bidders in two weeks. On December 24, 2016, CHT received an offer from Flexpoint Ford, at a total enterprise value of $365 million.[24]

46.     Although this offer was only communicated to CHT's Special Committee, not Investor-1 or Parmar, within hours Chinh Chu sent a message through a mutual contact, Tomer Vardi to Defendant Parmar that Chinh Chu was aware of the offer and its terms and that he didn't think it was "too big of a concern." This was news to Parmar, as he had not heard about the Flexpoint Ford offer and apparently Chinh Chu could get information on competing bids before even Parmar could.

---

[24] A copy of this offer is annexed hereto at Exhibit "S."

47.     To prevent the board from accepting these higher and better offers, Chinh Chu sent a letter to the board to instruct them that he interpreted Flexpoint Ford's bid as not being superior, falsely claiming that Flexpoint Ford "does not have "committed" financing."[25]   In reality, Flexpoint Ford is a far larger private equity firm than CC Capital and required no financing to close the proposed CHT deal and thus was "not subject to a financing contingency," as the Merger Agreement required.

48.     Chinh Chu's efforts succeeded, as his originally accepted bid is the one ultimately closed on.

## Financial Times Inquiry

49.     On or about August, 2016, CHT received a series of questions from a reporter at the Financial Times asking about the legitimacy of the acquisitions of Phoenix, Northstar and MDRX, the empty shells.   Chinh Chu directed Parmar to retain the services of a public relations firm who could coordinate with the public relations firm that CC Capital had hired to try to kill the Financial Times story and let the deal go on to closing.

50.     In coordinated statements to Financial Times, both CC Capital and CHT tried to convince the reporters that everything was ok with the deal.   Chu told the reporters that he was "comfortable" with proceedings, having spent $7 million

---

[25] A copy of this letter is annexed hereto at Exhibit "T."

and three months' work on due diligence alone.  While these statements delayed Financial Times from reporting the obvious flaws in CHT, ultimately it did not stop the public disclosure of these issues just before the closing.

51.     Despite the best efforts of Chu and the public relations firms hired by CC Capital and CHT, the Financial Times published an article on January 26, 2017, entitled "The Curious Case of Constellation Health and Blackstone's Former Top Deal Maker."[26]  This article discussed the empty shells, but noted that "the cat's cradle of corporate entities and generalised opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike." Yet the article notes Chu's history with Blackstone and closes by saying "[i]f anyone is/was in a position to kick Parmar's proverbial tyres, it was Chu. We must assume he knows what he's doing."

52.     While such an article would normally cause a deal like this to be delayed to perform additional due diligence, the bank requested none and Chinh Chu had the opposite reaction, demanding immediately to close the deal.

### CHT Deal Closes

53.     On January 30, 2017, after requests from Parmar to delay the closing to fix outstanding issues, the CHT deal closed, resulting Investor-1 gaining 51% interest in CHT and entities controlled by Parmar retaining 49%.

---

[26] A copy of this article is annexed hereto at Exhibit "U."

54.     At closing, the final funds flow document[27] showed a very different flow of funds than was anticipated in the prior documents, and very different from what the go-shop bidders thought they were bidding against:

a. The cash contributed by Investor-1 was lowered to $82,502,160.25 from the $88,687,476.20 originally anticipated. Presumably, the $6,185,315.95 difference between what Investor-1 (and the SEC) thought was contributed was pocketed by Chinh Chu.

b. Of the $212,502,160.25 cash contributed at closing by Investor-1 and BofA, $14,519,935.90 was used for various deal related fees, many of which are of questionable legitimacy. For example:

i. $2,555,023.91 to Winston & Strawn, LLP, a law firm that represented Investor-1, several times larger than reasonable for a deal of this size and complexity. On information and belief, Chinh Chu used this deal to pay off unrelated invoices to Winston & Strawn, LLP.

ii. $575,000 to John Altorelli ("Altorelli"), Chinh Chu's personal attorney and "clean-up guy," who later admitted that he performed no services as part of the deal.

---

[27] A copy of this spreadsheet is annexed hereto at Exhibit "V."

55.     Investor-1 could purchase a controlling interest in CHT for well below the actual value of the company and Chinh Chu and Truc To were fully aware of the irregularities in CHT's bookkeeping and value, but actively concealed their knowledge from the banks and the investors at Investor-1.  On information and belief, although Chinh Chu is the founder and managing director of Investor-1, he did not use any of his own money for this transaction, instead getting the money from his investors and clients of Investor-1.  He also saddled CHT with an enormous amount of bank debt, although CHT received no consideration for that debt.

## After Closing[28]

56.     Beginning the day after the closing, Parmar gets the cold shoulder from Chinh Chu and the other members of Investor-1, as they did not respond to Parmar's emails.  Unknown to Parmar at the time, Chinh Chu had immediately begun to grill other members of CHT, including Tomer Vardi, asking if they are aware of any problems with CHT's books or if they are aware of any fraud.  On information and belief, Chinh Chu was already fully aware of the empty shells, but needed a pretext to pretend that he only discovered them after closing and force Parmar out.

57.     That same day, Chinh Chu announced that CHT would be hiring Truc To, the KPMG partner in charge of the due diligence process, as CFO of CHT.  When

---

[28] The remainder of the Statement of Facts is relevant only to the branch of Defendant's motion under Rule 12(b)(7), as it contains facts outside the pleadings and does not rely on documents incorporated into the pleadings by reference.

CHT hired Truc To in March, 2017, his compensation package was significantly larger than any CFO at a comparably sized company to CHT and significantly larger than Parmar's compensation as CEO.[29] On information and belief, Truc To received this job as a result of a secret agreement between Truc To and Chu to manipulate the due diligence process to fit with Chu's larger fraudulent scheme.

## Chinh Chu Forces Parmar Out of CHT

58.     In July, 2017, Parmar was traveling to Los Angeles for meetings related to a potential acquisition when he was summoned to return to New York by Chinh Chu.  Upon his return, he met with Chinh Chu, who tersely informed Parmar that he "accepts" Parmar's resignation.  Chinh Chu went on to cut Parmar off from all lines of communication.  Chinh Chu, Truc To and Altorelli began conducting CHT meetings while excluding Parmar.  When Parmar asked why he was being excluded, even though he had not yet resigned or been terminated, Chu responded that he wanted to be more involved in operations going forward.  At the next board meeting, Chu announced that Parmar had resigned and that he had accepted Parmar's resignation.

59.     While Chinh Chu and Parmar continued to try to negotiate a severance agreement until Parmar's ultimate resignation in September, he was effectively

---

[29] A copy of the email outlining Truc To's compensation is annexed hereto at Exhibit "W."

sidelined immediately, while Chinh Chu hired forensic accountants to "discover" information that he and Truc To already knew.

### Fraudulent Bankruptcy

60.     On Friday, March 16, 2018, Chinh Chu caused CHT and most of its subsidiaries to file Chapter 11 petitions for bankruptcy in the Eastern District of New York.  The petitions themselves contained many irregularities, including:

a.  The Petitions were filed in the Eastern District of New York, which has minimal, if any jurisdiction over CHT and its subsidiaries.

b.  The petitions listed Winston & Strawn, LLP as the largest unsecured creditor at $3,000,000.  Winston & Strawn never provided any services to CHT, was paid a grossly inflated $2,555,023.91 at the closing of the going private transaction for its representation of Investor-1, and never submitted any invoices to CHT for work allegedly performed.

c.  Failure to list several companies controlled by Parmar as creditors of CHT, as they were owed $96 million, under consulting agreements.  Had CHT prepared a truthful petition, Parmar would have been appointed chair of the unsecured creditors committee.  Instead, Chinh Chu placed Winston & Strawn in this position.

    d. The financial statements later submitted showed that CHT and its subsidiaries are turning a significant profit and are more than capable of paying the BofA loan payments.

61.    With the bankruptcy in place, Chinh Chu then put into motion an elaborate plan to steal all the assets of CHT through the orchestration of two auctions. Both auctions were set up the same way:

    1. Chinh Chu brought in a straw purchaser to make an extremely low opening bid and act as the "stalking horse." Although the stalking horses seemed independent, they are funded and controlled by Chinh Chu.

    2. CHT's bankruptcy attorneys, at Chinh Chu's direction, set out bidding procedures designed to protect the stalking horse bid and prevent any legitimate bidders from entering the auction.

    3. Chinh Chu's stalking horse would win the auction and thus purchase all of CHT's assets out of the bankruptcy court at a fraction of their actual value and debt free.

62.    On May 10, 2018, CHT, now controlled by Chinh Chu, presented the Bankruptcy Court with proposed bidding procedures and timeline for the first sale of a portion of CHT's assets. CHT's attorneys informed the Bankruptcy Court that this opening bid of $10 million was based on a non-binding letter of intent that Medical Transcription Billing, Corp ("MTBC") had issued on April 10, 2018.

63.    MTBC is a publicly traded company that has operated at a net loss every single year, with total losses of over $26 million since 2014 and would have been unable legitimately to offer a $10 million bid on CHT's assets.[30]

64.    On April 4, 2018, just six days before issuing their letter of intent, MTBC announced a $10.5 million public offering of non-convertible preferred stock.[31]  Two days later, on April 6, 2018, MTBC announced that it had closed this $10.5 million public offering, with CEO Stephen Snyder saying:

> This upsized raise puts us in an excellent position to execute the Company's growth initiatives. As of today, we have approximately $13 million of cash, an untapped $5 million line of credit with Silicon Valley Bank, as well as positive cash flow from operations.[32]

65.    On information and belief, this public offering was orchestrated and purchased by Chinh Chu[33], so that he could set up MTBC as the stalking horse.

66.    On May 17, 2018 TG Capital, LLC, an entity associated with Arvind Walia, CEO of Orion, submitted a competing bid for $11,000,000, but MTBC

---

[30] MTBC was a perfect vehicle for Chinh Chu to steal these assets out of the bankruptcy proceeding, as it is engaged in the same business, but has struggled financially for years.  On December 20, 2013, MTBC filed their S-1 registration statement to take the company public on NASDAQ, with the expectation of raising $35 million.  It took over seven months to go public, on July 22, 2014, with a raise of only $5 million.  The company has posted losses every year since then.

[31] A copy of MTBC's press release is annexed hereto at Exhibit "X."

[32] A copy of MTBC's press release is annexed hereto at Exhibit "Y."

[33] It is unknown by Defendant whether Chinh Chu personally invested in MTBC, or through CC Capital or even Investor-1.

countered to win the auction, buying assets that produce $50-60 million annually, debt free, for $12.6 million.

67.     When Chinh Chu invested in MTBC, it was trading at $3.43/share. Within three months of his investment, MTBC's stock price rose to $5.25/share, with projections that it will go to "$6.37 and $8.16" by the end of the year, but will probably go much higher, once the true revenue of the CHT assets is reported on MTBC's next quarterly earnings statement.  Chinh Chu's insider trading will likely net him several million dollars profit.

68.     On July 5, 2018, CHT moved in the bankruptcy court to sell the remaining assets of CHT.[34]  This time, Chinh Chu selected HealthTek Solutions, LLC ("HealthTek") as his straw purchaser stalking horse with an initial bid of $16.5 million.  HealthTek was incorporated on June 19, 2018[35]  by TG Capital, LLC, the bidder associated with Arvind Walia, with Arvind Walia as a 10% shareholder.  In this motion, CHT explained that when TG Capital submitted a competing bid of in the first auction, it was for $23 million to purchase all the CHT assets, including those reserved for the second auction.  After some negotiations, TG Capital bifurcated its bid to $10.5 million on the first auction and $16.5 million on the second.

---

[34] A copy of this motion is annexed hereto at Exhibit "Z."

[35] The entity status from the Delaware Department of State is annexed hereto at Exhibit "AA."

69.     The value of TG Capital/Healthtek's bid is curious, as Altorelli met with Parmar on night of March 16, 2018, as the bankruptcy petitions were being filed and explained that Chinh Chu had attempted to give $26 million to another person to act as a straw purchaser and make a $26 million bid on the CHT assets. Unfortunately for Chinh Chu, this straw purchaser hadn't followed the plan and offered less than $10 million, which was rejected and forced CHT to proceed with the bankruptcy, or as Altorelli called it "phase 2."  Altorelli told Parmar words to the effect of now that the bankruptcy had been filed, they were in "phase 2," where "the whole thing can officially go for less than $30 million now."

70.     On information and belief, TG Capital/Healthtek's bids were orchestrated and funded by Chinh Chu.

71.     As there were no competing bidders, Healthtek purchased CHT's remaining assets for $16.5 million.  These were new assets, as CHT had purchased them for $60-95 million, paid over 3 years, depending on revenue[36], in February 2017.  This asset was acquired by CHT immediately after the going private transaction had closed and Chinh Chu was running CHT.

---

[36] It is unclear whether HealthTek agreed to continue these payments, as part of the sale or not.

## Obstruction of Justice

72.     To sideline Parmar, Chinh Chu provided a false narrative about the above outlined facts to investigators from both the SEC and Department of Justice ("DOJ") to have Parmar arrested and charged by DOJ and for the SEC to file this matter.  In addition to providing a false narrative, Chinh Chu took other actions to undermine Parmar's ability to defend himself.

73.     After forcing him out of CHT, Chinh Chu could access the login information for Parmar's personal email accounts under the domain name constellationhealthgroup.com, registered to Parmar personally the year before CHT was even incorporated and was not a CHT asset.

74.     On October 12, 2017, counsel for Parmar sent an email demanding that Chinh Chu cease and desist illegally accessing and using Parmar's emails.  This was sent to Chinh Chu's attorney Altorelli, Investor-1's attorneys at Troutman Sanders, and the head of the FTI forensic accounting team that Chinh Chu had hired.[37] Altorelli responded that he had "asked that the domain remain in a "frozen" state until an appropriate determination can be made as to the history, ownership, custody and the like. If we can't unravel it, then we may need to seek judicial assistance."

75.     On information and belief, Altorelli's response was a lie, as Chinh Chu and his legal and forensic accounting teams continued to use Parmar's private

---

[37] A copy of this email is annexed hereto at Exhibit "BB."

emails, including them as exhibits to various forensic reports and court filings. Moreover, they knowingly turned over these stolen emails to investigators from the SEC and DOJ. Many of these emails, particularly those relied on by DOJ, were privileged communications that Parmar had with his attorneys.[38]

76.     On September 28, 2017, Chinh Chu met with Parmar and told Parmar that he should pay Chinh Chu $10 million within 48 hours and Chinh Chu would prevent the matter from proceeding with the FBI and DOJ. Parmar did not submit to this extortionate demand.

77.     On information and belief, shortly after this attempted extortion, Chinh Chu did go to the FBI and DOJ to provide them with false allegations and a deeply flawed forensic accounting report to support his false charges.

78.     On May 16, 2018, Parmar was arrested and charged by the DOJ based on the false statements made by Chinh Chu to the DOJ.

## CONCLUSION

79.     For all these reasons, and in the associated Memorandum of Law, Defendant Paul Parmar respectfully requests that this Court issue an Order dismissing this case as to Paul Parmar, as the documents relied on by Plaintiff and

---

[38] Although not a part of this motion, Defendant intends to file another motion shortly to address the prejudice from SEC and DOJ investigators having access to, and using, emails which contain attorney-client privileged communications and were illegally obtained in violation of both state and federal criminal statutes. See 18 U.S.C. §2701, NY PL §§156.05, 156.10, 156.35.

incorporated by reference into the complaint establish that Plaintiff has failed to state a plausible cause of action for fraud. Moreover, the evidence strongly shows that Chinh Chu, Truc To, and others, were the ones who transmitted any fraudulent statement to induce Investor-1 to invest in CHT. Defendant Parmar had submitted all the actual true data to Chinh Chu and Truc To; they knew, consciously avoided or were reckless in not knowing, that the statements they made to Investor-1 were false.

Dated August 15, 2018
   Hoboken, New Jersey

       Respectfully submitted,

       Timothy C. Parlatore, Esq.
       *Attorney for the Defendant, Paul Parmar*
       221 River Street, 9th Floor
       Hoboken, New Jersey 10006
       212-679-6312
       212-202-4787 Facsimile
       timothy.parlatore@parlatorelawgroup.com

-----Original Message-----
From: Paul Parmar
Sent: Tuesday, April 5, 2016 4:18 PM
To: Doug Newton <newton@cc.capital>; Tomer Vardi <tomer@inter-planet.com>
Cc: Chinh <ccnewyork10@gmail.com>
Subject: RE: Constellation Health - CHT documents - 2 ( audited financial statements - 2013, 2014, 2015 )

ORION HEALTHCORP, INC.
AND SUBSIDIARIES

FINANCIAL STATEMENTS

DECEMBER 31, 2013 AND 2012

## ORION HEALTHCORP, INC. AND SUBSIDIARIES

### DECEMBER 2013 AND 2012

### TABLE OF CONTENTS

| | **Page** |
|---|---|
| Independent Auditor's Report | 1-2 |
| Financial Statements: | |
| Consolidated Balance Sheets | 3 |
| Consolidated Statements of Operations | 4 |
| Consolidated Statements of Cash Flows | 5 |
| Consolidated Statements of Stockholder's Equity (Deficit) | 6 |
| Notes to Consolidated Financial Statements | 7-26 |

Case 2:18-cv-09928-MCA-RWA Document 12-2 Filed 08/16/18 Page 4 of 529 PageID: 72



**ROSENBERG RICH BAKER BERMAN & COMPANY**

Independent Auditor's Report

To the Board of Directors and Stockholders of
Orion HealthCorp, Inc. & Subsidiaries

We have audited the accompanying consolidated balance sheet of Orion HealthCorp Inc. & Subsidiaries (the "Company") as of December 31, 2013 (Successor) and the consolidated related statements of operations, retained earnings, and cash flows for the periods from June 15, 2013 through December 31, 2013 (Successor) and January 1, 2013 through June 14, 2013 (Predecessor). These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



**www.rrbb.com**

**ROSENBERG RICH BAKER BERMAN & COMPANY**

265 Davidson Avenue, Suite 210 • Somerset, NJ 08873-4120 • PHONE 908-231-1000 • FAX 908-231-6894
111 Dunnell Road, Suite 100 • Maplewood, NJ 07040 • PHONE 973-763-6363 • FAX 973-763-4430

To the Board of Directors and Stockholders of
Orion HealthCorp, Inc. & Subsidiaries

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Orion HealthCorp, Inc. as of December 31, 2013 and the consolidated related statements of operations, retained earnings, and cash flows for the periods from June 15, 2013 through December 31, 2013 and January 1, 2013 through June 14, 2013, and the results of its operations and its cash flows for the year then ended in accordance with accounting principles generally accepted in the United States of America.

**Prior Period Financial Statements**

The consolidated financial statements of Orion HealthCorp, Inc. as of December 31, 2012 and for the year then ended, were audited by other auditors whose report dated May 17, 2013, expressed an unmodified opinion on those statements.

*Rosenberg Rich Baker Berman & Company*

Somerset, New Jersey
July 30, 2014

2

**Orion HealthCorp, Inc. and Subsidiaries**
**Consolidated Balance Sheet**

| | Successor | Predecessor |
|---|---|---|
| | December 31, 2013 | December 31, 2012 |
| **Current assets** | | |
| Cash and cash equivalents | $ 4,020,426 | $ 781,837 |
| Restrictive cash balance | 97,000 | - |
| Accounts receivable, net | 5,288,573 | 6,922,652 |
| Inventory | 339,989 | 323,175 |
| Prepaid expenses and other current assets | 1,290,224 | 1,237,162 |
| Deferred finance costs | 296,250 | - |
| Deferred tax asset | 252,000 | - |
| Total current assets | 11,584,462 | 9,264,826 |
| **Property and equipment, net** | 4,847,449 | 1,015,045 |
| **Other long-term assets** | | |
| Intangible assets, excluding goodwill | 11,631,297 | 10,087,820 |
| Goodwill | 12,316,734 | 19,350,436 |
| Deferred tax asset | 4,586,452 | - |
| Deferred finance costs | 715,938 | - |
| Other assets, net | 209,077 | 328,922 |
| Total other long-term assets | 29,459,498 | 29,767,178 |
| Total assets | $ 45,891,409 | $ 40,047,049 |
| **Current liabilities** | | |
| Accounts payable | $ 2,315,750 | $ 2,295,926 |
| Accrued expenses | 3,115,513 | 3,167,670 |
| Other current liabilities | 97,000 | - |
| Income taxes payable | 1,175,505 | - |
| Current portion of capital lease obligation | 3,260 | 43,264 |
| Line of credit | 500,000 | 8,967,282 |
| Current portion of long-term debt | 1,125,000 | 2,426,894 |
| Current portion of long-term debt held by related parties | - | 37,119,688 |
| Total current liabilities | 8,332,028 | 54,020,724 |
| **Long-term liabilities** | | |
| Capital lease obligation, net of current portion | - | 3,260 |
| Long-term debt, net of current portion | 14,483,005 | - |
| Deferred tax liability | 3,681,047 | - |
| Total long-term liabilities | 18,164,052 | 3,260 |
| **Commitments and Contingencies** | | |
| **Stockholders' equity (deficit)** | | |
| Common stock, par value $0.001; 1000 shares authorized at December 31, 2013;1000 shares issued and outstanding at December 31 2013 | 1 | - |
| Common stock, Class A, par value $0.001; 300,000,000 shares authorized at December 31, 2012;115,827,490 issued and outstanding at December 31, 2012 | - | 115,827 |
| Common Stock, Class D, par value $0.001; 50,000,000 shares authorized at December 31, 2012 ; 24,658,955 shares issued and outstanding at December 31, 2012 | - | 24,659 |
| Additional paid-in capital | 16,214,070 | 69,158,983 |
| Retained earnings | 3,181,258 | (83,276,404) |
| Total stockholders' equity (deficit) | 19,395,329 | (13,976,935) |
| Total liabilities and stockholders' equity (deficit) | $ 45,891,409 | $ 40,047,049 |

See Independent Auditor's Report

3

**Orion HealthCorp, Inc. and Subsidiaries**
**Consolidated Statements of Operations**

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | June 15, 2013 through December 31, 2013 | January 1, 2013 through June 14, 2013 | For the year ended December 31, 2012 |
| Net operating revenues | $ 28,179,611 | $ 23,800,052 | $ 51,745,311 |
| **Operating expenses:** | | | |
| Salaries and benefits | 10,558,971 | 10,870,981 | 24,121,297 |
| Physician compensation | 4,116,543 | 2,725,174 | 6,817,082 |
| Facility rent and related costs | 1,379,730 | 1,414,077 | 2,631,281 |
| Depreciation | 672,245 | 281,152 | 727,221 |
| Amortization | 964,167 | 1,920,500 | 4,292,295 |
| Professional and consulting fees | 1,034,823 | 2,587,629 | 5,581,106 |
| Insurance | 256,491 | 199,189 | 466,170 |
| Provision for doubtful accounts | 233,251 | 299,193 | 394,283 |
| Vaccines and medical supplies | 2,455,702 | 1,593,164 | 3,892,770 |
| Office and computer supplies | 134,061 | 152,847 | 335,369 |
| Postage and courier | 931,328 | 879,484 | 1,914,348 |
| Other | 1,757,916 | 1,436,347 | 2,967,721 |
| Total operating expenses | 24,495,228 | 24,359,737 | 54,140,943 |
| **Income (loss) from operations** | 3,684,383 | (559,685) | (2,395,632) |
| **Other income (expenses):** | | | |
| Interest expense | (1,075,508) | (3,144,520) | (7,191,305) |
| Gain on disposal of fixed assets | - | 664 | - |
| Other income (expense), net | 1,640,483 | (74,591) | - |
| Total other income (expenses), net | 564,975 | (3,218,447) | (7,191,305) |
| **Income (loss) before provision for income taxes** | 4,249,358 | (3,778,132) | (9,586,937) |
| Provision for income taxes | 1,068,100 | - | 49,107 |
| **Net income (loss)** | $ 3,181,258 | $ (3,778,132) | $ (9,636,044) |
| **Income (loss) per common shares** | | | |
| *Basic* | | | |
| Common Stock | $ 3,181.26 | $ - | $ - |
| Class A Common Stock | $ - | $ (0.03) | $ (0.07) |
| Class D Common Stock | $ - | $ (0.03) | $ (0.07) |
| *Diluted* | $ 3,181.26 | $ (0.03) | $ (0.07) |
| **Weighted average number of shares for basic** | | | |
| Common Stock | 1,000 | - | - |
| Class A common stock | - | 115,827,493 | 115,827,493 |
| Class D common stock | - | 24,658,955 | 24,658,955 |
| **Weighted average number of shares for Diluted** | | | |
| Common Stock | 1,000 | - | - |
| Class A common stock | - | 115,827,493 | 115,827,493 |
| Class D common stock | - | 24,658,955 | 24,658,955 |

Note: For the predecessor period ended June 14, 2013 and December 31, 2013 It will be anti dilutive if warrants are considered for diluted shares, as the Company is showing a net loss for this period.

Therefore, warrants outstanding for these preiods have not been considered for calculating diluted shares.

See Independent Auditor's Report

4

**Orion HealthCorp, Inc. and Subsidiaries**
**Consolidated Statements of Cash Flows**

| | Successor | Predecessor | |
| --- | --- | --- | --- |
| | June 15, 2013 through December 31, 2013 | January 1, 2013 through June 14, 2013 | For the year ended December 31, 2012 |
| **Cash Flow from operating activities:** | | | |
| Net loss | 3,181,258 | $ (3,778,132) | (9,636,044) |
| Adjustments to reconcile net loss to net cash provided by (used in) operating activities: | | | |
| Provision for doubtful accounts | 233,251 | 299,193 | 394,283 |
| Depreciation | 672,245 | 281,152 | 727,221 |
| Amortization | 964,167 | 1,920,500 | 4,292,295 |
| Deferred Tax benefit | (107,406) | - | - |
| Provision for taxes | 1,175,506 | - | - |
| Write back of acquisition related earnout payable | (1,905,000) | - | 74,817 |
| Conversion of PIK interest to principal | 108,005 | - | 6,434,493 |
| Amortization of deal relate expenses | 172,813 | - | - |
| Discount on subordinated notes payable | - | - | 184,650 |
| Gain on disposal of property and equipment | - | - | - |
| Changes in operating assets and liabilities: | | | |
| Accounts receivable | 652,500 | 449,135 | (1,684,379) |
| Inventory | (68,056) | 51,242 | 13,354 |
| Prepaid expenses and other assets | 166,410 | (219,472) | (171,609) |
| Restrictive cash balance | - | | |
| Other assets | 119,845 | - | 38,904 |
| Accounts payable and accrued expenses | 1,806,551 | (953,932) | (401,340) |
| Other liabilities | (303,000) | - | - |
| Net cash provided by operating activities | 6,869,088 | (1,950,314) | 266,645 |
| **Cash flows from Investing activities** | | | |
| Cash outlay for property and equipment | (4,559,313) | (226,488) | (215,243) |
| Development of software tool | (2,095,464) | - | - |
| Net deposits to restricted cash | (97,000) | - | - |
| Capital Paid for Acquisition | (27,006,454) | - | - |
| Net cash used in investing activities | (33,758,231) | (226,488) | (215,243) |
| **Cash flows from financing activities** | | | |
| Payments of capital lease obligations | (23,169) | (20,095) | (89,306) |
| Borrowings on line of credit | 500,000 | - | 5,077,473 |
| Payments on line of credit | - | (8,967,282) | (3,270,000) |
| Net proceeds from (repayments of) long term debt | 15,500,000 | 8,992,317 | (990,000) |
| Cash outlay for deferred finance costs | (1,185,000) | - | - |
| Principal Payments of long term debt held by related parties | - | 2,510,371 | - |
| Payments related to refinancing | - | | (192,242) |
| Proceeds from equity transaction | 14,997,392 | - | - |
| Net cash provided by (used in) financing activities | 29,789,223 | 2,515,311 | 535,925 |
| Net increase in cash and cash equivalents | 2,900,080 | 338,509 | 587,327 |
| **Cash and cash equivalents, beginning of period** | 1,120,346 | 781,837 | 194,510 |
| **Cash and cash equivalents, end of period** | $ 4,020,426 | $ 1,120,346 | $ 781,837 |
| **Supplemental Cash Flow Information** | | | |
| Cash Paid for interest | $ 847,841 | $ 389,102 | $ 781,923 |
| Cash Paid for Income Taxes | (51) | (39,910) | 45,717 |
| **Supplemental Schedule of Non-Cash Investing and Financing Activities** | | | |
| Notes payable issued for accrued interest | $ 108,005 | $ - | $ 6,434,493 |

See Independent Auditor's Report

5

**ORION HEALTHCORP, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY (DEFICIT)**
**JANUARY 1 2013 TO JUNE 14 2013 - PREDECESSOR PERIOD**

| | Common Stock | | Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances, January 1, 2013 | - $ | - $ | 69,158,983 $ | (83,276,404) $ | (14,117,421) |
| Class A | 115,827,490 | 115,827 | | | 115,827 |
| Class D | 24,658,955 | 24,659 | | | 24,659 |
| Net loss | - | - | - | (3,778,132) | (3,778,132) |
| Balances, June 14, 2013 | 140,486,445 $ | 140,486 $ | 69,158,983 $ | (87,054,536) $ | (17,755,066) |

**ORION HEALTHCORP, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY (DEFICIT)**
**JUNE 15 2013 TO DECEMBER 31 2013 - SUCCESSOR PERIOD**

| | Common Stock | | Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances, June 15, 2013 | - $ | - $ | 69,158,983 $ | (87,054,536) $ | (17,895,553) |
| Class A | 115,827,490 | 115,827 | - | - | 115,827 |
| Class D | 24,658,955 | 24,659 | - | - | 24,659 |
| Class A - Cancellation | (115,827,490) | (115,827) | - | - | (115,827) |
| Class D - Cancellation | (24,658,955) | (24,659) | - | - | (24,659) |
| Effect of acquisition and push down accounting | 1,000 | 1 | (52,944,913) | 87,054,536 | 34,109,624 |
| Net income | - | - | - | 3,181,258 | 3,181,258 |
| Balances, December 31, 2013 | 1,000 $ | 1 $ | 16,214,070 $ | 3,181,258 $ | 19,395,329 |

**ORION HEALTHCORP, INC.**
**AND SUBSIDIARIES**
**CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY (DEFICIT)**
**JANUARY 1 2012 TO DECEMBER 31 2012 - PREDECESSOR PERIOD**

| | Common Stock | | Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances, January 1, 2012 | - $ | - $ | 69,084,166 $ | (73,640,360) $ | (4,556,194) |
| Class A | 115,827,490 | 115,827 | - | - | 115,827 |
| Class D | 24,658,955 | 24,659 | - | - | 24,659 |
| Addition for the year | - | - | 74,817 | - | 74,817 |
| Conversion of Debt to Equity by parent | - | - | - | - | - |
| Net loss | - | - | - | (9,636,044) | (9,636,044) |
| Balances, December 31, 2012 | 140,486,445 $ | 140,486 $ | 69,158,983 $ | (83,276,404) $ | (13,976,935) |

See Independent Auditor's Report

6

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### A. Nature of Business

Orion HealthCorp, Inc., a Delaware Corporation (referred to as the "Company", "we", "us" or "our") is a healthcare services organization providing outsourced business services to physicians, serving the physician market through three operating segments - Revenue Cycle Management, Group Pruchasing and Practice Management - via six operating subsidiaries: Medical Billing Services, Inc. ("MBS"), Rand Medical Billing, Inc. ("Rand"), On Line Alternatives, Inc. ("OLA"), RMI Physician Services Corporation ("RMI'), Western Skies Billing Service ("WSB") and Integrated Physician Solutions, Inc. ("IPS"). Our mission is to provide superior business and financial management services resulting in optimal profitability for our clients and maximized enterprise value for our stakeholders. We believe our core competency is our long-term experience and success in working with and creating value for physicians.

### Revenue Cycle Management ("RCM") Segment

Our RCM segment includes five business units; MBS, Rand, RMI, WSB, and OLA. Through this segment, we offer expert medical billing and collections, practice management, and other related services to hospital-based and office-based physicians, giving them more time to focus on patient care in specialties such as pathology, anesthesiology, radiology, cardiology, family practice, internal medicine, orthopedics, neurology and emergency medicine.   These services help clients to be financially successful by improving cash flows and reducing administrative costs and burdens.  MBS currently provides services to 29 clients.  Rand currently provides services to 73 clients. RMI currently provides services to 14 clients.  WSB currently provides services to 42 clients.  Services provided by OLA were discontinued in 2013.

We deliver billing and collections services to help physicians receive optimal earnings for the care they provide. We assist our clients by maximizing their reimbursement through:

• Tenacious pursuit of every collectible dollar,
• To-the-letter compliance with ever-changing regulations and coding complexities,
• Thorough tracking and methodical working of correspondence, and
• Superior management of short-term cash flow and long-term income.

We also offer consulting services to assist clients with navigating and interacting with managed care organizations, as well as a wide range of management consulting services to help create a more efficient medical practice.

Our RCM segment comprised 62.89%, 69.05% and 66.10% of our total revenues for the Successor 2013 period, the Predecessor 2013 period and the fiscal year ended December 31 2012, respectively.

### Practice Management ("PM") Segment

Our PM segment, via IPS, is an experienced and innovative provider of business and practice management services exclusively dedicated to supporting the needs of primary care and subspecialty pediatric practices. Through this segment we provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis.   As of December 31, 2013, our PM segment managed six practice sites, representing three medical groups in Illinois and Ohio.  The physicians, who are all employed by separate corporations, provide all clinical and patient care related services.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL
STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

### *Practice Management ("PM") Segment (continued)*

There is a standard forty-year management service agreement ("MSA") between IPS and the various affiliated medical groups whereby a management fee is paid to IPS, which owns all of the assets used in the operation of the medical groups. IPS manages the day-to-day business operations of each medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group. All revenues are collected by IPS and the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "physician group distribution."

Our PM segment comprised 37.11%, 30.95% and 33.90% of our total revenues for the Successor 2013 period, the Predecessor 2013 period and the fiscal year ended December 31, 2012, respectively.

### Group Purchasing Organization ("GPO")

Our GPO segment provides for eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies. In exchange for the Company providing the pharmaceutical companies with eligible physicians, we receive an administrative fee.

### B. Basis of Presentation

The Company (Orion HealthCorp, Inc, together with its wholly owned subsidiaries) was acquired on June 14, 2013 by way of stock purchase by Constellation Health LLC.

The Company continued as the same legal entity after the acquisition. The accompanying consolidated statements of operations, changes in shareholders' equity, and cash flows are presented for the year ended December 31, 2013, which is presented in two periods: the Predecessor 2013 period (January 1, 2013 to June 14, 2013) and the Successor 2013 period (June 15, 2013 to December 31, 2013), which relate to the period preceding the Orion Acquisition and the period succeeding the Orion Acquisition, respectively. Although the accounting policies followed by the Company are consistent for the Predecessor and Successor periods, financial information for such periods has been prepared under two different historical-cost bases of accounting and is therefore not comparable. The results of the periods presented are not necessarily indicative of the results that may be achieved for future periods. Certain reclassifications have been made to the fiscal 2012 consolidated financial statements to conform to the 2013 presentation. We have also performed an evaluation of subsequent events through the date the financial statements were issued.

After the acquisition of Orion, which was effective June 14, 2014, on June 17, 2013, Orion HealthCorp, Inc., ("*Orion*") a Delaware corporation, amended and restated its Certificate of Incorporation. Pursuant to the amendment, Class A and Class D shares of common stock were cancelled and newly formed common shares were authorized and issued in the amount of 1,000 shares of common stock. As of December 31, 2013 Constellation Health, LLC, a Delaware limited liability company, owned all 1,000 shares of Orion common stock. Constellation Health LLC has three members, all of which are Delaware limited liability companies. The three members of Constellation Health, LLC are: (1.) Constellation Health Group, LLC, with an address at, 200 East Randoph Drive, Chicago, Illinois 60601, (2.) Constellation Health Investment LLC with an address at, c/o A. Mitchell Greene, Robinson Brog 875 Third Avenue New York, New York 10022; and (3.) First United Health, LLC, with an address at, c/o A. Mitchell Greene, Robinson Brog 875 Third Avenue New York, New York 10022.

8

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

### C. Revenue Recognition

IPS, a Physician Practice Management Company (PPM), assumes all financial risk for the performance of the medical practices. The physicians are employees of the captive professional corporation bound by non-compete agreements and the authority of the IPS management structure in place.

IPS recognizes revenue at the time the services are provided by its affiliated medical groups. Net patient service revenue is impacted by billing rates, changes in current procedural terminology code reimbursement, and collection trends. IPS reviews billing rates at each of its affiliated medical groups, on at least an annual basis, and adjusts those rates based on each insurer's current reimbursement practices. Amounts collected by IPS for treatment by its affiliated medical groups of patients covered by Medicare, Medicaid, and other contractual reimbursement programs, which may be based on cost of services provided or predetermined rates, are generally less than the established billing rates of IPS' affiliated medical groups. IPS estimates the amount of these contractual allowances and records a reserve against accounts receivable based on historical collection percentages for each of the affiliated medical groups, which include various payer categories. When payments are received, the contractual adjustment is written off against the established reserve for contractual allowances. The historical collection percentages are adjusted quarterly based on actual payments received, with any differences charged against net revenue for the quarter.

Additionally, IPS tracks cash collection percentages for each medical group on a monthly basis, setting quarterly and annual goals for cash collections, bad debt write-offs and aging of accounts receivable. IPS is not aware of any material claims, disputes or unsettled matters with third party payers and there have been no material settlements with third party payers for the Successor 2013 period, the Predecessor 2013 period and the fiscal year ended December 31 2012, respectively.

The Company also receives administration fees tiered by volume of Vaccines and Flu shots consumed by all participating physicians from pharmaceutical companies where it's participating doctors order the Vaccines and Flu Shots and administer vaccines. Revenue is recognized upon the administration of the vaccine by the doctor based on estimated usage during the year

MBS, Rand, RMI and WSB's principal source of revenues is fees charged to clients based on a percentage of net collections of the client's accounts receivable. They recognize revenue and bill their clients when the clients receive payment on those accounts receivable. Our RCM business units typically receive payment from the client within 30 days of billing. The fees vary depending on specialty, size of practice, payer mix, and complexity of the billing. In addition to the collection fee revenue, MBS, Rand, On Line, RMI and WSB also earn fees from the various consulting services that they provide, including medical practice management services, managed care contracting, coding and reimbursement services and transcription services. Consulting services are recognized as revenue at the time services are performed.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

### D. Business Combinations

The Company accounts for all business combinations using the acquisition method of accounting. Under this method, assets and liabilities, including any remaining non-controlling interests, are recognized at fair value at the date of acquisition. The excess of the purchase price over the fair value of assets acquired, net of liabilities assumed, and non-controlling interests is recognized as goodwill. Certain adjustments to the assessed fair values of the assets, liabilities, or non-controlling interests made subsequent to the acquisition date, but within the measurement period, which is up to one year, are recorded as adjustments to goodwill. Any adjustments subsequent to the measurement period are recorded in income. Any cost or equity method interest that the Company holds in the acquired company prior to the acquisition is re-measured to fair value at acquisition with a resulting gain or loss recognized in income for the difference between fair value and the existing book value. Results of operations of the acquired entity are included in the Company's results from the date of the acquisition onward and include amortization expense arising from acquired tangible and intangible assets.

As part of an acquisition consideration, the Company may include an earn out component to the sellers/ identified management team of the acquired company. This earn out is typically payable based on achieving certain revenue and profit levels. At each level of base, high and low scenario cases, this earn out is discounted to the present value at the time of acquisition and recorded as a liability. This liability is adjusted to fair value at each reporting date.

### E. Consolidation Policy

Our results for the Successor 2013 period, the Predecessor 2013 period and the fiscal year ended December 31 2012, include the results of MBS, Rand, OLA, RMI, WSB and IPS for the Successor 2013 period, the Predecessor 2013 period and the fiscal year ended December 31 2012, respectively.

All material intercompany balances and transactions have been eliminated in consolidation.

### F. Estimates

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. While we believe current estimates are reasonable and appropriate, actual results could differ from those estimates.

### G. Concentrations of Credit Risk

Factors that could adversely impact our operations or consolidated financial results include, but are not limited to, the following: the global credit crisis, further deterioration of the credit markets, loss of large clients, interest rate increases, and changes in healthcare legislation.

We monitor our operations with a view to minimize the impact to our overall business that could arise as a result of the risks and uncertainties inherent in our business.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

### H. Cash and Equivalents

We consider all short-term investments with an original maturity of three months or less to be cash equivalents. As of December 31, 2013 and 2012, the Company had no cash equivalents.

### I. Accounts Receivable and Allowance for Doubtful Accounts

MBS, Rand, OLA, RMI and WSB evaluate the need for an allowance using historical loss experience and the assessment of other risks. The allowance for doubtful accounts at December 31, 2013 and 2012 for MBS, RAND, OLA, RMI and WSB was;

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | December 31, | | | |
|  | 2013 | | 2012 | |
| Allowances for doubtful accounts | $ | 127,000 | $ | - |

IPS' affiliated medical groups grant credit without collateral to its patients, most of which are insured under third-party payer arrangements. The allowance for doubtful accounts that relates to patient service revenues is based on an evaluation of potentially uncollectible accounts. The allowance for doubtful accounts includes a reserve for 100% of the accounts receivable older than 150 days. Establishing an allowance for bad debt is subjective in nature. IPS uses historical collection percentages to determine the estimated allowance for bad debts, and adjusts the percentage on a quarterly basis. The allowance for doubtful accounts for IPS at December 31, 2013 and 2012 was:

|  | Successor | | Predecessor | |
| --- | --- | --- | --- | --- |
|  | December 31, | | | |
|  | 2013 | | 2012 | |
| Allowances for doubtful accounts | $ | 809,136 | $ | 616,386 |

We do not typically charge late fees or interest on past due accounts.

### J. Inventory

Inventory consists of vaccines, which are stated at the lower of cost or market. Cost is determined under the first-in, first-out method.

11

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

### K. Recent Accounting Pronouncements

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") and are adopted by us as of the specified effective date. Unless otherwise discussed, the Company believes that the impact of recently adopted and recently issued accounting pronouncements will not have a material impact on its consolidated financial position, results of operations, and cash flows.

In February 2013, the FASB issued amended guidance on the disclosure of accumulated other comprehensive income. The amendments to the previous guidance require an entity to provide information about the amounts reclassified from accumulated other comprehensive income by component. In addition, an entity is required to present, either on the face of the statements of operations or in the notes, significant amounts reclassified from accumulated other comprehensive income to the statement of operations. The Company adopted this guidance in 2013 on a prospective basis, which did not impact its consolidated financial statements.

In July 2013, the FASB issued ASU No. 2013-11, *Income Taxes (Topic 740) — Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists.* This amendment clarifies the guidance on the presentation of an unrecognized tax benefit, or a portion of an unrecognized tax benefit, in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. ASU No. 2013-11 is effective for fiscal periods beginning after December 15, 2013. The Company does not expect the adoption of this guidance to have a material impact on the consolidated financial statements.

### L. Deferred Rent

Deferred rent consists of rent escalation and lease incentive terms related to the Company's operating leases for its facilities. Deferred rent represents the difference between actual operating lease payments due and straight-line rent expense, which is recorded by the Company over the term of the lease, including any construction period. The excess of the difference between actual operating lease payments due and straight-line rent expense is recorded as a deferred credit in the early periods of the lease when cash payments are generally lower than straight-line rent expense, and is reduced in the later periods of the lease when payments begin to exceed the straight-line expense. Deferred rent accrued is $530,037 for the successor period ended December 31, 2013 and $142,713 for the predecessor year ended December 31, 2012.

### M. Goodwill and Intangible Assets

Goodwill represents the excess of cost over the fair value of net assets of companies acquired in business combinations accounted for using the purchase method.

Intangible assets include customer contracts and relationships and covenants not-to-compete acquired in connection with acquisitions, as well as software purchase and development costs. These intangible assets are amortized on a straight-line basis, which reflects the pattern in which economic benefits are expected to be realized. The Company concluded that use of the straight-line method was appropriate as the majority of the cash flows are expected to be recognized ratably over the estimated useful lives, without a significant degradation of the cash flows over time. The customer relationships and associated contracts represent the most significant portion of the value of the purchase price for every acquisition.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

M. Goodwill and Intangible Assets (continued)

Goodwill and Intangibles are reviewed for possible impairment upon the occurrence of an event or when circumstances indicate that a reporting unit's carrying amount is greater than its fair value.

Identified Intangible assets are amortized using straight-line method over their estimated useful lives as follows:

|  | Estimated useful life |
|---|---|
| Management service agreements | 25 years |
| Client relationships | 5 years |
| Group Purchase agreements | 5 years |

Amortization is computed at rates considered sufficient to amortize the cost of the assets, using the straight-line method over their estimated useful lives. Amortization of Intangibles for 2013 was $1,920,500 from January 1 to June 14, 2013 (Predecessor period) and $964,167 from June 15 to December 31, 2013 (Successor period). Amortization expense for the year ended December 31, 2012 was $4,292,295.

N. Software Development Costs

We capitalize software development costs in accordance with ASC 985-20, Costs of Software to be Sold, Leased, or Marketed. Research costs and software development costs, prior to the establishment of technological feasibility, determined based upon the creation of a working model, are expensed as incurred. Our software capitalization policy currently defines technological feasibility as a functioning beta test prototype with a confirmed working model, within a reasonably predictable range of costs. Additionally, technological feasibility is established when the Company has completed all planning, designing, coding, and testing activities that are necessary to establish that the product can be produced to meet its design specifications including functions, features, and technical performance requirements. Our policy is to amortize capitalized costs by the straight-line method over the remaining estimated economic life of the product. Software development costs capitalized in 2013 and 2012 were $2,095,464 for the successor period ended December 31, 2013 and $0 for predecessor period ended June 14, 2013 and year ended December 31, 2013, respectively.

O. Fair Value of financial instruments

The carrying amounts for cash, cash equivalents, accounts payable, and accrued expenses approximate fair value because of their short-term nature. At December 31, 2013, the carrying value and accrued interest of Term Loan A is $9 million, Term loan B is $6.6 million and $0.50 million of revolver loan. See note 10 for further discussion of notes payable.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 1. NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES (continued)

### P. Fair Value Measurements:

The authoritative guidance for fair value measurements defines fair value as the price that would be received if an asset were to be sold or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

Level 1 — Quoted prices in active markets for identical assets or liabilities.

Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities.

### Q. Income Taxes

Provisions for income taxes are based on taxes payable or refundable for the current year and deferred taxes on temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. Deferred tax assets and liabilities are included in the consolidated financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled. As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the current period's provision for income taxes. A valuation allowance is provided for deferred tax assets if it is more likely than not that the asset will not be realizable.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved with the taxing authority. If the Company considers that a tax position is "more-likely-than-not" to be sustained upon an audit by the taxing authority, based solely on the technical merits of the tax position, it recognizes the tax benefit. The Company measures the tax benefit by determining the largest amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the appropriate taxing authority that has full knowledge of all relevant information. The Company recognizes estimated future interest and penalties related to unrecognized tax positions, if any, as income tax expense in the consolidated statements of operations.

None of the Company's federal or state income tax returns are currently under examination by the Internal Revenue Service or state authorities. The Company is generally no longer subject to U.S. federal, state, or local income tax examinations by tax authorities for years before 2010.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 2. SEGMENT REPORTING INFORMATION

|  | Successor period | Predecessor period | |
| --- | --- | --- | --- |
|  | June 15, 2013 through December 31, 2013 | January 1, 2013 through June 14, 2013 | For the year ended December 31, 2012 |
| **Revenue Cycle Management** | | | |
| Revenues | 16,793,698 | 15,849,628 | 32,799,554 |
| Depreciation, Depletion and Amortization | 1,053,632 | 1,939,768 | 4,383,722 |
| Operating Income (Loss) | 4,741,467 | 2,408,193 | 4,652,298 |
| **GP & Corporate** | | | |
| Revenues | 1,007,229 | 720,424 | 1,385,717 |
| Depreciation, Depletion and Amortization | 577,406 | 248,033 | 586,845 |
| Operating Income (Loss) | (169,595) | (1,101,345) | (3,260,703) |
| **Practice Management:** | | | |
| Revenues | 10,378,684 | 7,230,001 | 17,560,040 |
| Depreciation, Depletion and Amortization | 5,375 | 13,850 | 48,950 |
| Operating Income (Loss) | 748,923 | 335,120 | 1,232,289 |

## 3. PROPERTY AND EQUIPMENT

Property and equipment are presented at cost. Depreciation is computed at rates considered sufficient to depreciate the cost of the assets, using the straight-line method over their estimated useful lives and capital leases and leasehold improvements being in the nature of operating leases are amortized over the lease term, as follows:

|  | Estimated useful life |
| --- | --- |
| Computer equipment | 2 - 5 years |
| Office equipment | 5 - 7 years |
| Furniture and fixtures | 5 - 7 years |
| Capital leases | Lease term |
| Leasehold improvements | Lease term |
| Medical and surgical equipment | 5 years |
| Automobiles | 5 years |

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 3. PROPERTY AND EQUIPMENT (continued)

Property and equipment, net consists of the following at December 31, 2013 and 2012:

| | Successor | Predecessor |
|---|---|---|
| | December 31, | |
| | 2013 | 2012 |
| Computer equipment and software | $ 8,348,406 | $ 2,738,480 |
| Office equipment | 313,184 | 313,184 |
| Furniture and fixtures | 529,265 | 425,066 |
| Capital leases | 910,866 | 910,866 |
| Leasehold improvements | 107,949 | 46,363 |
| Medical and surgical equipment | 19,529 | 19,529 |
| **Total** | **10,229,199** | **4,453,488** |
| Less accumulated depreciation | (5,381,750) | (3,438,443) |
| **Property and equipment, net** | $ **4,847,449** | $ **1,015,045** |

We recorded depreciation expense related to the above assets, $672,245 and $281,152 for the successor period June 15 to December 31, 2013 and predecessor period January 1 to June 14, 2013, respectively and $727,223 for the year ended December 31, 2012.

## 4. ADVERTISING AND BUSINESS PROMOTION COSTS

Advertising and business promotion costs are charged to operations as incurred.

| | Successor | Predecessor | |
|---|---|---|---|
| | June 15, 2013 through December 31, 2013 | January 1, 2013 through June 14, 2013 | Year Ended December 31, 2012 |
| Advertisement and business promotion costs | $84,166 | $ 71,218 | $ 156,274 |

16

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 5.  DEFERRED FINANCE COSTS

The Company incurred $1,185,000 towards debt syndication fees for new debt funding in 2013. This was categorized as deferred finance costs and is being amortized over the term of the debt. $172,813 was amortized using straight line method in the successor period ending December 31 2013.

Subsequent to the year ended December 31, 2013, the debt associated with the deferred finance costs was paid off and the deferred finance costs were expensed in 2014.  Refer to Subsequent Events disclosure note 18.1.

## 6.  ACQUISITIONS

The Company was acquired on June 14, 2013 (the 'Acquisition Date') by way of stock purchase.

Acquisition related transaction costs include investment banking, legal and accounting fees and other costs directly related to the acquisition.  Total transaction costs paid or accrued are $5.31 million and include $1.19 million towards debt issuance fees, capitalized as debt issuance costs and deferred to be amortized over the term of the loan.

***Purchase Price Allocation:***

The Acquisition was recorded under the acquisition method of accounting by the Parent and pushed-down to the Company by allocating the purchase consideration of $30.43 million to the cost of the assets acquired, including intangible assets, based on their estimated fair values at the Acquisition Date. The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $12.32 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The Company finalized its evaluation of the fair value of the assets acquired and liabilities assumed and the resulting purchase price allocation subsequent to June 14, 2013. As a result, adjustments were made to the preliminary purchase price allocation that impacted the allocation of certain intangible assets to the Company's reportable segments.

The following sets forth the Company's purchase price allocation (in thousands):

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 1,120 |
| Accounts receivable, net | | 6,174 |
| Inventory | | 272 |
| Prepaid expenses and other current assets | | 1,457 |
| Property and equipment, net | | 960 |
| Intangible assets | | 10,500 |
| Other assets, net | | 232 |
| Deferred tax asset - net | | 1,050 |
| Accounts payable | | (3,625) |
| Current portion of capital lease obligations | | (26) |
| **Total Purchase price allocation** | **$** | **18,114** |

17

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL
STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 6. ACQUISITIONS (continued)

### *Purchase Price Allocation: (continued)*

The Company has acquired intangible assets, not including goodwill, totaling approximately $10.50 million in the Acquisition. The amortization of these intangibles is not deductible for tax purposes and hence the Company has recorded a deferred tax liability of approximately $3.99 million to offset the future book amortization related to these intangibles.

During the process of acquisition of Orion, a contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2013 and 2014. A pool of $1 million and $3 million was allocated for 2013 and 2014 respectively. As a part of Purchase price allocation, on the date of acquisition of Orion, this liability was discounted to the present value of future expected cash flows based on the base, best and low scenarios of achieving the targeted revenue for 2013 and 2014. The discounted liability on this account was accrued at $1.9 million. These amounts were revalued again as of December 31, 2013 and were considered reduced to zero, as the obligation based on meeting the revenue targets was determined not probable as of that date. This reversal of contingent liability is shown under other income.

### *Identifiable Intangible Assets*

In performing the purchase price allocation, the Company considered, among other factors, the intended future use of acquired assets, analyses of historical financial performance and estimates of future performance. The following table sets forth the components of intangible assets as of the date of the Acquisition (in thousands):

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Customer Relationships | $ | 7,900 |
| Group Purchasing Agreements | | 600 |
| Management Service Agreement | | 2,000 |
| **Total Identifiable Intangible Assets** | **$** | **10,500** |

Customer relationships represent the fair value of the existing customer base.

## 7. OTHER ASSETS

Other assets consist of the following at December 31, 2013 and 2012:

| | Successor 2013 | | Predecessor 2012 | |
|---|---|---|---|---|
| Deposits | $ | 209,075 | $ | 209,075 |
| Financing costs | | - | | 3,463,248 |
| Accumulated amortization | | - | | (3,343,401) |
| Total | $ | 209,075 | $ | 328,922 |

18

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL
STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 8. PREPAID AND OTHER CURRENT ASSETS

|  | Successor | Predecessor |
|---|---|---|
|  | December 31, 2013 | December 31, 2012 |
| Prepaid rent and Insurance | $ 418,362 | $ 329,403 |
| Other prepaid expenses | 176,862 | 223,075 |
| Compensation related expenses | - | 411,625 |
| Prepaid legal fees | 495,000 | 273,059 |
| Prepaid vendor costs | 200,000 | - |
| Total | $ 1,290,224 | $ 1,237,162 |

## 9. INTANGIBLE ASSETS, EXCLUDING GOODWILL, NET

Intangible assets, excluding goodwill, net consist of the following at December 31, 2013 and 2012:

|  | Successor | Predecessor |
|---|---|---|
|  | December 31 2013 | December 31 2012 |
| Software tool - work in progress | $ 2,095,464 | $ - |
| Client relationships | 7,900,000 | 28,755,798 |
| Management service agreements | 2,000,000 | 9,216,911 |
| Group Purchasing agreements | 600,000 | 3,058,087 |
|  | 12,499,113 | 41,030,796 |
| Less accumulated amortization | (964,167) | (30,942,976) |
| **Net amount** | **$ 11,631,297** | **$ 10,087,820** |

Estimated future annual amortization of our identifiable intangible assets is as follows:

Year ending December 31:

| | |
|---|---|
| 2014 | $ 1,780,000 |
| 2015 | 2,199,093 |
| 2016 | 2,199,093 |
| 2017 | 2,199,093 |
| 2018 | 1,278,260 |
| Thereafter | 1,975,758 |
| Total | $ 11,631,297 |

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 10. LINE OF CREDIT AND LONG-TERM DEBT

The Company has a line of credit facility with a bank dated June 17 2013 that provides for maximum borrowing of $2,000,000 and maturing on May 31, 2017. The bank interest rate is 9.50%. The line of credit is collateralized by substantially all the assets of the Company. At Successor period ending December 31 2013, the outstanding line of credit is $500,000.

For the predecessor year ending December 31, 2012 the outstanding line of credit balance totaled $8,967,282. The Company had a line of credit facility with a bank dated December 2006 that provided for maximum borrowing of $10,000,000 and matured on June 30, 2012. On July 1, 2012, the bank increased the interest rate from 7.75% to 10.25% until the Company had refinanced its obligation. The line of credit was collateralized by substantially all the assets of the Company.

Our existing credit agreement for our line of credit contains certain financial covenants that require us to maintain minimum levels of monthly EBITDA, a minimum fixed charge coverage ratio, a maximum senior debt leverage ratio, and other customary terms and conditions.

Long-term debt consisted of the following at December 31, 2013 and 2012:

| | Successor | | Predecessor |
|---|---|---|---|
| | December 31, 2013 | | December 31, 2012 |
| $9,000,000 Term loan A payable to a financial institution, bearing fixed interest at 11.00%, interest payable monthly, principal payments monthly based on schedule after 6 months, maturing May 31, 2017, collateralized by a blanket lien on all assets. | $ 9,000,000 | $ | - |
| $6,500,000 Term loan B payable to a financial institution, bearing fixed interest at 12.00%, interest payable monthly plus an additional 3% PIK interest, principal payments payable after full repayment of Term loan A , maturing May 31, 2017, collateralized by a blanket lien on all assets. | 6,608,005 | | - |
| $4,500,000 senior note payable to a financial institution, bearing fixed interest at 10.25%, interest payable monthly, principal payments monthly based on schedule, matured June 30, 2012, collateralized by a blanket lien on all assets. | - | | 186,894 |
| Term loan payable to a financial institution, non-interest bearing, matures October 1, 2013. | - | | 2,240,000 |
| Total | 15,608,005 | | 2,426,894 |
| Less current maturities | (1,125,000) | | (2,426,894) |
| **Long term debt** | $ 14,483,005 | $ | - |

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 10. LINE OF CREDIT AND LONG-TERM DEBT (continued)

### *Long-term debt held by related parties consisted of the following:*

|  | Successor | Predecessor |
|---|---|---|
|  | December 31, 2013 | December 31, 2012 |
| Promissory note payable to sellers of RMI, bearing fixed interest at 14.53%, principal and interest payments monthly, matured August 2, 2012. | $ - | $ 1,737,978 |
| Promissory note payable to sellers of WSB, bearing fixed interest at 14.53%, principal and interest payments monthly, matured August 2, 2012. | - | 459,667 |
| Promissory note payable to seller of Rand, bearing fixed interest at 14.53%, principal and interest payments monthly, matured August 2, 2012. | - | 856,733 |
| $22,300,000 senior subordinated promissory notes payable to related parties, plus 16.75% PIK (6.75% PIK plus 7% cash prior to October 1, 2011) plus $184,650 annual amortized discount ($92,325 remains unamortized at December 31, 2012), principal due on June 30, 2013 | - | 34,065,310 |
| Total | - | 37,119,688 |
| Less current maturities | - | (37,119,688) |
| **Long-term notes payable held by related parties** | $ - | $ - |

Future aggregate annual maturities of debt are as follows:

| Year ending December 31: | | |
|---|---|---|
| 2014 | $ | 1,125,000 |
| 2015 | | 1,575,000 |
| 2016 | | 2,025,000 |
| 2017 | | 10,883,005 |
| Total debt | $ | 15,608,005 |

Our credit agreement for our Term loans contains certain financial covenants that require us to maintain a maximum leverage ratio and other customary terms and conditions.

During the year as a part of acquisition of the Company, old debt was retired and replaced by new debt funds. As a part of purchase price allocation this was push down to the company from the parent. Post-acquisition, the company has met all the financial covenants for the debt.

21

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 11. ACCRUED EXPENSES

Accrued expenses consisted of the following at December 31, 2013 and 2012:

| | Successor | Predecessor |
|---|---|---|
| | December 31, 2013 | December 31, 2012 |
| Compensation and related taxes | $ 541,615 | $ 1,083,506 |
| Interest | 159,488 | 752,428 |
| Deferred acquisition deal fees | 1,149,983 | - |
| Deferred rent | 530,037 | 142,713 |
| Professional Fees Payable | 342,406 | 424,028 |
| Other | 391,984 | 764,995 |
| **Total** | $ **3,115,513** | $ **3,167,670** |

## 12. OPERATING LEASES

We lease our facilities and corporate office space under operating leases that expire in various years through 2022. The leases provide for annual operating expense increases. Annual rental payments related to our facility leases totaled $2,088,725 and $1,972,297 for the years ended December 31, 2013 and 2012, respectively.

Future annual base rental expenses under these lease agreements are as follows: Year Ending December 31:

| | |
|---|---|
| 2014 | $ 1,922,621 |
| 2015 | 1,868,190 |
| 2016 | 1,548,699 |
| 2017 | 1,230,810 |
| 2018 | 1,104,943 |
| Thereafter | 2,233,562 |
| Total | $ 9,908,825 |

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 13. INCOME TAXES

The provision for income taxes for the years ended December 31, 2013 and 2012 is summarized as follows:

| | | Successor December 31, 2013 | Predecessor December 31, 2012 |
|---|---|---|---|
| Current: | | | |
| | Federal | $ 1,001,586 | $ - |
| | State | 173,920 | 49,107 |
| | Total | 1,175,506 | 49,107 |
| | | | |
| Deferred: | | | |
| | Federal | 171,315 | (2,745,533) |
| | State | (308,953) | (701,677) |
| | Valuation allowance | 30,232 | 3,447,210 |
| | Total | (107,406) | - |
| | | | |
| **Provision for Income taxes** | | $ **1,068,100** | $ **49,107** |

For the successor period ended December 31, 2013, the Company's effective income tax rate was 37% and for predecessor period ending December 31, 2012, the Company's effective income tax rate varied from the statutory federal income tax rate principally due to changes in the valuation allowance applied to the net deferred tax asset.

Our provision for federal and state taxes is comprised primarily of taxes from states that assess franchise and margin tax. Significant components of net deferred tax assets and liabilities are as follows:

| | Successor December 31, 2013 | Predecessor December 31, 2012 |
|---|---|---|
| Deferred tax liabilities: | | |
| Depreciation | $ - | $ (373,624) |
| Intangibles, amortization not available for tax deduction | (3,681,047) | - |
| | | |
| Total deferred tax liabilities | $ (3,681,047) | $ (373,624) |
| | | |
| Deferred tax assets: | | |
| Net operating loss - Federal and State - Current | $ 252,000 | $ - |
| Net operating loss – Federal and State – Long Term | 4,586,452 | 15,222,771 |
| Amortization of intangibles | - | 6,233,087 |
| Allowance for bad debts | - | 233,980 |
| Stock options | - | 315,286 |
| Other | - | 15,597 |
| Total deferred tax assets | $ 4,838,452 | $ 22,020,721 |
| | | |
| Net deferred tax assets | $ 1,157,405 | $ 21,647,097 |
| Valuation allowance | - | (21,647,097) |
| Net deferred tax assets | $ 1,157,405 | $ - |

23

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 13. INCOME TAXES (continued)

The company has earned taxable income in the successor period ending December 31 2013, and is expected to earn taxable income in future years to claim the benefit of deferred tax asset; therefore the Company is not making any valuation allowance for the successor period ended December 31 2013. Based on uncertainties associated with the future realization of the deferred tax assets, the valuation allowance established for the net deferred tax asset is $21,647,097 for predecessor period of December 31, 2012.

On the acquisition date in 2013, we have identified a net operating loss carry forwards of approximately $28,000,000, which will begin to expire in 2033 year. As a result of the acquisitions and restructurings, we have undergone an ownership change and the utilization of the tax net operating losses are subject to potential limitations pursuant to Internal Revenue Code Section 382. These limitations could reduce the amount of the net operating loss carry forwards utilized in the future. Furthermore, the ultimate utilization of the carry forwards is dependent upon the timing and extent of our future profitability. The annual limitations combined with the expiration date of the carry forwards may prevent the utilization of the carry forwards.

## 14. STOCK BASED COMPENSATION, WARRANTS AND OPTIONS –

At December 31, 2012, the Company had stock-based employee compensation. The Company recognized share-based payments to employees in the consolidated financial statements based on their fair values at the date of grant. The calculated fair value is recognized as expense over the requisite service period, net of estimated forfeitures, using the straight- line method. The Company considered many factors when estimating expected forfeitures, including types of awards, employee class and historical experience. The cost was based on the fair value at the grant date. The Company used the Black-Scholes model to determine the fair value of options.

At December 31, 2013, the Company does not have stock-based employee compensation.

For the Successor period ended December 31, 2013 and Predecessor period ended June 14 2013, the Company did not have any impact of our stock-based employee compensation plan on our consolidated statements of operations. For the predecessor year ended December 31, 2012, the impact of our stock-based employee compensation plan on our consolidated statements of operations was an increase in salaries and benefits expense of $74,817, with a corresponding increase in our net loss, resulting from the recognition of compensation expense associated with employee stock options.

Transactions with other than Employees

The company has cancelled all outstanding options upon acquisition and does not have any outstanding warrants or options as of December 31, 2013. The Company also did not issue any warrants in 2013.

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

## 14. STOCK BASED COMPENSATION, WARRANTS AND OPTIONS –

The following table summarizes the Company's outstanding warrants for the successor's period ended December 31, 2013 and predecessor's period ended December 31, 2012:

|  | Successor | | | Predecessor | |
|---|---|---|---|---|---|
|  | December 31, 2013 | | | December 31, 2012 | |
|  | Warrants | Price | | Warrants | Price |
| Outstanding at beginning of period | 13,323,931 | | | 13,857,941 | $0.001-19.00 |
| Issued | | | | - | |
| Exercised | | | | - | |
| Cancelled | (13,323,931) | | 1. | (534,010) | $ 3.20 |
| Outstanding at end of the year | - | | | 13,323,931 | $ 0.001 |
| Weighted average exercise price | $ - | | | $ 0.001 | |
| Weighted average remaining life of warrants at end of year | - | | | 0.50 | |

There are also no outstanding restricted stock units and options as at the Successor period ended December 31, 2013.

|  | Successor | | | Predecessor | | |
|---|---|---|---|---|---|---|
|  | December 31 2013 | | | December 31 2012 | | |
|  | Options and Restricted Stock Units | Price per Share | Weighted Average Exercise Price | Options and Restricted Stock Units | Price per Share | Weighted Average Exercise Price |
| Outstanding at beginning of period | 7,866,000 | | | 8,391,000 | $ 0.01-0.84 | $ 0.24 |
| Issued | - | - | | - | - | |
| Exercised | - | - | | - | - | |
| Forfeited | (7,866,000) | | | (525,000) | $ 0.18-0.19 | $ 0.19 |
| Outstanding at end of the year | - | | | 7,866,000 | $ 0.01-0.84 | $ 0.23 |
| Exercisable at end of year | - | | | 7,866,000 | | $ 0.23 |
| Weighted average remaining life at end of year | | | | | | |
| Outstanding | - | | | 4.62 years | | |
| Exercisable | - | | | 4.62 years | | |

ORION HEALTHCORP, INC. AND SUBSIDIARIES NOTES TO CONSOLIDATED FINANCIAL
STATEMENTS FOR THE YEARS ENDED DECEMBER 31, 2013 AND 2012

### 15. 401(K) PLAN

We have an employee retirement savings plan under Section 401(k) of the Internal Revenue Code for all eligible employees of Orion HealthCorp, Inc. Participants are permitted to defer compensation up to the dollar limitation as defined by the IRS for the taxable year. On a discretionary basis, we may match up to 50% of the first 6% of the non-highly compensated employee's deferrals. Orion's contributions vest beginning in the second year in equal installments over three years, and are 100% vested after four years. For the Successor period and predecessor period for 2013, the Company did not contribute any sums to match the contributions. For the Predecessor period ended December 31, 2012, the Company contributed approximately $234. There were no forfeitures during 2012 that were applied as a credit to 401(k) match expense.

### 16. COMMITMENTS AND CONTINGENCIES

As of December 31, 2013, our combined based annual salary commitments related to all employment agreements totaled $2,144,450 through 2013.

We are involved in various legal proceedings and claims arising in the ordinary course of business. Our management believes that the disposition of these additional matters, individually or in the aggregate, is not expected to have a materially adverse effect on our consolidated financial condition. However, depending on the amount and timing of such disposition, an unfavorable resolution of some or all of these matters could materially affect our future results of operations or cash flows in a particular period.

### 17. SUBSEQUENT EVENTS

1.  In April 2014, the Company entered into a new loan agreement to replace the existing loan facility. The new loan facility is a $40,000,000 Senior debt facility, bearing fixed interest at 10.00%, interest payable monthly, plus an additional 2% payable in kind interest. Principal payments start from June 30, 2015, maturing on March 31, 2018, collateralized by a blanket lien on all assets.

2.  The Company, on April 1, 2014, acquired North East Medical Systems (NEMS), which handles the revenue cycle management for medical practice. Purchase consideration paid for this acquisition is $2.15 million.

### 18. RELATED PARTY TRANSACTIONS

During the successor period ended December 31 2013, $180,944 amounts were paid by Orion's parent company, Constellation Health, LLC (Constellation) toward expenses accrued in the Company from June 15, 2013 to December 31, 2013. Balance payable to Constellation as of December 31, 2013 is $180,944.

# Constellation Healthcare Technologies, Inc.
# and Subsidiaries

## Consolidated Financial Statements

### For the Years Ended
### December 31, 2014 and 2013

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES

**Table of Contents**

| | Page |
|---|---|
| Independent Auditors' Report | 1 |
| Consolidated Balance Sheets | 2 |
| Consolidated Statements of Operations | 3 |
| Consolidated Statements of Cash Flows | 4-5 |
| Consolidated Statement of Stockholder's Equity | 6 |
| Notes to Financial Statement | 7-22 |



**ROSENBERG RICH BAKER BERMAN & COMPANY**

265 Davidson Avenue, Suite 210 • Somerset, NJ 08873-4120 • PHONE 908-231-1000 • FAX 908-231-6894
111 Dunnell Road, Suite 100 • Maplewood, NJ 07040 • PHONE 973-763-6363 • FAX 973-763-4430

www.rrbb.com

### Independent Auditor's Report

To the Board of Directors and Stockholders of
Constellation Healthcare Technologies, Inc. and Subsidiaries

We have audited the accompanying consolidated balance sheets of Constellation Healthcare Technologies, Inc. and Subsidiaries (the "Company") as of December 31, 2014 and 2013 and the related consolidated statements of operations, stockholder's equity, and cash flows for the year ended December 31, 2014 and the periods from June 15, 2013 through December 31, 2013 (Successor) and January 1, 2013 through June 14, 2013 (Predecessor). These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audit.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Orion Healthcorp, Inc. as of December 31, 2014 and 2013 and the results of its operations and its cash flows for the year ended December 31, 2014 and the periods from June 15, 2013 through December 31, 2013 (Successor) and January 1, 2013 through June 14, 2013 (Predecessor) in accordance with accounting principles generally accepted in the United States of America.

*Rosenberg Rich Baker Berman & Company*

Somerset, New Jersey
March 9, 2015

1

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

## CONSOLIDATED BALANCE SHEETS

| | December 31 2014 | December 31 2013 (As Restated) |
|---|---|---|
| **Current assets** | | |
| Cash and cash equivalents | $ 18,136,336 | $ 4,020,426 |
| Restrictive cash balance | - | 97,000 |
| Accounts receivable, net | 8,601,001 | 5,288,573 |
| Inventory | 382,745 | 339,989 |
| Prepaid expenses and other current assets | 663,644 | 1,290,224 |
| Deferred finance costs | 329,894 | 296,250 |
| Deferred tax asset | 252,000 | 252,000 |
| Total current assets | 28,365,620 | 11,584,462 |
| **Property and equipment, net** | 4,170,363 | 4,847,449 |
| **Other long-term assets** | | |
| Intangible assets, excluding goodwill | 15,419,629 | 11,631,297 |
| Goodwill | 13,722,379 | 12,316,734 |
| Deferred tax asset | 4,018,178 | 4,334,452 |
| Deferred finance costs | 577,309 | 715,938 |
| Other assets, net | 223,796 | 209,077 |
| Total other long-term assets | 33,961,291 | 29,207,498 |
| Total assets | $ 66,497,274 | $ 45,639,409 |
| **Current liabilities** | | |
| Accounts payable | $ 3,024,678 | $ 2,315,750 |
| Accrued expenses | 2,355,936 | 3,115,513 |
| Other current liabilities | 638,700 | 97,000 |
| Income taxes payable | 1,271,858 | 175,505 |
| Current portion of capital lease obligation | 29,107 | 3,260 |
| Line of credit | - | 500,000 |
| Current portion of long-term debt | 4,631,771 | 1,125,000 |
| Total current liabilities | 11,952,050 | 7,332,028 |
| **Long-term liabilities** | | |
| Long-term debt, net of current portion | 16,327,108 | 14,483,005 |
| Deferred tax liability | 4,156,491 | 4,681,047 |
| Total long-term liabilities | 20,483,599 | 19,164,052 |
| **Commitments and Contingencies** | | |
| **Stockholders' equity** | | |
| Common stock, par value $0.0001; 111,226,912 and 1,000 shares authorized at December 31, 2014 and 2013, respectively; 55,615,056 and 1,000 shares issued and outstanding | 5,562 | 1 |
| Additional paid-in capital | 29,488,953 | 16,214,070 |
| Retained earnings | 4,567,110 | 2,929,257 |
| Total stockholders' equity | 34,061,625 | 19,143,328 |
| Total liabilities and stockholders' equity | $ 66,497,274 | $ 45,639,408 |

The accompanying notes are an integral part of the consolidated financial statements.

2

## CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
## CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014 AND 2013

### CONSOLIDATED STATEMENTS OF OPERATIONS

| | Successor | Successor | Predecessor |
|---|---|---|---|
| | **2014** | **June 15, 2013 through December 31 2013 (As Restated)** | **January 1, 2013 through June 14 2013** |
| **Revenues** | $ 54,605,827 | $ 28,179,611 | $ 23,800,052 |
| **Operating expenses:** | | | |
| Salaries and benefits | 17,334,464 | 10,558,971 | 10,870,981 |
| Physician compensation | 7,223,111 | 4,116,543 | 2,725,174 |
| Facility rent and related costs | 2,538,546 | 1,379,730 | 1,414,077 |
| Depreciation | 1,363,293 | 672,245 | 281,152 |
| Amortization | 1,887,247 | 964,167 | 1,920,500 |
| Professional and consulting fees | 2,916,509 | 1,034,823 | 2,587,629 |
| Insurance | 651,211 | 256,491 | 199,189 |
| Provision for doubtful accounts | 427,643 | 233,251 | 299,193 |
| Vaccines and medical supplies | 4,371,464 | 2,455,702 | 1,593,164 |
| Office and computer supplies | 288,622 | 134,061 | 152,847 |
| Postage and courier | 1,891,431 | 931,328 | 879,484 |
| Other | 2,728,127 | 1,757,916 | 1,436,347 |
| Total operating expenses | 43,621,668 | 24,495,228 | 24,359,737 |
| **Income (loss) from operations** | 10,984,159 | 3,684,383 | (559,685) |
| **Other income (expenses):** | | | |
| Interest expense | (3,035,955) | (1,075,508) | (3,144,520) |
| Gain on disposal of fixed assets | - | - | 664 |
| Fees paid to debt providers | (2,164,089) | (241,448) | - |
| Debt related expenses | (3,213,194) | - | - |
| Other income (expense), net | (44,997) | 1,881,931 | (74,591) |
| Total other income (expenses), net | (8,458,235) | 564,975 | (3,218,447) |
| **Income (loss) before provision for income taxes** | 2,525,924 | 4,249,358 | (3,778,132) |
| Provision for income taxes | 888,071 | 1,320,101 | - |
| **Net income (loss)** | $ 1,637,853 | $ 2,929,257 | $ (3,778,132) |

The accompanying notes are an integral part of the consolidated financial statements.

3

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014 AND 2013

### CONSOLIDATED STATEMENTS OF CASH FLOWS

| | Successor | Successor | Predecessor |
|---|---|---|---|
| | 2014 | June 15, 2013 through December 31 2013 (As Restated) | January 1, 2013 through June 14 2013 |
| **Cash Flow from operating activities:** | | | |
| Net Income (Loss) | $ 1,637,853 | $ 2,929,257 | $ (3,778,132) |
| Adjustments to reconcile net income (loss) to net cash provided in (used in) operating activities: | | | |
| Provision for doubtful accounts | 427,643 | 233,251 | 299,193 |
| Depreciation | 1,363,293 | 672,245 | 281,152 |
| Amortization | 1,887,247 | 964,167 | 1,920,500 |
| Deferred Tax benefit | (208,282) | 184,000 | - |
| Write back of acquisition related earn out payable | - | (1,905,000) | - |
| Non-cash interest | 54,708 | 108,005 | - |
| Amortization of deal related expenses | 1,759,984 | 172,813 | - |
| Debt related expenses | 2,905,000 | - | - |
| *Changes in operating assets and liabilities:* | | | |
| Accounts receivable | 3,346,577) | 652,500 | 449,135 |
| Inventory | (42,755) | (68,056) | 51,242 |
| Prepaid expenses and other assets | 632,530 | 166,410 | (219,472) |
| Other assets | 624 | 119,845 | - |
| Accounts payable and accrued expenses | (12,456) | 1,806,551 | (953,932) |
| Income taxes payable | 1,096,353 | 1,136,101 | - |
| Other liabilities | (97,000) | (303,000) | - |
| Net cash provided by (used in) operating activities | 8,058,165 | 6,869,088 | (1,950,314) |
| | | | |
| **Cash flows from Investing activities:** | | | |
| Cash outlay for property and equipment | (68,662) | (4,559,313) | (226,488) |
| Cash acquired from acquisition | 11,900 | - | - |
| Development of software tool | (4,960,714) | (2,095,464) | - |
| Net deposits to restricted cash | 97,000 | (97,000) | - |
| Capital Paid for Acquisition | - | (27,006,454) | - |
| Net cash used in investing activities | (4,920,476) | (33,758,231) | (226,488) |
| | | | |
| **Cash flows from financing activities:** | | | |
| Payments of capital lease obligations | (21,174) | (23,169) | (20,095) |
| Borrowings on line of credit | - | 500,000 | - |
| Payments on line of credit | (500,000) | - | (8,967,282) |
| Payments on long term loan | (24,072,889) | | |
| Net proceeds from long term debt | 23,000,000 | 15,500,000 | 8,992,317 |
| Cash outlay for deferred finance costs | (414,541) | (1,185,000) | |
| Principal Payments of long term debt held by related parties | - | - | 2,510,371 |
| Distribution to parent | (4,389,756) | - | |
| Contribution from parent | 3,910,350 | | |
| Proceeds from sale of stock, net of related fees | 13,466,231 | 14,997,392 | - |
| Net cash provided by financing activities | 10,978,221 | 29,789,223 | 2,515,311 |
| | | | |
| Net increase in cash and cash equivalents | 14,115,909 | 2,900,080 | 338,509 |
| | | | |
| Cash and cash equivalents, beginning of period | 4,020,426 | 1,120,346 | 781,837 |
| Cash and cash equivalents, end of period | $ 18,136,336 | $ 4,020,426 | $ 1,120,346 |
| | | | |
| **Supplemental Cash Flow Information:** | | | |
| Cash Paid for interest | 2,931,240 | $ 847,841 | $ 389,102 |
| Cash Paid for Income Taxes | - | (51) | (39,910) |

The accompanying notes are an integral part of the consolidated financial statements.

4

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014 AND
2013

**CONSOLIDATED STATEMENTS OF CASH FLOWS (CONTINUED)**

| | Successor 2014 | Successor June 15, 2013 through December 31, 2013 | Predecessor January 1, 2013 through June 14, 2013 |
|---|---|---|---|
| **Supplemental Schedule of Non-Cash Investing and Financing Activities:** | | | |
| Notes payable issued for accrued interest | $ 162,716 | $ 108,005 | $ - |
| Assets acquired and liabilities assumed through Acquisition of NEMS: | | - | - |
| Accounts Receivable, net | $ 393,494 | $ - | $ - |
| Prepaid Expenses and other current assets | $ 5,950 | $ - | $ - |
| Property and equipment | $ 617,545 | $ - | $ - |
| Intangible assets, excluding goodwill, net | $ 715,000 | $ - | $ - |
| Goodwill | $ 1,405,646 | $ - | $ - |
| Other Assets, net | $ 15,178 | $ - | $ - |
| Accounts payable | $ 156,001 | $ - | $ - |
| Accrued Expenses | $ 173,688 | $ - | $ - |
| Current portion of capital lease obligations | $ 47,021 | $ - | $ - |
| Contingent purchase price liability | $ 638,700 | $ - | $ - |

The accompanying notes are an integral part of the consolidated financial statements.

## CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
## CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014 AND 2013

### CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY
### YEAR ENDED DECEMBER 31, 2014

| | Common Stock | | Paid-in Capital | Retained Earnings | Total |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| Balances, January 1, 2013 | 140,486,445 | $ 140,486 | $ 69,158,983 | $ (83,276,404) | $ (13,976,935) |
| Net loss from January 1, 2013 to June 14, 2013 | - | - | - | (3,778,132) | (3,778,132) |
| Balances, June 14, 2013 | 140,486,445 | $ 140,486 | $ 69,158,983 | $ (87,054,536) | $ (17,755,066) |
| | | | | | |
| Class A – Cancellation | (115,827,490) | $ (115,827) | $ - | $ - | $ (115,827) |
| Class D – Cancellation | (24,658,955) | (24,659) | - | - | (24,659) |
| Changes due to acquisition and push down accounting | 1,000 | 1 | (52,944,913) | 87,054,536 | 34,109,624 |
| Net income from June 15, 2013 to December 31, 2013 | - | - | - | 2,929,257 | 2,929,257 |
| | | | | | |
| Balances, January 1, 2014 | 1,000 | $ 1 | $ 16,214,070 | $ 2,929,257 | $ 19,143,328 |
| | | | | | |
| Proceeds from sale of stock, net of related fees | 55,614,056 | 5,561 | 13,460,670 | - | 13,466,231 |
| Distribution to parent | - | - | (4,389,756) | - | (4,389,756) |
| Contributions from parent | - | - | 3,910,350 | - | 3,910,350 |
| Deal fees and deferred financing fees paid by parent | - | - | 4,623,315 | - | 4,623,315 |
| Effect of push down accounting | - | - | (4,329,696) | - | (4,329,696) |
| Net income for 2014 | - | - | - | 1,637,853 | 1,637,853 |
| Balances, December 31, 2014 | 55,615,056 | $ 5,562 | $ 29,488,953 | $ 4,567,110 | $ 34,061,625 |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

1. **NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

**A. Nature of Business**

Constellation Healthcare Technologies, Inc., a Delaware Corporation (referred to as the "Company", "we", "us" or "our") is a healthcare services organization providing outsourced business services to physicians, serving the physician market through 3 operating segments - Revenue Cycle Management, Practice Management and Group Purchasing Organization - via seven operating subsidiaries: Medical Billing Services, Inc. ("MBS"), Rand Medical Billing, Inc. ("Rand"), RMI Physician Services Corporation ("RMI'), Western Skies Billing Service ("WSB") and Integrated Physician Solutions, Inc. ("IPS") and North Eastern Medical Services ("NEMS'). Our mission is to provide superior business and financial management services resulting in optimal profitability for our clients and maximized enterprise value for our stakeholders. We believe our core competency is our long-term experience and success in working with and creating value for physicians.

*Revenue Cycle Management ("RCM") Segment*

Our RCM segment includes five business units; MBS, Rand, RMI, WSB and NEMS. Through this segment, we offer expert medical billing and collections, practice management, and other related services to hospital-based and office-based physicians, giving them more time to focus on patient care in specialties such as pathology, anesthesiology, radiology, cardiology, family practice, internal medicine, orthopedics, neurology and emergency medicine. These services help clients to be financially successful by improving cash flows and reducing administrative costs and burdens. MBS currently provides services to 33 clients. Rand currently provides services to 69 clients. RMI currently provides services to 13 clients. WSB currently provides services to 35 clients. NEMS currently provides services to 45 clients.

We deliver billing and collections services to help physicians receive optimal earnings for the care they provide. We assist our clients by maximizing their reimbursement through:

- Tenacious pursuit of every collectible dollar,
- To-the-letter compliance with ever-changing regulations and coding complexities,
- Thorough tracking and methodical working of correspondence, and
- Superior management of short-term cash flow and long-term income.

We also offer consulting services to assist clients with navigating and interacting with managed care organizations, as well as a wide range of management consulting services to help create a more efficient medical practice.

Our RCM segment comprised 52.06%, 59.60% and 66.59% of our total revenues for the year ended December 31, 2014, Successor 2013 period, the Predecessor 2013 period and respectively.

*Practice Management ("PM") Segment*

Our PM segment, via IPS, is an experienced and innovative provider of business and practice management services exclusively dedicated to supporting the needs of primary care and subspecialty pediatric practices. Through this segment we provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis. As of December 31, 2014, our PM segment managed six practice sites, representing three medical groups in Illinois and Ohio. The physicians, who are all employed by separate corporations, provide all clinical and patient care related services.

There is a standard forty-year management service agreement ("MSA") between IPS and the various affiliated medical groups whereby a management fee is paid to IPS, which owns all of the assets used in the operation of the medical groups. IPS manages the day- to-day business operations of each medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group. All revenues are collected by IPS and the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "physician group distribution."

Our PM segment comprised 35.04%, 36.83% and 30.38% of our total revenues for the year ended December 31 2014, Successor 2013 period and the Predecessor 2013 period, respectively.

7

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

### Group Purchasing Organization ("GPO")

Our GPO segment provides for eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies. In exchange for this, we receive an administrative fee from the pharmaceutical companies.

### B. Basis of Presentation

Orion, (Orion HealthCorp, Inc, together with its wholly owned subsidiaries) was acquired on June 14th 2013 by way of stock purchase by Constellation Health LLC.

The Company continued as the same legal entity after the acquisition. The accompanying consolidated statements of operations, changes in shareholders' equity, and cash flows are presented for the period ended June 30, 2013, which is presented in two periods: the Predecessor 2013 period (January 1, 2013 to June 14, 2013) and the Successor 2013 period (June 15, 2013 to June 30, 2013), which relate to the period preceding the Orion Acquisition and the period succeeding the Orion Acquisition, respectively. Although the accounting policies followed by the Company are consistent for the Predecessor and Successor periods, financial information for such periods has been prepared under two different historical-cost bases of accounting and is therefore not comparable. The results of the periods presented are not necessarily indicative of the results that may be achieved for future periods. Certain reclassifications have been made to the 2013 consolidated financial statements to conform to the 2014 presentation. We have also performed an evaluation of subsequent events through the date the financial statements were issued.

After the acquisition of Orion, this was effective June 14, 2013, on June 17, 2013, Orion HealthCorp, Inc., ("Orion") a Delaware corporation amended and restated its Certificate of Incorporation. Pursuant to the amendment, Class A and Class D shares of common stock were consolidated into authorized and issued 1,000 shares of common stock.

On September 3, 2014, Constellation Healthcare Technologies, Inc ("Constellation") was incorporated in the state of Delaware, USA. Constellation was incorporated to own Orion Healthcorp, Inc and its Subsidiaries.

Constellation Healthcare Technologies was admitted to the AIM market on December 8, 2014 after placing 7,128,235 shares to the market with gross proceeds of £9,623,117 (approx. $15.08 million). The total shares issued by Constellation, after the IPO placement, are 55,615,056.

As of December 31, 2014 Constellation Healthcare Technologies, Inc ("Constellation"), a Delaware company, owned all 1000 shares of Orion common stock.

The Company acquired North East Medical Solution (NEMS), a Pennsylvania corporation effective April 1, 2014. The consolidated financials for year ended December 31, 2014 include the financials of NEMS from April 1, 2014 to December 31, 2014.

### C. Revenue Recognition

IPS, a Physician Practice Management Company (PPM), assumes all financial risk for the performance of the medical practices. The physicians are employees of the captive professional corporation bound by non-compete agreements and the authority of the IPS management structure in place.

IPS recognizes revenue at the time the services are provided by its affiliated medical groups. Net patient service revenue is impacted by billing rates, changes in current procedural terminology code reimbursement, and collection trends. IPS reviews billing rates at each of its affiliated medical groups, on at least an annual basis, and adjusts those rates based on each insurer's current reimbursement practices. Amounts collected by IPS for treatment by its affiliated medical groups of patients covered by Medicare, Medicaid, and other contractual reimbursement programs, which may be based on cost of services provided or predetermined rates, are generally less than the established billing rates of IPS' affiliated medical groups. IPS estimates the amount of these contractual allowances and records a reserve against accounts receivable based on historical collection percentages for each of the affiliated medical groups, which include various payer categories. When payments are received, the contractual adjustment is written off against the established reserve for contractual allowances. The historical collection percentages are adjusted quarterly based on actual payments received, with any differences charged against net revenue for the quarter. Additionally, IPS tracks cash collection percentages for each medical group on a monthly basis, setting quarterly and annual goals for cash collections, bad debt write-offs and aging of accounts receivable. IPS is not aware of any material claims, disputes or unsettled matters with third party payers and there have been no material settlements with third party payers for the year ended December 31 2014, Successor 2013 period, and the Predecessor 2013 period, respectively.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

The Company also receives administration fees tiered by volume of Vaccines and Flu shots consumed by all participating physicians from pharmaceutical companies where it's participating doctors order the Vaccines and Flu Shots and administer vaccines. Revenue is recognized upon the administration of the vaccine by the doctor based on estimated usage during the year

MBS, Rand, RMI, WSB and NEMS principal source of revenues is fees charged to clients based on a percentage of net collections of the client's accounts receivable. They recognize revenue and bill their clients when the clients receive payment on those accounts receivable. Our RCM business units typically receive payment from the client within 30 days of billing. The fees vary depending on specialty, size of practice, payer mix, and complexity of the billing. In addition to the collection fee revenue, MBS, Rand, On Line, RMI and WSB also earn fees from the various consulting services that they provide, including medical practice management services, managed care contracting, coding and reimbursement services and transcription services. Consulting services are recognized as revenue at the time services are performed.

### D. Business Combinations

The Company accounts for all business combinations using the acquisition method of accounting. Under this method, assets and liabilities, including any remaining non-controlling interests, are recognized at fair value at the date of acquisition. The excess of the purchase price over the fair value of assets acquired, net of liabilities assumed, and non-controlling interests is recognized as goodwill. Certain adjustments to the assessed fair values of the assets, liabilities, or non-controlling interests made subsequent to the acquisition date, but within the measurement period, which is up to one year, are recorded as adjustments to goodwill. Any adjustments subsequent to the measurement period are recorded in income. Any cost or equity method interest that the Company holds in the acquired company prior to the acquisition is re-measured to fair value at acquisition with a resulting gain or loss recognized in income for the difference between fair value and the existing book value. Results of operations of the acquired entity are included in the Company's results from the date of the acquisition onward and include amortization expense arising from acquired tangible and intangible assets.

Identifiable Intangibles assets are valued based on the discounted value of earning potential of contracts pertaining to those business segments.

As part of an acquisition consideration, the Company may include, earn out component to the sellers/ identified management team of the acquired company. This earn out is typically payable based on achieving certain revenue and profit levels. At each level of base, high and low scenario cases, this earn out is discounted to the present value at the time of acquisition and recorded as a liability. This liability is adjusted to fair value at each reporting date.

All expenses relating to the acquisitions are expensed as incurred.

### E. Consolidation Policy

Our results for the year ended December 31, 2014, the Successor 2013 period and the Predecessor 2013 period, include the results of MBS, Rand, RMI, WSB, IPS and NEMS.

All intercompany balances and transactions have been eliminated in consolidation.

### F. Estimates

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. While we believe current estimates are reasonable and appropriate, actual results could differ from those estimates.

### G. Concentrations of Credit Risk

Factors that could adversely impact our operations or consolidated financial results include, but are not limited to, the following: the global credit crisis, further deterioration of the credit markets, loss of large clients, interest rate increases, and changes in healthcare legislation.

We monitor our operations with a view to minimize the impact to our overall business that could arise as a result of the risks and uncertainties inherent in our business.

9

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

### H. Cash and Equivalents

We consider all short-term investments with an original maturity of three months or less to be cash equivalents. As of December 31, 2014 and 2013, the Company had no cash equivalents.

### I. Accounts Receivable and Allowance for Doubtful Accounts

MBS, Rand, RMI, WSB and NEMS evaluate the need for an allowance using historical loss experience and the assessment of other risks. The following table enumerates the allowances made on account of this business

|  | December 31 2014 | December 31, 2013 |
|---|---|---|
| Allowances for doubtful accounts | $ 62,395 | $ 127,000 |

IPS' affiliated medical groups grant credit without collateral to its patients, most of which are insured under third-party payer arrangements. The allowance for doubtful accounts that relates to patient service revenues is based on an evaluation of potentially uncollectible accounts. The allowance for doubtful accounts includes a reserve for 100% of the accounts receivable older than 150 days. Establishing an allowance for bad debt is subjective in nature. IPS uses historical collection percentages to determine the estimated allowance for bad debts, and adjusts the percentage on a quarterly basis.

|  | December 31 2014 | December 31 2013 |
|---|---|---|
| Allowances for doubtful accounts | $ 941,889 | $ 809,136 |

We typically do not charge late fees or interest on past due accounts.

### J. Inventory

Inventory consists of vaccines, which are stated at the lower of cost or market. Cost is determined under the first-in, first-out method.

### K. Recent Accounting Pronouncements

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") and are adopted by us as of the specified effective date. Unless otherwise discussed, the Company believes that the impact of recently adopted and recently issued accounting pronouncements will not have a material impact on its consolidated financial position, results of operations, and cash flows.

In July 2013, the FASB issued ASU 2013-11, *Income Taxes (Topic 740) — Presentation of an Unrecognized Tax Benefit When a Net Operating Loss Carryforward, a Similar Tax Loss, or a Tax Credit Carryforward Exists*. This amendment clarifies the guidance on the presentation of an unrecognized tax benefit, or a portion of an unrecognized tax benefit, in the financial statements as a reduction to a deferred tax asset for a net operating loss carryforward, a similar tax loss, or a tax credit carryforward. ASU No. 2013-11 is effective for fiscal periods beginning after December 15, 2013. The adoption of this ASU did not have a material impact on the consolidated financial statements.

In May 2014, the FASB issued ASU 2014-09, *Revenue from Contracts with Customers (Topic 606)*. The core principle of the guidance is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. ASU No. 2014-09 is effective for fiscal periods beginning after December 15, 2016, including, interim periods within that period. We are currently evaluating the impact of ASU 2014-09 on our consolidated financial statements and disclosures.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

In August 2014, the FASB issued ASU 2014-15, *Presentation of Financials Statements – Going Concern (Subtopic 205-40)*. *Disclosure of Uncertainties about and Entity's Ability to continue as a Going Concern.* The core principle of the guidance is that even if an entity's liquidation is not imminent, there may be conditions or events that raise substantial doubt about the entity's ability to continue as a going concern. In those situations, financial statements should continue to be prepared under the going concern basis of accounting, but the amendments in this Update should be followed to determine whether to disclose information about the relevant conditions and events. ASU 2014-15 is effective for fiscal periods beginning after December 15, 2016. We do not expect the adoption of the ASU 2014-15 to have a material effect on our financial statements and disclosures

**L. Deferred Rent**

Deferred rent consists of rent escalation and lease incentive terms related to the Company's operating leases for its facilities. Deferred rent represents the difference between actual operating lease payments due and straight-line rent expense, which is recorded by the Company over the term of the lease, including any construction period. The excess of the difference between actual operating lease payments due and straight-line rent expense is recorded as a deferred credit in the early periods of the lease when cash payments are generally lower than straight-line rent expense, and is reduced in the later periods of the lease when payments begin to exceed the straight-line expense. Deferred rent accrued is $534,755 for the years ended December 31, 2014 and $530,037 for the years ended December 31, 2013

**M. Goodwill and Intangible Assets**

Goodwill represents the excess of cost over the fair value of net assets of companies acquired in business combinations accounted for using the purchase method.

Intangible assets include customer contracts and relationships and covenants not-to-compete acquired in connection with acquisitions, as well as software purchase and development costs. These intangible assets are amortized on a straight-line basis, which reflects the pattern in which economic benefits are expected to be realized. The Company concluded that use of the straight-line method was appropriate as the majority of the cash flows are expected to be recognized ratably over the estimated useful lives, without a significant degradation of the cash flows over time. The customer relationships and associated contracts represent the most significant portion of the value of the purchase price for every acquisition.

Goodwill and Intangibles are reviewed for possible impairment, annually or upon the occurrence of an event or when circumstances indicate that a reporting unit's carrying amount is greater than its fair value.

Identified Intangible assets are amortized using straight-line method over their estimated useful lives as follows:

|  | Estimated useful life |
|---|---|
| Management service agreements | 25 years |
| Client relationships | 5 years |
| Group Purchase agreements | 5 years |
| Trade name | 5 years |
| Non-compete agreement | 5 years |

Amortization is computed at rates considered sufficient to amortize the cost of the assets, using the straight-line method over their estimated useful lives. Intangibles were amortized by $1,887,247 for the year ended December 31, 2014, $964,167 from June 15 to December 31, 2013 (Successor period) and $1,920,500 from January 1 to June 14, 2013 (Predecessor period).

**N. Software Development Costs**

We capitalize software development costs in accordance with ASC 985-20, Costs of Software to be Sold, Leased, or Marketed. Research costs and software development costs, prior to the establishment of technological feasibility, determined based upon the creation of a working model, are expensed as incurred. Our software capitalization policy currently defines technological feasibility as a functioning beta test prototype with a confirmed working model, within a reasonably predictable range of costs. Additionally, technological feasibility is established when the Company has completed all planning, designing, coding, and testing activities that are necessary to establish that the product can be produced to meet its design specifications including functions, features, and technical performance requirements. Our policy is to amortize capitalized costs by the straight-line method over the remaining estimated economic life of the product. Software development costs capitalized in 2014 and 2013 were $4,960,714 for the year ended December 31, 2014, $2,095,464 for the successor period ended December 31, 2013.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**O. Fair Value of financial instruments**

The carrying amounts for cash, cash equivalents, accounts payable, and accrued expenses approximate fair value because of their short-term nature. At December 31, 2014, the carrying value and accrued interest of the Term Loan is $20.78 million. See note 10 for further discussion of notes payable

**P. *Fair Value Measurements:***

The authoritative guidance for fair value measurements defines fair value as the price that would be received if an asset were to be sold or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

Level 1 — Quoted prices in active markets for identical assets or liabilities

Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data for substantially the full term of the assets or liabilities

Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities

### Quantitative Information about Level 2 Fair Value Measurements

| Nature | Fair value at December 31, 2014 | Valuation Techniques | Unobservable input | Range (weighted average) |
|---|---|---|---|---|
| Measurement of earn out payable | $ 638,700 | Discounted cash flows | Discount rate Revenue growth rate | 10% -15% to +15% (0%) |

**Q.  Income Taxes**

Provisions for income taxes are based on taxes payable or refundable for the current year and deferred taxes on temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. Deferred tax assets and liabilities are included in the consolidated financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled.  As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the current period's provision for income taxes.  A valuation allowance is provided for deferred tax assets if it is more likely than not that the asset will not be realizable.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved with the taxing authority.  If the Company considers that a tax position is "more-likely-than-not" to be sustained upon an audit by the taxing authority, based solely on the  technical merits of the tax position, it recognizes the tax benefit.   The Company measures the tax benefit by determining the largest amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the appropriate taxing authority that has full knowledge of all relevant information.   The Company recognizes estimated future interest and penalties related to unrecognized tax positions, if any, as income tax expense in the consolidated statements of operations.

None of the Company's federal or state income tax returns are currently under examination by the Internal Revenue Service or state authorities. The  Company  is generally no longer subject to U.S. federal, state, or local income tax examinations by tax authorities for years before 2010.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

2. **Restatement**

The Company restated its previously issued consolidated financial statements as of December 31, 2014 and for the successor period, June 15, 2013 through December 31, 2013, to correct an error related to certain amounts previously reported as '*Provision for taxes* ' in its consolidated statement of operations and, ' *Deferred tax Asset, Deferred tax liability and Income tax payable* ,' on its consolidated balance sheet.

Disclosures note 14 has been restated consistent with the consolidated financial statements.

The table below details the impact of the restatement on the Company's consolidated balance sheet as of December 31, 2013:

| | December 31, 2013 | | |
| | As reported | Adjustments | Restated |
|---|---|---|---|
| Deferred tax asset | $ 4,838,452 | $ (252,000) | $ 4,586,452 |
| Deferred tax liability | $ 3,681,047 | $ 1,000,000 | $ 4,681,047 |
| Income tax payable | $ 1,175,505 | $ (1,000,000) | $ 175,505 |
| Retained earnings | $ 3,181,257 | $ (252,000) | $ 2,929,257 |

The table below details the impact of the restatement on the Company's consolidated statement of operations for the successor period, June 15, 2013 through December 31, 2013:

| | December 31, 2013 | | |
| | As reported | Adjustments | Restated |
|---|---|---|---|
| Provision for income taxes | $ 1,068,101 | $ 252,000 | $ 1,320,101 |
| Net Income | $ 3,181,257 | $ (252,000) | $ 2,929,257 |

The table below details the impact of the restatement on the Company's consolidated statement of stockholder's equity as of December 31, 2013:

| | December 31, 2013 | | |
| | As reported | Adjustments | Restated |
|---|---|---|---|
| **Retained earnings** | | | |
| Net Income | $ 3,181,257 | $ (252,000) | $ ,929,257 |
| Balance at December 31 2013 | $ 3,181,257 | $ (252,000) | $ 2,929,257 |
| **Total Stockholder's equity** | | | |
| Net Income | $ 3,181,257 | $ (252,000) | $ 2,929,257 |
| Balance at December 31 2013 | $ 19,395,328 | $ (252,000) | $ 19,143,328 |

The table below details the impact of the restatement on the Company's consolidated statement of cash flows for the year ended December 31, 2013:

| | December 31, 2013 | | |
| | As reported | Adjustments | Restated |
|---|---|---|---|
| Net Income | $ 3,181,257 | $ (252,000) | $ 2,929,257 |

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

3.   **Segment reporting information**

| | | Successor period<br>Year ended<br>December 31, 2014 | | Successor period<br>June 15, 2013<br>through<br>December 31, 2013 | | Predecessor period<br>January 1, 2013<br>through<br>June 14, 2013 |
|---|---|---|---|---|---|---|
| **Revenue Cycle Management** | | | | | | |
| Revenues | $ | 28,425,915 | $ | 16,793,698 | $ | 15,849,628 |
| Depreciation, Depletion and Amortization | $ | 2,249,960 | $ | 1,053,631 | $ | 1,939,769 |
| Operating Income (Loss) | $ | 7,549,170 | $ | 4,741,467 | $ | 2,408,193 |
| | | | | | | |
| **GP & Corporate** | | | | | | |
| Revenues | $ | 7,048,604 | $ | 1,007,229 | $ | 720,424 |
| Depreciation, Depletion and Amortization | $ | 991,481 | $ | 577,406 | $ | 248,033 |
| Operating Income (Loss) | $ | 5,179,558 | $ | (169,595) | $ | (1,101,345) |
| | | | | | | |
| **Practice Management:** | | | | | | |
| Revenues | $ | 19,131,308 | $ | 10,378,684 | $ | 7,230,001 |
| Depreciation, Depletion and Amortization | $ | 9,099 | $ | 5,375 | $ | 13,850 |
| Operating Income (Loss) | $ | 1,505,971 | $ | 748,923 | $ | 335,120 |

Corporate expenses that are incurred for the company's general administration have not been apportioned to other business segments. These costs are grouped under General Purchasing and Corporate segment

The operating segments are identified and reported on the basis of internal reports about components of the group that are regularly reviewed by the Management Board to assess the performance of the segments.

The group's internal management reporting is structured primarily on the basis of the market segments in which the 3 operating segments – Revenue Cycle Management, Practice Management and General Purchasing (GP) & Corporate - operate.

Management assesses the performance of segments based on the measures of revenue and earnings before depreciation, interest and taxes (EBDIT), whereby the EBDIT measure includes allocations of expenses from supporting functions within the group.

Company runs shared services for each of its three segments. All resources, who form part of General management & administration, HR, Finance and accounting, IT, call center are part of shared services that are used by one or more segments and have been included in the reallocation.

Such allocations have been determined by the best management estimates based on number of resources served, volume of transactions processed and or relevant measures that reflect the level of benefits of these functions to each of the operating segments. As the 3 operating segments serve only external customers, there is no inter-segment revenue. Interest income and expenses and tax are not allocated to the segments. There is no measure of segment (non-current) assets and/or liabilities provided to the Management Board.

**Reconciliation of reportable segment revenues and profit or loss to the consolidated totals**

| | | Successor period<br>Year ended<br>December 31, 2014 | | Successor period<br>June 15, 2013<br>through<br>December 31 2013 | | Predecessor period<br>January 1, 2013<br>through<br>June 14 2013 |
|---|---|---|---|---|---|---|
| Total Revenues for reportable segments | $ | 54,605,827 | $ | 28,179,611 | $ | 23,800,053 |
| **Total Consolidated revenues** | $ | 54,605,827 | $ | 28,179,611 | $ | 23,800,053 |
| | | | | | | |
| Operating Profit for reportable segments | $ | 14,234,699 | $ | 5,320,795 | $ | 1,641,968 |
| Depreciation & amortization | | (3,250,540) | | (1,636,412) | | (2,201,652) |
| Interest expense | | (3,035,955) | | (1,075,508) | | (3,144,520) |
| Gain (loss) on disposal of fixed assets | | - | | - | | 664 |
| Other income (expense), net | | (5,422,280) | | 1,640,483 | | (74,591) |
| Provision for income taxes | | (888,071) | | (1,320,101) | | - |
| **Net income (loss)** | $ | 1,637,853 | $ | 2,929,257 | $ | (3,778,131) |

14

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

4.  **Property and Equipment**

Property and equipment are presented at cost. Depreciation is computed at rates considered sufficient to depreciate the cost of the assets, using the straight-line method over their estimated useful lives and capital leases and leasehold improvements being in the nature of operating leases are amortized over the lease term, as follows:

| | Estimated useful life |
|---|---|
| Computer equipment | 2 - 5 years |
| Office equipment | 5 - 7 years |
| Furniture and fixtures | 5 - 7 years |
| Leasehold improvements | Lease term |
| Capital leases | Lease term |
| Medical and surgical equipment | 5 years |
| Automobiles | 5 years |

Property and equipment, net consists of the following at December 31, 2014 and 2013:

| | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Computer equipment and software | $ 8,818,317 | $ 8,348,406 |
| Office equipment | 313,184 | 313,184 |
| Furniture and fixtures | 726,663 | 529,265 |
| Capital leases | 910,866 | 910,866 |
| Leasehold improvements | 126,852 | 107,949 |
| Medical and surgical equipment | 19,529 | 19,529 |
| Total | 10,915,411 | 10,229,199 |
| Less accumulated depreciation | (6,745,048) | (5,381,750) |
| **Property and equipment, net** | $ 4,170,363 | $ 4,847,449 |

We recorded depreciation expense related to the above assets, $1,363,293 for the year ended December 31, 2014, $672,245 and $281,152 for the successor period June 15 to December 31, 2013 and predecessor period January 1 to June 14, 2013, respectively.

The above asset categories include assets on capital lease:

| | December 31 2014 | December 31 2013 |
|---|---|---|
| Computer equipment and software | $ 598,023 | $ 598,023 |
| Office equipment | 235,137 | 235,137 |
| Furniture and fixtures | 77,706 | 77,706 |
| Total | 910,866 | 910,866 |
| Less Accumulated Amortization | (910,866) | (910,866) |
| **Net book value** | $ - | $ - |

5.  **Advertising and Business Promotion Costs**

Advertising and business promotion costs are charged to operations as incurred.

| | Successor | Successor | Predecessor |
|---|---|---|---|
| | Year ended December 31, 2014 | June 15, 2013 through December 31, 2013 | January 1, 2013 through June 14, 2013 |
| Advertisement and business promotion costs | $ 78,410 | $ 84,166 | $ 71,218 |

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

6.  **Deferred finance costs**

The Company incurred $1,185,000 towards debt syndication fees for new debt funding in 2013. This was categorized as deferred finance costs and was being amortized over the term of the debt. On March 31, 2014, this funding arrangement was replaced by a new funding and the unamortized balance of $938,125 was expensed on that date..

On March 31, 2014 as part of the new loan arrangement, $1,655,000 was incurred towards deferred finance costs on new financing arrangement.

On September 3 2014, the company modified terms of the new financing arrangement resulted in a write down of the deferred finance fee. The deferred finance fees at December 31, 2014 and 2013 are $907,203 and $1,012,188, respectively

7.  **Acquisitions**

1)  The Company was acquired on June 14, 2013 (the 'Acquisition Date') by way of stock purchase.

Acquisition related transaction costs include investment banking, legal and accounting fees and other costs directly related to the acquisition. Total transaction's costs paid/ accrued is $5.31 million and include $1.19 million towards debt issuance fees, capitalized as debt issuance costs and deferred to be amortized over the term of the loan.

*Purchase Price Allocation:*

The Acquisition was recorded under the acquisition method of accounting by the Parent and pushed-down to the Company by allocating the purchase consideration of $30.43 million to the cost of the assets acquired, including intangible assets, based on their estimated fair values at the Acquisition Date. The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $12.32 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation (in thousands):

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 1,120 |
| Accounts receivable, net | | 6,174 |
| Inventory | | 272 |
| Prepaid expenses and other current assets | | 1,457 |
| Property and equipment, net | | 960 |
| Intangible assets | | 10,500 |
| Other assets, net | | 232 |
| Deferred tax asset, net | | 1,050 |
| Accounts payable | | (3,625) |
| Current portion of capital lease obligations | | (26) |
| **Total Purchase price allocation** | $ | **12,317** |

The Company finalized its evaluation of the fair value of the assets acquired and liabilities assumed and the resulting purchase price allocation subsequent to June 14, 2013. As a result, adjustments were made to the preliminary purchase price allocation that impacted the allocation of certain intangible assets to the Company's reportable segments.

The Company has acquired intangible assets, not including goodwill, totaling approximately $10.50 million in the Acquisition. The amortization of these intangibles is not deductible for tax purposes and hence the Company has recorded a deferred tax liability of approximately $3.01 million to offset the future book amortization related to these intangibles.

During the process of acquisition of Orion, a contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2013 and 2014. A pool of $1 million and $3 million was allocated for 2013 and 2014 respectively. As a part of Purchase price allocation, on the date of acquisition of Orion, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2013 and 2014. The discounted liability on this account was accrued at $1.9 million. These amounts were revalued again as of December 31, 2013 and were considered reduced to zero, as the obligation based on meeting the revenue targets was determined not probable as of that date . This reversal of contingent liability is shown under other income.

16

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

*Identifiable Intangible Assets*

In performing the purchase price allocation, the Company considered, among other factors, the intended future use of acquired assets, analyses of historical financial performance and estimates of future performance. The following table sets forth the components of intangible assets as of the date of the Acquisition (in thousands):

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Customer Relationships | $ | 7,900 |
| Group Purchasing Agreements | | 600 |
| Management Service Agreement | | 2,000 |
| **Total Identifiable Intangible Assets** | **$** | **10,500** |

Customer relationships represent the fair value of the existing customer base.

2) In April 1, 2014, the Company's parent, Constellation Health LLC (Constellation), acquired North East Medical Solutions (NEMS), a Revenue Cycle Management company, based out of Pennsylvania, USA. NEMS was acquired for a total consideration of $2.79 million for a 100% ownership with 100% voting rights. Constellation transferred this acquisition to Orion Healthcare, immediately thereafter on the same day.

*Purchase Price Allocation:*

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $1.82 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation:

| Purchase Price | $ | 2,788,003 |
|---|---|---|
| Cash and cash equivalents | $ | 11,900 |
| Accounts receivable, net | | 393,494 |
| Prepaid expenses and other current assets | | 5,950 |
| Property and equipment, net | | 617,545 |
| Intangible assets | | 715,000 |
| Other assets, net | | 15,178 |
| Accounts payable | | (156,001) |
| Accrued Expenses | | (173,688) |
| Current portion of capital lease obligations | | (47,021) |
| **Net assets acquired** | **$** | **1,382,357** |
| **Excess Purchase Price Allocated to Goodwill** | **$** | **1,405,646** |

The Company has acquired intangible assets, not including goodwill, totaling approximately $715 thousands in the acquisition.

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Trade Name | $ | 220,000 |
| Non-Compete Agreements | | 15,000 |
| Customer Contracts | | 480 |
| **Total Identifiable Intangible Assets** | **$** | **715** |

A contingent consideration was set up for identified management team. This earn out is based on a minimum revenue generated for 2014 and 2015. A pool of $367 thousands and $474 thousands was allocated for 2015 and 2016 respectively. As a part of Purchase price allocation, on the date of acquisition of NEMS, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2014 and 2015. The discounted liability on this account was accrued at $639 thousand.

NEMS was acquired to foray into a different geographical area and increase the customer base. Along with organic growth plans, the company also constantly is looking for inorganic growth opportunities.

The revenues from NEMS were consolidated from April 2014, totaling $2.5 million for the year ended December 31, 2014. If NEMS was acquired at the beginning of the year, the additional revenues of $800 thousand would also have been included.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**8. Other Assets**

Other assets consist of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Deposits | $ 223,796 | $ 209,077 |
| Total | $ 223,796 | $ 209,077 |

**9. Prepaid and other current assets**

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Prepaid rent and Insurance | $ 393,024 | $ 418,362 |
| Prepaid maintenance | 270,620 | 176,862 |
| Prepaid legal fees | - | 495,000 |
| Prepaid vendor costs | - | 200,000 |
| Total | $ 663,644 | $ 1,290,224 |

**10. Intangible Assets, excluding Goodwill, net**

Intangible assets, excluding goodwill, net consist of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Software tool - work in progress | $ 7,056,043 | $ 2,095,464 |
| Client relationships | 8,380,000 | 7,900,000 |
| Management service agreements | 2,000,000 | 2,000,000 |
| Group Purchasing agreements | 600,000 | 600,000 |
| Trade Name | 220,000 | - |
| Non-Compete | 15,000 | - |
|  | 18,271,043 | 12,595,464 |
| Less accumulated amortization | (2,851,414) | (964,167) |
| Net amount | $ 15,419,629 | $ 11,631,297 |

Estimated future annual amortization of our identifiable intangible assets is as follows:

Year ending December 31:

| Year ended December 31, 2015 | $ 2,628,604 |
|---|---|
| Year ended December 31, 2016 | 3,334,209 |
| Year ended December 31, 2017 | 3,334,209 |
| Year ended December 31, 2018 | 2,413,375 |
| Year ended December 31, 2019 | 1,526,959 |
| Thereafter | 2,182,273 |
| **Total** | $ 15,419,629 |

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

11.  **Line Of Credit And Long-Term Debt**

The Company had a line of credit facility with a bank dated June 17 2013 that provides for maximum borrowing of $2,000,000 and maturing on May 31, 2017. The bank interest rate was 9.50%. The line of credit is collateralized by substantially all the assets of the Company. At Successor period ending December 31 2013, the outstanding line of credit is $500,000.

The Company also had a Term Loan, Type A, for $9,000,000 at a fixed interest rate 11%, and Term Loan, Type B, for $6,500,000 at a fixed interest rate 12% plus an additional 3% PIK interest. The term loans maturing on May 31, 2017

The Company entered into a new loan agreement dated March 31 2014 to replace the loan facility entered on June 17, 2013. The new loan facility is a $40,000,000 Senior debt facility, bearing fixed interest at 10.00%, interest payable monthly, plus an additional 2% payable in kind interest. Principal payments start from June 30 2015, maturing on March 31, 2018, collateralized by a blanket lien on all assets

This loan agreement was modified and amended in September 2014 reducing our facility to $23,000,000. Interest rate was fixed at higher of (a) 3 month LIBOR (**Base rate**) plus 9% and (b) 11%, without payment of kind interest.

For the successor year ending December 31, 2013 the outstanding line of credit balance totaled $500,000.

Long-term debt consisted of the following at December 31, 2014 and 2013:

| | December 31, 2014 | December 31, 2013 |
|---|---|---|
| $40,000,000 senior note payable to a financial institution, bearing interest at higher of (a) 3 month LIBOR (**Base rate**) plus 9% and (b) 11%, interest payable monthly, principal payments monthly based on schedule, maturing on September 30, 2017, collateralized by a blanket lien on all assets. | $ 20,958,879 | $ - |
| $9,000,000 Term loan A payable to a financial institution, bearing fixed interest at 11.00%, interest payable monthly, principal payments monthly based on schedule after 6 months, maturing May 31, 2017, collateralized by a blanket lien on all assets. | - | 9,000,000 |
| $6,500,000 Term loan B payable to a financial institution, bearing fixed interest at 12.00%, interest payable monthly plus an additional 3% PIK interest, principal payments payable after full repayment of Term loan A , maturing May 31, 2017, collateralized by a blanket lien on all assets. | - | 6,608,005 |
| Total | 20,958,879 | 15,608,005 |
| Less current maturities | (4,631,771) | (1,125,000) |
| **Long term debt** | **$ 16,327,108** | **$ 14,483,005** |

Future aggregate annual maturities of the debt are as follows:

| Year ending December 31: | | |
|---|---|---|
| 2015 | $ | 4,631,771 |
| 2016 | | 4,631,771 |
| 2017 | | 11,695,337 |
| **Total debt** | **$** | **20,958,879** |

Our credit agreement for our Term loans contains certain financial covenants that require us to maintain a maximum leverage ratio and other customary terms and conditions. Post-acquisition, the Company has met all the financial covenants for the debt.

During the year as a part of acquisition of the Company, old debt was retired and replaced by new debt funds. As a part of purchase price allocation this was push down to the company from the parent.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

**12. Accrued Expenses**

Accrued expenses consisted of the following at December 31, 2014 and 2013:

|  | December 31, 2014 | December 31, 2013 |
|---|---|---|
| Compensation and related taxes | $ 709,819 | $ 541,615 |
| Interest | 209,496 | 159,488 |
| Deferred acquisition deal fees | - | 1,149,983 |
| Deferred rent | 532,349 | 530,037 |
| Professional Fees Payable | 295,211 | 342,406 |
| Other | 609,061 | 391,984 |
| Total | $ 2,355,936 | $ 3,115,513 |

**13. Operating Leases**

We lease our facilities and corporate office space under operating leases that expire in various years through 2022. The leases provide for annual operating expense increases. Annual rental payments related to our facility leases totaled $1,986,863, $1,219,263 and $869,462 for the year ended December 31, 2014 and June 15 to December 31 2013, and January 1 to June 14, 2013 respectively.

Future annual base rental expenses under these lease agreements are as follows:

| | | |
|---|---|---|
| 2015 | $ | 2,001,407 |
| 2016 | | 1,620,345 |
| 2017 | | 1,248,721 |
| 2018 | | 1,104,943 |
| 2019 | | 1,084,320 |
| Thereafter | | 1,149,243 |
| **Total** | $ | **8,208,978** |

**14. Income Taxes**

The provision for income taxes for the years ended December 31, 2014 and 2013 is summarized as follows:

|  |  | December 31, 2014 | December 31, 2013 |
|---|---|---|---|
| Current: | | | |
| | Federal | $ 934,945 | $ 253,587 |
| | State | 161,408 | 173,920 |
| | Total | 1,096,353 | 427,507 |
| Deferred: | | | |
| | Federal | (177,040) | 1,171,315 |
| | State | (31,242) | (308,953) |
| | Valuation allowance | - | 30,232 |
| | Total | (208,282) | 892,594 |
| | **Provision for Income taxes** | $ 888,071 | $ 1,320,101 |

For the successor period ended December 31, 2014 , the Company's effective income tax rate was 37% and for successor period ending December 31, 2013, the Company's effective income tax rate was 37%.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

Our provision for federal and state taxes is comprised primarily of taxes from states that assess franchise and margin tax. Significant components of net deferred tax assets and liabilities are as follows:

Deferred tax liabilities:

| | Successor December 31, 2014 | | Predecessor December 31, 2013 | |
|---|---|---|---|---|
| Intangibles, amortization not available for tax deduction | $ | (4,156,491) | $ | (4,681,047) |
| Total deferred tax liabilities | $ | (4,156,491) | $ | (4,681,047) |
| | | | | |
| Deferred tax assets: | | | | |
| Net operating loss - Federal and State - Current | $ | 252,000 | $ | 252,000 |
| Net operating loss - Federal and State – Long Term | | 4,018,178 | | 4,334,452 |
| Total deferred tax assets | $ | 4,270,178 | $ | 4,586,452 |
| | | | | |
| Total net deferred tax assets/(liabilities) | | 113,687 | | (94,595) |
| Valuation allowance | | - | | - |
| Net deferred tax assets | $ | 113,687 | $ | (94,595) |

The Company has earned taxable income in the year ended December 31 2014 and successor period ended December 31, 2013, and is expected to earn taxable income in future years to claim the benefit of deferred tax asset; therefore the Company is not making any valuation allowance for the year ended December 31, 2014 and successor period ended December 31 2013.

On the acquisition date in 2013, we have identified a net operating loss carry forwards of approximately $28,000,000, which will begin to expire in 2033 year. As a result of the acquisitions and restructurings, we have undergone an ownership change and the utilization of the tax net operating losses are subject to potential limitations pursuant to Internal Revenue Code Section 382. These limitations could reduce the amount of the net operating loss carry forwards utilized in the future. Furthermore, the ultimate utilization of the carry forwards is dependent upon the timing and extent of our future profitability. The annual limitations combined with the expiration date of the carry forwards may prevent the utilization of the carry forwards.

Constellation Health LLC and the Company have entered into a tax indemnity agreement pursuant to which Constellation Health LLC has agreed to indemnify the Company against certain tax liabilities.

Prior to the Company's acquisition, the Company was a party to several promissory notes pursuant to which it borrowed funds from certain lenders. The lenders agreed to receive proceeds from the Company's acquisition in amounts less than the amounts owed by the Company under the notes, in full satisfaction of the Company's obligations under the notes (the "Cancellation of Debt").

Constellation Health LLC has agreed to indemnify the Company should the Cancellation of Debt cause the Company to be liable for any taxes in excess of the indemnification coverage provided in the Company's merger agreement but subject to a maximum of $12 million plus an amount equivalent to any applicable interest, fines, penalties, costs and charges thereon.

15. **Stock Based Compensation, Warrants and Options**

At December 31, 2013, the Company did not have any stock-based employee compensation.

At December 31, 2014, the Company did not have stock-based employee compensation.

For the Successor period ended December 31, 2014 and December 31 2013, the Company did not have any impact of our stock-based employee compensation plan on our consolidated statements of operations.

21

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES
CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2014
AND 2013

Transactions with Other than Employees

The company has cancelled all outstanding options upon acquisition and does not have any outstanding warrants or options as of December 31, 2014 and December 31, 2013. The Company also did not issue any warrants in 2013 and 2014.

There are also no outstanding restricted stock units and options as at the Successor period ended December 31, 2014.

**16. 401(K) Plan**

We have an employee retirement savings plan under Section 401(k) of the Internal Revenue Code for all eligible employees of Orion HealthCorp, Inc. Participants are permitted to defer compensation up to the dollar limitation as defined by the IRS for the taxable year. On a discretionary basis, we may match up to 50% of the first 6% of the non-highly compensated employee's deferrals. Orion's contributions vest beginning in the second year in equal installments over three years, and are 100% vested after four years. For the Successor period ending December 31, 2014 and December 31, 2013, the Company did not contribute any sums to match the contributions.

**17. Commitments and Contingencies**

As of December 31, 2014, our combined based annual salary commitments related to all employment agreements totaled $2,144,450 through 2014.

We are involved in various legal proceedings and claims arising in the ordinary course of business. Our management believes that the disposition of these additional matters, individually or in the aggregate, is not expected to have a materially adverse effect on our consolidated financial condition. However, depending on the amount and timing of such disposition, an unfavorable resolution of some or all of these matters could materially affect our future results of operations or cash flows in a particular period.

**18. Related party transactions**

During the year ended December 31, 2014, there were no related party transactions relating to sales and purchases.

First United Health LLC, a Delaware limited liability company ("FUH") and Constellation Health, LLC, a Delaware limited liability company (the "Company") entered into a consulting agreement ("Agreement") dated June 10, 2013, whereby FUH agreed to provide consulting services to the Company and further agreed for no extra charge to make available the services of Paul Parmar. The term of the agreement is for five (5) years provided; however, that pursuant to Section 1.3 the Consultant after the third anniversary of the Agreement may terminate the Agreement by providing 60 days written notice to the Company prior to the third anniversary of the Agreement. The Agreement, pursuant to Section 4.2, contains a right of first refusal to the Company. Further, pursuant to the Loan and Security Agreement with RCC Commercial, Inc., Parmar entered into a Non-Competition Agreement with FUH and the Company, whereby Parmar agreed for a period of two years after his termination to not compete against CH nor solicit its clients or customers anywhere in the world.

# Constellation Healthcare Technologies, Inc. and Subsidiaries

### Consolidated Financial Statements

### For Year Ended
### December 31, 2015

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES

**Table of Contents**

| | Page |
|---|---|
| Independent Auditors' Report ............................................................................................................................ | 1 |
| Consolidated Balance Sheets ........................................................................................................................... | 2 |
| Consolidated Statements of Income and Comprehensive Loss ...................................................................... | 3 |
| Consolidated Statements of Cash Flows ......................................................................................................... | 4-5 |
| Consolidated Statement of Stockholder's Equity ........................................................................................... | 6 |
| Notes to Financial Statements ......................................................................................................................... | 7-24 |



ACCOUNTANTS + ADVISORS

www.rrbb.com

**ROSENBERG RICH BAKER BERMAN & COMPANY**

265 Davidson Avenue, Suite 210 • Somerset, NJ 08873-4120 • PHONE 908-231-1000 • FAX 908-231-6894
111 Dunnell Road, Suite 100 • Maplewood, NJ 07040 • PHONE 973-763-6363 • FAX 973-763-4430

Independent Auditor's Report

To the Board of Directors and Stockholders of
Constellation Healthcare Technologies, Inc. & Subsidiaries

We have audited the accompanying consolidated balance sheets of Constellation Healthcare Technologies, Inc. & Subsidiaries (the "Company) which comprise the consolidated balance sheets as of December 31, 2015 and 2014 and the related consolidated statements of income and comprehensive loss, stockholder's equity, and cash flows for the years then ended and the related notes to the financial statements.

**Management's Responsibility for the Financial Statements**

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

**Auditor's Responsibility**

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

**Opinion**

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Constellation Healthcare Technologies, Inc. as of December 31, 2015 and 2014 and the results of its operations and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

*Rosenberg Rich Baker Berman & Company*

Somerset, New Jersey
March 21, 2016

1

# CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

### Constellation Healthcare Technologies, Inc. and Subsidiaries
### Consolidated Balance Sheets

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **Current assets** | | |
| Cash and cash equivalents | $ 2,516,379 | $ 18,136,336 |
| Accounts receivable, net | 15,060,632 | 8,601,001 |
| Inventory | 249,433 | 382,745 |
| Prepaid expenses and other current assets | 605,744 | 663,644 |
| Deferred finance costs | 409,455 | 329,894 |
| Deferred tax asset | 252,000 | 252,000 |
| Total current assets | 19,093,643 | 28,365,620 |
| | | |
| **Property and equipment, net** | 9,546,085 | 4,170,363 |
| | | |
| **Other long-term assets** | | |
| Intangible assets, excluding goodwill | 35,263,534 | 15,419,629 |
| Goodwill | 37,982,340 | 13,722,379 |
| Deferred tax asset | 5,596,995 | 4,018,178 |
| Deferred finance costs | 307,088 | 577,309 |
| Deferred offering costs | 60,202 | - |
| Other assets, net | 278,156 | 223,796 |
| Total other long-term assets | 79,488,315 | 33,961,291 |
| Total assets | $ 108,128,043 | $ 66,497,274 |
| | | |
| **Current liabilities** | | |
| Accounts payable | $ 4,088,883 | $ 3,024,679 |
| Accrued expenses | 4,423,110 | 1,823,586 |
| Income taxes payable | 2,832,298 | 1,271,858 |
| Current portion of capital lease obligation | 2,172 | 29,107 |
| Current portion of long-term debt | 4,848,632 | 4,631,771 |
| Current portion of contingent consideration | - | 638,700 |
| Payable to Sellers | 1,967,141 | |
| Total current liabilities | 18,162,236 | 11,419,701 |
| | | |
| **Long-term liabilities** | | |
| Long-term debt, net of current portion | 10,481,594 | 16,327,108 |
| Contingent consideration | 10,453,631 | - |
| Deferred rent liability | 605,149 | 532,349 |
| Deferred tax liability | 7,510,042 | 4,156,491 |
| Total long-term liabilities | 29,050,416 | 21,015,948 |
| | | |
| **Commitments and Contingencies** | | |
| | | |
| **Stockholders' equity** | | |
| Common stock, par value $0.0001; 150,000,000 shares authorized at December 31, 2015 and 111,226,912 shares authorized at December 31, 2014; 64,990,623 shares issued and outstanding at December 31, 2015 and 55,615,056 shares issued and outstanding at December 31, 2014. | 6,500 | 5,562 |
| Additional paid-in capital | 49,163,637 | 29,488,953 |
| Retained earnings | 11,575,405 | 4,567,110 |
| Accumulated other comprehensive loss | (79,519) | - |
| | | |
| Total stockholders' equity | 60,666,023 | 34,061,625 |
| Non-controlling interest in consolidated entity | 249,368 | |
| Total liabilities and stockholders' equity | $ 108,128,043 | $ 66,497,274 |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

Constellation Healthcare Technologies, Inc. and Subsidiaries
Consolidated Statements of Income and Comprehensive Loss

| | Year ended December 31, 2015 | Year ended December 31, 2014 |
|---|---|---|
| **Revenues** | $ 76,735,069 | $ 54,605,827 |
| **Operating expenses:** | | |
| Salaries and benefits | 21,465,227 | 17,334,464 |
| Facility rent and related costs | 3,318,017 | 2,538,546 |
| Depreciation | 1,327,392 | 1,363,293 |
| Amortization | 3,378,174 | 1,887,247 |
| Professional and consulting fees | 15,629,191 | 10,139,620 |
| Insurance | 444,081 | 651,211 |
| Provision for doubtful accounts | 733,764 | 427,643 |
| Vaccines and medical supplies | 4,417,260 | 4,371,464 |
| Office and computer supplies | 232,443 | 288,622 |
| Postage and courier | 1,807,249 | 1,891,431 |
| Other | 4,783,213 | 2,728,127 |
| Total operating expenses | 57,536,011 | 43,621,668 |
| **Income from operations** | 19,199,058 | 10,984,159 |
| **Other income (expenses):** | | |
| Interest expense | (2,579,398) | (3,035,955) |
| Change in fair value of contingent consideration | (1,075,899) | - |
| Fees paid to debt providers | - | (2,164,089) |
| Debt related expenses | (271,075) | (3,213,194) |
| Other expense, net | (3,921,262) | (44,997) |
| Total other income (expenses), net | (7,847,634) | (8,458,235) |
| **Income before provision for income taxes** | 11,351,424 | 2,525,924 |
| Provision for income taxes | 4,392,347 | 888,071 |
| **Net income** | $ 6,959,077 | $ 1,637,853 |
| Loss from consolidated entity attributable to non-controlling interest | (49,217) | - |
| **Net Income attributable to the company** | 7,008,294 | 1,637,853 |
| **Other Comprehensive Loss, net of tax** | | |
| Foreign currency translation adjustments | (79,519) | - |
| Other Comprehensive Loss | (79,519) | |
| **Comprehensive Income** | $ 6,928,775 | $ 1,637,853 |
| **Income per common shares** | | |
| *Basic* | | |
| Common Stock | $ 0.11 | $ 0.45 |
| *Diluted* | | |
| Common Stock | $ 0.11 | $ 0.45 |
| **Weighted average number of shares for basic** | | |
| Common Stock | 61,061,591 | 3,657,815 |
| **Weighted average number of shares for Diluted** | | |
| Common Stock | 61,061,591 | 3,657,815 |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

Constellation Healthcare Technologies, Inc. and Subsidiaries
Consolidated Statements of Cash Flows

| | Year ended December 31, 2015 | Year ended December 31, 2014 |
|---|---|---|
| **Cash Flow from operating activities:** | | |
| Net Income | $ 6,959,077 | $ 1,637,853 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | |
| Provision for doubtful accounts | 733,764 | 427,643 |
| Depreciation | 1,327,392 | 1,363,293 |
| Amortization | 3,378,174 | 1,887,247 |
| Deferred Tax | 1,761,921 | (208,282) |
| Change in fair value of contingent consideration | 1,075,899 | - |
| Gain on settlement of contingent consideration | (537,199) | - |
| Foreign currency exchange loss | 39,498 | - |
| Conversion of PIK interest to principal | - | 54,708 |
| Amortization of deferred finance fees | 363,044 | 1,759,984 |
| Debt related expenses paid by parent | - | 2,905,000 |
| *Changes in operating assets and liabilities:* | | |
| Accounts receivable | (4,885,482) | (3,346,577) |
| Inventory | 133,314 | (42,755) |
| Prepaid expenses and other assets | 57,900 | 632,530 |
| Deferred offering cost | (60,202) | - |
| Other assets | (54,360) | 624 |
| Accounts payable, accrued expenses | 5,487,313 | (12,456) |
| Income tax payable | (263,146) | 1,096,353 |
| Other liabilities | - | (97,000) |
| Net cash provided by operating activities | 15,516,907 | 8,058,164 |
| | | |
| **Cash flows from investing activities** | | |
| Cash outlay for property and equipment | (6,703,114) | (68,662) |
| Cash acquired from acquisition | - | 11,900 |
| Development of software tool | (3,078,701) | (4,960,714) |
| Net deposits to restricted cash | - | 97,000 |
| Capital Paid for Acquisition | (34,650,000) | - |
| Net cash used in investing activities | (44,431,815) | (4,920,476) |
| | | |
| **Cash flows from financing activities** | | |
| Payments of capital lease obligations | (26,935) | (21,174) |
| Payments on line of credit | - | (500,000) |
| Payments on long term loan | (6,036,531) | (24,072,889) |
| Payments on acquisition note payable | (144,821) | - |
| Net proceeds from long term debt | - | 23,000,000 |
| Cash outlay for deferred finance costs | (172,384) | (414,541) |
| Distribution to parent | - | (4,389,756) |
| Dividends paid | (176,390) | - |
| Contribution from parent | 1,000,000 | 3,910,350 |
| Proceeds from sale of stock, net of related fees | 18,852,012 | 13,466,231 |
| Net cash provided by financing activities | 13,294,951 | 10,978,222 |
| | | |
| Net (decrease) increase in cash and cash equivalents | (15,619,957) | 14,115,910 |
| | | |
| **Cash and cash equivalents, beginning of period** | 18,136,336 | 4,020,426 |
| **Cash and cash equivalents, end of period** | $ 2,516,379 | $ 18,136,336 |

The accompanying notes are an integral part of the consolidated financial statements.

4

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

Constellation Healthcare Technologies, Inc. and Subsidiaries
Consolidated Statements of Cash Flows (Continued)

| | | Year ended December 31, 2015 | | Year ended December 31, 2014 |
|---|---|---|---|---|
| **Supplemental Cash Flow Information** | | | | |
| Cash Paid for interest | $ | 2,579,398 | $ | $2,931,240 |
| Cash Paid for Income Taxes | | 1,333,073 | | - |
| | | | | |
| **Supplemental Schedule of Non-Cash Investing and Financing Activities** | | | | |
| Notes payable issued for accrued interest | $ | - | $ | 162,716   - |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

## CONSOLIDATED STATEMENT OF STOCKHOLDER'S EQUITY
### YEAR ENDED DECEMBER 31, 2015

| | Common Stock | | Paid-in Capital | Retained Earnings | Accumulated other comprehensive loss | Non-controlling interest in consolidated entity | Total |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| Balances, January 1, 2014 | 1,000 | $ 1 | $ 16,214,070 | $ 2,929,257 | $ - | $ - | $ 19,143,328 |
| Proceeds from sale of stock, net of related fees | 55,614,056 | 5,561 | 13,460,670 | - | - | - | 13,466,231 |
| Distributions to parent | - | - | (4,389,756) | - | - | - | (4,389,756) |
| Contribution from parent | - | - | 3,910,350 | - | - | - | 3,910,350 |
| Deal fees and deferred financing fees paid by parent | - | - | 4,623,315 | - | - | - | 4,623,315 |
| Effect of push down accounting | - | - | (4,329,696) | - | - | - | (4,329,696) |
| Net income for 2014 | - | - | - | 1,637,853 | - | - | 1,637,853 |
| Balances, December 31, 2014 | 55,615,056 | $ 5,562 | $ 29,488,953 | $ 4,567,110 | $ | $ | $ 34,061,625 |
| Proceeds from sale of stock, net of related fees | 9,375,567 | 938 | 18,851,074 | - | $ - | $ - | 18,852,012 |
| Contribution from parent | - | - | 1,000,000 | - | - | - | 1,000,000 |
| Dividends Paid | - | - | (176,390) | - | - | - | (176,390) |
| Other Comprehensive Loss | - | - | - | - | (79,519) | - | (79,519) |
| Non-controlling interest in consolidated entity | - | - | - | - | - | 298,585 | 298,585 |
| Net income for 2015 | - | - | - | 7,008,295 | - | (49,217) | 6,959,078 |
| Balances, December 31, 2015 | 64,990,623 | $ 6,500 | $ 49,163,637 | $ 11,575,405 | $ (79,519) | $ 249,368 | $ 60,915,391 |

The accompanying notes are an integral part of the consolidated financial statements.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

1. **NATURE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES**

   **A. Nature of Business**

   Constellation Healthcare Technologies, Inc., a Delaware Corporation (referred to as the "Company", "we", "us" or "our") is a healthcare services organization providing outsourced business services to physicians, serving the physician market through three operating segments - Revenue Cycle Management, Practice Management and Group Purchasing Organization. Our mission is to provide superior business and financial management services resulting in optimal profitability for our clients and maximized enterprise value for our stakeholders. We believe our core competency is our long-term experience and success in working with and creating value for physicians.

   *Revenue Cycle Management ("RCM") Segment*

   RCM segment offers expert medical billing and collections, practice management, and other related services to hospital-based and office-based physicians, giving them more time to focus on patient care in specialties such as pathology, anesthesiology, radiology, cardiology, family practice, internal medicine, orthopedics, neurology and emergency medicine. These services help clients to be financially successful by improving cash flows and reducing administrative costs and burdens.

   We deliver billing and collections services to help physicians receive optimal earnings for the care they provide. We assist our clients by maximizing their reimbursement through:

   - Tenacious pursuit of every collectible dollar,
   - To-the-letter compliance with ever-changing regulations and coding complexities,
   - Thorough tracking and methodical working of correspondence, and
   - Superior management of short-term cash flow and long-term income.

   We also offer consulting services to assist clients with navigating and interacting with managed care organizations, as well as a wide range of management consulting services to help create a more efficient medical practice.

   Our RCM segment comprised 65.3% and 52.1% of our total revenues for the years ended December 31, 2015 and December 31, 2014, respectively.

   *Practice Management ("PM") Segment*

   Our PM segment, via IPS, is an experienced and innovative provider of business and practice management services exclusively dedicated to supporting the needs of primary care and subspecialty pediatric practices. Through this segment we provide accounting and bookkeeping, human resource management, group purchasing, accounts receivable management, quality assurance services, physician credentialing, fee schedule review, training and continuing education, and billing and reimbursement analysis. The physicians, who are all employed by separate corporations, provide all clinical and patient care related services.

   There is a standard forty-year management service agreement ("MSA") between IPS and the various affiliated medical groups whereby a management fee is paid to IPS, which owns all of the assets used in the operation of the medical groups. IPS manages the day- to-day business operations of each medical group and provides the assets for the physicians to use in their practice for a fixed fee or percentage of the net operating income of the medical group. All revenues are collected by IPS and the fixed fee or percentage payment to IPS is taken from the net operating income of the medical group and the remainder of the net operating income of the medical group is paid to the physicians and treated as an expense on IPS's financial statements as "Professional and consulting Fees."

   Our PM segment comprised 24.7% and 35.0% of our total revenues for the years ended December 31, 2015 and December 31, 2014, respectively.

   **Group Purchasing Organization ("GPO")**

   Our GPO segment provides for eligible physicians to participate in discounts for vaccines and flu shots offered by certain pharmaceutical companies. In exchange for this, we receive an administrative fee from the pharmaceutical companies.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

**B. Basis of Presentation and Principles of Consolidation**

Orion, (Orion Healthcorp, Inc, together with its wholly owned subsidiaries) was acquired on June 14, 2013 by way of stock purchase by Constellation Health LLC.

The Company continued as the same legal entity after the acquisition. The accompanying consolidated statements of operations, changes in shareholders' equity, and cash flows are presented for the years ended December 31, 2015 and 2014, respectively. The accounting policies followed by the Company are consistent within the reporting periods. The results of the periods presented are not necessarily indicative of the results that may be achieved for future periods. Certain reclassifications have been made to the 2014 consolidated financial statements to conform to the 2015 presentation. We have also performed an evaluation of subsequent events through the date the financial statements were issued.

After the acquisition of Orion (effective, June 14, 2013), on June 17, 2013, Orion Healthcorp, Inc., ("Orion") a Delaware corporation amended and restated it's Certificate of Incorporation. Pursuant to the amendment, Class A and Class D shares of common stock were consolidated into authorized and issued 1,000 shares of common stock.

On September 3, 2014, Constellation Healthcare Technologies, Inc ("Constellation") was incorporated in the state of Delaware, USA. Constellation was incorporated to own Orion Healthcorp, Inc and its Subsidiaries.

Constellation Healthcare Technologies was admitted to the AIM market on December 8, 2014 after placing 7,128,235 shares to the market with gross proceeds of £9,623,117 (approx. $15.08 million). The total shares outstanding in Constellation, after the IPO placement, are 55,615,056.

Constellation Healthcare Technologies placed a secondary offering in 2015 and these shares were admitted to the AIM market on June 4, 2015 after placing 9,247,998 shares to the market with gross proceeds of £12,947,197 (approx. $18.77 million). Additional 127,569 shares were issued to the placing agents for their services, in lieu of cash payments. The total shares outstanding in Constellation, after the secondary placement, are 64,990,623.

As at December 31, 2015 Constellation Healthcare Technologies, Inc ("Constellation"), a Delaware company, owned all 1000 shares of Orion common stock.

The accompanying consolidated financial statements include the accounts of Constellation Healthcare Technologies Inc., its wholly- owned subsidiaries and entity which it controls. All significant inter-company accounts and transactions between these entities have been eliminated in these historical consolidated financial statements.

In 2015, with the acquisition of Physicians Practice Plus LLC, Constellation also acquired an option to acquire an entity in India, Porteck India Infoservices Pvt Limited (Porteck India).

A variable interest entity ("VIE") must be consolidated by a reporting entity if the reporting entity is the primary beneficiary because it has (i) the power to direct the VIE's activities that most significantly impact the VIE's economic performance, (ii) an implicit financial responsibility to ensure that a VIE operates as designed, and (iii) the obligation to absorb losses of the VIE or the right to receive benefits from the VIE.

Porteck India is considered to be a VIE, as defined by authoritative accounting guidance. All major decisions related to Porteck India, that most significantly impact its economic performance, including but not limited to engaging in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions are subject to the approval of Constellation. As such, we consolidate Porteck India. As of December 31, 2015 Porteck India has approximately $0.39 million of total assets that primarily consists of property & equipment, cash and cash equivalents and prepaid & other receivables. Additionally, as of December 31, 2015 Porteck India has liabilities of $0.36 million that primarily consists of liabilities associated with administration and operations. There were no Porteck India assets or liabilities in the 2014 as it became a VIE entity only in 2015. The following exchange rates were used to convert all elements of the financial statements of the Indian entity into US dollars, a) Assets and liabilities have been translated as per the exchange rate on the balance sheet date b) Average rate have been used for all revenue and expense elements. Differential amounts arising on accounting of translation is recorded as Exchange Translation (Loss)/Gain and shown separately in Accumulated other comprehensive loss under Stockholder's equity

All intercompany balances and transactions have been eliminated in consolidation.

**C. Revenue Recognition**

IPS, a Physician Practice Management Company (PPM), assumes all financial risk for the performance of the medical practices. The physicians are employees of the captive professional corporation bound by non-compete agreements and the authority of the IPS management structure in place.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

IPS recognizes revenue at the time the services are provided by its affiliated medical groups. Net patient service revenue is impacted by billing rates, changes in current procedural terminology code reimbursement, and collection trends. IPS reviews billing rates at each of its affiliated medical groups, on at least an annual basis, and adjusts those rates based on each insurer's current reimbursement practices. Amounts collected by IPS for treatment by its affiliated medical groups of patients covered by Medicare, Medicaid, and other contractual reimbursement programs, which may be based on cost of services provided or predetermined rates, are generally less than the established billing rates of IPS' affiliated medical groups. IPS estimates the amount of these contractual allowances and records a reserve against accounts receivable based on historical collection percentages for each of the affiliated medical groups, which include various payer categories. When payments are received, the contractual adjustment is written off against the established reserve for contractual allowances. The historical collection percentages are adjusted quarterly based on actual payments received, with any differences charged against net revenue for the quarter. Additionally, IPS tracks cash collection percentages for each medical group on a monthly basis, setting quarterly and annual goals for cash collections, bad debt write-offs and aging of accounts receivable. IPS is not aware of any material claims, disputes or unsettled matters with third party payers and there have been no material settlements with third party payers for the years ended December 31, 2015 and December 31, 2014, respectively.

The Company also receives administration fees tiered by volume of Vaccines and Flu shots consumed by all participating physicians from pharmaceutical companies where it's participating doctors order the Vaccines and Flu Shots and administer vaccines. Revenue is recognized upon the administration of the vaccine by the doctor based on estimated usage during the year

RCM's principal source of revenues is fees charged to clients based on a percentage of net collections of the client's accounts receivable. They recognize revenue and bill their clients when the clients receive payment on those accounts receivable. Our RCM business typically receive payment from the client within 30 days of billing. The fees vary depending on specialty, size of practice, payer mix, and complexity of the billing. In addition to the collection fee revenue, this segment also earns fees from the various consulting services that they provide, including medical practice management services, managed care contracting, coding and reimbursement services and transcription services. Consulting services are recognized as revenue at the time services are performed.

**D. Business Combinations**

The Company accounts for all business combinations using the acquisition method of accounting. Under this method, assets and liabilities, including any remaining non-controlling interests, are recognized at fair value at the date of acquisition. The excess of the purchase price over the fair value of assets acquired, net of liabilities assumed, and non-controlling interests is recognized as goodwill. Certain adjustments to the assessed fair values of the assets, liabilities, or non-controlling interests made subsequent to the acquisition date, but within the measurement period, which is up to one year, are recorded as adjustments to goodwill. Any adjustments subsequent to the measurement period are recorded in income. Any cost or equity method interest that the Company holds in the acquired company prior to the acquisition is re-measured to fair value at acquisition with a resulting gain or loss recognized in income for the difference between fair value and the existing book value. Results of operations of the acquired entity are included in the Company's results from the date of the acquisition onward and include amortization expense arising from acquired tangible and intangible assets.

Identifiable Intangible assets are valued based on the discounted value of earning potential of contracts pertaining to those business segments.

As part of an acquisition consideration, the Company may include, a contingent consideration component to the sellers/ identified management team of the acquired company. Contingent consideration is typically payable based on achieving certain revenue and profit levels. At each level of base, high and low scenario cases, this contingent consideration is discounted to the present value at the time of acquisition and recorded as a liability. This liability is adjusted to fair value at each reporting date.

All expenses relating to the acquisitions are expensed as incurred.

**E. Estimates**

The preparation of consolidated financial statements in conformity with U.S. generally accepted accounting principles requires us to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosures of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period. While we believe current estimates are reasonable and appropriate, actual results could differ from those estimates.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

**F. Concentrations of Credit Risk**

Factors that could adversely impact our operations or consolidated financial results include, but are not limited to, the following: deterioration of the credit markets, loss of large clients, ability to protect our intellectual property and confidential information, interest rate increases, and changes in healthcare legislation.

We monitor our operations with a view to minimize the impact to our overall business that could arise as a result of the risks and uncertainties inherent in our business.

**G. Cash and Equivalents**

We consider all short-term investments with an original maturity of three months or less to be cash equivalents. As of December 31, 2015 and 2014, respectively, the Company had no cash equivalents.

**H. Accounts Receivable and Allowance for Doubtful Accounts**

RCM business evaluates the need for an allowance using historical loss experience and the assessment of other risks. The following table enumerates the allowances made on account of this business

|                                  | December 31, 2015 | December 31, 2014 |
|----------------------------------|-------------------|-------------------|
| Allowances for doubtful accounts | $ 315,746         | $ 62,395          |

IPS' affiliated medical groups grant credit without collateral to its patients, most of which are insured under third-party payer arrangements. The allowance for doubtful accounts that relates to patient service revenues is based on an evaluation of potentially uncollectible accounts. The allowance for doubtful accounts includes a reserve for 100% of the accounts receivable older than 150 days. Establishing an allowance for bad debt is subjective in nature. IPS uses historical collection percentages to determine the estimated allowance for bad debts, and adjusts the percentage on a quarterly basis.

|                                  | December 31, 2015 | December 31, 2014 |
|----------------------------------|-------------------|-------------------|
| Allowances for doubtful accounts | $ 1,262,871       | $ 941,889         |

We typically do not charge late fees or interest on past due accounts.

**I. Inventory**

Inventory consists of vaccines, which are stated at the lower of cost or market. Cost is determined under the first-in, first-out method.

**J. Recent Accounting Pronouncements**

From time to time, new accounting pronouncements are issued by the Financial Accounting Standards Board ("FASB") and are adopted by us as of the specified effective date. The Company believes that the impact of recently adopted and recently issued accounting pronouncements did not have a material impact on its consolidated financial position, results of operations, and cash flows for 2015.

## CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

**On May 8, 2015, FASB issued ASU 2015-08,** "'Business Combinations (Topic 805): Pushdown Accounting - Amendments to SEC Paragraphs Pursuant to Staff Accounting Bulletin No. 115" ("ASU 2015-08"). The amendments in ASU 2015-08 amend various SEC paragraphs included in the FASB's Accounting Standards Codification to reflect the issuance of Staff Accounting Bulletin No. 115 ("SAB 115"). SAB 115 rescinds portions of the interpretive guidance included in the SEC's Staff Accounting Bulletins series and brings existing guidance into conformity with ASU No. 2014-17, "Business Combinations (Topic 805): Pushdown Accounting," which provides an acquired entity with an option to apply pushdown accounting in its separate financial statements upon occurrence of an event in which an acquirer obtains control of the acquired entity. The amendments in this adoption were effective upon issuance. The adoption of this ASU did not significantly impact the consolidated financial statements.

**On August 12, 2015, FASB issued ASU 2015-14,** Revenue *from Contracts with* Customers (Topic 606): In May 2014, the FASB and the International Accounting Standards Board (IASB) issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606). The standard's core principle is that a company will recognize revenue when it transfers promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services. In doing so, companies will need to use more judgment and make more estimates than under previous guidance. These may include identifying performance obligations in the contract, estimating the amount of variable consideration to include in the transaction price and allocating the transaction price to each separate performance obligations. In July 2015, the FASB approved the proposal to defer the effective date of ASU 2014-09 by one year. Early adoption is permitted after December 15, 2016, and the standard is effective for public entities for annual reporting periods beginning after December 15, 2017 and interim periods therein. We are currently evaluating the impact of ASU 2014-09 on our consolidated financial statements and disclosures.

**On August 18, 2015, FASB issued ASU 2015-15,** Presentation and Subsequent Measurement of Debt Issuance Costs associated with Line-of-Credit Arrangements. ASU 2015-15 is being issued to clarify the SEC staff's position on presentation and measuring debt issuance costs incurred in connection with line-of-credit arrangements given the lack of guidance on this topic in ASU 2015-03, *Simplifying the Presentation of Debt Issuance Costs*. The SEC staff has announced that it would 'not object to an entity deferring and presenting debt issuance costs as an asset and subsequently amortizing the deferred debt issuance costs ratably over the term of the line-of-credit arrangement. For public business entities, the amendments in this Update are effective for financial statements issued for fiscal years beginning after December 15, 2015. We do not expect the adoption of ASU 2015-15 to have a material effect on our consolidated financial statements and disclosures.

**On September 25, 2015, FASB issued ASU 2015-16** Business Combinations (Topic 805): Topic 805 requires that an acquirer retrospectively adjust provisional amounts recognized in a business combination, during the measurement period. To simplify the accounting for adjustments made to provisional amounts, the amendments in the Update require that the acquirer recognize adjustments to provisional amounts that are identified during the measurement period in the reporting period in which the adjustment amount is determined. The acquirer is required to also record, in the same period's financial statements, the effect on earnings of changes in depreciation, amortization, or other income effects, if any, as a result of the change to the provisional amounts, calculated as if the accounting had been completed at the acquisition date. In addition an entity is required to present separately on the face of the income statement or disclose in the notes to the financial statements the portion of the amount recorded in current-period earnings by line item that would have been recorded in previous reporting periods if the adjustment to the provisional amounts had been recognized as of the acquisition date. For public business entities, the amendments in this Update are effective for financial statements issued for fiscal years beginning after December 15, 2015. We do not expect the adoption of ASU 2015-16 to have a material effect on our consolidated financial statements and disclosures.

**On November 20, 2015, FASB issued ASU 2015-17** Income Taxes (Topic 740): Topic 740, Income Taxes, requires an entity to separate deferred income tax liabilities and assets into current and noncurrent amounts in a classified statement of financial position. Deferred tax liabilities and assets are classified as current or noncurrent based on the classification of the related asset or liability for financial reporting. Deferred tax liabilities and assets that are not related to an asset or liability for financial reporting are classified according to the expected reversal date of the temporary difference. To simplify the presentation of deferred income taxes, the amendments in this Update require that deferred income tax liabilities and assets be classified as noncurrent in a classified statement of financial position. For public business entities, the amendments in this Update are effective for financial statements issued for fiscal years beginning after December 15, 2016. We do not expect the adoption of ASU 2015-17 to have a material effect on our consolidated financial statements and disclosures.

**On February 25, 2016, FASB issued ASU 2016-02** Leases (Topic 842): The amendments in this Update create Topic 842, Leases, and supersede the leases requirements in Topic 840, Leases. Topic 842 specifies the accounting for leases. The objective of Topic 842 is to establish the principles that lessees and lessors shall apply to report useful information to users of financial statements about the amount, timing, and uncertainty of cash flows arising from a lease. For public business entities, the amendments in this Update are effective for financial statements issued for fiscal years beginning after December 15, 2018. We are currently evaluating the impact of ASU 2016-02 on our consolidated financial statements and disclosures.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

**K.   Deferred Rent**

Deferred rent consists of rent escalation and lease incentive terms related to the Company's operating leases for its facilities. Deferred rent represents the difference between actual operating lease payments due and straight-line rent expense, which is recorded by the Company over the term of the lease, including any construction period. The excess of the difference between actual operating lease payments due and straight-line rent expense is recorded as a deferred credit in the early periods of the lease when cash payments are generally lower than straight-line rent expense, and is reduced in the later periods of the lease when payments begin to exceed the straight-line expense. Deferred rent accrued is $605,149 at December 31, 2015 and $532,349 at December 31, 2014.

**L.   Goodwill and Intangible Assets**

Goodwill represents the excess of cost over the fair value of net assets of companies acquired in business combinations accounted for using the purchase method.

Intangible assets include customer contracts and relationships and covenants not-to-compete acquired in connection with acquisitions. These intangible assets are amortized on a straight-line basis, which reflects the pattern in which economic benefits are expected to be realized. The Company concluded that use of the straight-line method was appropriate as the majority of the cash flows are expected to be recognized ratably over the estimated useful lives, without a significant degradation of the cash flows over time. The customer relationships and associated contracts represent the most significant portion of the value of the purchase price for every acquisition.

Goodwill and Intangibles are reviewed for possible impairment, annually or upon the occurrence of an event or when circumstances indicate that a reporting unit's carrying amount is greater than its fair value.

Identified Intangible assets are amortized using straight-line method over their estimated useful lives as follows:

|  | Estimated useful life |
|---|---|
| Management service agreements | 25 years |
| Client relationships | 5 years |
| Group Purchase agreements | 5 years |
| Trade name | 5 years |
| Non-compete agreement | 5 years |

Amortization is computed at rates considered sufficient to amortize the cost of the assets, using the straight-line method over their estimated useful lives. Intangibles were amortized by $3,378,174 and $1,887,247 for the years ended December 31, 2015 and December 31, 2014, respectively.

**M. Software Development Costs**

We capitalize software development costs in accordance with ASC 985-20, Costs of Software to be Sold, Leased, or Marketed. Research costs and software development costs, prior to the establishment of technological feasibility, determined based upon the creation of a working model, are expensed as incurred. Our software capitalization policy currently defines technological feasibility as a functioning beta test prototype with a confirmed working model, within a reasonably predictable range of costs. Additionally, technological feasibility is established when the Company has completed all planning, designing, coding, and testing activities that are necessary to establish that the product can be produced to meet its design specifications including functions, features, and technical performance requirements. Our policy is to amortize the capitalized costs over the remaining estimated economic life of the product, which has been determined for the applicable product as three years. Software development costs capitalized in years ended December 31, 2015 and 2014 were $3,078,701 and $4,960,714, respectively.

**N.   Fair Value of financial instruments**

The carrying amounts for cash, cash equivalents, accounts payable, and accrued expenses approximate fair value because of their short-term nature. At December 31, 2015, the carrying value of the Term Loan is $14.92 million. See note 11 for further discussion of notes payable.

12

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

O. *Fair Value Measurements:*

The authoritative guidance for fair value measurements defines fair value as the price that would be received if an asset were to be sold or paid to transfer a liability in an orderly transaction between market participants on the measurement date. Market participants are buyers and sellers in the principal market that are (i) independent, (ii) knowledgeable, (iii) able to transact, and (iv) willing to transact. The guidance describes a fair value hierarchy based on the levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value which are the following:

Level 1 — Quoted prices in active markets for identical assets or liabilities.

Level 2 — Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or corroborated by observable market data for substantially the full term of the assets or liabilities.

Level 3 — Unobservable inputs that are supported by little or no market activity and that are significant to the value of the assets or liabilities.

**Quantitative Information about Level 3 Fair Value Measurements**

| Nature | Fair value at December 31, 2015 | Valuation Techniques | Unobservable input | Range |
|---|---|---|---|---|
| Measurement of contingent consideration – PPP | Nil | Option valuation using Monte Carlo simulation analysis | EBITDA growth rate | Year 1– (8.7)%  Year 2 – 15.2 % |
| | | | Annual EBITDA volatility | 35% |
| | | | Revenue growth rate | Year 1– (1.5)%  Year 2 - 8.4% |
| | | | Annual Revenue volatility | 18% |
| Measurement of contingent consideration – Northstar | $6,784,728 | Option valuation using Monte Carlo simulation analysis | EBITDA growth rate | Year 1- 40.0%  Year 2 – N/A Year 3 – N/A |
| | | | Annual EBITDA volatility | 35% |
| | | | Revenue growth rate | Year 1- 20.3%  Year 2 - 12.9% Year 3 - 6.2% |
| | | | Annual Revenue volatility | 18% |
| | | | Annual share price volatility | 68% |
| Measurement of contingent consideration – Phoenix | $3,568,903 | Option valuation using Monte Carlo simulation analysis | EBITDA growth rate | Year 1- 40.0%  Year 2 – N/A Year 3 – N/A |
| | | | Annual EBITDA volatility | 35% |
| | | | Revenue growth rate | Year 1- 20.3%  Year 2 - 12.9% Year 3 - 6.2% |
| | | | Annual Revenue volatility | 18% |
| | | | Annual share price volatility | 68% |

Contingent consideration for Northeast Medical Solutions has been settled in 2015 and has a carryforward balance of $100,000. $50,000 is payable on March 31, 2016 and balance is payable on March 31, 2017

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

**P. Income Taxes**

Provisions for income taxes are based on taxes payable or refundable for the current year and deferred taxes on temporary differences between the tax basis of assets and liabilities and their reported amounts in the consolidated financial statements. Deferred tax assets and liabilities are included in the consolidated financial statements at currently enacted income tax rates applicable to the period in which the deferred tax assets and liabilities are expected to be realized or settled. As changes in tax laws or rates are enacted, deferred tax assets and liabilities are adjusted through the current period's provision for income taxes. A valuation allowance is provided for deferred tax assets if it is more likely than not that the asset will not be realizable.

The Company records a liability for unrecognized tax benefits resulting from uncertain tax positions taken (or expected to be taken) in a tax return before the uncertain tax positions are finally resolved with the taxing authority. If the Company considers that a tax position is "more-likely-than-not" to be sustained upon an audit by the taxing authority, based solely on the technical merits of the tax position, it recognizes the tax benefit. The Company measures the tax benefit by determining the largest amount that is greater than 50% likely of being realized upon settlement, presuming that the tax position is examined by the appropriate taxing authority that has full knowledge of all relevant information. The Company recognizes estimated future interest and penalties related to unrecognized tax positions, if any, as income tax expense in the consolidated statements of operations.

None of the Company's federal or state income tax returns are currently under examination by the Internal Revenue Service or state authorities. The Company is generally no longer subject to U.S. federal, state, or local income tax examinations by tax authorities for years before 2012.

**2. Dividends**

At the Company's Annual General Meeting, held on June 3, 2015 a final dividend of 2.9 cents per share, in respect of the financial year ended December 31, 2014 had been declared and paid by June 30, 2015. Total dividend paid is $176,390.

**3. Segment reporting information**

|  | Year ended December 31, 2015 | Year ended December 31, 2014 |
|---|---|---|
| **Revenue Cycle Management** |  |  |
| Revenues | $ 50,131,907 | $ 28,425,915 |
| Depreciation, Depletion and Amortization | 3,769,051 | 2,249,960 |
| Operating Income before Depreciation & Amortization | 16,145,524 | 7,549,170 |
| **GP & Corporate** |  |  |
| Revenues | 7,666,437 | 7,048,604 |
| Depreciation, Depletion and Amortization | 930,444 | 991,481 |
| Operating Income before Depreciation & Amortization | 6,338,577 | 5,179,558 |
| **Practice Management:** |  |  |
| Revenues | 18,936,725 | 19,131,308 |
| Depreciation, Depletion and Amortization | 6,071 | 9,099 |
| Operating Income before Depreciation & Amortization | 1,420,523 | 1,505,971 |

Corporate expenses that are incurred for the company's general administration have not been apportioned to other business segments. These costs are grouped under General Purchasing and Corporate segment

The operating segments are identified and reported on the basis of internal reports about components of the group that are regularly reviewed by the Management Board to assess the performance of the segments.

The group's internal management reporting is structured primarily on the basis of the market segments in which the 3 operating segments – Revenue Cycle Management, Practice Management and General Purchasing (GP) & Corporate - operate.

Management assesses the performance of segments based on the measures of revenue and earnings before depreciation, interest and taxes (EBDIT), whereby the EBDIT measure includes allocations of expenses from supporting functions within the group.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

Company runs shared services for each of its three segments. All resources, who form part of general management & administration, HR, finance and accounting, IT, call center are part of shared services that are used by one or more segments and have been included in the reallocation.

Such allocations have been determined by the best management estimates based on number of resources served, volume of transactions processed and or relevant measures that reflect the level of benefits of these functions to each of the operating segments. As the 3 operating segments serve only external customers, there is no inter-segment revenue. Interest income and expenses and tax are not allocated to the segments. There is no measure of segment (non-current) assets and/or liabilities provided to the Management Board.

**Reconciliation of reportable segment revenues and profit to the consolidated totals**

|  | Year ended December 31, 2015 | Year ended December 31, 2014 |
|---|---|---|
| Total Revenues for reportable segments | $ 76,735,069 | $ 54,605,827 |
| **Total Consolidated revenues** | $ 76,735,069 | $ 54,605,827 |
|  |  |  |
| Operating profit before depreciation and amortization for reportable segments | $ 23,904,624 | $ 14,234,699 |
| Depreciation & amortization | (4,705,566) | (3,250,540) |
| Interest expense | (2,216,354) | (3,035,955) |
| Contingent consideration adjustment | (1,075,899) | - |
| Fees paid to debt providers | - | (2,164,089) |
| Amortization of deferred finance fees | (363,044) | (3,213,194) |
| Other income (expense), net | (4,192,337) | (44,997) |
| Provision for income taxes | (4,392,347) | (888,071) |
| **Net income** | $ 6,959,077 | $ 1,637,853 |

**4.    Property and Equipment**

Property and equipment are presented at cost. Depreciation is computed at rates considered sufficient to depreciate the cost of the assets, using the straight-line method over their estimated useful lives, capital leases and leasehold improvements are amortized over the lease term.

|  | Estimated useful life |
|---|---|
| Computer equipment | 2 - 5 years |
| Office equipment | 5 - 7 years |
| Furniture and fixtures | 5 - 7 years |
| Leasehold improvements | Lease term |
| Capital leases | Lease term |
| Medical and surgical equipment | 5 years |
| Automobiles | 5 years |

Property and equipment, net consists of the following at December 31, 2015 and 2014:

|  | December 31 2015 | December 31 2014 |
|---|---|---|
| Computer equipment | $ 15,398,252 | $ 8,818,317 |
| Office equipment | 675,425 | 313,184 |
| Furniture and fixtures | 880,959 | 726,663 |
| Capital leases | 910,866 | 910,866 |
| Leasehold improvements | 145,200 | 126,852 |
| Medical and surgical equipment | 19,529 | 19,529 |
| Total | 18,030,231 | 10,915,411 |
| Less accumulated depreciation | (8,484,146) | (6,745,048) |
| **Property and equipment, net** | $ 9,546,085 | $ 4,170,363 |

We recorded depreciation expense related to the above assets of $1,327,392 and $1,363,293 for the years ended December 31, 2015 and 2014, respectively.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

The above asset categories include assets on capital lease:

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Computer equipment | $ 598,023 | $ 598,023 |
| Office equipment | 235,137 | 235,137 |
| Furniture and fixtures | 77,706 | 77,706 |
| Total | 910,866 | 910,866 |
| Less Accumulated Amortization | (910,866) | (910,866) |
| Net book value | $ - | $ - |

**5. Advertising and Business Promotion Costs**

Advertising and business promotion costs are charged to operations as incurred.

|  | Year ended December 31, 2015 | Year ended December 31, 2014 |
|---|---|---|
| Advertisement and business promotion costs | $ 255,863 | $ 78,410 |

**6. Deferred finance costs**

The Company incurred $1,185,000 towards debt syndication fees for new debt funding in 2013. This was categorized as deferred finance costs and was being amortized over the term of the debt. On March 31, 2014, this funding arrangement was replaced by a new funding and the unamortized balance of $938,125 was expensed on that date.

On March 31, 2014 as part of the new loan arrangement, $1,655,000 was incurred towards deferred finance costs on new financing arrangement.

On September 3 2014, the Company modified terms of the new financing arrangement resulting in a write down of the deferred finance fee. The deferred finance fees amortized for years ended December 31, 2015 and 2014 are $363,044 and $1,759,984, respectively.

**7. Acquisitions**

1) On April 1, 2014, the Company's parent, Constellation Health LLC (Constellation), acquired North East Medical Solutions (NEMS), a Revenue Cycle Management company, based out of Pennsylvania, USA. NEMS was acquired for a total consideration of $2.79 million for a 100% ownership with 100% voting rights. Constellation transferred this acquisition to Orion Healthcare, immediately thereafter on the same day.

*Purchase Price Allocation:*

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $1.4 million was recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The following sets forth the Company's purchase price allocation:

| Purchase Price | $ | 2,788,003 |
|---|---|---|
| Cash and cash equivalents | $ | 11,900 |
| Accounts receivable, net |  | 393,494 |
| Prepaid expenses and other current assets |  | 5,950 |
| Property and equipment, net |  | 617,545 |
| Intangible assets |  | 715,000 |
| Other assets, net |  | 15,178 |
| Accounts payable |  | (156,001) |
| Accrued Expenses |  | (173,688) |
| Current portion of capital lease obligations |  | (47,021) |
| **Net assets acquired** | $ | **1,382,357** |
| **Excess Purchase Price Allocated to Goodwill** | $ | **1,405,646** |

16

## CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

The Company has acquired intangible assets, not including goodwill, totaling approximately $715 thousand in the acquisition.

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Trade Name | $ | 220,000 |
| Non-Compete Agreements | | 15,000 |
| Customer Contracts | | 480,000 |
| **Total Identifiable Intangible Assets** | **$** | **715,000** |

A contingent consideration was set up for identified management team. This contingent consideration is based on minimum revenue generated for 2014 and 2015. A pool of $367 thousand and $474 thousand was allocated for 2015 and 2016 respectively. As a part of Purchase price allocation, on the date of acquisition of NEMS, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue for 2014 and 2015.

The earn-out liability was settled per agreement dated September 16, 2015. Terms of settlement include a total payment of $200,000 with $100,000 to be paid by November 15, 2015 and the balance in 2 equal payments by March 31, 2016 and September 16, 2016. $100,000 is shown as liability as of December 31, 2015

2) In February 2015, the Company's parent, Constellation Health, LLC (Constellation), acquired certain net Revenue Cycle Management assets (PPP herein), based out of New York, USA. PPP was acquired for a total consideration of $13.05 million by way of an asset purchase agreement. Constellation transferred this acquisition to Orion Healthcorp, immediately thereafter on the same day.

*Purchase Price Allocation:*

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $4.42 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The table below presents the purchase price along with a preliminary allocation of the purchase price to the assets acquired and liabilities assumed in the acquisition.

| Purchase Price | $ | 13,045,819 |
|---|---|---|
| Intangible assets | | 9,167,139 |
| Other assets, net | | 9,716 |
| Permitted loan payable | | (552,699) |
| **Net assets acquired** | **$** | **8,624,156** |
| **Excess Purchase Price Allocated to Goodwill** | **$** | **4,421,663** |

The Company has acquired intangible assets, not including goodwill, totaling approximately $9.17 million in the acquisition.

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Trade Name | $ | 1,175,553 |
| Customer Relationships | | 1,587,458 |
| Non-Compete Agreements | | 1,371,316 |
| PARCS Software | | 5,032,812 |
| **Total Identifiable Intangible Assets** | **$** | **9,167,139** |

The purchase price includes contingent consideration measured at fair value based on the estimated earned obligation to the sellers. This contingent consideration is based on minimum revenue and EBITDA generated for 2015 and 2016. As a part of Purchase price allocation, on the date of acquisition of PPP, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue and EBITDA for 2015 and 2016, less permitted indebtedness of approximately $600 thousand assumed per the agreement. The discounted liability on this account was accrued at $245 thousand. As of December 31, 2015, this liability is nil.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

The allocation of the purchase price reflected in the accompanying financial statements is preliminary and based upon estimates and assumptions that are subject to change with in the measurement period (up to one year from the closing of the acquisition). The measurement period remains open, pending completion of valuation procedures related to acquired assets and assumed liabilities.

PPP was acquired to foray into a different geographical area and increase the customer base. Along with organic growth plans, the company also constantly is looking for inorganic growth opportunities.

3) In September 2015, the Company's parent, Constellation Health LLC (Constellation), acquired equity ownership of Northstar First Health LLC (Northstar), a Revenue Cycle Management company, based out of New Jersey, USA. Northstar was acquired for a total consideration of $17.39 million by way of a unit purchase agreement. Constellation transferred this acquisition to Orion Healthcorp, immediately thereafter on the same day.

*Purchase Price Allocation:*

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $10.81 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The table below presents the purchase price along with a preliminary allocation of the purchase price to the assets acquired and liabilities assumed in the acquisition.

| Purchase Price | $ | 17,391,033 |
|---|---|---|
| Intangible assets | | 6,414,146 |
| Cash and cash equivalents | | 82,609 |
| Accounts receivable, net | | 121,628 |
| Property and equipment, net | | 403 |
| Other assets, net | | - |
| Accrued expenses | | (34,136) |
| Long term liabilities | | - |
| **Net assets acquired** | **$** | **6,584,650** |
| **Excess Purchase Price Allocated to Goodwill** | **$** | **10,806,383** |

The Company has acquired intangible assets, not including goodwill, totaling approximately $6.41 million in the acquisition.

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Trade Name | $ | 1,584,255 |
| Customer Relationships | | 1,812,105 |
| Non-Compete Agreements | | 3,017,786 |
| **Total Identifiable Intangible Assets** | **$** | **6,414,146** |

The purchase price includes contingent consideration measured at fair value based on the estimated earned obligation to the sellers. This contingent consideration is based on minimum revenue and EBITDA generated for 2016, 2017 and 2018. As a part of Purchase price allocation, on the date of acquisition of Northstar, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue and EBITDA for 2016, 2017 and 2018,. The discounted liability on this account was accrued at $5.87 million. Fair value for this discounted liability as of December 31, 2015, is $6.78 million. To the extent earned in the designated periods subsequent to closing, it is payable in three installments of parent shares. 2,991,808 shares allocated for this purpose

The allocation of the purchase price reflected in the accompanying financial statements is preliminary and based upon estimates and assumptions that are subject to change with in the measurement period (up to one year from the closing of the acquisition). The measurement period remains open, pending completion of valuation procedures related to acquired assets and assumed liabilities.

## CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

4) In September 2015, the Company's parent, Constellation Health LLC (Constellation), acquired certain Revenue Cycle Management company assets hereinafter Phoenix, based out of New Jersey, USA. Phoenix was acquired for a total consideration of $13.66 million by way of an asset purchase agreement. Constellation transferred this acquisition to Orion Healthcorp, immediately thereafter on the same day.

*Purchase Price Allocation:*

The allocation of purchase price is based on management's judgment after evaluating several factors, including, but not limited to, valuation assessments of tangible and intangible assets. The excess of the total purchase price over the fair value of assets acquired and the liabilities assumed of $9.03 million is recorded as goodwill. The goodwill arising from the Acquisition consists largely of the commercial potential of the Company and the value of the assembled workforce.

The table below presents the purchase price along with a preliminary allocation of the purchase price to the assets acquired and liabilities assumed in the acquisition.

| | | |
|---|---|---|
| Purchase Price | $ | 13,660,987 |
| Intangible assets | | 4,561,958 |
| Property and equipment, net | | 65,264 |
| Other assets, net | | 1,850 |
| Net assets acquired | $ | 4,629,072 |
| Excess Purchase Price Allocated to Goodwill | $ | 9,031,915 |

The Company has acquired intangible assets, not including goodwill, totaling approximately $4.56 million in the acquisition.

| *Identifiable Intangible Assets:* | | |
|---|---|---|
| Trade Name | $ | 369,728 |
| Software | | 1,915,711 |
| Customer Relationships | | 82,574 |
| Non-Compete Agreements | | 2,193,945 |
| Total Identifiable Intangible Assets | $ | 4,561,958 |

The purchase price includes contingent consideration measured at fair value based on the estimated earned obligation to the sellers. This contingent consideration is based on minimum revenue and EBITDA generated for 2016, 2017 and 2018. As a part of Purchase price allocation, on the date of acquisition of Phoenix, this liability was discounted to the present value based on the base, best and low scenarios of achieving the targeted revenue and EBITDA for 2016, 2017 and 2018,. The discounted liability on this account was accrued at $3.16 million. Fair value this discounted liability as of December 31, 2015, is $3.57 million. To the extent earned in the designated periods subsequent to closing, it is payable in three installments of parent shares. 1,569,506 shares allocated for this purpose

The allocation of the purchase price reflected in the accompanying financial statements is preliminary and based upon estimates and assumptions that are subject to change with in the measurement period (up to one year from the closing of the acquisition). The measurement period remains open, pending completion of valuation procedures related to acquired assets and assumed liabilities.

**8. Other Assets**

Other assets consist of the following at December 31, 2015 and 2014:

| | December 31, 2015 | | December 31, 2014 | |
|---|---|---|---|---|
| Deposits | $ | 278,156 | $ | 223,796 |
| Total | $ | 278,156 | $ | 223,796 |

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

9. **Prepaid and other current assets**

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Prepaid insurance | $ 149,698 | $ 393,024 |
| Prepaid rent | 184,215 | - |
| Prepaid maintenance | - | 270,620 |
| Prepaid - Others | 217,416 | - |
| Advance taxes | 54,415 | - |
| **Total** | **$ 605,744** | **$ 663,644** |

10. **Intangible Assets, excluding Goodwill, net**

Intangible assets, excluding goodwill, net consist of the following at December 31, 2015 and 2014:

|  | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Software tool - work in progress | $ 17,083,401 | $ 7,056,043 |
| Client relationships | 11,862,138 | 8,380,000 |
| Management service agreements | 2,000,000 | 2,000,000 |
| Group Purchasing agreements | 600,000 | 600,000 |
| Trade Name | 3,349,536 | 220,000 |
| Non-Compete | 6,598,047 | 15,000 |
|  | 41,493,122 | 18,271,043 |
| Less accumulated amortization | (6,229,588) | (2,851,414) |
| **Net amount** | **$ 35,263,534** | **$ 15,419,629** |

Estimated future annual amortization of our identifiable intangible assets is as follows:

Period ending December 31:

| | |
|---|---|
| Year ended December 31, 2016 | $ 10,256,411 |
| Year ended December 31, 2017 | 10,256,411 |
| Year ended December 31, 2018 | 9,242,392 |
| Year ended December 31, 2019 | 2,754,694 |
| Year ended December 31, 2020 | 1,356,958 |
| Thereafter | 1,396,668 |
| **Total** | **$ 35,263,534** |

11. **Line Of Credit And Long-Term Debt**

The Company entered into a financing arrangement on June 17, 2013 Line of Credit facility and Term Loan.

The credit facility provided for maximum borrowing of $2,000,000 and maturing on May 31, 2017. The bank interest rate was 9.50%. The line of credit was collateralized by substantially all the assets of the Company. Term Loan, Type A, for $9,000,000 at a fixed interest rate 11%, and Term Loan, Type B, for $6,500,000 at a fixed interest rate 12% plus an additional 3% PIK interest. The term loans maturing on May 31, 2017

The Company entered into a new loan agreement dated March 31 2014 to replace the loan facility entered on June 17, 2013. The new loan facility was a $40,000,000 Senior debt facility, bearing fixed interest at 10.00%, interest payable monthly, plus an additional 2% payable in kind interest. Principal payments start from June 30 2015, maturing on March 31, 2018, collateralized by a blanket lien on all assets

This loan agreement was modified and amended in September 2014 reducing our facility to $23,000,000. Interest rate was fixed at higher of (a) 3 month LIBOR (**Base rate**) plus 9% and (b) 11%, without payment of kind interest. The maturity date was amended to September 30, 2017.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED
FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

Long-term debt consisted of the following at December 31, 2015 and 2014:

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| $23,000,000 senior note payable to a financial institution, bearing interest at higher of (a) 3 month LIBOR (**Base rate**) plus 9% and (b) 11%, interest payable monthly, principal payments monthly based on schedule, maturing on September 30, 2017, collateralized by a blanket lien on all assets. | $ 14,922,349 | $ 20,958,879 |
| $600,000 note payable for acquisition of P.C Advantage in November 2014 by Physicians Practice Plus, LLC | 407,877 | - |
| Total | 15,330,226 | 20,958,879 |
| Less current maturities | (4,848,632) | (4,631,771) |
| **Long term debt** | $ 10,481,594 | $ 16,327,108 |

Future aggregate annual maturities of the debt are as follows:

| Period ending: | | |
|---|---|---|
| Year ended December 31, 2016 | $ | 4,848,632 |
| September 30, 2017 | | 10,481,594 |
| **Total debt** | $ | 15,330,226 |

Our credit agreement for our Term loan contains certain financial covenants that require us to maintain a maximum leverage ratio and other customary terms and conditions. The Company is in compliance with all covenants as of December 31, 2015

**12. Accrued Expenses**

Accrued expenses consisted of the following at December 31, 2015 and 2014:

| | December 31 2015 | December 31 2014 |
|---|---|---|
| Compensation and related taxes | $ 1,031,243 | $ 709,819 |
| Interest | 171,064 | 209,496 |
| Professional fees payable | 669,848 | 295,211 |
| Acquisition fees payable | 1,860,000 | - |
| Other | 690,955 | 609,060 |
| Total | $ 4,423,110 | $ 1,823,586 |

**13. Operating Leases**

We lease our facilities and corporate office space under operating leases that expire in various years through 2022. The leases provide for annual operating expense increases. Annual rental payments related to our facility leases totaled $2,118,097 and $1,986,863 for the years ended December 31, 2015 and 2014, respectively.

Future annual base rental expenses under these lease agreements are as follows:

| | | |
|---|---|---|
| Year ended December 31, 2016 | $ | 1,803,982 |
| Year ended December 31, 2017 | | 1,365,943 |
| Year ended December 31, 2018 | | 1,213,813 |
| Year ended December 31, 2019 | | 1,117,400 |
| Year ended December 31, 2020 | | 654,618 |
| Thereafter | | 494,616 |
| **Total** | $ | 6,650,373 |

21

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

14. **Other expense, net**

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| Acquisition related expenses | $ 3,250,000 | $ - |
| Contingent consideration settlement | (538,700) | - |
| Settlements | 980,499 | - |
| Franchisee taxes | 229,463 | 44,997 |
| **Total** | **$ 3,921,262** | **$ 44,997** |

15. **Income Taxes**

The provision for income taxes for the year ended December 31, 2015 and 2014 is summarized as follows:

| | | December 31, 2015 | December 31, 2014 |
|---|---|---|---|
| Current: | | | |
| | Federal | $ 1,670,336 | $ 934,945 |
| | State | 960,090 | 161,408 |
| | Total | 2,630,426 | 1,096,353 |
| Deferred: | | | |
| | Federal | 1,841,415 | (177,040) |
| | State | (79,494) | (31,242) |
| Valuation allowance | | - | - |
| | Total | 1,761,921 | (208,282) |
| PROVISION (BENEFIT) FOR INCOME TAXES | | $ 4,392,347 | $ 888,071 |

For the years ended December 31, 2015 and 2014, respectively, the Company's effective income tax rate was 37%.

Our provision for federal and state taxes is comprised primarily of taxes from states that assess franchise and margin tax. Significant components of net deferred tax assets and liabilities are as follows:

| | December 31, 2015 | December 31, 2014 |
|---|---|---|
| **Deferred tax liabilities:** | | |
| Intangibles, amortization not available for tax deduction | $ (7,510,042) | $ (4,156,491) |
| Total deferred tax liabilities | (7,510,042) | (4,156,491) |
| | | |
| **Deferred tax assets:** | | |
| Net operating loss - Federal and State - Current | 252,000 | 252,000 |
| Net operating loss - Federal and State - Long term | 5,596,995 | 4,018,178 |
| Total deferred tax assets | 5,848,995 | 4,270,178 |
| | | |
| Total net deferred tax assets | (1,661,047) | 113,687 |
| Valuation allowance | - | - |
| Net deferred tax asset (liability) | $ (1,661,047) | $ 113,687 |

The Company has earned taxable income in the years ended December 31, 2015 and 2014, respectively, and is expected to earn taxable income in future years to claim the benefit of deferred tax asset; therefore the Company is not making any valuation allowance for the years ended December 31, 2015 and 2014, respectively.

## CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

On the acquisition date in 2013, we have identified a net operating loss carry forwards of approximately $28,000,000, which will begin to expire in 2033 year. As a result of the acquisitions and restructurings, we have undergone an ownership change and the utilization of the tax net operating losses are subject to potential limitations pursuant to Internal Revenue Code Section 382. These limitations could reduce the amount of the net operating loss carry forwards utilized in the future. Furthermore, the ultimate utilization of the carry forwards is dependent upon the timing and extent of our future profitability. The annual limitations combined with the expiration date of the carry forwards may prevent the utilization of the carry forwards.

Constellation Health LLC and the Company have entered into a tax indemnity agreement pursuant to which Constellation Health LLC has agreed to indemnify the Company against certain tax liabilities.

Prior to the Company's acquisition, the Company was a party to several promissory notes pursuant to which it borrowed funds from certain lenders. The lenders agreed to receive proceeds from the Company's acquisition in amounts less than the amounts owed by the Company under the notes, in full satisfaction of the Company's obligations under the notes (the "Cancellation of Debt").

Constellation Health LLC has agreed to indemnify the Company should the Cancellation of Debt cause the Company to be liable for any taxes in excess of the indemnification coverage provided in the Company's merger agreement but subject to a maximum of $12 million plus an amount equivalent to any applicable interest, fines, penalties, costs and charges thereon.

### 16. Stock Based Compensation, Warrants and Options

At December 31, 2015 and 2014, respectively, the Company did not have any stock-based employee compensation.

For the years ended December 31, 2015 and 2014, respectively, the Company did not have any impact, of our stock-based employee compensation plan, on our consolidated statements of operations.

Transactions with Other than Employees

The Company has cancelled all outstanding options upon acquisition and does not have any outstanding warrants or options as of December 31, 2015 and 2014, respectively. The Company also did not issue any warrants in the years ended December 31, 2015 and 2014, respectively.

There are also no outstanding restricted stock units and options as at year ended December 31, 2015.

### 17. 401(K) Plan

We have an employee retirement savings plan under Section 401(k) of the Internal Revenue Code for all eligible employees of Orion Healthcorp, Inc. Participants are permitted to defer compensation up to the dollar limitation as defined by the IRS for the taxable year. On a discretionary basis, we may match up to 50% of the first 6% of the non-highly compensated employee's deferrals. Orion's contributions vest beginning in the second year in equal installments over three years, and are 100% vested after four years. For the years ended December 31, 2015 and 2014, the Company did not contribute any sums to match the contributions.

### 18. Commitments and Contingencies

We are involved in various legal proceedings and claims arising in the ordinary course of business. Our management believes that the disposition of these additional matters, individually or in the aggregate, is not expected to have a materially adverse effect on our consolidated financial condition. However, depending on the amount and timing of such disposition, an unfavorable resolution of some or all of these matters could materially affect our future results of operations or cash flows in a particular period.

CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. AND SUBSIDIARIES CONSOLIDATED FINANCIAL STATEMENTS FOR YEARS ENDED DECEMBER 31, 2015 AND 2014

19.   **Related party transactions**

During the year ended December 31, 2015, there were no related party transactions relating to sales and purchases.

First United Health LLC, a Delaware limited liability company ("FUH") and Constellation Health, LLC, a Delaware limited liability company (the "Company") entered into a consulting agreement ("Agreement") dated June 10, 2013, whereby FUH agreed to provide consulting services to the Company and further agreed for no extra charge to make available the services of Paul Parmar.  The term of the agreement is for five (5) years provided; however, that pursuant to Section 1.3 the Consultant after the third anniversary of the Agreement may terminate the Agreement by providing 60 days written notice to the Company prior to the third anniversary of the Agreement.  The Agreement, pursuant to Section 4.2, contains a right of first refusal to the Company. Further, pursuant to the Loan and Security Agreement with RCC Commercial, Inc., Parmar entered into a Non-Competition Agreement with FUH and the Company, whereby Parmar agreed for a period of two years after his termination to not compete against CH nor solicit its clients or customers anywhere in the world.

20.   **Subsequent events**

In December 2015, the Company announced its intention to raise £30 million (approximately $45.5 million) by way of placing up to 16,471,195 new common shares with existing and new investors. The Placing and the Subscription are each conditional, inter alia, on the passing by Shareholders of the Resolutions at the General Meeting which will give the Directors the required authority to allot the New Shares and to disapply pre-emption rights in respect of the issue of the New Shares on a non-pre-emptive basis.

Pursuant to Company's General Meeting held on January 6, 2016, it was approved that 18,751,195 new shares will be admitted to the AIM market on January 6, 2016. Gross proceeds of £30 million. (Approx. $45 million). The Company received $42.22 million from net proceeds. Additional 63,767 shares were issued to the placing agents for their services, in lieu of cash payments.

As part of the acquisition agreement for Northstar and Phoenix, 2,991,808 and 1,569,506 shares respectively, were issued in escrow as part of their contingent consideration liability. Excluding these, the total shares outstanding in Constellation, after secondary placement in January 2016, are 83,805,585.

In February 2016, the Company acquired certain assets of MDRX Medical Billing, LLC ("MDRX"), a Revenue Cycle Management Company. MDRX was acquired for a total consideration of $30.00 million by way of an asset purchase agreement. Part of the $42.22 million proceeds raised from the placement of the 18,751,195 new shares admitted to the AIM market in January 2016 were used to fund the acquisition.

**Timothy Parlatore**

| | |
|---|---|
| **From:** | Paul Parmar <paulparmar@outlook.com> |
| **Sent:** | Monday, August 6, 2018 6:32 PM |
| **To:** | Timothy Parlatore |
| **Subject:** | FW: Constellation  Health - CHT documents - Actual Financial Package 2013 upto date Feb 2016 |
| **Attachments:** | Constellation consolidated financial package - Feb 2016.xlsx |

-----Original Message-----
From: Paul Parmar
Sent: Tuesday, April 5, 2016 4:20 PM
To: Doug Newton <newton@cc.capital>; Tomer Vardi <tomer@inter-planet.com>
Cc: Chinh <ccnewyork10@gmail.com>
Subject: RE: Constellation Health - CHT documents - 4 Actual Financial Package 2013 upto date Feb 2016

1

| | Q3 13 | Q4 13 | Jan-14 | Feb-14 |
|---|---|---|---|---|
| Net Income | | | 755,118 | 532,849 |
| Acquisition & Debt deal fees paid by parent | | | | |
| Depreciation | | | 107,512 | 118,428 |
| Amortization | | | 148,333 | 148,333 |
| Amortization of Financing Fees | | | 24,688 | 24,688 |
| Interest Expense | | | 157,076 | 141,387 |
| Income Taxes | | | - | - |
| **EBITDA** | **1,592,444** | **2,094,070** | **1,192,726** | **965,686** |
| | | | | |
| Sale/(purchase) of property & equipment | (20,558) | (30,804) | (15,426) | (2) |
| Purchase/ Development of Intangibles | (898,057) | (898,057) | (432,201) | (432,202) |
| **Total Capital Expenditures** | **(918,615)** | **(928,861)** | **(447,627)** | **(432,204)** |
| | | | | |
| **Cash paid for Income Taxes [3]** | - | - | - | - |
| **Cash paid of Interest [4]** | - | - | 157,076 | 141,387 |
| | | | | |
| | | | | |
| Dividend & Distributions | | | - | - |
| **Total Dividends / Distributions** | - | - | - | - |
| | | | | |
| Cash Balance | | | 3,012,674 | 2,706,515 |
| Current Assets | | | 11,802,779 | 11,616,351 |
| Current Liabilities | | | 5,960,577 | 5,457,285 |
| | | | | |
| **Indebtedness** | | | | |
| Indebtedness for Borrowed Money | | | 16,033,005 | 15,957,779 |
| Earnouts | | | - | - |
| | | | | |
| **Total Indebtedness** | | | | |
| | | | | |
| | | | | |
| **Fixed Charge Coverage Ratio** | | | | |
| LTM EBITDA | | | | |
| LTM Capital Expenditures | | | | |
| LTM Cash Payments for Income Taxes | | | | |
| Total Numerator | | | | |
| | | | | |
| LTM Cash Payments for Interest | | | | |
| Cash Payments for Dividends / Distributions | | | | |
| Cash Payments for Equity Interest Redemptions | | | | |
| Cash Payments for Earnouts | | | | |
| Total Demoninator | | | | |
| | | | | |
| **Fixed Charge Coverage Ratio (Actual)** | | | | |
| **Fixed Charge Coverage Ratio required** | | | | |

**Pass / Fail**

**Leverage Ratio**
Total Indebtedness
LTM EBITDA
**Leverage Ratio (Actual)**
**Leverage Ratio required**
**Pass / Fail**

**Senior Leverage Ratio**
Total Senior Indebtedness
LTM EBITDA
**Senior Leverage Ratio (Actual)**
**Senior Leverage Ratio required**
**Pass / Fail**

**Interest Coverage Ratio**
LTM EBITDA
LTM Cash Interest Payments
**Interest Coverage Ratio (Actual)**
**Interest Coverage Ratio required**
**Pass / Fail**

**Minimum Liquidity**
Unrestricted Cash
Minimum Liquidity
**Pass / Fail**

**Captial Expenditures**
LTM Capital Expenditures
Maximum Capital Expenditures
**Pass / Fail**

**Minimum Current Ratio**
Current Assets
Current Liabilities
**Current Ratio (Actual)**
**Current Ratio required**
**Pass / Fail**

**Minimum EBITDA**

LTM EBITDA (Actual)

EBITDA

**Pass / Fail**

| | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 |
|---|---|---|---|---|---|---|---|
| | 892,023 | (479,499) | 672,665 | (621,839) | 799,136 | 559,132 | 814,934 |
| | | | | - | | - | - |
| | 111,410 | 119,901 | 119,688 | 117,510 | 116,511 | 111,014 | 110,540 |
| | 148,333 | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 |
| | 24,688 | 938,125 | 24,574 | 24,574 | 24,574 | 24,574 | 24,574 |
| | 157,845 | 633,278 | 207,181 | 200,455 | 206,533 | 206,351 | 228,003 |
| | - | - | - | 1,311,644 | | - | - |
| | **1,334,299** | **1,372,055** | **1,184,358** | **1,192,593** | **1,307,005** | **1,061,321** | **1,338,301** |
| | (616) | 349 | (3,206) | (633) | (11,315) | (25,955) | (97,462) |
| | (432,201) | (432,201) | (432,202) | (432,202) | (553,037) | (553,033) | (527,341) |
| | **(432,817)** | **(431,853)** | **(435,408)** | **(432,835)** | **(564,352)** | **(578,988)** | **(624,803)** |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | **157,845** | **633,278** | **207,181** | **200,455** | **206,533** | **206,351** | **228,003** |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - |
| | 3,758,805 | 464,691 | 1,484,825 | 1,830,409 | 1,327,516 | 1,397,279 | 2,497,217 |
| | 12,963,645 | 11,282,691 | 12,490,101 | 13,413,631 | 12,979,102 | 13,943,658 | 15,156,266 |
| | 6,235,945 | 5,124,227 | 5,789,867 | 7,712,082 | 6,737,218 | 7,425,794 | 8,152,909 |
| | | | | | | | |
| | 15,882,779 | 23,000,000 | 23,000,000 | 23,000,000 | 23,000,000 | 23,000,000 | 23,000,000 |
| | - | 638,700 | 638,700 | 638,700 | 638,700 | 638,700 | 638,700 |
| | | | | **23,638,700** | | | **23,638,700** |
| | | | | | | | |
| | | | | 10,928,231 | | | 13,042,414 |
| | | | | (4,460,219) | (4,643,008) | (4,896,688) | (5,309,747) |
| | | | | - | | | - |
| | | | | 6,468,012 | | | 7,732,666 |
| | | | | 2,400,000 | | | 2,700,000 |
| | | | | - | | | - |
| | | | | - | - | - | - |
| | | | | 2,400,000 | | | 2,700,000 |
| | | | | **2.70x** | | | **2.86x** |
| | | | | **1.25x** | | | **1.25x** |

|  | Pass |  | Pass |
|---|---|---|---|
|  |  |  |  |
|  | 23,638,700 |  | 23,638,700 |
|  | 10,928,231 |  | 13,042,414 |
|  | **2.16x** |  | **1.81x** |
|  | **4.25x** |  | **4.25x** |
|  | Pass |  | Pass |
|  |  |  |  |
|  | 23,638,700 |  | 23,638,700 |
|  | 10,928,231 |  | 13,042,414 |
|  | **2.16x** |  | **1.81x** |
|  | **3.25x** |  | **3.25x** |
|  | Pass |  | Pass |
|  |  |  |  |
|  | 10,928,231 |  | 13,042,414 |
|  | 2,400,000 |  | 2,700,000 |
|  | **4.55x** |  | **4.83x** |
|  | **2.25x** |  | **2.25x** |
|  | Pass |  | Pass |
|  |  |  |  |
|  | 1,830,409 |  | 2,497,217 |
|  | 1,500,000 |  | 1,500,000 |
|  | Pass |  | Pass |

| 4,460,219 | 4,643,008 | 4,896,688 | 5,309,747 |
|---|---|---|---|
| 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 |
| Pass | Pass | Pass | Pass |

|  | 13,413,631 |  | 15,156,266 |
|---|---|---|---|
|  | 7,712,082 |  | 8,152,909 |
|  | **1.74x** |  | **1.86x** |
|  | **1.25x** |  | **1.25x** |
|  | Pass |  | Pass |

| 10,928,231 | 13,042,414 |
|---|---|
| 6,100,000 | 7,000,000 |
| **Pass** | **Pass** |

| | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 |
|---|---|---|---|---|---|---|---|
| | 537,064 | (128,053) | (2,695,678) | 776,980 | 898,821 | (704,941) | 1,296,578 |
| | - | 250,000 | 3,219,710 | - | - | 2,178,648 | - |
| | 108,381 | 107,631 | 114,768 | 105,271 | 104,271 | 103,254 | 102,902 |
| | 160,250 | 160,250 | 160,250 | 160,250 | 229,155 | 229,155 | 229,155 |
| | 24,574 | 24,574 | 24,574 | 27,491 | 27,491 | 27,491 | 27,491 |
| | 268,840 | 207,280 | 207,093 | 237,231 | 225,099 | 312,923 | 197,912 |
| | - | - | (423,573) | - | - | - | - |
| | **1,099,108** | **621,683** | **607,143** | **1,307,223** | **1,484,837** | **2,146,530** | **1,854,039** |
| | | | | | | | |
| | 16,953 | (52,183) | 120,834 | (557,045) | (511,311) | (572,822) | (598,623) |
| | (425,340) | (154,383) | (154,236) | (280,367) | (312,129) | (257,566) | (257,566) |
| | **(408,387)** | **(206,566)** | **(33,402)** | **(837,412)** | **(823,440)** | **(830,388)** | **(856,189)** |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | **268,840** | **207,280** | **207,093** | **237,231** | **225,099** | **312,923** | **197,912** |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - |
| | | | | | | | |
| | 3,213,197 | 1,568,846 | 18,136,336 | 16,989,425 | 16,871,679 | 2,882,894 | 3,232,586 |
| | 16,424,010 | 14,899,427 | 27,783,725 | 27,624,364 | 30,338,945 | 14,559,187 | 15,102,051 |
| | 7,249,538 | 6,966,988 | 6,681,579 | 6,250,613 | 7,179,214 | 6,631,371 | 6,386,976 |
| | | | | | | | |
| | 23,000,000 | 21,954,108 | 20,958,879 | 20,958,882 | 20,958,882 | 18,396,177 | 18,396,177 |
| | 638,700 | 638,700 | 638,700 | 638,700 | 638,700 | 884,412 | 884,412 |
| | | | **21,597,579** | | | **19,280,589** | |
| | | | | | | | |
| | | | 13,276,278 | | | 14,722,158 | |
| | (5,408,514) | (5,305,460) | (5,029,241) | (5,419,027) | (5,810,263) | (6,207,834) | (6,632,171) |
| | | | - | | | - | |
| | | | **8,247,037.0** | | | **8,514,323.9** | |
| | | | | | | | |
| | | | 2,715,000 | | | 2,811,503 | |
| | | | - | | | - | |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | | | 2,715,000 | | | 2,811,503 | |
| | | | | | | | |
| | | | **3.04x** | | | **3.03x** | |
| | | | **1.25x** | | | **1.25x** | |

| | | | | | | |
|---|---|---|---|---|---|---|
| | **Pass** | | | **Pass** | | |
| | | | | | | |
| | 21,597,579 | | | 19,280,589 | | |
| | 13,276,278 | | | 14,722,158 | | |
| | **1.63x** | | | **1.31x** | | |
| | **4.25x** | | | **4.25x** | | |
| | **Pass** | | | **Pass** | | |
| | | | | | | |
| | 21,597,579 | | | 19,280,589 | | |
| | 13,276,278 | | | 14,722,158 | | |
| | **1.63x** | | | **1.31x** | | |
| | **3.25x** | | | **3.25x** | | |
| | **Pass** | | | **Pass** | | |
| | | | | | | |
| | 13,276,278 | | | 14,722,158 | | |
| | 2,715,000 | | | 2,811,503 | | |
| | **4.89x** | | | **5.24x** | | |
| | **2.25x** | | | **2.25x** | | |
| | **Pass** | | | **Pass** | | |
| | | | | | | |
| | 18,136,336 | | | 2,882,894 | | |
| | 1,500,000 | | | 1,500,000 | | |
| | **Pass** | | | **Pass** | | |

| 5,408,514 | 5,305,460 | 5,029,241 | 5,419,027 | 5,810,263 | 6,207,834 | 6,632,171 |
|---|---|---|---|---|---|---|
| 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 |
| **Pass** | **Pass** | **Pass** | **Pass** | **Pass** | **Pass** | **Pass** |

| | | | | | | |
|---|---|---|---|---|---|---|
| | 27,783,725 | | | 14,559,187 | | |
| | 6,681,579 | | | 6,631,371 | | |
| | **4.16x** | | | **2.20x** | | |
| | **1.25x** | | | **1.25x** | | |
| | **Pass** | | | **Pass** | | |

| 13,276,278 | 14,722,158 |
| --- | --- |
| 7,500,000 | 8,250,000 |
| **Pass** | **Pass** |

| | May-15 | Jun-15 | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 |
|---|---|---|---|---|---|---|---|
| | 769,407 | (1,199,905) | 1,387,372 | 1,358,272 | (128,672) | 1,829,465 | 1,751,881 |
| | - | - | - | 390,882 | - | - | - |
| | 101,267 | 136,198 | 107,088 | 107,087 | 104,724 | 104,624 | 104,624 |
| | 229,155 | 229,155 | 229,155 | 229,155 | 380,161 | 380,161 | 380,161 |
| | 27,491 | 27,491 | 27,491 | 34,121 | 34,121 | 34,121 | 34,121 |
| | 204,542 | 198,157 | 211,961 | 198,981 | 212,410 | 188,025 | 182,941 |
| | - | 1,816,874 | - | - | - | - | - |
| | **1,331,862** | **1,207,970** | **1,963,067** | **2,318,499** | **602,745** | **2,536,396** | **2,453,728** |
| | | | | | | | |
| | (523,448) | (3,433,514) | (113,526) | 0 | (85,805) | (4,010) | (11,984) |
| | (257,566) | (325,922) | (519,716) | (173,601) | (173,601) | (173,601) | (173,601) |
| | **(781,014)** | **(3,759,436)** | **(633,242)** | **(173,601)** | **(259,406)** | **(177,611)** | **(185,585)** |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | **204,542** | **198,157** | **211,961** | **198,981** | **212,410** | **188,025** | **182,941** |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - |
| | | | | | | | |
| | 2,910,712 | 16,812,493 | 16,364,418 | 17,412,369 | 3,602,078 | 2,306,585 | 2,425,142 |
| | 15,651,908 | 29,791,420 | 31,253,549 | 33,533,744 | 19,496,113 | 19,167,899 | 19,262,642 |
| | 6,633,650 | 7,598,913 | 7,542,536 | 8,499,118 | 10,524,717 | 10,609,436 | 10,647,709 |
| | | | | | | | |
| | 18,396,177 | 17,219,484 | 17,238,234 | 17,238,234 | 16,080,291 | 16,080,291 | 16,080,291 |
| | 884,412 | 884,412 | 884,412 | 884,412 | 9,916,432 | 9,916,432 | 9,916,432 |
| | | | | | | | |
| | | **18,103,896** | | | **25,996,724** | | |
| | | | | | | | |
| | | 15,367,022 | | | 16,544,706 | | |
| | (6,977,777) | (10,304,378) | (10,373,267) | (9,967,881) | (9,602,483) | (9,371,708) | (9,350,727) |
| | | - | | | - | | |
| | | **5,062,644.4** | | | **6,942,222.6** | | |
| | | | | | | | |
| | | 2,733,364 | | | 2,677,967 | | |
| | | - | | | - | | |
| | | | | | | | |
| | - | - | - | - | - | - | - |
| | | 2,733,364 | | | 2,677,967 | | |
| | | | | | | | |
| | | **1.85x** | | | **2.59x** | | |
| | | **1.25x** | | | **1.25x** | | |

|  | Pass |  |  | Pass |  |  |
|---|---|---|---|---|---|---|
|  | 18,103,896 |  |  | 25,996,724 |  |  |
|  | 15,367,022 |  |  | 16,544,706 |  |  |
|  | **1.18x** |  |  | **1.57x** |  |  |
|  | **4.25x** |  |  | **4.25x** |  |  |
|  | Pass |  |  | Pass |  |  |
|  | 18,103,896 |  |  | 25,996,724 |  |  |
|  | 15,367,022 |  |  | 16,544,706 |  |  |
|  | **1.18x** |  |  | **1.57x** |  |  |
|  | **3.25x** |  |  | **3.25x** |  |  |
|  | Pass |  |  | Pass |  |  |
|  | 15,367,022 |  |  | 16,544,706 |  |  |
|  | 2,733,364 |  |  | 2,677,967 |  |  |
|  | **5.62x** |  |  | **6.18x** |  |  |
|  | **2.25x** |  |  | **2.25x** |  |  |
|  | Pass |  |  | Pass |  |  |
|  | 16,812,493 |  |  | 3,602,078 |  |  |
|  | 1,500,000 |  |  | 1,500,000 |  |  |
|  | Pass |  |  | Pass |  |  |

| 6,977,777 | 10,304,378 | 10,373,267 | 9,967,881 | 9,602,483 | 9,371,708 | 9,350,727 |
|---|---|---|---|---|---|---|
| 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 | 13,000,000 |
| Pass | Pass | Pass | Pass | Pass | Pass | Pass |

|  | 29,791,420 |  |  | 19,496,113 |  |  |
|---|---|---|---|---|---|---|
|  | 7,598,913 |  |  | 10,524,717 |  |  |
|  | **3.92x** |  |  | **1.85x** |  |  |
|  | **1.25x** |  |  | **1.25x** |  |  |
|  | Pass |  |  | Pass |  |  |

| 15,367,022 | 16,544,706 |
| 8,625,000 | 9,000,000 |
| **Pass** | **Pass** |

| | Dec-15 | Jan-16 | Feb-16 |
|---|---|---|---|
| | (1,083,128) | 799,947 | 1,003,375 |
| | - | - | - |
| | 103,297 | 205,567 | 205,748 |
| | 473,356 | 854,700 | 854,700 |
| | 34,121 | 34,121 | 34,121 |
| | 209,215 | 35,828 | 43,248 |
| | 2,551,125 | 490,290 | 614,972 |
| | **2,287,986** | **2,420,453** | **2,756,165** |
| | | | |
| | (9,800) | (859) | (301,295) |
| | (173,599) | - | (0) |
| | **(183,399)** | **(859)** | **(301,295)** |
| | | | |
| | | | |
| | - | - | - |
| | **209,215** | **35,828** | **43,248** |
| | | | |
| | | | |
| | | | |
| | - | - | - |
| | - | - | - |
| | | | |
| | 2,506,768 | 46,673,365 | 15,508,283 |
| | 18,335,529 | 63,926,151 | 32,665,344 |
| | 11,793,333 | 12,334,047 | 11,092,715 |
| | | | |
| | | | |
| | 14,922,349 | 15,922,349 | 15,922,349 |
| | 10,453,631 | 10,453,631 | 10,453,631 |
| | | | |
| | **25,375,980** | | |
| | | | |
| | | | |
| | | | |
| | 21,494,881 | | |
| | (9,500,724) | (8,664,170) | (8,142,025) |
| | - | | |
| | 11,994,157.5 | | |
| | | | |
| | 2,579,398 | | |
| | - | | |
| | | | |
| | - | - | - |
| | 2,579,398 | | |
| | | | |
| | **4.65x** | | |
| | **1.25x** | | |

**Pass**


25,375,980
21,494,881
**1.18x**
**4.25x**
**Pass**


25,375,980
21,494,881
**1.18x**
**3.25x**
**Pass**


21,494,881
2,579,398
**8.33x**
**2.25x**
**Pass**


2,506,768
1,500,000
**Pass**


| 9,500,724 | 8,664,170 | 8,142,025 |
|---|---|---|
| 13,000,000 | 13,000,000 | 13,000,000 |
| **Pass** | **Pass** | **Pass** |


18,335,529
11,793,333
**1.55x**
**1.25x**
**Pass**

21,494,881

9,375,000

**Pass**

## Constellation Healthcare Technologies, Inc.
**Consolidated Balance Sheet**

|  | Dec-12 | Jan-13 |
|---|---|---|
| Assets |  |  |
| Cash & Equivalents | 781,837 | 1,279,409 |
| Cash with restricted purposes- MIP from seller | - | - |
| Accounts Receivable, net | 6,922,652 | 7,184,376 |
| Inventory | 323,175 | 273,694 |
| Prepaid Expenses & other current assets | 1,237,161 | 1,284,863 |
|    Total Current Assets | 9,264,825 | 10,022,342 |
|  |  |  |
| PP&E, net | 1,015,045 | 986,357 |
| Intangible assets, excluding goodwill, net | 10,087,820 | 9,754,149 |
| Goodwill and Intangibles | 19,350,436 | 19,350,436 |
| Deferred tax asset |  |  |
| Deferred Finance costs | - | - |
| Other Assets, net | 328,922 | 309,636 |
| Total Assets | 40,047,048 | 40,422,920 |
|  |  |  |
| Liabilities & Equity |  |  |
| Accounts payable and accrued expenses | 5,463,596 | 5,824,043 |
| Provision for taxes |  |  |
| MIP Plan Payable from seller |  | - |
| Current portion of capital lease obligations | 46,524 | 42,703 |
| Current portion of long-term debt | 11,394,176 | 11,327,456 |
| Bank credit - Revolver | 37,119,688 | 37,487,195 |
|    Total Current Liabilities | 54,023,984 | 54,681,397 |
|  |  |  |
| Long Term Liabilities |  |  |
| Deferred tax liability | - | - |
| Earnout Payable | - | - |
| Sellers Payable |  |  |
| Long-term debt, net of current portion | - | - |
|    Total Long Term Liabilities | - | - |
| Total Liabiliies | 54,023,984 | 54,681,397 |
|  |  |  |
| Stockholders' Equity |  |  |
| Common Stock | 140,486 | 140,486 |
| Additional paid-in-capital | 69,158,983 | 69,158,988 |
| Retained earnings (Accumulated deficit) | (83,276,404) | (83,558,052) |
| Total Stockholders' Equity | (13,976,935) | (14,258,578) |
|  |  |  |
| Total Liabilities & Equity | 40,047,048 | 40,422,818 |
|  |  |  |
| *Working Capital* | *(44,759,159)* | *(44,659,055)* |

| Feb-13 | Mar-13 | Apr-13 | May-13 | June 14 2013 | June 15 2013 |
|---|---|---|---|---|---|
| 1,610,896 | 1,893,089 | 1,409,000 | 1,967,664 | 1,120,346 | 1,120,346 |
| - | | | | | |
| 7,159,801 | 6,720,543 | 6,810,872 | 6,453,625 | 6,174,324 | 6,174,324 |
| 291,486 | 303,942 | 277,328 | 271,933 | 271,933 | 271,933 |
| 1,328,848 | 1,685,228 | 1,573,292 | 1,478,932 | 1,456,634 | 1,456,634 |
| 10,391,031 | 10,602,802 | 10,070,492 | 10,172,154 | 9,023,237 | 9,023,237 |
| | | | | | |
| 942,448 | 901,561 | 1,019,400 | 982,382 | 960,381 | 960,381 |
| 9,420,478 | 9,086,807 | 8,753,136 | 8,419,465 | 8,263,752 | - |
| 19,350,436 | 19,350,436 | 19,350,436 | 19,350,436 | 19,350,436 | - |
| - | - | - | - | - | - |
| 290,349 | 271,063 | 251,776 | 232,490 | 232,490 | 232,490 |
| 40,394,742 | 40,212,669 | 39,445,240 | 39,156,927 | 37,830,296 | 10,216,108 |
| | | | | | |
| 6,214,420 | 6,093,659 | 5,459,980 | 5,274,056 | 4,509,559 | 4,509,559 |
| | | | | | - |
| 38,858 | 34,987 | 31,093 | 27,171 | 26,429 | 26,429 |
| 11,260,628 | 11,442,863 | 11,426,223 | 11,419,211 | 11,419,211 | - |
| 37,820,626 | 38,188,133 | 39,101,427 | 39,630,059 | 39,630,059 | - |
| 55,334,532 | 55,759,642 | 56,018,723 | 56,350,497 | 55,585,258 | 4,535,988 |
| | | | | | |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| 55,334,532 | 55,759,642 | 56,018,723 | 56,350,497 | 55,585,258 | 4,535,988 |
| | | | | | |
| 140,486 | 140,486 | 140,486 | 140,486 | 140,486 | 140,486 |
| 69,158,988 | 69,158,988 | 69,158,988 | 69,158,988 | 69,158,988 | 5,539,634 |
| (84,239,367) | (84,846,548) | (85,873,059) | (86,493,146) | (87,054,542) | - |
| (14,939,893) | (15,547,074) | (16,573,585) | (17,193,672) | (17,755,068) | 5,680,120 |
| 40,394,639 | 40,212,566 | 39,445,136 | 39,156,823 | 37,830,190 | 10,216,108 |
| (44,943,501) | (45,156,840) | (45,948,231) | (46,178,343) | (46,562,021) | 4,487,249 |

| June 30 2013 | Jul-13 | Aug-13 | Sep-13 | Oct-13 |
|---:|---:|---:|---:|---:|
| 1,893,054 | 2,476,725 | 2,332,922 | 1,683,953 | 2,987,576 |
| 400,000 | 400,000 | 300,000 | 266,000 | 97,000 |
| 5,634,338 | 5,814,312 | 6,153,087 | 6,332,290 | 6,272,239 |
| 288,565 | 297,148 | 267,622 | 386,213 | 376,782 |
| 1,153,335 | 1,177,069 | 1,082,318 | 1,143,482 | 934,540 |
| 9,369,292 | 10,165,254 | 10,135,949 | 9,811,938 | 10,668,137 |
| | | | | |
| 5,405,696 | 5,301,864 | 5,220,110 | 5,118,276 | 5,019,367 |
| 10,725,184 | 10,876,203 | 11,027,223 | 11,178,241 | 11,329,260 |
| 12,316,734 | 12,316,734 | 12,316,734 | 12,316,734 | 12,316,734 |
| 5,040,000 | 5,040,000 | 5,040,000 | 5,040,000 | 5,040,000 |
| 1,160,312 | 1,135,624 | 1,110,936 | 1,086,248 | 1,061,560 |
| 209,079 | 209,080 | 209,081 | 209,081 | 209,078 |
| 44,226,297 | 45,044,759 | 45,060,033 | 44,760,518 | 45,644,136 |
| | | | | |
| 5,689,798 | 6,147,199 | 6,038,953 | 5,286,815 | 5,788,157 |
| - | - | - | - | - |
| 400,000 | 400,000 | 300,000 | 266,000 | 97,000 |
| 23,225 | 19,252 | 16,094 | 12,916 | 9,717 |
| 137,709 | 113,618 | 89,527 | 64,655 | 39,783 |
| - | - | - | - | - |
| 6,250,732 | 6,680,069 | 6,444,574 | 5,630,386 | 5,934,657 |
| | | | | |
| 3,990,000 | 3,990,000 | 3,990,000 | 3,990,000 | 3,990,000 |
| 1,905,000 | 1,905,000 | 1,905,000 | 1,905,000 | 1,905,000 |
| | | | | |
| 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 | 16,000,000 |
| 21,895,000 | 21,895,000 | 21,895,000 | 21,895,000 | 21,895,000 |
| 28,145,732 | 28,575,069 | 28,339,574 | 27,525,386 | 27,829,657 |
| | | | | |
| 1 | 1 | 1 | 1 | 1 |
| 16,214,070 | 16,214,070 | 16,214,070 | 16,214,070 | 16,214,070 |
| (133,499) | 255,625 | 506,383 | 1,021,056 | 1,600,403 |
| 16,080,572 | 16,469,696 | 16,720,454 | 17,235,126 | 17,814,473 |
| | | | | |
| 44,226,303 | 45,044,764 | 45,060,027 | 44,760,512 | 45,644,130 |
| | | | | |
| *3,118,560* | *3,485,185* | *3,691,375* | *4,181,552* | *4,733,480* |

| Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 |
|---:|---:|---:|---:|---:|---:|
| 2,874,797 | 4,020,426 | 3,012,674 | 2,706,515 | 3,758,805 | 464,691 |
| 97,000 | 97,000 | - | | | - |
| 5,826,142 | 5,288,573 | 6,356,135 | 6,446,102 | 6,669,200 | 8,378,106 |
| 388,852 | 339,989 | 313,354 | 296,534 | 296,765 | 304,124 |
| 1,290,602 | 1,290,224 | 2,120,615 | 2,167,200 | 2,238,874 | 2,135,769 |
| 10,477,393 | 11,036,212 | 11,802,779 | 11,616,351 | 12,963,645 | 11,282,691 |
| | | | | | |
| 4,920,314 | 4,847,449 | 4,755,363 | 4,636,937 | 4,526,143 | 5,023,439 |
| 11,480,279 | 11,631,298 | 11,915,166 | 12,199,034 | 12,482,903 | 13,469,855 |
| 12,316,734 | 12,316,734 | 12,316,734 | 12,316,734 | 12,316,734 | 14,138,048 |
| 5,040,000 | 4,586,452 | 4,586,452 | 4,586,452 | 4,586,452 | 4,586,452 |
| 1,036,872 | 1,012,184 | 987,496 | 962,808 | 1,038,120 | 864,995 |
| 209,077 | 209,077 | 209,076 | 209,076 | 209,077 | 224,254 |
| 45,480,669 | 45,639,407 | 46,573,066 | 46,527,393 | 48,123,074 | 49,589,734 |
| | | | | | |
| 5,222,486 | 5,431,264 | 5,785,072 | 5,281,780 | 6,060,440 | 4,901,700 |
| - | 175,505 | 175,505 | 175,505 | 175,505 | 175,505 |
| 97,000 | 97,000 | - | - | - | - |
| 6,499 | 3,260 | - | - | - | 47,021 |
| 15,485 | - | - | - | - | - |
| - | - | - | - | - | - |
| 5,341,470 | 5,707,029 | 5,960,577 | 5,457,285 | 6,235,945 | 5,124,227 |
| | | | | | |
| 3,990,000 | 4,681,047 | 4,681,047 | 4,681,047 | 4,681,047 | 4,681,047 |
| 1,905,000 | - | - | - | - | 638,700 |
| 16,000,000 | 16,108,005 | 16,033,005 | 15,957,779 | 15,882,779 | 23,000,000 |
| 21,895,000 | 20,789,052 | 20,714,052 | 20,638,826 | 20,563,826 | 28,319,747 |
| 27,236,470 | 26,496,081 | 26,674,629 | 26,096,112 | 26,799,771 | 33,443,974 |
| | | | | | |
| 1 | 1 | 1 | 1 | 1 | 1 |
| 16,214,070 | 16,214,070 | 16,214,069 | 16,214,069 | 16,214,069 | 11,516,023 |
| 2,030,122 | 2,929,249 | 3,684,367 | 4,217,216 | 5,109,240 | 4,629,741 |
| 18,244,193 | 19,143,319 | 19,898,437 | 20,431,286 | 21,323,309 | 16,145,765 |
| | | | | | |
| 45,480,663 | 45,639,401 | 46,573,066 | 46,527,398 | 48,123,081 | 49,589,739 |
| | | | | | |
| 5,135,923 | 5,329,184 | 5,842,202 | 6,159,066 | 6,727,700 | 6,158,464 |

| | May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 |
|---|---|---|---|---|---|---|---|
| | 1,484,825 | 1,830,409 | 1,327,516 | 1,397,279 | 2,497,217 | 3,213,197 | 1,568,846 |
| | - | | | | | | - |
| | 8,559,529 | 8,961,188 | 9,506,038 | 10,196,128 | 10,632,477 | 11,213,692 | 11,617,787 |
| | 285,785 | 267,809 | 280,534 | 323,779 | 363,288 | 387,816 | 346,394 |
| | 2,159,963 | 2,354,225 | 1,865,014 | 2,026,472 | 1,663,284 | 1,609,304 | 1,366,399 |
| | 12,490,101 | 13,413,631 | 12,979,102 | 13,943,658 | 15,156,266 | 16,424,010 | 14,899,427 |
| | | | | | | | |
| | 4,906,957 | 4,790,080 | 4,684,884 | 4,599,825 | 4,586,747 | 4,461,413 | 4,405,964 |
| | 13,741,807 | 14,013,759 | 14,406,546 | 14,799,329 | 15,166,420 | 15,431,510 | 15,425,643 |
| | 14,138,048 | 14,138,048 | 14,138,048 | 14,138,048 | 14,138,048 | 14,138,048 | 14,138,048 |
| | 4,586,452 | 4,384,904 | 4,384,904 | 4,384,904 | 4,384,904 | 4,384,904 | 4,384,904 |
| | 1,115,421 | 1,105,847 | 1,081,273 | 1,056,699 | 1,032,124 | 1,007,550 | 1,137,090 |
| | 224,254 | 224,253 | 220,038 | 220,038 | 220,038 | 220,799 | 220,663 |
| | 51,203,040 | 52,070,523 | 51,894,795 | 53,142,501 | 54,684,547 | 56,068,233 | 54,611,740 |
| | | | | | | | |
| | 5,571,358 | 5,953,737 | 4,980,799 | 5,671,025 | 6,400,096 | 5,499,972 | 5,219,617 |
| | 175,505 | 1,716,421 | 1,716,421 | 1,716,421 | 1,716,421 | 1,716,421 | 1,716,421 |
| | - | - | - | - | - | - | - |
| | 43,004 | 41,924 | 39,998 | 38,348 | 36,392 | 33,145 | 30,949 |
| | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - |
| | 5,789,867 | 7,712,082 | 6,737,218 | 7,425,794 | 8,152,909 | 7,249,538 | 6,966,988 |
| | | | | | | | |
| | 4,681,047 | 4,250,227 | 4,250,227 | 4,250,227 | 4,250,227 | 4,250,227 | 4,250,227 |
| | 638,700 | 638,700 | 638,700 | 638,700 | 638,700 | 638,700 | 638,700 |
| | - | - | - | - | - | - | - |
| | 23,000,000 | 23,000,000 | 23,000,000 | 23,000,000 | 23,000,000 | 23,000,000 | 21,954,108 |
| | 28,319,747 | 27,888,928 | 27,888,927 | 27,888,927 | 27,888,927 | 27,888,927 | 26,843,036 |
| | 34,109,615 | 35,601,010 | 34,626,146 | 35,314,721 | 36,041,836 | 35,138,465 | 33,810,023 |
| | | | | | | | |
| | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| | 11,791,023 | 11,788,950 | 11,788,950 | 11,788,950 | 11,788,950 | 13,538,950 | 13,538,950 |
| | 5,302,406 | 4,680,567 | 5,479,703 | 6,038,835 | 6,853,768 | 7,390,832 | 7,262,779 |
| | 17,093,430 | 16,469,518 | 17,268,654 | 17,827,785 | 18,642,719 | 20,929,783 | 20,801,731 |
| | | | | | | | |
| | 51,203,045 | 52,070,528 | 51,894,799 | 53,142,507 | 54,684,556 | 56,068,248 | 54,611,754 |
| | | | | | | | |
| | *6,700,234* | *5,701,549* | *6,241,884* | *6,517,864* | *7,003,357* | *9,174,472* | *7,932,439* |

| Dec-14 | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 |
|---:|---:|---:|---:|---:|---:|---:|
| 18,136,336 | 16,989,425 | 16,871,679 | 2,882,894 | 3,232,586 | 2,910,712 | 16,812,493 |
| - | | | | | | |
| 8,601,001 | 9,439,224 | 12,310,906 | 10,701,300 | 10,875,736 | 11,756,413 | 11,893,024 |
| 382,744 | 316,009 | 291,871 | 253,325 | 291,060 | 268,476 | 231,001 |
| 663,644 | 879,705 | 864,489 | 721,669 | 702,667 | 716,307 | 854,901 |
| 27,783,725 | 27,624,364 | 30,338,945 | 14,559,187 | 15,102,051 | 15,651,908 | 29,791,420 |
| | | | | | | |
| 4,170,363 | 4,622,137 | 5,029,177 | 5,498,745 | 5,994,466 | 6,416,647 | 9,713,963 |
| 15,419,629 | 15,539,746 | 24,789,859 | 24,818,270 | 24,846,682 | 24,875,093 | 24,971,860 |
| 13,722,379 | 13,722,380 | 18,144,043 | 18,144,043 | 18,144,043 | 18,144,043 | 18,144,043 |
| 4,270,178 | 4,270,178 | 4,270,178 | 4,270,178 | 4,270,178 | 4,270,178 | 4,068,630 |
| 907,203 | 879,712 | 852,221 | 824,730 | 797,239 | 769,748 | 742,257 |
| 223,796 | 184,774 | 198,887 | 200,973 | 200,973 | 205,161 | 205,161 |
| 66,497,273 | 66,843,291 | 83,623,310 | 68,316,128 | 69,355,632 | 70,332,778 | 87,637,334 |
| | | | | | | |
| 5,380,614 | 4,952,447 | 5,881,047 | 6,388,040 | 6,143,644 | 6,392,395 | 5,676,068 |
| 1,271,858 | 1,271,858 | 1,271,858 | 221,858 | 221,858 | 221,858 | 1,907,646 |
| - | - | - | - | - | - | - |
| 29,107 | 26,308 | 26,308 | 21,473 | 21,473 | 19,397 | 15,198 |
| - | - | - | - | - | - | - |
| 6,681,579 | 6,250,613 | 7,179,214 | 6,631,371 | 6,386,976 | 6,633,650 | 7,598,913 |
| | | | | | | |
| 4,156,491 | 4,156,491 | 4,156,491 | 4,156,491 | 4,156,491 | 4,156,491 | 4,086,030 |
| 638,700 | 638,700 | 638,700 | 884,412 | 884,412 | 884,412 | 884,412 |
| - | - | 14,952,597 | 2,319,517 | 2,306,837 | 2,267,903 | 2,274,307 |
| 20,958,879 | 20,958,882 | 20,958,882 | 18,396,177 | 18,396,177 | 18,396,177 | 17,219,484 |
| 25,754,070 | 25,754,073 | 40,706,670 | 25,756,597 | 25,743,917 | 25,704,983 | 24,464,233 |
| 32,435,649 | 32,004,686 | 47,885,883 | 32,387,968 | 32,130,893 | 32,338,633 | 32,063,146 |
| | | | | | | |
| 5,562 | 5,563 | 5,563 | 5,563 | 5,563 | 5,563 | 6,500 |
| 29,488,953 | 29,488,954 | 29,488,954 | 30,384,628 | 30,384,628 | 30,384,628 | 49,163,638 |
| 4,567,101 | 5,344,082 | 6,242,903 | 5,537,962 | 6,834,541 | 7,603,947 | 6,404,042 |
| 34,061,617 | 34,838,598 | 35,737,419 | 35,928,153 | 37,224,732 | 37,994,138 | 55,574,181 |
| | | | | | | |
| 66,497,266 | 66,843,284 | 83,623,303 | 68,316,121 | 69,355,625 | 70,332,771 | 87,637,327 |
| | | | | | | |
| *21,102,146* | *21,373,751* | *23,159,731* | *7,927,817* | *8,715,075* | *9,018,258* | *22,192,507* |

| | Jul-15 | Aug-15 | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 |
|---|---|---|---|---|---|---|---|
| | 16,364,418 | 17,412,369 | 3,602,078 | 2,306,585 | 2,425,142 | 2,506,768 | 46,673,365 |
| | - | - | - | - | - | - | - |
| | 13,850,409 | 15,015,836 | 14,788,187 | 15,744,705 | 16,014,710 | 15,060,632 | 16,430,251 |
| | 238,539 | 282,556 | 241,360 | 312,948 | 239,137 | 249,431 | 346,603 |
| | 800,183 | 822,983 | 864,488 | 803,662 | 583,652 | 518,698 | 475,933 |
| | 31,253,549 | 33,533,744 | 19,496,113 | 19,167,899 | 19,262,642 | 18,335,529 | 63,926,151 |
| | | | | | | | |
| | 9,720,401 | 9,613,314 | 9,594,394 | 9,493,780 | 9,401,140 | 9,307,643 | 9,102,935 |
| | 25,262,421 | 25,206,867 | 35,976,411 | 35,769,851 | 35,563,291 | 35,263,534 | 34,408,834 |
| | 18,144,043 | 18,144,043 | 37,982,340 | 37,982,340 | 37,982,340 | 37,982,340 | 37,982,340 |
| | 4,068,630 | 4,068,630 | 4,068,630 | 4,068,630 | 4,068,630 | 5,848,995 | 5,848,995 |
| | 714,766 | 853,027 | 818,906 | 784,785 | 750,664 | 716,543 | 682,422 |
| | 209,976 | 211,884 | 257,170 | 272,190 | 274,141 | 276,364 | 280,537 |
| | 89,373,786 | 91,631,508 | 108,193,965 | 107,539,476 | 107,302,848 | 107,730,949 | 152,232,215 |
| | | | | | | | |
| | 5,619,692 | 6,578,397 | 8,620,832 | 8,709,876 | 8,750,368 | 8,977,932 | 9,029,166 |
| | 1,907,646 | 1,907,646 | 1,892,949 | 1,892,949 | 1,892,949 | 2,813,229 | 3,303,519 |
| | - | - | - | - | - | - | - |
| | 15,198 | 13,075 | 10,936 | 6,611 | 4,392 | 2,172 | 1,362 |
| | - | - | - | - | - | - | - |
| | 7,542,536 | 8,499,118 | 10,524,717 | 10,609,436 | 10,647,709 | 11,793,333 | 12,334,047 |
| | | | | | | | |
| | 4,086,030 | 4,086,030 | 4,086,030 | 4,086,030 | 4,086,030 | 7,497,240 | 7,497,240 |
| | 884,412 | 884,412 | 9,916,432 | 9,916,432 | 9,916,432 | 10,453,631 | 10,453,631 |
| | 2,661,013 | 2,603,882 | 9,395,334 | 6,826,662 | 4,799,880 | 2,375,018 | 2,368,152 |
| | 17,238,234 | 17,238,234 | 16,080,291 | 16,080,291 | 16,080,291 | 14,922,349 | 15,922,349 |
| | 24,869,690 | 24,812,559 | 39,478,088 | 36,909,416 | 34,882,634 | 35,248,238 | 36,241,372 |
| | 32,412,226 | 33,311,677 | 50,002,805 | 47,518,851 | 45,530,343 | 47,041,571 | 48,575,419 |
| | | | | | | | |
| | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 | 6,500 |
| | 49,163,638 | 49,163,638 | 49,163,638 | 49,163,638 | 49,163,638 | 49,163,638 | 91,331,115 |
| | 7,791,414 | 9,149,686 | 9,021,014 | 10,850,479 | 12,602,360 | 11,519,232 | 12,319,179 |
| | 56,961,552 | 58,319,824 | 58,191,153 | 60,020,617 | 61,772,498 | 60,689,370 | 103,656,794 |
| | | | | | | | |
| | 89,373,779 | 91,631,501 | 108,193,958 | 107,539,469 | 107,302,841 | 107,730,941 | 152,232,213 |
| | | | | | | | |
| | *23,711,013* | *25,034,626* | *8,971,396* | *8,558,464* | *8,614,933* | *6,542,196* | *51,592,104* |

Case 2:18-cv-00984-MCA-MAH Document 21-3 Filed 08/16/18 Page 24 of 57 PageID 751

**Feb-16**

| |
|---:|
| 15,508,283 |
| - |
| 16,456,962 |
| 242,520 |
| 457,579 |
| 32,665,344 |
| |
| 9,198,482 |
| 33,554,134 |
| 69,782,340 |
| 5,848,995 |
| 648,301 |
| 282,104 |
| 151,979,700 |
| |
| 7,173,672 |
| 3,918,491 |
| - |
| 552 |
| - |
| - |
| 11,092,715 |
| |
| 7,497,240 |
| 10,453,631 |
| 2,353,594 |
| 15,922,349 |
| 36,226,815 |
| 47,319,530 |
| |
| 6,500 |
| 91,331,115 |
| 13,322,555 |
| 104,660,170 |
| |
| 151,979,699 |
| |
| *21,572,629* |

**Constellation Healthcare Technologies, Inc.**
**Consolidated Statements of Operations**

| | Jan-13 | Feb-13 | Mar-13 |
|---|---|---|---|
| Revenues - RCM | 3,242,228 | 2,659,955 | 2,885,602 |
| Revenues - PM | 1,579,046 | 1,362,672 | 1,351,019 |
| Revenues - GPO | 118,500 | 118,500 | 118,500 |
| **Revenues - TOTAL** | **4,939,775** | **4,141,127** | **4,355,121** |
| | | | |
| **Operating expenses:** | | | |
| Salaries and benefits | 2,099,735 | 1,971,761 | 2,061,375 |
| Facility rent and related costs | 225,972 | 225,261 | 225,665 |
| Depreciation | 55,035 | 55,482 | 51,722 |
| Amortization | 352,959 | 352,957 | 352,958 |
| Professional and consulting fees | 1,164,417 | 1,002,869 | 969,741 |
| Insurance | 36,658 | 25,181 | 41,033 |
| Provision for doubtful accounts | 36,543 | 31,416 | 31,717 |
| Vaccines and medical supplies | 321,370 | 255,238 | 297,539 |
| Office and computer supplies | 27,481 | 32,772 | 19,427 |
| Postage and courier | 148,008 | 156,742 | 172,753 |
| Other | 253,939 | 254,142 | 241,769 |
| Total operating expenses | 4,722,116 | 4,363,821 | 4,465,699 |
| | | | |
| **Income (loss) from operations before other income (expenses)** | 217,659 | (222,694) | (110,578) |
| | | | |
| **Other income (expenses):** | | | |
| Interest expense | (485,660) | (445,125) | (482,959) |
| Extraordinary gain (loss) | - | - | - |
| Gain (loss) on disposal of fixed assets | - | 150 | - |
| Other expense, net | (13,646) | (13,646) | (13,644) |
| Total other income (expenses), net | (499,307) | (458,621) | (496,603) |
| | | | |
| **Net income (loss) before provision for income taxes** | (281,648) | (681,315) | (607,181) |
| | | | |
| Provision for income taxes | - | - | - |
| | | | |
| **Net income (loss)** | $ (281,648) | $ (681,315) | $ (607,181) |
| | | | |
| **EBDITA** | **625,652** | **185,745** | **294,102** |

| Apr-13 | May-13 | June 1-14 | June 15-30 | Jul-13 | Aug-13 | Sep-13 |
|---|---|---|---|---|---|---|
| 2,981,919 | 2,959,245 | 926,156 | 1,283,776 | 2,877,394 | 2,622,120 | 2,466,290 |
| 1,296,922 | 1,296,946 | 540,541 | 617,761 | 1,558,702 | 1,793,609 | 1,407,720 |
| 118,500 | 118,500 | 125,300 | 143,200 | 88,500 | 88,500 | 118,500 |
| **4,397,341** | **4,374,691** | **1,591,997** | **2,044,737** | **4,524,596** | **4,504,229** | **3,992,511** |
| | | | | | | |
| 1,920,885 | 1,962,776 | 854,448 | 927,159 | 1,810,993 | 1,735,436 | 1,547,343 |
| 236,830 | 255,572 | 244,777 | 105,022 | 192,259 | 192,256 | 204,668 |
| 48,856 | 48,055 | 22,001 | 62,644 | 103,830 | 102,312 | 101,835 |
| 352,959 | 352,958 | 155,713 | 97,580 | 148,333 | 148,333 | 148,333 |
| 949,941 | 872,674 | 353,160 | 153,611 | 769,702 | 970,997 | 543,953 |
| 40,979 | 41,025 | 14,313 | 16,358 | 42,605 | 35,450 | 42,414 |
| 29,734 | 29,847 | 139,936 | 14,785 | 36,056 | 42,808 | 33,117 |
| 274,236 | 300,066 | 144,715 | 165,389 | 434,990 | 460,757 | 319,591 |
| 32,849 | 26,423 | 13,895 | 15,880 | 21,157 | 20,950 | 17,590 |
| 165,009 | 170,136 | 66,836 | 76,384 | 145,914 | 144,929 | 132,553 |
| 314,259 | 261,362 | 110,876 | 481,341 | 234,379 | 203,888 | 194,077 |
| 4,366,538 | 4,320,895 | 2,120,671 | 2,116,151 | 3,940,219 | 4,058,116 | 3,285,476 |
| | | | | | | |
| 30,802 | 53,796 | (528,674) | (71,414) | 584,377 | 446,112 | 707,035 |
| | | | | | | |
| (1,044,183) | (660,239) | (26,355) | (54,807) | (181,610) | (181,711) | (178,719) |
| - | - | - | - | - | - | - |
| 514 | - | - | - | - | - | - |
| (13,644) | (13,644) | (6,367) | (7,277) | (13,643) | (13,643) | (13,643) |
| (1,057,313) | (673,883) | (32,722) | (62,085) | (195,254) | (195,354) | (192,362) |
| (1,026,511) | (620,087) | (561,396) | (133,499) | 389,124 | 250,758 | 514,673 |
| - | - | - | - | - | - | - |
| $ (1,026,511) | $ (620,087) | $ (561,396) | $ (133,499) | $ 389,124 | $ 250,758 | $ 514,673 |
| | | | | | | |
| **432,617** | **454,809** | **(350,959)** | **88,809** | **836,541** | **696,758** | **957,204** |

| Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 | Apr-14 |
|---:|---:|---:|---:|---:|---:|---:|
| 2,721,683 | 2,382,594 | 2,587,487 | 2,326,687 | 1,880,362 | 2,184,415 | 2,533,678 |
| 1,831,557 | 1,476,845 | 1,817,873 | 1,380,647 | 1,248,815 | 1,594,346 | 1,372,396 |
| 88,500 | 88,500 | 118,500 | 507,500 | 498,500 | 588,500 | 588,500 |
| **4,641,739** | **3,947,939** | **4,523,861** | **4,214,834** | **3,627,678** | **4,367,261** | **4,494,575** |
| | | | | | | |
| 1,618,327 | 1,438,691 | 1,481,019 | 1,450,886 | 1,265,040 | 1,385,636 | 1,512,182 |
| 195,744 | 188,898 | 300,884 | 193,850 | 193,890 | 199,162 | 220,086 |
| 100,857 | 100,316 | 100,458 | 107,512 | 118,428 | 111,410 | 119,901 |
| 148,333 | 148,333 | 148,333 | 148,333 | 148,333 | 148,333 | 160,250 |
| 908,091 | 715,708 | 1,089,306 | 526,227 | 445,044 | 692,691 | 549,423 |
| 42,246 | 42,245 | 35,172 | 43,015 | 43,015 | 42,980 | 55,842 |
| 41,413 | 34,559 | 30,513 | 32,646 | 29,462 | 32,111 | 32,803 |
| 446,365 | 305,039 | 323,571 | 335,150 | 295,074 | 300,625 | 286,899 |
| 21,462 | 16,795 | 20,227 | 20,908 | 17,329 | 19,870 | 41,814 |
| 134,167 | 140,691 | 156,690 | 189,914 | 165,593 | 154,287 | 181,951 |
| 209,729 | 194,919 | 216,167 | 184,645 | 182,677 | 187,473 | 245,906 |
| 3,866,734 | 3,326,194 | 3,902,340 | 3,233,083 | 2,903,884 | 3,274,577 | 3,407,056 |
| | | | | | | |
| 775,005 | 621,744 | 621,520 | 981,751 | 723,794 | 1,092,684 | 1,087,518 |
| | | | | | | |
| (182,015) | (177,096) | (292,365) | (157,076) | (141,387) | (157,845) | (633,278) |
| - | - | - | - | - | - | - |
| - | - | - | - | - | - | - |
| (13,643) | (14,928) | 1,890,072 | (69,557) | (49,557) | (42,816) | (933,739) |
| (195,658) | (192,024) | 1,597,706 | (226,633) | (190,944) | (200,661) | (1,567,017) |
| 579,347 | 429,720 | 2,219,226 | 755,118 | 532,849 | 892,023 | (479,499) |
| - | - | 1,320,100 | - | - | - | - |
| $ 579,347 | $ 429,720 | $ 899,126 | $ 755,118 | $ 532,849 | $ 892,023 | $ (479,499) |
| | | | | | | |
| **1,024,196** | **870,394** | **870,312** | **1,237,595** | **990,555** | **1,352,427** | **1,367,669** |

| May-14 | Jun-14 | Jul-14 | Aug-14 | Sep-14 | Oct-14 | Nov-14 | Dec-14 |
|---|---|---|---|---|---|---|---|
| 2,337,422 | 2,327,079 | 2,514,753 | 2,412,011 | 2,490,123 | 2,668,181 | 2,218,562 | 2,495,361 |
| 1,505,281 | 1,409,205 | 1,925,673 | 1,889,303 | 1,625,740 | 1,886,055 | 1,663,142 | 1,630,705 |
| 609,007 | 512,879 | 488,500 | 488,500 | 638,500 | 488,500 | 838,500 | 838,500 |
| **4,451,710** | **4,249,163** | **4,928,926** | **4,789,814** | **4,754,363** | **5,042,736** | **4,720,204** | **4,964,566** |
| | | | | | | | |
| 1,491,942 | 1,403,491 | 1,406,108 | 1,477,524 | 1,397,216 | 1,508,001 | 1,463,489 | 1,584,674 |
| 217,400 | 215,583 | 215,287 | 194,026 | 219,593 | 212,939 | 205,849 | 258,733 |
| 119,688 | 117,510 | 116,511 | 111,014 | 110,540 | 108,381 | 107,631 | 114,768 |
| 160,250 | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 |
| 696,799 | 588,203 | 1,016,306 | 1,078,188 | 888,074 | 1,144,476 | 1,136,503 | 1,318,602 |
| 64,245 | 65,612 | 70,735 | 67,256 | 66,749 | 65,594 | 36,025 | 28,133 |
| 32,889 | 33,600 | 39,141 | 40,797 | 37,926 | 42,271 | 35,979 | 38,018 |
| 321,111 | 339,191 | 466,065 | 439,279 | 400,334 | 413,663 | 413,777 | 361,355 |
| 34,833 | 33,742 | 20,462 | 17,804 | 18,704 | 19,315 | 19,265 | 36,700 |
| 149,370 | 137,049 | 148,747 | 133,044 | 157,243 | 141,327 | 127,286 | 244,412 |
| 241,226 | 202,904 | 222,824 | 191,891 | 213,496 | 278,842 | 245,149 | 316,439 |
| 3,529,753 | 3,297,135 | 3,882,437 | 3,911,072 | 3,670,126 | 4,095,059 | 3,951,204 | 4,462,084 |
| | | | | | | | |
| 921,957 | 952,028 | 1,046,489 | 878,743 | 1,084,237 | 947,677 | 769,000 | 502,481 |
| | | | | | | | |
| (207,181) | (200,455) | (206,533) | (206,351) | (228,003) | (268,840) | (207,280) | (207,093) |
| - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - |
| (42,111) | (61,768) | (40,820) | (113,260) | (41,301) | (141,773) | (689,773) | (3,414,640) |
| (249,292) | (262,223) | (247,353) | (319,611) | (269,303) | (410,613) | (897,053) | (3,621,733) |
| 672,665 | 689,805 | 799,136 | 559,132 | 814,934 | 537,064 | (128,053) | (3,119,251) |
| - | 1,311,644 | - | - | - | - | - | (423,573) |
| $ 672,665 | $ (621,839) | $ 799,136 | $ 559,132 | $ 814,934 | $ 537,064 | $ (128,053) | $ (2,695,678) |
| | | | | | | | |
| **1,201,895** | **1,229,787** | **1,323,251** | **1,150,007** | **1,355,027** | **1,216,307** | **1,036,881** | **777,499** |

| | Jan-15 | Feb-15 | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 |
|---|---|---|---|---|---|---|---|---|
| | 2,741,526 | 3,221,957 | 3,770,869 | 3,814,831 | 3,380,983 | 3,322,028 | 3,835,808 | 4,251,598 |
| | 1,525,494 | 1,585,098 | 1,521,911 | 1,468,894 | 1,275,681 | 1,431,355 | 1,676,118 | 1,826,239 |
| | 488,500 | 488,500 | 488,500 | 488,500 | 488,500 | 488,500 | 789,082 | 789,082 |
| | **4,755,520** | **5,295,555** | **5,781,280** | **5,772,225** | **5,145,164** | **5,241,883** | **6,301,008** | **6,866,918** |
| | | | | | | | | |
| | 1,423,142 | 1,620,272 | 1,756,894 | 1,642,095 | 1,625,989 | 1,713,749 | 1,343,015 | 1,361,009 |
| | 187,572 | 247,928 | 264,176 | 250,132 | 254,536 | 264,621 | 237,503 | 223,531 |
| | 105,271 | 104,271 | 103,254 | 102,902 | 101,267 | 136,198 | 107,088 | 107,087 |
| | 160,250 | 229,155 | 229,155 | 229,155 | 229,155 | 229,155 | 229,155 | 229,155 |
| | 808,475 | 1,036,016 | 1,412,618 | 1,252,815 | 1,031,649 | 1,096,930 | 1,774,099 | 1,743,275 |
| | 27,657 | 29,461 | 30,440 | 28,695 | 37,160 | 47,288 | 26,224 | 29,042 |
| | 33,711 | 32,222 | 35,571 | 35,015 | 31,031 | 39,868 | 40,384 | 43,366 |
| | 312,018 | 339,222 | 329,596 | 296,281 | 281,984 | 387,247 | 429,433 | 505,104 |
| | 12,938 | 21,349 | 17,094 | 21,828 | 14,707 | 17,204 | 27,879 | 23,654 |
| | 139,629 | 143,604 | 175,132 | 160,106 | 151,545 | 152,111 | 160,764 | 146,041 |
| | 316,563 | 305,296 | 317,322 | 233,886 | 274,631 | 277,112 | 259,304 | 606,679 |
| | 3,527,226 | 4,108,796 | 4,671,252 | 4,252,908 | 4,033,655 | 4,361,485 | 4,634,848 | 5,017,943 |
| | | | | | | | | |
| | 1,228,294 | 1,186,759 | 1,110,028 | 1,519,317 | 1,111,509 | 880,398 | 1,666,159 | 1,848,975 |
| | | | | | | | | |
| | (237,231) | (225,099) | (312,923) | (197,912) | (204,542) | (198,157) | (211,961) | (198,981) |
| | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - | - |
| | (214,083) | (62,839) | (1,502,046) | (24,827) | (137,560) | (65,271) | (66,827) | (291,722) |
| | (451,313) | (287,938) | (1,814,969) | (222,739) | (342,102) | (263,428) | (278,788) | (490,703) |
| | 776,980 | 898,821 | (704,941) | 1,296,578 | 769,407 | 616,969 | 1,387,372 | 1,358,272 |
| | - | - | - | - | - | 1,816,874 | - | - |
| | $ 776,980 | $ 898,821 | $ (704,941) | $ 1,296,578 | $ 769,407 | $ (1,199,905) | $ 1,387,372 | $ 1,358,272 |
| | | | | | | | | |
| | **1,493,815** | **1,520,185** | **1,442,437** | **1,851,375** | **1,441,931** | **1,245,750** | **2,002,402** | **2,185,218** |

| Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 |
|---|---|---|---|---|---|
| 5,250,410 | 5,503,865 | 5,261,819 | 5,771,142 | 4,923,247 | 5,279,315 |
| 1,555,159 | 1,953,959 | 1,571,089 | 1,551,743 | 1,505,865 | 1,593,586 |
| 789,082 | 789,082 | 789,082 | 789,082 | 716,841 | 726,552 |
| **7,594,651** | **8,246,907** | **7,621,991** | **8,111,968** | **7,145,953** | **7,599,453** |
| | | | | | |
| 1,622,168 | 1,645,580 | 1,527,578 | 1,753,320 | 2,059,964 | 2,006,569 |
| 250,020 | 237,692 | 204,487 | 492,903 | 223,466 | 256,068 |
| 104,724 | 104,624 | 104,624 | 103,297 | 205,567 | 205,748 |
| 380,161 | 380,161 | 380,161 | 473,356 | 854,700 | 854,700 |
| 1,977,815 | 2,697,299 | 2,222,350 | 1,424,611 | 1,622,815 | 1,693,198 |
| 32,986 | 43,148 | 76,741 | 33,332 | 46,459 | 27,630 |
| 39,041 | 44,079 | 36,975 | 322,503 | 35,295 | 37,337 |
| 458,443 | 347,473 | 415,213 | 315,246 | 303,440 | 373,039 |
| 18,489 | 26,677 | 11,192 | 19,432 | 25,103 | 21,700 |
| 158,951 | 144,263 | 138,085 | 132,170 | 148,022 | 112,551 |
| 493,228 | 478,592 | 594,167 | 531,335 | 264,920 | 304,741 |
| 5,536,025 | 6,149,588 | 5,711,572 | 5,601,504 | 5,789,751 | 5,893,281 |
| | | | | | |
| 2,058,626 | 2,097,318 | 1,910,418 | 2,510,463 | 1,356,202 | 1,706,172 |
| | | | | | |
| (212,410) | (188,025) | (182,941) | (209,215) | (35,828) | (43,248) |
| - | - | - | - | - | - |
| - | - | - | - | - | - |
| (1,974,888) | (79,829) | 24,404 | (833,251) | (30,137) | (44,577) |
| (2,187,298) | (267,854) | (158,537) | (1,042,466) | (65,965) | (87,825) |
| (128,672) | 1,829,465 | 1,751,881 | 1,467,997 | 1,290,237 | 1,618,347 |
| - | - | - | 2,551,125 | 490,290 | 614,972 |
| $ (128,672) $ | 1,829,465 $ | 1,751,881 $ | (1,083,128) $ | 799,947 $ | 1,003,375 |
| | | | | | |
| **2,543,512** | **2,582,104** | **2,395,203** | **3,087,116** | **2,416,469** | **2,766,620** |

**Orion Consolidated**

Monthly Cash Flows

Proforma

|  | | Jan-13 | Feb-13 | Mar-13 |
|---|---|---|---|---|
| Net Income | $ | (281,648) $ | (681,315) $ | (607,181) |
| Depreciation | | 55,035 | 55,482 | 51,722 |
| Provision for Doubtful debts | | 36,543 | 31,416 | 31,717 |
| Deferred tax adjustments | | - | - | - |
| Earnout Payable write back | | - | - | - |
| Conversion of PIK interest to principal | | | | |
| Amortization of Intangible | | 352,959 | 352,957 | 352,958 |
| Amortization of New Goodwill | | - | - | - |
| Amortization of Financing Fees | | - | - | - |
| | | | | |
| Change in Working Capital | | | | |
| (Inc.)/Dec. in Accounts Receivable | | (298,267) | (6,841) | 407,541 |
| (Inc.)/Dec. in Inventories | | 49,481 | (17,792) | (12,456) |
| (Inc.)/Dec. in Prepaid Expenses & Other | | (47,702) | (43,985) | (356,380) |
| Payment for other assets | | 19,286 | 19,287 | 19,286 |
| Inc./(Dec.) in Provision for taxes | | - | - | - |
| Other current liabilities | | - | | |
| Inc./(Dec.) in Accounts Payable & Accrued expenses | | 360,447 | 390,377 | (120,761) |
| | | | | |
| **Net cash provided by operating activities** | | **246,133** | **99,586** | **(233,554)** |
| | | | | |
| **Cash Flow from investing activities** | | | | |
| Sale/(purchase) of property & equipment | | (26,245) | (11,573) | (10,835) |
| Purchase/ Development of Intangibles | | (19,288) | (19,286) | (19,287) |
| Capital Paid for Acquisition | | - | - | - |
| Net deposits to restricted cash | | | | |
| **Net Cash Flow from investing activities** | | **(45,532)** | **(30,859)** | **(30,122)** |
| | | | | |
| **Cash Flow from financing activities activities** | | | | |
| Borrowing/ (payments) on Debt funds | | 300,787 | 266,603 | 549,742 |
| Short term lease obligations | | (3,821) | (3,845) | (3,871) |
| Deal Fees deferred paid | | - | - | - |
| Net proceeds from equity funds | | 5 | - | - |
| | | | | |
| **Net Cash Flow from financing activities activities** | | **296,971** | **262,758** | **545,871** |
| | | | | |
| ***Net increase in cash and cash equivalents*** | | ***497,572*** | ***331,485*** | ***282,195*** |
| | | | | |
| Beginning Cash Balance | | 781,837 | 1,279,409 | 1,610,894 |
| Ending Cash Balance | | 1,279,409 | 1,610,894 | 1,893,089 |

| | Apr-13 | May-13 | 15-Jun | 30-Jun | Jul-13 | Aug-13 |
|---|---|---|---|---|---|---|
| $ | (1,026,511) $ | (620,087) $ | (561,396) $ | (133,499) $ | 389,124 $ | 250,758 |
| | 48,856 | 48,055 | 22,001 | 62,644 | 103,830 | 102,312 |
| | 29,734 | 29,847 | 139,936 | 14,785 | 36,056 | 42,808 |
| | - | - | - | - | - | - |
| | - | - | - | - | - | - |
| | 352,959 | 352,958 | 155,713 | 97,580 | 148,333 | 148,333 |
| | - | - | - | - | - | - |
| | - | - | - | 24,688 | 24,688 | 24,688 |
| | (120,063) | 327,400 | 139,365 | 525,201 | (216,030) | (381,583) |
| | 26,614 | 5,395 | - | (16,632) | (8,583) | 29,526 |
| | 111,936 | 94,360 | 22,298 | 303,299 | (23,734) | 94,751 |
| | 19,287 | 19,286 | - | 23,411 | (1) | (1) |
| | - | - | - | - | - | - |
| | | | | 1,905,000 | | |
| | (633,679) | (185,924) | (764,497) | 233,105 | 457,401 | (108,246) |
| | **(1,190,867)** | **71,289** | **(846,579)** | **3,039,582** | **911,085** | **203,346** |
| | (166,695) | (11,037) | - | (4,507,959) | 2 | (20,558) |
| | (19,288) | (19,287) | (0) | (299,352) | (299,352) | (299,353) |
| | - | - | - | (27,006,454) | - | - |
| | | | | (400,000) | | |
| | **(185,983)** | **(30,324)** | **(0)** | **(32,213,765)** | **(299,351)** | **(319,911)** |
| | 896,654 | 521,620 | - | 16,000,000 | - | - |
| | (3,894) | (3,922) | (742) | 134,505 | (28,064) | (27,249) |
| | - | - | - | (1,185,000) | - | - |
| | - | - | - | 14,997,392 | - | - |
| | **892,760** | **517,698** | **(742)** | **29,946,897** | **(28,064)** | **(27,249)** |
| | *(484,090)* | *558,664* | *(847,321)* | *772,714* | *583,670* | *(143,814)* |
| | 1,893,089 | 1,409,000 | 1,967,663 | 1,120,342 | 1,893,055 | 2,476,725 |
| | 1,409,000 | 1,967,663 | 1,120,342 | 1,893,055 | 2,476,725 | 2,332,911 |

| | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 |
|---|---|---|---|---|---|---|
| $ | 514,673 | 579,347 | 429,720 | 899,126 | 755,118 | 532,849 |
| | 101,835 | 100,857 | 100,316 | 100,458 | 107,512 | 118,428 |
| | 33,117 | 41,413 | 34,559 | 30,513 | 32,646 | 29,462 |
| | - | - | - | 1,144,595 | - | - |
| | - | - | - | (1,905,000) | - | - |
| | | | | 108,005 | | |
| | 148,333 | 148,333 | 148,333 | 148,333 | 148,333 | 148,333 |
| | - | - | - | - | - | - |
| | 24,688 | 24,688 | 24,688 | 24,688 | 24,688 | 24,688 |
| | | | | | | |
| | (212,320) | 18,638 | 411,538 | 507,056 | (1,100,208) | (119,428) |
| | (118,591) | 9,431 | (12,070) | 48,863 | 26,635 | 16,820 |
| | (61,164) | 208,942 | (356,062) | 378 | (830,391) | (46,585) |
| | - | 3 | 1 | - | 1 | 0 |
| | - | - | - | 175,505 | - | - |
| | (752,138) | 501,342 | (565,671) | 208,778 | 353,821 | (503,292) |
| | **(321,567)** | **1,632,994** | **215,352** | **1,491,299** | **(481,845)** | **201,276** |
| | | | | | | |
| | (1) | (1,948) | (1,263) | (27,593) | (15,426) | (2) |
| | (299,351) | (299,352) | (299,352) | (299,352) | (432,201) | (432,202) |
| | - | - | - | - | (0) | - |
| | **(299,353)** | **(301,300)** | **(300,615)** | **(326,946)** | **(447,627)** | **(432,204)** |
| | | | | | | |
| | - | - | - | 0 | (75,000) | (75,226) |
| | (28,050) | (28,071) | (27,516) | (18,724) | (3,260) | - |
| | - | - | - | - | - | - |
| | - | - | - | - | (1) | - |
| | **(28,050)** | **(28,071)** | **(27,516)** | **(18,724)** | **(78,261)** | **(75,226)** |
| | *(648,969)* | *1,303,623* | *(112,779)* | *1,145,630* | *(1,007,733)* | *(306,154)* |
| | 2,332,911 | 1,683,942 | 2,987,565 | 2,874,786 | 4,020,416 | 3,012,683 |
| | 1,683,942 | 2,987,565 | 2,874,786 | 4,020,416 | 3,012,683 | 2,706,529 |

| | Mar-14 | Apr-14 | May-14 | Jun-14 | Jul-14 | Aug-14 |
|---|---|---|---|---|---|---|
| $ | 892,023 | (479,499) | 672,665 | (621,839) | 799,136 | 559,132 |
| | 111,410 | 119,901 | 119,688 | 117,510 | 116,511 | 111,014 |
| | 32,111 | 32,803 | 32,889 | 33,600 | 39,141 | 40,797 |
| | - | - | - | (229,272) | - | - |
| | - | - | - | - | - | - |
| | | (108,005) | | | | |
| | 148,333 | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 |
| | - | - | - | - | - | - |
| | 24,688 | 938,125 | 24,574 | 24,574 | 24,574 | 24,574 |
| | (255,210) | (1,348,215) | (214,312) | (435,259) | (583,991) | (730,887) |
| | (231) | (7,359) | 18,339 | 17,976 | (12,725) | (43,245) |
| | (71,674) | 109,055 | (24,194) | (194,261) | 489,210 | (161,458) |
| | (1) | 0 | 1 | 0 | 4,216 | |
| | - | - | - | 1,540,916 | - | - |
| | 778,660 | (1,904,116) | 669,672 | 382,382 | (972,935) | 690,229 |
| | **1,660,109** | **(2,487,059)** | **1,459,572** | **796,576** | **63,386** | **650,405** |
| | (616) | 349 | (3,206) | (633) | (11,315) | (25,955) |
| | (432,201) | (432,201) | (432,202) | (432,202) | (553,037) | (553,033) |
| | - | (2,137,402) | - | - | 0 | - |
| | **(432,817)** | **(2,569,255)** | **(435,408)** | **(432,835)** | **(564,352)** | **(578,988)** |
| | (75,000) | 7,225,226 | - | - | (0) | - |
| | - | 0 | (4,017) | (1,081) | (1,925) | (1,650) |
| | (100,000) | (765,000) | (275,000) | (15,000) | - | 0 |
| | - | (4,698,046) | 275,000 | (2,073) | - | - |
| | **(175,000)** | **1,762,181** | **(4,017)** | **(18,154)** | **(1,926)** | **(1,650)** |
| | *1,052,292* | *(3,294,133)* | *1,020,147* | *345,587* | *(502,891)* | *69,768* |
| | 2,706,529 | 3,758,821 | 464,688 | 1,484,835 | 1,830,422 | 1,327,531 |
| | 3,758,821 | 464,688 | 1,484,835 | 1,830,422 | 1,327,531 | 1,397,299 |

| | Sep-14 | Oct-14 | Nov-14 | Dec-14 | Jan-15 | Feb-15 |
|---|---|---|---|---|---|---|
| $ | 814,934 $ | 537,064 $ | (128,053) $ | (2,695,678) $ | 776,980 $ | 898,821 |
| | 110,540 | 108,381 | 107,631 | 114,768 | 105,271 | 104,271 |
| | 37,926 | 42,271 | 35,979 | 38,018 | 33,711 | 32,222 |
| | - | - | - | 20,990 | - | - |
| | - | - | - | - | - | - |
| | 160,250 | 160,250 | 160,250 | 160,250 | 160,250 | 229,155 |
| | - | - | - | - | - | - |
| | 24,574 | 24,574 | 24,574 | 24,574 | 27,491 | 27,491 |
| | (474,274) | (623,486) | (440,074) | 2,978,768 | (871,934) | (497,232) |
| | (39,509) | (24,528) | 41,422 | (36,350) | 66,735 | 24,138 |
| | 363,188 | 53,980 | 242,905 | 702,755 | (216,061) | 15,189 |
| | - | (761) | 136 | (3,133) | 39,022 | (4,397) |
| | - | - | - | (444,563) | - | - |
| | 729,074 | (900,121) | (280,352) | 161,000 | (428,164) | 375,923 |
| | **1,726,703** | **(622,377)** | **(235,581)** | **1,021,399** | **(306,699)** | **1,205,582** |
| | (97,462) | 16,953 | (52,183) | 120,834 | (557,045) | (511,311) |
| | (527,341) | (425,340) | (154,383) | (154,236) | (280,367) | (312,129) |
| | - | - | (0) | 415,669 | (1) | (500,000) |
| | **(624,803)** | **(408,387)** | **(206,567)** | **382,267** | **(837,413)** | **(1,323,440)** |
| | - | - | (1,045,892) | (995,229) | 3 | - |
| | (1,956) | (3,247) | (2,196) | (1,842) | (2,799) | - |
| | 0 | 0 | (154,115) | 205,313 | (0) | - |
| | - | 1,750,000 | 0 | 15,955,564 | 1 | - |
| | **(1,956)** | **1,746,753** | **(1,202,201)** | **15,163,806** | **(2,795)** | **-** |
| | *1,099,944* | *715,990* | *(1,644,349)* | *16,567,472* | *(1,146,907)* | *(117,858)* |
| | 1,397,299 | 2,497,243 | 3,213,233 | 1,568,883 | 18,136,355 | 16,989,448 |
| | 2,497,243 | 3,213,233 | 1,568,883 | 18,136,355 | 16,989,448 | 16,871,590 |

| | Mar-15 | Apr-15 | May-15 | Jun-15 | Jul-15 | Aug-15 |
|---|---|---|---|---|---|---|
| $ | (704,941) $ | 1,296,578 $ | 769,407 $ | (1,199,905) $ | 1,387,372 $ | 1,358,272 |
| | 103,254 | 102,902 | 101,267 | 136,198 | 107,088 | 107,087 |
| | 35,571 | 35,015 | 31,031 | 39,868 | 40,384 | 43,366 |
| | - | - | - | - | - | - |
| | - | - | - | - | - | - |
| | 229,155 | 229,155 | 229,155 | 229,155 | 229,155 | 229,155 |
| | - | - | - | - | - | - |
| | 27,491 | 27,491 | 27,491 | 27,491 | 27,491 | 34,121 |
| | 1,486,773 | (222,130) | (950,641) | (170,075) | (1,611,062) | (1,265,925) |
| | 38,546 | (37,736) | 22,584 | 37,475 | (7,538) | (44,017) |
| | 142,820 | 19,001 | (13,639) | (138,594) | 54,719 | (22,801) |
| | (2,087) | - | (4,188) | - | (4,815) | (1,908) |
| | (1,050,000) | - | - | 1,816,874 | - | - |
| | | | | | | - |
| | 506,992 | (244,395) | 248,750 | (716,326) | (56,377) | 958,705 |
| | **813,576** | **1,205,882** | **461,216** | **62,160** | **166,417** | **1,396,056** |
| | (572,822) | (598,623) | (523,448) | (3,433,514) | (113,526) | 0 |
| | (257,566) | (257,566) | (257,566) | (325,922) | (519,716) | (173,601) |
| | (12,300,000) | - | - | - | - | - |
| | **(13,130,388)** | **(856,189)** | **(781,014)** | **(3,759,436)** | **(633,242)** | **(173,601)** |
| | (2,562,705) | - | - | (1,176,693) | 18,750 | |
| | (4,835) | - | (2,076) | (4,199) | - | (2,123) |
| | - | - | - | - | - | (172,382) |
| | 895,675 | - | - | 18,779,947 | - | - |
| | **(1,671,865)** | **-** | **(2,076)** | **17,599,056** | **18,750** | **(174,505)** |
| | *(13,988,677)* | *349,692* | *(321,874)* | *13,901,780* | *(448,075)* | *1,047,950* |
| | 16,871,590 | 2,882,912 | 3,232,605 | 2,910,730 | 16,812,510 | 16,364,435 |
| | 2,882,912 | 3,232,605 | 2,910,730 | 16,812,510 | 16,364,435 | 17,412,385 |

| | Sep-15 | Oct-15 | Nov-15 | Dec-15 | Jan-16 | Feb-16 |
|---|---|---|---|---|---|---|
| $ | (128,672) $ | 1,829,465 $ | 1,751,881 $ | (1,083,128) $ | 799,947 $ | 1,003,375 |
| | 104,724 | 104,624 | 104,624 | 103,297 | 205,567 | 205,748 |
| | 39,041 | 44,079 | 36,975 | 322,503 | 35,295 | 37,337 |
| | - | - | - | 1,630,845 | - | - |
| | - | - | - | - | - | - |
| | 380,161 | 380,161 | 380,161 | 473,356 | 854,700 | 854,700 |
| | - | - | - | - | - | - |
| | 34,121 | 34,121 | 34,121 | 34,121 | 34,121 | 34,121 |
| | 1,197,679 | (1,569,268) | (333,762) | 593,912 | (1,404,913) | (64,049) |
| | 41,196 | (71,588) | 73,811 | (10,294) | (97,172) | 104,083 |
| | (41,505) | 60,827 | 220,009 | 64,954 | 42,765 | 18,354 |
| | (45,287) | (15,020) | (1,951) | (2,223) | (4,173) | (1,567) |
| | (14,697) | - | - | 920,280 | 490,290 | 614,972 |
| | 2,042,435 | 89,044 | 40,491 | 227,564 | 51,234 | (1,855,494) |
| | **3,609,196** | **886,445** | **2,306,361** | **3,275,188** | **1,007,661** | **951,581** |
| | (85,805) | (4,010) | (11,984) | (9,800) | (859) | (301,295) |
| | (173,601) | (173,601) | (173,601) | (173,599) | - | (0) |
| | (16,000,000) | (2,000,000) | (2,000,000) | (1,850,000) | (6,866) | (31,814,557) |
| | **(16,259,406)** | **(2,177,611)** | **(2,185,585)** | **(2,033,399)** | **(7,725)** | **(32,115,853)** |
| | (1,157,943) | - | - | (1,157,943) | 1,000,000 | - |
| | (2,139) | (4,326) | (2,218) | (2,220) | (810) | (810) |
| | - | - | - | - | - | - |
| | - | - | - | - | 42,167,477 | - |
| | **(1,160,082)** | **(4,326)** | **(2,218)** | **(1,160,163)** | **43,166,667** | **(810)** |
| | *(13,810,291)* | *(1,295,492)* | *118,557* | *81,626* | *44,166,602* | *(31,165,082)* |
| | 17,412,385 | 3,602,094 | 2,306,602 | 2,425,159 | 2,506,785 | 46,673,388 |
| | 3,602,094 | 2,306,602 | 2,425,159 | 2,506,785 | 46,673,388 | 15,508,306 |



**Project Aquila Alpha**

**Private and Confidential**

**Discussion Materials Prepared for**
**The Special Committee of the Board of Directors**

**August 17, 2016**



*Duff & Phelps Securities, LLC is a FINRA Registered Broker-Dealer*

*The information contained herein is of a confidential nature and is intended for the exclusive use of the persons or firm to whom it is furnished by us.*
*Reproduction, publication, or dissemination of portions hereof may not be made without prior written consent of Duff & Phelps, LLC.*

# Duff & Phelps Disclaimer

- The following pages contain material that is being provided to the special committee of the Company's board of directors (the "Special Committee") of Constellation Healthcare Technologies, Inc. ("Constellation" or the "Company") in connection with the proposed transaction (as herein described).

- The accompanying material was compiled and prepared on a confidential basis for the sole use of the Special Committee and not with a view toward public disclosure and may not be disclosed, summarized, reproduced, disseminated or quoted from or otherwise referred to, in whole or in part, without the prior written consent of Duff & Phelps, LLC and Duff & Phelps Securities, LLC (together referred to as "Duff & Phelps"), except as provided in the engagement letter.

- The information utilized in preparing this presentation was obtained from the management of the Company ("Company Management") and public sources. Any estimates and projections contained herein have been prepared by or based on discussions with Company Management and involve numerous and significant subjective determinations, which may or may not prove to be correct. Duff & Phelps has relied on the accuracy and completeness of the foregoing information. No representation or warranty, expressed or implied, is made as to the accuracy or completeness of such information and nothing contained herein is, or shall be relied upon as, a representation, whether as to the past, the present or the future. Duff & Phelps did not independently verify such information.

- Because this material was prepared for use solely in the context of an oral presentation to the Special Committee, which is familiar with the business and affairs of the Company, neither Duff & Phelps, nor any of its legal or financial advisors or accountants take any responsibility for the accuracy or completeness of any of the material if used by persons other than the Company and the Special Committee.

- These materials are not intended to represent an opinion but rather to serve as discussion materials for the Special Committee to review and as a basis upon which Duff & Phelps may render an opinion.

- No selected public company or selected transaction used in our analysis is directly comparable to the Company or the proposed transaction. All information and analyses contained herein are subject to change and such changes may be significant.

# Table of Contents

| Section | Topic | Page |
|---|---|---|
| 1. | Overview | 4 |
| 2. | Stock Price Performance | 8 |
| 3. | Valuation Analysis | 11 |
| 4. | Select Strategic and Financial Buyers | 21 |
| **Appendix** | | |
| 1. | Valuation Support | 28 |



Section 1

**Overview**

# Summary of Transaction

▪ CC Capital Management, LLC's ("CC Capital") and Mr. Paul Parmar's offer to Constellation dated August 9, 2016, is a purchase price of £2.11 per share, representing an enterprise value of $252 million on a cash-free and debt-free basis based on the June 30, 2016 actual balance sheet

▪ In addition to CC Capital's $63 million equity investment, Mr. Parmar, CEO, and Mr. Sam Zaharis, CFO, will rollover a combined $84 million of equity into the transaction

▪ The remainder of the purchase price will be financed with a $120 million term loan from Bank of America

▪ The sources and uses below represent CC Capital's offer as stated with the enterprise value build-up based on the June 30, 2016 balance sheet

| CC Capital Offer Analysis | | | |
|---|---|---|---|
| **Total Enterprise Value** | | | |
| *(in millions, except per share data)* | | | Adj. for |
| | | CC Capital | June Act. |
| Purchase Price Per Share | | £2.11 | £2.11 |
| x FDSO (in millions) | | 89.0 | 89.0 |
| Equity Value (GBP) | | £187.30 | £187.30 |
| | | | |
| GBP/USD Exchange Rate[1] | | 1.30 | 1.30 |
| Equity Value (USD) | | $244.3 | $244.3 |
| | | | |
| Less: Excess Cash | | | (20.8) [2][3] |
| Plus: Outstanding Debt | | | 12.6 [2] |
| Plus: Earnouts and Other | | | 15.7 [2] |
| Net Debt | | ($5.6) | $7.5 |
| | | | |
| Total Enterprise Value | | $238.8 | $251.9 |
| | | | |
| **Implied Transaction Multiples** | | | |
| 2015A Adj. EBITDA | *$24.5* | *9.7x* | *10.3x* |
| LTM Adj. EBITDA | *$36.5* | *6.5x* | *6.9x* |
| 2016E Adj. EBITDA | *$43.3* | *5.5x* | *5.8x* |
| 2017P Adj. EBITDA | *$48.0* | *5.0x* | *5.2x* |

| CC Capital Sources and Uses | |
|---|---|
| **Sources** | *($ in millions)* |
| Revolver | $0.0 |
| Term Loan A | 120.0 |
| Earnout and Other[2] | 15.7 |
| Total Debt | $135.7 |
| | |
| CC Capital Equity | 62.9 |
| Rollover Equity[4] | 83.9 |
| Total Equity | 146.8 |
| | |
| **Total Sources** | **$282.5** |
| | |
| **Uses** | |
| Total Enterprise Value[5] | $251.9 |
| | |
| Financing Fees | 2.0 |
| Upfront Financing Fees | 0.6 |
| Deal Finders Fee | 1.0 |
| CC Capital Fee | 2.4 |
| Operating Cash Float | 1.5 |
| Buyer Fees and Expenses[6] | 5.8 |
| Excess Cash | 17.4 |
| | |
| **Total Uses** | **$282.5** |

*(1) Per share price converted at the spot rate of $1.30/GBP as of August 10, 2016*
*(2) At June 30, 2016*
*(3) Excludes balance sheet cash of $1.5 million required for operating cash float per CC Capital*
*(4) Rollover equity stated in original offer divided by original offer price multiplied by revised offer price per share; converted at stated exchange rates in offer letters*
*(5) Total Enterprise Value calculation based on June 30, 2016 balance sheet*
*(6) Does not include fees to Duff & Phelps and Kirkland & Ellis*



# Summary of Transaction (cont'd)

| (in millions, except per share data) | | Offer | Last Close[1] | Moving Average[2] 30-Day | Moving Average[2] 180-Day | 52-Week Low | 52-Week High | Record High |
|---|---|---|---|---|---|---|---|---|
| **Price per Share (£)** | | **£2.11** | **£1.53** | **£1.45** | **£1.53** | **£1.27** | **£1.79** | **£1.88** |
| *Implied Offer Premium* | | | *37.7%* | *45.0%* | *38.2%* | *66.1%* | *17.9%* | *12.2%* |
| | | | | Implied Enterprise Value | | | | |
| Price per Share ($USD)[3] | | $2.74 | $1.99 | $1.89 | $1.98 | $1.65 | $2.33 | $2.44 |
| Shares Outstanding (in millions) | | 89.0 | 89.0 | 89.0 | 89.0 | 89.0 | 89.0 | 89.0 |
| Implied Equity Value | | $244.3 | $177.2 | $168.3 | $176.6 | $146.9 | $207.0 | $217.4 |
| Plus: Net Debt[4][5] | | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 | 7.5 |
| **Implied Enterprise Value** | | **$251.9** | **$184.7** | **$175.8** | **$184.2** | **$154.4** | **$214.6** | **$225.0** |
| | | | | Implied Enterprise Value / Revenue Multiples | | | | |
| 2015A Revenue | *$76.7* | 3.28x | 2.41x | 2.29x | 2.40x | 2.01x | 2.80x | 2.93x |
| LTM Revenue[4] | *$101.5* | 2.48x | 1.82x | 1.73x | 1.81x | 1.52x | 2.11x | 2.22x |
| 2016E Revenue | *$126.4* | 1.99x | 1.46x | 1.39x | 1.46x | 1.22x | 1.70x | 1.78x |
| 2017E Revenue | *$140.4* | 1.79x | 1.32x | 1.25x | 1.31x | 1.10x | 1.53x | 1.60x |
| | | | | Implied Enterprise Value / Adj. EBITDA Multiples | | | | |
| 2015A Adj. EBITDA[6] | *$24.5* | 10.3x | 7.5x | 7.2x | 7.5x | 6.3x | 8.8x | 9.2x |
| LTM Adj. EBITDA[4] | *$36.5* | 6.9x | 5.1x | 4.8x | 5.0x | 4.2x | 5.9x | 6.2x |
| 2016E Adj. EBITDA | *$43.3* | 5.8x | 4.3x | 4.1x | 4.2x | 3.6x | 5.0x | 5.2x |
| 2016E Adj. EBITDA Less QofE[7] | *$38.5* | 6.5x | 4.8x | 4.6x | 4.8x | 4.0x | 5.6x | 5.8x |
| 2016E Adj. EBITDA Less QofE (50%) | *$40.9* | 6.2x | 4.5x | 4.3x | 4.5x | 3.8x | 5.2x | 5.5x |
| 2017P Adj. EBITDA | *$48.0* | 5.2x | 3.8x | 3.7x | 3.8x | 3.2x | 4.5x | 4.7x |

*(1) Last close as of August 10, 2016*

*(2) Moving averages represent volume-weighted average price*

*(3) Per share price converted at the spot rate of $1.30 / GBP as of August 10, 2016*

*(4) As of June 30, 2016*

*(5) Includes $10.5 million and $5.2 million of earnout payable and sellers payable, respectively; assumes operating cash float of $1.5 million*

*(6) Adj. EBITDA includes public company expenses*

*(7) Per CC Capital offer letter dated August 9, 2016; Duff & Phelps has not seen source document*

Note: EBITDA based on financials provided by Constellation



# Summary of Historical and Projected Financial Performance

**Historical and Projected Financial Performance**

*($ in millions)*

|  | 2012A | 2013A | 2014A | 2015A | LTM[1] | **Management Projections** | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | 2016E | 2017P | 2018P | 2019P | 2020P | 2021P |
| Revenue Cycle Management (RCM) | $32.8 | $32.6 | $28.4 | $50.1 | $73.2 | $99.6 | $113.8 | $115.4 | $117.1 | $118.8 | $120.6 |
| Practice Management (PM) | 17.6 | 17.9 | 19.1 | 18.9 | 19.2 | 18.8 | 19.5 | 19.5 | 19.5 | 19.5 | 19.5 |
| Group Purchasing Organization (GPO) | 1.4 | 1.5 | 7.1 | 7.7 | 9.2 | 8.0 | 7.1 | 7.1 | 7.1 | 7.1 | 7.1 |
| Total Revenue | $51.7 | $52.0 | $54.6 | $76.7 | $101.5 | $126.4 | $140.4 | $142.0 | $143.7 | $145.4 | $147.2 |
| *Growth* | *NA* | *0.5%* | *5.1%* | *40.5%* | *65.9%* | *64.7%* | *11.1%* | *1.2%* | *1.2%* | *1.2%* | *1.2%* |
| Adjusted EBITDA[2] | $3.3 | $7.6 | $14.9 | $24.5 | $36.5 | $43.3 | $48.0 | $56.2 | $60.4 | $61.2 | $62.0 |
| *Margin* | *6.3%* | *14.7%* | *27.3%* | *31.9%* | *35.9%* | *34.3%* | *34.2%* | *39.6%* | *42.0%* | *42.1%* | *42.1%* |
| *Growth* | *NA* | *134.3%* | *95.2%* | *64.2%* | *120.6%* | *77.0%* | *10.7%* | *17.1%* | *7.6%* | *1.3%* | *1.3%* |
| *Adj. EBITDA Less QofE Adjustment [3]* |  |  |  |  |  | *$38.5* |  |  |  |  |  |
| *Adj. EBITDA Less QofE Adjustment - 50%* |  |  |  |  |  | *$40.9* |  |  |  |  |  |
| Capital Expenditures | $0.2 | $4.8 | $0.1 | $6.4 | $1.1 | $0.8 | $2.0 | $2.0 | $2.0 | $2.1 | $2.1 |
| *as % of Total Revenue* | *0.4%* | *9.2%* | *0.1%* | *8.4%* | *1.1%* | *0.7%* | *1.4%* | *1.4%* | *1.4%* | *1.4%* | *1.4%* |
| Net Working Capital | $3.0 | $1.5 | $4.3 | $6.9 | $14.7 | $16.1 | $16.2 | $17.0 | $17.2 | $17.4 | $17.6 |
| *as % of Total Revenue* | *5.8%* | *2.9%* | *7.8%* | *8.9%* | *14.5%* | *12.8%* | *11.6%* | *11.9%* | *12.0%* | *12.0%* | *12.0%* |

*(1) Latest twelve months ended June 30, 2016*
*(2) Adjusted EBITDA includes the add-back of estimated public company estimates*
*(3) Per CC Capital offer dated August 9, 2016*

**2016 Monthly Performance**

*($ in millions)*

|  | **Actual** | | | | | | **Estimated** | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |  |
| Revenues - RCM | $4.8 | $5.3 | $5.3 | $9.3 | $9.2 | $9.5 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 | $9.4 | $99.6 |
| Revenues - PM | 1.5 | 1.6 | 1.6 | 1.4 | 1.3 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 1.6 | 18.8 |
| Revenues - GPO | 0.7 | 0.7 | 0.7 | 0.7 | 0.7 | 0.8 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 8.0 |
| Total Revenue | $7.1 | $7.6 | $7.6 | $11.5 | $11.2 | $11.8 | $11.6 | $11.6 | $11.6 | $11.6 | $11.6 | $11.6 | $126.4 |
| Operating Expenses | $4.7 | $4.8 | $5.1 | $7.1 | $6.9 | $7.2 | $7.9 | $7.9 | $8.0 | $8.0 | $8.2 | $8.2 | $83.8 |
| Plus: Public Company Costs | $0.0 | $0.1 | $0.1 | $0.1 | $0.0 | $0.1 | $0.1 | $0.1 | $0.1 | $0.1 | $0.1 | $0.1 | $0.8 |
| Adjusted EBITDA | $2.4 | $2.8 | $2.7 | $4.5 | $4.4 | $4.6 | $3.8 | $3.8 | $3.7 | $3.7 | $3.5 | $3.5 | $43.3 |
| *Margin* | *33.4%* | *37.2%* | *35.2%* | *39.1%* | *39.0%* | *39.4%* | *32.5%* | *32.5%* | *31.9%* | *31.9%* | *30.2%* | *30.3%* | *34.3%* |
| Capital Expenditures | $0.0 | $0.0 | $0.0 | $0.8 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.0 | $0.8 |
| *% of Revenue* | *0.0%* | *0.0%* | *0.1%* | *7.3%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.0%* | *0.7%* |

*Note: Financials provided by Constellation*

CONFIDENTIAL



Section 2

**Stock Price Performance**

Case 2:18-cv-09284-MCA-MAH Document 12-4 Filed 08/16/18 Page 9 of 30 PageID: 197

# Stock Price Performance

## Trading History Since IPO

## One-Year Trading History



# Stock Price Performance – vs. S&P 500 Index / S&P 500 Healthcare Index / FTSE





Section 3    **Valuation Analysis**

# Observed Valuation Ranges





*(1) The discounted cash flow less QofE adjustments represents an implied 2016E Adj. EBITDA multiple range of 7.2x-8.7x as demonstrated in the light gray section of the range*
*(2) Selected public company multiples are size adjusted; range excludes athenahealth, Inc., HMS Holdings Corp. and Craneware plc; in addition to the differential in size, most of the public company comparables derive a portion of their revenue from the sale or license of software*
*Note: Financials provided by Constellation; per share value is net of $1.5 million of operating cash float*

# EBITDA Sensitivity and Observed Value Range

*($ in millions, except per share)*

| | |
|---|---:|
| 2016E EBITDA | $42.6 |
| Plus: Public Company Expenses | 0.8 |
| **2016E Adj. EBITDA** | **$43.3** |
| Less: Quality of Earnings Adjustment[1] | (4.8) |
| **2016E Adj. EBITDA Less QofE** | **$38.5** |
| Less: Quality of Earnings Adjustment (50%) | (2.4) |
| **2016E Adj. EBITDA Less QofE (50%)** | **$40.9** |

*(1) CC Capital offer letter dated August 9, 2016*

| Implied TEV from Public Companies | | Observed Value Range | | |
|---|---|---|---|---|
| Observed Public Companies/M&A Transactions Multiple Range | | 5.9x | - | 13.6x |
| | | **Implied Enterprise Value** | | |
| 2016E EBITDA | $42.6 | $250.3 | - | $577.7 |
| 2016E Adj. EBITDA | $43.3 | $254.9 | - | $588.3 |
| 2016E Adj. EBITDA Less QofE (50%) | $40.9 | $240.8 | - | $555.7 |
| 2016E Adj. EBITDA Less QofE | $38.5 | $226.7 | | $523.1 |
| | | **Per Share Price** | | |
| 2016E EBITDA | $42.6 | £2.10 | - | £4.93 |
| 2016E Adj. EBITDA | $43.3 | £2.14 | - | £5.02 |
| 2016E Adj. EBITDA Less QofE (50%) | $40.9 | £2.02 | - | £4.74 |
| 2016E Adj. EBITDA Less QofE | $38.5 | £1.89 | - | £4.46 |

CONFIDENTIAL

# Observed Public Companies Multiples

- Duff & Phelps selected eight publicly-traded companies within the healthcare IT/revenue cycle management industry that were deemed most relevant to its analysis

- Duff & Phelps analyzed the financial performance of each of the publicly-traded companies. Duff & Phelps then analyzed the selected public companies' trading multiples of enterprise value to LTM revenue and EBITDA, and enterprise value to projected revenue and EBITDA

*(US$ in millions, except per share data)*

| COMPANY INFORMATION | MARKET DATA | | | ENTERPRISE VALUE AS MULTIPLE OF | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company Name | Common Stock Price on 08/10/2016 | % of 52-Week High | Enterprise Value | LTM EBITDA | 2016 EBITDA | 2016 Adjusted EBITDA[1] | 2017 EBITDA | 2018 EBITDA | LTM Revenue | 2016 Revenue | 2017 Revenue | 2018 Revenue |
| The Advisory Board Company | $41.27 | 75.3% | $2,217 | 18.3x | 11.5x | 10.8x | 10.5x | 9.3x | 2.76x | 2.70x | 2.51x | 2.31x |
| Allscripts Healthcare Solutions, Inc. | 13.65 | 86.5 | 4,029 | 30.2 | 13.9 | 13.2x | 12.1 | 11.1 | 2.81 | 2.55 | 2.32 | 2.18 |
| athenahealth, Inc. | 125.19 | 73.5 | 5,086 | 59.5 | 21.5 | 20.7x | 17.7 | 14.3 | 5.03 | 4.61 | 3.86 | 3.21 |
| Computer Programs & Systems Inc. | 28.79 | 48.7 | 541 | 19.3 | 9.5 | 9.1x | 8.4 | 9.2 | 2.38 | 1.95 | 1.88 | 1.83 |
| Cotiviti Holdings, Inc. | 27.75 | 98.3 | 3,260 | 13.5 | 14.3 | 13.6x | 12.8 | 11.4 | 5.78 | 5.44 | 4.91 | 4.44 |
| Craneware plc | 14.05 | 99.5 | 332 | 23.5 | 21.0 | 20.6x | 18.4 | 16.6 | 7.16 | 6.66 | 5.74 | 5.22 |
| HMS Holdings Corp. | 23.00 | 99.7 | 1,952 | 20.9 | 15.9 | 15.2x | 14.3 | 12.8 | 3.98 | 3.93 | 3.69 | 3.45 |
| Quality Systems Inc. | 12.24 | 69.9 | 814 | 14.4 | 9.1 | 8.5x | 8.5 | 8.8 | 1.65 | 1.62 | 1.56 | 1.49 |
| **Mean** | | **81.4%** | **2,279** | **25.0x** | **14.6x** | **14.0x** | **12.8x** | **11.7x** | **3.94x** | **3.68x** | **3.31x** | **3.02x** |
| **Median** | | **80.9%** | **2,085** | **20.1x** | **14.1x** | **13.4x** | **12.5x** | **11.3x** | **3.40x** | **3.31x** | **3.10x** | **2.76x** |

LTM = Latest Twelve Months
Enterprise Value = (Market Capitalization + Management Equity + Debt + Preferred Stock + Non-Controlling Interest) - (Cash & Equivalents + Net Non-Operating Assets)
EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

*(1) Size-adjusted is adjustment to multiple to account for difference in size between public companies and CHT*
Source: S&P Capital IQ, SEC Filings, Annual and Interim Reports.



# Observed Public Companies Metrics

| COMPANY INFORMATION | REVENUE GROWTH | | | | | EBITDA GROWTH | | | | | EBITDA MARGIN | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Company Name | 3-YR CAGR | LTM | 2016 | 2017 | 2018 | 3-YR CAGR | LTM | 2016 | 2017 | 2018 | 3-YR AVG | LTM | 2016 | 2017 | 2018 |
| The Advisory Board Company | 19.4% | 22.5% | 6.8% | 7.7% | 8.4% | 17.2% | 88.1% | 87.5% | 9.6% | 12.5% | 11.5% | 15.1% | 23.5% | 23.9% | 24.8% |
| Allscripts Healthcare Solutions, Inc. | -1.4 | 4.3 | 14.1 | 9.8 | 6.6 | 1.0 | 56.7 | 157.3 | 15.2 | 8.8 | 4.3 | 9.3 | 18.3 | 19.2 | 19.6 |
| athenahealth, Inc. | 29.9 | 21.2 | 19.2 | 19.4 | 20.3 | 7.0 | 22.0 | 288.4 | 21.4 | 23.8 | 8.4 | 8.4 | 21.4 | 21.8 | 22.4 |
| Computer Programs & Systems Inc. | -0.2 | 17.6 | 52.7 | 3.4 | 3.1 | -9.2 | -35.5 | 72.1 | 12.8 | -9.2 | 23.7 | 12.3 | 20.6 | 22.5 | 19.8 |
| Cotiviti Holdings, Inc. | NA | 33.5 | 10.8 | 10.6 | 10.7 | NA | 26.9 | 14.1 | 11.3 | 12.1 | 36.1 | 36.6 | 38.1 | 38.3 | 38.8 |
| Craneware plc | 3.0 | 7.8 | 11.2 | 16.0 | 9.9 | 6.6 | 10.9 | 18.2 | 14.2 | 10.8 | 28.8 | 30.5 | 31.7 | 31.2 | 31.4 |
| HMS Holdings Corp. | 0.0 | 8.2 | 4.9 | 6.5 | 6.8 | -15.3 | 18.4 | 36.2 | 10.7 | 11.8 | 20.8 | 19.1 | 24.7 | 25.7 | 26.9 |
| Quality Systems Inc. | 2.3 | -0.4 | 1.8 | 4.3 | 4.8 | -16.4 | 8.5 | 56.2 | 7.1 | -3.2 | 12.0 | 11.5 | 17.9 | 18.4 | 17.0 |
| **Mean** | **7.6%** | **14.3%** | **15.2%** | **9.7%** | **8.8%** | **-1.3%** | **24.5%** | **91.3%** | **12.8%** | **8.4%** | **18.2%** | **17.8%** | **24.5%** | **25.1%** | **25.1%** |
| **Median** | **2.3%** | **12.9%** | **11.0%** | **8.8%** | **7.6%** | **1.0%** | **20.2%** | **64.2%** | **12.0%** | **11.3%** | **16.4%** | **13.7%** | **22.5%** | **23.2%** | **23.6%** |
| **Aquila Alpha** | **14.0%** | **65.9%** | **64.7%** | **11.1%** | **1.2%** | **95.8%** | **120.6%** | **77.0%** | **10.7%** | **17.1%** | **24.6%** | **35.9%** | **34.3%** | **34.2%** | **39.6%** |

LTM = Latest Twelve Months

CAGR = Compounded Annual Growth Rate

EBITDA = Earnings Before Interest, Taxes, Depreciation and Amortization

EBIT = Earnings Before Interest and Taxes

Source: S&P Capital IQ, SEC Filings, Annual and Interim Reports.

CONFIDENTIAL

## Observed M&A Transactions

*($ in millions)*

| Announced | Target Name | Target Business Description | Acquirer Name | Enterprise Value | LTM Revenue | LTM EBITDA | EBITDA Margin | EV / Revenue | EV / EBITDA |
|---|---|---|---|---|---|---|---|---|---|
| 12/11/2015 | MDRX Medical Billing, LLC | Healthcare practice management and billing services | Constellation Healthcare Technologies, Inc. | $30.0 | $31.6 | $4.8 | 15.2% | 0.95x | 6.3x |
| 11/1/2015 | MedAssets, Inc. | Technology-enabled RCM and clinical resource management services | Pamplona Capital Management | $2,775.2 | $764.2 | $217.8 | 28.5% | 3.63x | 12.7x |
| 9/18/2015 | Phoenix Health LLC | Worker's compensation and automobile claims processing services | Constellation Healthcare Technologies, Inc. | $14.0 | $9.8 | $2.2 | 22.4% | 1.43x | 6.4x |
| 9/16/2015 | NorthStar First Health, LLC | RCM and consulting services for private practice and hospital based practices | Constellation Healthcare Technologies, Inc. | $18.0 | $7.9 | $1.9 | 24.1% | 2.28x | 9.5x |
| 3/17/2015 | Physicians Practice Plus Inc. ("PPP") [1] | RCM services for healthcare practice management providers | Constellation Healthcare Technologies, Inc. | $20.0 | $10.7 | $3.4 | 31.8% | 1.87x | 5.9x |
| 6/23/2014 | Capario, Inc. | RCM solutions that connect healthcare providers and payers | Emdeon Inc. (nka:Change Healthcare Holdings, Inc.) | $111.2 | $54.1 | - | - | 2.06x | - |
| 5/14/2014 | Cymetrix Corporation (nka:Navigant Cymetrix Corporation) | Patient-centered solutions for sustained improvements in revenue cycle performance | Navigant Consulting Inc. | $100.0 | $83.0 | - | - | 1.20x | - |
| 6/10/2013 | U.S. Collections, Inc. [2] | Receivables management services various healthcare providers | Parallon Business Solutions, LLC | $278.0 | $100.0 | $25.2 | - | - | 11.0x |
| 8/3/2011 | Emdeon Inc. (nka:Change Healthcare Holdings, Inc.) | Software and analytics, connectivity, communication and payment solutions | Blackstone Group; Hellman & Friedman LLC | $3,306.3 | $1,119.6 | $300.5 | 26.8% | 2.95x | 11.0x |
| | | | **Mean** | **$739.2** | **$242.3** | **$79.4** | **24.8%** | **2.05x** | **9.0x** |
| | | | **Median** | **$100.0** | **$54.1** | **$4.8** | **25.4%** | **1.96x** | **9.5x** |

[1] Pro-forma LTM EBITDA of $3.4M incorporates PPP's Nov. 2014 acquisition of P.C. Advantage
[2] Multiple not disclosed; Duff & Phelps' estimate
Source: Capital IQ and company filings

DUFF&PHELPS

CONFIDENTIAL

16

# Discounted Cash Flow Analysis Summary

*($ in millions)*

| | LTM[1] | Management Projections | | | | | | '15 - '21 CAGR | '16 - '21 Average |
|---|---|---|---|---|---|---|---|---|---|
| | | 2016E | 2017P | 2018P | 2019P | 2020P | 2021P | | |
| Revenue | $101.5 | $126.4 | $140.4 | $142.0 | $143.7 | $145.4 | $147.2 | 7.8% | |
| *Growth* | *65.9%* | *64.7%* | *11.1%* | *1.2%* | *1.2%* | *1.2%* | *1.2%* | | *13.4%* |
| Adjusted EBITDA | $36.5 | $43.3 | $48.0 | $56.2 | $60.4 | $61.2 | $62.0 | 10.7% | |
| *Margin* | *35.9%* | *34.3%* | *34.2%* | *39.6%* | *42.0%* | *42.1%* | *42.1%* | | *39.0%* |
| *Growth* | *120.6%* | *77.0%* | *10.7%* | *17.1%* | *7.6%* | *1.3%* | *1.3%* | | |

| | | 7/16-12/16 | | | | | |
|---|---|---|---|---|---|---|---|
| Earnings Before Interest and Taxes | | $21.0 | $45.9 | $53.8 | $57.7 | $59.1 | $60.3 |
| Pro Forma Taxes @ 38.0% | | (8.0) | (17.5) | (20.4) | (21.9) | (22.4) | (22.9) |
| Net Operating Profit After Tax | | $13.0 | $28.5 | $33.4 | $35.8 | $36.6 | $37.4 |
| Depreciation | | $0.9 | $2.0 | $2.4 | $2.7 | $2.1 | $1.7 |
| Capital Expenditures | | (0.0) | (2.0) | (2.0) | (2.0) | (2.1) | (2.1) |
| (Increase) Decrease in Working Capital | | (1.4) | (0.1) | (0.7) | (0.2) | (0.2) | (0.2) |
| Free Cash Flow | | $12.6 | $28.4 | $33.0 | $36.2 | $36.5 | $36.8 |

| Enterprise Value | | Low | - | High |
|---|---|---|---|---|
| Terminal Growth Rate | | 6.0x | - | 7.0x |
| Weighted Average Cost of Capital | | 14.00% | - | 11.00% |
| **Discounted Cash Flow Value** | | **$325.0** | **-** | **$400.0** |
| Plus: Value of NOLs and Tax Amortization Benefit | | $10.0 | - | $10.0 |
| **Indicated Enterprise Value Range (Rounded)** | | **$335.0** | **-** | **$410.0** |

| Implied Enterprise Value Multiples | | | | |
|---|---|---|---|---|
| LTM Adj. EBITDA[1] | $36.5 | 9.2x | - | 11.2x |
| 2016E Adj. EBITDA | 43.3 | 7.7x | - | 9.5x |
| 2016E Adj. EBITDA Less QofE | 38.5 | 8.7x | - | 10.6x |
| 2016E Adj. EBITDA Less QofE (50%) | 40.9 | 8.2x | - | 10.0x |
| 2017P Adj. EBITDA | 48.0 | 7.0x | - | 8.5x |
| LTM Revenue[1] | 101.5 | 3.3x | - | 4.0x |

*(1) Latest twelve months ended June 30, 2016*



# Discounted Cash Flow Analysis Summary – QofE Adjustment

*($ in millions)*

| | LTM[1] | Management Projections | | | | | | '15 - '21 | '16 - '21 |
| | | 2016E | 2017P | 2018P | 2019P | 2020P | 2021P | CAGR | Average |
|---|---|---|---|---|---|---|---|---|---|
| Revenue | $101.5 | $126.4 | $140.4 | $142.0 | $143.7 | $145.4 | $147.2 | 7.8% | |
| *Growth* | *65.9%* | *64.7%* | *11.1%* | *1.2%* | *1.2%* | *1.2%* | *1.2%* | | *13.4%* |
| Adjusted EBITDA less QofE | $31.7 | $38.5 | $43.2 | $51.4 | $55.6 | $56.4 | $57.2 | 13.3% | |
| *Margin* | *31.2%* | *30.5%* | *30.8%* | *36.2%* | *38.7%* | *38.8%* | *38.9%* | | *35.6%* |
| *Growth* | *70.3%* | *97.7%* | *12.1%* | *19.0%* | *8.3%* | *1.4%* | *1.4%* | | |

| | | **7/16-12/16** | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Earnings Before Interest and Taxes | | $18.6 | $41.1 | $49.0 | $52.9 | $54.3 | $55.5 | | |
| Pro Forma Taxes @ 38.0% | | (7.1) | (15.6) | (18.6) | (20.1) | (20.6) | (21.1) | | |
| Net Operating Profit After Tax | | $11.6 | $25.5 | $30.4 | $32.8 | $33.6 | $34.4 | | |
| Depreciation | | $0.9 | $2.0 | $2.4 | $2.7 | $2.1 | $1.7 | | |
| Capital Expenditures | | (0.0) | (2.0) | (2.0) | (2.0) | (2.1) | (2.1) | | |
| (Increase) Decrease in Working Capital | | (1.4) | (0.1) | (0.7) | (0.2) | (0.2) | (0.2) | | |
| Free Cash Flow | | $11.6 | $25.5 | $30.0 | $33.2 | $33.5 | $33.8 | | |

| **Enterprise Value** | | **Low** | **-** | **High** | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Terminal Growth Rate | | 6.0x | - | 7.0x | | | | | |
| Weighted Average Cost of Capital | | 14.00% | - | 11.00% | | | | | |
| **Discounted Cash Flow Value** | | **$300.0** | **-** | **$365.0** | | | | | |
| Plus: Value of NOLs and Tax Amortization Benefit | | $10.0 | **-** | $10.0 | | | | | |
| **Indicated Enterprise Value Range (Rounded)** | | **$310.0** | **-** | **$375.0** | | | | | |

| **Implied Enterprise Value Multiples** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| LTM Adj. EBITDA[1] | $36.5 | 8.5x | - | 10.3x | | | | | |
| 2016E Adj. EBITDA | 43.3 | 7.2x | - | 8.7x | | | | | |
| 2016E Adj. EBITDA Less QofE | 38.5 | 8.0x | - | 9.7x | | | | | |
| 2016E Adj. EBITDA Less QofE (50%) | 40.9 | 7.6x | - | 9.2x | | | | | |
| 2017P Adj. EBITDA | 48.0 | 6.5x | - | 7.8x | | | | | |
| LTM Revenue[1] | 101.5 | 3.1x | - | 3.7x | | | | | |

*(1) Latest twelve months ended June 30, 2016*



# Leveraged Buyout Analysis

*($ in millions)*

| Sources | Amount | Cash Rate | PIK Rate | % of Capital | Equity Particip. | EBITDA Multiple |
|---|---|---|---|---|---|---|
| Sr. Term Loan | $120 | L + 3.0% | | 42.5% | | 2.8x |
| Revolver | 0 | | | 0.0% | | 0.0x |
| Total Debt | 120 | | | 42.5% | 0.0% | 2.8x |
| Earnout and Other | 16 | | | 5.6% | | |
| Sponsor's Equity | 63 | | | 22.3% | 42.8% | |
| Management | 84 | | | 29.7% | 57.2% | |
| **Total Sources** | **$282** | | | **100.0%** | **100.0%** | |

| Uses | |
|---|---|
| Purchase Price | $252 |
| Transaction Fees | 12 |
| Operating Cash Float | 2 |
| Excess Cash | 17 |
| **Total Uses** | **$282** |

## Financial Statistics and Coverage Ratios

| FYE: December 31 | At Close[1] | Stub 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|
| Adjusted EBITDA | $36 | $22 | $48 | $56 | $60 | $61 | $62 |
| Capital Expenditures | (0) | (0) | (2) | (2) | (2) | (2) | (2) |
| Cash Interest Expense | | (2) | (3) | (3) | (2) | (0) | (0) |
| Mandatory Debt Amortization | | (1) | (2) | (2) | (2) | (3) | 0 |
| Additional Debt Repayment | | (5) | (23) | (28) | (36) | (20) | 0 |
| Total Debt Outstanding | 120 | 114 | 89 | 60 | 22 | 0 | 0 |
| Cash Balance | 2 | 2 | 2 | 2 | 2 | 18 | 57 |
| Net Debt | 119 | 112 | 88 | 58 | 21 | (18) | (57) |
| Total Debt / EBITDA | 3.3x | 2.6x | 1.9x | 1.1x | 0.4x | 0.0x | 0.0x |

## LBO Value Calculation

| | |
|---|---|
| Equity Contributed | $147 |
| Add: Sr. Term Loan and Earnout | 136 |
| Less: Operating Cash Float | (2) |
| Less: Excess Cash | (17) |
| Less: Total Fees | (12) |
| Total Enterprise Value | $252 |
| *Implied Multiple of LTM Adj. EBITDA* | *6.9x* |
| *Implied Multiple of 2016E Adj. EBITDA* | *5.8x* |

## 5-Year IRR Analysis

| | |
|---|---|
| Exit Year | 2021 |
| Initial Equity Investment | $147 |
| Exit Proceeds to Investor | $417 |
| Implied IRR | 21% |

|  | | Entry Multiple[2] | | | | | |
|---|---|---|---|---|---|---|---|
| | $252 | $260 | $282 | $303 | $325 | $347 | $368 |
| | 5.8x | 6.0x | 6.5x | 7.0x | 7.5x | 8.0x | 8.5x |
| **5.8x** | 21% | 20% | 17% | 14% | 12% | 10% | 9% |
| **6.0x** | 22% | 20% | 17% | 15% | 13% | 11% | 9% |
| **6.5x** | 23% | 22% | 19% | 17% | 14% | 12% | 11% |
| **7.0x** | 25% | 23% | 20% | 18% | 16% | 14% | 12% |
| **7.5x** | 26% | 25% | 22% | 19% | 17% | 15% | 13% |
| **8.0x** | 27% | 26% | 23% | 20% | 18% | 16% | 14% |
| **8.5x** | 29% | 27% | 24% | 22% | 19% | 17% | 16% |

*Exit Multiple* (vertical label for rows)

*(1) Close represents LTM as of June 30, 2016*

*(2) Expressed as a multiple of 2016E Adj. EBITDA of $43.3 million*



CONFIDENTIAL

# Premiums Paid Analysis

| Date Announced | Target | Buyer | Status | Offer Value Per Share | Previous Close | Premium | 30-Day Avg. | Premium | 180-Day Avg. | Premium | 365-Day Avg. | Premium | Record High | Premium |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8/9/2016 | Press Ganey Holdings, Inc. (NYSE:PGND) | EQT Partners | Pending | $40.50 | $40.33 | 0.4% | $40.15 | 0.9% | $33.22 | 21.9% | $32.19 | 25.8% | $40.97 | (1.1%) |
| 7/13/2016 | Imprivata, Inc. (NYSE:IMPR) | Thoma Bravo, LLC | Pending | $19.25 | $14.50 | 32.8% | $13.98 | 37.7% | $12.48 | 54.2% | $13.50 | 42.6% | $21.53 | (10.6%) |
| 5/3/2016 | IMS Health Holdings, Inc. (NYSE:IMS) | Quintiles Transnational Holdings Inc. (NYSE:Q) | Pending | $26.53 | $26.87 | (1.3%) | $26.50 | 0.1% | $25.78 | 2.9% | $28.04 | (5.4%) | $33.15 | (20.0%) |
| 4/27/2016 | ExamWorks Group, Inc. | Leonard Green & Partners, L.P. | Closed | $35.05 | $33.57 | 4.4% | $31.07 | 12.8% | $27.48 | 27.5% | $31.69 | 10.6% | $44.09 | (20.5%) |
| 11/2/2015 | MedAssets, Inc. | Pamplona Capital Management LLP | Closed | $31.35 | $23.68 | 32.4% | $22.67 | 38.3% | $21.52 | 45.7% | $20.46 | 53.2% | $26.39 | 18.8% |
| 8/6/2015 | Merge Healthcare Incorporated | IBM Corporation (NYSE:IBM) | Closed | $7.13 | $5.41 | 31.8% | $5.13 | 38.9% | $4.74 | 50.6% | $3.84 | 85.7% | $28.72 | (75.2%) |
| 8/4/2015 | IPC Healthcare, Inc. | Team Health Holdings, Inc. (NYSE:TMH) | Closed | $80.25 | $58.46 | 37.3% | $54.87 | 46.3% | $49.42 | 62.4% | $46.99 | 70.8% | $62.88 | 27.6% |
| 9/23/2013 | Greenway Medical Technologies, Inc. | Vista Equity Partners | Closed | $20.35 | $16.95 | 20.1% | $15.27 | 33.2% | $13.07 | 55.7% | $14.84 | 37.1% | $19.44 | 4.7% |
| 9/12/2012 | Mediware Information Systems, Inc. | Thoma Bravo, LLC | Closed | $22.00 | $15.75 | 39.7% | $14.50 | 51.7% | $14.38 | 53.0% | $13.70 | 60.6% | $18.19 | 20.9% |
| 4/10/2012 | eResearchTechnology, Inc. | Genstar Capital Management, LLC | Closed | $8.00 | $7.84 | 2.0% | $7.49 | 6.8% | $5.53 | 44.7% | $5.61 | 42.6% | $28.94 | (72.4%) |
| 3/7/2012 | Transcend Services, Inc. | Nuance Communications, Inc. (Nasdaq:NUAN) | Closed | $29.50 | $20.97 | 40.7% | $21.80 | 35.3% | $24.41 | 20.9% | $24.97 | 18.2% | $85.00 | (65.3%) |
| **Mean** | | | | | | **21.8%** | | **27.5%** | | **39.9%** | | **40.2%** | | **(17.5%)** |
| **Median** | | | | | | **31.8%** | | **35.3%** | | **45.7%** | | **42.6%** | | **(10.6%)** |
| **CC Capital Offer** | | | | **£2.11** | **£1.53** | **37.7%** | **£1.45** | **45.0%** | **£1.53** | **38.2%** | **£1.66** | **26.9%** | **£1.88** | **12.2%** |

*Note: Share prices represent volume-weighted average price*

CONFIDENTIAL

Section 4

**Select Strategic and Financial Buyers**

# Overview of Select Financial and Strategic Buyers

## Financial Buyers

### Private Equity Firms

- Large, well capitalized firms seeking to deploy capital in the HCIT and RCM sector

- Current portfolio investments with an industry focus or demonstrated interest in HCIT, RCM, and outsourced services

     
   
     
    
 

## Strategic Buyers

### RCM / HCIT Companies

- Large, acquisitive companies with a market presence and focus on end-to-end RCM, ARM and HCIT solutions

     
    

### BPO Companies

- Large, well capitalized companies with strong offshore presences

- Existing divisions with a focus on RCM and other collection activities

    
   



# Select Financial Buyers



- **Latest Fund:** $1.9B (2015)
- **Location:** Boston, MA
- **Notable Investment(s):** Automated HealthCare Solutions (2010); Casamba (2016)
- **Company Description**: Automated Healthcare Solutions is a leading provider of a claims management technology platform for point of care medication dispensing.



- **Latest Fund:** $1.3B (2015)
- **Location:** Menlo Park, CA
- **Notable Investment(s):** MEA | NEA (2013)
- **Company Description**: Solutions that enable the capture, transmission and storage of medical and dental information such as medical attachments (e.g., x-rays, test reports, etc.), records and audits.



- **Latest Fund:** $17.5B (2014)
- **Location:** New York, NY
- **Notable Investment(s):** RegionalCare Hospital Partners (2015)
- **Company Description**: Operates hospitals, outpatient centers and urgent care centers. First healthcare investment for Apollo as it expects to invest more resources in the field.



- **Latest Fund:** $2.3B (2015)
- **Location:** Boston, MA
- **Notable Investment(s):** United Recovery Systems (2008); Array Services Group (2014)
- **Company Description**: United Recovery Systems provides accounts receivable management services to issuers in healthcare, credit card, retail, commercial and deficiency loan industries.



- **Latest Fund:** $7.3B (2014)
- **Location:** Boston, MA
- **Notable Investment(s):** Navicure (2016)
- **Company Description**: Cloud-based healthcare claims management and patient payment solutions automating account receivables processes.



- **Latest Fund:** $650M (2012)
- **Location:** New York, NY
- **Notable Investment(s):** Recondo Technology (2013); Adreima (2013)
- **Company Description**: Recondo Technology provides HCIT RCM solutions, including eligibility verification and authorization, electronic claims management and payor reporting and analytics.



- **Latest Fund:** $893M (2015)
- **Location:** West Palm Beach, FL
- **Notable Investment(s):** Convey Health Solutions (2009)
- **Company Description**: Provider of specialty healthcare business process outsourcing services, including the outsourcing of insurance products from enrollment to disenrollment.



- **Latest Fund:** $615M (2014)
- **Location:** Chicago, IL
- **Notable Investment(s):** Strategic Healthcare Programs (2012) – Exited in 2014 to Roper Industries
- **Company Description**: Leading provider of software and informatics solutions to the post-acute healthcare market.



- **Latest Fund:** $950M (2015)
- **Location:** Chicago, IL
- **Notable Investment(s):** JetPay Corporation (2013)
- **Company Description**: Provider of vertically integrated solutions for businesses including, card acceptance, processing, payroll, payroll tax filing and other financial transactions.



- **Latest Fund:** $2.9B (2012)
- **Location:** San Francisco, CA
- **Notable Investment(s):** T-System, Inc. (2010); QGenda, Inc. (2016)
- **Company Description**: T-System provides clinical documentation solutions for hospital emergency departments (EDs), with about 40% of the nation's EDs using T-System's products.

**DUFF&PHELPS**

## Select Financial Buyers (cont'd)



- **Latest Fund:** $3.5B (2011)
- **Location:** San Francisco, CA
- **Notable Investment(s):** Sierra-Cedar (2011)
- **Company Description:** Applications services, consulting, technical and managed services for the deployment, management and optimization of next-generation applications and technology.



- **Latest Fund:** $3.9B (2014)
- **Location:** Chicago, IL
- **Notable Investment(s):** Cedar Gate Technologies (2014)
- **Company Description:** Partnership focused on acquiring companies and products in the HCIT industry as part of a strategy to build a market-leading healthcare data and analytics company.



- **Latest Fund:** $1.8B (2014)
- **Location:** Miami, FL
- **Notable Investment(s):** Integrity Solution Services (2009)
- **Company Description:** Provider of accounts receivable management and business process outsourcing services, including first-party, early stage collection services.



- **Latest Fund:** $4.1B (2014)
- **Location:** New York, NY
- **Notable Investment(s):** HealthPort (2014)
- **Company Description:** Provider of medical information access management and compliance services on behalf of healthcare organizations, enabling the compliant exchange of protected health information.



*fka Moelis Capital Partners*

- **Latest Fund:** $800M (2007)
- **Location:** New York, NY
- **Notable Investment(s):** OmniSYS (2013)
- **Company Description:** Market leader in medical, immunization and DME claim billing and consumer engagement workflow integrated into the pharmacy management system workflow of more than 25,000 pharmacies.



- **Latest Fund:** $4.1B (2014)
- **Location:** London, United Kingdom
- **Notable Investment(s):** MedAssets (2015)
- **Company Description:** RCM and clinical resource management services through technology-enabled products for hospitals, health systems, non-acute healthcare providers and payers.



- **Latest Fund:** $561M (2012)
- **Location:** Boston, MA
- **Notable Investment(s):** Bottom Line Systems (2016)
- **Company Description:** RCM technology and services for healthcare providers, including healthcare payment compliance and managed care contract improvement services.



- **Latest Fund:** $3.2B (2012)
- **Location:** Boston, MA
- **Notable Investment(s):** ABILITY Network (2014); Wellcentive (2014)
- **Company Description:** ABILITY Network provides innovative, web-based workflow solutions that simplify clinical and administrative tasks for acute and post-acute providers.



- **Latest Fund:** $5.3B (2015)
- **Location:** Boston, MA
- **Notable Investment(s):** eviCore healthcare (2010)
- **Company Description:** Provider of medical cost management services for commercial and Medicaid payors. The Company caters to various markets including cardiology, oncology, ultrasound and sleep study management.



- **Latest Fund:** ~$2.0B (2016)
- **Location:** Boston, MA
- **Notable Investment(s):** Intermedix (2010)
- **Company Description:** RCM services for emergency physicians and hospital emergency departments, emergency medical services (ambulance) agencies, urgent care centers and fire departments.

# Select Financial Buyers (cont'd)



- **Latest Fund:** $10.5B (2016)
- **Location:** Fort Worth, TX
- **Notable Investment(s):** Evolent Health (2013)
- **Company Description:** Partners with leading health systems to drive value-based care transformation by providing clinical, analytical and financial-based solutions.



- **Latest Fund:** $12.0B (2015)
- **Location:** New York, NY
- **Notable Investment(s):** DocuTAP (2016)
- **Company Description:** Provides urgent care practices with an innovative approach to workflow management. Its flagship product, DocuTAP EMR, fully integrates practice management and electronic medical records capabilities.

**WATER STREET**

- **Latest Fund:** $750M (2012)
- **Location:** Chicago, IL
- **Notable Investment(s):** Zenith American Solutions (2011)
- **Company Description:** Third-party employee benefit program administration company offering health claims processing, eligibility management, health claims payment and data collection.



- **Latest Fund:** $3.2B (2016)
- **Location:** New York, NY
- **Notable Investment(s):** GetWellNetwork (2013)
- **Company Description:** Patient engagement solutions that help healthcare providers engage, educate and empower patients along the care continuum. Delivered across multiple technology platforms including mobile devices.

# Select Strategic Buyers



- **Enterprise Value:** $2.2B
- **Location:** Washington, DC
- **Notable Investment(s):** HealthPost (2014); Royall & Company (2014); Care Team Connect (2013)
- **Investment Description:** HealthPost offers cloud-based software, enabling seamless appointment scheduling across multiple care settings.



- **Enterprise Value:** $5.1B
- **Location:** Watertown, MA
- **Notable Investment(s):** Arsenal Health (2016); Razor Insights (2015); Epocrates (2013)
- **Investment Description:** Arsenal Health provides automated appointment rescheduling via SMS, real-time drill-down reports, administrative tools and phone and email support.



- **Enterprise Value:** $22.6B
- **Location:** Kansas City, MO
- **Notable Investment(s):** Siemens Medical Solutions (2015); Labotix Automation (2013)
- **Investment Description:** Siemens Medical Solutions provides a broad range of clinical and financial IT applications, as well as consulting and managed services to support health providers.



- **Enterprise Value:** $16.1B
- **Location:** Montreal, Canada
- **Notable Investment(s):** Logica (2012)
- **Investment Description:** Global IT and business process services provider delivering business consulting, systems integration and outsourcing services.



- **Ownership:** Blackstone; Hellman & Friedman
- **Location:** Nashville, TN
- **Notable Investment(s):** McKesson's Business Performance Solutions Group (in process); Altegra Health (2015)
- **Investment Description:** McKesson's Business Performance Services group provides RCM solutions, patient access, coding and billing.



- **Ownership:** Tenet Healthcare Corp. (NYSE:THC)
- **Location:** Frisco, TX
- **Notable Investment(s):** Spi Healthcare (2014)
- **Investment Description:** RCM, health infor-mation management and software solutions for independent and provider-owned physician practices.



- **Enterprise Value:** $2.9B
- **Location:** Cincinnati, OH
- **Notable Investment(s):** Stream Global Services (2014); Datacom Group (2013)
- **Investment Description:** Stream Global Services is a BPO service provider specializing in customer relationship management.



- **Enterprise Value:** $5.4B
- **Location:** Hamilton, Bermuda
- **Notable Investment(s):** Endeavour Software Technologies (2015)
- **Investment Description:** Cutting-edge Enterprise Digital Transformation solutions, including data analytics, mobility and cloud enablement.



- **Enterprise Value:** $15.8B
- **Location:** Uttar Pradesh, India
- **Notable Investment(s):** Geometric Limited (2016)
- **Investment Description:** Broad end-to-end capabilities and rich experience across IT, product lifecycle consulting, mechanical and manu-facturing engineering.



- **Enterprise Value:** $36.9B
- **Location:** Karnataka, India
- **Notable Investment(s):** Panaya (2015)
- **Investment Description:** Leading provider of automation technology for large scale enterprise software management. Panaya's CloudQuality suite uniquely positions Infosys to bring automation to several of its service lines.



# Select Strategic Buyers (cont'd)



- **Ownership:** Serco Group plc (LSE:SRP)
- **Location:** Maharashtra, India
- **Notable Investment(s):** Sparsh BPO Services (2011)
- **Investment Description:** BPO services comprising contact center services, such as customer, sales, collection and transaction processing services.



- **Enterprise Value:** $7.3B
- **Location:** Sunrise, FL
- **Notable Investment(s):** Cardon Outreach (2016); MedData (2014)
- **Investment Description:** Cardon Outreach is a national provider of RCM services, delivering solutions to more than 800 hospitals through its integrated single technology platform.



- **Ownership:** Navigant Consulting Inc. (NYSE:NCI)
- **Location:** Irvine, CA
- **Notable Investment(s):** RevenueMed (2015); Cymetrix (2014)
- **Investment Description:** RevenueMed provides coding, RCM and business process management services for the healthcare sector.



- **Ownership:** Private
- **Location:** Tampa, FL
- **Notable Investment(s):** N/A
- **Investment Description:** Omega Healthcare is an offshore provider of RCM, medical coding, billing, accounts receivable management and claims processing.



- **Ownership:** United Health Group (NYSE:UNH)
- **Location:** Eden Prairie, MN
- **Notable Investment(s):** Connextions (2011)
- **Investment Description:** Technology, analytics and business services to the healthcare industry, helping carriers, providers and employers maximize revenue and increase efficiencies by optimizing customer experience.



- **Ownership:** HCA Holdings, Inc. (NYSE:HCA)
- **Location:** Nashville, TN
- **Notable Investment(s):** U.S. Collections (2013)
- **Investment Description:** End-to-end RCM services and health information management outsourcing. Services include early out services, payment compliance, denials management and payroll services.



- **Enterprise Value:** $4.7B
- **Location:** Charlotte, NC
- **Notable Investment(s):** Aperek (2014); TheraDoc (2014)
- **Investment Description:** Aperek provides a data analytics platform that aims to improve healthcare delivery by reducing costs through supply chain management.



- **Enterprise Value:** $815M
- **Location:** Irvine, CA
- **Notable Investment(s):** Gennius (2015); Mirth Corp. (2013)
- **Investment Description:** Gennius is a healthcare data analytics company that computes utilization and quality analyses of integrated patient, administrative and financial data.



- **Ownership:** TPG
- **Location:** Pittsford, NY
- **Notable Investment(s):** Apollo Health Street (2013)
- **Investment Description:** Leading provider of healthcare business services and health information technology based solutions, supporting hospitals, physicians and health plans.



- **Enterprise Value:** $17.1B
- **Location:** Bengaluru, India
- **Notable Investment(s):** Opera Solutions (2013 and 2014)
- **Investment Description:** Big data predictive and prescriptive analytics, specializing in machine learning to extract predictive patterns for businesses worldwide.



Appendix                    **Valuation Support**

# Weighted Average Cost of Capital

**Weighted Average Cost of Capital Analysis**

| Levered Beta | Discount Rate Range | | Sources and Considerations |
|---|---|---|---|
| Unlevered Beta | 1.00 | 1.10 | Selected Public Companies |
| Debt % of Capital | 25.0% | 10.0% | Selected Public Companies |
| Equity % of Capital | 75.0% | 90.0% | Selected Public Companies |
| Tax Rate | 38.0% | 38.0% | Blended Federal & State Corporate Income Tax Rate; Management Discussion |
| Levered Beta | 1.21 | 1.18 | |
| **Levered Cost of Equity** | | | |
| Risk-free Rate | 4.0% | 4.0% | Average Historical Yield on Treasury |
| Levered Beta | 1.21 | 1.18 | See Above |
| Market Risk Premium | 5.5% | 5.5% | Duff & Phelps Study |
| Small Stock Premium | 2.5% | 5.0% | 2016 CRSP Decile Size Premium Study; Duff & Phelps Cost of Capital Study |
| Levered Cost of Equity | 13.2% | 15.5% | |
| **Cost of Debt** | | | |
| Cost of Long-term Debt | 6.0% | 7.0% | Company's Borrowing Rate; BB Bond Rate |
| Tax Rate | 38.0% | 38.0% | Blended Federal & State Corporate Income Tax Rate; Management Discussion |
| After-tax Cost of Debt | 3.7% | 4.3% | |
| **Weighted Average Cost of Capital (WACC)** | | | |
| Debt % of Capital | 25.0% | 10.0% | |
| Equity % of Capital | 75.0% | 90.0% | |
| Calculated WACC | 10.8% | 14.4% | |

# Comparable Company Size Adjustment

| Selected Public Company | Market Cap | Size Premium | New WACC | 2016 EBITDA Multiple | Change in Implied DCF | Size-Adjusted Multiple |
|---|---|---|---|---|---|---|
| The Advisory Board Company | $1,662 | 1.63% | 10.50% | 11.5x | 0.7x | 10.8x |
| Allscripts Healthcare Solutions, Inc. | 2,547 | 1.49% | 10.25% | 13.9x | 0.7x | 13.2x |
| athenahealth, Inc. | 4,925 | 0.99% | 10.00% | 21.5x | 0.8x | 20.7x |
| Computer Programs & Systems Inc. | 390 | 2.54% | 11.25% | 9.5x | 0.4x | 9.1x |
| Cotiviti Holdings, Inc. | 2,502 | 1.49% | 10.25% | 14.3x | 0.7x | 13.6x |
| Craneware plc | 377 | 2.54% | 11.25% | 21.0x | 0.4x | 20.6x |
| HMS Holdings Corp. | 1,942 | 1.63% | 10.50% | 15.9x | 0.7x | 15.2x |
| Quality Systems Inc. | 753 | 2.04% | 10.75% | 9.1x | 0.6x | 8.5x |

| | |
|---|---|
| **From:** | Chinh Chu <chu@cc.capital> |
| **Sent:** | Thursday, July 14, 2016 1:17 PM |
| **To:** | Paul Parmar |
| **Subject:** | Re: Duff and Phelps |

Let's chat when you are free

I have an idea regarding the loan

On Jul 14, 2016, at 11:57 AM, Paul Parmar <paul@constellationhealthgroup.com> wrote:

See what I was concerned about.

**From:** Adam J Greene [mailto:ajg@robinsonbrog.com]
**Sent:** Thursday, July 14, 2016 11:56 AM
**To:** Sam Zaharis <Sam.Zaharis@constellationhealthgroup.com>; Paul Parmar
<paul@constellationhealthgroup.com>
**Cc:** David E. Danovitch <ded@robinsonbrog.com>; A. Mitchell Greene <amg@robinsonbrog.com>; Lee
Pershan <lsp@robinsonbrog.com>
**Subject:** Duff and Phelps

Paul I just had a call with them, they are concerned over process when can we jump on a call to discuss
keeping the board independent. Please let us know

*Adam J. Greene, Esq.*
Robinson Brog Leinwand Greene Genovese & Gluck PC
875 Third Avenue/9th Floor
New York, NY 10022
(212) 603-0496 (Voice)

PRIVILEGED AND CONFIDENTIAL

# CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.

Meeting of:

**Special Committee of the Board of Directors**
**August 23, 2016**
**10:00 a.m. ET**

**By Conference Telephone**

## Meeting Minutes

_____

<u>Directors present</u>:   **Mark Feuer -** Chairman
**John Johnston**
**Sir Rodney Aldridge**
**David Clark**

Also present were **Brooks Dexter**, Managing Director, **Andrew Capitman**, Managing Director, and **Eric Coburn**, Managing Director, of Duff & Phelps, LLC ("<u>Duff</u>"), and **David Feirstein**, Partner, **Andrew Arons**, Partner, and **Sarkis Jebejian**, Partner, of Kirkland and Ellis LLP ("<u>Kirkland & Ellis</u>" or ("<u>K&E</u>"), counsel to the Special Committee.

_____

Pursuant to notice duly and validly given in accordance with the Bylaws of Constellation Healthcare Technologies, Inc. (the "<u>Corporation</u>"), a special meeting of the Special Committee of the Corporation's Board of Directors (the "<u>Committee</u>") was called to order at 10:00 a.m. (ET) on Tuesday, August 23, 2016.  Mr. Feuer acted as Chair of the meeting and Mr. Arons acted as Secretary.  Mr. Feuer called the meeting to order and confirmed that all those present could hear each other.

Mr. Feuer noted that the purpose of the meeting is to discuss the status of the revised acquisition proposal received August 23, 2016 from a buyer group led by CC Capital (a financial buyer led by Chinh Chu) and including the Corporation's Chief Executive Officer, Paul Parmar, providing for the acquisition of the outstanding shares of the Corporation (other than shares held by certain members of management, including affiliates affiliated with Mr. Parmar) at a price of GBP 2.26 per share (the "<u>Proposal</u>"), which the buyer group had indicated was its best and final offer, and for the Committee to meet with Mr. Parmar to discuss the Corporation's standalone plan and the prospects of the Corporation in the event the Proposal is not accepted.

Kirkland & Ellis noted for the Committee that Mr. Parmar would be joining the meeting in his capacity as the Corporation's Chief Executive Officer and as its majority shareholder and a member of the buyer group submitting the Proposal, and that the Committee should consider his statements in light of those roles.  With respect to statements by the buyer group in connection with the premium represented by the Proposal relative to the Corporation's stock price, Kirkland & Ellis noted that premium and market price are not valuation methodologies. Kirkland & Ellis also noted that while

**PRIVILEGED AND CONFIDENTIAL**

the Committee could consider the Proposal in light of alternative available transactions, it should as a threshold matter compare it to the Corporation's standalone valuation. The members of the Committee (the "Directors") asked questions regarding these matters, which were answered. The Directors also discussed the possibility of conferring with stockholders of the Corporation in order to gauge their interest in the Proposal. Kirkland & Ellis explained that this may be possible subject to UK legal requirements, but that the Directors are the fiduciaries and that the shareholders' views should not be viewed as determinative.

Kirkland & Ellis next confirmed with each Director that he did not have any responsive disclosure in connection with the conflicts questionnaire that had been previously circulated by Kirkland & Ellis.

At 10:15 a.m. (ET) Mr. Parmar joined the meeting. Mr. Feuer reiterated that Mr. Parmar had been invited to provide his perspective on the outlook for the Corporation in the event the Proposal was not accepted.

Mr. Parmar began by providing an overview of various fundraising initiatives and alternative transactions considered by management prior to the Proposal. Mr. Parmar discussed his desired growth strategy for the Corporation, noting that changes in the Corporation's industry would prompt any acquisitions to be larger than those the Corporation had effectuated in the past.  Mr. Parmar indicated that in connection therewith, he believed that in the absence of a transaction with CC Capital, the Corporation would need to undertake an alternative fundraising transaction, including through equity offerings and by incurring indebtedness through a new credit facility, in order to achieve his desired growth. Mr. Parmar expressed his expectations with respect to the likelihood of successfully undertaking such alternatives and the prices and valuations at which they could be effectuated, noting in particular that an equity issuance would likely be at a discount to the Corporation's market price.

The Directors and representatives from Duff asked Mr. Parmar questions regarding the Corporation's standalone prospects, including with respect to the organic growth projections in management's projections and the necessity of shifting to a strategy of larger acquisitions, which were answered by Mr. Parmar. Mr. Parmar also discussed with the Committee a precedent transaction he viewed as most similar to the Proposal, but such transaction was conducted at approximately 9 times EBITDA (but less than 1 times revenue).

At 10:45 a.m. (ET) Mr. Parmar departed the meeting.

Mr. Feuer indicated that the Committee would need to now consider how to proceed with respect to the Proposal. Mr. Feuer first noted that Duff had reviewed the Proposal and that Duff was not prepared to provide a fairness opinion with respect to it. Mr. Feuer next provided an overview of (i) the feedback he had received from CC Capital, including in respect of certain factors that in its view would make it difficult for the Corporation to obtain the financing it needs to grow or for another buyer to acquire the Corporation, and (ii) unsolicited feedback from a stockholder of the Corporation who had been made aware of the Proposal and who claimed to own approximately 3% of the

outstanding shares, who believed the Proposal was an attractive deal for shareholders that the Directors should approve given the lackluster share price. The Directors then discussed the implications of Duff's inability to render a fairness opinion with respect to the Proposal, the topics raised by Mr. Parmar during the meeting and the other feedback received from the buyer group and certain stockholders. The Committee discussed the Corporation's standalone valuation based on management's forecasts, and the strategic and operational alternatives available to the Corporation in the event it did not pursue the proposal, noting in particular that it was the sense of the Committee that the Corporation continued to generate organic growth. The Directors also discussed the alternative fundraising transactions mentioned by Mr. Parmar, noting that it would not be uncommon for an equity issuance to occur at a discount to the Corporation's market price.

The Directors also discussed the implications of the fact that certain stockholders had been made aware of the Proposal, noting that the Directors should not communicate with any stockholders in the absence of guidance from legal counsel on appropriate methods for such communication, and that the Committee had no background on how such stockholders had become aware of the Proposal or what their motivations may be in communicating with the Directors.

The Committee asked Duff to address at what price they may be in a position to provide a fairness opinion. Representatives from Duff indicated that based on their valuation analysis, and assuming the buyer group's proposed quality of earnings adjustments were reviewed and accepted (which had not yet been received by Duff), a price above GBP 2.60 could reach the bottom end of the range for fairness to be considered. The Directors discussed the price necessary to reach the range for fairness to be considered, noting that the Proposal remained materially below such price.

Mr. Feuer discussed the potential challenges to marketing the Corporation or obtaining the financing necessary to execute on Mr. Parmar's strategic vision, and the fact that the Proposal represented a substantial premium over the current trading price of the shares, and that as a result, the Proposal may be favorable for stockholders. The Committee discussed with Kirkland & Ellis its fiduciary duties with respect to the proposal and asked Kirkland & Ellis to address what considerations should be taken into account in its deliberations. Kirkland & Ellis reiterated that market price did not represent a valuation methodology and that instead the Proposal should be considered in light of the Corporation's standalone value based on management's forecasts and Duff's valuation analysis, and further noted that in this context, Mr. Parmar's views should be evaluated in the context of his role as a member of the buyer group submitting the Proposal. The Committee asked questions regarding potential litigation in the M&A context and associated matters that the Directors faced, which were answered by Kirkland & Ellis.

The Committee discussed alternatives available to the buyer group, including the possibility that the buyer group has indicated that they may acquire shares directly from the stockholders or initiate a tender offer, as they were not subject to a standstill restriction. The Directors discussed this possibility, noting that notwithstanding Duff's advice and traditional valuation methodologies, the Proposal may be attractive to certain

**PRIVILEGED AND CONFIDENTIAL**

stockholders in light of the premium to the market price of the stock and that as a result a tender offer may be viewed favorably by the stockholders.

After further discussion, it was the sense of the Committee that the Proposal was not fair based on the standalone value of the Corporation as reflected in management's forecasts and that Mr. Feuer should reiterate to the buyer group that the Proposal remains too low and that the Committee would not approve a transaction at the price of the current Proposal.

## **Adjournment**

There being no further business, the meeting was adjourned at 12:15 P.M. (ET).

/s/
_____
Name:   Mark Feuer
Title:     Chairman of the Special Committee

**From:** Mark Feuer <mfeuer@beechwood.com>
**Sent:** Friday, September 9, 2016 1:30 AM
**To:** Dexter, Brooks <brooks.dexter@duffandphelps.com>
**Cc:** Andrew Arons <andrew.arons@kirkland.com>; Andrew Duff And Phelps
<Andrew.Capitman@duffandphelps.com>; Paul Parmar <paul@constellationhealthgroup.com>
**Subject:** CCH

Brooks,

Reference is made to the engagement letter, dated as of June 29, 2016 (the "Engagement Letter"), by
and between Duff & Phelps, LLC ("Duff") and Constellation Healthcare Technologies, Inc. (the
"Company"), pursuant to which Duff was engaged to serve as an independent financial advisor to the
special committee of the board of directors of the Company (the "Special Committee").

As you are aware, the work of the Special Committee has ended. Therefore, as permitted by the
Engagement Letter, this email is a written notice to Duff of the termination of the Engagement Letter
and of the Special Committee's engagement of Duff pursuant to the Engagement Letter.

Best regards, Mark

CONFIDENTIALITY NOTE: The information contained in this email message may be legally privileged and
confidential information intended only for the use of the individual or entity to whom it is addressed. If
the reader of this message is not the intended recipient, you are hereby notified that any dissemination,
distribution or copy of this message is strictly prohibited. If you have received this email in error, please
immediately delete the message. Thank you.

| | |
|---|---|
| **From:** | Chinh Chu <chu@cc.capital> |
| **Sent:** | Monday, September 12, 2016 8:15 AM |
| **To:** | Paul Parmar |
| **Cc:** | Doug Newton; John Johnston; Stuart Andrews; Julian Blunt; Scott Mathieson; Simon Johnson; Sam Zaharis; Matthew Doughty |
| **Subject:** | Re: Special Committee |

Thank you

Message received and noted

On Sep 12, 2016, at 7:44 AM, Paul Parmar <paul@constellationhealthgroup.com> wrote:

> Good Morning Chinh, Doug
> Hope all is well,
>
> I wanted to inform you both and CC capital that Special Committee was disbanded and if you and your firm are looking to have any communication with CHT it should be through me as the CEO of the firm, Sam Zaharis the CFO of the firm and John Johnston as the Chairman to the Board of directors, further, I have also included Finncap our NOMAD and investment bank and companies Legal counsel in London, In addition to Me and John you can also reach out to us through Stuart Andrews ( FinnCap ) and Matt Doughty (DWF).
>
> Regards
> Paul Parmar

| **From:** | Paul Parmar |
| **Sent:** | Tuesday, September 13, 2016 6:30 PM |
| **To:** | Andrew Barnett |
| **Attachments:** | research material.pdf |

| | | | |
|---|---|---|---|
| **From:** | Paul Parmar | | |
| **Sent:** | Wednesday, September 14, 2016 1:57 PM | | |
| **To:** | Mehta.Tarun; Shawn H. Zimberg, MD | | |
| **Cc:** | Sam Zaharis; Pavan Bakhshi; John Johnston; Remmert.BT; Schnell.Val; Bowen.Josh | | |
| **Subject:** | RE: CHT | | |

| **Tracking:** | **Recipient** | **Delivery** | **Read** |
|---|---|---|---|
| | Mehta.Tarun | | |
| | Shawn H. Zimberg, MD | | |
| | Sam Zaharis | Delivered: 9/14/2016 1:57 PM | Read: 9/14/2016 2:00 PM |
| | Pavan Bakhshi | | |
| | John Johnston | | |
| | Remmert.BT | | |
| | Schnell.Val | | |
| | Bowen.Josh | | |

Looking forward. I will work out the economics with you. Going forward carry on your matters with John and Dr. Shawn Zimberg also copied to this email is another member of the Special Committee, they can introduce your team to the entire special committee.

---

**From:** Mehta.Tarun [mailto:Tarun.Mehta@SunTrust.com]
**Sent:** Wednesday, September 14, 2016 12:13 PM
**To:** Paul Parmar <paul@constellationhealthgroup.com>
**Cc:** Sam Zaharis <Sam.Zaharis@constellationhealthgroup.com>; Pavan Bakhshi <pavanbakhshi@gmail.com>; John Johnston <john.johnston06@icloud.com>; Remmert.BT <BT.Remmert@SunTrust.com>; Schnell.Val <Val.Schnell@suntrust.com>; Bowen.Josh <Josh.Bowen@SunTrust.com>
**Subject:** RE: CHT

Than you Paul for your email.  Yes we would be certainly interested.  We have good understanding of the Company from our previous dialogues so am certain we can accommodate Special Committees needs on timing etc.
Yes please introduce me to the Special Committee or should I interact with John?  Given you are an interested party we will need to work directly with the Special Committee.  However, if we are hired (which we would love to be) by the Special Committee we would need to spend time with you and Sam too on the diligence.

Thanks again for the email.  As you know we are the 8th largest Bank in the US with assets of more than $200 billion and we have an investment bank with over 1,200 employees.  M&A and strategic advisory is core to our investment bank and we have all the necessary skillset to work with the Special Committee on this assignment.  We will send over our credentials and engagement letter shortly.
Thanks.

Tarun


Tarun Mehta

1

SunTrust Robinson Humphrey
Managing Director
Group Head – Financial Services Investment Banking
711 Fifth Avenue, 6th Floor
New York, NY 10022
Office: 212.303.4117 | Mobile: 917.626.5613
Email: tarun.mehta@suntrust.com

---

**From:** Paul Parmar [mailto:paul@constellationhealthgroup.com]
**Sent:** Wednesday, September 14, 2016 11:55 AM
**To:** Mehta.Tarun
**Cc:** Sam Zaharis; Pavan Bakhshi; John Johnston
**Subject:** CHT

Tarun,

Hope all is well,

CHT received a bid from CC capital ( Chinh Chu ) to take the company private and I wanted to inquire SunTrust's  interest in playing the role of an Independent advisor and providing a fairness opinion on CHT valuation. This is time critical please let me know if you have the bandwidth to help CHT with these roles for the next few weeks. I think this could be a great fit as you have done extensive due diligence on CHT when we explored the Debt transaction as well as partnership on various fronts, and your experience with us and knowledge in this space is the key reason I am reaching out to you.

I can provide more background once I receive your reply. And if SunTrust is interested in getting engaged on this work then I will also introduce you to the Special Committee that has been formed for this transaction. I have copied CHT's chairman John Johnston and CHT's CFO Sam Zaharis as well on this email. John is a member on the Special Committee as well, Me and Sam are not.

Please send us your engagement agreement .

Looking forward.

Regards
Paul Parmar

Important: Information contained herein has been derived from sources believed to be reliable but is not guaranteed as to accuracy and does not purport to be a complete analysis of the security, company or industry involved

All prices, yields and opinions are subject to change due to market forces and other conditions. This communication is not to be construed as an offer to sell or a solicitation to buy any security. SunTrust Robinson Humphrey, Inc. or its affiliates may have a position in the securities referenced. In selling securities, SunTrust Robinson Humphrey, Inc. may act as principal for our own account or as agent for our customers or others. SunTrust Robinson Humphrey, Inc. may also have acted as underwriter for the issuers of such securities, and either we or our affiliates may currently be providing investment banking or traditional banking services to those issuers. Additional information is available on request.

None of SunTrust Robinson Humphrey, Inc. or SunTrust Bank or any of their affiliates (collectively,

2

"SunTrust") is recommending an action to you as a municipal entity or obligated person. SunTrust is not acting as an advisor to you and does not owe a fiduciary duty pursuant to Section 15B of the Exchange Act to you with respect to the information and material contained in this communication. SunTrust is acting for its own interests. You should discuss any information and material contained in this communication with any and all internal or external advisors and experts that you deem appropriate before acting on this information or material

The information contained in this message is intended only for the confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately. Thank you.

By replying to this e-mail, you consent to SunTrust's monitoring activities of all communication that occurs on SunTrust's systems.

SunTrust Robinson Humphrey, Inc., member FINRA and SIPC. SunTrust and SunTrust Robinson Humphrey are service marks of SunTrust Banks, Inc.

[ST:XCL]

**From:** Older, Stephen <SOlder@mcguirewoods.com>
**Sent:** Monday, September 26, 2016 11:30 AM
**To:** Paul Parmar < paul@pegasusbluestarfund.com>; john.johnston06@icloud.com
**Cc:** Rothschild, Jeffrey L. <JRothschild@mcguirewoods.com>; Older, Stephen
<SOlder@mcguirewoods.com>
**Subject:** FW: CHT

Paul and John, wanted to let you know I got a call from Suntrust General Counsel telling me they are not
going to move forward on the engagement and that they are happy to sign any document saying they
don't have any rights going forward. We should discuss next steps.

**Stephen Older**
Partner
McGuireWoods LLP
1345 Avenue of the Americas
7th Floor
New York, NY 10105-0106
T:   +1 212 548 2122
M: +1 917 750 6241
F:   +1 212 715 2307
solder@mcguirewoods.com
Bio | VCard | www.mcguirewoods.com

# McGUIREWOODS

**From:** Humphreys.Adam.J [mailto:Adam.J.Humphreys@SunTrust.com]
**Sent:** Monday, September 26, 2016 11:26 AM
**To:** Older, Stephen <SOlder@mcguirewoods.com>
**Subject:** CHT

Stephen,
As discussed, the "engagement letter" is attached.

Adam
404-926-5970


Important: Information contained herein has been derived from sources believed to be reliable
but is not guaranteed as to accuracy and does not purport to be a complete analysis of the
security, company or industry involved

All prices, yields and opinions are subject to change due to market forces and other conditions.
This communication is not to be construed as an offer to sell or a solicitation to buy any security.
SunTrust Robinson Humphrey, Inc. or its affiliates may have a position in the securities
referenced. In selling securities, SunTrust Robinson Humphrey, Inc. may act as principal for our

own account or as agent for our customers or others. SunTrust Robinson Humphrey, Inc. may also have acted as underwriter for the issuers of such securities, and either we or our affiliates may currently be providing investment banking or traditional banking services to those issuers. Additional information is available on request.

None of SunTrust Robinson Humphrey, Inc. or SunTrust Bank or any of their affiliates (collectively, "SunTrust") is recommending an action to you as a municipal entity or obligated person. SunTrust is not acting as an advisor to you and does not owe a fiduciary duty pursuant to Section 15B of the Exchange Act to you with respect to the information and material contained in this communication. SunTrust is acting for its own interests. You should discuss any information and material contained in this communication with any and all internal or external advisors and experts that you deem appropriate before acting on this information or material

The information contained in this message is intended only for the confidential use of the designated recipient. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately. Thank you.

By replying to this e-mail, you consent to SunTrust's monitoring activities of all communication that occurs on SunTrust's systems.

SunTrust Robinson Humphrey, Inc., member FINRA and SIPC. SunTrust and SunTrust Robinson Humphrey are service marks of SunTrust Banks, Inc.

[ST:XCL]

*This e-mail from McGuireWoods may contain confidential or privileged information. If you are not the intended recipient, please advise by return e-mail and delete immediately without reading or forwarding to others.*

**From:** Arvind Walia <awalia@porteck.com>
**Sent:** Wednesday, July 20, 2016 10:02 PM
**To:** Sam Zaharis <Sam.Zaharis@constellationhealthgroup.com>; Doug Newton <newton@cc.capital>; Paul Parmar <paul@constellationhealthgroup.com>; Melodie Kraljev <Melodie.Kraljev@orionhealthcorp.com>; Garrett Mays <garrett.mays@orionhealthcorp.com>
**Subject:** RE: Software Demo

Thu, Jul 21, 2016 11:30 AM - 12:30 PM Eastern Daylight Time
Please join my meeting from your computer, tablet or smartphone.
https://global.gotomeeting.com/join/373972821


**You can also dial in using your phone.**
United States : +1 (571) 317-3122
Access Code: 373-972-821



------------------------------------
Arvind Walia
CEO, Orion Health Corporation
300 Jericho Quadrangle West Suite 320
Jericho, NY 11753
http://www.orionhealthcorp.com/
516-874-8101 (phone)
646-536-2515 (fax)
516-770-6222 (Mobile)
------------------------------------------

**From:** Sam Zaharis [mailto:Sam.Zaharis@constellationhealthgroup.com]
**Sent:** Wednesday, July 20, 2016 5:37 PM
**To:** Doug Newton; Paul Parmar; Arvind Walia
**Subject:** RE: Software Demo

Doug,

I just spoke to Arvind and 11:30am tomorrow is locked it. Arvind will shortly circulate dial in details.

Regards,



SAM

**From:** Doug Newton [mailto:newton@cc.capital]
**Sent:** Wednesday, July 20, 2016 5:25 PM
**To:** Paul Parmar <paul@constellationhealthgroup.com>; Sam Zaharis

<[Sam.Zaharis@constellationhealthgroup.com](mailto:Sam.Zaharis@constellationhealthgroup.com)>; Arvind Walia <[Arvind.Walia@orionhealthcorp.com](mailto:Arvind.Walia@orionhealthcorp.com)>
**Subject:** Software Demo

Are we able to confirm / send GoToMeeting info for the software demo tomorrow at 11:30am EST?

Thank you,

Doug

**Douglas Newton**
C.C. Capital
555 Madison Avenue, 26th Floor
New York, NY 10022

*p +1 212-207-8647*
*m +1 917-359-3026*
*f +1 212-588-8713*
[newton@cc.capital](mailto:newton@cc.capital)

Case 2:18-cv-00984-MCA-MAH Document 12-12 Filed 08/16/18 Page 3 of 50 PageID: 234



# Introduction to
# Pegasus BI
# &
# PARCS





# Revenue Cycle Management Services

Orion HealthCorp provides clients with a comprehensive array of services custom designed to meet every aspect of their billing needs.

- ❑ Coding
- ❑ Claim scrubbing
- ❑ AR Follow up and Denial Management
- ❑ Payment and Refund processing
- ❑ Credentialing
- ❑ Eligibility Verification
- ❑ Insurance Authorization

We also provide some highly customized services to Hospitals who do their own billing, but require support for ancillary billing services.

- ❑ AR Support
- ❑ Denial Management
- ❑ Medicaid and Patient Advocacy
- ❑ Self-Pay Outsource Program





# National Presence

## CHT Has Offices In 9 States and We Are Growing

**Texas Office (Corporate)**
**713.432.1100**
3200 Wilcrest, Suite 600
Houston Texas 77042

**California Office**
**805.578.8300**
1633 Erringer Road, 1st Floor
Simi Valley, California 93065

**West Virginia Office**
**304.422.6577**
417 Grand Park Drive, Suite 204
Parkersburg, West Virginia 26102

**New York Office**
**718.748.7316**
2901 4th Ave, 1st Floor
Brooklyn, New York 11209

**Colorado Office**
**303.979.1070**
7175 West Jefferson Ave., Suite 2500
Lakewood, Colorado 80235



**New York Office**
**516.874.8100**
100 Jericho Quadrangle
Suite 235
Jericho, New York 11753

**Pennsylvania Office**
**412.457.0175**
3824 Northern Pike, Suite 600
Monroeville Pennsylvania 15146

**Georgia Office/Vaccine Group
Purchasing Alliance**
**888.440.4772**
368 W. Pike St., Suite 103
Lawrenceville, Georgia 30046

**New Jersey Office**
**888.440.4772**
440 Franklin St., Suite 300
Bloomfield, New Jersey 07003

**New Jersey Office**
**713.432. 1100**
1715 Route 35 South St., Suite 301
Middletown, New Jersey 07748

**Michigan Office**
**517.486.4262**
105 W Jefferson St.
Blissfield, MI 49228

★ Locations of CHT owned medical practices



# CHT's Competitive Advantages

## Integrated Suites of Technology Solutions : Pegasus



**Key features:**

> *Pegasus* analytics designed to enable:

  ❖ The identification of revenue / cash generating opportunities

  ❖ Expanding the productivity of personnel

  ❖ Benchmarking across specialties, physicians, and/or organizations

  ❖ Improving service levels

  ❖ Monitoring goals

  ❖ Improving the depth and speed of analysis

  ❖ Improving risk management and auditing capabilities

  ❖ Reducing employee costs

**Key benefits:**

> Designed to provide immediate margin enhancement

> Designed for immediate and simple installation on top of systems of acquired business

> Exclusive to Constellation's clients

> Designed to deliver:

  ❖ Increase in top line growth

  ❖ Increase in clients gross margin

  ❖ Increases client 'stickiness'

  ❖ Increases efficiency of collections for client

> Enhances client relationship





# CHT's Competitive Advantages – Pegasus toolset

**Integrated suites of technology solutions means CHT is well positioned to deliver physician back office operations automation and optimization**

## Pegasus Accounts Receivable & Billing Collections System



The Pegasus Accounts Receivable & Billing Collections System (PARCS) is an enterprise engine that enables the processing of claims and offers a wide-range of reporting services. Highly automated, PARCS accelerate billing and claims processing through the integration of claim data. PARCS decision support and reporting enable a practice to view the appropriate information in "real-time," which should result in effective decision making and improved management of the revenue cycle process.

## Insurance Authorization/Pre-Authorization & Eligibility Verification



MDInsuranceAuth has developed a service for insurance authorization requests. Our web based service allows Providers to sign up online and submit requests for insurance carriers. In addition our system is designed to assist your administrative staff by verifying all scheduled patients have provided accurate and active insurance information.

## Pegasus Transcription Management Software



PTRANS manages transcription for the providers. The providers can dictate reports and the dictated reports are then routed for transcription. The reports are distributed back to the providers and referring doctors.

## Pegasus Scanning & Batch Management System



PSCAN enables scanning of all patient documents and the EOBs with a view to effectively managing the revenue cycle services. The Batch Management System enables routing and completion of the billing and denial effort and links the scanned batches to the billing and the denial/follow-up transactions.

## Pegasus – Integrated Business Intelligence Solution



Pegasus a business intelligence solution is designed to enhance its RCM services and provide an analytics tool relating to payment and operational performance. Pegasus consists of web-based dashboards, interactive reports and data visualization tools for effective financial and operational decision-making and transforms that data into actionable information. Pegasus Software-as-a-Service ("SaaS")-based tools are vendor agnostic and are designed to provide organizations with easy-to-use, interactive analytics for optimal business management

## Rich Media Portal (RMP) Software



The RMP is a SharePoint Portal for rich media management, designed to enable companies to easily manage, search & distribute their rich media files. By integrating the security and collaboration features of a Portal with the rich media management features of a Digital Asset Management system, the RMP utilizes existing tools and storage formats to automate media management and workflow, which should result in increased efficiencies. RMP offers a solution to companies that desire to leverage digital asset management with Portal features.

## Pegasus Solutions for Provider Networks- PSPN



PSPN manages the Radiology network, contract and fee schedules. It facilitates the scheduling/billing of referred patients for the case managers. Re-pricing engine re-prices the claims according to the contracts and the cost containment model.

## HDOCS



Certified by the Centers for Medicare and Medicaid Services, HDOCS is a medical software company offering hospitals, health organizations, physician practices electronic health record (EHR) and electronic medical record (EMR) solutions. This system is designed to offer unique, sophisticated and easy-to-use solutions that aim to simplify practice management, including clinical, administrative and financial information processing.



# Application Landscape

## Pegasus Accounts Receivable and Collections System - PARCS



**On-Line Client Access**
- ❑ Insurance Eligibility Check
- ❑ Claims Processing Status
- ❑ Patient Scheduling
- ❑ Claims missing info correction
- ❑ Reporting

**On-Line Patient Access**
- ❑ Billing History Check
- ❑ Bill Pay

**Patient Call Center**
- ❑ Billing History Check
- ❑ Bill Pay
- ❑ Claims Information

Client EHR

claims

HL7 Interface
or
Secure FTP

Pegasus Scan
**PSCAN**
Automated Scan
Processing

claims

Pegasus Code Review
**PCR**
ICD & CPT Coding
Review

**PARCS**

- Claims Processing
- Batch Management
- Automated Patient Billing Letters
- Missing Information Management
- Denials and AR Follow-up Management
- Reporting and Claims Status

HL7 Interface
or
Secure FTP

**Zebu Compliance Solutions**
Claims Scrubbing

**iHCFA**
Workers Comp &
Auto Ins. Processing

EDI

Clearinghouses

**Orion Billing Systems**

Two Way Integration

**Pegasus BI**
Management Reporting
Decision Support
What-if and Trend Analysis
Custom Client Dashboard
Performance Reporting



# Solutions Landscape



# *Pegasus* : **Business Intelligence Cockpit**





# *Pegasus* : **Business Intelligence Cockpit**





# *Pegasus* : Business Intelligence Cockpit











# PARCS – Automation and Workflow

**Pegasus Accounts Receivable and Collections System (PARCS)**

PARCS is our proprietary workflow and automation platform that provides clients with transparency into Orion's operations and delivers world class productivity to Orion's billing operations.  The following is a list of the key functions provided by PARCS.

- ❑ Tracking patient claims and denials
- ❑ Intelligence based wizards for proper billing
- ❑ Claims follow-up management
- ❑ Intelligence based wizards for follow-up and denials
- ❑ Rules based analysis of payments to ensure clients receive the maximum payment for each procedure (Automated appeal of payments that do not meet contracted amounts)
- ❑ Contract management and Project management
- ❑ Rules based Quality Assurance and Quality Monitoring
- ❑ Reporting and Analytical tools

# PARCS – Automation and Workflow – cont.



## Pegasus Accounts Receivable and Collections System - PARCS



**On-Line Client Access**
- ☐ Insurance Eligibility Check
- ☐ Claims Processing Status
- ☐ Patient Scheduling
- ☐ Claims missing info correction
- ☐ Reporting

**On-Line Patient Access**
- ☐ Billing History Check
- ☐ Bill Pay

**Patient Call Center**
- ☐ Billing History Check
- ☐ Bill Pay
- ☐ Claims Information

Client EHR

claims

HL7 Interface or Secure FTP

Pegasus Scan **PSCAN** Automated Scan Processing

claims

Pegasus Code Review **PCR** ICD & CPT Coding Review

**PARCS**
- Batch Management
- Claims Processing
- Automated Patient Billing Letters
- Missing Information Management
- Denials and AR Follow-up Management
- Reporting and Claims Status

**Zebu Compliance Solutions** Claims Scrubbing

HL7 Interface or Secure FTP

**iHCFA** Workers Comp & Auto Ins. Processing

EDI

Clearinghouses

**Orion Billing Systems**

Two Way Integration

**Pegasus BI**
Management Reporting
Decision Support
What-if and Trend Analysis
Custom Client Dashboard
Performance Reporting

Case 2:18-cv-09284-MCA-MAH   Document 12-12   Filed 08/16/18   Page 15 of 30 PageID: 246



# Pegasus BI – Reporting and Analytics

## Pegasus Business Intelligence – Pegasus BI

Pegasus BI is our proprietary Business Intelligence tool that provides dashboard based RCM performance monitoring, what-if analysis, management decision support, and trend analysis for our clients and our management team.  The following is a list of the key components of Pegasus BI.

- ❑ Industry leading reporting and analytics front end provided by Tableau.
- ❑ Customizable Manager Dashboard
- ❑ User based security
- ❑ Daily updates from all billing platforms
- ❑ State of the Art Enterprise SQL database with customizable data stores for fast and efficient information access
- ❑ Ad Hoc inquiries and standardized reports provide un-surpassed reporting capability



# Sample KPI Report

This is a sample of the type of Key Performance Indicator (KPI) Reports used by Orion Management to monitor and resolve performance issues.

## Metrics Report

A high-level look at company wide productivity.
Select a metrics point for a detailed look at that value

| Division | Category | Metric | October 31, 2016 Monday | November 1, 2016 Tuesday | November 2, 2016 Wednesday | November 3, 2016 Thursday |
|---|---|---|---|---|---|---|
| **Billing** | Backlog | Claims On Hold # | 159.00 | 159.00 | 166.00 | 81.00 |
| | | Missing Info > 5 Days # | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Missing Info > 5 Days $ | 0.00 | 0.00 | 0.00 | 0.00 |
| | | UnBilled # | 54.00 | 54.00 | 54.00 | 60.00 |
| | | UnBilled > 48 Hrs $ | 2,623.75 | 2,623.75 | 2,623.75 | 3,633.25 |
| | | UnBilled $ | 2,623.75 | 2,623.75 | 2,623.75 | 3,633.25 |
| | | Untimely Filing $ | 164,879.39 | 0.00 | 0.00 | 0.00 |
| | Financial | Billed Amount $ | 2,481,971.71 | 1,729,591.45 | 1,990,117.85 | 1,166,558.72 |
| | | Charges Posted $ | 1,879,437.81 | 728,457.39 | 841,875.55 | 666,113.12 |
| | | Claims On Hold $ | 24,874.93 | 24,874.93 | 25,416.43 | 6,993.91 |
| | Productivity | Avg Editing TAT | 2.00 | 4.78 | 18.25 | 3.00 |
| | | Avg Scanning TAT | 13.99 | 20.07 | 14.21 | 16.13 |
| | | Billed Claims # | 37,678.00 | 26,598.00 | 26,307.00 | 25,493.00 |
| | | Charge Batches Completed # | 169.00 | 120.00 | 71.00 | 172.00 |
| | | Charges Posted # | 28,021.00 | 8,942.00 | 18,493.00 | 10,114.00 |
| | | EDI Reject CH # | 0.00 | 0.00 | 0.00 | 0.00 |
| | | EDI Reject CL # | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Missing Info Actions Pending > 2 D.. | 0.00 | 0.00 | 0.00 | 0.00 |
| **Denials & AR** | Backlog | Action Pending # | 62,385.00 | 63,638.00 | 66,261.00 | 68,422.00 |
| | | Action Pending Oldest | 25,989.00 | 26,718.00 | 27,669.00 | 28,558.00 |
| | | Action Unassigned # | 68,986.00 | 70,280.00 | 73,019.00 | 75,245.00 |
| | | AR > 180 Days $ | 11,274,549.33 | 11,292,507.11 | 11,299,473.18 | 11,306,162.03 |
| | | Follow Up Pending > 30 Days | 762.00 | 762.00 | 742.00 | 712.00 |
| | | Follow Up Pending Oldest | 230.00 | 0.00 | 215.00 | 717.00 |
| | | Follow Up Unassigned # | 1.00 | 0.00 | 1.00 | 7.00 |
| | | Untouched Claims > 3 Months # | 8,336,811.00 | 8,340,179.00 | 8,341,918.00 | 8,349,151.00 |
| | Financial | Action Pending $ | 3,352,606.68 | 3,421,669.76 | 3,563,906.74 | 3,668,847.80 |
| | | Follow Up Pending $ | 135,108.10 | 135,695.47 | 128,443.70 | 139,553.76 |
| | | Total AR | 12,847,309.33 | 12,847,309.33 | 12,831,923.98 | 12,849,336.80 |
| | Productivity | Action Code Escalation Required # | 9,499.00 | 9,641.00 | 9,852.00 | 10,324.00 |
| | | Action Code State Complaint # | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Appeals Effectiveness 60 Days | 6.62 | 7.02 | 7.13 | 7.15 |
| | | Appeals Effectiveness 90 Days | 1.01 | 1.01 | 1.01 | 2.74 |
| | | Claim Confirmation # | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Denials Batches Not Started # | 995.00 | 890.00 | 823.00 | 881.00 |
| | | Denials Sub-Batches Pending # | 55,307.00 | 55,954.00 | 57,097.00 | 58,926.00 |

*California* (vertical label spanning Denials & AR section)



# Technology Deck



**Import Tools**

**Code Review/HL7 Interface**
(Inputs from the Hospital systems enables coding and puts data in PM Software

**PScan**
Scan paper into PScan and it creates a batch in PARCS

**PM System**

**Houston** — Imagine and Med FM

**Denver** — Centricity

**Simi Valley** — Reflection

**Pittsburgh** — All Script

**New York** — SQLMed Criterions Med Mgr & iPARCS

Import Utility - DB

**BI Tools and DB**

**PARCS-BI**
(Fin. Backlog Productivity Metrics Reports)

PARCS-BI Database
All practices

**Workflow Automation**

**PARCS**
Workflow automation and claim Status management

PARCS Database
All practices claim data and status

PARCS Import Utility & DB



# Pegasus BI – Client Dashboard

## Client Dashboard for Where is my Money







# Expected Collections

## Expected Collections

| Orion Location | Practice Name | Payments | Expected Payment | Predicted Payments | $0.00 |
|---|---|---|---|---|---|
| Pennsylvania | Practice - 1 | $943.83 | $7,545.59 | $6,640.35 | |
| | Practice - 2 | $26,579.01 | $51,398.83 | $47,790.20 | |
| | Practice - 3 | $6,864.53 | $30,683.94 | $45,663.58 | |
| | Practice - 4 | $9,938.17 | $18,963.35 | $20,969.26 | |
| | Practice - 5 | $95,844.66 | $341,890.79 | $304,110.92 | |
| | Practice - 6 | $24,171.37 | $63,613.81 | $59,522.92 | |
| | Practice - 7 | $79,912.94 | $439,552.69 | $273,718.11 | |
| | Practice - 8 | $25,921.25 | $64,143.74 | $68,698.16 | |
| | Practice - 9 | $22,681.33 | $14,279.07 | $37,268.44 | |
| | Practice - 10 | $14,398.20 | $30,784.52 | $27,493.56 | |
| | Practice - 11 | $26,627.40 | $51,445.81 | $53,381.85 | |
| | Practice - 12 | $28,003.89 | $91,528.82 | $89,179.97 | |
| | Practice - 13 | $62,373.56 | $114,572.90 | $115,649.70 | |
| | Practice - 14 | $43,368.43 | $51,409.87 | $58,185.98 | |
| | Practice - 15 | $30,217.63 | $113,703.83 | $97,878.42 | |
| | | | | | $0.00 |



# **Where is My Money**

## Balance By Denial

| | |
|---|---|
| **Grand Total** | $155,276.61 |
| Additional Information is Requested | $1,275.65 |
| Applied Deduc | $2,966.52 |
| Applied to Coins | $73.66 |
| Applied to Copay | $52.17 |
| Benefits maxed for year | $0.00 |
| Bundled | $45.00 |
| Claim approved to be paid | $0.00 |
| Claim in Process | $10,243.00 |
| Contractual Adjustment | $2,949.10 |
| Denied | $407.13 |
| Duplicate Claim | $0.00 |
| Follow Up Pending | $107,621.44 |
| In-Progress | ($148.57) |
| Incorrect Billing Submission | $0.00 |
| Incorrect Patient Info | $2,594.00 |
| Insurance info error | $8,846.13 |
| Invalid Dx-CPT-Mod | $2,231.63 |
| Need primary EOB/Invoice | $81.82 |

| | **Practice Name** | | 🔻 ▼ | **Date Of Service** | |
|---|---|---|---|---|---|
| Practice - 1 | | | ▼ | Last 12 months | ▼ |

## **Where Is My Money**

| Month, Year of Date Of Service ⇉ | Charge Amount | Total Adjustment | Total Payment | Balance |
|---|---|---|---|---|
| **Grand Total** | $1,365,515.14 | $896,965.69 | $313,272.84 | $155,276.61 |
| November 2016 | $31,330.00 | $0.00 | $487.25 | $30,842.75 |
| October 2016 | $142,565.00 | $62,111.76 | $21,732.43 | $58,720.81 |
| September 2016 | $130,856.00 | $87,212.65 | $30,287.41 | $13,355.94 |
| August 2016 | $135,387.00 | $85,048.83 | $30,369.44 | $19,968.73 |
| July 2016 | $112,879.00 | $79,187.45 | $26,978.51 | $6,713.04 |
| June 2016 | $128,208.00 | $95,399.72 | $29,760.31 | $3,047.97 |
| May 2016 | $106,223.00 | $72,857.51 | $25,703.61 | $7,661.88 |
| April 2016 | $124,910.92 | $90,553.73 | $32,077.25 | $2,279.94 |
| March 2016 | $139,509.42 | $99,090.68 | $39,127.41 | $1,291.33 |
| February 2016 | $81,169.00 | $58,672.05 | $20,865.69 | $1,631.26 |
| January 2016 | $104,815.80 | $74,289.40 | $26,001.05 | $4,525.35 |
| December 2015 | $127,662.00 | $92,541.91 | $29,882.48 | $5,237.61 |

Private and Confidential



# Aging Report by Denial Reason

| Aging Summary by Reason | | | | Report Date: | | 12/31/2015 | |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| Filter Criteria : | | | | | | | |
| Visit Date Range From:  01/01/2014 | | | | | | | |
| Visit Date Range To:  12/31/2014 | | | | | | | |
| Include Negative Balance: Yes | | | | | | | |
| | | | | | | | |
| Status/Denial Reason | 0 - 30 | 31 - 60 | 61 - 90 | 91-120 | 120+ | Grand Total | |
| Additional Information is Requested | $1,463.91 | $384.18 | | | | $1,848.09 | |
| Applied Deduc | $346.95 | $390.89 | $24.35 | | | $762.19 | |
| Applied to Coins | $76.70 | $140.00 | $7.38 | $37.50 | | $261.58 | |
| Applied to Copay | $221.18 | $1,044.47 | $282.05 | $125.00 | $35.00 | $1,707.70 | |
| Benefits maxed for year | $1,256.18 | $104.00 | $0.00 | $0.00 | | $1,360.18 | |
| Bundled | $550.00 | $50.00 | $420.00 | $1,021.41 | | $2,041.41 | |
| Claim in Process | $34,993.64 | $13,791.13 | $3,930.49 | $1,165.09 | $2,837.14 | $56,717.49 | |
| COB ISSUE | $1,063.36 | $125.00 | $5,225.00 | | | $6,413.36 | |
| Incorrect Patient Info | | $350.00 | $600.00 | $3,380.43 | $1,335.00 | $5,665.43 | |
| Insurance info error | $8,103.77 | $4,238.63 | $102.63 | $3,029.25 | | $15,474.28 | |
| Invalid Dx-CPT-Mod | $3,750.79 | $2,414.01 | $1,870.65 | $100.00 | | $8,135.45 | |
| Invalid Ref Dr Info | $3,098.48 | $200.00 | $0.00 | $1,000.00 | | $4,298.48 | |
| Member Not eligible | $8,638.66 | $111.29 | $281.10 | | | $9,031.05 | |
| | | | | | | | |
| Grand Total | $63,563.62 | $23,343.60 | $12,743.65 | $9,858.68 | $4,207.14 | $113,716.69 | |

Private and Confidential

# Metrics Report

## Metrics Report

A high-level look at company wide productivity.
Select a metrics point for a detailed look at that value

| | Orion Location | Practice Name | Date |
|---|---|---|---|
| | (All) | (All) | Last 14 days |

| Division | Category | Metric | July 25, 2016 Monday | July 26, 2016 Tuesday | July 27, 2016 Wednesday | July 28, 2016 Thursday | July 29, 2016 Friday | August 1, 2016 Monday | August 2, 2016 Tuesday | August 3, 2016 Wednesday | August 4, 2016 Thursday | August 5, 2016 Friday |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Billing | Backlog | Claims On Hold # | 162.00 | 163.00 | 169.00 | 89.00 | 89.00 | 273.00 | 273.00 | 214.00 | 55.00 | 75.00 |
| | | Missing Info > 5 Days # | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Missing Info > 5 Days $ | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | UnBilled # | 76.00 | 9,709.00 | 44,784.00 | 65,981.00 | 81,856.00 | 75.00 | 6,653.00 | 14,560.00 | 36,154.00 | 54,074.00 |
| | | UnBilled > 48 Hrs $ | 3,854.25 | 993,923.75 | 2,957,576.39 | 4,144,071.06 | 5,309,361.71 | 3,641.50 | 511,323.85 | 1,367,194.21 | 2,562,414.06 | 3,569,851.15 |
| | | UnBilled $ | 3,854.25 | 993,923.75 | 2,957,576.39 | 4,144,071.06 | 5,309,361.71 | 3,641.50 | 511,323.85 | 1,367,194.21 | 2,562,414.06 | 3,569,851.15 |
| | | Untimely Filing $ | 28,567.03 | 41,910.54 | 41,994.69 | 42,494.69 | 42,917.92 | 44,075.79 | 44,075.79 | 45,279.73 | 45,279.73 | 45,511.11 |
| | Financial | Billed Amount $ | 2,602,505.65 | 1,318,883.60 | 2,735,959.20 | 2,611,750.27 | 4,208,654.83 | 2,385,803.10 | 17,235.15 | 66,846.27 | | |
| | | Charges Posted $ | 1,056,636.25 | 2,089,912.92 | 1,266,730.54 | 1,489,691.95 | 1,034,782.56 | 554,068.61 | 913,429.86 | 1,404,490.48 | 1,065,129.11 | |
| | | Claims On Hold $ | 27,153.60 | 27,378.60 | 27,167.00 | 16,391.38 | 16,391.38 | 36,249.30 | 36,249.30 | 20,566.86 | 6,819.47 | 8,783.73 |
| | Productivity | Avg Editing TAT | 10.62 | 7.54 | 7.10 | 5.90 | 0.00 | 0.00 | 0.00 | 45.00 | 0.00 | 0.00 |
| | | Avg Scanning TAT | 10.40 | 15.29 | 15.93 | 27.43 | 7.67 | 6.00 | 2.00 | 12.50 | 22.50 | 14.00 |
| | | Billed Claims # | 40,935.00 | 12,852.00 | 56,623.00 | 33,873.00 | 73,487.00 | 42,504.00 | 119.00 | 1,897.00 | | |
| | | Charge Batches Completed # | 11.00 | 26.00 | 78.00 | 81.00 | 99.00 | 172.00 | 25.00 | | 1.00 | |
| | | Charges Posted # | 36,215.00 | 37,738.00 | 24,074.00 | 20,312.00 | 16,102.00 | 7,121.00 | 8,914.00 | 25,742.00 | 19,332.00 | |
| | | EDI Reject CH # | | | | | | | | | | |
| | | EDI Reject CL # | | | | | | | | | | |
| | | Missing Info Actions Pending > 2 ... | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Missing Info Approval # | | | | | | | | | | |
| Denials & AR | Backlog | Action Pending # | 484.00 | 479.00 | 483.00 | 488.00 | 489.00 | 504.00 | 505.00 | 506.00 | 527.00 | 528.00 |
| | | Action Pending Oldest | 2,646.00 | 2,660.00 | 2,674.00 | 2,688.00 | 2,702.00 | 2,744.00 | 2,758.00 | 2,772.00 | 2,933.00 | 2,816.00 |
| | | Action Unassigned # | 448.00 | 450.00 | 456.00 | 465.00 | 465.00 | 536.00 | 536.00 | 536.00 | 612.00 | 613.00 |
| | | AR > 180 Days $ | 19,333,129.99 | 17,981,688.98 | 18,047,219.27 | 18,084,947.45 | 18,124,658.86 | 18,460,829.21 | 18,570,553.90 | 18,646,579.82 | 18,686,870.72 | 18,733,494.33 |
| | | Follow Up Pending > 30 Days | 82,884.00 | 82,978.00 | 67,154.00 | 63,424.00 | 61,514.00 | 68,776.00 | 68,820.00 | 68,852.00 | 65,328.00 | 63,174.00 |
| | | Follow Up Pending Oldest | 188,306.00 | 188,381.00 | 188,456.00 | 188,531.00 | 188,606.00 | 188,831.00 | 188,906.00 | 188,981.00 | 189,056.00 | 189,131.00 |
| | | Follow Up Unassigned # | 7,345,474.00 | 6,156,982.00 | 6,157,011.00 | 6,141,984.00 | 6,141,684.00 | 6,139,626.00 | 6,139,751.00 | 29,175,530.00 | 29,172,815.00 | 29,173,052.00 |
| | | Untouched Claims > 3 Months # | 8,342,128.00 | 8,340,948.00 | 8,345,190.00 | 8,349,574.00 | 8,361,605.00 | 8,355,880.00 | 8,358,828.00 | 8,360,662.00 | 8,362,777.00 | 8,369,118.00 |
| | Financial | Action Pending $ | 77,807.70 | 78,179.20 | 79,359.10 | 80,422.85 | 80,635.60 | 82,512.00 | 82,875.40 | 83,103.15 | 85,872.60 | 85,832.85 |
| | | Follow Up Pending $ | 19,110,608.63 | 18,127,221.41 | 18,141,965.50 | 18,146,560.69 | 18,181,565.59 | 18,177,206.14 | 18,180,080.84 | 18,183,408.25 | 186.25 | 196.59 |
| | | Total AR | 72,012,115.48 | 59,891,731.09 | 61,791,452.02 | 62,931,158.07 | 64,209,955.82 | 64,969,536.41 | 65,452,173.86 | 66,187,376.58 | 67,492,234.34 | 68,469,319.68 |
| | Productivity | Action Code Escalation Required # | 1,250.00 | 1,252.00 | 1,273.00 | 1,309.00 | 1,331.00 | 1,279.00 | 1,307.00 | 1,297.00 | 1,307.00 | 1,313.00 |
| | | Action Code State Complaint # | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Appeals Effectiveness 60 Days | | | | | | | | | | |
| | | Appeals Effectiveness 90 Days | | | | | | | | | | |
| | | Claim Confirmation # | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | | Denials Batches Not Started # | 660.00 | 637.00 | 640.00 | 623.00 | 620.00 | 643.00 | 637.00 | 684.00 | 687.00 | 668.00 |

California

Confidential

# Client Monitoring Report



Confidential

# Daily Expected Metrics



Confidential

# Expected Collections Report



# Client Lag Tables Report



# Where is my money Report





Confidential

# Client locations Report



# CPT Compare Report



# Financial Dashboards



# Project Chariot

## Final document

July 27, 2016

CONFIDENTIAL AND PROPRIETARY
Any use of this material without specific permission of McKinsey & Company is strictly prohibited

McKinsey&Company

# Key messages (1/3)

- **Market size** – RCM market has been growing at a robust rate and this trend is expected to continue over next 10 years. The total RCM market is ~$15B in 2015 with an expected growth of 7-10%[1] CAGR to ~$24B by 2020 and to ~$35B by 2025; historically, market has grown at similar rate as well (~9% CAGR, $10B in 2010)
    – Growth in outsourced RCM market is driven by increase in billing outsourcing(~$9B), (~$21B) from a greater shift in outsourcing
    – ~$6B of $15B in 2015 is in the physician segment (which is a 35% outsourced rate), with $9B in the hospital segment (which is a 16% outsourced rate)
    – Along the RCM value chain, in 2015, in physician market 20% (or $1.3B) of the total outsourced physician revenue is coming from "pre-service" functions, while 25% (or $1.6B) is coming from point-of-service and 55% (or $3.5B) is coming from post-service
    – Of ~$6B physician market in 2015, ~38% ($2.4B) is in mid and large size physician groups which is expected to grow to ~41% ($3.9B) by 2020 , ~50% (~$3B) is in hospital employed physician groups which is expected to decrease relatively to~43% ($4.1B) by 2020

- **Outsourcing trends, barriers and natural limit** – Outsourcing trend is expected to grow in the physician RCM space substantially from ~35% outsourced in 2015 to ~50% in 2020 and ~65% by 2025 with a natural limit of ~86% as indicated by physicians surveys. This trend is expected to rise due to several factors including implementation of ICD-10, margin pressures on physician practices, increase in value based reimbursements overtime thus forcing physician practices to outsource more
    – ~85% of solo and small physician practices are looking to outsource medical billing function by end of 2017
    – 95% of business managers are certain their old practice management and revenue cycle cannot accommodate upcoming regulatory requirements and updates (e.g. ACO/value based reimbursement)
    – While more physicians would like to outsource RCM processes, physicians have preferences in what they would like to outsource vs offshore;94% prefer a US-based vendor account manager or billing liaison to interface with practice in an outsourcing engagement – to avoid language barriers
    – The top barrier to outsourcing uptake is the perception that vendors fail to understand their customer's unique needs (33%), followed closely by the thinking that vendors are unreliable (26%)

- **Barriers to switching and costs associated with switching**- Almost half of customers (45-50%) indicate that they do not plan to switch vendors for any part of their RCM process, even 5 years from now – driven by the operational disruption and cost of installation/ purchasing.; actual churn and switching rate is much lower (~4-5% per year) due to barriers to switching
    – *"The implementation timeframe can take up to 200 days; after the chaos, [the provider] tries to recoup the loss"*
    – *"The dreaded bubble or interim when you've notified the old vendor, who has decreased effort, and you're waiting for the new vendor…"*
    – Physician groups estimates that it takes ~7-9 months to switch a vendor with significant switching costs (varying from 11% in operating income in large physician practices to 53% of operating income in small physician practices)
    – **Customers value** eliminating the need for more employees and achieving reliable results as the two most important benefits of using a third party vendor for RCM (56% for both reasons)

---

1. 10% CAGR used throughout this document for illustrative purposes

# Key messages (2/3)

- **Salesforce model for physician RCM:** Vendor selection for RCM solutions in physician practices typically comes down to CEO preference
  - "The billing process and in particular collections are the most critical thing – this will decide about money on my table in the end. When I picked my provider I made sure that our practice is not the first one of that size the provider is serving"
  - Nine out of 10 CFOs reported that outsourcing discussions are rarely shared with middle management until contracts have been executed

- **Impact of value based care:**
  - Chariot will benefit from value-based care if they can reduce labor costs to manage increased complexity and capture the upside of increased demand for RCM
  - Capitated payments may reduce margins, but we do not believe they will be take off in the near future (non-capitated risk based arrangements expected to increase at a faster pace but they do not pose risk to Chariot business model)

- **Impact of consolidation:** Consolidation is likely to continue in the next few years, and Chariot may benefit assuming it serves the mid-large groups that are acquiring other groups ; additionally this could open up a new opportunity to serve hospital employed physicians in a meaningful way
  - Total number of physicians is projected to increase at 1% annually through 2025; in addition, demand for physicians continues to outpace supply due to increased access to coverage
  - Consolidation has resulted in the relative decline of independent physician groups as they are acquired by hospitals (8% declined 2008-2013)
  - Chariot does not currently play substantially in hospital-owned physician segment but this is an attractive segment that can be a natural fit given similar buying pattern behaviors, requirement for senior exec relationships etc; however Chariot will need to address the need of providing end to end RCM solution and add more automation to their process

- **Impact of Automation:** Automation will not fully replace the need for human expertise as select processes in the value chain require significant interaction; however, automation is growing at a significant pace
  - Automation is expected to increase over next 5 years across the value chain; however extent of automation will vary - e.g. ~20-25% in residual billing (from 10-15% in 2015), 50-55% in eligibility/verification (from 15% in 2015)
  - The revenue pool for automated RCM is growing much faster (28% per annum) than the revenue pool for manual RCM (2% per annum)

# Key messages (3/3)

- **Entering/expanding in adjacent areas:**
  - Chariot has an opportunity to build a stronger market share in hospital employed physician market due to similar purchasing behaviors, buying factors etc.
  - In addition to this Chariot can potentially move into smaller hospital facilities billing as that is an under-tapped market ($0.4B RCM market in 2015); large RCM players do not want to provide custom solutions, point solutions at a lower cost; however this will require Chariot to build additional capabilities in facilities billing and provide custom solutions as needed by the customers
  - It will be difficult for Chariot to go down-market (solo and small physician practices); while Chariot has the skill set, it will require it to change its salesforce model to a low cost regional model which could be a potential drag on economics of the company (Also mention lower potential market)

- **Pricing and competitive pressures:**
  - Chariot is positioned at the higher end of services (given its wide offering of manual handling, particularly for exceptions and rejected claims) and thereby also charges a net fee rate that is above industry average
  - Total spend on RCM is expected to decrease from ~3% of total physician revenue to ~2% of total revenue over the next 10 years, however likely with differences by physician segment driven by growth in automation, shrinking physician economics, and increasing competitive pressures

- **Chariot's performance:**
  - Chariot's base business has grown (12% in the last three years) in large part to customers acquired over the last two years (revenue clients acquired before this period has actually declined ~3% per annum)
  - Additional drivers are the average spend size per client (which has increased from $170k to $270k from 2013 to 2016), reduction in churn (from ~16% to 7% YoY client churn); despite the fact that the number of clients has been constant (at 190) since 2013
  - Amongst the newer customers, 64% of have been growing, whereas only 29% of clients acquired in 2013 are growing
  - Chariot has seen a slow decline in average fee rate per contract (from ~7% avg. net fee to ~6% net fee over the last 10 years), however the bulk (~80% of fee contracts have consistently remained in the 4.5-8.5% range)

# Summary risks/ issues for consideration

- **Product bundling from end to end providers**

- **Technological disintermediation**

- **Capitation**

- **Price compression**

- **Market limits on outsourcing**

- **Insourcing risks as customers scale**

- **GPO and practice consolidation risk**

# Contents

- **Market sizing**

- Market dynamics

- Competitive landscape

- Chariot deep dive

- Value creation

- Summary of India site visit

- Pricing structure

# 1 Project Chariot – summary of findings (1/10)

| | **Questions to answer** | **Findings** |
|---|---|---|

**Size and growth** (A)

| | | |
|---|---|---|
| ■ | What is the size of the overall RCM market? | ■ The total spend on RCM activities (i.e., RCM outsourced and insourced) is at ~$73B (2015) and has grown at a rate of 4% per annum since 2010, when the total RCM market was ~$54B |
| | | ■ Looking only at the outsourced RCM market, including third party provided services and software, the market is at ~$15B (2015) and has grown at a rate of 9% p.a. since 2010, when the total outsourced was ~$10B |
| | | – Shift to outsourcing from 30% (2010) to 35% (2015) – excl. Facilities |
| | | ■ The outsourced RCM market will grow to $24B in 2020 (or a CAGR of up to 10% since 2015) and to $39B in 2025 (or a CAGR of up to 9% since 2015) |
| | | – RCM (excluding facilities) was 35% outsourced in 2015, but will grow to 50% in 2020 and ~65% by 2025 (or from 9% to 11% to 13%, respectively, including Facilities) |
| | | – Physician-only outsourced RCM market will grow to ~$10B in 2020 (a CAGR of 9% since 2015) and to ~$13B in 2025 (a CAGR of 8% since 2015) |

| | | |
|---|---|---|
| ■ | What is driving this growth? | ■ Overall, between now (2015) and 2025, there will be ~$20B in incremental outsourced RCM, which will come from: |
| | | – $14B from growth in total billings |
| | | – $(5)B from changes in fee margin |
| | | – $13B from a greater shift to outsourcing |
| | | – $(1)B from shift in the mix of billings across segments (with different propensity to outsource) due to consolidation |

| | | |
|---|---|---|
| ■ | How does the market breakdown across segments and key portions of the RCM value chain? | ■ Along the RCM value chain, in 2015, 20% (or $3B) of the total outsourced revenue is coming from "pre-service" functions, while 25% (or $3.8B) is coming from point-of-sale and 55% (or $8.5B) is coming from post-service |
| | | – Coding will more than double from $2.3B in 2015 to $4.8B in 2020 (a CAGR of 16%), and will grow to $7.1B in 2025 (or a 25% CAGR since 2015) |
| | | – Billing will grow from $2.3B in 2015 to $3.6B in 2020 (a CAGR of 9%) and will grow to $5.3B in 2025 (or a 18% CAGR since 2015) |
| | | – The pre-service segment will grow from $3.1B in 2015 to $6.1B in 2020 and to $8.9B in 2025 (a CAGR of 24% between 2015 and 2025) |

# 1 Project Chariot – summary of findings (2/10)

| | | Questions to answer | Findings |
|---|---|---|---|
| **A** | **Size and growth** (cont.) | ▪ What is the addressable and capturable market for physician practices only? | ▪ The addressable market for Chariot includes medium(10-50 physicians) to large sized(50+ physicians), independent and hospital owned practices |
| | | ▪ What is the % of insourced vs. outsourced RCM services looking across various size practices? | ▪ RCM outsourcing depends on if the delivery is of service or software solutions<br>— Services are outsourced ~50% of the time - roughly doubled in size compared to 4-5 years ago<br>— Software is typically purchased from external sources(~85%) rather than home grown solution; penetration is expected to increase further |
| **B** | **Consolida-tion** | ▪ What do we estimate the impact of physician consolidation will be on the market size? What is the timing of the expected consolidation? | ▪ Total number of physicians is projected to increase at 1% annually through 2025; in addition, demand for physicians continues to outpace supply due to increased access to coverage<br>▪ Consolidation has resulted in the relative decline of independent physician groups as they are acquired by hospitals (8% declined 2008-2013)<br>▪ Consolidation is likely to continue in the next few years, and Chariot may benefit assuming it serves the mid-large groups that are acquiring other groups |
| | | ▪ How is Chariot positioned for this consolidation given its customer composition by practice size ? | ▪ Chariot does not currently play substantially in hospital-owned physician segment but this is an attractive segment that can be a natural fit given similar buying pattern behaviors, requirement for senior exec relationships etc; however Chariot will need to address the need of providing end to end RCM solution and add more automation to the process |

# 2  Project Chariot – summary of findings (3/10)

| | Questions to answer | Findings |
|---|---|---|
| **A** Attitudes and adoption | ▪ How are physicians/ groups changing attitudes towards "carving out" the billing process vs. end-to-end solutions? <br><br> ▪ What will be the level of adoption of front end revenue cycle tools (e.g., insurance verification and eligibility) in physician segment? | ▪ While currently there is no single vendor providing full gamut of RCM services, based on our interviews with physicians, there is a strong need to have one end-to-end provider… <br> — *"There is no vendor that can give us everyone I need, wrapped up in a single solution"* <br> — *"If there was a software that offers compatibility with existing EMR or physician practice management services I would buy it in a heartbeat"* <br> ▪ …however, this would most likely involve having a combined service and software offering <br> — Software vendors dominate pre-treatment RCM, whereas software and services vendors are competing in post-treatment RCM |
| | ▪ Please identify if there is a natural limit in outsourced across different size spectrum (i.e. certain practices will always in-source)? | ▪ The natural limit is at least 86% (as indicated by physician groups in our survey that would consider outsourcing ) and likely higher which will propel at least 10 years of growth <br> — 75% report that EMR and practice management vendors influence their RCM vendor choice <br> — Only respondents who said that they would never consider outsourcing are those on the smaller end (less than 30 physicians); however, this was only ~1-in-5 in this size category <br> ▪ The top barrier to outsourcing uptake is the perception that vendors fail to understand their customer's unique needs, followed closely by the thinking that vendors are unreliable <br> — No one in our survey mentioned cost or inability to scale as impediments for considering outsourcing their RCM |
| **B** Economic benefits | ▪ Has outsourcing RCM resulted in improved office efficiency and overall operations of practice? | ▪ 87% of outsourcing practices report efficiency improvement… <br> — 25% say they have recognized major efficiency improvement after outsourcing RCM |
| | ▪ Did practice growth accelerate after adding the outsourced RCM practice? | ▪ …with 47% reporting that it helped them grow at least somewhat more quickly <br> — About half said that they grew at the same rate after outsourcing revenue cycle management |
| **C** Value based care | ▪ What will be the impact of value based care and capitation on Chariot business model and what is the likely timeframe? | ▪ Chariot will benefit from value-based care if they can reduce labor costs to manage increased complexity and capture the upside of increased demand for RCM; in addition, capitated payments may reduce margins, but we do not believe they will be take off in the near future (non-capitated risk based arrangements expected to increase at a faster pace but they do not pose risk to Chariot business model) |

MARKET DYNAMICS

Case 2:18-cv-09284-MCA-LDW Document 21-23 Filed 08/25/18 Page 231 of 526 PageID: 427
Case 2:18-cv-09284-MCA-LDW Document 112-3 Filed 08/25/18 Page 10 of 99 PageID: 271

**2** **Project Chariot – summary of findings (4/10)**

| | Questions to answer | Findings |
|---|---|---|
| **D** **Automa-tion** | ▪ Will there be a drive towards more automation of manual processes? | ▪ Automation will not fully replace the need for human expertise as select processes in the value chain require significant interaction (e.g., reprogramming of coding, collections) and will continue to require these<br>▪ Automation is expected to increase over next 5 years across the value chain; however extent of automation will vary- e.g. ~20-25% in residual billing (from 10-15% in 2015), 50-55% in eligibility/verification (from 15% in 2015) |
| | ▪ How well prepared is Chariot for any likely shift towards automation?  Can Chariot automate most part of the billing process, especially with claims with high first pass rates? | ▪ Chariot currently has limited automated capabilities, but it's offerings in eligibility/verification, coding, and claims are offering starting points<br>▪ It is possible to automate billing with high first pass rates, but this will require large investments to gather claims data sets and coding |
| | ▪ Will automation make the profit pools smaller? | ▪ Revenue pool for automated RCM is growing much faster (28% per annum) than the revenue pool for manual RCM (at 2% per annum)<br>— This takes into account that net collections are expected to decline from ~3% today to ~2% |
| **E** **Consoli-dation/ scale** | ▪ How well does the business scale as it grows its customer base? | ▪ Comparable BPO companies have shown stable margins even as revenue has grown, however with increasing employee productivity, allowing margin distribution on other fronts (e.g., technology, discounting) |
| | ▪ Are there likely to be pricing pressures as competitors scale their businesses over time? | ▪ Pricing pressure is predominantly present from the provider side due to<br>— Provider consolidation (increased purchasing power and requests for discounting)<br>— Provider income and net margin pressure, leading to cost reduction initiatives<br>▪ Economies of scale at the vendor level allow increased margin, which is used for discounting in client negotiations & new business attraction |
| | ▪ How does it scale by the size of customer (e.g., what are the margins by varying sizes of customer)? | ▪ N/A (data on profit margin by client not received) |

Case 2:18-cv-09283-MCA-LDW Document 21-2-3 Filed 09/25/18 Page 232 of 526 PageID: 428
Case 2:18-cv-09283-MCA-MAH Document 12-13 Filed 08/27/18 Page 11 of 99 PageID: 272

**2** **Project Chariot – summary of findings (5/10)**

| | **Questions to answer** | **Findings** |
|---|---|---|
| **F** **Value proposition to physicians** | ▪ What are the costs associated with switching billing vendors? Please provide dollar costs as well as time and other elements creating sticky customer base | ▪ Cost of switching can represent up to ~50% of one year's profits for a small practice<br>— This declines to ~15% for medium practices (50 physicians)<br>▪ Based on our survey results, 50% of physicians plan to switch with the next four years; however, actual churn is much lower<br>▪ Almost half of customers (45-50%) indicate that they do not plan to switch vendors for any part of their RCM process, even 5 years from now – driven by the operational disruption and cost of installation/purchasing<br>— *"The implementation timeframe can take up to 200 days; after the chaos, [the provider] tries to recoup the loss"*<br>— *"The dreaded bubble or interim when you've notified the old vendor, who has decreased effort, and you're waiting for the new vendor…"* |

**3** | **Project Chariot – summary of findings (6/10)**

| | Questions to answer | Findings |
|---|---|---|
| **A** **Competitors** | ▪ Who are the true competitors that are competing on the same business model as Chariot? Do they have similar value propositions and capabilities? | ▪ Preliminary survey of portfolio offerings reveal McKesson / Change, Athena, MedAssets, and Conifer Health as the most direct service competitors, especially with a focus on post-treatment processes where Chariot specializes today<br><br>▪ Allscripts appear to be a differentiated competitors with strong software offerings and broad portfolio play across the RCM process, in addition to service offerings |
| **B** **Product offering** | ▪ How do the technology platforms of Chariot compare to those of others? (Athena, eClinical, Practicefusion, Navicure, Cario, Change / McKesson, ZirMed). How does it compare across different attributes such as customer satisfaction (i.e., churn), total cost to customers etc.? How do physicians view Chariot? | ▪ Limited differentiation vs. competitors<br>— Lack of unique product proposition given limited scale and lack of focus on software<br>— Lack of extensive data analytic capabilities<br>▪ Cited (interview based) plan to switch of 10-12% industry average, with 3-4% industry churn reported, vs. a 0% plan to leave for Chariot and a reported 7% actual churn (15-16'), down from 16% (13-14')<br>▪ Overall very low usage and awareness of Chariot (1/55 in survey), however with positive impression (4/5 avg. score, 10/10 in client calls)<br>▪ Complemented for flexibility, ease of use, transparency |
| | ▪ Please provide assessment of capital and time required for Chariot to have systems that can provide similar value to customers in overall cost and collections | ▪ Multiple options exist<br>— Invest significant time and funds to build solution from scratch, taking +1 year (incl. IT team scale up), however creating proprietary and customized solutions<br>— Acquire (larger) player with existing technology, feasible in <6m, however requiring up-front cash and with potential integration challenges against current solutions<br>— Selectively acquire smaller players and connect solutions |
| | ▪ Please provide an assessment of Chariot's detailed presentation and their offering. Is Chariot better positioned to be the value added solution provider to the billing industry for next 10 years<br>— Please provide context of customer who is currently insourced vs those that are outsourced | ▪ 6 out of 8 Chariot's products meet one of the top two customer needs (need to eliminate people and achieving more reliable results); however there is potential for a differentiated value proposition<br>▪ Physician practices value eliminating the need to hire more people (27%) and achieving more reliable results (19%) as top 2 benefits of hiring a vendor for RCM efforts<br>— Typically small physician groups (38%) and some large physician practices (25%) insource more than others as either they can handle the volume (small) or have the scale to hire enough staff (large)<br>— Single specialty groups outsource more than others likely due to the mid-large physician practice size and the fact that they can benefit from the expertise of the vendor of their specialty |

Case 2:18-cv-09284-MCA-LDW   Document 21-23  Filed 09/25/18  Page 234 of 526 PageID: 480
Case 2:18-cv-09284-MCA-MAH   Document 12-13   Filed 08/25/18   Page 13 of 99 PageID: 274

**3** **Project Chariot – summary of findings (7/10)**

| | Questions to answer | Findings |
|---|---|---|
| | ▪ How does total cost to customers compare across offerings? Is higher TCO than competitors sustainable? | ▪ Balanced TCO dependent on physician needs<br>— No installation, set-up, and fixed fees, however a relatively high % of collections fee (5-15%)<br>— Appropriate for specialty physicians with high coding needs and customization (e.g., high out of network share of patients)<br>— Larger solutions offer more standardized solution with lower pricing, potentially fixed fees, but lower flexibility and customization<br>▪ Higher TCO is appropriate where value is offered that covers specialty needs, and is shielded through switching costs |
| | ▪ Are there likely to be pricing pressures as competitors scale their businesses over time? | ▪ As competition intensifies through consolidation, Chariot will have to expand its breadth of offerings and provide end-to-end solutions to combat pricing pressures<br>— Expand into pre-service, going beyond today's billing/coding offerings<br>— Align software compatibility with established EMR solutions<br>— Explore innovative pricing models, e.g., partner-vendor discounts, at-risk |
| **C Cost and Pricing** | ▪ Please analyze the ROI to a practice from using Chariot vs standalone and vs other automated and other competitive solutions | ▪ RCM providers overall generate positive return across all solutions as physicians lose revenue if not engaged, yet differs highly by type of provider<br>— Automated only on average would provide the highest ROI, however has a lower collection rate<br>— Overall differences are limited (~83% for automated, ~70% for variable model e.g., Chariot, ~66% for end-to-end solutions)<br>— Chariot's fee on net revenue collection model implies a benefit for smaller, fully outsourced practices, vs. large providers with in-house capabilities |

# 4 Project Chariot – summary of findings (8/10)

| | Questions to answer | Findings |
|---|---|---|
| **A** **Growth and churn** | ▪ How is Chariot generating organic growth? | ▪ Base business has shown a ~12% CAGR over last 3 years driven mostly by the customers acquired over the last two years<br>— Revenue from customer base acquired before 2014 base declined at a rate of 3% per annum<br>— Whereas revenue from new customers (since 2014) have provided a 15% CAGR to the overall revenue growth<br>▪ Last year saw much higher share of growing accounts than the previous two years<br>— 64% of clients acquired in 2015 have been growing, whereas only 29% in client acquired in 2013 are growing<br>▪ There was an increase in spend per customer from $170k to $270k for existing customers from 2013 to 2016<br>— Likely driven by expanded product portfolio, and adding larger clients (~$350k) |
| | ▪ What has Chariot done to alleviate churn? | ▪ Reduction in churn (from ~16% to 7% YoY client churn) also contributed to the growth from customers<br>— Total client base of ~190 clients in 2013, which is the same as current client base<br>▪ Specific initiatives on churn are not public and require discussion with management and compared against best practices (e.g., proactive campaigns, loyalty management, increased customer service) |
| **B** **Current customer base** | ▪ Please assess Chariot's customer base by size of practice and provide the pros and cons of this segmentation | ▪ Customer base is highly concentrated in states with HQ location (incl. acquired companies), with revenue of >$5MM in New York and Texas, and California in 2015<br>— Outside-in based on top 125 clients<br>— Significant uncovered territory exists in states with <$1M revenue (17) or no presence (27)<br>▪ Large customer base in radiology ($12.5M of $40M revenue base); whereas, highest revenue per customer comes from the hospital segment<br>— 8 clients in surgery (8% of top 100) contribute to the lowest average revenue of all segments, whereas surgery procedures are typically high value<br>▪ *Data for segmentation by size was not made available by management* |

Case 2:18-cv-09283-MCA-LDW Document 21-23 Filed 09/25/18 Page 236 of 526 PageID: 432
Case 2:18-cv-09283-MCA-WAH Document 11-21 Filed 08/08/18 Page 15 of 99 PageID: 278

**5** **Project Chariot – summary of findings (9/10)**

| | Questions to answer | Findings |
|---|---|---|
| **A** **Growth and EBITDA** | ▪ How do you get an ebitda uplift after an acquisition? | ▪ Four key drivers of EBITDA uplift, with cross-selling and cost synergy driving much of the impact:<br>— Cross- and-upselling of acquired and existing portfolio to existing and acquired customer base respectively<br>— Cost synergy identification<br>  ▫ SG&A cost synergies (management, salesforce consolidation)<br>  ▫ Call and service center economies of scale<br>— Pricing opportunities by bundling extended solutions |
| | ▪ What can Chariot reasonably capture (organically, through acquisition, etc.)? | ▪ The market is growing at 9-10% per annum through 2025; however, we believe that the company can drive incremental growth for a CAGR of up to 20%, driven by:<br>— Up to 5% per annum to come from up-selling existing customers and 5% from new customer acquisition |
| | ▪ What impact would alternative pricing arrangements have on the business (subject to Chariot's strategy regarding any such alternative pricing arrangements)? | ▪ Margins will decline since customers demand a shift in pricing model (from variable to fixed)<br>▪ Chariot needs to reduce its cost base to ensure at least stable profit margins in the future |
| **B** **Customer base expansion** | ▪ What would be needed from a salesforce / go-to-market perspective to move up or down market? E.g., to compete against big players in the hospital segment?<br>Will this impact the physician segment? | ▪ Chariot's current model of 6 salespeople and in-person visits from leadership is not sustainable, nor does it acknowledge differences in customer purchasing behavior<br>— Small/medium groups buy largely based on reputation and recommendation, and also rely on online marketing<br>— Large groups and hospital-employed physicians learn about vendors at national conferences and ask for reviews from their peer groups; in addition, they require onsite consultative selling along with formal RFP submission<br>— Facilities selling depends on Chariot's ability to access and develop C-suite relationships with the parent hospitals, or form partnerships with EMR/PM vendors already selling to those facilities |

VALUE CREATION

**5** **Project Chariot – summary of findings (10/10)**

| | Questions to answer | Findings |
|---|---|---|
| **B** **Customer base expansion** (cont'd) | ▪ If need be, can Chariot realistically expand down-market (e.g., capture smaller practices) without pressures on margins? | ▪ 2 driving forces which make this an unlikely scenario:<br>— Physician practices are consolidating and hence growing in size (leaving fewer practices in the market)<br>— Shift in pricing model will affect the margins throughout the customer base (from small to large)<br>▪ Also, it is important to consider that expanding down market may require a better understanding of needs/ customization of services and well as compatibility with existing systems<br>— These two categories represent ~40% of the reason why smaller practices (<50 physicians) would not consider outsourcing – vs. <13% of the reason for larger practices<br>▪ If Chariot does wish to expand down-market, the company would need to address key difference in why practices outsource<br>— The top reason small practices (<50 physicians) would outsource is driven by relieving staffing pressure; whereas the top reason for larger practices (>50 physicians) are to reduce operational costs or enhance accuracy |
| **B** **Next 10 years** | ▪ What does it take for Chariot to be better positioned to be the value added solution provider to the billing industry for next 10 years from the perspective of<br>— A customer who is currently insourced<br>— A customer who is currently at Chariot | ▪ To retain current customers, Chariot will need to expand offerings to end-to-end solutions with high IT compatibility and increasing automation as well as continue to scale its operations as its clients grow<br>▪ Covering currently insourced customers will require building a strong reputation; specific needs differ by group<br>— Small groups will require best-in-breed solutions driven by low-cost, persistent, and regional salesforce<br>— Medium/large groups will require consultative selling with tailored solutions and performance targets<br>— Hospital employed groups will require understand of their existing/hospital EMR/PM vendor compatibility<br>— Facilities will require specialty expertise and the use of automation to increase claims and billing success<br>▪ Chariot is currently best positioned to capture the the medium/large specialty physician groups |

# 1A Consumer out-of-pocket spend was ~15% of the $3T healthcare market in 2014



**Consumers**
$ **844** billion

$ **339** billion

**Not including**

$ **66** billion   of *bad debt*

*"Retail revenue cycle"* (Consumer out-of-pocket spend)

$ **514** billion

**Employers**
$ **829** billion[4]

$ **829** billion

**Payers**

$ 1,593 billion

*"Wholesale revenue cycle"*

**Providers**
- Physicians
- Hospitals
- Pharmacies

**Government**[1]
$ **1,359** billion

$221 billion

$92 billion

$ **824** billion

**Medicare Advantage**[2]   **Managed Medicaid**[2]   **Fee For Service Medicare & Medicaid**[3]

Total healthcare financial flows: **$3.0T**

1 Approximately $230 billion of this is spent on government public health and research
2 ~80% of the value from these payments flows through to providers
3 Also includes other government insurance programs: Children's Health Insurance Program, Department of Defense, Department of Veterans Affairs
4 $220B of this comes from foundations, etc.

SOURCE: National Health Expenditure Data (2014); Centers for Medicare/Medicaid Services; Office of the Actuary; Kaiser Family Foundation; Census Bureau; Bureau of Labor Statistics

**SIZE AND GROWTH**

# 1A Healthcare expenditures expected to increase post-ACA at ~6% YoY, but consumer out-of-pocket spend is only increasing at 4.3% YoY



**Healthcare expenditure is projected to grow at ~6%** overall through 2020 and beyond

In the same period, **out-of-pocket spend is expected to grow at 4.3%**

SOURCE: National Health Expenditure data; Centers for Medicare and Medicaid Services; Office of the Actuary; HARA benchmark in Hospital Receivables 2014,

McKinsey & Company | 18

SIZE AND GROWTH

Case 2:18-cv-09284-MCA-LDW   Document 21-23   Filed 08/25/18   Page 240 of 526 PageID: 436
Case 2:18-cv-09284-MCA-LDW   Document 21-23   Filed 08/25/18   Page 240 of 526 PageID: 436

**1A  Healthcare Revenue Cycle Management market is undergoing significant disruption**

| Many forces increasing urgency of RCM transformation | |
|---|---|
| **Shift to Balance After Insurance** | ▪ Providers have 2-3x higher exposure to Balance After Insurance (BAI) due to reform implications |
| **Increasing cost pressure** | ▪ Reform is placing intense pressure on cost, with a projected $10-20B in margin contraction[1] |
| **Reimburse-ment models are changing** | ▪ There is shift from traditional Fee-For-Service payment models to more risk-sharing payment models (e.g., Episode-based, bundled payments) |
| **Changes in the regulatory environment** | ▪ Changes in regulations (e.g., ICD-10) are increasing the complexity of billing and represent an additional headwind to RCM productivity |

**Provider response**

▪ Fundamentally rethinking their RCM processes – moving from backend process to focus on pre-encounter to collections

▪ Taking a more analytically driven approach to RCM to determine revenue flows and reduce revenue leakage

▪ Broader focus on provider productivity and financial performance

▪ Hiring consulting services to implement required system upgrades and to build staff capabilities

1 Margin contraction assumes no hospital response

SIZE AND GROWTH

## 1A Shift in BAI: RCM urgency is increasing; hospital and physician BAI is estimated to be 2-3x of current levels by 2018



**Breakdown of US hospital bad debt**

USD billions, moderate estimates

BAI — 5.2-5.4 → 13.6-13.9

Payor dispute — 6.2-6.3 → 7.2-8.0

Self-pay / uninsured[1] — **23.7-24.6** → **17.7-8.2**

|  | 2010 | 2018 (with reform) |
|---|---|---|
| **Non-self-pay** | 32-33% | 53-55% |
| BAI | 15% | 35% |
| Payor dispute | 17-18% | 18-20% |
| **Self-pay[1]** | 67-68% | 45-47% |

**Providers need to manage patient liability early and focus on front end collection**

- Bad debt from BAI expected to increase substantially
- Bad debt after BAI is typically smaller amount and harder to collect from individuals after service
- Potentially coming from population that is economically challenged

**Implications for RCM**

- Retail transition to focus on patient BAI collections
- New capabilities to determine patient liability and collect early

1 Post-discount for uninsured.  Note: all figures account for increased use of HDHPs  (based on historical trends) and increased cost sharing for commercial plans in light of reform, BAI Balance After Insurance ; HDHPs, high-deductible  health plans.

SIZE AND GROWTH

Case 2:18-cv-09283-MCA-LDW   Document 21-3 Filed 08/25/18 Page 242 of 526 PageID: 488
Case 2:18-cv-09283-MCA-LDW   Document 11-2 Filed 08/16/18 Page 421 of 599 PageID: 282

# 1A Reimbursement models: Increased reimbursement complexity due to myriad of risk-sharing agreements amplifies the need for RCM solutions

| | **Provider led agreements** | | **Payor led agreements** |
|---|---|---|---|
| **ACOs[1]** | ▪ Groups of doctors, hospitals, and other providers who agree to provide coordinated care to their Medicare patients<br>▪ ~488 ACOs registered as of Q3 2013 but only 8 have demonstrated significantly lower growth in Medicare spending per beneficiary | **Govern-ment (Medicare, Medicaid)** | ▪ Experimenting with ACOs, including Pioneer ACOs[2], MSSP[3], and Advance Payment ACOs<br>▪ Multiple risk-sharing innovations, including:<br>  — Bundled Payments for Care Improvement<br>  — State Innovation Models<br>  — Initiatives focused on Medicaid and CHIP[4] population (e.g., Strong Start for Mothers) |
| **Patient centered medical homes** | ▪ Team of physicians and extenders, coordinated by a primary care physician, to provide high levels of care; typically tied to pay for performance (e.g., CareOregon) | | |
| **Formal, informal partner-ships** | ▪ Joint ventures and other partnerships between providers or payors and providers | **Commer-cial** | ▪ At least 8 of the top 10 payors by lives covered are experimenting with their own risk sharing arrangements |
| **Integrated networks** | ▪ Payor and provider in the same system, under a single ownership (e.g., UPMC, Highmark) | | |

1 Accountable Care Organization 2 Pioneer ACO Model is a CMS Innovation Center initiative designed to support organizations with experience operating as Accountable Care Organizations. As of 2012, currently there are 23 Pioneer ACOs 3 Medicare Shared Savings Plan 4 Children's Health Insurance Program

SOURCE: L&M Policy Research; Expert interviews; McKinsey analysis; press release; Leavitt Partners; CMS; Health Affairs; NAACOS

# 1A Customers RCM needs are fundamentally changing with the increased exposure and shifts in reimbursement models

**RCM agenda for hospital CFOs is changing from predominately back-office billing to be more diverse**

- **New capabilities during "Pre-Encounter"** (e.g., perform insurance verification and prior authorization) to simplify end-to-end revenue cycle management

- **Investing in ICD-10** preparation and compliance requirements to ensure readiness for regulatory changes

- **Focus on performance transformation of existing processes** to reduce cost to collect and invoice, reduce reimbursement leakage and reduce A/R days

- **Upskill revenue cycle management staff** by building expertise through consolidation and specialization, e.g., payor, reimbursement method

- **Increased analytics to determine** quality of care metrics, risk stratification and determine reimbursements for new payment models

- **Exploring risk-sharing arrangements and methodologies** requiring the need for advanced analytics

**RCM agenda in ambulatory space focused on practice management integration and accurate coding**

- **Traditional Revenue Cycle Management approach** with focus on accurate coding ad billing patients for services; less complex process

- **Focus on determining and collecting patient liability** at the time of registration

- **Revenue Cycle Management tightly integrated with Practice Management,** which drives differentiation since ability to bill and collect is similar across practices

- **Hospital owned physician groups focused on meeting higher standards in documentation** and coding to improve reimbursements

- **Large group practices deploying focused on following disease state** to determine how to create right interventions and bring patients back for revenue

SOURCE: AHIP, Passport Health Communications;  2010 HIMSS leadership survey, (398 healthcare IT professionals);
Morgan Stanley AlphaWise survey, 71 Hospital CFOs, Sep-Oct 11, 2010

McKinsey & Company   |   22

Case 2:18-cv-09283-MCA-LDW  Document 11-23  Filed 06/16/18  Page 245 of 529 PageID: 264

MARKET SIZING

# 1A US outsourced RCM market will increase to $39B by 2025

## Overall US RCM market ($B) – size and growth



ILLUSTRATIVE BASE CASE

- **The total spend on RCM activities (i.e., RCM outsourced and insourced) is at ~$70B (2015)**
  - Having grown at a rate of 4% per annum since 2010, when the total RCM market was ~$58B
- **Looking only at the outsourced RCM market, including third party provided services and software, the market is at ~$15B (2015)**
  - Having grown at a rate of 9% p.a. since 2010, when the total outsourced was ~$9B
  - Shift to outsourcing from 30% (2010) to 35% (2015) – excl. Facilities
- **The outsourced RCM market will grow to $24B in 2020 (or a CAGR of up to 10% since 2015) and to $35B in 2025 (or a CAGR of 9% since 2015)**
  - RCM (excluding facilities) was 35% outsourced in 2015, but will grow to 50% in 2020 and ~65% by 2025 (or from 16% to 25% to 40%, respectively, including Facilities)
  - Physician-only outsourced RCM market will grow to ~$10B in 2020 (a CAGR of 9% since 2015) and to ~$14B in 2025 (a CAGR of 10% since 2015)

SOURCE: Black Book 2015 RCM Report, American Hospital Directory, SK&A Physician office survey, expert interviews

# 1A US outsourced RCM market will increase ~7-10% in ten years

MARKET SIZING

**Overall US RCM market ($B) – drivers of growth**



**~$24B** in incremental outsourced RCM between 2015 to 2025, expected to come from:
- **$9B** from growth in total **billings**
- **$(5)B** from changes in **fee margin**
- **$21B** from a greater shift to **outsourcing**
- **$<(1)B** from shift in the mix of billings across segments (with different propensity to outsource) due to **consolidation**

ILLUSTRATIVE BASE CASE

MARKET SIZING

Case 2:18-cv-09283-MCA-LDW   Document 21-2 3 Filed 08/25/19 Page 246 of 526 PageID: 442
Filed 08/16/18  Page 25 of 99 PageID: 266

# 1A ~$15B outsourced RCM market in 2015

> 20% (or ~$3B) of the total outsourced revenue is coming from "pre-service" functions, while 25% (or $3.8B) is coming from point-of-sale and 55% (or $8.5B) is coming from post-service

**RCM value chain,** $Mn

| | | Point of service | | | Post-service | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Pre-service | Coding/ transcription | Clinical documentation & charge capture | Residual billing | Credit/ Collections | Other[1] | Total (in Bn) |
| **Split** | 20% | 15% | 10% | 15% | 20% | 20% | 100% |
| **Large Physician (>50)** | 311 | 233 | 156 | 233 | 311 | 311 | 1.6 |
| **Medium Physician (10-50)** | 162 | 121 | 81 | 121 | 162 | 162 | 0.8 |
| **Small Physician (9-2)** | 160 | 120 | 80 | 120 | 160 | 160 | 0.8 |
| **Solo** | 39 | 29 | 19 | 29 | 39 | 39 | 0.2 |
| **Hospital-employed** | 609 | 457 | 304 | 457 | 609 | 609 | 3.0 |
| **Facility[2]** | 1,800 | 1,350 | 900 | 1,350 | 1,800 | 1,800 | 9.0 |
| **Total (in Bn)** | 3.1 | 2.3 | 1.5 | 2.3 | 3.1 | 3.1 | 15 |

1 E.g., Claims processing; Denials & re-submission; 2 Large = ~$6.6B, Medium = ~$1.9B, Small = ~$0.4B

SOURCE: Market research, Expert interviews, Team analysis

MARKET SIZING

Case 2:18-cv-09283-MCA-LDW   Document 21-23  Filed 08/25/18  Page 247 of 526 PageID: 443
Case 2:18-cv-09283-MCA-LDW   Document 21-23  Filed 08/16/18  Page 26 of 99 PageID: 267

# 1A  ~$24B outsourced RCM market in 2020

2020

> 25% (or $6.0B) of the total outsourced revenue is coming from "pre-service" functions, while 30% (or $7.3B) is coming from point-of-sale and 45% (or $10.9B) is coming from post-service

**RCM value chain,** $Mn

| | Pre-service | Point of service | | Post-service | | | Total (in Bn) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | Coding/ transcription | Clinical documentation & charge capture | Residual billing | Credit/ Collections | Other[1] | |
| **Split** | 25% | 20% | 10% | 15% | 20% | 10% | **100%** |
| **Large Physician (>50)** | 623 | 499 | 249 | 374 | 499 | 249 | **2.4** |
| **Medium Physician (10-50)** | 400 | 320 | 160 | 240 | 320 | 160 | **1.5** |
| **Small Physician (9-2)** | 297 | 238 | 119 | 178 | 238 | 119 | **1.1** |
| **Solo** | 96 | 76 | 38 | 57 | 76 | 38 | **0.4** |
| **Hospital-employed** | 1,020 | 816 | 408 | 612 | 816 | 408 | **4.1** |
| **Facility[2]** | 3,624 | 2,899 | 1,449 | 2,174 | 2,899 | 1,449 | **14.5** |
| **Total (in Bn)** | **6.0** | **4.8** | **2.4** | **3.6** | **4.8** | **2.4** | **24** |

1 E.g. Claims processing; Denials & re-submission;  2 Large = ~$10.7B,  Medium = ~$3.1B, Small = ~$0.6B

# 1A Assumptions: we believe that there will still be room to grow through outsourcing for next 10 years

**Outsourcing  (% Total RCM market)**

|  | 2010 | 2015 | 2020 | 2025 |
|---|---|---|---|---|
| **Large Physician (>50)** | 35% | 40% | 60% | 75% |
| **Medium Physician (10-50)** | 25% | 30% | 50% | 65% |
| **Small Physician (9-2)** | 15% | 20% | 30% | 50% |
| **Solo** | 5% | 10% | 20% | 35% |
| **Hospital-employed** | 50% | 55% | 65% | 80% |
| **Weighted Average (Physicians only)** | 30% | 35% | 50% | 66% |
| **Average (Facility only)** | 12% | 16% | 25% | 40% |
| **Weighted Average (Physicians plus)** | 17% | 21% | 31% | 46% |

**Long term limit is 70-80%**

**Long term limit is ~50%**

SOURCE:  Market research, Expert interviews, Team analysis

McKinsey & Company  |  27

Case 2:18-cv-09293-MCA-LDW Document 212-3 Filed 08/25/18 Page 249 of 526 PageID: 445
Case 2:18-cv-09293-MCA-LDW Document 212-3 Filed 08/25/18 Page 249 of 526 PageID: 265

# 1B Consolidation of independent physician groups presents Chariot with growth opportunity, consolidation of hospital-owned groups offer an attractive opportunity as well

**Effects of consolidation**

| Consolidation Within… | Market size | Demand for RCM outsourcing | Purchasing behavior | Implications for Chariot |
|---|---|---|---|---|
| **Independent physician groups** | • As a whole, independent physicians has remained nearly stagnant, with 1.4% growth from 2011 to 2014<br>• Within the segment, large groups will expand from 28% to 33%, while small groups shrink from 33% to 28% (by share of physicians) | • Growing preference among groups of 10+ physicians to outsource RCM, regardless of whether they anticipate staying independent or getting acquired | • Open to using a combination of outsourcing and software | • Opportunity to increase market share if Chariot serves the mid-large groups that are acquiring other groups<br>• Offering a broader solutions portfolio and incorporating software will differentiate and increase loyalty |
| **Hospital-owned physician groups** | • Hospital-owned physicians have increased 6.1% from 2011 to 2014<br>• Hospital-owned physicians represented 11% of all physicians in 2008, and 15% by 2013 and is expected to grow to ~19% by 2018 | • Due to increasing margin pressures and value based care demand for RCM services have increased in this segment | • Values evidence that vendor will increase productivity and administrative workflow<br>• Increasing demand for end-to-end solutions due to system complexity | • Exciting opportunity to enter new market currently not addressed<br>• Requires addressing end to end RCM solution along with technology |

**Physician consolidation will stabilize in next 2-3 years , with RCM market expected to grow in next 5-7 years due to time needed for trickle down effects**

SOURCE: Black Book 2014 RCM Report, American Hospital Directory, SK&A Physician office survey, Beckers HR Hospitals Physicians polls; expert interviews

CONSOLIDATION

# 1B Increasing physician group consolidation and hospital ownership are currently reshaping the RCM market



**Physician groups are merging with hospitals or forming hybrid corporatized groups**

**Physicians by employment type[1]**
Number of physicians; percent

☐ Not currently addressed by Chariot
■ Currently addressed by Chariot

|  | 764,700 | 767,200 | 791,300 |
|---|---|---|---|
| Hospital owned | 11% | 15% | 17% |
| Hospital with Group affiliation | 6% | 9% | 11% |
| Multi-specialty physician groups | 37% | 31% | 28% |
| Single-specialty physician group and solo physicians | 46% | 45% | 44% |
|  | 2008 | 2013 | 2018 |

**Physician groups have consolidated in recent years to achieve scale and savings**

1 SK&A datafiles based on physician phone survey; 2018 projects are extrapolated from historic 2008-2013 trends and discounted at 60% through 2018; total physicians based AAMC March 2015 and November 2008 reports
2 SK&A self-reported ownership reconciled against AMA 2012 Physician Practice Benchmark Survey self-reported ownership

SOURCE: AMA physician group data file; MGMA physician compensation and production survey, 2003–09; Hospital and Health Networks, HIDA 2013 Acute care market report, SK&A Physician datafile 2008, 2013, Physician Compensation and Production Survey, Medical Group Management Survey, 2002-12; Merritt Hawkins 2011 Review of Physician and CRNA Recruiting Incentives; Jackson Healthcare trend watch

CONSOLIDATION
Case 2:18-cv-09293-MCA-LDW   Document 21-2   Filed 08/25/18   Page 251 of 526 PageID: 447
Case 2:18-cv-09293-MCA-LDW   Document 21-3   Filed 08/25/18   Page 53 of 99 PageID: 291

# 1B Supporting insights: Consolidation of independent physician groups and hospital-owned groups

## Market trends

| | | |
|---|---|---|
| **Market size** | The number of physicians with hospital affiliation is growing faster than the number of independent physicians | **Physician number growth by type** CAGR 2011-2014 |



| Hospital-employed | Individual contract | Group contract | Independent |
|---|---|---|---|
| 6.1 | 4.9 | 7.8 | 1.4 |

**Effects of consol-idation**

**Demand for RCM outsourcing**

9 out of 10 of practices, both independent and hospital-owned, anticipated declining or negative profitability due to diminishing reimbursements and inefficient billing

68% of 10+ physician groups out-source a combination of collec-tions and claims management

**Purchasing behavior**

64% of physician groups would consider a combination of **software and outsourcing** vendors to improve RCM processes



72% of hospital CFOs consider **end-to-end** RCM to be the best option until value-based payment models are improved

SOURCE: Black Book 2014 RCM Report, American Hospital Directory, SK&A Physician office survey, Beckers HR Hospitals Physicians polls; expert interviews

# Contents

- Market sizing

- **Market dynamics**

- Competitive landscape

- Chariot deep dive

- Value creation

- Summary of India site visit

- Pricing structure

**2A  86% of physician groups would consider outsourcing and 75% report that EMR and practice management vendors influence their RCM vendor choice**

**"Would your organization be open to outsourcing revenue cycle management through a third party vendor? For example, this could mean delegating the manual processes to an offshore team."**

N=55



No, my organization would not consider outsourcing

Yes, my organization is enthusiastic about outsourcing

My organization would consider outsourcing

- **53%** are open to outsourcing
- To convince these potential customers will require a **clear value proposition**
- Of those who would not consider outsourcing, 44% are groups of 10-29 physicians

**"Please consider how your choice of vendor for EMR and physician practice management influences your choice of vendor for revenue cycle management. Which of the following is most accurate?"**

N=55



■ BOTH my EMR AND my physician practice management vendors influence my choice of revenue cycle management vendor

□ My EMR vendor influences my choice of revenue cycle management vendor

■ NEITHER my EMR NOR my physician practice management vendor influences my choice of revenue cycle management vendor

■ My physician practice management vendor influences my choice of revenue cycle management vendor

- **EMR and PM vendor recommendations** are important
- RCM solutions need to **integrate** well—and this may require establishing partnerships
- **Moving fast is critical**, as some EMR and practice management vendors (e.g., Epic) have already established RCM solutions

- **81%** of Hospital CFOs consider outsourcing to be the best stop gap measure until new RCM software is afforded and installed – as such, Chariot's outsourcing business may offer a distinctive advantage as it develops technology solutions

ATTITUDES AND ADOPTION

# 2A The #1 barrier to outsourcing uptake is the perception that vendors fail to understand their customer's unique needs



**"What are the top reasons you would not consider outsourcing?"[1]**

Most Important → Least Important

| Criteria | Weight out of 100 (Average for n=27) |
|---|---|
| Does not fully understand my organization's needs | 38 |
| Unreliable in its quality | 29 |
| Other (please specify):[2] | 21 |
| Incompatible with other technology or services | 13 |
| Too expensive | 0 |
| Does not enable our organization to scale | 0 |

*"I like the internal control"*

*"I would never offshore"*

44% of participants come from **groups with 10-29 physicians**

- For them, 1 in 4 are **multi-specialty**
- #1 reason is understanding their organization's needs and #2 reason is technology compatibility
- 3 out of 4 customer say their EMR and/or practice management provider influences their RCM vendor choice

1 Full question = "What are the top THREE reasons why you would NOT consider outsourcing revenue cycle management. Please rank the following where 1=most important"; 2 Other answer included (N=1): "Leverages their expertise"

SOURCE: Survey, Team analysis

McKinsey & Company   |   33

# 2A Groups that insource have bimodal distribution with a long tail of fragmented specialties while groups that outsource are dominated by mid-size and large physician practices

| | **Outsourcing providers** | **Insourcing providers** | **Interpretation** |
|---|---|---|---|
| **Practice setting** | ▪ 33% of PCP groups and single-specialty groups outsource<br><br>▪ 46% of all outsourcing groups are single-specialty groups | ▪ 50% of solo practitioners insource | ▪ Single-specialty groups likely outsource to benefit from vendor expertise with their specialty |
| **Size (# physicians)** |  |  | ▪ Insourcing groups are likely to be small enough to manage the volume without additional hires or large enough to benefit from scale economies of a hired department |
| **Top 3 specialties represented** | 1. Primary care (39% of all outsourcing groups)<br>2. Orthopedic (26%)<br>3. Cardiovascular (26%) | 1. Primary care (14% of all insourcing groups)<br>2. Orthopedics (10%)<br>3. Surgery (10%) | ▪ Insourcing groups tend to be more fragmented in specialties<br><br>▪ 90% of outsourcing is dominated by three specialties |

X Number of physicians

Outsourcing size: 1-9: 17, 10-29: 26, 30-99: 39, 100+: 18

Insourcing size: 1-9: 38, 10-29: 20, 30-99: 17, 100+: 25

# 2A Software vendors dominate pre-treatment RCM, whereas software and services vendors are competing in post-treatment RCM

**Please recall the revenue cycle management functions described earlier. For which of the functions do you currently use a third party vendor?**

| RCM process | | Software only | Service only | Neither | Both |
|---|---|---|---|---|---|
| Pre-service | Registration / scheduling | 71% | 9% | 18% | 2% |
| Pre-service | Eligibility / verification | 60% | 15% | 20% | 5% |
| Pre-service | Upfront collections | 51% | 15% | 35% | 0% |
| Point of service | Charge capture | 65% | 15% | 20% | 0% |
| Point of service | Coding | 60% | 18% | 18% | 4% |
| Post-service | Claims | 53% | 38% | 2% | 7% |
| Post-service | Denials | 42% | 42% | 4% | 13% |
| Post-service | Residual billing | 35% | 40% | 16% | 9% |
| Post-service | Collections | 27% | 53% | 9% | 11% |

- Customers are equally likely to use software or services in the post-treatment RCM
- However, there is low service uptake (14-17%) in the pre-service RCM, where software vendors dominate
- Single-specialty physician groups in particular prefer software over services for upfront collections, charge capture, and denials
- White space is found in upfront collections

1 Average of customer scores across each category weighted by the average importance assigned to each factor

SOURCE: External and internal interviews; survey

ATTITUDES AND ADOPTION

Case 2:18-cv-09284-MCA-LDW   Document 212-1  Filed 08/25/18  Page 257 of 526 PageID: 453
Case 2:18-cv-09284-MCA-LDW   Document 112-13  Filed 08/16/18  Page 536 of 99 PageID: 252

**2A** **Deep dive: denials management presents an exciting opportunity for technology-driven solutions**



■ Large and growing outsourcing
■ Emerging opportunities to outsource
☐ Highly penetrated

"There is no good solution for denials, and that is where analytics can add a lot of value

**Provider RCM**

- Front end RCM
  - Scheduling
  - Insurance. elig/ Pre-auth/cert
  - POS collections
  - Financial counselling
- Patient encounter RCM
  - Transcription
  - Coding
  - Case management
- Back office RCM
  - Billing
  - Denials management
  - Cash posting
  - Collections
- End to End RCM

| Steps to prevent denials | Potential solutions |
|---|---|
| ■ Review of provider contracts | ■ Up-to-date database of provider requirements (e.g., documentation, timeframe) |
| ■ Inadequate scrubbing | ■ Automated checks for ICD-9/ICD-10 compliance<br>■ In-house clearinghouse or partnership accelerates process |
| ■ Inability to categorize denials by cause | ■ Data mining and analytics to recognize repeated mis-submissions and sources of human error |
| ■ Lack of expertise to interpret cause of denial | ■ Organization support for human intervention and submission expertise required |
| ■ Inconsistent resubmission workflow | ■ Denial, resubmission, and resolution tracking<br>■ Resubmission success metrics |

**An RCM vendor that can leverage data analytics that integrates provider-specific claims requirements can provide a differentiated solutions to fill an unmet need**

SOURCE: McKesson (RelayHealth Reimbursement VP), Nelson Hall, IDC, Survey of hospital executives (n = 100), interviews

Case 2:18-cv-09284-MCA-LDW   Document 212-3 Filed 08/25/18   Page 258 of 526 PageID: 454
Case 2:18-cv-09284-MCA-LDW   Document 112-1 Filed 06/26/18   Page 37 of 39 PageID: 244

**2A As competition intensifies and new players enter, Chariot will have to expand its breadth of offerings and provide end-to-end solutions to combat pricing pressures**

| Emerging dynamics | Examples / evidence |
|---|---|
| **Increased focus on pre-service solutions** | ▪ *"Scheduling and eligibility involves collecting and recognizing data from and about patients. It's complicated and there are **few companies that do it well**" - Industry expert*<br>▪ **Upfront collections** is most **underpenetrated** step with 35% using neither software nor service |
| **More integrated RCM solutions in the market** | ▪ 75% of groups report their **EMR and/or practice management vendor** influences RCM vendor choice<br>▪ *"A customer can purchase software at a cheap price, only to find that it's not compatible with a part of their system; then they end up paying much more" – Former VP of Operations, Competitor* |
| **Different pricing models in play** | ▪ Players will likely move to more **integrated** pricing models or start **discounting** one product and make up profit in other parts of value chain<br>– Practice Fusion has partnered with Dragon to offer discounted coding/transcription services, reducing total cost of ownership and increasing integration<br>– Optum was ranked #3 in the Black Book largely due to its #1 ranked flexible pricing model |

**Implications for Chariot**

▪ Barriers to switching vendors will continue to exist and it will help Chariot to retain its customers

▪ However increasing competition will put pricing pressure on Chariot's products; there are ways Chariot can address this though

– Increase pre-service offering and move from a niche billing and coding player to an end-to-end RCM player in physician space

– Align software compatibility with established EMR solutions to make products more in-demand than competitors

– Explore different pricing models including partnering-vendor discounts and going at-risk with the providers

# 2B Customers value eliminating the need for more employees and achieving reliable results

■ Customer priorities

## "What are the top 3 benefits of using a third party vendor?"

| Criteria | Weight out of 100 (Average for n=55) |
|---|---|
| **Eliminates the need to employ more people** | 21 |
| **Achieves more reliable results** | 19 |
| **Collects and tracks data** | 17 |
| **Costs less money** | 14 |
| **Helps with scaling operations if we grow** | 12 |
| **Comes with a bundle for services for other functions (e.g., EMR)** | 11 |
| **Accomplishes the task faster** | 7 |
| **Other (please specify)** | 0 |

**Most Important** → **Least Important**

*"Small practices can handle the volume on their own; big practices can afford to hire. But medium-sized physicians will outsource"*

*– RCM expert*

*"Fewer hands mean less error, whether it's a spelling error, anything that increases my denial rate"*

*– Chief Executive Officer at Orthopedic Group*



*"It would be great if you could track the errors that keep causing denials"*

*– RCM expert*



ECONOMIC BENEFITS

## 2B 87% of outsourcing practices report efficiency improvement, but half of them continue to grow at the same rate before and after outsourcing



**Physician perception of productivity and efficiency change post-outsourcing[1]**

N=55

Some efficiency improvement after outsourcing revenue cycle management — 62

Major efficiency improvement after outsourcing revenue cycle management — 25

No change in efficiency after outsourcing revenue cycle management — 11

Decreased efficiency after outsourcing revenue cycle management — 2

46% of benefactors are single-specialty groups

**Physician perception of practice growth post-outsourcing[2]**

N=55

We grew at the SAME rate after outsourcing revenue cycle management — 51

We grew SOMEWHAT more quickly after outsourcing revenue cycle management (e.g., less than 50% increase in patient volumes) — 36

We grew A LOT more quickly after outsourcing revenue cycle management (e.g., greater than 50% increase in patient volumes) — 11

We had NEGATIVE growth after outsourcing revenue cycle management (e.g., decrease in patient volumes) — 2

We grew more SLOWLY after outsourcing revenue cycle management — 0

Employed physician groups tend to experience high growth

1 "Please compare the office PRODUCTIVITY and operational EFFICIENCY of your organization before and after you began outsourcing revenue cycle management processes. Which best describes the change?"
2 "Compare the GROWTH of your organization before and after you began outsourcing revenue cycle management processes. This includes any growth, such as increasing opening a new office, increasing patient /procedure volumes, or acquiring another organization. Which best describes the change?"

SOURCE: Survey results

VALUE-BASED CARE
Case 2:18-cv-09283-MCA-LDW   Document 212-3   Filed 08/25/18   Page 261 of 526 PageID: 457
Case 2:18-cv-09283-MCA-WAY   Document 112-1   Filed 08/16/18   Page 260 of 99 PageID: 451

**2C Long-term implications of value-based care increases complexity and demand for outsourcing, but increases customers' cost of doing business**

| Immediate effect | Emerging customer needs | Implications for Chariot |
|---|---|---|
| **Increased complexity for coding and claims** | ▪ **Manual intervention** will be necessary (along with automation) to meet complex needs | ➕ Increased demand for outsourcing services<br>➖ Increased labor costs |
| | ▪ **Accurate and complete** coding and denial management will become more important | ➕ Increased potential to differentiate services |
| | ▪ **Differences in regional requirements** and regulations will become critical to manage, which impacts billing and coding | ➕ Need for expertise to understand regional requirements and ever-changing regulations |
| **Healthcare provider margin compression** | ▪ Emphasis to control costs will increase the **importance of price** in selecting vendors | ➖ Pressure to innovate and lower cost or face margin erosion |
| | ▪ **Capitation** payments may increase over time; however slow growth expected (non-capitated risk based arrangements expected at faster pace but they do not pose risk to Chariot) | ➖ Margin compression due to reduced customer revenues |
| | ▪ Accelerated physician group consolidation could likely mean **vendor consolidation or end-to-end RCM solutions** | ❓ Opportunity or threat, depending on whether vendors also consolidate |
| | ▪ Demand for **greater transparency** in contracting and pricing to demonstrate total cost of ownership (TCO) | ❓ Increased need to find recurring revenue without increasing TCO |

> **Chariot will benefit from value-based care if they can reduce their labor costs to manage increased complexity and capture the upside of increased demand for RCM; in addition, capitated payments may reduce margins, but we do not believe they will be take off at a substantial scale in coming 5 years**

SOURCE: Black Book 2014 RCM Report, American Hospital Directory, SK&A Physician office survey, Beckers HR Hospitals Physicians polls; expert interviews

VALUE-BASED CARE

Case 2:18-cv-09283-MCA-LDW   Document 212-3 Filed 03/25/19   Page 262 of 526 PageID: 458
Case 2:18-cv-09283-MCA-LDW   Document 212-3 Filed 03/25/19   Page 262 of 526 PageID: 302

# 2C Supporting insights: long-term implications of value-based care

| Immediate effect | Expert interview quotes | Market trends |
|---|---|---|

**Increased complexity for coding and claims**

> "Fewer hands means less error. Even a spelling error can increase my denial rate"
>
> **– CEO of 30-physician practice**

> "Blue Cross Blue Shield has a business in every state, and that's because the RCM process varies widely by state"
> **– CEO of 30-physician practice**

81% of physician practices anticipate declining or negative profitability due to underutilized or inefficient billing and records technology

**Healthcare provider margin compres-sion**

> "I'm tired of vendors selling me a cheap product, and then telling me I need to buy something else to stay compatible with the system. There's a lot of upselling and in the end it all adds up"
> **– CEO of 30-man radiology practice**

> "We brought in 7 vendors and they each gave their presentation. At the end of the day, thought, it's cost"
> **– Director of Revenue Cycle Services**

Recent M&A activity in the RCM industry signals vendor consolidation (e.g., McKesson's acquisition of Change/Emdeon)

**Timing of impact**

- ~20 major payors and providers[1] pledged to convert ~75% of their businesses to value-based payment arrangements by 2020
- Healthcare spending on risk-based models has increased from 10-15% in 2013 to 25-25% in 2014

1 Payors incl. Aetna, Blue Cross Blue Shield of Massachusetts, Blue Shield of California and Health Care Service Corporation; Providers incl. Advocate Health Care, Aledade, Inc., Ascension, Atrius Health, Dartmouth-Hitchcock Health, Dignity Health, Heritage Provider Network, Optum, OSF HealthCare, Partners HealthCare, Premier, Inc., Providence Health & Services, SCL Health, SSM Health, Trinity Health and Tucson Medical Center Healthcare

SOURCE: Black Book 2014 RCM Report, American Hospital Directory, SK&A Physician office survey, Beckers HR Hospitals Physicians polls; expert interviews

**2D** **Automation is expected to grow in RCM over next few years while creating need for specialized services to provide complete solutions**

### Trends in automation

- The extent of automation will vary across the RCM value chain depending on the complexity of activities

- RCM will continue to require a service component to resolve regulation complexities and patient interactions; level of expertise required in services will increase

- Successfully automating back-office processes will reduce servicing cost and increase profit margins

### Implications for Chariot

- To be an end-to-end solution provider Chariot will need to continue developing automation capabilities across the value chain

- Chariot has an advantage with a specialized labor force to continue to enhance the skills and provide level of expertise that will be required going forward in services

- Investment in automated internal processes will help Chariot remain cost competitive relative to peers by increasing labor efficiency

# 2D The extent of automation will grow across RCM processes, but there will always be a servicing component necessary

| | | Extent of automation (% of total processes): Current | Extent of automation (% of total processes): Projected in next 5 years | Rationale | Chariot's current automation |
|---|---|---|---|---|---|
| Pre-service | Registration/ scheduling | 10 | 30-40 | ▪ Resistance from physicians to adapt new technology<br>▪ Requires patient interaction<br>▪ Limited form standardization | |
| Pre-service | Eligibility/ verification | 15 | 50-55 | ▪ Comfort of using old ways will lead to slow adaption<br>▪ However still expected to double due to easy to use tools | |
| Pre-service | Upfront collections | 10 | 30-40 | ▪ Utilizing additional digital channels to collect; however still will require some intervention in most practices | |
| Service | Charge capture | 20 | 50-55 | ▪ Requirements for electronic records for participation in select programs will force some practices to automate coding | |
| Service | Coding | 20 | 50-55 | ▪ Requirements for electronic records for participation in select programs will force some practices to automate coding | |
| Post-service | Denials | 20 | 40-45 | ▪ Increasing sophistication in automating more denial reasons, increasing acceptance by payors | |
| Post-service | Residual billing | 10-15 | 20-25 | ▪ Utilizing additional digital channels to collect; however adaption in patients will take some time | |
| Post-service | Collections | 30 | 60 | ▪ Expected to use more digital channels including -mobile, web-based, advanced IVR | |

- **Procedural steps** (e.g., communication, organization, data matching, forms) will become **highly automated** (~80%)
- Steps **requiring human expertise and judgment** (e.g., financial counseling, denials management) **will benefit from data analysis** and specialized knowledge to **direct attention to high-impact tasks**

SOURCE: Industry interviews, McKinsey analysis

AUTOMATION

## 2D RCM functions show a range of "automatability" relative to variety of other tasks



■ High automatable[1]    ■ Medium automatable    ■ Low or not automatable

**Automatability[2] challenge score**

- Irrigate lawns, trees, or plants
- Communicate org information to customers/stakeholders
- Analyze market research data
- Inspect products or operations to ensure that standards are met
- Direct medical science or healthcare programs

**Tasks**

502 tasks (~24%)    503 tasks (~25%)    1029 tasks (~51%)

**Example RCM activities**

- Order entry in the system
- Code procedure in charge master
- Generate bill
- Payment posting in the system
- First party collection attempts thru IVR, web- based
- Third party collections attempts thru IVR , web-based

- Generate claims form from a provider
- Send through a clearing house
- Schedule an appointment
- Complex procedures eligibility and verification
- Understanding and working through denied claims

- Collect payments at point of service
- Manage complex denials
- Discuss financial aid, payment plans and charity
- Analyze data to put rules in place for prioritizing different collection channels

1 "High" automatability defined as the lowest 50% of technically automatable tasks on the automatability challenge index
2 "Automatability" analyzed for a variety of tasks across different industries, with the following assumptions:
- If a task's capability required exceeds that of emerging technology, then task is not automatable
- Tasks that require more state-of-the-art technological capabilities are considered harder to automate
- Integrating multiple (and more demanding) capabilities is harder than just focusing on one capability

SOURCE: BLS, O-Net, expert interviews, McKinsey analysis

AUTOMATION

## 2D Revenue pool for automated processes is expected to increase in next 5 years at a faster rate than manual revenue pools

■ Automated   ■ Manual



**Automated RCM revenues vs. manual RCM revenues, 2015-2020,** B USD

- **Automated services** will increase to ~$10B in RCM revenue pool with a **CAGR of 28%** from 2015 to 2020
- **Manual services** will not only **persist but grow with total RCM growth** – however with a comparably low **CAGR of 2%;** specialized manual services will become important to capture additional revenue
- **All RCM processes will get more and more automated-** both services and software companies will be expected to automate more processes than before

1 Other includes upfront collections and denials, as categorized in the market sizing; automation increased on average from 11% to 30%

CONSOLIDATION / SCALE

# 2E In companies that have scaled, although margins remain fairly stagnant, size and productivity have increased over time



**Key takeaways**

- Companies growing at scale experience revenue, size and productivity growth
- Limited profitability changes are visible as companies scale
- Employee productivity (profit/employee) grows
- Likely investments occur in systems, or marketing (e.g., discounting)

SOURCE: CPAT, company financials

McKinsey & Company | 46

VALUE PROPOSITION TO PHYSICIANS

Case 2:18-cv-02284-MCA-LDW Document 212-3 Filed 08/25/18 Page 268 of 526 PageID: 464
Case 2:18-cv-02284-MCA-LDW Document 121-3 Filed 08/16/18 Page 67 of 99 PageID: 308

## 2F Physician margins are under pressure as costs build up and impede physician budget

Bucket of RCM spend



**Average physician practice P&L, U.S.,** USD

| | 2013 | 2014 | 2020E[1] |
|---|---|---|---|
| **Revenue** | 100% | 100% | 100% |
| Total Physician Cost | 41% | 37% | 36% |
| Other General Operating Cost: | 4% | 4% | 4% |
| Total nonphysician Provider Cost | 4% | 4% | 6% |
| Ancillary Services Costs | 1% | 3% | 3 |
| Medical and Surgical Supply Cost | 3% | 5% | 5% |
| Building and Occupancy Cost | 3% | 5% | 5% |
| Total Support Staff | 32% | 27% | 26% |
| Information Tech costs | 0% | 2% | 3% |
| Prof. liability insurance | 0% | 1% | 1% |
| **Profit** | 13% | 12% | 11% |

**Total costs**

### Implications for Chariot

- **Physician margins will be under pressure** as well in the future
- **Physicians** are obligated to **spend a larger share of their revenue on non-physician provider services** (e.g. RCM)
- **The implications for Chariot** are more **cost sensitive customers** that on the other side **are more interested in RCM solutions**
- Out-Of-Pocket payments represent **3-4%** of physician practice charges which is expected to grow at a CAGR of ~4%

Case 2:18-cv-09284-MCA-MAH Document 12-13 Filed 08/16/18 Page 48 of 99 PageID: 309

# 2F Survey results and interviews indicate that disruption to operations and financial costs are the biggest costs with switching billing vendors

#1 contributor | #2 contributor

Most Important ↑ Least Important

| Top contributors to switching costs | Ranking of contributors to cost: #1 contributor | #2 contributor | Total | Incremental financial impact |
|---|---|---|---|---|
| Disruption to operations | 20 | 20 | 40 | 30-40% reduction in revenues 90 days before and after date of implementation due to data migration and disincentived performance from outbound vendor |
| Financial cost of purchasing, installation, maintenance, etc. | 21 | 15 | 36 | Usually assumed by incumbent vendor |
| Training for personnel | 5 | 9 | 14 | Training fees ranging $40-60/hour for 1-2 days |
| IT systems change or incompatibility | 4 | 4 | 8 | Depends; potential costs include early termination or paying for 3rd party integrator |
| Physicians dissatisfaction | 3 | 2 | 5 | Loss of skilled physicians who prefer outbound vendor |
| Need to hire or rehire people | 1 | 5 | 6 | Depends; includes FTE hours from directors/managers; Wages of new hires ranging $40-$60/hour |

"The implementation timeframe can take up to 200 days; after the chaos, [the provider] tries to recoup the loss"
**– Former VP of Operations, competitor**

"The dreaded bubble or interim when you've notified the old vendor, who has decreased effort, and you're waiting for the new vendor to migrate everything"
**– Internal McKinsey expert**

**Disruption to operations** is the most important contributor due to

- Missed billing and collections from data migration
- Decreased responsibility from outgoing vendor

**45-50%** of customers indicate that they **do not plan to switch** vendors for any part of their RCM process, **even 5 years from now**

SOURCE: Survey results

**2F** **Costs for switching take up to ~50% of one year profits for a small practice, though diminish with group size**

**Estimated average switching costs by size of physician group[1]**, K USD



| Switch cost component | Small (9 physicians) | Medium (50 physicians) | Large (100 physicians) | Rationale/assumptions |
|---|---|---|---|---|
| Installation average | 250 | 275 | 300 | • $250,000-300,000 depending on vendor upfront costs<br>• Includes EMR interfacing<br>• Includes dual operations during transition (may be negotiated away) |
| Disruption to operations | 28 | 154 | 308 | • Average ~1.5% reduction in revenues for 90-120 days<br>• Includes knowledge transfer between old and new vendors |
| Training | 4 | 11 | 17 | • Training fees averaging $120/hr for three 8-hour days |
| Severance | 2 | 5 | 8 | • Assuming 25% reduction in labor<br>• Average annual salary of $40,000 with 4-6 week severance package |
| Vendor negotiations | 0 | 0 | 0 | • Equivalent of manager's work for 2 day (e.g., to view presentation, evaluate RFPs, negotiate contracts) |
| Total switching cost | 284 | 445 | 634 | |
| Total revenues (K USD) | 4,500 | 25,000 | 50,000 | |
| Switching cost as % of total revenues | 6% | 2% | 1% | |
| Switching cost as % of 1-year profits | 53% | 15% | 11% | |

1 See appendix for breakdown of calculations and assumptions

# Contents

- Market sizing

- Market dynamics

- **Competitive landscape**

- Chariot deep dive

- Value creation

- Summary of India site visit

- Pricing structure

COMPETITORS

**3A** **Compared to top ranked RCM vendors in 2016, Chariot's is rated high in customer service, ease of use, and implementation**

Strong ▬▬▬▬ Weak

**Performance characteristics as perceived by customers**

Criteria in decreasing order of importance →

| VENDOR | Cost of ownership | Compatibility[2] | Customer support/service | Functionality[3] | Ease of use | Recommen-dation[4] | Technology | Implementa-tion |
|---|---|---|---|---|---|---|---|---|
| Kareo | | | | | | | | |
| Athena Health | | | | | | | | |
| Aprima | | | | | | | | |
| Healthfusion Meditouch | | | | | | | | |
| Carecloud | | | | | | | | |
| Dr Chrono | | | | | | | | |
| Practice Fusion | | | | | | | | |
| Mckesson | | | | | | | | |
| Greenway | | | | | | | | |
| Cure MD | | | | | | | | |
| eClinical Works | | | | | | | | |
| **Chariot**[1] | | | | | | | | |

> Chariot's solutions fall in the middle of the pack relative to its peers, offering strong customer support but falling short in patient and client facing tools such as verification/ eligibility and scheduling/ reminders

1 Based on industry interviews (N=8) + 1 actual client interview; 2 is compatible with other solutions; 3 customization, transparency and viability of solutions; 4 Likelihood to be recommended

COMPETITORS

## 3A Chariot is not well known in the market but slightly below average in overall customer satisfaction





**Level of satisfaction with players[1]**
Share of responses (N=55)

**Avg. rating[1]**
(N=55)

**Usage of vendor**
# of respondents/55

| Legend | | | | |
|---|---|---|---|---|
| ■ Very low | ■ Low | ■ Neutral | ■ High | ■ Very high |

| Vendor | Satisfaction | Total | Avg. rating | Usage |
|---|---|---|---|---|
| Zirmed | 29 / 43 / 29 | 100 | 4.0 | 7 |
| Navicure | 40 / 40 / 20 | 100 | 3.8 | 5 |
| eClinical | 30 / 60 / 10 | 100 | 3.8 | 10 |
| MedAssets | 33 / 67 | 100 | 3.7 | 3 |
| Athena | 14 / 21 / 50 / 14 | 100 | 3.6 | 14 |
| Practicefusion | 50 / 50 | 100 | 3.5 | 4 |
| Other (please specify) | 6 / 11 / 28 / 44 / 11 | 100 | 3.4 | 18 |
| Optum | 60 / 40 | 100 | 3.4 | 5 |
| McKesson | 12 / 48 / 32 / 8 | 100 | 3.4 | 25 |
| **Chariot[2]** | 50 / 50 | 100 | 3.5 | 4 |

**Limited industry memberships / activities –** No published presence in Healthcare Information Management Systems Society (HIMSS) or Healthcare Financial Management Association (HFMA) in last 3 years

*"I have never heard of Chariot, what services do they provide?"*
*– CEO of a large physician practice*

1 "How would you rate your satisfaction with your current third party vendors OVERALL? Please rank your satisfaction from 1 to 5, where 1=Very poor and 5=Excellent" 2 Includes customers that indicated that they use Orion; additional participants were polled to reach usage of N=4

SOURCE: Industry interviews, survey (N=58)

McKinsey & Company | 52

COMPETITORS

**3A** **Chariot's rating scores are average for the cohort of "Other" vendors captured in the survey**



Legend: ■ Very low  ■ Low  ■ Neutral  ■ High  ■ Very high

| | Level of satisfaction with players[1]<br>Share of responses (N=21) | Avg. rating[2]<br>(N=21) | Usage of vendor<br># of respondents |
|---|---|---|---|
| Accelacapture/White Plume | | 5.0 | 1 |
| Canopy Partners | | 5.0 | 1 |
| Adavocate | | 4.0 | 1 |
| ChiroTouch | | 4.0 | 1 |
| Epion | | 4.0 | 1 |
| Glostream | | 4.0 | 1 |
| Medlycs, Zotech, Intermedix | | 4.0 | 1 |
| Private company not listed | | 4.0 | 1 |
| RealMed | | 4.0 | 1 |
| Next Gen | | 3.5 | 2 |
| CureMD | | 3.0 | 1 |
| Epic | | 3.0 | 1 |
| Greenway Primesuite | | 3.0 | 1 |
| Omni | | 3.0 | 1 |
| Affiliated Professional Services | | 2.0 | 1 |
| Ingenious Med | | 2.0 | 1 |
| Allscripts | | 1.0 | 1 |
| **Chariot[3]** | | 3.5 | 4 |

> **Average of "Other" vendors is 3.4**

1 "How would you rate your satisfaction with your current third party vendors OVERALL?  Please rank your satisfaction from 1 to 5, where 1=Very poor and 5=Excellent"     2 Avg. rating is averaged across 3 ratings for "overall satisfaction," "technology", and "collections/revenue"
3 Includes customers that indicated that they use Orion; additional participants were polled to reach usage of N=4

SOURCE: Industry interviews, survey (N=21 for "Other" vendors)

PRODUCT OFFERING
Case 2:18-cv-09284-MCA-LDW Document 212-3 Filed 09/25/19 Page 275 of 526 PageID: 471
Case 2:18-cv-09284-MCA-LDW Document 212-3 Filed 08/26/18 Page 275 of 526 PageID: 471

**3B** **Most of Chariot's products address customer priorities, but there is potential to bring differentiation by expanding from Chariot's strengths in billing and radiology solutions**

Details to follow

| Chariot solutions | Function | Presentation quotes[1] | Top 2 benefits of using a vendor[2] | | Assessment |
|---|---|---|---|---|---|
| | | | Eliminates need to employ more people | Achieves more reliable results | |
| PARCS | ▪ Claims processing, A/R and billing collections, reporting | "Highly automated" and "Real time" | ✔ | ✔ | ▪ Billing is commoditized but **potential to improve denial management** |
| MDINSURANCEAUTH | ▪ Authorization and eligibility, online request submission checking for data completion | "Designed to assist your administrative staff" | ✔ | ✔ | ▪ Potential to create **automated offering and reduce denials,** applicable for ~40% of claims |
| PTRANS | ▪ Report dictation software for transcription | "Providers can dictate reports" | ✔ | ✔ | ▪ **Differentiated** |
| PSCAN | ▪ Document scanning and batch management | "Scanning" and "routing" | ✔ | | ▪ Undifferentiated |
| PEGASUS | ▪ Payment and operations analytics with dashboard and reporting/visualization | "Easy-to-use interactive analytics" | | ✔ | ▪ Undifferentiated |
| RMP SOFTWARE | ▪ SharePoint portal | "Security and collaboration" | | | ▪ Undifferentiated |
| PSPN | ▪ Radiology contract and fee scheduling/billing with re-pricing based on cost containment model | "Manages the radiology network" | ✔ | ✔ | ▪ Potential to gain **expertise in specialty networks,** e.g., Schumacher, Votec |
| HDOCS | ▪ CMS-certified EMR solutions | "Unique, sophisticated, and easy-to-use" | | | ▪ **Differentiated;** most small/med vendors connect to host's EMR |

▪ While 6 of the 8 solutions meet at least one of customers' top two needs, most of the products do not offer differentiated value proposition

▪ There is potential to build off existing billing collections and radiology solutions to achieve differentiation

1 Presentation quotes from Chariot's "Aquila Alpha" presentation  2 Based on survey (N=60) physician groups, asking customers to rank their benefits

**3B** **Developing full scale solutions requires extensive labor investments and financial commitment over a longer period of time**

### Optum™ Claims Manager - product development

CASE EXAMPLE

### Context for financial cost

| | Description | Comments |
|---|---|---|
| **Product** | ▪ "A powerful and proven tool that enables physician practice groups and facilities to review claims before submission in order to reduce claim denial rates, shorten accounts receivable cycles, and increase the rate of collection" | *(On customer need)* "Physicians and facilities are two complete different animals" |
| **Time investment** | ▪ 4 months to create data set of claims rules<br>▪ 6 months to develop software prototype<br>▪ Live within 12 months | *(On speed)* "We are big but we are slow to make decisions. I imagine startups are agile and can innovate more quickly, though it still takes time to launch new ideas" |
| **Labor investment** | ▪ 2 product managers<br>▪ 40-person developer team (e.g., engineers, system architects)<br>▪ 5-person testing team<br>▪ 30-person clinical team (e.g., claims SMEs, nurses)<br>▪ 14-person offshore India and 20-person domestic programming team<br>▪ Lawyers leveraged from United Health<br>▪ Permanent team to make ongoing quarterly updates to claims policies | *(On complexity)* "Medicare was 9000 written policies – and we were coding for Medicare, Medicaid, and commercial insurance" |

**In addition to product development, vendors allocate resources to maintenance and product updates**

**Industry R&D investment**
(for new product innovation and upgrades)[1]

| | |
|---|---|
| ▪ McKesson[2] | $392M |
| ▪ Greenway | $48M |
| ▪ Athena | $25M |
| ▪ Change | |

**Multiple strategic options are possible**
- Invest significant time and funds to build solution from scratch, taking +1 year (incl. IT team scale up), however creating proprietary and customized solutions
- Acquire (larger) player with existing technology, feasible in <6m, however requiring up-front cash and with potential integration challenges against current solutions
- Selectively acquire smaller players and connect solutions

1 Last reported year; 2 Includes other business units (e.g., distribution, pharmacy systems)

# COST AND PRICING

## 3C Vendor selection is predominantly based on cost of ownership and compatibility



**Rank of selection criteria for vendor selection[1],** Share of responses (N=55)

| | Most important → Less important | # of mentions |
|---|---|---|
| Total cost of ownership | 51 \| 9 \| 16 \| 12 \| 12 = 100 | |
| Compatible with EMR system / vendor | 39 \| 21 \| 14 \| 18 \| 7 = 100 | |
| Compatible with physician practice management system / vendor | 3 \| 47 \| 28 \| 6 \| 16 = 100 | |
| Customer support (e.g., IT specialists on call) | 15 \| 21 \| 21 \| 24 \| 21 = 100 | |
| Service breadth across functions | 13 \| 20 \| 27 \| 13 \| 27 = 100 | |
| Ease of use for physicians | 22 \| 11 \| 14 \| 25 \| 28 = 100 | |
| Ability to link to existing systems (e.g., EMR, HIS) | 9 \| 18 \| 18 \| 39 \| 15 = 100 | |
| Ability to customize | 28 \| 39 \| 6 \| 28 \| 0 = 100 | |
| Based on recommendation | 8 \| 17 \| 25 \| 25 \| 25 = 100 | |
| Automation / differentiated technology | 14 \| 7 \| 21 \| 21 \| 36 = 100 | |
| Speed to implement | 6 \| 17 \| 11 \| 33 \| 33 = 100 | |

*"The only way I would spend money to outsource services is if I knew that I would make it back in savings"*

**– CEO of small physician practice**

*"There is no vendor that can give us everyone I need, wrapped up in a single solution"*

**– CEO of 30-physician practice**

- In order to gain market share, Chariot will have to address the top 2-3 concerns for customers (i.e. cost of ownership and compatibility)
- Although 'ease of use' and 'ability to link with existing systems' may not be a deal-breaker, it is a criteria that distinguishes a standout RCM provider

1 "When you choose a third party vendor, what are the top FIVE decision factors? Please rank them with 1=most important."

Case 2:18-cv-00293-MCA-LDW   Document 212-3 Filed 08/25/19   Page 278 of 526 PageID: 474

# 3C Average annual intent to switch vendor across physicians is 10-12% per year



| Vendor | No plan to switch | Plans to switch within 4 years | Avg. switch per year[2] |
|---|---|---|---|
| athenahealth | 7 | 6 | 12% |
| Chariot | 3 | 1 | 6% |
| eClinicalWorks | 5 | 5 | 13% |
| McKESSON | 9 | 14 | 15% |
| MedAssets | 2 | 1 | 8% |
| MediRevv | 1 | 0 | 0% |
| navicure | 2 | 3 | 15% |
| OPTUM | 3 | 1 | 6% |
| practice fusion | 2 | 2 | 13% |
| ZIRMED | 2 | 5 | 18% |
| | N=31[3] | N=27[3] | |

**Overall, ~50% of all RCM customers plan to switch vendors in the next 4 years**

1 Full question = "If and when do you plan to adopt or switch vendors for the following functions?"
2 % planned to switch over 4 years / 4; 3 Respondents were allowed to include multiple vendors, sum does not equal N

# 3C Engaging RCM provider results in positive ROI – however collection rate and incremental revenue vary considerably

**ROI of a physician practice with 50 practitioners using different RCM contracts for 5 year time span,** M USD

| 5 year horizon | Chariot (variable) | End-to-end solutions | Automated only |
|---|---|---|---|
| **Total revenue** (in $M) | 125 | 125 | 125 |
| **Physician collection rates** (in %) | 89% | 92% | 79% |
| **Total rev. collections** (in $M) | 111 | 115 | 98 |
| **Total cost of collection** (in $M) | 6.1 | 7.6 | 2.5 |
|    **Payment to vendor** | 4.4 | 5.7 | - |
|    **Total FTE costs** | 0.2 | 0.2 | 0.6 |
|    **Total software costs (var.)** | - | - | 0.2 |
|    **Upfront investment** | - | 0.2 | 0.3 |
|    **Baseline costs to collect** (in $M) | 1.5 | 1.5 | 1.5 |
| **Baseline collections**[1] (In $M) | 96 | 96 | 96 |
| **Incremental revenue collected** (in $M) | 15 | 19 | 2.5 |
| **Incremental costs collected** (in $M) | 4.6 | 6.1 | 1.1 |
| **ROI** (in %) | ~225% | ~205% | ~130% |

> **These numbers are based on an average physician practice and will vary significantly based on payor mix, vendor contracts and baseline effectiveness of the practice**

1 77% Baseline collections by conducting collections in-house with slight software support only

# Contents

- Market sizing

- Market dynamics

- Competitive landscape

- **Chariot deep dive**

- Value creation

- Summary of India site visit

- Pricing structure

GROWTH AND CHURN

Case 2:18-cv-00284-MCA-LDW Document 212-3 Filed 08/25/18 Page 281 of 526 PageID: 477
Case 2:18-cv-00284-MCA-WAH Document 112-3 Filed 08/16/18 Page 65 of 99 PageID: 321

**4A** **Chariot's revenues have grown entirely from increase in average spend per client**

Base business



**RCM Revenue analysis** (M, USD)

**+12% p.a.**



**Number of customers**

**0% p.a.**

**Average revenue/customer** (K, USD)

**+12% p.a.**

**Key insights**

- **Growth is based on selling more products** to old customers and **acquiring new customers** in 2015 and 2016

- Existing customers **show a rising average revenue/customer** in 2012, to a certain extent driven by market growth (~10% CAGR, of which 2% market, and 8% outsourcing growth)

- **Newly added customers in 2016** show significantly high revenue per customer

**Questions for management**
- What is the strategy for continued revenue/ client growth?
- Why were 2014 additions only small clients?

1 Excl. acquisitions

Case 2:18-cv-00284-MCA-LDW   Document 212-3 Filed 08/25/18   Page 282 of 526 PageID: 478
Case 2:18-cv-00284-MCA-LDW   Document 112-3 Filed 08/16/18   Page 81 of 99 PageID: 372

# 4A Chariot has been able to reduce its churn rates significantly, however further initiatives can be added



## Number of customers

**Customer added**
- ■ Added 2016
- ■ Added 2015
- ■ Added 2014
- □ Before 2014

**0% p.a.**

| | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Total | 191 | 173 | 194 | 191 |
| Added 2016 | | | | 10 |
| Added 2015 | | 12 | 37 | 35 |
| Added 2014 | | | 11 | 9 |
| Before 2014 | 191 | 161 | 146 | 137 |

**% churn vs. prior year**

| | 2014 | 2015 | 2016 |
|---|---|---|---|
| | 16% | 9% | 7% |

**Vs. est. industry churn rate of 3-4%**

## Initiatives to reduce churn

| Initiative | Explanation | Done by chariot |
|---|---|---|
| **Avoid mismatches** | ▪ **Avoid or prevent mismatch between product and customer's needs**, e.g., targeted campaigns to migrate customers to suitable products | ? |
| **Proactive campaigns** | ▪ Launch tailored proactive campaigns to **tackle churn in advance** (e.g. contract renewal, promos, new products) | ? |
| **Reward loyalty** | ▪ Launch loyalty programs to **reward highly loyal customers** | ? |
| **Customer service** | ▪ **Address potential "technical" causes** (e.g., on-boarding process, first bill shock) of churn leakages across customer lifecycle through **effective caring process** | ? |
| **Save initiatives** | ▪ Launch a dedicated **save-desk** for potential churners through micro-segmented offer to increase save-rate | ? |

Action to be discussed with management

Case 2:18-cv-09293-MCA-LDW Document 21-2 Filed 08/25/18 Page 283 of 526 PageID: 479
Case 2:18-cv-09284-MCA-MAH Document 12-13 Filed 08/16/18 Page 62 of 99 PageID: 323

# 4A Traditionally existing clients caused an average decline in revenue, however since last year a larger share of existing clients are growing

SOURCE: Chariot data, team analysis



Case 2:18-cv-00284-MCA-LDW Document 212-3 Filed 09/25/19 Page 284 of 526 PageID: 480

# 4B Four specialties make up the majority of revenue but have different revenue per customer and fee profiles



**Revenue analysis of Chariot RCM clients, 2016E**

| | Revenue per segment in M, USD | Avg. revenue per customer In K, USD | Avg. fee by customer % | Number of customers #, 2016 |
|---|---|---|---|---|
| Multi-Speciality | 31.6 | 251 | 5.8 | 126 |
| Radiology | 20.5 | 331 | 6.1 | 62 |
| Pathology | 17.0 | 115 | 7.3 | 148 |
| Internal Medicine | 11.2 | 114 | 5.9 | 98 |
| Anesthesiology | 3.9 | 230 | 6.3 | 17 |
| Neurology | 3.2 | 319 | 5.9 | 10 |
| Oncology | 2.9 | 418 | 6.6 | 7 |
| Pain Management | 2.5 | 98 | 5.4 | 25 |
| Laboratory | 1.7 | 331 | 6.8 | 5 |
| Rehab | 1.4 | 38 | 5.7 | 36 |
| Other | 4.4 | 74 | 6.0 | 60 |
| **Total** (in MUSD) | **100** | | | **594** |

Case 2:18-cv-00284-MCA-LDW   Document 212-3 Filed 08/25/18  Page 285 of 526 PageID: 481
Case 2:18-cv-00284-MCA-LDW   Document 122-1 Filed 08/16/18  Page 84 of 99 PageID: 325

# 4B Newer Chariot contracts have appeared at the lower end of the spectrum, though size of account does not influence fee rate

**Fee rate by size of customer ($ revenue per year)**

**Fee rate**
% of net collection



**Net revenue from client**
2016 extrapolated, MM $

**Fee rate by year of client introduction[1]**

**Fee rate**
% of net collection



**Year of contract launch**

1 Excl. 12 pre-2000 contracts

SOURCE:  Chariot data

CURRENT CUSTOMER BASE

# 4B Net fee rates have declined slowly over time as clients were added



**Fee rates**
All clients, % of net collections

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9.9 | 7.0 | 4.0 | 9.0 | 8.0 | 6.6 | 7.2 | 6.9 | 6.0 | 6.6 | 6.6 | 6.4 | 6.2 | 6.2 | 6.1 | 5.9 | 5.6 | 5.9 |
| <2000 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 2016 |

**Number of active contracts**
# of contracts by start year

| | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | 1 | 1 | 7 | 6 | 12 | 19 | 15 | 18 | 45 | 30 | 40 | 63 | 42 | 51 | 102 | 80 | 50 |
| <2000 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 2016 |

# 4B Current customer base is highly concentrated and related to headquarter locations

2016

Case 2:18-cv-00284-MCA-LDW Document 212-3 Filed 09/25/19 Page 66 of 99 PageID: 483



**State 2016 rev. by customer main location**
Millions, USD

- 1-2
- >5
- 2-5
- < 1
- Company HQ

**Implications**

- Customers are spread throughout the country **and located in 22 of 50 US states**

- **The biggest customers are located in** Texas, CA and New York (close to main company HQs)

- **Salesforce should continue to further expand existing customers** in Texas and New York, **while also developing new customers** in the Midwest and West Coat of the US

1 Extrapolated based on first five months

SOURCE: Chariot data

McKinsey & Company | 66

# Contents

- Market sizing

- Market dynamics

- Competitive landscape

- Chariot deep dive

- **Value creation**

- Summary of India site visit

- Pricing structure

# 5A Multiple value creation levers can be applied to lift EBITDA

● Low
● High

| Lever | Description | Est. potential for Chariot | Service / software industry examples | Value creation potential |
|---|---|---|---|---|
| **Cross-selling** | ▪ Acquire complementary solutions and sell to existing customer base | ▪ Leverage services and solutions from acquired companies (e.g. NEMS, NorthStar) and offer to existing customer base | ▪ Core business launches ancillary revenue stream with >60% attachment rate<br>— E.g., JD Power grew advisory business around core PIN business (90% attach rate) | ◐ |
| **Upselling** | ▪ Sell existing product offering to newly acquired customers | ▪ Tab in customer pool that was added to Chariot by the new acquisitions and offer them "richer" products | ▪ Potential to trade off contract duration and/or discounts for additional sales<br>— E.g., Gartner acquired Capterra to expand IT advisory customer base to new segment | ● |
| **Pricing** | ▪ Achieve price premium from holistic solution offering<br>▪ Offer new ancillary services | ▪ Expand product portfolio to end-to-end offerings to charge higher fees<br>▪ Switch from variable pricing to value based subscriptions to outpace competition | ▪ ~4-6% revenue lift with high flow-through to EBITDA due to high renewal rates and switching costs<br>— E.g., Thomson Reuters acquired PLC to own the end-to-end Legal workflow (4% uplift) | ◑ |
| **Cost synergies** | ▪ Benefit from economies of scale across operations and SG&A | ▪ Utilize best processes from each acquired company to further reduce costs | ▪ Target average ~2-5% of cost base in cost savings<br>— E.g., McGraw-Hill acquired SNL to generate synergies of ~$70M (3% of cost base) | ◕ |

1 Revenue Cycle Management

# 5A Chariot revenue will continue to benefit from market growth, and can potentially further grow its base business

HIGH-LEVEL ESTIMATES



**Analysis of drivers of Chariot's revenue growth,** % CAGR

| Growth allocation | 2013 - 16 | 2016 - 20 | 2020 - 25 | Rationale |
|---|---|---|---|---|
| **RCM market growth** | 3 | **2** | 1 | ▪ **Shift to RCM outsourcing** contributes in all time horizons most to **overall outsourcing**<br>▪ Overall outsourcing growth varies between **9-10 %p.a.** |
| **Shift to RCM outsourcing** | 6 | 7 | 8 | |
| **Overall outsourcing** | **9** | **9** | **10** | |
| **Pricing** | 0 | 0-2 | -3 - 0 | ▪ **More existing customers will be retained** by being **flexible on pricing**<br>▪ **Continued upsell** over next years as new acquisitions are integrated; long term upsell potential dependent on new acquisitions |
| **Upselling** | **3** | **0 - 2** | 0 - 5 | |
| **Current Chariot business** | **12** | **9-13** | **8-15** | |
| **New customer generation** | 0 | 0-5 | 0-5 | ▪ **New customer generation** highly possible given significant white space across US states; however requires significant investment in salesforce, or further acquisitions |
| **Total Chariot[1]** | **12** | **9-18** | **5-20** | |

1 Chariot forecast is highly dependent on initiatives launched

# 5A Pricing model will evolve over time towards a risk/reward model

**Low** — Degree of risk to RCM vendor — **High**

**Description**

| Variable pricing model (e.g., transaction based) | Value-based subscription pricing | Business process KPI based pricing | Predominant gain share model |
|---|---|---|---|
| ▪ Fee based on **percentage of collections**<br><br>▪ **Cost-plus pricing model** - costs are determined based on # of resources, expertise/location mix of resources, technology etc.<br><br>▪ **Productivity commitments represent risk** for RCM vendors | ▪ **Customer pays a monthly/yearly fee** for services based on **scalable metrics** - e.g. rev. or cost under mgmt., #users etc.<br><br>▪ Pricing **tied to expected value** to be delivered based on historical track-record<br><br>▪ **SP must manage costs** while meeting client SLAs to maximize profitability | ▪ **Pricing tied to business KPIs achieved** e.g. # qualified leads, #service calls, DSO reduction etc.<br><br>▪ **Fixed fee structure for each KPI** e.g. $1 per lead generated, $5 for every conversion<br><br>▪ **Represents high level of risk** as TCV determined by success of service<br><br>▪ **CSAT assessments** | ▪ **Pre-dominantly outcome based pricing model** where SP and customer share gains<br><br>▪ **Accelerating schedule of gain-share for SP** – e.g. 10% of first $10M, 20% of next $20M etc.<br><br>▪ **Represents highest level of risk for SP** as complete TCV is tied to demonstrated gains in costs and/or sales |

**Timeline**

| Current | Near term | Long term |
|---|---|---|
| ▪ Dominant pricing model until today<br><br>▪ Customers start to challenge this model | ▪ In 2016,starting shift towards the spectrum of fixed pricing models<br><br>▪ The most basic model is to charge a flat fee for (e.g. software subscriptions updates etc.) | ▪ Performance based models (putting the RCM vendors at risk) will not be used in the short run |

CUSTOMER BASE EXPANSION

**5B** **Chariot can leverage its current salesforce and strategy to expand up-market; to expand down-market will require investing in new approach**

| | Customer segment | How customers learn about vendors | Sales approach required | Selected quotes |
|---|---|---|---|---|
| **Down-market** | **Small physician groups** | ▪ Rely on online searches and word-of-mouth, sales reps | ▪ Online and offline marketing<br>▪ Low-cost, persistent regional salesforce | *"People buy from people"*<br>*– CEO of 10+ physician practice*<br><br>*"We find current customers and call them up to learn about their experience"*<br>*– CEO of 15+ physician practice* |
| **Core market** | **Medium physician groups** | ▪ Rely on recommendations from peers, word of mouth | ▪ Customer endorsements<br>▪ Online and offline marketing<br>▪ Relationship with EMR/PM vendors | |
| | **Large physician groups** | ▪ Rely on national conferences ; publications<br>▪ Put out RFPs | ▪ Relationship with C-suite<br>▪ Presentations at conferences<br>▪ Active referral programs<br>▪ RFP protocol | *"We hear about vendors at the HFMA and MGMA"*<br>*– CEO of 50+ physician practice* |
| **Up-market** | **Small hospital-employed physicians** | ▪ Rely on national conferences / publications, parent hospital recommendation | ▪ Relationship with C-suite<br>▪ Networking with medical associations<br>▪ Presentation at conferences | *"Consultations have greater than 50% closing rate. Customers are already bought in at this point"*<br>*– VP of Sales, competitor* |
| | **Facilities** | ▪ Rely on recommendations, parent hospital recommendation | ▪ Relationships with parent health system; C-suite selling<br>▪ Consultative walk-throughs and workflow analytics<br>▪ Proven track record of success | *"We spend $5,000-10,000 per selling consultation"*<br>*– VP of Sales, competitor* |

**Implications for Chariot**

▪ **Go-to-market today**
  – 6 employees with executive relationships at medium/large practices

▪ **To sell up-market**
  – Build upon existing executive relationships
  – Be present at conferences (e.g., HIMSS, HFMA)
  – Partner with EMR/PM vendors

▪ **To sell down-market**
  – Build low-cost, regional salesforce with standardized value proposition and pricing model
  – Incentivize existing customers to endorse

McKinsey & Company | 71

Case 2:18-cv-09284-MCA-LDW Document 21-23 Filed 09/25/18 Page 293 of 526 PageID: 489

## 5B Small physician groups value saving staffing costs as the #1 benefit



**Weighted score of benefits, by physician group size**

█ Most important benefit

| Benefit[1] | 0-9 | 10-49 | 50-99 | 100+ |
|---|---|---|---|---|
| **Increased process efficiency** | 13 | 4 | 9 | 7 |
| **Reduced operational costs** | 13 | 15 | 28 | 13 |
| **Reduced staffing burden** | 28 | 21 | 17 | 17 |
| **Increased accuracy of results** | 20 | 17 | 17 | 23 |
| **Increased data collection** | 18 | 15 | 9 | 10 |
| **Includes ancillary/ bundled products** | 3 | 13 | 9 | 13 |
| **Enhanced operational scalability** | 3 | 14 | 11 | 17 |
| | N=10 | N=24 | N=11 | N=10 |

1 Full question = What are the top 3 benefits of using a third party vendor for your organization's revenue cycle management? Please rank the following criteria where 1=most important benefit.

CUSTOMER BASE EXPANSION

Case 2:18-cv-09283-MCA-LDW   Document 212-3 Filed 08/25/19   Page 294 of 526 PageID: 490
Case 2:18-cv-09283-MCA-LDW   Document 212-3 Filed 08/25/18   Page 73 of 99 PageID: 354

# 5B Unreliability is #1 reason groups do not consider outsourcing, regardless of size



**Weighted score of reasons, by physician group size**
Physicians who indicated they do not consider outsourcing (n=9)

| Criteria[1] | Small (0-9) N=2 | Medium (10-49) N=5 | Large (50-99) N=1 | Very large (100+) N=1 |
|---|---|---|---|---|
| Unreliable in its quality | 62 | 58 | 100 | 80 |
| Incompatible with other technology or services | 0 | 19 | 0 | 7 |
| Does not fully understand my organization's needs | 19 | 22 | 0 | 13 |
| Other | 19 | 16 | 0 | 0 |

*"Would **never** offshore"*

*"Results are not as good."*

*"I will only use a company associated with my **EMR**"*

*"We find offshore services perform below the level we require for **our image**"*

1 Full question = What are the top THREE reasons why you would NOT consider outsourcing revenue cycle management. Please rank the following where 1=most important.

NEXT 10 YEARS

Case 2:18-cv-09283-MCA-LDW Document 21-3 Filed 08/25/18 Page 295 of 526 PageID: 491
Case 2:18-cv-09284-MCA-WAW Document 21-3 Filed 08/25/18 Page 295 of 599 PageID: 355

# 5C Current portfolio and capabilities position Chariot to expand services with existing customers and physicians, and serve new customers

| | | Reason to outsource | Products desired by customers | Requirements for Chariot | Chariot's readiness | Revenue - CAGR 2015 - 20 |
|---|---|---|---|---|---|---|
| **Current Chariot customers** | **Medium / large practices** | ▪ Operational dependency<br>▪ IT stickiness and compatibility constraints | ▪ End-to-end solutions with integration and bundled discounts<br>▪ Customized services and consultation to improve financial performance | ▪ Expand portfolio breadth across RCM processes, including mix of services and software<br>▪ Market and build reputable brand<br>▪ Increase cross-selling | ◕ | 15% |
| **Currently insourced** | **Small practices** | ▪ Unprepared to handle increased complexity in eligibility<br>▪ Pressure to perform financially or risk being acquired | ▪ Bolt-on solutions that integrate with existing EHR/PM systems<br>▪ Flexible subscription pricing | ▪ Best-of-breed, software-based solutions for discrete RCM processes that aid administrative staff<br>▪ Low-cost, regional salesforce | ◔ | 8% |
| | **Medium/ large practice** | ▪ Financial and operational improvement to protect against group / hospital acquisition | ▪ Free consultation at point-of-sale and guaranteed financial / operational improvements<br>▪ End-to-end solutions for integration and bundled discounts | ▪ End-to-end services and software with flexible EMR/PM compatibility<br>▪ Continued executive relationships and RFP protocol<br>▪ Consultative analytics to quantify value proposition | ◕ | 15% |
| | **Hospital-employed groups** | ▪ Hospital's system does not fully meet group's needs | ▪ Bolt-on or end-to-end solutions that integrate with existing EMR/PM solutions | ▪ Customizable platforms and user interfaces, end-to-end solutions<br>▪ Partnership with EMR/PM solutions or 3rd parties to ensure integration | ◑ | 6% |
| | **Hospitals /facilities** | ▪ Financial improvement ambition<br>▪ Focus on core activities | ▪ End-to-end, automated solutions that include EMR/PM systems<br>▪ Fast implementation<br>▪ Reliability | ▪ Access to patient and payor data<br>▪ Automation and analytics capabilities<br>▪ Targeted hospital salesforce<br>▪ Custom solutions For facilities RCM | ○ | 10% |

# Contents

- Market sizing

- Market dynamics

- Competitive landscape

- Chariot deep dive

- Value creation

- **Summary of India site visit**

- Pricing structure

INFORMATION FROM SITE VISIT

Case 2:18-cv-09284-MCA-MAH   Document 21-13   Filed 08/25/18   Page 297 of 526 PageID: 498
Case 2:18-cv-09284-MCA-MAH   Document 11-13   Filed 08/16/18   Page 76 of 99 PageID: 357

# Porteck background

| History | <ul><li>Porteck was established in 2004 and since inception Hasit Nanda & Arvind Walia was involved in leading the company</li><li>Hasit Nanda who is chief operational and technology head of Porteck is responsible for day to day operations in absence of Arvind Walia</li><li>It was one of the few companies which was established in India during 2004 and got acquired by Orion in 2014</li></ul> |
|---|---|
| **Organization Structure** | <ul><li>Currently it has close to ~1400 employees. Out of 1400, ~1100 are production agent, ~200 are quality control group, ~30 support staff  and ~ 50 are solution developers</li><li>Roughly 250 production agents are on bench at any given time. Bench duration for agents ranges from 2-6 months depending on the demand and expertise of agent</li><li>Currently there are 2 shifts which covers 20 hours. Senior management have shift timings adjusted to overlap both the shifts</li><li>It handles all simple tasks in medical billing (MRI, CT SCAN etc related bills) whereas complex task ( emergency services , high end coding) are handled by US locations</li></ul> |
| **Roles & response-bilities** | <ul><li>Entire production operation has been divided into  three main process which are medical billing, accounts receivable and quality control</li><ul><li>– Medical billing has different sections: eligibility, authorization, coding, billing, submission</li><li>– Accounts receivable are responsible for handling rejections, delay, and collection</li><li>– Quality control has different teams mapped to each section of medical billing. The sample size for QC varies from 20-100% for stable to newly transitioned clients</li></ul><li>Solution developer team is responsible for managing and improving their in-house tool Iparcs. Since the tool is in-house, adding new client and configuring becomes easy and quick</li><li>Support staff is the smallest pool of people (~30), which handles  Admin, HR, IT helpdesk, Finance related task</li></ul> |

1 Preliminary analysis based on client interviews and walkthrough

# Porteck Facility Deep Dive – Infra , Technology & Employee Engagement

| | |
|---|---|
| **Infra-structure** | ▪ Porteck has 4 floor building and completely rented out with a capacity of ~900 seats at a time and ~2200 seats if fully utilized for 24 hours<br>▪ Building has ~10 big training and meeting rooms<br>▪ Cafeteria for employees for lunch and Dinner<br>▪ Transport facility for pick up and drop<br>▪ Network room for IT operations<br>▪ IT room for repairing and maintaining IT hardware<br>▪ Generators for uninterrupted power supply<br>▪ Security at critical points |
| **Technology** | ▪ Inhouse tool lparcs for database management and bridging different processes<br>▪ Microsoft Office 360<br>▪ HDVC for video conferencing<br>▪ GoToMeeting for screen sharing<br>▪ Phones for outbound calls<br>▪ **No internal communicator like Microsoft office communicator**<br>▪ Biometric system for the employees to track their leaves etc<br>▪ CCTV cameras to track phone usage in production area |
| **Employee engagement** | ▪ Target based working model for agent (100 bills /day for newly hired with 95% accuracy), however no incentive to improve upon target<br>▪ **No rewards/recognition system in place**<br>▪ **Performance management missing, no way to track individual performance history for the agents**<br>▪ **No team for workforce management** |

1 Preliminary analysis based on client interviews and walkthrough

INFORMATION FROM SITE VISIT
Case 2:18-cv-09284-MCA-LMH   Document 21-13   Filed 08/25/18   Page 299 of 526 PageID: 495
Case 2:18-cv-09284-MCA-LMH   Document 21-13   Filed 08/16/18   Page 78 of 99 PageID: 355

# Porteck Facility Deep Dive – Workflow



Billing Team    AR Team    Quality Team

**On an average OCR captures 80% of the fields and for image it captures ~50% of the field so some field can be captured by OCR**

Eligibility of the Claim → Authorization of the claims → Coding the claims → Billing the claims → Submitting the claims

QA audits

**QA audit happens for at least 20% of the claims by each step which can be reduced further if accuracy is high**

AR follow UP ← Denial Processing ← Payment processing

**All follow up is done by dialing on the phone and opportunity to reduce the team further**

Case 2:18-cv-09283-MCA-LDW Document 21-2 Filed 08/25/18 Page 300 of 526 PageID: 406
Case 2:18-cv-09284-MCA-MAH Document 12-13 Filed 08/16/18 Page 79 of 99 PageID: 340

HIGHLY PRELIMINARY

# Porteck fully loaded cost per seat per month ~420[1] USD which is top quartile when compared to other back office players in India

1 Preliminary analysis based on client interviews and walkthrough



# There is 15-20% opportunity[1] to reduces cost base further

| | Opportunity Potential | Opportunity Estimate |
|---|---|---|
| **Average Handle Time** | ▪ Auto filling basic details from Parcs to the client system<br>▪ Automating basic steps in payment process<br>▪ Improving agent efficiency by performance management | 9-11% |
| **Occupancy Improvement** | ▪ Using auto dialer for collection calls<br>▪ Internal communicator like Microsoft office communicator to communicate between different teams to avoid wastage of time | 4-6% |
| **Bench Cost Improvement** | ▪ Reducing the number of agents on bench at any point of time<br>▪ Reducing the bench duration for each agent | 2-3% |
| **Span of Control** | ▪ Looks efficient due to optimal current span:<br>— TL 1:15 to 1:20<br>— Manager 1:50 to 1:75<br>— Process Owner 1:200 to 1:500 | None |
| **Seat Utilization** | ▪ Looks efficient as two shifts are used to maximize seat utilization and minimize infrastructure and IT cost | None |

1 Preliminary analysis based on client interviews and walkthrough

INFORMATION FROM SITE VISIT
Case 2:18-cv-02684-MCA-MAH Document 21-13 Filed 08/25/18 Page 302 of 526 PageID: 408
Case 2:18-cv-02684-MCA-MAH Document 11-13 Filed 08/16/18 Page 81 of 99 PageID: 342

# Responses to the Questions (1/3)

**Q1. Are there opportunities to bring in more outside employees into Porteck?**

- Currently Porteck is operating with capacity of ~1400 which can be further improved to ~2200 by leveraging following levers
  - Utilizing current empty space
  - Utilizing training rooms and outsourcing training to other vendor
  - Activating third shift

**Q2. How long does it take to bring on new billing operations into the Porteck facility?**

- It would take 2-3 months to bring on new billing operations. Entire operations will be brought in steps. For example first Porteck will activate eligibility and authorization , then it will bring in coding and then billing

**Q3. Given Arvind is in the US a lot, who has operational day to day control over Porteck, India?**

- Hasit Nanda who is COO and CTO for Porteck. He has studied in London and worked in many reputed companies. He started the Porteck along with Arvind

**Q4. How rapid is employee cost / salary / benefit inflation?**

- Wages have been increasing ~ 8-10% (couple of percentage point up from inflation of ~6-7%) in last 3-4 years but that has not put any pressure on costing due to 2 reasons
  - Rupee has depreciated with respect to dollar by 20-30% in last 3-4 years
  - Fully loaded cost per seat has gone down from ~700 dollar to ~400 in last 5 years due to scale of the operations ( no license cost in night shifts, same workstations, internal tool which otherwise cost ~5000 dollar per seat , gain in efficiency due to maturity of process etc.)

Case 2:13-cv-02284-WCA-JWW Document 21-13 Filed 08/25/18 Page 303 of 526 PageID: 499
Case 2:13-cv-02284-WCA-JWW Document 42-13 Filed 08/16/18 Page 82 of 99 PageID: 348

# Responses to the Questions (2/3)

**Q5. How much communication / integration is there with New Jersey operations? Please describe?**

- Same as question 4

**Q6. Does India ever directly collect any of medical bills or does all of the financial collection always occur in the US with Porteck's support?**

- Porteck facility supports US operations and don't talk directly with clients. Porteck charges US unit on cost and margin basis. Direct collection doesn't happen in India

**Q7. Are there other organizations that compete with Porteck facility? Please name**

- Yes, there are many organizations in the same area which directly competes with Porteck facility. Examples are
  1. Accretive Health (http://www.accretivehealth.com/
  2. Alpha Thought (could not find on web)
  3. Pacific (http://www.pacificbpo.com/)
  4. E4E (http://www.e4e.com/)

**Q8. What causes Porteck and Constellation to be different?**

- Porteck was acquired by Constellation due to many reasons
  1. ~400 dollar of fully loaded cost is low compared to market and it is driven by the fact that Porteck has inbuilt tools for workflow, documentation and integration coupled with operational efficiency
  2. Entire process has been simplified and broken into steps which allow them to have good quality control while maintaining efficiency
  3. It imparts quality training to agents and there are various checks in place to make sure quality is a top priority

INFORMATION FROM SITE VISIT

Case 2:18-cv-02284-MCA-LDW   Document 21-13 Filed 08/25/18 Page 304 of 526 PageID: 500
Case 2:18-cv-02284-MCA-LDW   Document 11-13 Filed 08/16/18 Page 83 of 99 PageID: 344

# Responses to the Questions (3/3)

- Porteck only lost one client in last 12 years and that is also due to the fact that the client was acquired by some other company

**Q9. Is there a limit to how much expansion the facility or the operations can sustain?**

- Current facility can expand till ~2200 seats where as there is another similar facility owned by Arvind family which can be rented out for Porteck operations as soon as there is a need. Right now other facility is rented to some other company

**Q10. How much investment would be required to grow beyond that level?**

- Activating additional seat would require ~500 dollar capex ( hardware , software and other facility) and so investment required to activate another 100 seat would be ~50000 dollar only

**Q11. How much communication / integration is there with Houston operations? Please describe?**

- All managers, senior managers and process owners communicate with Houston/New Jersey teams daily for 1-2 hours. Communication happens over phone, VOIP and by window sharing platforms on big screens. Communication happens to understand the client requirements, changes in the processes, aligning on new volume expectation etc.

**Q12. What is the purpose of maintaining US presence**

- Marketing/Branding
- Getting clients
- Data security
- Complex cases
- Client request for processing in US only
- Client facing operations

# Contents

- Market sizing

- Market dynamics

- Competitive landscape

- Chariot deep dive

- Value creation

- Summary of India site visit

- **Pricing structure**

# Key messages on RCM spend and pricing

**Conclusion**

**Fee structure vs. RCM spend**

- Total industry RCM spend (~3% of total revenue) is not a comparable metric to different pricing models/fee structures in the market
- Most physicians/ facilities have different pricing models at different stages of RCM value chain
- RCM spend over next 10 years is expected to reduce as a percent of revenue

**Expected trends in fee structure for early collections and billings**

- Differences in fee structure among physician practices can be explained due to following reasons:
  - Specialists vs PCP need for RCM solution is different (specialist, radiologist etc.)
  - Select specialties (e.g., pathology, radiology) are more prone to rejection of claims by payors and require more follow up
- Typical labor based pricing and transaction based pricing will fall overtime (as has happened in mature outsourcing industry) and players will shift to risk sharing models and consolidate overtime to maintain advantage ; fee structure will likely come down to 4.5-5% for fee collections for medical coding and billing in next 10 years
- Given the fragmented nature of RCM industry, lack of financial rigor in many medium to large scale physician practices, high switching barriers of different vendors we expect pricing will come down but will due there will still be variations across practices
- Several practices may still be willing to pay a high rate because of several reasons- lack of awareness of fee structure trends due to sticking to one vendor, lack of financial rigor in the practice, further sub-selection of sending only tougher claims to the vendor
- All typical RCM solutions are ROI positive for physicians and will find further uptake in the market given market pressures

**Chariot's client base**

- Chariot's average net fee rate is ~6% down from 7% 10 years ago particularly due to introduction of new clients with lower fees or renegotiating contracts at the lower rate
- Chariot's client base is predominantly specialty physicians

# Example RCM spend for one physician



**RCM spend for physicians only ($) – breakdown, 2015 , Assumes average physician revenue =$500K per annum**

| | Applicable revenue pool for RCM value chain ($) | Avg. fee structure | Collection/ transaction rate | RCM spend |
|---|---|---|---|---|
| Total annual rev | 500,000 | | | 15,210 |
| Pre-service | 100,000 | ⊗ 4% | ⊗ 20% | ⊜ 800 |
| Coding/transcription | 75,000 | ⊗ 4% | ⊗ 60% | ⊜ 1,800 |
| Clinical doc. and charge capture | 50,000 | ⊗ 3.5% | ⊗ 55% | ⊜ 960 |
| Residual billing | **75,000** | ⊗ 6% | ⊗ 55% | ⊜ 2,500 |
| Credit/collections | 100,000 | ⊗ 20% | ⊗ 30% | ⊜ 6,000 |
| Others-denials and claims | 100,000 | ⊗ 4.5-5% | ⊗ 70% | ⊜ 3,150 |

**Average RCM spend across the value chain is ~3%**

- Fee structure varies across the value chain in RCM and is not comparable to the average RCM spend (including outsourced and insourced)
- Average collections and transaction rates along with fee structure can vary significantly due to several reasons including type of practice, payor mix, level of capabilities of the practice etc.
- Vendors have different packaged solutions for outsourcing and not all pricing models will reflect above structures

**Fee structure for reviewed chariot contracts are based on % of net collections (e.g., 3.25% of collections for Diagnostic Imaging Group, 6.875% of net collections for Tyler Radiology Associates)**

Source: Expert interviews, NHE , MGMA, Statistica , press search

McKinsey & Company | 86

# ~80% of Chariot clients have fee rates within 4.5-8.5% range, which has been stable over time

**Fee rate by bucket**



% of client fee rates[1] (n = 534)

| Bucket | Value |
|---|---|
| <3.5 | 0 |
| 3.5-4.5 | 13 |
| 4.5-5.5 | 18 |
| 5.5-6.5 | 27 |
| 6.5-7.5 | 24 |
| 7.5-8.5 | 9 |
| 8.5-9.5 | 4 |
| 9.5-10.5 | 4 |
| 10.5-11.5 | 1 |
| 11.5-12.5 | 0 |
| >12.5 | 0 |

~78%

**Fee rate by year of client introduction excl. outliers[1]**



**Fee rate**
% of net collection

Year of contract launch

1 Excl. 12 pre-2000 contracts

SOURCE: Chariot data

# Net fee rates have declined slowly over time as clients were added



**Fee rates**
All clients, % of net collections

| <2000 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 9.9 | 7.0 | 4.0 | 9.0 | 8.0 | 6.6 | 7.2 | 6.9 | 6.0 | 6.6 | 6.6 | 6.4 | 6.2 | 6.2 | 6.1 | 5.9 | 5.6 | 5.9 |

**Number of active contracts**
# of contracts by start year

| <2000 | 00 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | 12 | 13 | 14 | 15 | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | 1 | 1 | 7 | 6 | 12 | 19 | 15 | 18 | 45 | 30 | 40 | 63 | 42 | 51 | 102 | 80 | 50 |

SOURCE: Chariot data

# Chariot is not well known in the market but highly rated



**Level of satisfaction with players[1]**
Share of responses (N=55)

**Avg. rating[1]**
(N=55)

**Usage of vendor**
# of respondents/55

Legend: ■ Very low  ■ Low  ■ Neutral  ■ High  ■ Very high

| | Level of satisfaction with players | | | Avg. rating | Usage of vendor |
|---|---|---|---|---|---|
| Zirmed | 29 | 43 | 29 | 4.0 | 7 |
| Navicure | 40 | 40 | 20 | 3.8 | 5 |
| eClinical | 30 | 60 | 10 | 3.8 | 10 |
| MedAssets | 33 | 67 | | 3.7 | 3 |
| Athena | 14 / 21 | 50 | 14 | 3.6 | 14 |
| Practicefusion | 50 | 50 | | 3.5 | 4 |
| Other (please specify) | 6 / 11 / 28 | 44 | 11 | 3.4 | 18 |
| Optum | 60 | 40 | | 3.4 | 5 |
| McKesson | 12 / 48 | 32 | 8 | 3.4 | 25 |
| **Charriot** | 100 | | | 4.0 | 1 |

**Limited industry memberships / activities –** No published presence in Healthcare Information Management Systems Society (HIMSS) or Healthcare Financial Management Association (HFMA) in last 3 years

*"I have never heard of Chariot, what services do they provide?"*
***– CEO of a large physician practice***

1 "How would you rate your satisfaction with your current third party vendors OVERALL?  Please rank your satisfaction from 1 to 5, where 1=Very poor and 5=Excellent"

# Chariot's rating scores above average for the cohort of "Other" vendors captured in the survey

🟥 Very low  🟥 Low  ⬛ Neutral  🟩 High  🟩 Very high



| | Level of satisfaction with players[1] Share of responses (N=18) | Avg. rating[2] (N=18) | Usage of vendor # of respondents |
|---|---|---|---|
| Accelacapture/White Plume | | 5.0 | 1 |
| Canopy Partners | | 4.7 | 1 |
| Adavocate | | 4.7 | 1 |
| ChiroTouch | | 4.7 | 1 |
| Epion | | 4.3 | 1 |
| Glostream | | 4.0 | 1 |
| Medlycs, Zotech, Intermedix | | 4.0 | 1 |
| Private company not listed | | 4.0 | 1 |
| RealMed | | 3.5 | 2 |
| Next Gen | | 3.3 | 1 |
| CureMD | | 3.0 | 1 |
| Epic | | 2.7 | 1 |
| Greenway Primesuite | | 2.3 | 1 |
| Omni | | 2.0 | 1 |
| Affiliated Professional Services | | 2.0 | 1 |
| Ingenious Med | | 1.7 | 1 |
| Allscripts | | 1.0 | 1 |
| **Chariot** | | 4.0 | 1 |

> **Average of "Other" vendors is 3.4**

1 "How would you rate your satisfaction with your current third party vendors OVERALL? Please rank your satisfaction from 1 to 5, where 1=Very poor and 5=Excellent"   2 Avg. rating is averaged across ratings for "overall satisfaction," "technology", and "collections/revenue"

# Appendix

# 1C  $10B outsourced RCM market in 2010

> 20% (or $2.0B) of the total outsourced revenue is coming from "pre-service" functions, while 25% (or $X2.5B) is coming from point-of-sale and 55% (or $5.5B) is coming from post-service

**RCM value chain,** $B

| Split | Pre-service | Point of service | | Post-service | | | Total |
| | | Coding/ transcription | Clinical documentation & charge capture | Residual billing | Credit/ Collections | Other[1] | |
|---|---|---|---|---|---|---|---|
| **Split** | 20% | 15% | 10% | 15% | 20% | 20% | **100%** |
| **Large Physician (>50)** | 221 | 166 | 111 | 166 | 221 | 221 | **1,105** |
| **Medium Physician (10-50)** | 109 | 82 | 55 | 82 | 109 | 109 | **547** |
| **Small Physician (9-2)** | 98 | 73 | 49 | 73 | 98 | 98 | **488** |
| **Solo** | 16 | 12 | 8 | 12 | 16 | 16 | **78** |
| **Hospital-employed** | 449 | 337 | 225 | 337 | 449 | 449 | **2,245** |
| **Facility[2]** | 1,109 | 832 | 555 | 832 | 1,109 | 1,109 | **5,547** |
| **Total** | **2,002** | **1,502** | **1,001** | **1,502** | **2,002** | **2,002** | **10,012** |

1 E.g. Claims processing; Denials & re-submission;  2 Large = ~$4.1B, Medium = ~$1.2B, Small = ~$0.3B

Case 2:18-cv-09283-MCA-LDW Document 21-23 Filed 08/25/18 Page 314 of 526 PageID: 510
Case 2:18-cv-09283-MCA-LDW Document 21-23 Filed 08/16/18 Page 93 of 99 PageID: 354

# 1C ~$24B outsourced RCM market in 2020

> 25% (or $6.0B) of the total outsourced revenue is coming from "pre-service" functions, while 30% (or $7.3B) is coming from point-of-sale and 45% (or $10.9B) is coming from post-service

**RCM value chain,** $B

| | Pre-service | Point of service | | Post-service | | | Total |
| | | Coding/ transcription | Clinical documentation & charge capture | Residual billing | Credit/ Collections | Other[1] | |
|---|---|---|---|---|---|---|---|
| **Split** | 25% | 20% | 10% | 15% | 20% | 10% | **100%** |
| **Large Physician (>50)** | 623 | 499 | 249 | 374 | 499 | 249 | **2,493** |
| **Medium Physician (10-50)** | 400 | 320 | 160 | 240 | 320 | 160 | **1,601** |
| **Small Physician (9-2)** | 297 | 238 | 119 | 178 | 238 | 119 | **1,190** |
| **Solo** | 96 | 76 | 38 | 57 | 76 | 38 | **382** |
| **Hospital-employed** | 1,020 | 816 | 408 | 612 | 816 | 408 | **4,080** |
| **Facility[2]** | 3,624 | 2,899 | 408 | 2,174 | 2,899 | 1,449 | **14,495** |
| **Total** | **6,060** | **4,848** | **2,424** | **3,636** | **4,848** | **2,424** | **24,241** |

1 E.g. Claims processing; Denials & re-submission; 2 Large = ~$10.7B, Medium = ~$3.1B, Small = ~$0.6B

Case 2:18-cv-09283-MCA-LDW   Document 21-2.3 Filed 08/25/18  Page 315 of 526 PageID: 511
Case 2:18-cv-09283-MCA-LDW   Document 21-2.3 Filed 08/16/18  Page 54 of 99 PageID: 355

# 1c  ~$39B outsourced RCM market in 2025

2025

> 25% (or $9.6B) of the total outsourced revenue is coming from "pre-service" functions, while 30% (or $11.6B) is coming from point-of-sale and 45% (or $17.4B) is coming from post-service

**RCM value chain,** $B

| | Pre-service | Point of service | | Post-service | | | Total |
| | | Coding/ transcription | Clinical documentation & charge capture | Residual billing | Credit/ Collections | Other[1] | |
|---|---|---|---|---|---|---|---|
| **Split** | 25% | 20% | 10% | 15% | 20% | 10% | **100%** |
| **Large Physician (>50)** | 822 | 658 | 329 | 493 | 658 | 329 | **3,290** |
| **Medium Physician (10-50)** | 549 | 439 | 220 | 330 | 439 | 220 | **2,197** |
| **Small Physician (9-2)** | 523 | 419 | 209 | 314 | 419 | 209 | **2,093** |
| **Solo** | 177 | 141 | 71 | 106 | 141 | 71 | **706** |
| **Hospital-employed** | 1,325 | 1,060 | 530 | 795 | 1,060 | 530 | **5,300** |
| **Facility[2]** | 6,250 | 5,000 | 2,500 | 3,750 | 5,000 | 2,500 | **25,000** |
| **Total** | **9,647** | **7,717** | **3,859** | **5,788** | **7,717** | **3,859** | **38,586** |

1 E.g. Claims processing; Denials & re-submission;  2 Large = ~$18.5B, Medium = ~$5.4B, Small = ~$1.1B

# 2E Use of type of RCM vendor and RCM spend depends on physician needs

ILLUSTRATIVE

## Practice example – assumption based

| Physician type | Physician practice A<br>Primary care | Physician practice B<br>Specialist |
|---|---|---|
| **Total revenue, $MM** | **10.0** | **10.0** |
| % out of pocket | 30% | 10% |
| % to be billed | 70% | 90% |
| **Total to be billed** | **7.0** | **9.0** |
| % in network | 70% | 50% |
| % out of network | 30% | 50% |
| **Total out of network** | **2.1** | **4.5** |
| Collection rate (w/o RCM) | 70% | 50% |
| Collection rate (w/ RCM) | 90% | 90% |
| Benefit of RCM, % | 20% | 40% |
| **Benefit of RCM, $M** | **0.42** | **1.8** |
| | | |
| Net collection fee | 1% | 6% |
| **Spend on RCM, $M** | **0.07** | **0.54** |
| % of total revenue | 0.7% | 5.4% |
| **Extra profit from RCM** | **0.35** | **1.26** |
| | | |
| **Decision** | Uses alternative solution<br>(e.g., basic software) | Will use sophisticated RCM |

~3% avg. RCM spend

# 2E Industry spend on RCM is expected to decline slowly over the next 10 years



**RCM spend (as a % of total revenue of the practice)**

**RCM spend evolution for RCM solutions (IT and software) physicians 2015 – 2025[1],** Respondents

| | 2015 | 2020 | 2025 |
|---|---|---|---|
| >4% | | | |
| 4% - 3.5% | 2 | | |
| <3.5% - 3% | 5 | 2 | |
| <3% - 2.5% | 1 | 4 | 1 |
| <2.5% - 2% | | 2 | 2 |
| <2% - 1.5% | | | 4 |
| <1.5 - 1% | | 1 | |
| <1% | | | |

Average 3.1% (2015)
Average 2.5% (2020)
Average 2.0% (2025)

**Key insights**

- Decrease in price is based on 2 factors
  - Increasing pressure on physician margins thus leading to more negotiations from customers
  - Increasing competition from other vendors

1 Based on industry interviews; includes all types of RCM software

# Perspectives are informed by data reports, expert interviews and initial survey insights

| Data sources  | Interviews | Survey |
|---|---|---|

**Major databases, reports, and public sources (not exhaustive)**
- Micro Market Monitor Research
- Kaulkin Ginsberg Research
- Market Survey
- NextGen Healthcare Survey
- Black Book Survey
- AMA
- MGMA
- Annual reports
- Press clippings
- McKinsey proprietary research

**External experts**
- CEO – Medium orthopedic group
- Former CEO – Anesthesiology services company
- Director of Revenue Cycle Services – Medical center
- RCM Manager/Practice Administrator – Laser eye center
- CEO – RCM service provider
- CEO – Large medical/physician group
- CIO – Medium healthcare system
- Former VP of Operations – RCM service provider
- CEO- Large physician group
- VP of Operations- RCM service provider
- Former Senior Direction of Sales – RCM solutions provider
- CEO – Medium orthopedic group
- Director of Administration – Medium orthopedic group
- Former Director of Project Management – RCM solutions vendor

**Internal experts**
- 5 RCM experts
- Billing / outsourcing industry expert
- Practicing MD
- Former physician with own practice
- Healthcare operations experts
- Digitalization / automation expert

**Survey**
- Conducted with 55 U.S. physicians who passed selection criteria out of a pool of 560 participants
- Representing a range of group sizes and 25 specialties

**Target data**
- Management presentation
- Detailed customer list with y-o-y revenue evolution
- Consolidated financials 2014-2015
- Customer contracts
- List of potential customers

Case 2:18-cv-09293-MCA-LDW   Document 21-3 Filed 08/25/18  Page 319 of 526 PageID: 555

# Engaging RCM provider results in positive ROI

**ROI of a physician practice with 50 practitioners using different RCM contracts for 5 year time span,** M USD

| 5 year horizon | Chariot (variable) | End-to-end solutions | Automated only |
|---|---|---|---|
| **Total revenue** (in $M) | 125 | 125 | 125 |
| **Physician collection rates** (in %) | 89% | 92% | 79% |
| **Total rev. collections** (in $M) | 111 | 115 | 98 |
| **Total cost of collection** (in $M) | 6.1 | 7.6 | 2.5 |
|     **Payment to vendor** | 4.4 | 5.7 | - |
|     **Total FTE costs** | 0.2 | 0.2 | 0.6 |
|     **Total software costs (var.)** | - | - | 0.2 |
|     **Upfront investment** | - | 0.2 | 0.3 |
|     **Baseline costs to collect** (in $M) | 1.5 | 1.5 | 1.5 |
| **Baseline collections**[1] (In $M) | 96 | 96 | 96 |
| **Incremental revenue collected** (in $M) | 15 | 19 | 2.5 |
| **Incremental costs collected** (in $M) | 4.6 | 6.1 | 1.1 |
| **ROI** (in %) | ~225% | ~205% | ~130% |

> These numbers are based on an average physician practice and will vary significantly based on payor mix, vendor contracts and baseline effectiveness of the practice

1 77% Baseline collections by conducting collections in-house with slight software support only

# Sample contracts evaluation

| Client/ Customer | Services offered (along RCM value chain) | Fees and expenses | Contract terms[1] Length |
|---|---|---|---|
| Baylor College of Medicine | Practice management <br> ▪ Patient billing and collection <br> ▪ Claims follow-up and collection <br> ▪ Claims processing and clearing | ▪ Dept. of pathology: 6.5% of collections on inpatient businesses; 5.5% collections on outpatient businesses <br> ▪ Dept. of radiology: 7% of collections | 2 years |
| Diagnostic Imaging Group, LCC | Medical billing <br> ▪ Utilization review <br> ▪ Denial management <br> ▪ Payment posting <br> ▪ Billing <br> ▪ A/R follow-up, collection | ▪ 3.25% of collections <br> ▪ Anticipated - $30M / year (in 2009) | 5 years |
| Houston Medical Imaging, LLC | Medical billing <br> ▪ A/R management <br> ▪ Billing and collections <br> ▪ Managed Care contracting <br> ▪ Dedicated employee service | ▪ Management fee: 7% of net collections <br> ▪ Dedicated employee service fee: costs incurred per employee (base salary + employment taxes + benefits, health and retirement) <br> ▪ Late fee: 1.5% of collection / month | 3 years |
| Tyler Radiology Associates | A/R management <br> ▪ Billing and collections <br> ▪ Claims submission (EDI and paper) <br> ▪ Payment posting <br> ▪ Billing statement <br> ▪ Claim reconciliation and follow-up | ▪ 6.875% of net collections <br> ▪ (an additional) 5% of net collections for the first 3 months <br> ▪ Late fee: 1% per month | 3 years |
| Innovative Radiology P.A. | A/R management <br> ▪ Billing and collections | ▪ 11.625% of net collections <br> ▪ Late fee: 1.5% per month (of net collections) | 3 years |

1 After the initial term the contract will renew for consecutive additional one year terms (unless terminated in writing)

**From:** Melodie Kraljev
**Sent:** Thursday, August 25, 2016 3:02 PM
**To:** 'tto@kpmg.com'; 'vanessabertoldo@kpmg.com'
**Subject:** Audit

Hello,

Please see attached list. It shows all accounts by practice with bills in June 2016 and Dec 2015 (two tabs). Please provide your selection and I will prepare records for tomorrow.
I am blocking off 10 AM tentatively assuming I can have the records pulled by that time.

Thank you

Melodie Kraljev
Vice President of Operations
Orion Health Corporation
300 Jericho Quadrangle West Suite 320
Jericho, NY 11753
http://www.orionhealthcorp.com/
516-874-8110 (phone)
917-797-9060 (Mobile)

Please note: My new email address is melodie.kraljev@orionhealthcorp.com

CONFIDENTIALITY NOTICE: This electronic message is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and restricted from being  disclosed under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately by return e-mail and delete  and destroy any hard copies of the original message and any copies of it from your computer system.



August 9, 2016

[Newco]
555 Madison Avenue
26th Floor
New York, NY 10022
Attention:  Doug Newton


Re: Constellation Healthcare Technologies, Inc. - Commitment Letter

Ladies and Gentlemen:

[[Newco] ("you") has advised Merrill Lynch, Pierce, Fenner & Smith Incorporated (or any of its designated affiliates, "MLPFS") and Bank of America, N.A. ("Bank of America") that [CC Capital] (together with its controlled affiliates, the "Sponsor") intends to form a corporation or limited liability company (the "Merger Sub") to acquire (the "Acquisition"), directly or indirectly, all of the outstanding equity interests of Constellation Healthcare Technologies, Inc. (the "Borrower") pursuant to a [merger agreement] among, *inter alios¸* the Borrower and the Merger Sub (the "Merger Agreement").  The Acquisition will be effected through the merger of the Merger Sub with and into the Borrower, with the Borrower being the surviving corporation of the merger.][1] You have also advised Bank of America and MLPFS that you intend to finance the Acquisition, the costs and expenses related to the Transaction (as hereinafter defined), the refinancing of certain existing indebtedness and the ongoing working capital and other general corporate purposes of the Borrower and its subsidiaries after consummation of the Acquisition from the following sources (and that no other financing will be required in connection with the Transaction): (i) a term loan facility in favor of the Borrower in an aggregate principal amount of up to $120 million (the "Term Loan Facility"), (ii) a revolving credit facility in favor of the Borrower in an aggregate principal amount of up to $15 million (the "Revolving Credit Facility"; and together with the Term Loan Facility, the "Senior Credit Facilities") and (iii) an amount in cash contributed by the Sponsor as well as rollover equity from existing shareholders and management of the Borrower, in each case in the form of common equity or other form of equity reasonably acceptable to MLPFS and in an aggregate amount of not less than 55% of the total funds necessary to consummate the Transaction (as defined below) (the "Equity Contribution"); provided that after giving effect to the Equity Contribution, the Sponsor shall own and control, directly or indirectly, at least 55% of the voting stock of the Borrower.  The Acquisition, the entering into and funding of the Senior Credit Facilities, the Equity Contribution and all related transactions are hereinafter collectively referred to as the "Transaction".

In connection with the foregoing, (i) Bank of America (together with any other initial lender that becomes a party hereto pursuant to a Joinder (as hereinafter defined), collectively, the "Initial Lender") is pleased to advise you of its several, but not joint, commitment to provide the full principal amount of the Senior Credit Facilities and (ii) Bank of America is pleased to advise you of its commitment to act as the sole administrative agent (in such capacity, the "Administrative Agent") for the Senior Credit Facilities, in each case, upon and subject only to the terms and conditions set forth in this letter (this "Commitment Letter"),

---

[1] Note: To be revised as necessary to reflect actual transaction structure.

in the Summary of Terms and Conditions attached as Exhibit A hereto and incorporated herein by this reference (the "Summary of Terms") and in the Fee Letter (as hereinafter defined). MLPFS is pleased to advise you of its willingness in connection with the foregoing commitment, as lead arranger and bookrunner (in such capacities, the "Lead Arranger" and collectively with the Initial Lender, the "Commitment Parties", "we" or "us") for the Senior Credit Facilities, to form a syndicate of banks and financial institutions (including the Initial Lender) (collectively, the "Lenders") in consultation with you for the Senior Credit Facilities.

Bank of America will act as sole Administrative Agent for the Senior Credit Facilities and MLPFS will act as Lead Arranger for the Senior Credit Facilities. It is further agreed that MLPFS shall have "left side" designation and shall appear on the top left of any Information Materials (as defined below) and all other offering or marketing materials in respect of the Senior Credit Facilities and shall perform the duties and exercise the authority customarily performed and exercised by them in such role. You agree that no other agents, co-agents, arrangers or bookrunners will be appointed, no other titles will be awarded and no compensation (other than compensation expressly contemplated by this Commitment Letter and the Fee Letter referred to below) will be paid to any Lender (as defined below) in order to obtain its commitment to participate in the Senior Credit Facilities unless you and we shall so agree; provided that prior to the date that is fifteen (15) business days after your acceptance of this Commitment Letter and the Fee Letter (but not after such date), we may syndicate up to $75 million of Bank of America's commitment hereunder to financial institutions in consultation with you and we may (a) cause such financial institutions to become parties to this Commitment Letter and the Fee Letter with certain of such financial institutions being designated as joint lead arrangers and joint bookrunners for the Senior Credit Facilities and (b) award such joint lead arrangers and joint bookrunners additional agent or co-agent titles (each, an "Additional Party") in a manner and with economics determined by us in consultation with you (it being understood that (i) the economics provided to all Additional Parties in the aggregate shall not exceed 25% of the total economics for the Senior Credit Facilities, and in no event will MLPFS receive less than 75% of the aggregate economics payable by you with respect to the Senior Credit Facilities (without taking into account any agency fees or upfront fees, commitment fees, amendment fees or similar fees payable to lenders in their capacities as such) and (ii) each Additional Party or affiliates thereof shall commit to providing a percentage of the aggregate principal amount of the Senior Credit Facilities at least commensurate with the economics and fees awarded to such Additional Party and its affiliates, and the commitments of Bank of America in respect of the Senior Credit Facilities will be reduced by the amount of the commitments of such Additional Parties (or their relevant affiliates)), upon the execution by such Additional Party (and any relevant affiliate) of customary joinder documentation (a "Joinder") and, thereafter, each such Additional Party shall constitute a "Lead Arranger" hereunder, it or its relevant affiliate providing such commitment shall constitute an "Initial Lender" hereunder, and it and any such affiliate providing such commitment shall constitute a "Commitment Party" hereunder

The commitment of the Initial Lender hereunder with respect to the Senior Credit Facilities and the undertaking of the Lead Arranger to provide the services described herein with respect to the Senior Credit Facilities are subject solely to the satisfaction of each of the following conditions precedent in a manner acceptable to the Commitment Parties: [(a) the completion of a due diligence review of the assets, liabilities (including contingent liabilities) and business of the Borrower and its subsidiaries and of the Merger Sub and its subsidiaries in scope and with results satisfactory to us in our sole and absolute discretion; (b) Bank of America shall have obtained formal internal credit approval;][2] (c) each of the conditions precedent identified in the Summary of Terms under the heading "Conditions Precedent to Closing"; and (d) the negotiation, execution and delivery of definitive documentation for the Senior Credit Facilities (the "Loan

---

[2] Note: Expected to be removed prior to execution of the Merger Agreement and Commitment Letter, subject to completion of such due diligence and receipt of final credit approval.

Documentation") consistent with the Summary of Terms and otherwise reasonably satisfactory to the Commitment Parties.

Notwithstanding anything in this Commitment Letter, the Fee Letter, the Loan Documentation or any other agreement or other undertaking concerning the financing contemplated hereby or the Acquisition to the contrary, (i) the only representations and warranties the accuracy of which shall be a condition to the availability of the Senior Credit Facilities on the Closing Date (as defined below) shall be the Specified Representations (defined below) and (ii) the terms of the Loan Documentation shall be in a form such that they do not impair availability of the Senior Credit Facilities on the Closing Date if the conditions in clauses (a) through [(e)] of the immediately preceding paragraph are satisfied (it being understood that, to the extent any security interest in any Collateral is not or cannot be provided and/or perfected on the Closing Date (other than the pledge and perfection of the security interests in equity securities of the Borrower's wholly owned domestic subsidiaries (to the extent required under the terms of Exhibit A hereto) and assets with respect to which a lien may be perfected by the filing of a financing statement under the Uniform Commercial Code) after your use of commercially reasonable efforts to do so or without undue burden or expense, then the provision and/or perfection of a security interest in such Collateral shall not constitute a condition precedent to the availability of the Senior Credit Facilities on the Closing Date, but instead shall be required to be delivered after the Closing Date pursuant to arrangements and timing to be mutually agreed by the Administrative Agent and the Borrower acting reasonably, but in any event not less than 60 days after the Closing Date). For purposes hereof, "Specified Representations" means (a) such of the representations and warranties made by the Borrower with respect to the Borrower and its subsidiaries and/or assets in the Merger Agreement that are material to the interests of the Lenders, but only to the extent that you (or your subsidiary or affiliate) have the right to terminate your (or its) obligations under the Merger Agreement, or decline to consummate the Acquisition, as a result of a breach of such representations and warranties in the Merger Agreement (the "Specified Merger Agreement Representations") and (b) the representations and warranties of the Borrower and the Guarantors in the Loan Documentation relating to (1) corporate or other organizational existence, (2) corporate power and authority to enter into the Loan Documentation, (3) the enforceability of the Loan Documentation, (4) due authorization, execution and delivery of the Loan Documentation, (5) the execution, delivery and performance of the Loan Documentation does not contravene any material law in any material respect, or conflict with the organizational documents of the Borrower and the Guarantors, (6) use of proceeds and Federal Reserve margin regulations, (7) solvency as of the Closing Date (after giving effect to the Transaction) of the Borrower and its subsidiaries consistent with the form of solvency certificate attached hereto as Exhibit B, (8) the Investment Company Act and (9) OFAC, FCPA and PATRIOT Act (the "Specified Credit Agreement Representations"). This paragraph shall be referred to herein as the "Limited Conditionality Provision".

The Lead Arranger reserves the right, prior to or after the Closing Date, to syndicate all or a portion of the Initial Lender's commitment hereunder with respect to the Senior Credit Facilities to other Lenders in consultation with the Borrower; provided that notwithstanding the foregoing, the Lead Arranger will not select or syndicate to (x) those banks, financial institutions and other institutional lenders separately identified in writing by you to the Lead Arranger prior to the date hereof or (y) to competitors (or affiliates thereof that, for the avoidance of doubt, are clearly identifiable as such based solely on the legal name of such affiliate) of the Borrower or any of its subsidiaries (other than bona fide fixed income investors or debt funds) that are identified in writing by you to the Lead Arranger prior to the date hereof or are identified in writing by you to the Lead Arranger and the Administrative Agent after the Syndication Date from time to time (but which supplementation after the Syndication Date shall not apply retroactively for any purposes, including to disqualify any parties that have previously acquired an assignment or participation interest in the Senior Credit Facilities or to assess compliance with the confidentiality provisions hereof or of the Loan Documentation) (collectively, "Disqualified Lenders"). Notwithstanding the right of the Lead Arranger to syndicate the Senior Credit Facilities and receive commitments with respect thereto, (a) the Initial Lender

shall not be relieved, released or novated from its obligations hereunder (including its obligation to fund its commitment to the Senior Credit Facilities on the date of the consummation of the Acquisition) in connection with any syndication, assignment or participation of the Senior Credit Facilities, including its commitment in respect thereof, until after the funding of the Senior Credit Facilities on the Closing Date has occurred, (b) no assignment or novation shall become effective (as between you and the Initial Lender) with respect to all or any portion of the Initial Lender's commitment with respect to the Senior Credit Facilities until the initial funding of the Senior Credit Facilities has occurred on the Closing Date, and (c) unless you otherwise agree in writing, the Initial Lender shall retain exclusive control over all rights and obligations with respect to its commitment with respect to the Senior Credit Facilities, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the initial funding of the Senior Credit Facilities on the Closing Date has occurred.

The Lead Arranger intends to commence syndication of the Senior Credit Facilities promptly upon your acceptance of this Commitment Letter and the Fee Letter.  Until the earlier of (i) the date upon which a Successful Syndication (as defined in the Fee Letter) is achieved and (ii) the 90th day following the Closing Date (the "Syndication Date"), you agree to actively assist, and to use your commercially reasonable efforts to cause the Borrower to actively assist, the Lead Arranger in achieving a syndication of the Senior Credit Facilities that is satisfactory to the Lead Arranger and you.  Such assistance shall include your (a) providing and causing your advisors to provide (and using your commercially reasonable efforts to cause the Borrower and its advisors to provide) the Commitment Parties and the other Lenders upon request with all financial statements, projections and other information reasonably deemed necessary by the Initial Lender and the Lead Arranger to complete syndication, including, but not limited to, information and evaluations prepared by you and your advisors, or on your behalf, or by the Borrower and its advisors, or on their behalf, relating to the transactions contemplated hereby (including the Projections (as hereinafter defined), the "Information"), (b) assisting (including by using commercially reasonable efforts to cause the Borrower to assist) in the preparation of an Information Memorandum and other marketing materials to be used in connection with the syndication of the Senior Credit Facilities (collectively with the Summary of Terms, the "Information Materials"), (c) using your commercially reasonable efforts to ensure that the syndication efforts of the Lead Arranger benefit materially from your and the Borrower's existing banking relationships, and (d) otherwise assisting the Lead Arranger in its syndication efforts, including by making your and your subsidiaries' officers and advisors available (and your using commercially reasonable efforts to cause the officers and advisors of the Borrower and its subsidiaries to be available) from time to time to attend and make presentations regarding the business and prospects of the Borrower and its subsidiaries and/or the Merger Sub and its subsidiaries, as appropriate, at one or more meetings of prospective Lenders, at times and locations to be mutually agreed.  You hereby agree that the Information Memorandum to be used in connection with the syndication of the Senior Credit Facility shall be completed at least thirty (30) days prior to the Closing Date (as hereinafter defined).

It is understood and agreed that the Lead Arranger will manage and control all aspects of the syndication in consultation with you, including decisions as to the selection of prospective Lenders and any titles offered to proposed Lenders, when commitments will be accepted and the final allocations of the commitments among the Lenders.  It is understood that no Lender participating in the Senior Credit Facilities will receive compensation from you in order to obtain its commitment, except on the terms contained herein, in the Summary of Terms and in the Fee Letter.  It is also understood and agreed that the amount and distribution of the fees among the Lenders will be at the sole and absolute discretion of Bank of America and MLPFS.

To ensure an orderly and effective syndication of the Senior Credit Facilities and the commitments provided herein, you agree that, prior to and during the syndication of the Senior Credit Facilities, you will not syndicate or authorize any offering, placement or arrangement of any debt securities, bank financing, senior credit facility or other debt capital by or on behalf of the Borrower or any of its subsidiaries, the Merger

Sub or any of its subsidiaries, any other entity formed by you to consummate the Acquisition or otherwise in connection with the Acquisition, without the prior written consent of the MLPFS.

Notwithstanding anything to the contrary contained in this Commitment Letter or the Fee Letter, neither the commencement nor the completion of the syndication of the Senior Credit Facilities, nor any other provision of this Commitment Letter shall constitute a condition precedent to the availability and initial funding of the Senior Credit Facilities on the Closing Date and it is understood that the Initial Lender's commitments hereunder are not conditioned upon the syndication of, or receipt of commitments in respect of, the Senior Credit Facilities and in no event shall the successful completion of syndication of the Senior Credit Facilities constitute a condition to the availability of the Senior Credit Facilities on the Closing Date.

You represent, warrant and covenant that (a) all financial projections concerning the Borrower and its subsidiaries and the Merger Sub and its subsidiaries that have been or are hereafter made available to the Commitment Parties or the Lenders by you or any of your subsidiaries or representatives (or on your or their behalf) or by the Borrower or any of its subsidiaries or representatives (or on their behalf) in connection with the transactions contemplated hereby (the "Projections") have been or will be prepared in good faith based upon reasonable assumptions; it being understood that any such Projections are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are beyond your control, that no assurance can be given that any particular Projections will be realized, that actual results may differ and that such differences may be material and (b) all Information, other than Projections, which has been or is hereafter made available to the Commitment Parties or the Lenders by you or any of your representatives or subsidiaries (or on your or their behalf) or by the Borrower or any of its subsidiaries or representatives (or on their behalf) in connection with any aspect of the transactions contemplated hereby, when taken as a whole after giving effect to all supplements and updates provided thereto, as and when furnished, is and will be complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading. You agree to furnish us with further and supplemental information from time to time until the date of the initial borrowing under the Senior Credit Facility (the "Closing Date") and, if requested by us, for a period thereafter ending upon the Syndication Date, so that the representation, warranty and covenant in the immediately preceding sentence are correct on the Closing Date and on such later date on which the syndication of the Senior Credit Facilities is completed as if the Information were being furnished, and such representation, warranty and covenant were being made, on such date. In issuing this commitment and in arranging and syndicating the Senior Credit Facilities, the Commitment Parties are and will be using and relying on the Information without independent verification thereof and do not assume responsibility for the accuracy or completeness of the Information. Without limiting your obligations under this paragraph, it is understood that the Initial Lender's commitment with respect to the Senior Credit Facilities hereunder is not conditioned upon the accuracy of, or your compliance with, the representations, warranties and covenants in this paragraph.

You acknowledge that the Lead Arranger and/or the Initial Lender on your behalf will make available Information Materials to the proposed syndicate of Lenders by posting the Information Materials on Syndtrak, IntraLinks or another similar electronic system. In connection with the syndication of the Senior Credit Facilities, unless the parties hereto otherwise agree in writing, you shall be under no obligation to provide Information Materials suitable for distribution to any prospective Lender (each, a "Public Lender") that has personnel who do not wish to receive material non-public information (within the meaning of the United States federal securities laws, "MNPI") with respect to the Borrower or its affiliates, the Merger Sub or its affiliates, or the respective securities of any of the foregoing. You agree, however, that the Loan Documentation will contain provisions concerning Information Materials to be provided to Public Lenders and the absence of MNPI therefrom. Prior to distribution of Information Materials to prospective Lenders, you shall provide us with a customary letter authorizing the dissemination thereof.

By executing this Commitment Letter, to the extent the Closing Date occurs, you agree to reimburse each Commitment Party from time to time on demand for all reasonable out-of-pocket fees and expenses (including, but not limited to, (a) the reasonable fees, disbursements and other charges of Moore & Van Allen PLLC, as counsel to Bank of America and MLPFS, and of special and local counsel to the Lenders retained by MLPFS or the Administrative Agent and (b) due diligence expenses) incurred in connection with the Senior Credit Facilities, the syndication thereof, the preparation of the Loan Documentation and the other transactions contemplated hereby. You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto.

You agree to indemnify and hold harmless the Initial Lender, the Lead Arranger, each Lender and each of their respective affiliates and their respective partners, officers, directors, employees, agents, trustees, administrators, managers, advisors and representatives (each, an "Indemnified Party") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, losses, liabilities and expenses (including, without limitation, the reasonable fees, disbursements and other charges of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) any matters contemplated by this Commitment Letter, the Fee Letter, the Merger Agreement or any related transaction or (b) the Senior Credit Facilities, or any use made or proposed to be made with the proceeds thereof **(IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PARTY)**, except to the extent such claim, damage, loss, liability or expense (i) is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct, (ii) arises from a material breach of the obligations of such Indemnified Person under this Commitment Letter or the Fee Letter (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (iii) in connection with any proceeding that does not involve an act or omission by you or any of your affiliates and that is brought by an Indemnified Person against any other Indemnified Person (other than any claims against an Indemnified Person in its capacity or in fulfilling its role as Administrative Agent, L/C Issuer, Lead Arranger or any similar role under this Commitment Letter or the Fee Letter). In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors, the Borrower or any other third party or an Indemnified Party, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of your direct, as opposed to special, indirect, consequential or punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct. Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for your direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction.

This Commitment Letter and the fee letter among you, Bank of America and MLPFS of even date herewith (the "Fee Letter") and the contents hereof and thereof are confidential and, except for disclosure hereof or thereof on a confidential basis to your accountants, attorneys and other professional advisors retained by

you in connection with the Senior Credit Facilities or as otherwise required by law, may not be disclosed in whole or in part to any person or entity without our prior written consent; provided, however, it is understood and agreed that you may (i) disclose this Commitment Letter (including the Summary of Terms) but not the Fee Letter after your acceptance of this Commitment Letter and the Fee Letter, in filings with the Securities and Exchange Commission and other applicable regulatory authorities and stock exchanges, (ii) disclose this Commitment Letter (including the Summary of Terms) but not the Fee Letter to the Borrower and its officers, directors, accountants, attorneys and other professional advisors on a confidential and need to know basis in connection with their consideration of the Transaction, (iii) to the extent portions thereof have been redacted in a manner to be reasonably agreed by us (including the portions thereof addressing fees payable to the Commitment Parties and/or the other Lenders, economic flex terms and other economic terms), disclose the Fee Letter to the Borrower and its officers, directors, accountants, attorneys and other professional advisors on a confidential and need to know basis, and (iv) after your acceptance of this Commitment Letter and the Fee Letter, disclose the aggregate fees payable under the Fee Letter (but not the Fee Letter itself) in generic disclosure of aggregate sources and uses contained in any offering memorandum, prospectus or other marketing materials relating to the Senior Credit Facilities. We hereby notify you and each guarantor that pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "Act"), each of us is required to obtain, verify and record information that identifies you and each such guarantor, which information includes your and their names and addresses and other information that will allow us, as applicable, to identify you and each guarantor in accordance with the Act.

Each of the Commitment Parties shall use all confidential information provided to them by or on behalf of you hereunder solely for the purpose of providing the services which are the subject of this letter agreement and otherwise in connection with the transactions contemplated hereby and shall treat confidentially all such information; provided, however, that nothing herein shall prevent any Commitment Party from disclosing any such information (i) pursuant to the order of any court or administrative agency or in any pending legal or administrative proceeding, or otherwise as required by applicable law or compulsory legal process (in which case such Commitment Party agrees to inform you promptly thereof prior to such disclosure to the extent not prohibited by law, rule or regulation), (ii) upon the request or demand of any regulatory authority having jurisdiction over any Commitment Party or any of their respective affiliates, (iii) to the extent that such information becomes publicly available other than by reason of disclosure in violation of this agreement by a Commitment Party, (iv) to any Commitment Party's respective affiliates, and their and such affiliates' respective employees, legal counsel, independent auditors and other experts or agents who need to know such information in connection with transactions contemplated hereby and are informed of the confidential nature of such information, (v) for purposes of establishing a "due diligence" defense, (vi) to the extent that such information is or was received by a Commitment Party from a third party that is not to such Commitment Party's knowledge subject to confidentiality obligations to you, (vii) to the extent such information is independently developed by a Commitment Party, or (viii) to potential Lenders, participants, assignees or potential counterparties to any swap or derivative transaction relating to the Borrower or any of its subsidiaries or any of their respective obligations, in each case, who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph or as otherwise reasonably acceptable to you and the Initial Lender and the Lead Arranger, including as may be agreed in any confidential information memorandum or other marketing material). This paragraph shall terminate on the first anniversary of the date hereof.

You acknowledge that the Commitment Parties or their affiliates may be providing financing or other services to parties whose interests may conflict with yours. The Commitment Parties agree that they will not furnish confidential information obtained from you to any of their other customers and that they will treat confidential information relating to you and your affiliates with the same degree of care as they treat their own confidential information. The Commitment Parties further advise you that they will not make available to you confidential information that they have obtained or may obtain from any other customer.

In connection with the services and transactions contemplated hereby, you agree that the Commitment Parties are permitted to access, use and share with any of their bank or non-bank affiliates, agents, advisors (legal or otherwise) or representatives any information concerning you or any of your affiliates that is or may come into the possession of the Commitment Parties or any of such affiliates.

In connection with all aspects of each transaction contemplated by this Commitment Letter, you acknowledge and agree, and acknowledge your affiliates' understanding, that:  (a) (i) the arranging and other services described herein regarding the Senior Credit Facilities are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Commitment Parties, on the other hand, (ii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate, and (iii) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; (b) (i) each of the Commitment Parties has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you, any of your affiliates or any other person or entity and (ii) no Commitment Party has any obligation to you or your affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein; and (c) the Commitment Parties and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from yours and those of your affiliates, and no Commitment Party has any obligation to disclose any of such interests to you or your affiliates. To the fullest extent permitted by law, you hereby waive and release any claims that you may have against any Commitment Party and their respective affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated by this Commitment Letter.

This Commitment Letter (including the Summary of Terms) and the Fee Letter shall be governed by, and construed in accordance with, the laws of the State of New York.  Each of the parties hereto hereby irrevocably waives any and all right to trial by jury in any action, proceeding or counterclaim (whether based on contract, tort or otherwise) arising out of or relating to this Commitment Letter (including the Summary of Terms), the Fee Letter, the transactions contemplated hereby and thereby or the actions of the Commitment Parties in the negotiation, performance or enforcement hereof.  With respect to any suit, action or proceeding arising in respect of this Commitment Letter (including the Summary of Terms), the Fee Letter, the transactions contemplated hereby and thereby or the actions of the Commitment Parties in the negotiation, performance or enforcement hereof, the parties hereto hereby irrevocably and unconditionally submit to the exclusive jurisdiction of any state or federal court located in the Borough of Manhattan and irrevocably and unconditionally waive any objection to the laying of venue of such suit, action or proceeding brought in such court and any claim that such suit, action or proceeding has been brought in an inconvenient forum; provided that, notwithstanding the foregoing to the contrary, it is understood and agreed that any determinations as to (x) the accuracy of any representations and warranties made by or on behalf of the Borrower and its subsidiaries in the Merger Agreement and whether as a result of any inaccuracy thereof you or any of your subsidiaries that is a party to the Merger Agreement can terminate your (or its) obligations under the Merger Agreement or not consummate the Acquisition, (y) the determination of whether the Acquisition has been consummated in accordance with the terms of the Merger Agreement and (z) the interpretation of the definition of "Company Material Adverse Effect" (as defined in the Summary of Terms) and whether a Company Material Adverse Effect has occurred shall, in each case, be governed by the laws of the State whose laws govern the Merger Agreement (it being understood and agreed that such governing law of the Merger Agreement shall be the State of [Delaware] unless the Commitment Parties have otherwise agreed in writing).  The parties hereto hereby agree that service of any process, summons, notice or document by registered mail addressed to you or us will be effective service of process against such party for any action or proceeding relating to any such dispute.  A final judgment in any such action or proceeding may be enforced in any other courts with jurisdiction over you, or any Commitment Party, as applicable.  Nothing in this Commitment Letter, the Summary of Terms or the Fee Letter shall affect any right that any Commitment Party or any of their affiliates may otherwise

have to bring any claim, action or proceeding relating to this Commitment Letter (including the Summary of Terms), the Fee Letter and/or the transactions contemplated hereby and thereby in any court of competent jurisdiction to the extent necessary or required as a matter of law to assert such claim, action or proceeding against any assets of the Borrower or any of its subsidiaries or enforce any judgment arising out of any such claim, action or proceeding.

The provisions of the immediately preceding seven paragraphs shall remain in full force and effect regardless of whether any definitive documentation for the Senior Credit Facilities shall be executed and delivered, and notwithstanding the termination of this Commitment Letter or any commitment or undertaking of any Commitment Party hereunder.

This Commitment Letter and the Fee Letter may be executed in counterparts which, taken together, shall constitute an original. Delivery of an executed counterpart of this Commitment Letter or the Fee Letter by facsimile or other electronic means (such as by email in "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart thereof.

The commitments and undertakings of the Commitment Parties may be terminated by us if you fail to perform your obligations under this Commitment Letter or the Fee Letter on a timely basis.

This Commitment Letter (including the exhibits hereto) and the Fee Letter embody the entire agreement and understanding among the Commitment Parties, you and your affiliates with respect to the Senior Credit Facilities and supersede all prior agreements and understandings relating to the specific matters hereof. Those matters that are not covered or made clear herein or in the Summary of Terms or the Fee Letter are subject to mutual agreement of the parties. No party has been authorized by any Commitment Party to make any oral or written statements that are inconsistent with this Commitment Letter. This Commitment Letter is not assignable by you without our prior written consent and is intended to be solely for the benefit of the parties hereto and the Indemnified Parties. The parties hereby agree that MLPFS may, without notice to you, assign its rights and obligations under this Commitment Letter to any other registered broker-dealer wholly-owned by Bank of America Corporation to which all or substantially all of Bank of America Corporation's or any of its subsidiaries' investment banking, commercial lending services or related businesses may be transferred following the date of this Commitment Letter. This Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of the Commitment Parties and you.

This Commitment Letter and all commitments and undertakings of the Commitment Parties hereunder will expire at 5:00 p.m. (Eastern time) on August 16, 2016 unless you execute this Commitment Letter and the Fee Letter and return them to us prior to that time (which may be by facsimile transmission or other electronic means (such as by email in "pdf" or "tif" format)), whereupon this Commitment Letter (including the Summary of Terms) and the Fee Letter (each of which may be signed in one or more counterparts) shall become binding agreements. Thereafter, all commitments and undertakings of the Commitment Parties hereunder will expire on the earliest of (i) [_____], 2016,[3] (ii) the consummation of the Acquisition with or without the funding of the Senior Credit Facilities, and (iii) the date that the Merger Agreement is terminated in accordance with its terms, unless the Loan Documentation is executed and delivered prior to such date. In consideration of the time and resources that the Commitment Parties will devote to the Senior Credit Facilities, you agree that, until such expiration, you will not (and will not allow the Borrower to) solicit, initiate, entertain or permit, or enter into any discussions in respect of, any offering, placement or

---

[3] To be the drop dead date in the Merger Agreement provided that BAML's commitment is not to exceed December 15, 2016.

arrangement of any competing senior credit facility or facilities or other competing debt financing for the Borrower, the Merger Sub or their respective subsidiaries.

**THIS WRITTEN AGREEMENT (WHICH INCLUDES THE SUMMARY OF TERMS) AND THE FEE LETTER REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

[THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

We are pleased to have the opportunity to work with you in connection with this important financing.

Very truly yours,

BANK OF AMERICA, N.A.

By: _____

Name:   Thomas M. Paulk
Title:    Senior Vice President

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

By: _____

Name: _____
Title: _____

ACCEPTED AND AGREED TO
AS OF THE DATE FIRST ABOVE WRITTEN:

[NEWCO]

By: _____
Name: _____
Title: _____

**SUMMARY OF TERMS AND CONDITIONS**
**CONSTELLATION HEALTHCARE TECHNOLOGIES, INC.**
**$135 MILLION SENIOR SECURED CREDIT FACILITIES**

*Capitalized terms not otherwise defined herein have the same meanings as specified therefor in the commitment letter (the "Commitment Letter") to which this Summary of Terms and Conditions is attached.*

**BORROWER:**

Constellation Healthcare Technologies, Inc., a Delaware corporation (the "Borrower").

**GUARANTORS:**

The Senior Credit Facilities and any treasury or cash management services, interest rate, currency, foreign exchange or commodity swap or hedging arrangements entered into with a Lender (or any affiliate thereof) ("Additional Secured Obligations") will be guaranteed by [Newco] and each existing and future direct and indirect domestic subsidiary of the Borrower (collectively, the "Guarantors"; and together with the Borrower, the "Loan Parties"). In addition, the Borrower will guaranty any Additional Secured Obligations entered into by any domestic subsidiary of the Borrower with a Lender (or any affiliate thereof); provided, Guarantors will not include any unrestricted subsidiary (defined in a manner, and subject to restrictions, to be mutually agreed, provided that no subsidiary in existence on the Closing Date shall be an unrestricted subsidiary), and any restricted subsidiary that is (a) an immaterial subsidiary (defined in a manner to be mutually agreed), (b) prohibited or restricted by applicable law or contract existing on the Closing Date (or at the time of acquisition of such subsidiary but not entered into in contemplation thereof) from guaranteeing the Senior Credit Facilities and the Additional Secured Obligations would require governmental (including regulatory) consent, approval, license or authorization in order to provide a Guarantee (unless such consent, approval, license or authorization has been obtained), or if such Guarantee would result in material adverse tax consequences as reasonably determined by the Borrower in consultation with the Administrative Agent, (c) a domestic subsidiary substantially all of the assets of which consist of equity of foreign subsidiaries (each, a "Foreign Subsidiary Holding Company"), (d) a special purpose securitization vehicle (or similar entity), (e) a not-for-profit subsidiary, (f) a captive insurance subsidiary, or (g) a subsidiary with respect to which, in the reasonable judgment of the Borrower and the Administrative Agent, the burden or cost of providing a Guarantee will be excessive in view of the benefits to be obtained by the Lenders therefrom.

All guarantees will be guarantees of payment and not of collection. Notwithstanding anything contained herein to the contrary, any Additional Secured Obligations of a Loan Party shall exclude certain swap obligations if, and to the extent that, such swap obligation is or

becomes illegal under the Commodity Exchange Act with respect to such Loan Party (determined after giving effect to any keepwell or other support for the benefit of such Loan Party).

**ADMINISTRATIVE AGENT:**

Bank of America, N.A. ("Bank of America") will act as sole administrative agent (the "Administrative Agent").

**LEAD ARRANGER AND BOOKRUNNER**

Merrill Lynch, Pierce, Fenner & Smith Incorporated (or any of its affiliates) will act as lead arranger and bookrunner (the "Lead Arranger"), subject to the appointment of additional lead arrangers in accordance with the Commitment Letter that are mutually acceptable to the Borrower and the Lead Arranger.

**LENDERS:**

A syndicate of financial institutions (including Bank of America, but excluding any Disqualified Lenders) arranged by the Lead Arranger in consultation with the Borrower, which institutions shall be acceptable to the Administrative Agent (collectively, the "Lenders").

**SENIOR CREDIT FACILITY:**

An aggregate principal amount of up to $135 million will be available through the following facilities:

*Revolving Facility:* $15 million revolving facility (the "Revolving Facility"), which will include a $5 million sublimit for the issuance of standby letters of credit (each a "Letter of Credit") and a $5 million sublimit for swingline loans (each a "Swingline Loan"). Letters of Credit will be issued by Bank of America (in such capacity, the "L/C Issuer") and Swingline Loans may be made available by Bank of America (in such capacity, the "Swingline Lender"), and each of the Lenders under the Revolving Facility will purchase an irrevocable and unconditional participation in each Letter of Credit and each Swingline Loan.

*Term Loan Facility:* $120 million term loan facility, all of which will be drawn on the Closing Date (the "Term Loan Facility").

The Revolving Facility and the Term Loan Facility are collectively referred to herein as the "Senior Credit Facilities".

**PURPOSE:**

The proceeds of the Senior Credit Facilities shall be used (a) to pay a portion of the consideration for the acquisition (the "Acquisition"), directly or indirectly, all of the outstanding equity interests of the Borrower pursuant to a [merger agreement] among, *inter alios¸* the Borrower and the Merger Sub (the "Merger Agreement"), (b) to refinance certain indebtedness and (c) of for general corporate purposes not in contravention of any law or of any Loan Document (as hereinafter defined).

**CLOSING DATE:** The execution of definitive Loan Documents, anticipated to occur on or before [_____], 2016 (the "Closing Date").

**INTEREST RATES:** As set forth in Addendum I.

**MATURITY:** The Revolving Facility shall terminate and all amounts outstanding thereunder shall be due and payable in full five years after the Closing Date.

The Term Loan Facility shall be subject to repayment according to the Scheduled Amortization (as hereinafter defined), with the final payment of all amounts outstanding, *plus* accrued interest, being due five years after the Closing Date.

**INCREASE OPTION:** The Loan Documentation will provide that the Senior Credit Facilities may be increased by an aggregate amount of up to $50 million; provided that after giving effect to any such increase on a pro forma basis (and assuming full utilization of any such increase), the Consolidated Leverage Ratio shall be less than or equal to 3.25 to 1.0. Such increases may take the form of new term loans, an increase to the existing Term Loan Facility or an increase of the Revolving Facility. Any such request shall be in a minimum amount of $5,000,000 and in increments of $5,000,000 in excess thereof or, if less, the entire remaining unused accordion amount. Such increases may be effected from time to time after the Closing Date subject to customary terms and conditions and provided that (a) no default or event of default exists at the time of any such increase (or, in the case of a limited conditionality acquisition, (i) no default or event of default exists at the time the applicable acquisition agreement is entered into and (ii) no payment of bankruptcy event of default exists at the time of such increase and the closing of such limited conditionality acquisition), (b) the Borrower may make a maximum of three (3) such requests, (c) to the extent the Senior Credit Facilities are secured by mortgages at the time of such increase, flood diligence shall have been completed and, if applicable, the Administrative Agent shall have received evidence of flood insurance satisfactory to the Administrative Agent and the Lenders and (iv) such other conditions as requested by the Lenders providing such increase shall have been satisfied. The Borrower may offer the increase to (i) its existing Lenders, and each existing Lender will have the right, but not the obligation, to commit to all or a portion of the proposed increase and (ii) third party financial institutions reasonably acceptable to the Administrative Agent, the Swingline Lender, the L/C Issuer and the Borrower.

**AVAILABILITY/SCHEDULED AMORTIZATION:** *Revolving Facility*: Extensions of credit under the Revolving Facility may be made on a revolving basis up to the full amount of the Revolving Facility and Letters of Credit may be issued up to the sublimit for Letters of Credit. Swingline Loans may be issued up to the sublimit for Swingline Loans.

3

*Term Loan Facility*:  The Term Loan Facility will be subject to quarterly amortization of principal, commencing on the last day of the first full fiscal quarter following the Closing Date, equal to 1.25% of the initial principal amount of the Term Loan Facility for the first two years of the Term Loan Facility, 1.875% of the initial principal amount of the Term Loan Facility for the third and fourth years of the Term Loan Facility and 2.5% of the initial principal amount of the Term Loan Facility for the last year of the Term Loan Facility (the "Scheduled Amortization").

**MANDATORY PREPAYMENTS AND COMMITMENT REDUCTIONS:**

In addition to the amortization set forth above and subject to exceptions and baskets to be mutually agreed upon, (a) 100% of all net cash proceeds of asset sales and dispositions and involuntary dispositions (subject to exceptions to be agreed, including reinvestment of proceeds), (b) 100% of all net cash proceeds of debt issuances not permitted under the Loan Documentation, and (c) to the extent the Consolidated Leverage Ratio (as hereinafter defined) as of the most recently ended fiscal quarter for which financial statements have been delivered was greater than or equal to 2.75 to 1.0, 100% of all net cash proceeds of extraordinary receipts (subject to exceptions to be agreed) shall be applied to the prepayment of the Senior Credit Facilities in the following manner:  *first*, to the first 4 installments due under the Term Loan Facility and thereafter to the remaining installments on a pro rata basis and, *second*, to the Revolving Facility (without any corresponding commitment reduction).

**OPTIONAL PREPAYMENTS AND COMMITMENT REDUCTIONS:**

The Borrower may prepay the Senior Credit Facilities in whole or in part at any time without premium or penalty, subject to reimbursement of the Lenders' breakage and redeployment costs in the case of prepayment of LIBOR borrowings.  Each such prepayment of the Term  Loan Facility will be applied as determined by the Borrower and to the remaining amortization payments applicable to the Term Loan Facility, as directed by the Borrower (and absent such direction, to the remaining installments on a pro rata basis).  The unutilized portion of the commitments under the Senior Credit Facilities may be irrevocably reduced or terminated by the Borrower at any time without penalty.

**SECURITY:**

Subject to the Limited Conditionality Provision, the Borrower and each of the Guarantors shall grant the Administrative Agent (for the benefit of the Lenders and the other secured parties, collectively, the "Secured Parties")) valid and perfected first priority (subject to certain exclusions, exceptions, limitations, thresholds and baskets to be mutually agreed between Borrower and the Lead Arranger) liens and security interests in all of the following:

(a)  Equity Interests. All present and future shares of capital stock of (or other ownership or profit interests in) each of its present and future subsidiaries (limited, in the case of each entity that is a

"controlled foreign corporation" under Section 957 of the Internal Revenue Code, to a pledge of 65% of the capital stock of each such first-tier foreign subsidiary to the extent the pledge of any greater percentage would result in material adverse tax consequences to the Borrower).

(b)  Real and Personal Property. All of its present and future property and assets, real and personal, including, but not limited to, machinery and equipment, inventory and other goods, accounts receivable, owned real estate with a value above a threshold to be agreed, bank accounts, general intangibles, financial assets, investment property, letter of credit rights, license rights, patents, trademarks, tradenames, copyrights, chattel paper, insurance proceeds, contract rights, hedge agreements, documents, instruments, indemnification rights, tax refunds and cash.  No landlord lien waivers, estoppels or collateral access letters will be required as a condition to funding on the Closing Date (and thereafter on a commercially reasonable efforts basis only).

(c)  Proceeds, Products, Etc. All proceeds and products of the property and assets described in clauses (a) and (b) above.

The Security shall ratably secure the relevant party's obligations in respect of the Senior Credit Facilities and the Additional Secured Obligations.

No control agreements shall be required with respect to the Borrower's deposit accounts.

**CONDITIONS PRECEDENT TO CLOSING:**

The closing and the initial extension of credit under the Senior Credit Facilities will be subject to satisfaction of the following conditions precedent:

(i)  The negotiation, execution and delivery of the Loan Documentation consistent with this Summary of Terms and Conditions.

(ii)  The Administrative Agent shall have received customary opinions of counsel to the Borrower and the Guarantors (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the Loan Documentation) and of appropriate local counsel and such corporate resolutions, certificates and other documents as the Lenders shall reasonably require.

(iii)  There shall not have occurred since [_____][1] any event or condition that has had or could be reasonably expected, either

---

[1] To be the date of the Merger Agreement.

individually or in the aggregate, to have a [Company Material Adverse Effect]. "Company Material Adverse Effect" shall have the meaning set forth in the Merger Agreement.

(iv)    All existing third party indebtedness for borrowed money of the Borrower and its subsidiaries under that certain [Credit Agreement dated ___ among Borrower, as borrower, the lenders from time to time party thereto and ___, as administrative agent,] shall have been (or will be concurrently with the funding of the Senior Credit Facilities on the Closing Date) repaid and all liens securing obligations thereunder released.

(v)    The Administrative Agent shall have received a solvency certificate as to the Borrower and its subsidiaries from the chief financial officer of the Borrower, in substantially the form attached to the Commitment Letter as Exhibit B.

(vi)    [The Lead Arranger shall be reasonably satisfied with Merger Agreement and][2] the Merger Agreement shall not be altered, amended or otherwise changed or supplemented or any condition therein waived in any manner that would be materially adverse to the Lenders without the prior written consent of the Lead Arranger (which consent shall not be unreasonably withheld or delayed); provided that (w) the granting of any consent under the Merger Agreement that is not materially adverse to the interest of the Lenders will not otherwise constitute an amendment, modification or waiver, (x) any increase in the purchase price of the Acquisition will be deemed not to be materially adverse to the Lenders so long as such increase is funded solely by an increase in the Equity Contribution, (y) any reduction in the purchase price of the Acquisition shall not be deemed to be materially adverse to the interests of the Lenders, so long as such reduction (A) does not exceed 10% and (B) is applied to reduce the Equity Contribution and the commitments in respect of the Senior Credit Facility on a pro rata basis such that the pro forma capitalization of the Transaction remains 55% equity and 45% debt; provided further that after giving effect to any increase or reduction of the Equity Contribution, the Sponsor shall own and control, directly or indirectly, at least 55% of the voting stock of the Borrower and (z) any change to the definition of ["Material Adverse Effect"] in the Merger Agreement shall be deemed materially adverse to the Lenders. The Acquisition shall have been, or contemporaneously with the closing and funding of the Senior Credit Facilities will be, consummated in all material respects in accordance with the terms of the Merger Agreement.

---

[2] Note: Expected to be removed prior to execution of the Merger Agreement and Commitment Letter, subject to the Lead Arranger being reasonably satisfied with the terms of the Merger Agreement. The expectation is that the Merger Agreement will be signed at the same times as the Commitment Letter.

(vii) To the extent required by the Loan Documentation and subject to the Limited Conditionality Provision, all documents and instruments required to create and perfect the Administrative Agent's security interests in the Collateral shall have been executed and delivered and, if applicable, be in proper form for filing.

(viii) [Reserved]

(ix) The Administrative Agent shall have received (A) consolidated and consolidating financial statements of the Borrower and its subsidiaries giving effect to the transactions contemplated hereby on a *pro forma* basis, (B) forecasts prepared by management of the Borrower of balance sheets, income statements and cash flow statements for each of the 5 full fiscal years of the Borrower ending after the Closing Date, and (C) audited consolidated financial statements of the Borrower and its subsidiaries for the fiscal year ended December 31, 2015 and unaudited consolidated financial statements of the Borrower and its subsidiaries for each fiscal quarter ending after December 31, 2015 and at least 50 days before the Closing Date.

(x) [Reserved][3]

(xi) The Lenders shall have received all documentation and other information as has been reasonably requested in writing at least 3 days prior to the Closing Date by any such Lender that it reasonably determines is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the PATRIOT Act.

(xii) On and as of the Closing Date, both before and after giving effect to the Transaction, the Specified Representations shall be true and correct.

(xiii) The Administrative Agent shall have received satisfactory evidence that (A) the contribution of at least $[_____] million[4] of cash common equity by the Sponsor shall have been consummated substantially concurrently with the initial borrowings under the Senior Credit Facilities and (ii) the rollover of at least $[___] million of common equity of the Borrower currently held by existing shareholders and management of the Borrower shall have been consummated substantially

---

[3] Note: Flood diligence not required unless real property is required to be pledged at closing. At this time, it is BAML's understanding that no real property will be pledged at closing.

[4] Note: To be the amount that results in the Sponsor owning and controlling at least 55% of the voting stock.

CHAR1\1474788v8

concurrently with the initial borrowings under the Senior Credit Facilities.

(xiv)    The Administrative Agent shall have received satisfactory evidence that after giving effect to all borrowings on the Closing Date, (A) there shall be at least $15 million of availability under the Revolving Facility and (B) the Borrower and its subsidiaries do not have any debt outstanding other than debt under the Senior Credit Facilities.

(xv)    (i) All fees payable pursuant to the Fee Letter on or prior to the Closing Date shall have been paid and (ii) all other accrued fees and expenses of the Lead Arrangers, the Administrative Agent and the Lenders (including the fees and expenses of counsel (including any local counsel) for the Administrative Agent) payable on or prior to the Closing Date and for which invoices have been presented at least two business days prior to the Closing Date shall have been paid.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT AFTER CLOSING:**    Usual and customary for transactions of this type, including, without limitation, the following: (a) all of the representations and warranties in the Loan Documents shall be true and correct, in each case, as of the date of such extension of credit and (b) no default or event of default under the Senior Credit Facilities shall have occurred and be continuing, or would result from such extension of credit.

**REPRESENTATIONS AND WARRANTIES:**    Subject to the Limited Conditionality Provision, and limited to the following, with such exclusions, exceptions, qualifications, thresholds and baskets to be mutually agreed: (i) legal existence, qualification and power; (ii) due authorization and no contravention of law, contracts or organizational documents; (iii) governmental and third party approvals and consents; (iv) enforceability; (v) accuracy and completeness of specified financial statements and other information and no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect; (vi) no material litigation; (vii) no default; (viii) ownership of property (including disclosure of liens, properties, leases and investments); (ix) insurance matters; (x) environmental matters; (xi) tax matters; (xii) ERISA compliance; (xiii) identification of subsidiaries, equity interests and loan parties; (xiv) use of proceeds and not engaging in business of purchasing/carrying margin stock; (xv) status under Investment Company Act; (xvi) accuracy of disclosure; (xvii) compliance with laws; (xviii) intellectual property; (xix) solvency; (xx) perfection information and collateral documents; and (xxi) status as EEA financial institution.

**COVENANTS:**    Usual and customary for transactions of this type and limited to the following (with such exclusions, exceptions, qualifications, thresholds and baskets to be mutually agreed and including 'grower' baskets to be

8

mutually agreed (it being understood that 'grower' baskets shall not be provided for restricted payments)):

*Affirmative Covenants*:  (a) delivery of annual and quarterly financial statements (including budgets and forecasts); (b) delivery of certificates and other information; (c) delivery of notices; (d) payment of obligations; (e) preservation of existence; (f) maintenance of properties; (g) maintenance of insurance; (h) compliance with laws; (i) books and records; (j) inspection rights; (k) use of proceeds; (l) covenant to guarantee obligations and give security; (m) further assurances; and (n) compliance with anti-corruption laws.

*Negative Covenants*:  Restrictions on (a) liens; (b) indebtedness; (c) investments (including restrictions on loans, advances and acquisitions); (d) fundamental changes; (e) dispositions; (f) payments of dividends, share repurchases and other distributions; (g) changes in nature of business; (h) transactions with affiliates; (i) burdensome agreements; (j) use of proceeds; (k) amendments of organizational documents and changes in fiscal year, legal name, state of formation; form of entity and accounting changes; (l) sale and leaseback transactions; (m) prepayment of certain indebtedness; (n) amendment of certain indebtedness; (o) sanctions; (p) use of proceeds in violation of anti-corruption laws; and (q) activities of [Newco].

*Financial Covenants*: To include the following:

- Maximum Consolidated Leverage Ratio (total funded debt / EBITDA) of 4.00 to 1.0, with step downs to be agreed upon.

- Minimum Consolidated Fixed Charge Coverage Ratio ((EBITDA – capital expenditures – cash taxes – sponsor and management fees paid) / (scheduled amortization (it being understood that such scheduled amortization shall not be reduced by the amount of any voluntary or mandatory prepayments) + interest)) of 1.25 to 1.0.

The definition of EBITDA will permit customary add backs for (i) synergies, cost savings and restructuring charges resulting from the initial acquisition as well as from Permitted Acquisitions in a manner to be agreed, provided that such synergies, cost savings and restructuring charges must be determined in good faith, factually supportable, set forth on a schedule to be mutually agreed for each acquisition and achievable within 18 months of the Closing Date or closing of the applicable Permitted Acquisition (as the case may be) with certification by the chief financial officer of the Borrower, provided that the aggregate amount added back to EBITDA pursuant to this clause (i) and clause (ii) below during any twelve month period shall not exceed 20% of EBITDA (determined prior to the add backs set forth in this clause (i) and clause (ii) below),

9

(ii) non-recurring charges provided that the aggregate amount added back to EBITDA pursuant to this clause (ii) and clause (i) above during any twelve month period shall not exceed 20% of EBITDA (determined prior to the add backs set forth in this clause (ii) and clause (i) above), (iii) extraordinary charges provided that the aggregate amount added back to EBITDA pursuant to this clause (iii) during any twelve month period shall not exceed $2,000,000 and (iv) sponsor and management fees and expenses paid during the applicable period provided that the aggregate amount of sponsor and management fees added back during any twelve month period shall not exceed 4% of EBITDA (determined prior to any add back for costing savings, synergies and restructuring charges).

Each of the ratios referred to above will be calculated on a consolidated basis for each consecutive four (4) fiscal quarter period.

In any event, the following exceptions to the negative covenants will be included on terms to be mutually agreed:

(a)     acquisitions by the Borrower or a restricted subsidiary of all or substantially all the assets of, or all the equity interests in, a target or a division or line of business of a seller ("Permitted Acquisition"); provided: (i) no Event of Default is then continuing or would be caused thereby (other than in respect of any limited conditionality acquisition, in which case no payment or bankruptcy Event of Default will then be continuing provided that no Event of Default shall have been continuing at the time the applicable acquisition agreement was signed), (ii) the Consolidated Leverage Ratio will be no greater than 3.50 to 1.0 (or, if the then permitted Consolidated Leverage Ratio is less than 3.50 to 1.0, the Consolidated Leverage Ratio will be no greater than the permitted Consolidated Leverage Ratio), (iii) such target or such division or line of business will be in the same, similar or related line of business in which the Borrower and its restricted subsidiaries are engaged as of the Closing Date, (iv) any acquisition must be consensual, and (v) acquisitions of entities that do not become Guarantors (or of assets that do not become collateral securing the Senior Credit Facilities) will be subject to the applicable limitations on investments in non-Guarantor restricted subsidiaries to be mutually agreed; and

(b)     an 'available amount', with a starter basket to be agreed and otherwise based on percentages of excess cash flow to be agreed (which percentages shall be based on the Consolidated Leverage Ratio in a manner to be agreed) plus other customary add backs, for investments, restricted payments and junior debt prepayments (subject to compliance with a Consolidated Leverage Ratio to be determined and absence of Event of Default).

10

| | |
|---|---|
| **EQUITY CURE RIGHT:** | For purposes of determining compliance with the Financial Covenants, any equity contribution (in the form of common equity or other equity having terms reasonably acceptable to the Administrative Agent) made to the Borrower after the last day of any fiscal quarter and on or prior to the day that is ten (10) business days after the day on which financial statements are required to be delivered for that fiscal quarter will, at the request of the Borrower, be included in the calculation of consolidated adjusted EBITDA solely for the purposes of determining compliance with the Financial Covenants at the end of such fiscal quarter and any subsequent period that includes such fiscal quarter (any such equity contribution, a "<u>Cure Amount</u>"); provided, (a) the Borrower will be permitted to request that a Cure Amount be included in the calculation of consolidated adjusted EBITDA with respect to any fiscal quarter (i) no more than twice during any consecutive four fiscal quarter period, and (ii) no more than four times in the aggregate during the term of the Senior Credit Facilities; (b) each Cure Amount will be no greater than the amount required to cause the Borrower to be in compliance with the Financial Covenants; (c) all Cure Amounts and the use of proceeds thereof will be disregarded for all other purposes under the Loan Documents (including in calculating consolidated adjusted EBITDA for purposes of determining pricing, basket and threshold levels and other items governed by reference to consolidated adjusted EBITDA); and (d) any prepayment of the Senior Credit Facilities with the proceeds of any Cure Amount will be disregarded in determining the Financial Covenant for the applicable fiscal quarter.  The right of the Borrower in this paragraph is referred to herein as the "<u>Equity Cure Right</u>". |
| **EVENTS OF DEFAULT:** | Usual and customary in transactions of this type and limited to the following, with such exclusions, exceptions, qualifications, thresholds and baskets to be mutually agreed:  (a) non-payment; (b) default of specific covenants; (c) other defaults; (d) breach of representations and warranties; (e) cross-defaults to other indebtedness in an amount to be agreed; (f) bankruptcy and insolvency defaults (with grace period for involuntary proceedings); (g) inability to pay debts or attachment; (h) monetary judgment defaults in an amount to be agreed and material nonmonetary judgment defaults; (i) customary ERISA defaults; (j) invalidity of Loan Documents; and (k) change of control. |
| **ASSIGNMENTS AND PARTICIPATIONS:** | *Revolving Facility Assignments*:  Subject to the consents described below, each Lender will be permitted to make assignments to other financial institutions in respect of the Revolving Facility in a minimum amount equal to $2.5 million. |
| | *Term Loan Facility Assignments*:  Subject to the consents described below, each Lender will be permitted to make assignments to other financial institutions in respect of the Term Loan Facility in a minimum amount equal to $1 million. |
| | *Consents*:  The consent of the Borrower (such consent not to be unreasonably withheld or delayed) will be required unless (a) a payment |

or insolvency Event of Default has occurred and is continuing or (b) the assignment is to a Lender, an affiliate of a Lender or an Approved Fund (as such term shall be defined in the Loan Documents); <u>provided</u> the Borrower shall be deemed to have consented to such assignment unless it shall object thereto by written notice to the Administrative Agent within ten (10) business days after having received notice thereof. The consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) will be required for any assignment (i) in respect of the Revolving Facility or an unfunded commitment under the Term Loan Facility to an entity that is not a Lender with a commitment in respect of the applicable facility, an affiliate of such Lender or an Approved Fund in respect of such Lender or (ii) of any outstanding term loan to an entity that is not a Lender, an affiliate of a Lender or an Approved Fund. The consent of the L/C Issuer and the Swingline Lender will be required for any assignment under the Revolving Facility.

*Assignments Generally*:  An assignment fee in the amount of $3,500 will be charged with respect to each assignment unless waived by the Administrative Agent in its sole discretion. Each Lender will also have the right, without consent of the Borrower or the Administrative Agent, to assign as security, all or part of its rights under the Loan Documents to any Federal Reserve Bank.

*Participations*:  Lenders will be permitted to sell participations on standard terms and conditions.

*Disqualified Lenders*: Notwithstanding anything herein to the contrary, no assignment will be made to a Disqualified Lender without prior written consent of the Borrower (except that no such consent shall be required after the occurrence and during the continuance of a payment or bankruptcy event of default).

*Affiliated Lenders; Buybacks*:  The Loan Documentation shall provide that loans under the Term Loan Facility ("<u>Term Loans</u>") may be purchased by and assigned to the Sponsor or any Non-Debt Fund Affiliate through (a) Dutch auctions open to all Term Loan Lenders on a pro rata basis in accordance with customary procedures to be mutually agreed and/or (b) open market purchases on a non-pro rata basis; provided, that, (i) Term Loans owned or held by the Sponsor or any Non-Debt Fund Affiliate shall be excluded in the determination of any Required Lender votes and shall be deemed not to be outstanding for purposes of determining whether all Term Loan Lenders have taken action, (ii) Term Loans owned or held by the Sponsor or any Non-Debt Fund Affiliate shall not, in the aggregate for all such persons, exceed 20% of the Term Loan Facility then outstanding, and the number of Non-Debt Fund Affiliates (together with the Sponsor) that hold the Term Loans shall at no time exceed three such Lenders, (iii) proceeds of Revolving Facility may not be used to effect any such purchase or assignment of Term Loans, (iv) neither the Sponsor nor any Non-Debt Fund Affiliate shall be permitted to attend any "Lender-only" conference calls or meetings or receive any related "Lender-only" information or

receive advice of counsel to the Administrative Agent and the Lenders, (v) neither the Sponsor nor its Non-Debt Fund Affiliates, as applicable, shall be required to make any representation to the seller that it does not possess material non-public information with respect to the Borrower and its subsidiaries, (vi) the Sponsor and its Non-Debt Fund Affiliates, as applicable, shall agree that the Administrative Agent shall vote on behalf of the Sponsor or such Non-Debt Fund Affiliate in connection with a plan of reorganization under any insolvency proceeding, (vii) the Administrative Agent is notified of each such assignment, and (viii) no default or event of default has occurred or would result from such assignment.

In addition, the Loan Documentation shall provide that Term Loans may be purchased by and assigned to any Debt Fund Affiliate through (a) Dutch auctions open to all Term Loan Lenders on a pro rata basis in accordance with customary procedures to be mutually agreed and/or (b) open market purchases on a non-pro rata basis; provided, that, that for any "Required Lender" votes, any Debt Fund Affiliates cannot, in the aggregate, account for more than 49.9% of the amounts included in the determination of whether such consent or waiver has been obtained.

If any Loan Party is the subject of an insolvency proceeding, the Sponsor or any Non-Debt Fund Affiliates shall grant to the Administrative Agent a power of attorney, giving the Administrative Agent the right to vote the Sponsor's or any Non-Debt Fund Affiliate's claims in bankruptcy on all matters submitted to the Lenders for a vote, and such claims shall, in any event, be voted in the same proportion, for and against, as votes that were cast on each matter by Lenders that are not the Sponsor or any Non-Debt Fund Affiliates.

In addition, the Term Loans may be purchased by and assigned to the Borrower or any of its subsidiaries on a non-pro rata basis through (a) open market purchases subject to a cap of 10% of the Term Loan Facility then outstanding, or (b) Dutch auctions open to all applicable Lenders on a pro rata basis in accordance with customary procedures, in each case (except for clause (iv) below, which shall apply solely to clause (b)), so long as (i) no default or event of default is has occurred and is continuing, (ii) any such Term Loans are permanently cancelled immediately upon acquisition thereof, (iii) no proceeds of the Revolving Facility are used to fund such purchases, (iv) such purchases are open to all applicable Term Loan Lenders on a pro rata basis, such auction shall be subject to customary provisions regarding the treatment of material non-public information with respect to the business of the Borrower and its subsidiaries provided that the Borrower shall not be required to make any representation to the seller that it does not possess material non-public information with respect to the Borrower and its subsidiaries and (v) if the Sponsor or any Non-Debt Fund Affiliate has purchased any Term Loans at the time of an open market purchase or a Dutch auction by the Borrower, the Sponsor and/or such Non-Debt Fund Affiliates shall participate in all open market purchases and/or Dutch auction purchases by the Borrower to the extent necessary to ensure that the Term Loans

13

owned or held by the Sponsor or any Non-Debt Fund Affiliate do not, in the aggregate for all such persons, exceed 20% of the Term Loan Facility then outstanding.

"<u>Non-Debt Fund Affiliate</u>" means any affiliate of the Sponsor, other than (a) the Borrower or any subsidiary of the Borrower, (b) any Debt Fund Affiliate and (c) any natural person.

"<u>Debt Fund Affiliate</u>" means any affiliate of the Sponsor (other than any natural person) that is primarily engaged in, or advises funds or other investment vehicles that are engaged in, making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course and with respect to which the Sponsor and its affiliates (other than Debt Fund Affiliates) does not, directly or indirectly, possess the power to direct or cause the direction of the investment policies of such entity.

**WAIVERS AND AMENDMENTS:**
Amendments and waivers of the provisions of the Loan Documents will require the approval of Lenders holding loans and commitments representing more than 50% of the aggregate amount of the loans and commitments under the Senior Credit Facilities (the "<u>Required Lenders</u>"), except that (a) the consent of each Lender shall be required with respect to (i) the amendment of certain of the pro rata sharing provisions, (ii) the amendment of the voting percentages of the Lenders, (iii) the release of all or substantially all of the collateral securing the Senior Credit Facilities and (iv) the release of all or substantially all of the value of the guaranties of the Borrower's obligations made by the Guarantors, and (b) the consent of each Lender affected thereby shall be required with respect to (i) increases or extensions in the commitment of such Lender, (ii) reductions of principal, interest or fees, and (iii) postponing any date fixed for payment of principal, interest, fees or other amounts due under the Loan Documents (other than mandatory prepayments).

**INDEMNIFICATION:**
The Borrower will indemnify and hold harmless the Administrative Agent, the Lead Arranger, each Lender, the L/C Issuer, the Swingline Lender and their respective affiliates and their partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives (each such person, an "<u>Indemnitee</u>") from and against all losses, claims, damages, liabilities and expenses arising out of or relating to the Senior Credit Facilities, the Loan Documents, the Borrower's use of loan proceeds or the commitments, including, but not limited to, reasonable attorneys' fees (including the allocated cost of internal counsel) and settlement costs; <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| **GOVERNING LAW:** | State of New York. |
| **PRICING/FEES/**<br>**EXPENSES:** | As set forth in Addendum I. |
| **OTHER:** | Each of the parties shall (a) waive its right to a trial by jury and (b) submit to New York jurisdiction.  The Loan Documents will contain customary increased cost, withholding tax, capital adequacy, yield protection provisions and EU bail-in provisions and shall reflect operational, agency, assignment and related provisions that are customarily included in credit agreements with respect to which Bank of America acts as administrative agent, swingline lender and/or letter of credit issuer. |

CHAR1\1474788v8

# ADDENDUM I
## PRICING, FEES AND EXPENSES

**INTEREST RATES:**   The interest rates per annum applicable to the Senior Credit Facilities (other than in respect of and Swingline Loans) will be LIBOR *plus* the Applicable Margin (as hereinafter defined) or, at the option of the Borrower, the Base Rate (to be defined as the highest of (a) the Federal Funds Rate plus 0.50%, (b) the Bank of America prime rate and (c) the one (1) month LIBOR adjusted daily plus 1.00%) *plus* the Applicable Margin. "Applicable Margin" means with respect to the Term Loan Facility and the Revolving Facility, (i) for the first full fiscal quarter following the Closing Date, 3.00% per annum, in the case of LIBOR loans, and 2.00% per annum, in the case of Base Rate loans, and (ii) thereafter, a percentage per annum to be determined in accordance with a pricing grid to be agreed, based on the Leverage Ratio. Each Swingline Loan shall bear interest at the Base Rate plus the Applicable Margin for Base Rate loans under the Revolving Facility. If LIBOR or the Base Rate shall be less than zero, such rate shall be deemed zero for purposes of the Senior Credit Facilities.

The Borrower may select interest periods of one (1), two (2), three (3), six (6) or twelve (12) months for LIBOR loans, in each case subject to availability. Interest shall be payable at the end of the selected interest period, but no less frequently than quarterly.

Automatically upon the occurrence and during the continuance of any payment event of default of the Borrower or any Loan Party, the amount of such past due payment under the Senior Credit Facilities shall bear interest at a rate per annum of two percent (2%) in excess of the rate then applicable to such obligation.

**COMMITMENT FEE:**   Commencing on the Closing Date, a commitment fee of (a) for the first full fiscal quarter following the Closing Date, 0.375% per annum, and (b) thereafter, a percentage per annum determined in accordance with a pricing grid to be agreed shall be payable on the actual daily unused portions of the Revolving Facility. Such fee shall be payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Closing Date. Swingline Loans will not be considered utilization of the Revolving Facility for purposes of this calculation.

**LETTER OF CREDIT FEES:**   Letter of Credit fees shall be payable on the maximum amount available to be drawn under each Letter of Credit at a rate per annum equal to the Applicable Margin from time to time applicable to LIBOR loans under the Revolving Facility. Such fees will be (a) payable quarterly in arrears, commencing on the first quarterly payment date to occur after the Closing Date, and (b) shared proportionately by the Lenders under the Revolving Facility. In addition, a fronting fee shall be payable to the L/C Issuer for its own account, in an amount to be mutually agreed.

| | |
|---|---|
| **CALCULATION OF INTEREST AND FEES:** | Computations of interest for Base Rate Loans shall be made on the basis of a year of 365/366 days.  All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed. |
| **COST AND YIELD PROTECTION:** | Customary for transactions and facilities of this type, including, without limitation, in respect of breakage or redeployment costs incurred in connection with prepayments, changes in capital adequacy and capital or liquidity requirements or their interpretation (including implementation of the Dodd-Frank Wall Street Reform and Consumer Protection Act and Basel III), illegality, unavailability, reserves without proration or offset and payments free and clear of withholding or other taxes. |
| **EXPENSES:** | If the Closing Date occurs, the Borrower will pay all reasonable costs and expenses of the Administrative Agent and the Lead Arranger associated with the preparation, due diligence, administration, syndication and closing of all Loan Documents, including, without limitation, the legal fees of counsel to the Administrative Agent and the Lead Arranger.  The Borrower will also pay the expenses of the Administrative Agent and each Lender in connection with the enforcement of any of the Loan Documents. |

2

EXHIBIT B

SOLVENCY CERTIFICATE

To the Administrative Agent and each of the Lenders party to the Credit Agreement referred to below:

I, the undersigned chief financial officer of [_____], a [_____] (the "Borrower"), in that capacity only and not in my individual capacity (and without personal liability), do hereby certify as of the date hereof, and based upon facts and circumstances as they exist as of the date hereof (and disclaiming any responsibility for changes in such facts and circumstances after the date hereof), that:

1.        This certificate is furnished to the Administrative Agent and the Lenders pursuant to Section __ of the [Credit Agreement], dated as of _____, among _____ (the "Credit Agreement").  Unless otherwise defined herein, capitalized terms used in this certificate shall have the meanings set forth in the Credit Agreement.

2.        For purposes of this certificate, the terms below shall have the following definitions:

(a)        "Fair Value"

The amount at which the assets (both tangible and intangible), in their entirety, of the Borrower and its Subsidiaries taken as a whole would change hands between a willing buyer and a willing seller, within a commercially reasonable period of time, each having reasonable knowledge of the relevant facts, with neither being under any compulsion to act.

(b)        "Present Fair Salable Value"

The amount that could be obtained by an independent willing seller from an independent willing buyer if the assets of the Borrower and its Subsidiaries taken as a whole are sold with reasonable promptness in an arm's-length transaction under present conditions for the sale of comparable business enterprises insofar as such conditions can be reasonably evaluated.

(c)        "Liabilities"

The recorded liabilities (including contingent liabilities that would be recorded in accordance with GAAP) of the Borrower and its Subsidiaries taken as a whole, as of the date hereof after giving effect to the consummation of the Transactions, determined in accordance with GAAP consistently applied.

(d)        "Will be able to pay their Liabilities as they mature"

For the period from the date hereof through the Maturity Date, the Borrower and its Subsidiaries taken as a whole will have sufficient assets and cash flow to pay their Liabilities as those liabilities mature or (in the case of contingent Liabilities) otherwise become payable, in light of business conducted or anticipated to be conducted by the Loan Parties as reflected in the projected financial statements and in light of the anticipated credit capacity.

(e)        "Do not have Unreasonably Small Capital"

The Borrower and its Subsidiaries taken as a whole after consummation of the Transactions do not have unreasonably small capital to conduct its business.  I understand that "unreasonably small capital" depends upon the nature of the particular business or businesses conducted or to be conducted, and I have reached my conclusion based on the needs and anticipated needs for capital of the business conducted or anticipated to be conducted by the Loan Parties as reflected in the projected financial statements and in light of the anticipated credit capacity.

3.       For purposes of this certificate, I, or officers of the Borrower under my direction and supervision, have performed the following procedures as of and for the periods set forth below.

(a)       I have reviewed the financial statements (including the pro forma financial statements) referred to in Section ___ of the Credit Agreement.

(b)       I have knowledge of and have reviewed to my satisfaction the Credit Agreement.

(c)       As chief financial officer of the Borrower, I am familiar with the financial condition of the Borrower and its Subsidiaries.

4.       Based on and subject to the foregoing, after giving effect to the consummation of the Transactions, (i) the Fair Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities, (ii) the Present Fair Salable Value of the assets of the Borrower and its Subsidiaries taken as a whole exceeds their Liabilities; (iii) the Borrower and its Subsidiaries taken as a whole do not have Unreasonably Small Capital; and (iv) the Borrower and its Subsidiaries taken as a whole will be able to pay their Liabilities as they mature.

* * *

2

IN WITNESS WHEREOF, the Borrower has caused this certificate to be executed on its behalf by chief financial officer as of the date first written above.

[_____],
a [_____]


By:   _____
      Name:
      Title:

| From: | Chinh Chu <chu@cc.capital> |
|---|---|
| Sent: | Tuesday, July 19, 2016 3:40 PM |
| To: | Mfeuer@beechwood.com |
| Cc: | Doug Newton; Richard DiBlasi; Roger Aguinaldo; Andrew Barnett |
| Subject: | Follow Up |

Mark,

It was nice talking to you on the phone today.  We look forward to working with you and the Special Committee on this project.

I thought that it would be useful to summarize the three points that we discussed on the call:

1.     We understand and agree with the point that you made regarding the Board's fiduciary responsibility.  Regarding this point, we would be amenable to a 4 week "Go-Shop" period post the execution of the Purchase Agreement (terms of such Go-Shop to be contained in the signed transaction) -- enables the company to entertain other potential offers for Constellation.  As you may appreciate, we would not be amenable to the company initiating a market check prior to us executing a transaction – if the Company pursues a market check, we will stop our work and withdraw our offer at that time.  The rationale is that a Go Shop enables the Board to exercise its fiduciary duty and a market check will be very disruptive to the Company as the company barely has the bandwidth to handle our diligence.

2.     Deals are based on momentum and we do not want to put the deal at risk with lengthy delays.  We are incurring millions of dollars of expense as part of our due diligence process and welcome expeditious progress in reaching a conclusion to our process.

3.     We look forward to having conversation or meeting with Duff & Phelps at their earliest convenience.

As you know, our offer price is the result of several sets of negotiations with Paul (representing the shareholders) where we had to raise our offer a couple of times.  We feel that our offer maximizes value to CHT shareholders as it represents over a 50 per premium to today's current market price.  We look forward to working with you and DUFF & Phelps toward a successful consummation of the transaction.

Our contact information is as follows:

Chinh Chu
212-355-5511 work
917-566-9403 cell
CC Capital
555 Madison Avenue, 26th floor
NY, NY

We look forward to working with you and Duff & Phelps toward a successful transaction.

Sincerely,
Chinh Chu

-----Original Message-----
From: Chinh Chu <chu@cc.capital>
Sent: Tuesday, August 23, 2016 6:16 PM
To: Paul Parmar <paul@constellationhealthgroup.com>; Doug Newton <newton@cc.capital>
Cc: Richard DiBlasi <DiBlasi@cc.capital>
Subject: Terms of a modified Market Check

- CC Capital extends its offer for 3 weeks
- CC Capital causes Bank of America/Merrill Lynch to extend its financing commitment for 3 weeks
- CC Capital releases Bank of America/Merrill Lynch to work with other potential bidders on the
financing -- this is important because the new potential bidders will have access to financing, the most
difficult part of the transaction

In return, CHT and the Special Committee agrees to:
1.  pay a "Commitment Fee" of $12 million for the extended commitment to CC Captial 2. pay the fees
and expenses of CC Capital and BoA incurred up to this point
- CC Capital is not asking for a last look or information rights

At the end of the 3 weeks period, if CHT does not enter into a transaction with another firm, CHT will in
good faith negotiate the contract to sign up a deal w CC Capital at 2.11 NOT 2.28

**From:** Chinh Chu <chu@cc.capital>
**Sent:** Thursday, August 25, 2016 12:24 PM
**To:** Paul Parmar <paul@constellationhealthgroup.com>
**Subject:** Fw: CHT - Follow Up

Paul,

Per our conversation.

Chinh

Sent from my BlackBerry 10 smartphone.

**From:** Chinh Chu <chu@cc.capital>
**Sent:** Thursday, August 25, 2016 12:20 PM
**To:** Mark Feuer
**Subject:** CHT - Follow Up

Mark,

Thank you for the formal feedback from the Special Committee yesterday. After reflecting on your response that our revised offer was inadequate, we respectfully submit that this is the best option for CHT shareholders as the 2.26 price represents a 50+ per cent premium over the current stock price and that the most likely next step for CHT would be to issue stock to fund its growth at prices below the current market price. We reaffirm that the 2.26 was our Best and Final price and we are not in a position to increase our offer any further.

However, I wanted to address the modified market check idea that was discussed on our call yesterday. We would like to propose the following:

CC Capital would provide:
1. CC Capital would extend of our offer for a period of 4 weeks
2. CC Capital would cause BoA/Merrill to extend its financing commitment relating to our offer for 4 weeks
3. CC Capital would release BoA/Merrill and the other banks with whom we have engaged to finance other potential bidders for CHT -- this is an important point as financing is one of the biggest impediments of the deal and this also expedites the timing of a transaction
4. CC Capital would execute a NDA and standstill agreement

In return, CHT would pay CC Capital (at the time of the Extension of the CC Capital offer):
A) Expenses to date incurred by CC Capital and BoA/Merrill (approximately $5 million)
B) Commitment Fee of $12 million (for extending the Offer and leaving it outstanding for 4 weeks)

Please note that we are neither asking for information rights nor matching rights (nor last looks).

This path would provide the Special Committee the opportunity to engage in a market check but compensates CC Capital for the extention of our offer and our willingness to help expedite the financing. We continue to maintain our consistent position that we would not agree to a regular way market check and in such case, our offer would not be outstanding (during and certainly after such

market check) and we would not agree to the terms indicated herein (including the financing point). We think that this proposal represents a huge concession on our part and enables the Special Committee to fulfil it's fiduciary duties and for your advisors to confirm the valuation of CHT.

Thank you for your consideration. We are available to answer any questions and we respectfully ask that you revert to us by the end of the day tomorrow.

Sincerely,
Chinh Chu


Sent from my BlackBerry 10 smartphone.

**From:** Arons, Andrew <andrew.arons@kirkland.com>
**Sent:** Tuesday, September 6, 2016 2:27 PM
**To:** Sam Zaharis <Sam.Zaharis@constellationhealthgroup.com>; Mark Feuer <mfeuer@beechwood.com>
**Cc:** Paul Parmar <paul@constellationhealthgroup.com>
**Subject:** RE: Modified Market Check

Sam,

Yes, I understand that the committee rejected the proposal.

Best,
Andrew

**Andrew Arons**

**KIRKLAND & ELLIS LLP**
601 Lexington Avenue, New York, NY 10022
**T** +1 212 446-4695
**F** +1 212 446 4900

andrew.arons@kirkland.com

**From:** Sam Zaharis [mailto:Sam.Zaharis@constellationhealthgroup.com]
**Sent:** Tuesday, September 06, 2016 10:44 AM
**To:** Mark Feuer; Arons, Andrew
**Cc:** Paul Parmar
**Subject:** Modified Market Check

Good morning Mark and Andrew.

CC Capital are waiting for an official reply from the Special Committee that the CC Capital modified market check request has been rejected. They are looking to formally close the process of the bid but need an answer on the modified market check first.

Regards,

SAM ZAHARIS

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

**FLEXPOINT FORD**

AVENUE
SUITE 3300
CHICAGO, IL 60611
T 312.327.4520
F 312.327.4525
WWW.FLEXPOINTFORD.COM

December 24, 2016

**VIA EMAIL**

James Cassel, Chairman
Philip Cassel, Vice President
Cassel Salpeter
801 Brickell Avenue, Suite 1900
Miami, Florida 33131

Dear James and Phil:

Thank you for providing Flexpoint Ford, LLC ("Flexpoint") the opportunity to submit a Letter of Intent to acquire Constellation Healthcare Technologies, Inc. ("CHT" or the "Company"). We have enjoyed getting to know Paul Parmar over the last week and have been very impressed with CHT's position in the healthcare revenue cycle management ("RCM") industry. Flexpoint has extensively researched the RCM industry and is aggressively pursuing investments within the sector. Accordingly, we would like to explore a potential transaction with the Company and believe that Flexpoint offers a compelling partnership opportunity to help CHT realize its value and growth potential.

1.    Introduction

By way of background, Flexpoint is an industry focused private equity firm dedicated to the healthcare and financial services sectors. We currently manage over $2 billion of committed equity capital including Flexpoint Fund III, L.P. which was raised in 2015 with $950 million of capital. Our team at Flexpoint has helped build several highly regarded companies across a number of healthcare and financial services sectors. We have invested in healthcare payor and provider businesses which gives us a deep understanding of the healthcare revenue cycle and the increase in patient liability and payor reimbursement complexity. Furthermore, we believe we could leverage our relationships with providers such as hospital systems and physician groups to help grow the Company.

We also have deep experience working with financial services companies similar to CHT. Our current financial services portfolio consists of over 10 companies, including Jefferson Capital, a provider of recovery services for charged-off consumer accounts; and Service Finance Company, a service provider that originates, underwrites, and services financing for home improvement and solar projects. Furthermore, our experience with the regulatory landscape for revenue cycle management and patient advocacy businesses will allow us to be a value added partner in growing the Company.

Our expertise in the RCM industry is augmented by our relationship with Mike Labedz, a senior advisor to Flexpoint. Mike is the former CEO of HealthPort Technologies ("HealthPort"), a leading clinical data company providing medical information access management and compliance services to hospitals and physician groups. Before selling HealthPort to New Mountain Capital, Mike grew the business through organic growth and acquisitions into the largest provider in the U.S. of release of information (ROI) services and audit management tracking technology. Mike maintains a strong network of relationships with hospitals, health systems, physician practices, and other providers having partnered with thousands of such groups while serving as HealthPort's CEO. Mike's former sales team could also be made available to CHT, which we believe would immediately increase CHT's growth rate and value proposition.

- 1 -

CHT
December 24, 2016

2.    <u>Purchase Price and Transaction Structure</u>

Flexpoint proposes to acquire a majority interest in CHT based on a total enterprise valuation of approximately $365 million, assuming a sustainable level of working capital and a balance sheet free of debt and debt-like items, which we understand from you to be $28.4 million, and excess cash, which we understand from you to be $6.4 million. Our proposal assumes that in arriving to equity value the Company would deduct existing net debt (and debt-like items) and potential obligations owed in a transaction (the "Obligations") from the total enterprise valuation. The Obligations would exclude Flexpoint's transaction expenses, but would include items such as breakup fees and expenses, financing fees and expenses, and the Company's transaction fees and expenses. We anticipate funding the acquisition with a combination of cash equity provided by funds affiliated with Flexpoint, partial roll over of proceeds by Paul Parmar, promissory notes to be issued to the existing shareholders, and third-party debt as discussed below. Our proposal assumes cash of $3.075 (USD) per share and promissory notes of $0.451 (USD) per share to the selling shareholders and is based on Paul Parmar rolling proceeds equal to 45-49% of the pro forma equity capitalization.

Our offer is based on a review of the materials you have provided, including historical and projected revenues and Adjusted EBITDA. We have assumed that your guidance regarding these projections is both realistic and achievable, and will be confirmed upon further due diligence.

3.    <u>Lenders and Financing</u>

We have strong relationships with many leading institutional lenders, including current lending partners of both Flexpoint and our portfolio companies. These lending relationships include Bank of America and Jefferies. We view these lenders as stable, long-term financial partners who would have an aligned interest in CHT's success and who should allow us to raise a desirable level of debt capital expeditiously and on favorable terms. While our current offer assumes that a portion of the consideration to the selling shareholders would be in the form of promissory notes, we would be willing to exchange a portion of the promissory notes with additional cash to the selling shareholders to the extent that we are able to raise additional third-party debt at closing beyond $130 million. We believe this increased financing capacity would be achievable due to the leveraged finance community's understanding of and support for Mike Labedz's track record in helping grow similar businesses.

4.    <u>Business and Growth Plan</u>

We are committed to CHT's growth strategy and are prepared to invest in the business, both organically as well as via acquisitions. Post-closing, we would work with management to identify, source, and close add-on acquisitions that would augment the Company's existing business. To support these acquisitions, we would commit significant additional equity to the Company to build out the business as the leading platform in the healthcare RCM industry. We believe this capital commitment will accelerate the Company's growth rate and provide additional opportunities for the Company's management team.

5.    <u>Non-Binding; Remaining Due Diligence; Confidentiality</u>

This offer is not intended to be binding on any party; it is subject to customary due diligence and the negotiation of a definitive agreement. Key remaining items to be completed in the diligence process include, but are not limited to, financial and accounting diligence, services and customer review,

CHT
December 24, 2016

regulatory review, information technology systems review, legal review, management background checks, and insurance review. Our due diligence advisors include Morrison & Foerster (legal), PricewaterhouseCoopers (accounting and tax), Benesch (regulatory), Lockton (insurance), Axium (background checks), and Performance Improvement Partners (technology infrastructure). Flexpoint is a partnership with a straightforward and simple approval process. We have discussed this opportunity at length with our partners and can move quickly to conclude this proposed transaction. As an independent private equity fund, Flexpoint is not subject to any shareholder or investor approvals.

Please note that our letter is confidential and is not for public disclosure. Although you may share it with the special committee of the Board of CHT, it should not be disclosed to any other person, including other prospective purchasers of, or investors in, the Company without our prior written consent. The Company may disclose this proposal to its legal and financial advisors who have a need to know such information in connection with their evaluation of a proposal from us, provided that such advisors are subject to confidentiality restrictions.

We are optimistic about the continued growth prospects for CHT and believe that Flexpoint would be an excellent partner for Paul Parmar and the Company. We have enjoyed our meeting and ongoing discussions with Paul and the CHT management team, and we appreciate the high level of responsiveness from the CHT and Cassel Salpeter teams. Please feel free to contact us if you have any questions regarding our offer. We look forward to working with you and to taking the next steps in completing a transaction.

Sincerely,

| Steve Begleiter | Jonathan Oka | Dan Grigorescu | Thomas Shi |
| Managing Director | Managing Director | Vice President | Vice President |
| (646) 217-7572 | (312) 327-4547 | (312) 327-4546 | (646) 217-7567 |

December 26, 2016

**CONFIDENTIAL**

Constellation Healthcare Technologies, Inc.
3200 Wilcrest Drive, Suite 600
Houston, TX 77042
Attn: Special Committee & Board of Directors

Members of the Special Committee & Board:

CC Capital writes this letter as a matter of course to outline our position regarding recent developments about which we recently became aware. We view our interactions as collaborative in executing the agreed upon transaction.

The discussion herein relates to that certain Agreement and Plan of Merger, dated as of November 24, 2016 (the "Merger Agreement"), entered into by and among Constellation Healthcare Technologies, Inc., CHT Holdco, LLC, CHT MergerSub, Inc. and the other parties named therein. All terms used but not otherwise defined herein shall have the meaning ascribed to such term in the Merger Agreement. All section references are to sections of the Merger Agreement.

We understand that the Company has received an Acquisition Proposal. Specifically, yesterday morning, counsel to the Special Committee informed us that:

> "The terms of the proposal are the price per share of $3.075 in cash and $0.451 in promissory notes, Paul Parmar having 45%-49% of the equity of the buyer, and the source of the purchase price being a combination of equity and debt."

Pursuant to Section 6.3(d), please provide a full summary of the terms of such Acquisition Proposal. In addition, please confirm for us the time and date of your receipt of such Acquisition Proposal.

We were advised that the party submitting the Acquisition Proposal (the "Competing Buyer") does not have "committed" financing, which we note is an enumerated requirement for any Acquisition Proposal to be deemed a Superior Proposal. Consequently, no Superior Proposal Determination could have been made during and prior to the expiration of the Go-Shop Period.

In light of the foregoing, we note the following:

- Pursuant to Section 6.6, the Company remains obligated to distribute the Proxy Statement on December 28, 2016, the date mutually agreed upon by the parties, and hold the general meeting on January 18, 2016 with respect to the Merger.
- Pursuant to Section 6.3(a), the Company shall, and shall direct its Representatives to, (i) immediately cease any discussions or negotiations with any Persons, including the Competing Buyer, that may be ongoing with respect to any Acquisition Proposal, and

(ii) promptly request each such Person to return all confidential information heretofore furnished to such Persons.

- Pursuant to Section 6.3(f), the Company and the Board, including the Special Committee, shall reaffirm its approval and recommendation of the Merger Agreement and the Merger within five (5) Business Days hereof.
- Pursuant to Section 8.1(b)(ii), if the Board or Independent Committee effects a Change in Recommendation as a result of a Superior Proposal Determination at any time or publicly announces its intention to do so, we shall have the right to terminate the Merger Agreement and demand payment concurrently with respect to such termination, pursuant to Section 8.2(g)(ii) due to a Superior Proposal Determination "made after the Go-Shop Period", of the Tier 3 Termination Fee ($16,100,000) plus the Company Expense Reimbursement ($4,000,000).

We further note that the Company and Special Committee have several obligations under Section 6.3(f) as to the process regarding the Acquisition Proposal, including any potential Parent Proposal and the Notice Period requirement with respect thereto.

We reserve all rights and remedies that may exist or otherwise arise under the Merger Agreement, and nothing stated herein shall constitute an amendment, modification or waiver of any terms and conditions of the Merger Agreement. Pursuant to Section 9.19, CC Capital shall exercise all rights and remedies of Parent and Sub with respect to any of the foregoing matters.

We want to thank the Special Committee for their diligent efforts to date. We remain committed to our transaction and continue to embrace a cooperative spirit with the Special Committee. We remain open and available to answer any questions the Special Committee might have.

CC CAPITAL MANAGEMENT, LLC


By: Douglas Newton
Title: Partner


cc:    Constellation Healthcare Technologies, Inc.
       McGuire Woods LLP
       Robinson Brog Leinwand Greene Genovese & Gluck P.C.

3/11/2018
Case 2:18-cv-08893-MCA-LDW Document 21-3 Filed 08/25/19 Page 366 of 536 PageID: 4559
Case 2:18-cv-03284-MCA-MAH Document 12-22 Filed 06/15/18 Page 1 of 11 PageID: 403

 

# FINANCIAL TIMES



## ALPHAVILLE

**HOME**   MARKETS LIVE   LONG ROOM

**Markets**   **Companies**

## The curious case of Constellation Health and Blackstone's former top deal maker

      22

JANUARY 26, 2017 2:18 PM

By: **Alexandra Scaggs**

Who knew that a spelling mistake (http://www.investegate.co.uk/constellation-health--cht/rns/acquisition/201609230700076191K/) would lead us down a path to accusations of self-dealing, a Sidney Lumet film, and a mental hospital?

This is a rather convoluted story that begins back at the end of September, when **Constellation Healthcare Technologies, Inc**, an American supplier of medical billing systems quoted on the AIM market in London, announced the acquisition of something called VEGA Medial Professionals LLC.

Medial Professionals?? Medical Professionals, surely. Except however you spelt it, VEGA Medical/Medial Professionals LLC didn't seem to have a digital history, which seemed odd. Even if this was a relatively small deal, pre-acquisition Google gave us no results at all.

So enquiries were made. Corporate financiers were phoned, PRs were pestered. And yes, "Sorry!", there had indeed been a spelling mistake.

At which point another question arose. The relevant LLC entity, VEGA Medical Professionals, had only been registered in Delaware on February 2 — just seven months before the Constellation takeover news.

This jarred slightly with statements from Constellation, namely... (http://www.investegate.co.uk/constellation-health--cht/rns/acquisition/201609230700076191K/)



> In the year to 31 July 2016 VEGA generated revenues of $15.6 million with underlying EBITDA of $0.8 million and had net assets of $2.9 million as at that date. The directors anticipate that the synergies between the two businesses will result in at least $7.0 million of additional EBITDA on a proforma basis being achieved in the first 24 months of ownership.

It seemed a bit odd to use the phrase "year to" if the entity hadn't actually existed for a full 12 months. And this VEGA deal also seemed to have striking similarities with one or two other acquisitions undertaken by Constellation since it had listed in London in December 2014.

Seven months earlier, for instance, Constellation had acquired MDRX Medical Billing LLC for $28m (http://www.investegate.co.uk/constellation-health--cht-/rns/acquisition-of-mdrx-medical-billing-llc/201602100700075847O/) (with an option for $2m more). The business was also registered in Delaware, America's favourite corporate haven, just two months before news of its takeover.

What was going on? Well, the company's strategy has been to acquire companies that provide billing, scheduling, technology and other back-office services for physicians. It's a fragmented industry, seemingly ripe for consolidation.

Constellation was buying up lots of small medical billing businesses, injecting them into freshly-minted Delaware holding companies and then injecting these into the publicly-listed parent.

There were questions to be answered here around transparency and prices paid. For instance: who owned the Delaware entities immediately before Constellation took them over? And how much had the Delaware entities paid for the underlying operating businesses?

Getting clear answers from Constellation's chief executive and major shareholder Paul Parmar was proving difficult, if only because he needed to retain much of the requested detail confidential on behalf of various "mom & pop" vendors.

But then the matter suddenly became academic to anyone concerned that publicly-quoted businesses are being properly run: on November 25 Constellation announced it was going private (http://www.investegate.co.uk/constellation-health--cht-/rns/recommended-acquisition/201611250700061554Q/).

The thinking was, the consolidation of all these little medical billing firms would be better handled away from the public markets. A private-equity firm called CC Capital

Management, with the help of a credit facility from Bank of America Merrill Lynch, would supply the necessary finance. Shareholders in London were offered a way out with $2.93 per share in cash and a stub-like promissory note.

The take private deal was due to complete today — Thursday, Jan 26. Except it didn't.

A short statement simply said (http://www.investegate.co.uk/constellation-health--cht-/rns/suspension-of-trading/20170126080123180 7V/) certain conditions had not been met in time.

—————

**But court documents from last month might provide some insight here.**

At the end of December, a shareholder filed a lawsuit against Constellation Health and Mr Parmar (http://courthousenews.com/wp-content/uploads/2016/12/constellation.pdf), claiming the company was formed as "a sham, created to siphon assets… into the pocket of Parmar," according to a court filing.

Destra Targeted Income Unit Investment Trust, on behalf of the holders of Constellation units, have accused Parmar of self-dealing:



> Paul Parmar, however, has diverted these CHT Shares, and other interests representing the CHT Shares, to himself, through a series of at least three sham corporate transactions by and among a labyrinth of Delaware limited liability companies that he forms and/or controls.

Destra claims that Parmar acquired a private healthcare company (which eventually became Constellation) in 2012 as part of a joint business venture with Southport Lane Management, a PE firm run by financiers, Alexander Chatfield Burns, Joel Plasco, Andrew Scherr and others.

But in 2014, Destra says in its court complaint, Southport founder "Burns checked himself into a mental health ward, leaving behind an affidavit detailing 'unusual transactions.'" Then things went south at Southport — at which point, Destra claims, "Parmar and what was left of Southport… conspired to place their interests in CHT beyond the reach of" creditors.

The complaint is complex and laid out in excruciating detail. But this diagram might help, and you can peruse the filing for more detail (http://courthousenews.com/wp-content/uploads/2016/12/constellation.pdf), if you'd like:



The company has declined to comment on the complaint, simply saying that a fresh statement will be made in due course. The fate of the plan to move private is unknown.

But while we wait for more clarity, let's look at more detail of what we do know about Mr Parmar...

————



Ownership of Constellation has been a puzzle for some time.

For instance, in the annual report for the year ended Dec. 31, 2015 (http://www.constellationhealthgroup.com/investor/news-docs/Posting%20Of%20Annual%20Report%20and%20Accounts%203%20June%202016.pdf) (page 15 if you're following along at home), Mr Parmar is listed as owning 58 per cent of the company's shares. Except the accompanying notes say that he doesn't actually own them, but manages the stock on behalf of unnamed beneficiaries instead. And those beneficiaries do not include Mr Parmar or his family.

When investing in this kind of acquisitive company with a perplexing ownership structure, it's doubly important to vet management carefully, says Aswath Damodoran, a corporate finance professor at NYU Stern.

"The problem is, they're so opaque," he said. "Whenever you're buying into a company like this, you're buying into the credibility of the management."

Mr Parmar himself, it must be said, is quite a colourful character, who also goes by the name Parmjit Singh Parmar.

He was a highly publicised (http://www.wsj.com/articles/SB10001424052970203388804576617173383075208) big spender after the financial crisis and later suffered a very public foreclosure on his 32 acre New Jersey compound.

He also ran Funky Buddha Productions, which has a production credit on "Before the Devil Knows You're Dead (http://www.imdb.com/title/tt0292963/combined)," a Sidney Lumet film starring Philip Seymour Hoffman and Marisa Tomei.

(A co-producer on that film, David Bergstein, was arrested on fraud allegations (http://www.hollywoodreporter.com/news/producer-david-bergstein-arrested-26m-fraud-946071) in November last year. Bergstein, who has pleaded innocent (https://www.sec.gov/litigation/complaints/2016/comp-pr2016-235.pdf) in the fraud case, once accused Mr Parmar of recording their phone conversations (http://www.hollywoodreporter.com/thr-esq/new-david-bergstein-lawsuit-references-522424) and threatening to release them unless Mr Parmar was paid $5m, according to court documents. Mr Parmar contested the allegation and claimed Bergstein knew he was being recorded. In any event, the two men later reached a settlement agreement, the details of which have not been publicised.)

A strange WordPress site about him (https://parmarpaul2.wordpress.com/) says the following:



Paul Parmar is a professional and Institutional Investor from New York who has far-reaching experience of more than 20+ years in investing and managing Healthcare

Services companies. He is a self-made multi-millionaire in the United States. He is the man who is gifted with exceptional mental abilities and inventive skills.

Paul Parmar holds over 13 years of experience at managerial, executive and planning levels in 500 fortune companies. He is also an active investor in Insignia Investment Management Group, Insignia Wealth Management Group, Funky Buddha Media, Illusions, Inc., JetNetwork and JetFirst, Air Support, LLC and TADS, and International Imaging Network. He is a Director of Beyond Luxury Watch Boutique Pvt. Ltd., Physicians Practice Management, and MDTablet, LLC.

When asked for comment about the site, Mr Parmar said through his attorney that he does not control the site, and is "actively investigating ways to have the web site which contains false and misleading information deactivated."

But two companies on that list stick out nonetheless.

Mr Parmar's involvement in Jet Network and Jet First eventually led to a civil-court judgement totalling$93m in Florida against him and four other entities, as the result of a lawsuit from one of his business partners in the concern. The judgement is currently being challenged, and a hearing is scheduled for February 21.

Jet Network's bankruptcy trustee also said the company "made certain payments via wire transfer... upon the express orders of Parmar" that weren't repaid, according to court documents.

Parmar's attorneys didn't respond to a question about the trustee's finding, but said this in response to our question about the $93m judgement:



> Mr. Parmar is extremely confident that the judgment will be vacated and that the will be [sic] litigation dismissed.

**Meanwhile, it seems the foreclosure saga for Mr Parmar's $23m compound isn't over, either.**

Deutsche Bank assigned the mortgage to an entity called Aquila Alpha LLC in March of 2016, according to a foreclosure complaint filed on 4 Nov 2016.

Aquila filed the complaint against Parmar, seeking the full amount of the principal and interest accrued on that mortgage, according to documents obtained from the Chancery Division of the Superior Court of New Jersey in December. The firm claimed in the complaint that Parmar failed to make required payments from January through May.

Parmar hasn't responded to requests for comment on the foreclosure filing, either.

————

If you've got this far you might be wondering about the **Blackstone chap** featured in the headline!

His name is **Chinh Chu**. He's on the left here, with Prince Edward and Zakiya Khatou-Chevassus, the boss of yacht charter firm Carte Blanche International...



If the cat's cradle of corporate entities and generalised opacity across Constellation's operations could be seen as a red flag to potential investors and financial journalists alike, one aspect of this story offered comfort: the identify of the person largely funding the move to private ownership. (CC Capital would own 50.7 per cent under the merger agreement, according to the Delaware filing.)

Until his departure, a little over a year ago, Chu ranked as Blackstone Group's longest-serving deal-maker. Joining the private equity firm in 1990, he rose to the position of Senior Managing Director and Co-Chairman, becoming [a billionaire (http://www.bornrich.com/chinh-chu.html)](http://www.bornrich.com/chinh-chu.html) in the process.

When Chu, who fled Vietnam with his family as a child, left Blackstone, Steve Schwarzman sent a memo to staff:



> I remember hiring Chinh out of Salomon Brothers, when he was only a year and a half out of school...He had an unstoppable will to win with great ethics, intelligence and fortitude. This is sad news for me personally and for the firm as a whole.

Chu had led multiple multi-billion-dollar acquisitions at Blackstone. His experience of serious M&A due diligence is quite possibly unrivalled, globally.

What's more taking Constellation private is/was Chu's first deal for his own newly-created family office.

If anyone is/was in a position to kick Parmar's proverbial tyres, it was Chu. We must assume he knows what he's doing.

Copyright (http://www.ft.com/servicestools/help/copyright) The Financial Times Limited 2018. All rights reserved. You may share using our article tools. Please don't cut articles from FT.com and redistribute by email or post to the web.

Print a single copy of this article for personal use. Contact us if you wish to print more to distribute to others. © The Financial Times Ltd.



💬 22

Read next:

**Markets**

# Thoughts for the weekend

From Sarkozy the wannabe dictator to the sexuality of drones.

MARCH 9, 2018  By: FT Alphaville                                                      4 💬

**COMMENTS (22)**

Sign in

+ Follow                                                                          Submit Comment

By submitting this comment I confirm that I have read and agreed to the FT Terms and Conditions. Please also see our commenting guidelines.

**Newest** | Oldest | Most recommended

**BritCaNotCPA**                                                                   Oct 25, 2017

Here are all the steps a company should take to undertake a fair process, clearly Parmar with his colorful and highly litigious background along with Mr. Chu with reputation of overpaying bankers and attorneys and underpaying shareholders have managed to undermine the process and delivered a substantially lower price for the shareholders

1. Did Parmar get any separate, additional consideration for becoming part of buyers group.
2. Internal exercise prior to start - General Valuation by market check – Failed  - The market multiple for any healthcare services and technology companies larger than 50m in revenue is 4.5+ X revenue or 11+X EBITDA, this

transaction was done at under 2X revenue and 5.5X EBITDA so at a 60% discount using either Revenue multiple or EBITDA multiple

3.   Did the company appoint a fair and independent Special Committee with all the powers to negotiate and execute the transaction without any influence from Parmar & Chu ?

4.   Did the company declare the key management Including Parmar and his shareholders as a part of buyers group and separate them from the workings and details of the transaction and its work papers

5. Did Special Committee and independent advisors remain independent ? did they recieve any additional consideration for approving this transaction ?

6.   Did the Special Committee hire independent advisors that Parmar and Chu have no influence over

7.   Did the Special Committee hire a Valuation firm, did they hire a advisor to give a fairness opinion ?

8.   Did this transaction receive a fairness opinion ( I would not believe at a 60% discounted sale price by either method of revenue multiple or EBITDA multiple ) this transaction could ever receive a fairness opinion

9.   Why did the Special committee agree to a breakup fee in the Go Shop ? with a massive breakup fee it is not really a true Go Shop ? this has unethical and improper written all over it.

10.   Were there any bids in the Go Shop ? if yes why were they rejected ?

11.   A major acquisition was closed in March, less than 30 days from CC Capital transaction, which implies the diligence and all the work was done on London Shareholders time and expense, and Parmar & Chu are reaping the benefits of that acquisition ?

Report  Share                                                                                    Recommend  |  Reply

**Dave Carter Wood**                                                                                    Feb 3, 2017

Would be interesting to know who Destra got their money from? IE who funded Parmar initially?

Report  Share                                                                                    Recommend  |  Reply

**Upaswellasdown**                                                                                    Jan 31, 2017

Just got to this late - absolutely superb. Makes me FT subscription seem like a bargain (incidentally I also donate to Roddy at SIRF).

That Wordpress blog is the weirdest website I've ever seen.

Report  Share                                                                              2  Recommend  |  Reply

**EmpressMB**                                                                                    Jan 31, 2017

Standout work Alexandra!! One of the best pieces of detailed investigative journalism I've read in a while.

Report  Share                                                                                    Recommend  |  Reply

**Kristov**                                                                                    Jan 27, 2017

Since we're talking about opaque LLC's, kindly note the new President of the United States' LLC empire, as disclosed to the Federal Election Commission: (there are a dozen sheets in the workbook, please tab through).

https://docs.google.com/spreadsheets/d/1pcGitimzMCsZ_DnnOZFQswywjc-uimWQ90qAFsoHj6Y/edit#gid=93294644

Report   Share                                                   1 | Recommend | Reply

▼

**Donald Cheesepuff**                                                      Jan 28, 2017

Thats just plain showing off! I think the interesting thing in Parmars case is that they are all set up in Delaware. The US waged war on the Caymans etc and yet have one of the worlds largest tax havens in their backyard.

Report   Share                                                   2 Recommend | Reply

**Kristov**                                                               Jan 28, 2017

**@Donald Cheesepuff** yes there's that hypocrisy too re delaware. you know what they say about capital? it belongs to the owners.....''golden rule of wall street'' and all.

Report   Share                                                   Recommend | Reply

**Student**                                                               Jan 27, 2017

Excellent piece. Makes the subscription worthwhile.

Report   Share                                                   1 Recommend | Reply

**Donald Cheesepuff**                                                      Jan 26, 2017

Is the deal unravelling?

Report   Share                                                   Recommend | Reply

▼

**Paul Murphy**                                        Jan 26, 2017

**@Donald Cheesepuff** Dunno.  Statement expected in the morning.

Report   Share                                                   Recommend | Reply

**Donald Cheesepuff**                                                      Jan 26, 2017

You didn't mention CFCO - perfect vehicle to take CHT onto Nasdaq

Report   Share                                                   Recommend | Reply

**Paul Murphy**                                        Jan 26, 2017

**@Donald Cheesepuff** ??



Report   Share     Recommend | Reply

**Donald Cheesepuff**     Jan 26, 2017

http://seekingalpha.com/news/3184248-largest-ever-blank-check-ipo-tap

Report   Share     Recommend | Reply

**Paul Murphy**   FT     Jan 26, 2017

**@Donald Cheesepuff** So the stated rationale for taking it off the lightly regulated AIM market in London is that the hoovering up of these small medical billing companies is better done off the public markets. On investor calls with London people Chu has said that he's doing this as his first family office deal. Whether that involves a subsequent float in the US, no idea.

I'd also add that since Parmar has been involved in a lot of litigation etc in the past, you'd assume Chu is looking through all that -- at the opportunity afforded by the underlying sector. But that's just my speculation.

Report   Share     Recommend | Reply

+ 4 replies

**peugeotdude505**     Jan 26, 2017

I like his blog

Report   Share     Recommend | Reply

**hedgehog**     Jan 26, 2017

Great journalism ft/ Alexandra!

Report   Share     15 Recommend | Reply

▼

**Brutto**     Jan 26, 2017

**@hedgehog** Agreed!

Report   Share     1 Recommend | Reply

**ActOfWill**     Jan 27, 2017

**@Brutto @hedgehog** +1

Report   Share     Recommend | Reply

**PROJECTION CHARIOT**
Flow of Funds - Cash Portion

| Name | Amount | Wire Information | Notes |
|---|---|---|---|
| **CASH AT CLOSE** | | | |
| **SOURCES - CASH TO JV AT CLOSE** | | | |
| Cash to CHT HoldCo | $82 502 160.25 | Bank — JPMorgan Chase Bank N.A. Equity contribution | |
| | | Address — 270 Park Avenue | |
| | | City State — New York NY 10017 | |
| | | ABA/Routing Number — 021000021 | |
| | | Account Name — CC Capital CHT Holdco LLC | |
| | | Account Number | |
| | | FFC Account Name | |
| | | Attention | |
| CONFIRMED BY D NEWTON | | Reference — Project Chariot | |
| **TOTAL SOURCES TO JV —>** | $82 502 160.25 | | |
| **SOURCES - CASH TO CHT AT CLOSE** | | | |
| BANK OF AMERICA | $130 000 000.00 | Bank — JPMorgan Chase Bank N.A. Senior credit facilities | |
| | | Address — 270 Park Avenue | |
| | | City State — New York NY 10017 | |
| | | ABA/Routing Number — 021000021 | |
| | | Account Name — CC Capital CHT Holdco LLC | |
| | | Account Number | |
| | | FFC Account Name | |
| | | Attention | |
| CONFIRMED BY D NEWTON | | Reference — Project Chariot | |
| **TOTAL SOURCES TO CHT —>** | $130 000 000.00 | | |
| **USES - CASH FROM JV AT CLOSE** | | | |
| **CASH MERGER CONSIDERATION** | | | |
| CAPITA REGISTRARS LIMITED | $177 154 981.43 | Bank — Royal Bank of Scotland | 92 081 632 Shares Outstanding |
| | | Address | 24 855 637 Shares Contributed to JV |
| | | City State | 6 763 544 Shares Direct Pay - Withholding Tax |
| | | ABA/Routing Number | 60 462 451 Net Shares Paid to Capita |
| | | Account Name — Capita Registrars Limited re: CHT Inc. Cash Consideration A/C | |
| | | Sort Code | $2.93 Per Share |
| | | IBAN | $177 154 981.43 Total Consideration Paid - Capita $196 972 165.35 Total ex Withholding Shares |
| | | Swift | |
| CONFIRMED BY M. LILLY | | Reference — CHT Inc. Cash Consideration A/C | |
| Max Edward Royde | $6 067.20 | Bank | 215 040 Shares |
| | | Address | $2.93 / Share 6 763 544 |
| | | City State | |
| | | ABA/Routing Number | $630 067.20 Total Wire |
| | | Account Name | |
| | | Sort Code | |
| | | IBAN | |
| | | Swift | |
| | | Reference — Mr. Max Royde | |
| Forest Nominees Limited GC1 a/c | $8 413 495.00 | Bank | 2 871 500 Shares |
| Beneficial - Richard Griffiths | | Address | $2.93 / Share |
| | | City State | |
| | | ABA/Routing Number | $8 413 495.00 Total Wire |
| | | Account Name | |
| | | Account Number | |
| | | Sort Code | |
| | | IBAN | |
| | | Swift | |
| | | Reference | |
| Platform Securities KKCLT a/c | $2 930 000.00 | Bank — National Westminster Bank PLC | 1 000 000 Shares |
| Beneficial - Richard Griffiths | | Address | $2.93 / Share |
| | | City State | |
| | | ABA/Routing Number | $2 930 000.00 Total Wire |
| | | Account Name — TDWCS LLP (Client Money) | |
| | | Account Number | |
| | | Sort Code | |
| | | IBAN | |
| | | Swift | |
| | | Reference — Constellation Healthcare Merger Consideration | |
| AAKB Investments Limited | $7 843 621.72 | Bank — JP Morgan Chase | 2 677 004 Shares |
| Beneficial - Pavan Bakhshi | | City State — New York NY | $2.93 / Share |
| | | Swift Address — CHASUS33 | |
| | | ABA/Routing Number — 021000021 | $7 843 621.72 Total Wire |
| | | Account Name — Investec Bank (Channel Islands) Limited | |
| | | Chips UID | |
| | | Swift Address | |
| | | Beneficiary — AAKB Investments Limited | |
| | | Account Number Investec | |
| | | Reference — Constellation Health Merger Consideration | |
| **TOTAL CASH MERGER CONSIDERATION —>** | $196 877 654.35 | | |
| **Cash for Fees to CHT** | $9 519 985.90 | | |
| To CHT for Fees | $9 519 985.90 | Bank — JP Morgan Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number — 021000021 | |
| | | Account Name — Orion HealthCorp Inc. | |
| | | Account Number | |
| | | FFC Account Name | |
| | | Attention | |
| | | Reference | |
| ALPHA CEPHEUS LLC | $6 059.00 | Bank — WSFS Bank | |
| | | Address — 500 Delaware Avenue | |
| | | City State — Wilmington DE 19801 | |
| | | ABA/Routing Number — 031100102 | |
| | | Account Name — Young Conaway Stargatt & Taylor LLP Attorney Trust Account | |
| | | Account Number | |
| | | FFC Account Name | |
| | | Attention | |
| | | Reference — er number 075360.1001 to be transferred to Master Interest Bearing Account | |
| **BUY-SIDE EXPENSES (To be Paid by CHT)** | | | |
| Bank of America | $3 098 019.50 | Bank — Bank of America N.A. New York NY | $2 356 250.00 Underwriting Fee |
| | | Address | $725 000.00 Upfront Fee |
| | | City State | $10 000.00 Agency Fee |
| | | ABA/Routing Number — 026009593 | $6 769.50 Expenses |
| | | Account Name — Large Corporate Loan Servicing | $3 098 019.50 |
| | | FFC Account Name | |
| CONFIRMED MVA | | Attention — Credit Services - Charlotte | |
| | | Reference — Orion Healthcorp Inc. | |
| Moore & Van Allen PLLC | $195 000.00 | Bank — Bank of America Charlotte NC | |
| BofA Counsel | | Address | |
| | | City State | |
| | | ABA/Routing Number — 026009593 | |
| | | Account Name — Moore & Van Allen PLLC | |
| | | Account Number | |
| CONFIRMED MVA | | FFC Account Name | |
| | | Attention | |
| | | Reference — Thomas L. Mitchell/527000.027492 | |
| WINSTON & STRAWN LLP | $2 555 023.91 | Bank — BMO Harris Bank N.A. | $3 000 000.00 Reflecting pay at close discount |
| | | Address | $55 023.91 Disbursements on behalf of client |
| | | City State — Chicago IL | |
| | | ABA/Routing Number — 071000288 | |
| | | Account Name — Winston & Strawn LLP | |
| | | Account Number | |
| | | FFC Account Name | |
| | | Attention | |
| | | Reference — Invoice 535277 / CM 106332 00002 | |
| John Altorelli | $5 000.00 | Bank — Santander Bank N.A. | |
| | | Address — 601 Penn Street | |
| | | City State — Redding PA 19601 | |
| | | ABA/Routing Number — 231372491 | |
| | | Account Name — Citynetwork LLC | |
| | | Account Number | |
| CONFIRMED BY J ALTORELLI | | FFC Account Name | |
| | | Attention | |
| | | Swift Code | |

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | Notes |
|---|---|---|---|
| | | Reference | CC Capital -- Constellation Healthcare Technologies Inc. |
| KPMG | $500 000.00 | Bank | Bank of New York Mellon |
| | | Address | 500 Ross Street RM 0940 |
| | | City State | Pittsburgh PA 15262 |
| | | ABA/Routing Number | 043000261 |
| | | Account Name | KPMG |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| CONFIRMED KPMG | | Attention | |
| | | Reference | Invoice #800138662G |
| Finsbury | $54 799.31 | Bank | Wells Fargo Bank N.A. |
| | | Address | 420 Montgomery Street |
| | | City State | San Francisco CA 94104 |
| | | ABA/Routing Number | 121000248 |
| | | Account Name | Finsbury LLC |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Invoice #105240 |
| RICHARDS LAYTON & FINGER | $350 000.00 | Bank | M&T Bank |
| | | Address | Rodney Square North |
| | | City State | Wilmington Delaware 19890 |
| | | ABA/Routing Number | 022000046 |
| | | Account Name | Richards Layton & Finger |
| | | Account Number | |
| | | FFC Account Name | |
| CONFIRMED S BIGLER | | Attention | |
| | | Reference | Invoice 527945 |
| McKinsey & Company | $460 000.00 | Bank | Citibank N.A. |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 021000089 |
| | | Account Name | McKinsey & Company Inc. |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | No. NE-KKP001-22710 |
| ELICIT INSIGHTS CONSULTING | $8 125.00 | Bank | JP Morgan Chase Invoice Paid by CC Capital Management |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 021000021 |
| | | Account Name | CC Capital Management LLC |
| | | Account Number | |
| CONFIRMED BY D NEWTON | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Project Chariot |
| BLACK DUCK CONSULTING | $62 500.00 | Bank | JP Morgan Chase Invoice Paid by CC Capital Management |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 021000021 |
| | | Account Name | CC Capital Management LLC |
| | | Account Number | |
| CONFIRMED BY D NEWTON | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Project Chariot |
| CC CAPITAL MANAGEMENT | $25 000.00 | Bank | JP Morgan Chase Expense Reimbursement |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 021000021 |
| | | Account Name | CC Capital Management LLC |
| | | Account Number | |
| CONFIRMED BY D NEWTON | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Project Chariot |
| FOX ROTHSCHILD LLP | $9 250.00 | Bank | We ls Fargo Bank BofA Related Fees |
| | | Address | 123 S. Broad Street |
| | | City State | Philadelphia PA |
| | | ABA/Routing Number | 121000248 |
| | | Account Name | Fox Rothschild LLP |
| | | Account Number | |
| CONFIRMED BY FOX ROTHSCHILD | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Invoice 738888 C lent no 166452 |
| VORYS SATER SEYMOUR AND PEASE LLP | $5 800.00 | Bank | PNC Bank BofA Related Fees |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 041000124 |
| | | Account Name | Vorys Sater Seymour and Pease LLP |
| | | Account Number | |
| CONFIRMED BY VORYS | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Invoice 1180659 Acc          Consulting Fees |
| Parth Mehrotra | $ 0 000.00 | Bank | Citibank N.A. |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 021000089 |
| | | Account Name | Parth Mehrotra |
| | | Account Number | |
| CONFIRMED | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| TOTAL USES FROM JV --> | $7 826 517.73 | Reference | Project Chariot |

| USES - CASH FROM CHT AT CLOSE (SELL-SIDE EXPENSES AND FINANCING FEES) | | | |
|---|---|---|---|
| MCGUIRE WOODS LLP | $587 500.00 | Bank | Bank of America |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 026009593 |
| | | Account Name | McGuire Woods Operating Account |
| | | Account Number | |
| CONFIRMED BY S OLDER | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Stephen Older |
| DWF LLP | $65 000.00 | Bank | Barclays Bank Plc |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | DWF USD Office |
| | | Account Number | |
| CONFIRMED BY M DOUGHTY | | IBAN | |
| | | SWIFT/BIC | |
| | | Sort Code | |
| | | Reference | CHT Invoice No           |
| ROBINSON BROG | $380 500.00 | Bank | Wells Fargo Bank N.A. Paid in December; Balance |
| | | Address | 150 East 42nd Street 35th Floor |
| | | City State | New York NY 10017 |
| | | ABA/Routing Number | 121000248 |
| | | Account Name | Robinson Brog Leinwand Greene Genovese & Gluck P.C. |
| | | Account Number | |
| CONFIRMED BY A GREENE | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Adam Greene / Project Chariot |
| SPECIAL COMMITTEE FEES | $65 000.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| Kirkland & Ellis | $151 000.00 | Bank | Citibank |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | 271070801 |
| | | Account Name | Kirkland & Ellis LLP |
| | | Account Number | |
| CONFIRMED BY KIRKLAND | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | 26206-1 |
| St fel | $125 000.00 | Bank | |

**PROJECTION CHARIOT**
**Flow of Funds - Cash Portion**

| Name | Amount | Wire Information | Notes |
|---|---|---|---|
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| SunTrust | $125,000.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| Cassel Salpeter | $62,500.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| Redleaf | $52,500.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| RRBB | $25,000.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| Young Conway | $375,000.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| FinnCap | $300,000.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| Paul Parmer Deal Fee | $3,227,416.18 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| Deal Finders Fee | $1,000,000.00 | Bank | |
| | | Address | |
| | | City State | |
| | | ABA/Routing Number | |
| | | Account Name | |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | |
| Vincent Serafino Geary Waddell Jenevein | $0.00 | Bank | |
| | | Address | Sovereign Bank |
| | | | 17950 Preston Road Suite 500 |
| | | City State | Dallas TX 75252 |
| | | ABA/Routing Number | 111924994 |
| | | Account Name | Vincent Serafino Geary Waddell Jenevein PC - Operating Account |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | Project Chariot |
| Wolf Rifkin Shapiro Schulman & Rabkin LLP | $0.00 | Bank | City National Bank |
| | | Address | 400 N. Roxbury Drive |
| | | City State | Beverly Hills CA |
| | | ABA/Routing Number | 122016066 |
| | | Account Name | Wolf Rifkin Shapiro Schulman & Rabkin LLP |
| | | Account Number | |
| | | FFC Account Name | |
| | | FFC Account Number | |
| | | Attention | |
| | | Reference | 19425-002 |
| **TOTAL USES FROM CHT --->** | **$8,341,418.18** | | |

**Funding Adjustment**

Sources
| | | |
|---|---|---|
| CC Capital | $82,502,160.25 | |
| BANK | 130,000,000.00 | |
| **Total Cash Sources** | **$212,502,160.25** | |

HoldCo Uses
| | | |
|---|---|---|
| Merger Consideration | $196,972,165.35 | |
| Note to Paul | 6,010,059.00 | |
| Cash to CHT for Fee Payments | 9,519,935.90 | |
| **Total Cash Sources** | **$212,502,160.25** | $0.0000 |

CHT Sources
| | | |
|---|---|---|
| Cash to CHT for Fee Payments | $9,519,935.90 | |
| Cash at CHT | 5,000,000.00 | |
| **Total CHT Sources** | **$14,519,935.90** | |

CHT Uses
| | | |
|---|---|---|
| Buyside Fees | $7,928,517.72 | |
| Sellside Fees | 6,341,418.18 | |
| Cash at Company | 250,000.00 | |
| **Total CHT Sources** | **$14,519,935.90** | $0.0023 |

**From:** Chinh Chu <chu@cc.capital>
**Sent:** Thursday, March 2, 2017 2:40 PM
**To:** Doug Newton <newton@cc.capital>; Paul Parmar <paul@constellationhealthgroup.com>
**Subject:** RE: Truc

Lets send to Paul and agree on this

**From:** Doug Newton
**Sent:** Thursday, March 2, 2017 2:31 PM
**To:** Chinh Chu <chu@cc.capital>; paul@constellationhealthgroup.com
**Subject:** Truc

This was the construct we proposed yesterday

| Truc / CFO Comp | | 4.3x in Year 5 | 2.0x in Year 5 |
|---|---|---|---|
| Total Equity | | 162,666,652 | 162,666,652 |
| Base Case Year 5 Equity Value | | 699,466,603 | 325,333,304 |
| Base Case Year 5 Option Value | | 536,799,951 | 162,666,652 |
| % to Truc | | 1.50% | 1.50% |
| Total 5 Year Comp | | 8,051,999 | 2,440,000 |
| Total Annual Equity Comp | | 1,610,400 | 488,000 |
| Proposed Salary | | 350,000 | 350,000 |
| Proposed Bonus | | 350,000 | 350,000 |
| Total Annual Comp | | 2,310,400 | 1,188,000 |

In addition, would propose that half of the comp (salary and bonus) be paid by CC Capital via an additional monitoring fee

-----Original Message-----
From: Chinh Chu
Sent: Thursday, March 2, 2017 2:24 PM
To: Paul Parmar <paul@constellationhealthgroup.com>; Doug Newton <newton@cc.capital>
Subject: Truc

Truc will be in NYC tomorrow

My recommendation:
- I will meet w him at 11am
- Doug can take him out to lunch alone of with Paul
- Paul and Sam (with or without Doug) can spend time w him in the afternoon
- If things go well, Paul should make him the offer (if Doug is there in the room, great, if not Paul should proceed) in the afternoon

We need to agree on the offer this afternoon - Doug can you pls send something around for us to review

Regards,
Chinh


**Douglas Newton**
C.C. Capital
555 Madison Avenue, 26th Floor
New York, NY 10022

*p +1* 212-207-8647
*m +1* 917-359-3026
*f +1* 212-588-8713
newton@cc.capital



April 4, 2018

## MTBC Announces $10.5 Million Public Offering of Non-Convertible Preferred Stock

SOMERSET, N.J., April 04, 2018 (GLOBE NEWSWIRE) -- MTBC (the "Company") (NASDAQ: MTBC) (NASDAQ: MTBCP), a leading provider of proprietary, cloud-based healthcare IT solutions and services, today announced the pricing of an upsized public offering of approximately 420,000 shares of its non-convertible 11% Series A Cumulative Redeemable Perpetual Preferred Stock ("Series A Preferred Stock") at a price of $25 per share, for gross proceeds of approximately $10.5 million. The offering is expected to close on or about April 6, 2018, subject to the satisfaction of customary closing conditions.

H.C. Wainwright & Co., is acting as exclusive lead placement agent for the offering and Boenning & Scattergood, Inc. is acting as co-placement agent.

After deducting placement agent's fees and other offering expenses payable by MTBC, the net proceeds to MTBC are anticipated to be approximately $9.4 million. MTBC intends to use the net proceeds from the offering, if completed, for general corporate purposes and additional working capital to support the Company's growth initiatives.

The shares of preferred stock were sold pursuant to a registration statement on Form S-1 (File No. 333-223886) that was declared effective by the Securities and Exchange Commission (the "SEC") on April 3, 2018. The securities may be offered only by means of a prospectus. The preliminary prospectus related to the offering has been filed with the SEC and a final prospectus related to the offering will be filed with the SEC. Copies of the preliminary prospectus and the final prospectus, when available, may be obtained by contacting H.C. Wainwright & Co., LLC, 430 Park Avenue, 4th Floor, New York, New York 10022, or by calling (646) 975-6996 or emailing placements@hcwco.com or may also be obtained at the SEC's website located at www.sec.gov.

This press release shall not constitute an offer to sell or the solicitation of an offer to buy the securities described herein or any other securities, nor shall there be any sale of these securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful.

### About MTBC
MTBC is a healthcare information technology company that provides a fully integrated suite of proprietary web-based solutions, together with related business services, to healthcare providers. Our integrated Software-as-a-Service (or SaaS) platform helps our customers increase revenues, streamline workflows and make better business and clinical decisions, while reducing administrative burdens and operating costs. MTBC's common stock trades on the NASDAQ Capital Market under the ticker symbol "MTBC," and its Series A Preferred Stock trades on the NASDAQ Capital Market under the ticker symbol "MTBCP."

For additional information, please visit our website at www.mtbc.com.

Follow MTBC on Twitter, LinkedIn and Facebook.

### Disclaimer:
This press release is for information purposes only, and does not constitute an offer to sell or solicitation of an offer to buy, nor shall there be any sale of these securities in any state or other jurisdiction in which such offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of such state or jurisdiction.

SOURCE MTBC


Company Contact:

Rachel Grossinger

Marketing Manager

Medical Transcription Billing, Corp.

rgrossinger@mtbc.com

732-873-5133


Investor Contact:

Bill Korn

Chief Financial Officer

Medical Transcription Billing, Corp.

bkorn@mtbc.com

732-873-5133

 Primary Logo


Source: MTBC

News Provided by Acquire Media



## MTBC Closes $10.5 Million Public Offering of Non-Convertible Preferred Stock

April 6, 2018

SOMERSET, N.J, April 06, 2018 (GLOBE NEWSWIRE) -- MTBC(the "Company") (NASDAQ:MTBC) (NASDAQ: MTBCP), a leading provider of proprietary, cloud-based healthcare IT solutions and services, today announced the sale in a public offering of 420,000 shares of its non-convertible 11% Series A Cumulative Redeemable Perpetual Preferred Stock ("Series A Preferred Stock") at a price of $25 per share, for gross proceeds of approximately $10.5 million.

"This upsized raise puts us in an excellent position to execute the Company's growth initiatives," said Stephen Snyder, MTBC CEO. He continued, "As of today, we have approximately $13 million of cash, an untapped $5 million line of credit with Silicon Valley Bank, as well as positive cash flow from operations."

H.C. Wainwright & Co. acted as exclusive lead placement agent for the offering and Boenning & Scattergood, Inc. acted as co-placement agent. After deducting placement agents' fees and other offering expenses payable by MTBC, the net proceeds to MTBC are approximately $9.4 million.

The shares of Series A Preferred Stock were sold pursuant to a registration statement on Form S-1 that was declared effective by the Securities and Exchange Commission (the "SEC") on April 3, 2018 and an additional registration statement filed pursuant to Rule 462(b). The securities may be offered only by means of a prospectus. The final prospectus related to the offering has been filed with the SEC. Copies of the final prospectus may be obtained by contacting H.C. Wainwright & Co., LLC, 430 Park Avenue, 4th Floor, New York, New York 10022, or by calling (646) 975-6996 or emailing placements@hcwco.com or may also be obtained at the SEC's website located at www.sec.gov.

This press release shall not constitute an offer to sell or the solicitation of an offer to buy the securities described herein or any other securities, nor shall there be any sale of these securities in any state or jurisdiction in which such offer, solicitation or sale would be unlawful.

About MTBC

MTBC is a healthcare information technology company that provides a fully integrated suite of proprietary web-based solutions, together with related business services, to healthcare providers. Our integrated Software-as-a-Service (or SaaS) platform helps our customers increase revenues, streamline workflows and make better business and clinical decisions, while reducing administrative burdens and operating costs. MTBC's common stock trades on the NASDAQ Capital Market under the ticker symbol "MTBC," and its Series A Preferred Stock trades on the NASDAQ Capital Market under the ticker symbol "MTBCP."

For additional information, please visit our website at www.mtbc.com.

Follow MTBC on Twitter, LinkedIn and Facebook.

Disclaimer:

This press release is for information purposes only, and does not constitute an offer to sell or solicitation of an offer to buy, nor shall there be any sale of these securities in any state or other jurisdiction in which such offer, solicitation or sale would be unlawful prior to the registration or qualification under the securities laws of such state or jurisdiction.

SOURCE MTBC


Company Contact:
Rachel Grossinger
Marketing Manager
Medical Transcription Billing, Corp.rgrossinger@mtbc.com
732-873-5133

Investor Contact:
Bill Korn
Chief Financial Officer
Medical Transcription Billing, Corp.bkorn@mtbc.com
732-873-5133

Case 8-18-71748-ast    Doc 366    Filed 07/05/18    Entered 07/05/18 23:24:49

Case 2:18-cv-00282-MCA-LDW    Document 21-27  Filed 08/25/18  Page 382 of 526 PageID: 578
Case 2:18-cv-00284-MCA-MAH    Document 21-27  Filed 08/25/18  Page 2 of 526 PageID: 422

Thomas R. Califano, Esq.
**DLA PIPER LLP (US)**
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
thomas.califano@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------x
| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No: 18-_____(AST) |
| | : | |
| Debtors. | x | (Jointly Administered) |

--------------------------------------------------------------------

**MOTION OF DEBTOR NEW YORK NETWORK MANAGEMENT, L.L.C. FOR
ENTRY OF ORDERS (A)(I) EXTENDING THE BIDDING PROCEDURES RELATING
TO THE SALE OF CERTAIN ASSETS; (II) APPROVING BID PROTECTIONS;
(III) APPROVING THE FORM AND MANNER OF NOTICE OF CONTINUED
AUCTION; (IV) ESTABLISHING PROCEDURES FOR NOTICING AND
DETERMINING CURE AMOUNTS; (V) SCHEDULING A HEARING ON THE
PROPOSED SALE; AND (VI) GRANTING RELATED RELIEF; AND
(B)(I) APPROVING ASSET PURCHASE AGREEMENT AND AUTHORIZING
THE SALE OF CERTAIN OF THE DEBTOR'S ASSETS; (II) AUTHORIZING
THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
ENCUMBRANCES AND INTERESTS; (III) AUTHORIZING THE ASSUMPTION,
SALE AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
<u>UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF</u>**

New York Network Management, L.L.C. ("<u>NYNM Management</u>" or "<u>Seller</u>"), by and

through its proposed counsel, DLA Piper LLP (US), hereby submits this motion (the "<u>Motion</u>")

and respectfully represents as follows:

<u>**RELIEF REQUESTED**</u>

Pursuant to sections 105(a), 363, 365 and 503 of title 11 of the United States Code, 11

U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>"), Rules 2002, 6004, 6006, 9007 and 9008 of the

Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), Rule 6004-1 of the Local

Bankruptcy Rules for the Eastern District of New York (the "<u>Local Bankruptcy Rules</u>") and the

Sale Guidelines, adopted as Administrative Order No. 557 of the United States Bankruptcy Court

for the Eastern District of New York (the "<u>Sale Guidelines</u>"), NYNM Management seeks entry

of an order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Second Bidding

Procedures Order</u>"), (i) approving the extension of the procedures set forth in the First Bidding

Procedures Order (as defined below), unless otherwise modified herein, to the sale of the NYNM

Assets (as defined below); (ii) approving the Break-Up Fee and Expense Reimbursement (as

defined below); (iii) scheduling a final hearing (the "<u>Sale Hearing</u>") on the NYNM Sale (as

defined below) and setting objection deadlines with respect thereto; (iv) approving the form and

manner of notice of the continued auction for the NYNM Assets (the "<u>Continued Auction</u>"); and (vi) granting related relief.

Additionally, NYNM Management also requests the entry of an additional order (i) authorizing and approving the Asset Purchase Agreement (the "<u>Agreement</u>")[1] annexed to this Motion as <u>Exhibit B</u> between NYNM Management and HealthTek Solutions, LLC (the "<u>Stalking Horse</u>" or "<u>HealthTek</u>") (or such other asset purchase agreement as may be selected at the Continued Auction as the highest or best offer); (ii) authorizing the sale of the NYNM Assets free and clear of liens, claims, encumbrances, and interests, pursuant to the Agreement (the "<u>NYNM Sale</u>"); (iii) authorizing the assumption and assignment of the Assumed Contracts and Leases; and (iv) granting related relief.

In support of this Motion, NYNM Management respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 363, 365 and 503 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008, and Local Bankruptcy Rule 6004-1.

## BACKGROUND

### A.      <u>General Background</u>

4.      On March 16, 2018 (the "<u>Petition Date</u>"), Orion HealthCorp, Inc., Constellation Healthcare Technologies, Inc., NEMS Acquisition, LLC, Northeast Medical Solutions, LLC,

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement.

NEMS West Virginia, LLC, Physicians Practice Plus, LLC, Physicians Practice Plus Holdings, LLC, Medical Billing Services, Inc., Rand Medical Billing, Inc., RMI Physician Services Corporation, Western Skies Practice Management, Inc., Integrated Physician Solutions, Inc., NYNM Acquisition, LLC, Northstar FHA, LLC, Northstar First Health, LLC, Vachette Business Services, Ltd., MDRX Medical Billing, LLC, Vega Medical Professionals, LLC, Allegiance Consulting Associates, LLC, Allegiance Billing & Consulting, LLC, and Phoenix Health, LLC (collectively, the "Initial Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The chapter 11 cases of the Initial Debtors are jointly administered for procedural purposes only [D.I. 34].

5.      The Initial Debtors continue to be in possession of their assets and to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

6.      On April 4, 2018, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102(a)(1) of the Bankruptcy Code [D.I. 82].  As of the date hereof, no trustee or examiner has been appointed in the Initial Debtors' chapter 11 cases.

7.      On July 5, 2018, NYNM Management (together with the Initial Debtors, the "Debtors") filed with this Court a voluntary petition for relief under the Bankruptcy Code.

8.      NYNM Management continues to be in possession of its assets and to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee, examiner or committee has been appointed in NYNM Management's chapter 11 case.

9.     Contemporaneously herewith, the Debtors have filed, among other motions, (i) a motion for the joint administration of NYNM Management's chapter 11 case with the chapter 11 cases of the Initial Debtors; and (ii) a motion seeking entry of an order extending certain of the existing orders entered by the Court in the Initial Debtors' chapter 11 cases to NYNM Management.

10.     Additional factual background regarding the Debtors, including their business operations, capital and debt structures, and the events leading to the filing of these chapter 11 cases, is set forth in detail in the *Declaration of Timothy J. Dragelin in Support of Chapter 11 Petitions and First Day Motions* [*In re Orion HealthCorp, Inc.*, Case No. 18-71748 (AST), D.I. 2] (the "First Day Declaration") and the *Supplemental Declaration of Timothy J. Dragelin in Support of Chapter 11 Petition of New York Network Management, L.L.C. and Motions Filed Contemporaneously Therewith* (the "Supplemental Declaration," and together with the First Day Declaration, the "Declarations").

### B.     Overview of the Proposed NYNM Sale

11.     As discussed in the First Day Declaration, Debtor Orion HealthCorp, Inc. owns all of the equity interests in Debtor NYNM Acquisition, LLC.  Debtor NYNM Acquisition, LLC, in turn, is the sole member of NYNM Management.  NYNM Management, in turn, owns all of the equity interests in New York Network IPA, Inc., New York Premier IPA, Inc., Brooklyn Medical Systems IPA 3, Inc., Brooklyn Medical Systems IPA 4, Inc. and Brooklyn Medical Systems IPA 5, Inc. (collectively, the "IPA Entities"), which operate an independent practice association business, as well as an additional non-debtor entity.

12.     By this Motion, NYNM Management seeks to sell (i) all shares of capital stock and other equity interests in the IPA Entities (the "IPA Equity"), (ii) those contracts of NYNM Management that are shown as "Assigned Contracts" on Schedule 1.3 to the Agreement (the

"NYNM Contracts"), and (iii) the cash in that certain bank account ending in 3730 at JPMorgan Chase Bank, N.A. owned by NYNM Management into which Preferred Provider Organization payments are made under the NYNM Contracts (the "NYNM PPO Lockbox Cash" and together with the IPA Equity and NYNM Contracts, the "NYNM Assets").

## C.    **The Initial Debtors' Sale Process**

13.    On May 10, 2018, the Initial Debtors filed the *Motion of the Debtors for Entry of Orders (A)(I) Approving Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets; (II) Approving Bid Protections; (III) Approving the Form and Manner of Notice of Sale by Auction; (IV) Establishing Procedures for Noticing and Determining Cure Amounts; (V) Scheduling a Hearing on the Proposed Sale; and (VI) Granting Related Relief; and (B)(I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain of the Debtors' Assets; (II) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; (III) Authorizing the Assumption, Sale and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [D.I. 191] (the "Bidding Procedures Motion"), seeking to establish certain bidding procedures and sell the Debtors' revenue cycle management business (the "RCM Assets") to Medical Transcription Billing, Corp. ("MTBC").

14.    In response to the Bidding Procedures Motion, objections were filed by (i) Pediatric Associates of Dayton, Inc., Children's Medical Center, Inc., and Pediatric Group Associates Inc. [D.I. 213] (the "Physician Groups Objection"); (ii) the Official Committee of Unsecured Creditors [D.I. 214] (the "Committee Objection"); (iii) Arvind Walia and TG Capital LLC [D.I. 216] (the "TG Objection"); and (iv) GSS Infotech Limited [D.I. 226] (the "GSS Objection" and together with the Physician Groups Objection, the Committee Objection, and the TG Objection, the "Objections").

15.     On May 24, 2018, the Court held a hearing with respect to the Bidding Procedures Motion, which resulted in the Court overruling the Objections and entering the *Order (I) Approving Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets; (II) Approving Bid Protections; (III) Approving the Form and Manner of Notice of Sale by Auction; (IV) Establishing Procedures for Noticing and Determining Cure Amounts; (V) Scheduling a Hearing on the Proposed Sale; and (VI) Granting Related Relief* [D.I. 273] (the "First Bidding Procedures Order").  The First Bidding Procedures Order approved, among other things, certain bidding procedures, certain bidding protections, procedures for the assumption and assignment of certain executory contracts and unexpired leases and scheduled an auction (the "Initial Auction") and sale hearing for the sale of the RCM Assets.  The Court also directed the Initial Debtors to consider establishing bidding procedures with respect to a proposed sale of the NYNM Assets.

16.     Thereafter, the Initial Debtors noticed the potential sale of substantially all of the Debtors' assets, including the NYNM Assets, at the Initial Auction by service of the First Bidding Procedures Order.  Further, and as part of its continued search to identify potential buyers, Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the Debtors' investment banker, performed a review of the marketplace and noticed potential buyers of the NYNM Assets that they should submit bids or provide an indication of their value range by the June 19, 2018 deadline established by the First Bidding Procedures Order.  HealthTek expressed sufficient interest to execute non-disclosure agreements and conduct preliminary due diligence on all of the Debtors' assets, including the NYNM Assets.  The other potential bidders expressed interest solely in the RCM Assets.

17.     As a result, on June 19, 2018, the Initial Debtors received the Agreement from the Stalking Horse for the purchase of substantially all of the Debtors' assets, including the NYNM Assets, in the amount of $23.0 million (the "Initial Offer").  After receiving the Initial Offer, the Debtors and the Stalking Horse engaged in extensive negotiations regarding the details of a transaction whereby the Stalking Horse would acquire certain of NYNM Management's assets subject to higher and/or better bids pursuant to section 363 of the Bankruptcy Code.   The Stalking Horse disclosed to NYNM Management that Arvind Walia, who previously managed the Debtors' RCM Business, will be a minority investor (approximately 10%) in the Stalking Horse.

18.     On June 25, 2018, the Initial Debtors commenced the Initial Auction in accordance with the First Bidding Procedures Order.  In connection with the Initial Auction, the Initial Debtors asked HealthTek to bifurcate its Initial Offer and increase its offer for the NYNM Assets.  In response, HealthTek bifurcated its Initial Offer into an offer for the RCM Business for $10.6 million and an offer for the NYNM Assets for $16.5 million.

19.     As a result of the Initial Debtors' discussions with HealthTek, the Initial Debtors and HealthTek agreed to adjourn the Initial Auction with respect to the NYNM Assets and seek Court approval to, among other things, (i) establish HealthTek as the Stalking Horse, (ii) establish a timeline for the sale of the NYNM Assets and (iii) schedule the Continued Auction.

20.     In order to assure that the highest and/or best transaction is achieved with respect to the NYNM Assets, the Debtors will continue to market the NYNM Assets to other potential purchasers and hold the Continued Auction solely with respect to the NYNM Assets prior to the Sale Hearing before the Court.

Case 8-18-71748-ast    Doc 366    Filed 07/05/18    Entered 07/05/18 23:24:49

Case 2:18-cv-09284-MCA-LDW    Document 21-27    Filed 08/25/18    Page 390 of 526 PageID: 586
Case 2:18-cv-09284-MCA-LDW    Document 21-27    Filed 08/25/18    Page 9 of 526 PageID: 480

### D.    The Proposed Timeline and Deadlines

21.    As further discussed below, NYNM Management requests that the Court set the following timeline and deadlines in connection with the proposed NYNM Sale process:[2]

| | |
|---|---|
| **Hearing on the Motion:** | **July 9, 2018 at 11:00 a.m. ET** |
| **NYNM Sale Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Continued NYNM Bid Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Continued Auction** | **July 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **July 20, 2018 at 4:00 p.m. ET** |
| **Sale Hearing** | **July 23, 2018 at 11:00 a.m. ET** |

22.    NYNM Management submits that, in light of the marketing process already undertaken and the additional efforts that will be made going forward prior to the Continued Auction and Sale Hearing, the timing of the NYNM Sale of the NYNM Assets proposed herein is reasonable under the circumstances to effectuate a sale to either the Stalking Horse under the terms of the Agreement or, alternatively, to a higher and better bidder for the NYNM Assets.

23.    The Stalking Horse has also imposed certain deadlines on NYNM Management under the Agreement in order to accomplish the NYNM Sale.  The principal deadlines set forth in the Agreement are summarized below:

- Schedule the deadline to submit competing bids on the NYNM Assets for no later than July 18, 2018 at 4:00 p.m. (prevailing Eastern Time);

- Conducting the Continued Auction (if necessary) by July 20, 2018;

- Schedule the Sale Hearing to approve the Sale of the NYNM Assets for no later than July 23, 2018;

---

[2] All dates proposed herein are subject to the Court's availability.

- Entry of an order approving the Sale by no later than two (2) days after the Sale Hearing; and

- Consummate the NYNM Sale by no later than July 31, 2018.

24.    NYNM Management believes that the process set forth herein provides sufficient additional time to fully expose the NYNM Assets for sale in the hope of receiving additional qualified bids and achieving a competitive bidding process prior to the Continued Auction.

**E.**    **The Proposed NYNM Sale**

25.    NYNM Management believes that it is in the best interests of its estate to enter into the Agreement.  The following sub-paragraphs summarize key provisions of the Agreement, but are qualified in their entirety by reference to the actual Agreement:

(a) Purchase Price.  The aggregate consideration for the sale and transfer of the NYNM Assets (the "Purchase Price") shall be in the amount of $16.5 million.

(b) Purchased Assets.  Under the Agreement, the purchased assets include, collectively, (i) all shares of capital stock and other equity interests in the IPA Entities owned by NYNM Management, (ii) those contracts of NYNM that are shown as "Assigned Contracts" on Schedule 1.3 to the Agreement, and (iii) the cash in that certain bank account ending in 3730 at JPMorgan Chase Bank, N.A. owned by NYNM Management into which Preferred Provider Organization payments are made under the Added Contracts to which NYNM Management is a party.

(c) Assumed Liabilities.  Under the Agreement, the Stalking Horse will assume the following liabilities (the "Assumed Liabilities"): (i) the obligations of Seller under the NYNM Contracts to the extent such obligations are applicable to and accrue solely with respect to a NYNM Contract with respect to periods subsequent to the Effective Time[3]; (ii) Taxes that relate to the ownership or operation of the NYNM Assets with respect to any Tax period beginning after the Closing Date; (iii) all Assumed Cure Amounts with respect to the NYNM Contracts; and (iv) all Liabilities arising from the ownership of the NYNM Assets or operation of the IPA Entities arising after the Closing Date.

(d) Excluded Assets.  Excluded Assets consist of the following: (i) any cash on hand, in banks, and any cash equivalents (other than the NYNM PPO Lockbox Cash); (ii) all claims, rights and causes of action of Seller arising under or relating to

---

[3]  Pursuant to the Agreement, the Stalking Horse shall not be liable for any accounts payable for goods or services due prior to the Effective Time and such payables shall be the responsibility of Seller.

10

Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) including, without limitation, any such claims and actions arising under Sections 544, 545, 547, 548, 549 or 551 of the Bankruptcy Code, and commercial tort claims; (iii) Seller's rights under the Agreement (including the right to receive the Purchase Price) and under any of the ancillary agreements to be entered into in connection with the transactions contemplated hereby; (iv) all shares of capital stock or other equity interests of Seller or any of its Affiliates, all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Seller or any of its Affiliates, and all securities owned and held by Seller, whether equity or debt or a combination thereof, other than the IPA Equity; (v) all Tax Returns and Tax records of Seller and its Affiliates; (vi) all Tax refunds, credits, abatements or similar offsets against Taxes of Seller and its Affiliates that relate to Specifically Excluded Liabilities; (vii) all Tax attributes of Seller and its Affiliates; (viii) the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of Seller that are required by Law to be retained; (ix) all claims arising on or prior to the Closing Date under any directors and officers liability insurance policies owned by Seller; (xi) all claims and causes of action arising on or before the Closing Date that Seller has against any current or former Affiliate, insider of Seller or any third party (and any recovery on account thereof), including claims for breaches of fiduciary duty, fraud or similar cause of action, rights of recoupment and avoidance, except to the extent that such claims or causes of action (a) may constitute a counterclaim, defense, offset, or recoupment right with respect to affirmative claims (if any) that such third party may assert against Purchaser or its Affiliates, (b) arise under any rights under warranties (express or implied), representations and guarantees made by any third party to Seller in connection with the NYNYM Assets or the NNNI Business, (c) arise under the Assigned Contracts assumed and assigned to Purchaser, or (d) relate to the NYNYM Assets; provided, however, nothing in this Section 3.1.10 shall in any event be deemed to eliminate from the Excluded Assets any other asset expressly designated as such pursuant to this Article 3; (x) professional retainers paid by Seller; (xii) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller; (xiii) all customer deposits; (xiii) all Benefit Plans, and any other "employee benefit plan" (as defined in ERISA) or any other employee benefit plan, program or arrangement, including, in each case, any underlying assets, agreements, policies and rights in connection therewith; (xiv) all insurance policies (except to the extent relating to the NYNYM Assets), all directors and officers liability insurance policies and errors and omissions insurance policies and all rights to assert claims with respect to any such policies; (xv) all unearned insurance premiums and all accrued insurance refunds or rebates; all unearned insurance premiums and all accrued insurance refunds or rebates; all rights with respect to an occurrence under any insurance policy prior to the Closing Date; (xvi) all

Contracts that are not Assigned Contracts, and all Contracts that have terminated or expired prior to the Closing in the Ordinary Course of Business; (xvii) any documents or communications of Seller that are subject to Seller's attorney-client privilege and/or the work-product immunity doctrine; (xviii) those assets, if any, listed on <u>Schedule 3.1.18</u>; and (xix) all assets of Seller other than the IPA Equity, the Assigned Contracts and NYNM PPO Lockbox Cash.

(e)   <u>Excluded Liabilities.</u>   Seller shall retain all liabilities and obligations that are not Assumed Liabilities, as described in the Agreement.

(f)   <u>Books and Records.</u>   Organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of the Seller that are required by Law to be retained are Excluded Assets.  Moreover, pursuant to Section 6.4.6 of the Agreement, Stalking Horse shall make available to Seller copies of all books, files, documents and records included as part of the NYNM Assets as Seller may reasonably request for a period of eighteen (18) months post-Closing.  If Seller desires copies of any of such documents or records, all copying costs shall be borne by Seller. Additionally, pursuant to section 6.9 of the Agreement, so long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the NYNM Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Seller reimburse Purchaser for the reasonable costs and expenses thereof.

(g)   <u>Closing and Other Deadlines</u>.   The Closing is subject to certain customary conditions.  *See* Agreement, Articles 7 and 8.

(h)   <u>Termination</u>.   The rights of Seller and the Stalking Horse to terminate the Agreement are set forth in Article 10 of the Agreement.

(i)   <u>Break-up Fee</u>.   If the Agreement is terminated pursuant to Section 10.1.2, 10.1.4, 10.1.5(a), 10.1.6 (where Purchaser is the non-breaching party), 10.1.7 or 10.1.8 (other than through the failure of Purchaser to have complied fully with its obligations under the Agreement), in each case where Purchaser is not then in default under the Agreement and an Alternative Transaction is consummated

within twelve (12) months of such termination, then Purchaser shall be entitled to receive a break-up fee in the amount equal to $495,000 (the "Break Up Fee"), as provided in Section 6.4.2.2.

(j)   Expense Reimbursement.   If the Agreement is terminated by Purchaser under certain circumstances, then Purchaser shall be entitled to Purchaser's reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, escrow and other fees and expenses) not to exceed $450,000 (the "Expense Reimbursement"), with such amount being payable by the Seller on or before the tenth (10th) Business Day after such termination.

(k)   Non-Solicitation.   The Agreement does not provide limitations on NYNM Management's ability to solicit offers for the NYNM Assets.

26.   NYNM Management believes that the NYNM Sale will provide the best means to maximize value for all of its constituencies.   The Initial Debtors commenced marketing the NYNM Assets upon entry of the First Bidding Procedures Order and continue to negotiate with all potential purchasers, including the Stalking Horse, in an effort to achieve maximum value for the benefit of all of their constituents.

27.   NYNM Management, after efforts to maximize value, a review of various reorganization, liquidation and sale options and discussions with its professionals, determined in the exercise of its reasonable business judgment that the most effective way to maximize the value of NYNM Management's estate for the benefit of all stakeholders would be (i) to enter into the Agreement subject to higher and better bids and (ii) to proceed with the Sale process for NYNM Assets.

28.   NYNM Management has had discussions with both its prepetition and post-petition financing lenders and the Committee regarding the marketing process and proposed Sale and believe that these constituencies will support the NYNM Sale of the NYNM Assets.

**F.   Notice of Continued Auction and Sale Hearing**

29.   As noted above, the NYNM Management proposes that the Continued Auction occur on **July 18, 2018 at 10:00 a.m. (prevailing Eastern Time)** and that the Sale Hearing

occur on **July 23, 2018 at 11:00 a.m**. **(prevailing Eastern Time)**.  NYNM Management proposes that objections, if any, to the Sale Motion be filed **on or before 4:00 p.m. on July 17, 2018 (prevailing Eastern Time).**

30.     NYNM Management requests that the Court approve the manner of the notice of the proposed sale of the NYNM Assets (the "Continued Auction and Hearing Notice"), attached as Annex 1 to the Second Bidding Procedures Order, which NYNM Management will serve, together with the Second Bidding Procedures Order, no later than two (2) business days following entry of the Second Bidding Procedures Order by first class mail, postage prepaid on the following parties:  (a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to NYNM Management's prepetition and post-petition lenders; (d) all taxing and regulatory authorities having jurisdiction over any of the NYNM Assets subject to the sale, including the Internal Revenue Service and the Securities and Exchange Commission; (e) the state/local environmental agencies in the jurisdictions where NYNM Management owns or leases real property; (f) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding Procedures Order; (g) all persons or entities known to NYNM Management that have or have asserted a lien on, or security interest in, all or any portion of the NYNM Assets; (h) all counterparties to executory contracts or unexpired leases with NYNM Management; (i) counsel to the Stalking Horse; (j) all Attorneys General for the states in which NYNM Management conducts business; and (k) all potential bidders or parties interested in purchasing assets of NYNM Management, including but not limited to the NYNM Assets, as previously identified or otherwise known to NYNM Management (collectively, the "Notice Parties").

31.     In addition, NYNM Management requests that the Court approve the form of the

notice to creditors (the "Creditor Notice"), attached as Annex 2 to the Second Bidding Procedures Order. Within two (2) business days of entry of the Second Bidding Procedures Order, NYNM Management will serve copies of the Creditor Notice upon all other known creditors and parties in interest. The Creditor Notice will provide that any party that has not received a copy of the Motion, the Agreement, the Second Bidding Procedures Order, or any other document referenced in the Creditor Notice can obtain such copies on the Court's website at www.ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.

32.     Within two (2) days after entry of the Order, NYNM Management will also cause the Creditor Notice to be published on the website of NYNM Management's claims and noticing agent.

### G.     Sale Hearing

33.     The Successful Bid and the Backup Bid (or the Stalking Horse's Agreement in the event the Continued Auction is not held) will be subject to approval by the Court at the Sale Hearing free and clear of all liens, claims, interest, and encumbrances pursuant to section 363(f) of the Bankruptcy Code (other than the liens and interests permitted under the Agreement) with all such liens, claims, interests, and encumbrances to attach to the proceeds of the NYNM Sale of the NYNM Assets, except as otherwise provided with the same validity and in the same order of priority as they attached to the NYNM Assets prior to the NYNM Sale. Upon approval of the Backup Bid by the Court, the Backup Bid shall remain open and irrevocable until the earlier of (i) consummation of the NYNM Sale pursuant to the Successful Bid or (ii) September 1, 2018 per the Agreement.

34.     NYNM Management requests that the Court schedule the Sale Hearing on **July 23, 2018 at 11:00 a.m. ((prevailing Eastern Time)**, which is the next omnibus hearing date in the Debtors' chapter 11 cases. NYNM Management further requests that Objections, if any, to

the NYNM Sale (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Stalking Horse, Baker Botts LLP, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel C. Grillo [emanuel.grillo@bakerbotts.com]), and (i) any other party requesting notice in this case

(collectively, the "Objection Parties"), so that it is actually received by each of the foregoing parties by **4:00 p.m. (prevailing Eastern Time) on July 17, 2018** (the "Sale Objection Deadline").

35.     In the event NYNM Management selects a Successful Bidder or Backup Bidder other than the Stalking Horse at the Continued Auction, or the terms of the proposed NYNM Sale are modified at the time of the Continued Auction, NYNM Management requests that the objection deadline solely with respect to NYNM Management's choice of such alternative Successful Bidder or Backup Bidder, the modifications to the terms of the NYNM Sale to the Successful Bidder, or adequate of assurance of future performance by the alternative Successful Bidder or Backup Bidder shall be on **July 20, 2018 at 11:00 a.m.**  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties.

### H.     Break-Up Fee and Expense Reimbursement

36.     In recognition of the Stalking Horse's substantial expenditure of time, energy and resources, and the benefits to NYNM Management's estate of securing a "stalking horse" or guaranteed minimum bid, NYNM Management seeks approval to pay (a) a breakup fee (the "Break-Up Fee") of 3% of the Purchase Price ($495,000) to the Stalking Horse in the event that the Stalking Horse is not the Successful Bidder at the Continued Auction and NYNM Management consummates an Alternative Transaction, and (b) an expense reimbursement not to exceed $450,000 (the "Expense Reimbursement," and together with the Break-Up Fee, the "Bid Protections") if the Agreement is terminated for that reason or otherwise as provided for in the Agreement.

37.     The Break-Up Fee and Expense Reimbursement are required by the Agreement. NYNM Management believes that the Break-Up Fee and Expense Reimbursement are fair and

reasonable, given the benefit to its estate of having a definitive Agreement and the risk to the Stalking Horse that a third-party offer ultimately may be accepted, and are necessary to preserve and enhance the value of NYNM Management's estate.  Additionally, the Break-Up Fee and Expense Reimbursement are consistent with those offered to MTBC in connection with the sale of the Debtors' RCM business.

38.    The Agreement and the Stalking Horse's monetary offer will form the basis upon which other bids will be submitted and evaluated.  The establishment of the Break-Up Fee and Expense Reimbursement permits NYNM Management to insist that competing bids for the NYNM Assets be higher or otherwise better than the Purchase Price under the Agreement, which is a clear benefit to NYNM Management's estate.  Thus, even if the Stalking Horse is ultimately not the Successful Bidder, and is paid the Break-Up Fee and Expense Reimbursement, NYNM Management will still have benefited significantly from the Agreement, due to the floor established by the Stalking Horse leading to an improved bid and increasing the likelihood that the NYNM Assets will be sold at the highest value to NYNM Management's estate.

**I.    Closing**

39.    The closing shall take place in accordance with terms of the Agreement, or in accordance with the terms of such other agreement approved by the Court at the Sale Hearing.

**J.    Corporate Action**

40.    NYNM Management requests that no further corporate action of NYNM Management or approval of any of its equity security holders shall be required to authorize NYNM Management to consummate the transactions contemplated by the Agreement.  Except as expressly permitted by any Orders granting this Motion, NYNM Management requests that all holders of claims against and interests in, and equity security holders of NYNM Management be forever barred, estopped and enjoined from commencing, prosecuting or continuing in any

manner any action or other proceeding of any kind against NYNM Management's employees, officers or directors, or its professionals and advisors, on account of or related to the Agreement or the transactions contemplated thereby, *provided*, *however*, that nothing in any Order granting this Motion shall prevent any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

<div align="center">

**BASIS FOR RELIEF REQUESTED**

</div>

**I.      THE ORDER SHOULD BE ENTERED**

      **A.      <u>The Bidding Procedures Should be Extended</u>**

      41.      Continuation of the Bidding Procedures, which are standard for the sale of assets in large chapter 11 cases, established in the First Bidding Procedures and extended to the Second Bidding Procedures Order will ensure that NYNM Management's estate receives the greatest benefit available from the sale of the NYNM Assets.  The Bidding Procedures were structured to attract the maximum number of Qualified Bids while allowing NYNM Management the flexibility to select the bid or bids that provide the greatest overall value to NYNM Management's estate.  During the course of NYNM Management's marketing process, it appeared obvious that there was a market for the NYNM Assets.  The Bidding Procedures as continued by the Second Bidding Procedures Order will set out a time frame that will allow potential purchasers sufficient time to construct and submit informed Qualified Bids on the NYNM Assets, while still providing for the expeditious sale of the NYNM Assets.

      42.      Thus, NYNM Management submits that the Bidding Procedures as described in established in the First Bidding Procedures and extended to the Second Bidding Procedures Order, as modified therein, should be approved because they are reasonably designed to ensure

<div align="center">19</div>

that NYNM Management's estate receives the maximum benefit available from the sale of assets, and therefore warrant extension to the NYNM Asset-focused sale process.

### B.    The Break-Up Fee and Reimbursement Amount are Reasonable and Appropriate

43.    Bid incentives such as the Break-Up Fee and Expense Reimbursement encourage a potential buyer to invest the time, money and effort required to negotiate with a debtor, and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process. NYNM Management submits that approval of the Break-Up Fee and Expense Reimbursement are justified by the facts and circumstances of these cases, whether considered under the business judgment rule or as an administrative expense of the estate.

44.    Courts in this Circuit have approved break-up fees under the "business judgment rule," which proscribes judicial second-guessing of good-faith decisions made by a corporation's board of directors exercising its business judgment. *See*, *e.g.*, *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014); *In re Integrated Resources, Inc.*, 147 B.R. 746, 752 (Bankr. S.D.N.Y. 1992)("[T]he business judgment of the Debtor is the standard applied under the law in this district"); *In re Ray Realty Fulton, Inc.*, No. 1-09-41225-DEM, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009) (break-up fee held reasonable and appropriate under business judgment rule because it offered the best means of maximizing value for benefit of debtor's estate); *see also In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (internal citation omitted).

45.     Courts in this Circuit have held that break-up fees should be approved as long as three questions are answered in the negative:  (a) is the relationship between the parties who negotiated the fee tainted by self-dealing or manipulation; (b) does the fee discourage bidding; and (c) is the amount of the fee unreasonable relative to the proposed purchase price.  *In re Integrated Resources, Inc.*, 147 B.R. at 657; *In re APP Plus, Inc.*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (citing *Integrated Resources* but adding a fourth factor taking into account "whether the proposed [break-up fee] is unduly burdensome to the estate in view of the specific facts and circumstances of [the] case and whether it is in the best interests of the estate, creditors, and equity holders.").   On this point, courts within the Second Circuit have repeatedly recognized the benefits to a debtor's estate resulting from the presence of an established stalking horse bid.  *See, e.g.*, *Gey Assocs. Gen. P'Ship v. 310 Assocs. (In re 310 Assocs.)*, 346 F.3d 31, 34 (2d Cir. 2003) (noting that presence of stalking horse bid may encourage later bidders, and break-up fee compensates stalking horse "for the risk it shoulders in being first bidder"); *In re APP Plus, Inc.*, 223 B.R. at 874 (discussing rationale for break-up fees); *Metaldyne*, 409 B.R. at 670 ("Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer.").   NYNM Management submits that all requisite elements for approval of the Bid Protections are met here.

46.     In this case, the Break-Up Fee and Expense Reimbursement were the product of efforts by NYNM Management's investment banker to market the NYNM Assets to all potentially interested buyers, and resulted from arm's-length negotiations conducted in good faith between NYNM Management and the Stalking Horse.   The Break-Up Fee and Expense Reimbursement reflect the time spent, efforts made, and resources expended by the Stalking

Horse and its advisors in the due diligence and negotiation process that culminated in the Agreement.  In light of the relatively limited interest from the market at large, and the extensive diligence efforts required to value the NYNM Assets, the Bid Protections were essential to securing the Stalking Horse's commitment to participate in the Continued Auction as the "stalking horse bidder."  The amount of the Break-Up Fee (3% of the Purchase Price) and Expense Reimbursement (not to exceed $450,000) is appropriate in light of the Purchase Price, and is not so high that it would cause any chilling effect on other prospective purchasers.  The Break-Up Fee and Expense Reimbursement are reasonable and within "market" for such fees.

47.    NYNM Management's ability to offer the Break-Up Fee and Expense Reimbursement enables NYNM Management to ensure the sale of the NYNM Assets to a contractually-committed bidder at a price NYNM Management believes to be fair while, at the same time, providing NYNM Management with the potential of an even greater return to the estate.  NYNM Management and the Stalking Horse are not related,[4] and each has acted in good faith and negotiated at arm's length throughout this process.

48.    Indeed, the Break-Up Fee and Expense Reimbursement induced the Stalking Horse to submit a bid that will serve as a minimum floor for the NYNM Assets on which NYNM Management, its creditors and other bidders may rely.  Approval of the Bid Protections is all the more appropriate where, as here, NYNM Management will be afforded the ability to shop the NYNM Assets for a higher or better offer without risk of losing the Stalking Horse.  *In re Global Crossing, Ltd.*, 295 B.R. 726, 745-46 (Bankr. S.D.N.Y. 2003).  NYNM Management's ability to do so would be eliminated, however, if NYNM Management is not authorized to pay the Break-Up Fee and Expense Reimbursement.  Absent authorization of the payment of the Break-Up Fee

---

[4]    The Stalking Horse disclosed to NYNM Management that Arvind Walia, who previously managed the Debtors' RCM Business, will be a minority investor (approximately 10%) in the Stalking Horse

and Expense Reimbursement, NYNM Management might lose the opportunity to obtain the highest and best available offer for the NYNM Assets and the downside protection that will be afforded by the Agreement.

49.    Courts have considered break-up fees to be administrative expenses of debtor's estate, as they are "an actual and necessary cost and expense of preserving the debtor's estate within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code." *See In re Ray Realty Fulton, Inc.*, Case No. 09-41225, 2009 WL 2600760, at *1 (Bankr. E.D.N.Y. Aug. 21, 2009); *see also In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Sept. 17, 2008) (break-up fee, if triggered, deemed an actual and necessary cost and expense of preserving Debtor's estate, within the meaning of section 503 of the Bankruptcy Code); *In re Fortunoff Fine Jewelry and Silverware, LLC*, No. 08–10353, 2008 WL 618983, at *2 (Bankr. S.D.N.Y. Feb. 22, 2008) (purchasers granted an allowed administrative claim in Debtors' chapter 11 cases in an amount equal to the break-up fee).

50.    Here, NYNM Management's customers and employees will take comfort that the Stalking Horse's bid will ensure the continuation of NYNM Management's business. Moreover, the Stalking Horse has provided a material benefit to NYNM Management and its creditors in the form of a baseline value for the NYNM Assets, which increases the likelihood that the Continued Auction will yield the best possible price. Both NYNM Management and the Stalking Horse, as parties to the Agreement, agree that the protections afforded by the Break-Up Fee and Expense Reimbursement are an integral part of the bargain. Accordingly, approval of the Bidding Procedures, including the Break-Up Fee and Expense Reimbursement, is a bargained-for condition to the Stalking Horse's obligation to proceed with the transaction contemplated in the Agreement.

51.    For the foregoing reasons, NYNM Management requests (1) that the payment of the Break-Up Fee and the Expense Reimbursement under the conditions set forth in the Agreement be approved as a superpriority administrative expense with priority pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (2) that the Court approve and authorize payment of the Break-Up Fee and Expense Reimbursement pursuant to the terms of the Agreement.

C.    **The Continued Auction and Sale Hearing Notice Should be Approved**

52.    Pursuant to Bankruptcy Rules 2002(a) and 6004, NYNM Management is required to give 21 days' notice of any proposed sale of property not in the ordinary course of business. Bankruptcy Rule 2002(c) further provides that such notice must include the time and place of any auction, a sale hearing, and the time fixed for objections to the sale.  NYNM Management provided notice of the Sale of the NYNM Assets upon service of the First Bidding Procedures Order on June 7, 2018.  *See* Affidavit of Service [D.I. 301].

53.    Further, the Initial Debtors' Bidding Procedures set forth that the Initial Auction may be continued until a successful bidder is chosen from the bids submitted at the Initial Auction.  *See* Bidding Procedures Order, Annex 1 at p. 8 ("If an Auction is conducted, it shall continue until the Debtors determine, in consultation with the Committee and the DIP Agent, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction").  Amongst the qualified bids submitted at the Initial Auction was the Stalking Horse's bid for the NYNM Assets.  The Continued Auction and Hearing Notice and the Creditor Notice, as applicable, set forth all the information a potential bidder and any other party in interest should require about the continued bidding process for the NYNM Assets, including: notice of the Bidding Procedures and information on how to obtain a copy of the Bidding Procedures; the

24

Bid Deadline; the time, date, and location of the Continued Auction; and the time, date and location of the Sale Hearing.

54.    NYNM Management submits that the Continued Auction and Hearing Notice and the Creditor Notice as proposed comply with Bankruptcy Rule 2002 and the Sale Guidelines, and constitute good and adequate notice of the Continued Auction and the sale of the NYNM Assets. Because NYNM Management proposes to serve the Continued Auction and Hearing Notice upon all Notice Parties and the Creditor Notice upon all other known creditors and parties in interest, NYNM Management submits that the notice requirements of Bankruptcy Rules 2002(a)(2) and 6004 are satisfied.  Therefore, NYNM Management respectfully requests that the Court approve the Continued Auction and Hearing Notice and the Creditor Notice and the notice procedures proposed above.

## II.    THE SALE ORDER SHOULD BE ENTERED

### A.    There is a Compelling Business Justification for the Sale Because It Will Maximize Value to NYNM Management's Estate

55.    Section 363(b)(1) of the Bankruptcy Code provides, in relevant part, that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Section 105(a) of the Bankruptcy Code in turn provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).  Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper.  *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002).

56.    Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets prior to confirmation of a plan.  However, courts in this Circuit and elsewhere hold that the sale or use of property outside the ordinary course of business should be approved where NYNM Management can articulate a business justification for the transaction.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re CPJFK, LLC*, 496 B.R. 290, 304 (Bankr. E.D.N.Y. 2011) (adopting *Lionel Corp.* standard for sound business justification); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989).  Whether or not there are sufficient business reasons to justify a transaction depends upon the facts and circumstances of each case.  *Lionel*, 722 F.2d at 1071.

57.    NYNM Management submits that sound business justification exists to sell the NYNM Assets to the Stalking Horse pursuant to the Agreement or the Successful Bidder pursuant to the Bidding Procedures.  As explained in the Supplemental Declaration, NYNM Management commenced its chapter 11 case to, among other things, effectuate a sale of its assets in the belief that doing so will maximize value for all stakeholders.  Since the filing of this case the loss of key clients and management personnel for NYNM have made the reasons for a sale on the proposed timeline even more compelling.  Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of NYNM Management's estate for the benefit of all stakeholders.

58.    Under these circumstances, a compelling business justification exists for the expeditious sale of the NYNM Assets outside the ordinary course of business and prior to confirmation of a plan of reorganization.  Accordingly, NYNM Management submits that the

proposed sale of the NYNM Assets pursuant to section 363 of the Bankruptcy Code should be approved.

**B.    The NYNM Sale is Proposed in "Good Faith" as
Contemplated By Section 363(m) of the Bankruptcy Code**

59.    The Agreement is the product of extensive arm's length negotiations between NYNM Management and the Stalking Horse.  In addition, NYNM Management intends to negotiate any other asset purchase agreement at arm's length and in good faith and, thus, believes that any Successful Bidder, including the Stalking Horse, should be entitled to the protections of section 363(m) of the Bankruptcy Code.

60.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b)…of this section of a sale…of property does not affect the validity of a sale…under such authorization to an entity that purchased…such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale…were stayed pending appeal.

11 U.S.C. § 363(m).

61.    Section 363(m) of the Bankruptcy Code thus protects a good faith purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) of the Bankruptcy Code applies to sales of interests in tangible assets, such as the NYNM Assets.

62.    The Second Circuit instructs that a party would have to show fraud or collusion between a purchaser and the debtor-in-possession or trustee to demonstrate a lack of good faith. *See Kabro Assocs. of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 273 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [purchaser's] good faith status at a judicial sale involves fraud, collusion between the [purchaser] and other bidders

or the trustee, or an attempt to take grossly unfair advantage of other bidders.") (internal citations omitted); *see also In re Angelika Films 57th, Inc.*, Nos. 97 Civ. 2239 (MBM), 1997 WL 283412, at *7 (S.D.N.Y. May 29, 1997); *In re Bakalis*, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).  No such facts exist here.

63.    To the contrary, NYNM Management submits, and will present evidence at the Sale Hearing, if necessary, that as set forth above, the Agreement was an arm's-length transaction, in which the Successful Bidder acted in good faith.  The Continued Auction is an open sale process, with the NYNM Assets to be sold to the bidder who submits the highest and best bid per the terms set forth in the Sale Guidelines, and NYNM Management will have its own advisors to negotiate on its behalf throughout the Continued Auction and the NYNM Sale. Accordingly, NYNM Management requests that the Court make the finding at the Sale Hearing that the Successful Bidder has purchased the NYNM Assets in good faith within the meaning of section 363(m) of the Bankruptcy Code.

### C.    The NYNM Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Interests, and other Encumbrances

64.    Under section 363(f) of the Bankruptcy Code, a debtor-in-possession may sell all or any part of its property free and clear of any and all liens, claims or interests in such property if any of the following criteria are met:  (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a bona fide dispute; or (v) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); *Citicorp Homeowners Serv.,*

*Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met); *see also In re Dundee Equity Corp.*, No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) (same); *In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

65.    In addition, several courts have held that section 363(f) grants bankruptcy courts the power to convey assets free and clear of all pre-petition claims.  *See, e.g.*, *In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325, at *5 (Bankr. D. Del. Mar. 27, 2001) (collecting cases and discussing need to extinguish pre-petition claims in order to facilitate sale of assets for maximum value).  Furthermore, other courts, concluding that section 363(f) does not empower them to convey assets free and clear of pre-petition claims, have nonetheless held that Bankruptcy Code section 105(a) provides them with the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f).  *See, e.g.*, *In re General Motors Corp.*, 407 B.R. 463, 499-504 (Bankr. S.D.N.Y. 2009) (discussing Second Circuit precedent permitting sale of assets "free and clear" of successor liability claims pursuant to section 363(f) and 105(a)) (internal citations omitted); *Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

66.    NYNM Management expects that proposed sale of the NYNM Assets will satisfy, at minimum, the second and/or fifth requirement of section 363(f) of the Bankruptcy Code, if not others as well.  Holders of liens, claims or interests in or against the NYNM Assets will be adequately protected because their liens, claims and/or interests will attach to the proceeds of the sale with the same force, effect, and priority as their prior liens, claims and/or interest in the

NYNM Assets, subject to any defenses NYNM Management may possess with respect thereto. Moreover, such holders of liens, claims or interests may consent to the sale of the NYNM Assets. Accordingly, the sale of the NYNM Assets free and clear of all adverse interests is warranted and the Sale should be approved under section 363(f) of the Bankruptcy Code.

## III.    "EXTRAORDINARY PROVISIONS" OF THE SALE UNDER THE SALE GUIDELINES

67.    The Agreement contains certain provisions designated "extraordinary" under the Sale Guidelines. In each instance, as explained more fully below, NYNM Management believes that the "extraordinary provisions" are necessary components of the NYNM Sale and will serve to ensure that the NYNM Assets are sold through a process that is both prompt and for the highest possible value. The Agreement contains the following "Extraordinary Provisions" as per the Sale Guidelines:[5]

### A.    Record Retention.

68.    Organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of the Seller that are required by Law to be retained are Excluded Assets. Moreover, pursuant to Section 6.4.6 of the Agreement, Stalking Horse shall make available to Seller copies of all books, files, documents and records included as part of the NYNM Assets as Seller may reasonably request for a period of eighteen (18) months post-Closing. If Seller desires copies of any of such documents or records, all copying costs shall be

---

[5]    This list of possible "Extraordinary Provisions" (as such term is defined in the Sale Guidelines) is not intended to be an admission that any of these provisions are unusual relief in sales transactions of this nature conducted pursuant to section 363 of the Bankruptcy Code.

borne by Seller.  Additionally, pursuant to section 6.9 of the Agreement, so long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the NYNM Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Seller reimburses Purchaser for the reasonable costs and expenses thereof.  NYNM Management will have reasonable access to its books and records to enable administration of its chapter 11 case.

**B.  No Successor Liability for the Successful Bidder**

69.  NYNM Management requests that the Court enter an order authorizing the NYNM Assets to be sold free and clear of all liens, claims, interests and encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.  In addition, NYNM Management submits that the NYNM Assets may be sold free and clear of claims, including successor liability claims, if any, as no Successful Bidder will, as a result of any action taken in connection with the purchase of the NYNM Assets:  (a) be a successor to NYNM Management; (b) have, *de facto* or otherwise, merged with or into NYNM Management; or (c) be a continuation or substantial continuation of NYNM Management or any enterprise of NYNM Management.  To the contrary, as explained in the Supplemental Declaration, NYNM Management has commenced its chapter 11 proceeding for, among other reasons, the purpose of selling all or substantially all of

its assets to an outside buyer prior to a liquidation of any remaining Excluded Assets and the wind-up of any remaining operations. The NYNM Assets will pass to the Successful Bidder and any employees of NYNM Management who join the Successful Bidder following the NYNM Sale will do so on terms acceptable to the Successful Bidder and only the Successful Bidder.

70. The ability to acquire the NYNM Assets free and clear of any successor liability claims is a critical component of the bargain reflected in the Agreement; it will bring stability and finality to the purchase of NYNM Assets via the NYNM Sale, and thus enhances the ultimate value of the NYNM Assets to the Successful Bidder, and, by extension, to the estate.

## C. Any Actions Against the Successful Bidder Arising Out of the NYNM Sale Should be Enjoined

71. NYNM Management requests that, as part of the Sale Order, the Court order that all persons and entities be forever barred and permanently enjoined from taking any actions against the ultimate buyer or its affiliates (as they existed immediately prior to closing) to recover any claim which such person has against NYNM Management. Notwithstanding the foregoing, NYNM Management does not seek any order (1) preventing such persons or entities from pursuing an action against the Successful Bidder under the terms of any applicable agreement or related documents for purchase of the NYNM Assets; or (2) barring any administrative agencies, governmental, tax and regulatory authorities, secretaries of state, federal, state and local officials from properly exercising their police and regulatory powers.

72. The foregoing injunction provisions are an integral part of the bargain reflected in the Agreement. In the interests of bringing greater stability and finality to the transfer of the NYNM Assets pursuant to the NYNM Sale, NYNM Management submits that entry of an order in the form described above is justified in the interest of maximizing the value of the NYNM Assets to the estate.

### D.    Deadlines that Limit Notice

73.    The deadlines set forth in the Agreement will be within twenty-one (21) days of the entry of the Order.  However, entry of these deadlines does not effectively limit notice to interested parties because NYNM Management previously provided notice of the sale of substantially all of NYNM Management's assets, including the NYNM Assets, at an auction upon service of the First Bidding Procedures Order as directed by this Court.  *See* Affidavit of Service [D.I. 301].

74.    Further, the Bidding Procedures set forth that the Initial Auction may be continued until a successful bidder is chosen from the bids submitted at the Initial Auction.  *See* Bidding Procedures Order, Annex 1 at p. 8 ("If an Auction is conducted, it shall continue until the Debtors determine, in consultation with the Committee and the DIP Agent, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction").  Amongst the qualified bids submitted at the Initial Auction was the Stalking Horse's bid for the NYNM Assets.  Accordingly, NYNM Management submits that notice of the Continued Auction is not effectively limited and sufficient notice has been provided for the Continued Auction and the Sale Hearing in accordance with Bankruptcy Rules 2002(a) and 6004, Local Bankruptcy Rule 6004-1 and Section 2 of the Sale Guidelines.

### E.    The Proposed NYNM Sale Does Not Constitute a Fraudulent Transfer

75.    NYNM Management requests a finding in the Sale Order that the Agreement (or any alternative agreement between NYNM Management and a Successful Bidder) was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia, and that neither NYNM Management nor the Stalking Horse is entering into the NYNM Sale transaction fraudulently.

76.    As set forth herein, NYNM Management has structured the proposed Bidding Procedures and sale process to ensure that the resulting NYNM Sale will be an arm's-length transaction yielding the highest and best value for the NYNM Assets.   In addition, NYNM Management and its advisors has undertaken a comprehensive review of the market to identify all potentially interested buyers so as to ensure the maximum number of participants in the Continued Auction.   Accordingly, NYNM Management submits that good cause exists for a finding that the proposed NYNM Sale does not constitute a fraudulent transfer.

**F.    The Successful Bid is Fair Consideration for the NYNM Assets and Receipt of the Assumed Contracts and Leases**

77.    NYNM Management requests a finding in the Sale Order that the consideration provided by the Successful Bidder to NYNM Management for its purchase of the NYNM Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act.   As set forth herein, NYNM Management has structured the Bidding Procedures and sale process to ensure that the resulting NYNM Sale will be an arms-length transaction yielding the highest and best value for the NYNM Assets.  The eventual sale price for the NYNM Assets will have been twice subjected to a market check; first by way of Houlihan Lokey's marketing of the NYNM Assets and efforts to identify potential bidders, a process that resulted in the identification of the Stalking Horse and the negotiation of the Stalking Horse bid, and second, through the open and competitive Continued Auction process.   NYNM Management submits that these steps will ensure that the eventual price paid by the Successful Bidder will constitute the highest and best value for the NYNM Assets, and thus fair consideration.

78.    In addition, a finding that the Purchase Price constitutes fair consideration is an important part of the bargain reflected in the Agreement; it will bring stability and finality to the

purchase of the NYNM Assets via the NYNM Sale, and thus enhances the ultimate value of the NYNM Assets to the Successful Bidder, and, by extension, to the estate. For these reasons, NYNM Management submits that good cause exists for a finding that the consideration provided by the Successful Bidder to NYNM Management for its purchase of the NYNM Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code.

### G. Relief from the Fourteen Day Waiting Periods Under Bankruptcy Rules 6004(h)

79.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property. . . is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." NYNM Management hereby requests that the Sale Order be effective immediately by providing that the fourteen-day stay under Bankruptcy Rules 6004(h) is waived.

80.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rules 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, Collier on Bankruptcy suggests that the fourteen-day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 16th Ed. Rev., ¶ 6004.11. Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

81.     A prompt closing of the NYNM Sale is of critical importance to the continued stability of NYNM Management's business and the preservation of value for the estate. Based

on its experience operating the business, NYNM Management believes with good cause that consummating a sale transaction as soon as practicable is necessary to maintain value. Accordingly, NYNM Management hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h).

## NO PRIOR REQUEST

82.    No prior Motion for the relief requested herein has been made to this or any other court.

## NOTICE

83.    Notice of this Motion has been given to the following parties:  (a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to Bank of America, N.A.; (d) counsel to BMO Harris Bank, N.A.; (e) counsel to Keybank National Association; (f) counsel to Stifel Bank & Trust; (g) counsel to Woodforest National Bank; (h) all taxing and regulatory authorities having jurisdiction over any of the NYNM Assets subject to the sale, including the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the state/local environmental agencies in the jurisdictions where NYNM Management own or lease real property; (k) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date of the filing of this Motion; (l) all persons or entities known to NYNM Management that have or have asserted a lien on, or security interest in, all or any portion of the NYNM Assets; (m) all counterparties to executory contracts or unexpired leases with NYNM Management; (n) counsel to the Stalking Horse; (o) all Attorneys General for the states in which NYNM Management conducts business; and (p) all potential bidders previously identified or otherwise known to NYNM Management.  NYNM Management submit that the notice provided for herein is consistent with Section 2(b) of the Sale Guidelines. As described above, NYNM Management intends to provide additional notice of the Continued

Auction, NYNM Sale, and Sale Hearing once the Second Bidding Procedures Order is entered. In light of the nature of the relief requested herein, NYNM Management submits that no other or further notice is necessary.

<div align="center">[<em>Remainder of Page Intentionally Left Blank</em>]</div>

## CONCLUSION

**WHEREFORE,** NYNM Management respectfully requests that this Court enter the

Order and the Sale Order granting the relief requested herein and that it grant NYNM

Management such other and further relief as is just and proper.

Dated: July 5, 2018                Respectfully submitted,
      New York, New York

                                      **DLA PIPER LLP (US)**

                                      */s/ Thomas R. Califano*
                                      Thomas R. Califano (6144)
                                      DLA Piper LLP (US)
                                      1251 Avenue of the Americas
                                      New York, New York 10020-1104
                                      Telephone: (212) 335-4500
                                      Facsimile:  (212) 335-4501
                                      E-mail:  thomas.califano@dlapiper.com

                                      *Counsel to the Debtors and Debtors in Possession*

## **EXHIBIT A**

Order

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x

| In re: | : | Chapter 11 |
|---|---|---|
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-_____ (AST)[1] |
| | : | |
| Debtors. | x | (Jointly Administered) |

----------------------------------------------------------------------

**ORDER (I) APPROVING BIDDING PROCEDURES RELATING TO THE SALE OF CERTAIN ASSETS OF NEW YORK NETWORK MANAGEMENT, L.L.C; (II) APPROVING BID PROTECTIONS; (III) APPROVING THE FORM AND MANNER OF NOTICE OF SALE BY AUCTION;(IV) ESTABLISHING PROCEDURES FOR NOTICING AND DETERMINING CURE AMOUNTS; (V) SCHEDULING A HEARING ON THE PROPOSED SALE; AND (VI) GRANTING RELATED RELIEF**

Upon the Motion (the "Motion") of New York Network Management, L.L.C.

("NYNM Management"), for an order (A) approving certain bidding procedures (the "Bidding

---

[1] The Debtors have sought to jointly administer the chapter 11 case of New York Network Management, L.L.C. with the above-captioned chapter 11 cases.  The Court, however, has not yet granted such relief.

Procedures") for the sale of certain of the assets of NYNM Management, (B) scheduling an auction and sale hearing related thereto, (C) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases related thereto (the "Assignment Procedures"), all as more fully set forth in the Motion, and (D) granting related relief, including but not limited to approving the form and manner of notices related to the foregoing; and NYNM Management having entered into an Asset Purchase Agreement (the "Agreement")[2] dated July 5, 2018 with HealthTek Solutions, LLC (together with any permitted assignee, the "Stalking Horse" or "Purchaser"), for the sale of certain of the assets of NYNM Management (as defined in the Agreement, the "NYNM Assets"); and the Court having subject-matter jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334; and the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided; and no other or further notice needing to be provided; and the relief requested in the Motion being in the best interests of NYNM Management and its estate and creditors; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and any objections to the Motion having been overruled or resolved; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings held before the Court; and after due deliberation and sufficient cause appearing therefor,

---

[2]  All capitalized terms not defined herein have the meanings ascribed to them in the Motion or the Agreement, as applicable.

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A. The Court has jurisdiction over this matter and over the property of NYNM Management and its bankruptcy estate pursuant to 28 U.S.C. §§ 157(a) and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M)-(O). The statutory predicates for the relief sought herein are 11 U.S.C. §§ 105, 363, and 365, Fed. R. Bankr. P. 2002, 6004, 6006, 9007, and 9008, and Local Bankruptcy Rule 6004-1. Venue of this case and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B. NYNM Management has properly filed and noticed the Motion as to the relief to be granted pursuant to this Order. The issuance and immediate effectiveness of this Order as of the date hereof is supported by evidence of compelling business justifications and other circumstances demonstrating that the relief granted by this Order is necessary to prevent immediate and irreparable harm to NYNM Management and its estate.

C. Good and sufficient notice of the relief sought in the Motion has been given, and no further notice is required, except as set forth in the Bidding Procedures with respect to the Auction and the Sale Hearing and in the Assignment Procedures. A reasonable opportunity to object or to be heard regarding the relief granted herein was afforded to all interested persons and entities.

D. NYNM Management has articulated good and sufficient reasons for granting the Motion to the extent provided herein, including approving the Bid Protections, the Bidding Procedures, and the Assignment Procedures.

E. The Bid Protections were negotiated in good faith and at arm's length, are reasonable and appropriate, and represent the best method for maximizing the return to NYNM Management's estate for the NYNM Assets.

F.      The Stalking Horse has expended, and will likely continue to expend, considerable time, money, and energy pursuing the purchase of the NYNM Assets and has engaged in extended arm's-length and good-faith negotiations over the terms and conditions of the Agreement, the Bidding Procedures, and the Assignment Procedures.

G.      Recognizing this expenditure of time, energy, and resources, NYNM Management has agreed to pay the Expense Reimbursement and the Break-Up Fee (the "Bid Protections") to the Stalking Horse, subject to the conditions set forth in the Agreement.  The Bid Protections, as allowed herein, are (i) actual and necessary costs and expenses of preserving NYNM Management's estate within the meaning of Bankruptcy Code Section 503(b); (ii) commensurate to the real and substantial benefits conferred upon NYNM Management's estate by the Stalking Horse; (iii) reasonable and appropriate in light of the size and nature of the proposed sale, comparable transactions, the commitments that have been made, and the efforts that have been made and will be made by the Stalking Horse; and (iv) necessary to induce the Stalking Horse to continue to pursue the purchase of the NYNM Assets.

H.      The Agreement does not contemplate the sale or lease of personally identifiable information, as that term is defined in the Bankruptcy Code.

**THEREFORE, IT IS HEREBY ORDERED THAT**:

1.      The Bidding Procedures attached hereto as **Annex 1** are hereby authorized and approved.

2.      The form and sufficiency of the Auction and Hearing Notice attached hereto as **Annex 2** is approved.

3.      The Assignment Procedures attached hereto as **Annex 3** are authorized and approved.

- 4 -

4.      The form and sufficiency of the Assignment Notice attached hereto as **Annex 4** is approved.

5.      The form and sufficiency of the Auction Results Notice attached hereto as **Annex 5** is approved.

6.      The form and sufficiency of the Creditor Notice attached hereto as **Annex 6** is approved.

7.      The form and sufficiency of the Further Assignments Notice attached hereto as **Annex 7** is approved.

8.      The Bid Protections are approved.  NYNM Management may pay the Bid Protections to the Stalking Horse as set forth in the Agreement, subject to the modifications set forth in the Bidding Procedures.  The Bid Protections approved by the Court shall be a superpriority administrative expense claim in NYNM Management's chapter 11 case pursuant to section 507 of the Bankruptcy Code.

9.      Objections, if any, to the sale of the NYNM Assets, the assumption and assignment of contracts and leases, and the cures thereunder, if any, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the following parties (the "Objection Parties"): (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino

[al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so that it is **actually received** by each of the foregoing parties by **4:00 p.m. (prevailing Eastern Time) on July 17, 2018** (the "**Objection Deadline**"), and service to the above parties may be by email.

10.    The deadline to submit bids for all or a portion of the NYNM Assets will be **July 17, 2018 at 4:00 p.m. (prevailing Eastern Time)**.

11.    In the event that NYNM Management timely receives one or more Qualified Bids in addition to the Agreement with the Stalking Horse, NYNM Management shall conduct an auction beginning at **10:00 a.m. (prevailing Eastern Time) on July 18, 2018**. The Auction will take place at the offices of DLA Piper LLP (US), located at 1251 Avenue of the Americas, New York, NY 10020.

12.     In the event NYNM Management selects a Successful Bidder or Backup Bidder other than the Purchaser at the Auction, the Objection Deadline solely with respect to NYNM Management's choice of such alternative bidder(s), the modifications to the terms of the Sale to the Successful Bidder, or adequate of assurance of future performance by the alternative Successful Bidder or Backup Bidder will be on **July 20, 2018 at 11:00 a.m.**  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties.

13.     The Court shall conduct the Sale Hearing and consider any unresolved objections to the Sale on **July 23, 2018 at 11:00 a.m. (prevailing Eastern Time)** or at such other time ordered by the Court.  The Sale Hearing will be held before The Honorable Judge Alan S. Trust, Courtroom 2554, United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800.

14.     The Stalking Horse shall be considered a party in interest under section 1109(b) of the Bankruptcy Code and shall have standing to challenge NYNM Management's selection of the Successful Bid at the Auction.

15.     The appointment of a consumer privacy ombudsman is not required in connection with the transactions contemplated by the Agreement.

16.     Notwithstanding anything in the Agreement or in this Order to the contrary, in the event that NYNM Management's authorized governing bodies or management, as applicable, in the exercise of their fiduciary duties, decide that it is not in the best interests of the estate to consummate the transactions contemplated under the Agreement, NYNM Management may terminate the Agreement without liability other than the Bid Protections,

which are subject to the limitations of this Order and the Agreement.  This paragraph shall be construed as a provision in the Agreement.

17.    Nothing herein shall limit the Court's ability to review NYNM Management's determination of the highest and best offer for the NYNM Assets or other assets.

18.    This Court shall retain exclusive jurisdiction over any matter or dispute relating to this Order and to the sale of the NYNM Assets, the Bid Protections, the Agreement, the Bidding Procedures, the Assignment Procedures, the Sale Hearing, the Continued Auction, the Successful Bid, the Backup Bid, and/or any other matter that in any way relates to the foregoing.

19.    Notwithstanding the possible applicability of Fed. R. Bankr. P. 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this Order.

**ANNEX 1 TO THE BIDDING PROCEDURES ORDER**
**Bidding Procedures**

# BIDDING PROCEDURES FOR SALE OF CERTAIN
# ASSETS OF NEW YORK NETWORK MANAGEMENT, L.L.C.

New York Network Management, L.L.C. ("**NYNM Management**"), as a chapter 11 debtor and debtor-in-possession, has entered into that certain Asset Purchase Agreement (the "**Agreement**") for the sale of certain of its assets (the "**NYNM Assets**") to HealthTek Solutions, LLC (together with any permitted assignee, the "**Purchaser**" or the "**Stalking Horse**"), which provides, among other things, for the payment of $16.5 million and the assumption of the Assumed Liabilities (as defined in the Agreement).  The transaction with the Purchaser pursuant to the Agreement is referred to herein as the "**Sale**".

On July [_], 2018, the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**") granted NYNM Management's motion (the "**Bidding Procedures Motion**") for an order approving the following bidding procedures (the "**Bidding Procedures**") to be employed in connection with the solicitation for higher or otherwise better bids at an auction (the "**Auction**") for the sale of the NYNM Assets (the "**Bidding Procedures Order**"), if necessary.  The Bidding Procedures Order also approved certain procedures (the "**Assignment Procedures**") relating to the assumption and assignment of certain executory contracts and unexpired leases, the assumption and assignment of which will be a condition to closing the transactions contemplated by the Agreement (collectively, the "**Assumed Contracts and Leases**").

      1.     **Important Dates**

| | |
|---|---|
| **Sale Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Bid Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Auction** | **July 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **July 20, 2018 at 11:00 a.m. ET** |
| **Sale Hearing** | **July 23, 2018 at 11:00 a.m. ET** |

      2.     **Assets to be Sold Free and Clear**

Except as otherwise provided in definitive documentation with respect to the Sale, all of NYNM Management's rights, title and interest in and to the NYNM Assets shall be sold free and clear of all pledges, liens, security interests, hypothecations, encumbrances, claims, charges, options, deeds of trust, encroachments, retentions of title, conditional sale arrangements, restrictive covenants, rights of first offer, rights of first refusal, licenses or any other limitations, restrictions and interests of any kind (collectively, the "**Claims and Interests**").

3.    **Stalking Horse**

The Agreement provides that the Stalking Horse shall act as the "stalking horse bidder" in the Auction and, if it is not the Successful Bidder, shall be entitled to a break-up fee in the amount of $495,000 (the "**Break-Up Fee**") and reimbursement of the reasonable, documented, out-of-pocket expenses not to exceed $450,000 (the "**Expense Reimbursement**" and together with the Break-Up Fee, the "**Bid Protections**"), which are payable in accordance with the terms of the Agreement.

4.    **Mailing and Publication of Notices**

No later than two (2) business days following entry by the Bankruptcy Court of the Bidding Procedures Order, NYNM Management shall mail by first-class mail (or by email as to any potential purchasers referenced below) the notice of the proposed sale of the NYNM Assets (the "**Auction and Hearing Notice**") in the form approved by the Bankruptcy Court in the Bidding Procedures Order to (a) the Office of the United States Trustee for the Eastern District of New York; (b) counsel to the Committee; (c) counsel to NYNM Management's prepetition lenders; (d) all taxing authorities having jurisdiction over any of the NYNM Assets subject to the sale, including the Internal Revenue Service and the Securities and Exchange Commission; (e) the state/local environmental agencies in the jurisdictions where NYNM Management owns or leases real property; (f) all parties that have requested special notice pursuant to Bankruptcy Rule 2002 as of the date prior to the date of entry of the Bidding Procedures Order; (g) all persons or entities known to NYNM Management that have or have asserted a lien on, or security interest in, all or any portion of the NYNM Assets; (h) all counterparties to executory contracts or unexpired leases with NYNM Management; (i) counsel to the Stalking Horse; (j) all Attorneys General for the states in which NYNM Management conducts business; and (k) all potential bidders previously identified or otherwise known to NYNM Management.

In addition, no later than two (2) business days following entry by the Bankruptcy Court of the Bidding Procedures Order, NYNM Management shall mail by first-class mail the Creditor Notice in the form approved by the Bankruptcy Court in the Bidding Procedures Order upon all other known creditors and parties in interest.

Within two (2) days after entry of the Bidding Procedures Order, NYNM Management shall also cause the Creditor Notice to be published on the website of NYNM Management's claims and noticing agent.

Any other interested party that wishes to receive a copy of the Bidding Procedures Order or the Bidding Procedures Motion shall make such request in writing to NYNM Management's counsel, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]).  Additionally, copies may be downloaded from the Court's docket at http://ecf.nyeb.uscourts.gov and from NYNM Management's restructuring website at: http://dm.epiq11.com/orionhealthcorp.

5.    **Confidentiality Agreement / Due Diligence**

NYNM Management may afford any interested party the opportunity to conduct a reasonable due diligence review in the manner determined by NYNM Management in its discretion, in consultation with the Official Committee of Unsecured Creditors (the "**Committee**") and Bank of America, N.A., the administrative agent in connection with NYNM Management's prepetition financing facilities (the "**DIP Agent**").  NYNM Management shall not be obligated to furnish any due diligence information after the Bid Deadline (defined below).

**Contacts for parties interested in conducting due diligence:**

Any entity that wishes to conduct due diligence with respect to the NYNM Assets must deliver to counsel to NYNM Management, DLA Piper LLP (US) (Attn:  Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]) and NYNM Management's investment banker, Houlihan Lokey Capital, Inc. (Attn: Bradley Jordan [bjordan@hl.com] and David Salemi [dsalemi@hl.com]) an executed confidentiality agreement in form and substance substantially similar to the confidentiality agreement executed by the Stalking Horse and satisfactory to NYNM Management, in consultation with the Committee and the DIP Agent, and which shall inure to the benefit of the Stalking Horse or the Successful Bidder, as applicable, from and after a closing of the sale.

NYNM Management may allow any party delivering such a confidentiality agreement (such person or entity, a "**Potential Bidder**") to conduct due diligence with respect to the NYNM Assets and other assets.

6.    **Qualification of Bids and Bidders**

To participate in the bidding process and to have a bid considered by NYNM Management, each Potential Bidder must deliver a written offer or offers satisfying the below criteria.  A "**Qualified Bidder**" is a Potential Bidder that delivers a binding bid that in NYNM Management's discretion (after consultation with the Committee and the DIP Agent) satisfies the following criteria (a "**Qualified Bid**").  The Stalking Horse (i) shall be deemed a Qualified Bidder and the bid reflected in the Agreement shall be deemed a Qualified Bid without compliance with the requirements below, and (ii) for the avoidance of doubt, shall not be required to serve as the Backup Bidder.

(a)    Bid Deadline.  Each Bid Package (defined below) must be delivered in written and electronic form (where available) to: (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]); and (c) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades,

Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]), so as to **actually be received no later than July 17, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline")**.

(b)    <u>Bid Package</u>.  Each bid must include (collectively, the "**Bid Package**"): (i) a written and signed irrevocable and binding offer letter (w) stating that the Potential Bidder offers to consummate a transaction on terms and conditions no less favorable than those found in the Agreement and in an amount at least equal to the Minimum Bid (as defined below), (x) confirming that the bid will remain irrevocable and binding until five business days following the entry of the Sale Order, (y) confirming that the Potential Bidder has had the opportunity to conduct due diligence prior to its offer and does not require further due diligence, has relied solely upon its own independent review and investigation and did not rely on any written or oral representations except as expressly set forth in the Modified Agreement (defined below), and (z) agreeing that the Potential Bidder shall, if designated as such in accordance with these procedures, serve as the Backup Bidder (defined below) until the consummation of the transaction pursuant to the Successful Bid; (ii) an executed copy of the Agreement as modified by the Potential Bidder in accordance with its bid ("**Modified Agreement**"); (iii) an electronic markup of the Agreement showing the revisions in the Modified Agreement, along with a clean copy of the Modified Agreement (formatted as a Microsoft Word document). NYNM Management, in consultation with the Committee and the DIP Agent, shall determine whether any Modified Agreement that modifies the Agreement in any respect beyond the identity of the purchaser and the purchase price under the Agreement is a Qualified Bid.

(c)    <u>Minimum Bid</u>.  The amount of the purchase price in any bids for the NYNM Assets must provide for consideration in cash, and/or a valid credit-bid by a secured creditor of NYNM Management, that is at least $150,000, in the aggregate, more than the Purchase Price stated in the Agreement, plus the amount required to satisfy the Bid Protections, as approved by the Bidding Procedures Order ($945,000) (the "**Minimum Bid**").

(d)    <u>Financial Information</u>. The Bid Package must contain such financial and other information that will allow NYNM Management, in consultation with the Committee and the DIP Agent, to make a determination as to the Potential Bidder's financial wherewithal and its ability to consummate the transactions contemplated by the Modified Agreement, including evidence of adequate financing, any proposed conditions to closing and adequate assurance of such bidder's ability to perform under any of the Assumed Contracts and Leases.   Any counterparty to an unexpired lease or executory contract that is scheduled to be assumed and assigned to the buyer may request adequate assurance information from NYNM

Management's counsel, and NYNM Management's counsel may provide such information to contract counterparties, provided that any party receiving adequate assurance information from the Stalking Horse or any other Qualified Bidder is required to maintain the confidentiality of such information.

(e)    Regulatory Approvals.  The Bid Package must describe all regulatory approvals the Potential Bidder will need and provide evidence of the Potential Bidder's ability to obtain all necessary regulatory approvals in a timely manner, if applicable.

(f)    Executory Contracts and Unexpired Leases.  The Modified Agreement must identify with particularity each and every proposed Assumed Contract and Lease.

(g)    Additional Bid Protections.  The bid must not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment, or propose to modify any of the Bidding Procedures.

(h)    Identity of Bidders.  Each Potential Bidder must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such bid, including the names and addresses of any members or individuals with an interest in the entity, and the complete terms of any such participation, as well as disclose the organization form and the business conducted by each entity.  Any Potential Bidder shall be required to provide such additional information as NYNM Management may require regarding a Potential Bidder's ability to satisfy the requirements of the applicable regulatory authorities.

(i)    Due Diligence.  The bid must not contain any due diligence or financing contingencies of any kind, and must affirmatively acknowledge that the Potential Bidder (i) had an opportunity to conduct due diligence prior to making its offer and does not require further due diligence, (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the NYNM Assets in making its bid, and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the NYNM Assets, or the completeness of any information provided in connection therewith.

(j)    Consents.  Each Potential Bidder must represent that it has obtained all necessary organizational approvals to make its competing bid and to enter into and perform the Modified Agreement and include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Modified Agreement.

- 5 -

(k)    <u>Deposit</u>. A Potential Bidder for the NYNM Assets (other than the Purchaser) must deposit **$500,000** (the "**Deposit**") with NYNM Management's counsel in the form of a certified check or wire transfer at least three (3) business days before the Auction. The Potential Bidder shall forfeit the Deposit if (i) the Potential Bidder is determined to be a Qualified Bidder and withdraws or modifies its bid other than as provided herein, (ii) the bidder is the Backup Bidder and withdraws the bid prior to the consummation of the Sale contemplated by the Successful Bid, or (iii) the bidder is the Successful Bidder and (x) withdraws the bid before the consummation of the sale contemplated by the Successful Bid, or (y) breaches the Agreement (or Modified Agreement, as applicable) associated with such bid. The Deposit shall be returned to the Potential Bidder (unless such Potential Bidder has forfeited its Deposit) (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder; (ii) if the Potential Bidder is determined to not be the Successful Bidder or the Backup Bidder at the Auction, no later than five (5) business days following conclusion of the Auction; or (iii) if the Potential Bidder is determined to be the Backup Bidder, no later than five (5) business days after consummation of the Sale to the Successful Bidder. The Deposit will not be required to be maintained in an interest-bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

NYNM Management shall have the right, after consultation with the Committee and the DIP Agent, to determine whether a bid meeting the requirements set forth in the Bidding Procedures is a Qualified Bid and shall notify bidders whether their bids have been determined to be Qualified Bids, as soon as possible, and prior to the Auction. For the avoidance of doubt, the Stalking Horse is a Qualified Bidder and the Agreement constitutes a Qualified Bid. After NYNM Management determine which bids are Qualified Bids, NYNM Management shall so notify the Stalking Horse and provide copies of all Qualified Bids to the Stalking Horse.

NYNM Management reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed a Qualified Bid.

Without the written consent of NYNM Management, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid during the period that such Qualified Bid remains binding as specified herein; *provided that* any Qualified Bid may be improved at the Auction, as set forth in these Bidding Procedures.

7.    **No Auction if Only One Qualified Bid**

If no Qualified Bids (other than Purchaser's Agreement) are submitted, NYNM Management shall not hold the Auction, but shall proceed with the Sale Hearing to seek approval of the sale of the NYNM Assets to the Purchaser pursuant to the Agreement (or any modifications agreed to between NYNM Management and Purchaser, in consultation with the Committee and the DIP Agent).

8.    **Auction**

In the event that NYNM Management timely receives more than one Qualified Bid (other than the Purchaser's Agreement), NYNM Management shall conduct the Auction with respect to the NYNM Assets.  The Auction will take place at the offices of NYNM Management's counsel, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, starting at **10:00 a.m. (prevailing Eastern Time) on July 18, 2018**, or at such other place, date and time as may be designated by NYNM Management, in consultation with the Committee and the DIP Agent, at or prior to the Auction.  NYNM Management may adopt rules for the Auction at any time that NYNM Management, in consultation with the Committee and the DIP Agent, reasonably determines to be appropriate to promote a spirited and robust auction.  Any rules adopted by NYNM Management will not unilaterally modify any of the terms of the Agreement (as may be consensually modified at the Auction) without the consent of the Purchaser.  The Auction shall be governed by the following procedures:

(a)    <u>Participation</u>.  Qualified Bidders shall be entitled to participate in the Auction, and each Qualified Bidder shall appear in person at the Auction, or through a duly authorized representative.  At least one day prior to the commencement of the Auction, each Qualified Bidder must confirm in writing that it will participate in the Auction; <u>provided</u>, <u>however</u>, that in the event a Qualified Bidder does not attend the Auction, the relevant Qualified Bid shall nonetheless remain fully enforceable against that Qualified Bidder in accordance herewith.  Representatives of the Committee, the United States Trustee, NYNM Management's prepetition secured lenders and their respective advisors shall be permitted to attend the Auction.

(b)    <u>Anti-Collusion</u>.  At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged and will not engage in any collusion with any other Qualified Bidder with respect to the bidding or the Sale.

(c)    <u>Conduct of Auction</u>.  The Auction will be conducted openly with the proceeding being transcribed and each Qualified Bidder being informed of the terms of the previous bid.

(d)    <u>Bidding</u>.  Bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted prior to the Auction; Qualified Bidders for all of the NYNM Assets may then submit

- 7 -

successive bids in increments of $150,000 (the "**Bid Increment**"). Any bid submitted after the conclusion of the Auction shall not be considered for any purpose. At the Auction, Purchaser shall be entitled to credit-bid in an amount equal to the Bid Protections for any subsequent bid(s) it submits at the Auction.

(e)    Successful Bid.    If an Auction is conducted, it shall continue until NYNM Management determines, in consultation with the Committee and the DIP Agent, which offer is the highest or otherwise best offer from among the Qualified Bids submitted at the Auction (such bid or bids, as applicable, the "**Successful Bid**"); *provided, however,* that when evaluating any bid submitted by the Purchaser, such bid shall be deemed to include the full amount of the Bid Protections; *provided further* that in the event the Purchaser's last bid is higher or otherwise better than the last bids submitted by all other Qualified Bidders, the Purchaser's last bid shall be deemed to be the Successful Bid.  The Qualified Bidder submitting such Successful Bid shall become the "**Successful Bidder**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, as applicable, together with any changes made thereto by the Successful Bidder at the Auction. Within one (1) business day after the conclusion of the Auction, but in any event prior to the commencement of the Sale Hearing (as defined below), the Successful Bidder shall complete and execute all agreements, contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Bid was made.  Following the conclusion of the Auction, NYNM Management shall file a notice of the selection of the Successful Bidder, substantially in the form of Annex 5 to the Bidding Procedures Order, with the Court and shall serve such notice on all counterparties to Assumed Leases and Contracts that are proposed to be assigned to the Successful Bidder by electronic mail or facsimile transmission if NYNM Management have such contact information, or otherwise by overnight delivery service.

(f)    Backup Bid.    At the conclusion of the Auction, NYNM Management will also announce the second-highest or otherwise second-best bid from among the Qualified Bids submitted at the Auction (the "**Backup Bid**"). The Qualified Bidder submitting such Backup Bid shall become the "**Backup Bidder**," and shall have such rights and responsibilities of the purchaser, as set forth in the applicable Modified Agreement, together with any changes made thereto by the Backup Bidder at the Auction. ***The Backup Bid shall remain open and irrevocable until the consummation of the Sale of the NYNM Assets pursuant to the Successful Bid,*** provided that the Backup Bid shall only remain open until the Outside Date (as defined below).  In the event the Backup Bidder fails to comply with the requirements of this paragraph, it will be deemed to have forfeited its Deposit. The Backup Bidder's Deposit will be returned by NYNM Management upon the earlier of the following:

(i) the Outside Date, or (ii) immediately following consummation of the Successful Bid.  Notwithstanding any other provision contained herein, the Purchaser or any other bidder shall remain as Backup Bidder only through the earlier of (i) September 1, 2018 (the "**Outside Date**"), or (ii) the consummation of the Sale pursuant to the Successful Bid.

9.        **Sale Hearing**

        The Successful Bid and the Backup Bid (or the Purchaser's Agreement in the event the Auction is not held) will be subject to approval by the Bankruptcy Court after a hearing (the "**Sale Hearing**") that will take place **July 23, 2018 at 11:00 a.m. (prevailing Eastern Time)** and entry of an order approving such sale (the "**Sale Order**").  The Sale Hearing will be held before The Honorable Judge Alan S. Trust, Courtroom 2554, United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800.  Upon approval of the Backup Bid by the Bankruptcy Court, the Backup Bid shall remain open and irrevocable until the earlier of (i) consummation of the Sale pursuant to the Successful Bid or (ii) the Outside Date.

        Objections, if any, to the Sale, the assumption and assignment of contracts and leases, and the cures thereunder (if any), and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the following parties (the "**Objection Parties**"):  (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so that it is **actually received** by each of the foregoing parties by **4:00 p.m. (prevailing Eastern Time) on July 17, 2018** (the "**Objection Deadline**").

10.    **Supplemental Objections**

In the event NYNM Management selects a Successful Bidder or Backup Bidder other than the Purchaser at the Auction, or the terms of the proposed Sale are modified at the time of the Auction, the Objection Deadline solely with respect to NYNM Management's choice of such alternative Successful Bidder or Backup Bidder, the modifications to the terms of the Sale to the Successful Bidder, or adequate of assurance of future performance by the alternative Successful Bidder or Backup Bidder shall be at **11:00 a.m. on July 20, 2018** (the "**Supplemental Objection Deadline**").  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties by the Supplemental Objection Deadline.

11.    **Consummation of the Sale**

Following the Sale Hearing, if for any reason the Successful Bidder fails to consummate the purchase of the NYNM Assets, then the Backup Bidder will automatically be deemed to have submitted the highest or otherwise best bid.  Thereafter, NYNM Management and the Backup Bidder are authorized to immediately effect the sale of the NYNM Assets to the Backup Bidder on the terms of the Backup Bid as soon as is commercially reasonable, without further order of the Bankruptcy Court.  If such failure to consummate the purchase is the result of a breach by the Successful Bidder, its Deposit shall be forfeited to NYNM Management, and NYNM Management specifically reserve the right to seek all available damages from the defaulting bidder.

12.    **Jurisdiction**

The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale of the NYNM Assets, the Bid Protections, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid, the Backup Bid, and any other matter that in any way relates to the foregoing.  All Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any Auction-related disputes.

13.    **Reservation of Rights**

**NYNM Management reserves the right, in its discretion and subject to the exercise of its business judgment, to modify or terminate these Bidding Procedures, to waive terms and conditions set forth herein, to extend any of the deadlines or other dates set forth herein, to adjourn the Auction and/or Sale Hearing, and/or, subject to the terms of the Agreement, to terminate discussions with any and all prospective acquirers and investors (except for the Purchaser) at any time and without specifying the reasons therefor, in each case without further notice but in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order;** *provided that* **NYNM Management may materially modify these Bidding Procedures with the consent of the Committee and the DIP Agent or further order of the Bankruptcy Court; provided further that nothing herein shall authorize NYNM Management to unilaterally extend any date or deadlines set forth in the Agreement or otherwise extend or enlarge the**

obligations of the Purchaser thereunder; and it being further understood that the Bidding Procedures and the Bidding Procedures Order must be in a form reasonably satisfactory to the Purchaser pursuant to the Agreement.  NYNM Management further reserves the right to adopt any other procedures reasonably necessary to implement the Bidding Procedures, provided that such procedures (i) are not inconsistent with these Bidding Procedures, the Agreement, the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Bankruptcy Court entered in these cases, and (ii) are disclosed to each Qualified Bidder at the Auction.

## ANNEX 2 TO THE BIDDING PROCEDURES ORDER
### Auction and Hearing Notice

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Orion HealthCorp, Inc. | : | Case No. 18-71748 (AST) |
| Constellation Healthcare Technologies, Inc. | : | Case No. 18-71749 (AST) |
| NEMS Acquisition, LLC | : | Case No. 18-71750 (AST) |
| Northeast Medical Solutions, LLC | : | Case No. 18-71751 (AST) |
| NEMS West Virginia, LLC | : | Case No. 18-71752 (AST) |
| Physicians Practice Plus, LLC | : | Case No. 18-71753 (AST) |
| Physicians Practice Plus Holdings, LLC | : | Case No. 18-71754 (AST) |
| Medical Billing Services, Inc. | : | Case No. 18-71755 (AST) |
| Rand Medical Billing, Inc. | : | Case No. 18-71756 (AST) |
| RMI Physician Services Corporation | : | Case No. 18-71757 (AST) |
| Western Skies Practice Management, Inc. | : | Case No. 18-71758 (AST) |
| Integrated Physician Solutions, Inc. | : | Case No. 18-71759 (AST) |
| NYNM Acquisition, LLC | : | Case No. 18-71760 (AST) |
| Northstar FHA, LLC | : | Case No. 18-71761 (AST) |
| Northstar First Health, LLC | : | Case No. 18-71762 (AST) |
| Vachette Business Services, Ltd. | : | Case No. 18-71763 (AST) |
| MDRX Medical Billing, LLC | : | Case No. 18-71764 (AST) |
| Vega Medical Professionals, LLC | : | Case No. 18-71765 (AST) |
| Allegiance Consulting Associates, LLC | : | Case No. 18-71766 (AST) |
| Allegiance Billing & Consulting, LLC | : | Case No. 18-71767 (AST) |
| Phoenix Health, LLC | : | Case No. 18-71789 (AST) |
| New York Network Management, L.L.C. | : | Case No. 18-_____ (AST)[1] |
| | : | |
| Debtors. | x | (Jointly Administered) |

-------------------------------------------------------------------

**NOTICE OF AUCTION AND HEARING TO CONSIDER
APPROVAL OF THE SALE OF CERTAIN ASSETS OF
NEW YORK NETWORK MANAGEMENT, L.L.C. AND
PROCEDURES RELATED THERETO**

PLEASE TAKE NOTICE THAT:

1.    <u>Introduction</u>.  On July [__], 2018, the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**"), upon the motion (the "**Motion**") of

---

[1] The Debtors have sought to jointly administer the chapter 11 case of New York Network Management, L.L.C. with the above-captioned chapter 11 cases.  The Court, however, has not yet granted such relief.

New York Network Management, L.L.C. ("**NYNM Management**"), entered an order (the "**Bidding Procedures Order**"): (a) approving the bidding procedures and bid protections (the "**Bidding Procedures**")[2] with respect to the sale (the "**Sale**") of certain of NYNM Management's assets (the "**NYNM Assets**"); (b) scheduling an auction (the "**Auction**") for the NYNM Assets and a hearing approving the sale of the NYNM Assets (the "**Sale Hearing**"); and (c) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the NYNM Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**").  A copy of the Bidding Procedures is annexed hereto as **Exhibit A**.

2.     Important Dates.  Pursuant to the Bidding Procedures and the Assignment Procedures, the Bankruptcy Court has established the following dates:

| | |
|---|---|
| **Sale Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Bid Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Auction** | **July 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **July 20, 2018 at 11:00 a.m. ET** |
| **Sale Hearing** | **July 23, 2018 at 11:00 a.m. ET** |

3.     The Agreement.  NYNM Management entered into that certain Asset Purchase Agreement for the sale of the NYNM Assets (the "**Agreement**") with HealthTek Solutions, LLC (together with any permitted assignee, the "**Purchaser**"), and the assignment of certain contracts and leases related thereto.  As set forth in the Bidding Procedures, the Sale of the NYNM Assets remains subject to competing offers from qualified prospective bidders.

4.     Due Diligence.  Parties interested in conducting due diligence should contact NYNM Management's investment banker, Houlihan Lokey Capital, Inc. (Attn: Bradley Jordan [bjordan@hl.com] and David Salemi [dsalemi@hl.com]).

5.     Submission of Bids.  To participate in the bidding process and to have a bid considered by NYNM Management, each potential bidder must deliver a written offer or offers satisfying the criteria prescribed in the Bidding Procedures.  Each Bid Package must be delivered in written and electronic form (where available) to: (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq.

---

[2]  Capitalized terms not defined herein shall have the meaning assigned to such terms in the Bidding Procedures.

[rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]); and (c) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]), so as to **actually be received no later than July 17, 2018 at 4:00 p.m. (prevailing Eastern Time) (the "Bid Deadline"**).

6.      Auction.    In the event that NYNM Management receives qualified bids for the NYNM Assets other than the one submitted by the Purchaser, NYNM Management intends to conduct the Auction.    The Auction will take place at the offices of NYNM Management's counsel, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, starting at **10:00 a.m. (prevailing Eastern Time) on July 18, 2018.**

7.      Sale Hearing.    The Bidding Procedures Order provides that the Sale Hearing will be held on **July 23, 2018 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Alan S. Trust, United States Bankruptcy Judge, in Courtroom 2554, United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800.    At the Sale Hearing, NYNM Management will request that the Bankruptcy Court enter an order approving the Sale of the NYNM Assets to the prevailing bidder(s) at the Auction (or to the Purchaser in the event the Auction is not held).

8.      Objections.    Objections, if any, to the Sale (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the following parties (the "**Objection Parties**"): (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:   Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com], (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so that it is **actually received** by each of the

foregoing parties by **4:00 p.m. (prevailing Eastern Time) on July 17, 2018 (the "Objection Deadline")**.

9.     <u>Supplemental Objections</u>.  Only in the event NYNM Management selects a Successful Bidder or Backup Bidder other than the Purchaser at the Auction or the terms of the proposed Sale are modified at the time of the Auction, the Objection Deadline solely with respect to NYNM Management's choice of such alternative Successful Bidder or Backup Bidder, the modifications to the terms of the Sale to the Successful Bidder, or adequate assurance of future performance by the alternative Successful Bidder or Backup Bidder shall be at **11:00 a.m. on July 20, 2018** (the "**Supplemental Objection Deadline**").  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties by the Supplemental Objection Deadline.

10.    A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Bankruptcy Court's website at https://ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.

Dated: _____, 2018
      New York, New York

**DLA PIPER LLP (US)**

_____

Thomas R. Califano (6144)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

EAST\157539614.3

**ANNEX 3 TO THE BIDDING PROCEDURES ORDER**
**Assignment Procedures**

## ASSIGNMENT PROCEDURES FOR SALE OF CERTAIN
## ASSETS OF NEW YORK NETWORK MANAGEMENT, L.L.C.

New York Network Management, L.L.C. ("**NYNM Management**"), as a chapter 11 debtor and debtor-in-possession, has entered into that certain Asset Purchase Agreement (the "**Agreement**") for the sale of certain of its assets (the "**NYNM Assets**") to HealthTek Solutions, LLC (together with any permitted assignee, the "**Purchaser**"), which provides, among other things, for the payment of $16.5 million and the assumption of the Assumed Liabilities (as defined in the Agreement). The transaction with the Purchaser pursuant to the Agreement is referred to as the "**Sale**".

On [_____], 2018, the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**") granted NYNM Management's motion (the "**Motion**") for an order approving, *inter alia*, (i) the following procedures (the "**Assignment Procedures**") relating to the assumption and assignment to the Purchaser of certain executory contracts and unexpired leases by NYNM Management as contemplated by the Sale (the "**Assumed Contracts and Leases**"), including procedures for providing notice of assignment to parties to such Assumed Contracts and Leases (each, a "**Counterparty**") and (ii) certain bidding procedures (the "**Bidding Procedures**") to be employed in connection with the solicitation for higher or otherwise better bids at an auction (the "**Auction**") of the NYNM Assets. The Motion also sought an order approving the Sale subject to the results of the Auction (the "**Sale Order**").

### A.    **Important Dates**

| | |
|---|---|
| **Sale Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Bid Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Auction** | **July 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **July 20, 2018 at 11:00 a.m. ET** |
| **Sale Hearing** | **July 23, 2018 at 11:00 a.m. ET** |

### B.    **Assumed Contracts and Leases**

Pursuant to the Agreement, the Assumed Contracts and Leases consist of (i) certain executory contracts (the "**Assumed Contracts**") and (ii) unexpired leases (the "**Assumed Leases**") designated to be assumed by NYNM Management and assigned to the Purchaser.

C.    **Initial Notice of Assumed Contracts and Leases**

Within two (2) business days after entry of the Bidding Procedures Order, NYNM Management will serve by first-class mail an omnibus notice (the "**Assignment Notice**") on each Counterparty to an agreement that is or may be an Assumed Contract or Assumed Lease, substantially in the form attached as **Annex 4** to the Bidding Procedures Order (and such party's attorney, if such attorney has filed a notice of appearance in NYNM Management's chapter 11 proceedings) at the last known address available to NYNM Management.  The Assignment Notice shall include an exhibit that identifies (i) the name and address of the Counterparty, (ii) the specific Assumed Contract or Assumed Lease at issue, (iii) for each Assumed Lease, the premises relating to the Assumed Lease, and (iv) the cure amount asserted by NYNM Management that is necessary to cure any default under the relevant Assumed Contract or Assumed Lease pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

The Assignment Notice shall also include (i) a description of the Purchaser and a statement as to the Purchaser's ability to perform NYNM Management's obligations under the Assumed Contracts and/or Assumed Leases ("**Purchaser's Adequate Assurance**"), (ii) the date of the Objection Deadline (defined below), (iii) the date of the Auction, and (iv) the date of the Sale Hearing.

The Assignment Notice shall also be served upon counsel to the Purchaser, counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]).

D.    **Contract/Lease Objections**

To the extent that any interested party wishes to object to any matter pertaining to the sale of the NYNM Assets or the assumption and assignment of an Assumed Contract or Assumed Lease, including, without limitation, Purchaser's Adequate Assurance or the Cure Amount designated in the Assignment Notice, then such interested party must file a written objection (the "**Contract/Lease Objection**") with the Court no later than **July 17, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**"), and simultaneously serve such Contract/Lease Objection on the following parties (the "**Objection Parties**"): (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and

- 2 -

Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, counsel to the Purchaser, Baker Botts L.L.P., 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so that it is **actually received** by each of the foregoing parties by the Objection Deadline.

To the extent that any Counterparty does not timely serve a Contract/Lease Objection as set forth above, such Counterparty will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any, and agreed that payment of that Cure Amount is sufficient to cure any monetary or non-monetary default under the applicable Assumed Contract or Assumed Lease; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

E.    **Supplemental Notice of Assumed Contracts and Leases**

Following the conclusion of the Auction, NYNM Management will file an omnibus notice (the "**Auction Results Notice**"), substantially in the form attached as **Annex 5** to the Bidding Procedures Order, and will serve such notice on all Counterparties (and their attorneys, if an attorney has filed a notice of appearance in NYNM Management's chapter 11 proceeding) by electronic mail or facsimile transmission if NYNM Management have such contact information, or otherwise by overnight delivery service at the last known address available to NYNM Management.  The Auction Results Notice shall, *inter alia*, identify the successful bidder (the "**Successful Bidder**") and the backup bidder (the "**Backup Bidder**")[1] chosen at the Auction in accordance with the Bidding Procedures and such other information as hereinafter provided.

The Auction Results Notice shall include, to the extent the Successful Bidder or Backup Bidder is not the Purchaser, a description of the Successful Bidder and the Backup Bidder and, upon request, NYNM Management will provide a statement as to the ability of the Successful Bidder or the Backup Bidder to perform NYNM Management's obligations under the Assumed Contracts and Assumed Leases (the "**Successful Bidder's Adequate Assurance**" or the "**Backup Bidder's Adequate Assurance**") and such statement shall be kept confidential to the extent required by the Successful Bidder or the Backup Bidder.

---

[1]  After entry of the Sale Order, all references herein to the Purchaser shall refer to the Successful Bidder.  In the event that the Backup Bidder is substituted for the Successful Bidder pursuant to the Sale Order, all references to the Purchaser shall refer to the Backup Bidder.  Similarly, after entry of the Sale Order, all references herein to the Agreement shall refer to the bid submitted by the Successful Bidder.

F. **Supplemental Objections**

To the extent that any Counterparty wishes to object to (i) the Successful Bidder's or the Backup Bidder's Adequate Assurance designated in the Auction Results Notice, if the Successful Bidder or Backup Bidder is not the Purchaser; or (ii) the selection of an alternative purchaser as a result of the Auction, such party shall file its objection (the "Supplemental Sale Objection") with the Court no later than **July 20, 2018 11:00 a.m.** (the "Supplemental Objection Deadline"). Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties by the Supplemental Objection Deadline.

To the extent that any Counterparty does not timely serve a Supplemental Sale Objection as set forth above, such Counterparty will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Contract or Assumed Lease; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof.

G. **Further Assignments**

Without limiting any rights of the Purchaser set forth in the Agreement, during the period between the entry of the Bidding Procedures Order and the Sale Hearing, the Purchaser or the Successful Bidder may designate additional executory contracts or unexpired leases for assumption by NYNM Management and assignment to the Purchaser or Successful Bidder (the "**Further Assignments**"). NYNM Management shall serve by first-class mail an omnibus notice (the "**Further Assignments Notice**") on each Counterparty to the Further Assignments, substantially in the form attached as **Annex 7** to the Bidding Procedures Order. To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (a "**Further Assignment Objection**") with the Court no later than **4:00 p.m. (prevailing Eastern Time) on the fifteenth day after service of the Further Assignments Notice**. In the event a Further Assignment Objection is filed, such objections will be heard at a hearing to be scheduled by the Bankruptcy Court.

H. **Resolution and Adjudication of Objections**

Upon filing of an objection by a Counterparty, NYNM Management and/or the Purchaser will contact the objecting Counterparty to attempt to consensually resolve any timely served objection. If NYNM Management and/or the Purchaser are unable to resolve an objection in response to the Initial Assignment Notice or the Auction Results Notice, (i) to the extent such objections relate to the adequate assurance of future performance by the Purchaser or Successful Bidder (each an "**Adequate Assurance Objection**"), such objections will be heard at the Sale Hearing (except in the case of an Adequate Assurance Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Bankruptcy Court) or (ii) to the extent such objections relate to a Cure Amount (a "**Cure Objection**"), such objections will be heard at the Sale Hearing (except in the case of a Cure Objection to a Further Assignment, with a hearing on such an objection to be scheduled by the Bankruptcy Court).

- 4 -

In the event an objection is solely a Cure Objection, then such objecting party will be deemed to consent to the assumption of the related executory contract or unexpired lease and its assignment to the Purchaser, notwithstanding such objection.  In the event NYNM Management and/or the Purchaser are unable to resolve the Cure Objection prior to the hearing on such objection, the Purchaser may elect not to request assumption and assignment of the related executory contract or unexpired lease as part of the Sale.

At the Closing or as promptly thereafter as is practical, the Cure Amounts as to which no objections have been filed, or to which the Purchaser and applicable Counterparties have agreed, shall be paid pursuant to the Agreement.

Payment of the Cure Amounts shall be deemed to discharge the obligation of NYNM Management and the Purchaser to: (i) cure any defaults under the Assumed Contracts and Leases; and (ii) compensate, or provide adequate assurance that NYNM Management will promptly compensate, any non-Debtor party to the Assumed Contracts and Leases for any actual pecuniary loss resulting from any default thereunder.

I.      **Reservation of Rights**

The assumption and assignment of any of the Assumed Contracts and Leases is subject to Court approval and consummation of the Sale.  Accordingly, NYNM Management shall be deemed to have assumed and assigned Assumed Contracts and Leases ultimately identified under the Agreement as of and effective only upon the Closing (as defined in the Agreement).  Absent a Closing that includes such Assumed Contracts and Leases, each of the Assumed Contracts and Leases shall be deemed neither assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by NYNM Management under the Bankruptcy Code.

EAST\157539614.3

**ANNEX 4 TO THE BIDDING PROCEDURES ORDER**
**Assignment Notice**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-_____ (AST)[1] |
| | : | |
| Debtors. | x | (Jointly Administered) |

----------------------------------------------------------------------

**NOTICE OF ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS AND UNEXPIRED LEASES PURSUANT TO THE
SALE OF CERTAIN ASSETS OF NEW YORK NETWORK MANAGEMENT, L.L.C.**

PLEASE TAKE NOTICE THAT:

        1.      On July [__], 2018, the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**"), upon the motion (the "**Motion**") of New York Network Management, L.L.C. ("**NYNM Management**") entered an order (the "**Bidding**

---

[1] The Debtors have sought to jointly administer the chapter 11 case of New York Network Management, L.L.C. with the above-captioned chapter 11 cases. The Court, however, has not yet granted such relief.

**Procedures Order**"): (a) approving the bidding procedures and bid protections (the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of certain of NYNM Management's assets (the "**NYNM Assets**"); (b) scheduling an auction (the "**Auction**") for the NYNM Assets and a hearing approving the sale of the NYNM Assets (the "**Sale Hearing**"); and (c) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the NYNM Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**").

2.        NYNM Management entered into that certain Asset Purchase Agreement for the sale of the NYNM Assets (the "**Agreement**") with HealthTek Solutions, LLC (together with any permitted assignee, the "**Purchaser**"), and the assignment of certain contracts and leases related thereto.

3.        In the event that NYNM Management receives additional qualified bids for the NYNM Assets, NYNM Management intends to conduct the Auction with respect to the NYNM Assets.  The Auction will take place at the offices of NYNM Management's counsel, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, starting at **10:00 a.m. (prevailing Eastern Time) on July 18, 2018.**

4.        Attached as **Annex A** hereto is a description of the Purchaser that demonstrates the Purchaser's ability to perform NYNM Management's obligations under the Assumed Contracts and Leases ("**Purchaser's Adequate Assurance**").

5.        NYNM Management hereby provides notice that it may assume and assign certain agreements to which NYNM Management is a party, including at least one or more such agreements to which NYNM Management believes you or your predecessor in interest is a party, which agreements are identified in **Annex B** hereto (singularly or collectively, the "**Assumed Agreements**").   Annex B also identifies, for each Assumed Agreement, the effective date of assignment; a description of the Assumed Agreement; the premises relating to the Assumed Agreement (if the relevant Assumed Agreement is a lease); and the cure amount, asserted by NYNM Management, that is necessary to cure any default under the relevant Assumed Agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Amount**").

6.        Nothing contained in this Notice is to be construed as an admission by NYNM Management as to the character of any document denominated as an Assumed Agreement, as an executory contract or unexpired lease, or to the rights of any parties thereto. The sale of the NYNM Assets and assumption and assignment of the Assumed Agreements will take place pursuant to the Bidding Procedures Order.

7.        To the extent that any interested party wishes to object to any matter pertaining to the assumption and assignment of an Assumed Contract or an Assumed Lease, including, without limitation, Purchaser's Adequate Assurance or the Cure Amount designated in this Notice, then such interested party must file a written objection (an "**Objection**") with the Bankruptcy Court no later than **July 17, 2018 at 4:00 p.m.** (prevailing Eastern Time) (the "**Objection Deadline**"), and simultaneously serve such an Objection on the following parties (the "**Objection Parties**"): (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano, Esq.

[thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn: Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com] and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so that it is **actually received** by the Objection Deadline.

8.      In the event NYNM Management selects a Successful Bidder or Backup Bidder other than the Purchaser at the Auction or the terms of the proposed Sale are modified at the time of the Auction, an objection solely with respect to NYNM Management's choice of such alternative Successful Bidder or Backup Bidder, the modifications to the terms of the Sale to the Successful Bidder, or the Successful Bidder's or Backup Bidder's ability to perform NYNM Management's obligations under an Assumed Contract or Assumed Lease must be filed with the Court no later than **July 20, 2018 11:00 a.m.** (the "Supplemental Objection Deadline"). Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the Objection Parties by the Supplemental Objection Deadline. **IF YOU WISH TO RECEIVE NOTICE BY ELECTRONIC MAIL OF THE SELECTION OF A SUCCESSFUL BIDDER OR BACKUP BIDDER FOLLOWING THE CONCLUSION OF THE AUCTION, PLEASE PROVIDE YOUR CONTACT INFORMATION IN WRITING TO CONSTELLATION@EPIQGLOBAL.COM.** You also may review NYNM Management's notice of the auction results on the Bankruptcy Court's website at https://ecf.nyeb.uscourts.gov or (without charge) at: http://dm.epiq11.com/orionhealthcorp.

9.      To the extent that any interested party does not timely serve an Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assumed Agreement; (ii) agreed that the Purchaser has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any, and agreed that payment of that Cure Amount is sufficient to cure any monetary or non-monetary default under the applicable Assumed Agreement; and (iv) agreed to the terms of the Sale Order.

10.     A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Bankruptcy Court's website at https://ecf.nyeb.uscourts.gov or (without charge) at: http://dm.epiq11.com/orionhealthcorp.

Dated: _____, 2018                     **DLA PIPER LLP (US)**
       New York, New York

_____

Thomas R. Califano (6144)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

# ANNEX 5 TO THE BIDDING PROCEDURES ORDER

**Auction Results Notice**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Orion HealthCorp, Inc. | : | Case No. 18-71748 (AST) |
| Constellation Healthcare Technologies, Inc. | : | Case No. 18-71749 (AST) |
| NEMS Acquisition, LLC | : | Case No. 18-71750 (AST) |
| Northeast Medical Solutions, LLC | : | Case No. 18-71751 (AST) |
| NEMS West Virginia, LLC | : | Case No. 18-71752 (AST) |
| Physicians Practice Plus, LLC | : | Case No. 18-71753 (AST) |
| Physicians Practice Plus Holdings, LLC | : | Case No. 18-71754 (AST) |
| Medical Billing Services, Inc. | : | Case No. 18-71755 (AST) |
| Rand Medical Billing, Inc. | : | Case No. 18-71756 (AST) |
| RMI Physician Services Corporation | : | Case No. 18-71757 (AST) |
| Western Skies Practice Management, Inc. | : | Case No. 18-71758 (AST) |
| Integrated Physician Solutions, Inc. | : | Case No. 18-71759 (AST) |
| NYNM Acquisition, LLC | : | Case No. 18-71760 (AST) |
| Northstar FHA, LLC | : | Case No. 18-71761 (AST) |
| Northstar First Health, LLC | : | Case No. 18-71762 (AST) |
| Vachette Business Services, LTD. | : | Case No. 18-71763 (AST) |
| MDRX Medical Billing, LLC | : | Case No. 18-71764 (AST) |
| Vega Medical Professionals, LLC | : | Case No. 18-71765 (AST) |
| Allegiance Consulting Associates, LLC | : | Case No. 18-71766 (AST) |
| Allegiance Billing & Consulting, LLC | : | Case No. 18-71767 (AST) |
| Phoenix Health, LLC | : | Case No. 18-71789 (AST) |
| New York Network Management, L.L.C. | : | Case No. 18-_____ (AST)[1] |
| | : | |
| Debtors. | x | (Jointly Administered) |

----------------------------------------------------------------------

**NOTICE OF AUCTION RESULTS IN CONNECTION
WITH THE SALE OF CERTAIN ASSETS OF
NEW YORK NETWORK MANAGEMENT, L.L.C.**

PLEASE TAKE NOTICE THAT:

        1.     <u>Introduction</u>.  New York Network Management, L.L.C. ("**NYNM Management**"), as a chapter 11 debtor and debtor-in-possession in the above-referenced chapter 11 cases, conducted an auction (the "**Auction**") with respect to the proposed sale (the "**Sale**") of

---

[1] The Debtors have sought to jointly administer the chapter 11 case of New York Network Management, L.L.C. with the above-captioned chapter 11 cases.  The Court, however, has not yet granted such relief.


certain of NYNM Management's assets (the "**NYNM Assets**") in accordance with the order (the "**Bidding Procedures Order**") of the Bankruptcy Court of the Eastern District of New York (the "**Bankruptcy Court**"), entered on [_____], 2018, (a) approving the bidding procedures (the "**Bidding Procedures**"), (b) scheduling the Auction and a hearing (the "**Sale Hearing**") for the Sale of the NYNM Assets, and (c) approving certain procedures related to the assumption and assignment of those executory contracts and unexpired leases related to the NYNM Assets and whose assignment is contemplated by the Sale.

2.    Auction Results.  Upon conclusion of the Auction, NYNM Management determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder was [_____] (the "**Successful Bidder**") and the second highest or otherwise best bidder was [_____] (the "**Backup Bidder**").  The asset purchase agreements of the Successful Bidder and the Backup Bidder, as these documents were modified by the Successful Bidder and the Backup Bidder at the Auction (respectively, the "**Successful Bid**" and the "**Backup Bid**") are attached hereto as **Exhibit A-1** and **Exhibit A-2**, respectively.

3.    Initial Assignment Notice.  On [_____], 2018, NYNM Management served an initial assignment notice that indicated its intent to assume and assign certain agreements to which any of NYNM Management is a party (collectively, the "**Assigned Agreements**"), as well as the cure amount asserted by NYNM Management that is necessary to cure any default under the relevant Assigned Agreement pursuant to section 365 of the Bankruptcy Code (the "**Cure Amounts**").

4.    Additional Assigned Agreements.  Attached as **Exhibit B-1** and **Exhibit B-2** hereto is a list, pursuant to the **Successful Bid** and the **Backup Bid**, respectively, of any additional Assigned Agreements, along with any associated Cure Amounts.

5.    Adequate Assurance of Future Performance.  Attached as **Annex A** hereto is a description of the **[Successful Bidder / Backup Bidder]** that demonstrates that party's ability to perform NYNM Management's obligations under the Assigned Agreements.

6.    Sale Hearing.  The Bidding Procedures Order provides that the Sale Hearing will be held on **July 23, 2018 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Alan S. Trust, United States Bankruptcy Judge, in Courtroom 2554, United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800.  At the Sale Hearing, NYNM Management will request that the Bankruptcy Court enter an order approving the Sale of the NYNM Assets to the Successful Bidder.

7.    Objection Deadline.  Any interested party that wishes to object to (i) the Successful Bidder's or the Backup Bidder's ability to perform under an Assigned Agreement; or (ii) the selection of an alternative purchaser as a result of the Auction file its objection (each, a "**Sale Objection**") with the Court no later than **July 20, 2018 at 11:00 a.m.** (the "**Supplemental Objection Deadline**").  Any such objection shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on the following parties (the "**Objection Parties**"):  (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn:  Thomas R. Califano,

Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com] and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case by the Supplemental Objection Deadline. Any party wishing to object to the assumption of an Additional Assumed Contract or Additional Assumed Lease listed on Exhibit B-1 or B-2 shall file a written objection with the Bankruptcy Court no later than **July 20, 2018 at 11:00 a.m.**, and simultaneously serve such an objection on Objection Parties, so that it is <u>actually received</u> by the deadline.  Such objections will be heard at a hearing to be scheduled by the Bankruptcy Court.

8.	To the extent that any interested party does not timely present a Sale Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Assigned Agreement; (ii) agreed that the Successful Bidder and the Backup Bidder have provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) agreed to the terms of the Sale Order; and (iv) waived any and all objections in connection with items (i) through (iii) hereof.

9.	A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Court's website at https://ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.

Dated: _____, 2018    **DLA PIPER LLP (US)**
      New York, New York

        _____
        Thomas R. Califano (6144)
        DLA Piper LLP (US)
        1251 Avenue of the Americas
        New York, New York 10020-1104
        Telephone: (212) 335-4500
        Facsimile:  (212) 335-4501
        E-mail:  thomas.califano@dlapiper.com

        *Counsel to the Debtors and Debtors in Possession*

**ANNEX 6 TO THE BIDDING PROCEDURES ORDER**
**Creditor Notice**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-_____ (AST)[1] |
| | : | |
| Debtors. | x | (Jointly Administered) |

---------------------------------------------------------------------

## NOTICE OF AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE OF CERTAIN ASSETS OF NEW YORK NETWORK MANAGEMENT, L.L.C.

PLEASE TAKE NOTICE OF THE FOLLOWING:

       1.    <u>Introduction</u>.  On July [_], 2018, New York Network Management, L.L.C. ("**NYNM Management**"), as a chapter 11 debtor and debtor-in-possession in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), filed (a) a motion (the "**Bidding Procedures Motion**") for an order (the "**Bidding Procedures Order**"), (i) approving the

---

[1] The Debtors have sought to jointly administer the chapter 11 case of New York Network Management, L.L.C. with the above-captioned chapter 11 cases.  The Court, however, has not yet granted such relief.

bidding procedures and bidder protections (the "**Bidding Procedures**") with respect to the sale (the "**Sale**") of certain of NYNM Management's assets (the "**NYNM Assets**"), and assignment of certain contracts and leases related thereto; (ii) scheduling an auction (the "**Auction**") for the NYNM Assets and a hearing approving the transactions (the "**Sale Hearing**"); and (iii) approving certain procedures (the "**Assignment Procedures**") related to the assumption and assignment of those executory contracts and unexpired leases related to the NYNM Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**"); and (b) a motion (the "**Sale Motion**") for an order (the "**Sale Order**"), (a) approving the Sale of the NYNM Assets, and (b) approving the assumption and assignment of the Assumed Contracts and Leases.

On July [_], 2018, the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**") entered an order (the "**Bidding Procedures Order**"): (a) approving the Bidding Procedures with respect to the Sale of the NYNM Assets; (b) scheduling the Auction and the Sale Hearing; and (c) approving the Assignment Procedures for the Assumed Contracts and Leases.

2.    <u>Agreement</u>.   NYNM Management has entered into that certain Asset Purchase Agreement with HealthTek Solutions, LLC (together with any permitted assignee, the "**Purchaser**"), for the Sale of the NYNM Assets and the assignment of certain contracts and leases related thereto.

3.    <u>Important Dates</u>.   Pursuant to the Bidding Procedures Order, the Bankruptcy Court has set the following relevant dates for the Auction and approval of the Sale of the NYNM Assets:

| | |
|---|---|
| **Sale Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Contract/Lease Objection Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Bid Deadline** | **July 17, 2018 at 4:00 p.m. ET** |
| **Auction** | **July 18, 2018 at 10:00 a.m. ET** |
| **Supplemental Objection Deadline** | **July 20, 2018 at 11:00 a.m. ET** |
| **Sale Hearing** | **July 23, 2018 at 11:00 a.m. ET** |

4.    <u>Auction</u>.   In the event that NYNM Management receives qualified bids for the NYNM Assets other than the one submitted by the Purchaser, NYNM Management intends to conduct the Auction. The Auction will take place at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020, starting at **10:00 a.m. (prevailing Eastern Time) on July 18, 2018.**

5.    <u>Sale Hearing</u>.  The Bidding Procedures Order provides that the Sale Hearing will be held on **July 23, 2018 at 11:00 a.m. (prevailing Eastern Time)**, before the Honorable Alan S. Trust, United States Bankruptcy Judge, in Courtroom 2554, United States Bankruptcy Court for the Eastern District of New York, 271-C Cadman Plaza East, Brooklyn, NY 11201-1800.  At the Sale Hearing, NYNM Management will request that the Bankruptcy Court enter an order approving the Sale of the NYNM Assets to the prevailing bidder at the Auction (or to the Purchaser in the event the Auction is not held).

6.    <u>Objections</u>.  Objections, if any, to the Sale (other than objections with respect to cure amounts or adequate assurance of future performance under the Assumed Contracts and Leases, which are subject to the Assignment Procedures) and any filed supplements thereto, shall: (i) be in writing; (ii) specify with particularity the basis of the objection; and (iii) be filed with the Court and simultaneously served on: (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so as to be actually received by **4:00 p.m. (prevailing Eastern Time) on July 17, 2018** (the "**Objection Deadline**").

7.    <u>PLEASE NOTE</u>:  This is the ONLY NOTICE of the sale of the NYNM Assets that will be mailed to ALL KNOWN GENERAL CREDITORS of NYNM Management under any applicable law.  Further updates regarding the sale process and a copy of the Motion, the Agreement, the Bidding Procedures, the Assignment Procedures, or any other document referenced herein can be viewed and obtained on the Court's website at www.ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.  You may also contact counsel for NYNM Management to request copies of the Motion or any other document.

Dated: _____, 2018                    **DLA PIPER LLP (US)**
      New York, New York

                               _____
                               Thomas R. Califano (6144)
                               DLA Piper LLP (US)
                               1251 Avenue of the Americas
                               New York, New York 10020-1104
                               Telephone: (212) 335-4500
                               Facsimile:  (212) 335-4501
                               E-mail:  thomas.califano@dlapiper.com

                               *Counsel to the Debtors and Debtors in Possession*

**ANNEX 7 TO THE BIDDING PROCEDURES ORDER**
**Further Assignments Notice**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ORION HEALTHCORP, INC. | : | Case No. 18-71748 (AST) |
| CONSTELLATION HEALTHCARE TECHNOLOGIES, INC. | : | Case No. 18-71749 (AST) |
| NEMS ACQUISITION, LLC | : | Case No. 18-71750 (AST) |
| NORTHEAST MEDICAL SOLUTIONS, LLC | : | Case No. 18-71751 (AST) |
| NEMS WEST VIRGINIA, LLC | : | Case No. 18-71752 (AST) |
| PHYSICIANS PRACTICE PLUS, LLC | : | Case No. 18-71753 (AST) |
| PHYSICIANS PRACTICE PLUS HOLDINGS, LLC | : | Case No. 18-71754 (AST) |
| MEDICAL BILLING SERVICES, INC. | : | Case No. 18-71755 (AST) |
| RAND MEDICAL BILLING, INC. | : | Case No. 18-71756 (AST) |
| RMI PHYSICIAN SERVICES CORPORATION | : | Case No. 18-71757 (AST) |
| WESTERN SKIES PRACTICE MANAGEMENT, INC. | : | Case No. 18-71758 (AST) |
| INTEGRATED PHYSICIAN SOLUTIONS, INC. | : | Case No. 18-71759 (AST) |
| NYNM ACQUISITION, LLC | : | Case No. 18-71760 (AST) |
| NORTHSTAR FHA, LLC | : | Case No. 18-71761 (AST) |
| NORTHSTAR FIRST HEALTH, LLC | : | Case No. 18-71762 (AST) |
| VACHETTE BUSINESS SERVICES, LTD. | : | Case No. 18-71763 (AST) |
| MDRX MEDICAL BILLING, LLC | : | Case No. 18-71764 (AST) |
| VEGA MEDICAL PROFESSIONALS, LLC | : | Case No. 18-71765 (AST) |
| ALLEGIANCE CONSULTING ASSOCIATES, LLC | : | Case No. 18-71766 (AST) |
| ALLEGIANCE BILLING & CONSULTING, LLC | : | Case No. 18-71767 (AST) |
| PHOENIX HEALTH, LLC | : | Case No. 18-71789 (AST) |
| NEW YORK NETWORK MANAGEMENT, L.L.C. | : | Case No. 18-_____ (AST)[1] |
| | : | |
| Debtors. | x | (Jointly Administered) |

-------------------------------------------------------------------

**NOTICE OF FURTHER ASSUMPTION AND ASSIGNMENT OF
ADDITIONAL EXECUTORY CONTRACTS AND UNEXPIRED LEASES
PURSUANT TO THE SALE OF CERTAIN ASSETS OF
NEW YORK NETWORK MANAGEMENT, L.L.C.**

PLEASE TAKE NOTICE THAT:

1.     Introduction.     New York Network Management, L.L.C. ("**NYNM Management**, as a chapter 11 debtor and debtor-in-possession in the above-referenced chapter 11 cases (the "**Chapter 11 Cases**"), conducted an auction (the "**Auction**") with respect to the

---

[1] The Debtors have sought to jointly administer the chapter 11 case of New York Network Management, L.L.C. with the above-captioned chapter 11 cases.  The Court, however, has not yet granted such relief.

proposed sale (the "**Sale**") of certain of NYNM Management's assets (the "**NYNM Assets**"), in accordance with the order (the "**Bidding Procedures Order**") of the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**"), entered on July [_], 2018, (a) approving the bidding procedures (the "**Bidding Procedures**"), (b) scheduling the Auction and a hearing (the "**Sale Hearing**") for the Sale of the NYNM Assets; and (c) approving certain procedures related to the assumption and assignment of those executory contracts and unexpired leases related to the NYNM Assets and whose assignment is contemplated by the Sale (the "**Assumed Contracts and Leases**").

2.      *[if applicable]* Auction Results.  Upon conclusion of the Auction, NYNM Management determined, pursuant to the Bidding Procedures and subject to the Bankruptcy Court's approval, that the highest or otherwise best bidder was [_____] (the "**Successful Bidder**") and the second highest or otherwise best bidder was [_____] (the "**Backup Bidder**").  The asset purchase agreements of the Successful Bidder and the Backup Bidder, as these documents were modified by the Successful Bidder and the Backup Bidder at the Auction (respectively, the "**Successful Bid**" and the "**Backup Bid**") are attached hereto as **Exhibit A-1** and **Exhibit A-2**, respectively.

3.      Initial Assignment Notice.  On [_____], 2018, NYNM Management served an initial assignment notice that indicated its intent to assume and assign certain agreements to which any of NYNM Management is a party (collectively, the "**Assigned Agreements**"), as well as the cure amount, asserted by NYNM Management, that is necessary to cure any default under the relevant Assigned Agreement pursuant to section 365 of the Bankruptcy Code (the "**Initial Assignment Cure Amounts**").

4.      Attached as **Annex A** hereto is a description of the **[Purchaser / Successful Bidder]** that demonstrates its ability to perform NYNM Management's obligations under the Further Assignments ("**[Purchaser's / Successful Bidder's] Adequate Assurance**").

5.      NYNM Management hereby provides notice of its intent to assume and assign certain agreements to which any of NYNM Management is a party, which agreements are identified in **Annex B** hereto (singularly or collectively, the "**Further Assumed Agreements**"). Annex B also identifies, for each Further Assumed Agreement, the effective date of assignment; a description of the Further Assumed Agreement; the premises relating to the Further Assumed Agreement (if the relevant Further Assumed Agreement is an Assumed Lease); and the cure amount, asserted by NYNM Management, that is necessary to cure any default under the relevant Further Assumed Agreement pursuant to section 365 of the Bankruptcy Code (the "**Further Assignment Cure Amounts**", and together with the Initial Assignment Cure Amounts, the "**Cure Amounts**").

6.      Nothing contained in this Notice is to be construed as an admission by NYNM Management as to the character of any document denominated as a Further Assumed Agreement, as an executory contract or unexpired lease, or to the rights of any parties thereto.

7.      To the extent that any interested party wishes to object to any matter pertaining to the Further Assignments, then such interested party must file a written objection (an "**Further Assignments Objection**") with the Bankruptcy Court no later than **4:00 p.m.**

**(prevailing Eastern Time) on the fifteenth day after service of this Notice** (the "**Further Assignments Objection Deadline**"), and simultaneously serve such an Objection on the following parties: (a) counsel to NYNM Management, DLA Piper LLP (US), 1251 Avenue of the Americas, New York, NY 10020 (Attn: Thomas R. Califano, Esq. [thomas.califano@dlapiper.com] and Rachel Nanes, Esq. [rachel.nanes@dlapiper.com]); (b) counsel to the Committee, Pachulski Stang Ziehl & Jones LLP, 780 Third Ave., 34th Floor, New York, NY 10017 (Attn: Ilan D. Scharf, Esq. [ischarf@pszjlaw.com]), (c) the Office of the United States Trustee, Long Island Federal Plaza Courthouse, 560 Federal Plaza, Central Islip, New York 11722 (Attn: Alfred M. Dimino [al.m.dimino@usdoj.gov]); (d) counsel to Bank of America, N.A., Moore & Van Allen, PLLC, 100 North Tyron Street, Suite 4700, Charlotte, North Carolina 28202 (Attn: David Eades, Esq. [davideades@mvalaw.com] and Gabriel L. Mathless, Esq. [gabemathless@mvalaw.com]); (e) counsel to BMO Harris Bank, N.A., Chapman and Cutler LLP, 111 West Monroe Street, Chicago, IL 60603 (Attn. Stephen R. Tetro II, Esq. [stetro@chapman.com]); (f) counsel to KeyBank National Association, 127 Public Square, 2nd Floor, Cleveland, Ohio 4114 (Attn: Robert J. Burns, Esq. [bob_j_burns@KeyBank.com]); (g) counsel to Stifel Bank & Trust and Woodforest National Bank, Reed Smith LLP, 335 South Grand Avenue, Suite 2900, Los Angeles, California 90071 (Attn: Christopher Rivas, Esq. [crivas@reedsmith.com]) and 1202 Market Street, Suite 1500, Wilmington, Delaware 19801 (Attn: Kurt F. Gwynne, Esq. [kgwynne@reedsmith.com]); (h) counsel to the Purchaser, Baker Botts L.L.P, 30 Rockefeller Plaza, New York, NY 10112 (Attn: Emanuel Grillo [emanuel.grillo@bakerbott.com] and Chris Newcomb [chris.newcomb@bakerbotts.com]); and (i) any other party requesting notice in this case, so that it is <u>actually received</u> by the Further Assignments Objection Deadline.  Such objections will be heard at a hearing to be scheduled by the Bankruptcy Court.

8.    To the extent that any interested party does not timely serve a Further Assignments Objection as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Further Assumed Agreement; (ii) agreed that the **[Purchaser / Successful Bidder]** has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount, if any, and agreed that payment of that Cure Amount is sufficient to cure any monetary or non-monetary default under the applicable Further Assumed Agreement; and (iv) agreed to the terms of the Sale Order.

9.    A copy of the Bidding Procedures Order or any other document referenced herein can be viewed and obtained on the Bankruptcy Court's website at https://ecf.nyeb.uscourts.gov or (without charge) at http://dm.epiq11.com/orionhealthcorp.

Dated: _____, 2018         **DLA PIPER LLP (US)**
     New York, New York

_____

Thomas R. Califano (6144)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020-1104
Telephone: (212) 335-4500
Facsimile:  (212) 335-4501
E-mail:  thomas.califano@dlapiper.com

*Counsel to the Debtors and Debtors in Possession*

# **EXHIBIT B**

Agreement

**ASSET PURCHASE AGREEMENT**

**BETWEEN**

**HEALTHTEK SOLUTIONS, LLC,**

**as Purchaser,**

**and**

**NEW YORK NETWORK MANAGEMENT, L.L.C.,**

**Debtor-in-Possession**

**as Seller**

**Dated as of July 5, 2018**

# TABLE OF CONTENTS

**Page**

ARTICLE 1        PURCHASE OF ASSIGNED ASSETS ........................................................ 1

    1.1    Purchase and Sale of NYNYM Assets................................................................... 1

    1.2    Assumption of Certain Liabilities ....................................................................... 1

    1.3    Assignment of Certain Contracts ........................................................................ 3

    1.4    Instruments of Conveyance, Assumption or Assignment................................... 4

    1.5    "AS IS" TRANSACTION .................................................................................... 4

ARTICLE 2        PURCHASE PRICE .................................................................................. 5

    2.1    Purchase Price ...................................................................................................... 5

    2.2    Payment of the Purchase Price............................................................................. 5

    2.3    Allocation of the Purchase Price .......................................................................... 6

ARTICLE 3        EXCLUDED ASSETS .............................................................................. 7

    3.1    Excluded Assets ................................................................................................... 7

    3.2    Purchaser Agreement ........................................................................................... 9

ARTICLE 4        SELLER'S REPRESENTATIONS AND WARRANTIES ....................... 9

    4.1    Organization and Corporate Power...................................................................... 9

    4.2    Title and Related Matters ..................................................................................... 9

    4.3    Necessary Property .............................................................................................. 9

    4.4    Litigation............................................................................................................ 10

    4.5    Insurance ............................................................................................................ 10

    4.6    Absence of Certain Changes .............................................................................. 10

    4.7    Compliance with Laws ...................................................................................... 11

    4.8    Transactions with Related Persons; Outside Interests ....................................... 13

    4.9    Officers, Directors, Managers, Employees, Consultants and Agents;
           Compensation .................................................................................................... 13

    4.10    ERISA and Related Matters................................................................................ 13

    4.11    Real Property ..................................................................................................... 14

    4.12    Reserved............................................................................................................. 15

    4.13    Reserved............................................................................................................. 15

    4.14    Authorization ..................................................................................................... 15

    4.15    No Conflict with Other Instruments or Agreements........................................... 15

| | 4.16 | Brokers or Finders | 16 |
| | 4.17 | Taxes | 16 |
| | 4.18 | Financial Information | 16 |
| ARTICLE 5 | | PURCHASER'S REPRESENTATIONS AND WARRANTIES | 16 |
| | 5.1 | Organization and Corporate Power | 16 |
| | 5.2 | Authorization | 16 |
| | 5.3 | No Conflict with Other Instruments or Agreements | 16 |
| | 5.4 | Brokers or Finders | 17 |
| | 5.5 | Funding | 17 |
| | 5.6 | Adequate Assurance | 17 |
| | 5.7 | Governmental or Regulatory Approvals | 17 |
| | 5.8 | Legal Proceedings | 17 |
| | 5.9 | Brokers | 17 |
| | 5.10 | Solvency | 17 |
| | 5.11 | Affiliation with Parmjit Parmar | 18 |
| ARTICLE 6 | | COVENANTS, AGREEMENTS PENDING CLOSING, AND OTHER AGREEMENTS | 18 |
| | 6.1 | Conduct of Seller's Business Pending the Closing | 18 |
| | 6.2 | Additional Covenants and Agreements of Seller | 19 |
| | 6.3 | Covenants and Agreements of Purchaser | 20 |
| | 6.4 | Bankruptcy Actions | 21 |
| | 6.5 | Porteck Services Agreement | 24 |
| | 6.6 | Employment of Seller's Employees | 24 |
| | 6.7 | Salaries and Benefits | 25 |
| | 6.8 | ERISA | 27 |
| | 6.9 | Reasonable Access to Records and Certain Personnel | 27 |
| | 6.10 | Reserved | 27 |
| | 6.11 | Cure Amounts | 27 |
| | 6.12 | NYNM PPO Lockbox | 27 |
| | 6.13 | Acquisition | 27 |
| | 6.14 | Seller Access | 28 |
| ARTICLE 7 | | CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS | 28 |
| | 7.1 | Conditions Precedent | 28 |

| | | | |
|---|---|---|---|
| | 7.2 | Court Approval Required | 29 |
| | 7.3 | Consents to the Transactions | 29 |
| ARTICLE 8 | | CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS | 30 |
| | 8.1 | Representations and Warranties; Performance | 30 |
| | 8.2 | Orders | 30 |
| | 8.3 | Purchaser's Deliveries | 30 |
| | 8.4 | No Termination | 30 |
| | 8.5 | No Injunctions | 30 |
| ARTICLE 9 | | CLOSING | 30 |
| | 9.1 | Time, Place and Manner of Closing | 30 |
| | 9.2 | Closing Deliveries of Seller | 31 |
| | 9.3 | Closing Deliveries of Purchaser | 32 |
| | 9.4 | Transfer Taxes | 33 |
| | 9.5 | Proration of Taxes and Charges | 33 |
| | 9.6 | Consummation of Closing | 33 |
| ARTICLE 10 | | TERMINATION OF AGREEMENT | 34 |
| | 10.1 | Termination Events | 34 |
| | 10.2 | Break-Up Fee; Expense Reimbursement | 34 |
| | 10.3 | Effect of Termination | 35 |
| | 10.4 | Termination Procedure | 35 |
| ARTICLE 11 | | FURTHER ASSURANCES | 35 |
| | 11.1 | Separate Agreements Executed in Connection with Closing | 35 |
| | 11.2 | Cooperation of the Parties After Closing | 35 |
| | 11.3 | Payroll | 36 |
| ARTICLE 12 | | DEFINITIONS | 36 |
| ARTICLE 13 | | MISCELLANEOUS PROVISIONS | 44 |
| | 13.1 | Nature and Survival of Representations and Warranties | 44 |
| | 13.2 | Exhibits and Schedules | 44 |
| | 13.3 | Assignment | 44 |
| | 13.4 | Governing Law and Jurisdiction | 44 |
| | 13.5 | Severability | 44 |
| | 13.6 | Notices | 44 |
| | 13.7 | Public Announcements | 46 |

13.8    Expenses ........................................................................................................ 46

13.9    Third Parties ................................................................................................... 46

13.10   Time of the Essence ........................................................................................ 46

13.11   Construction .................................................................................................... 46

13.12   Counterparts; Electronic Signatures; Effectiveness of this Agreement ............... 46

13.13   Remedies Cumulative ..................................................................................... 47

13.14   Entire Agreement; Amendment; Waiver .......................................................... 47

13.15   Disclaimer; Non-Recourse .............................................................................. 47

13.16   Bulk Sales Laws .............................................................................................. 48

13.17   No Right of Set-Off ........................................................................................ 48

# **SCHEDULES**

| | | |
|---|---|---|
| Schedule 1.3 | - | Assigned Contracts |
| Schedule 3.1.18 | - | Excluded Assets |
| Schedule 4.2 | - | Title |
| Schedule 4.4 | - | Litigation |
| Schedule 4.6.1 | - | Absence of Certain Changes |
| Schedule 4.6.2 | - | Notice of Termination |
| Schedule 4.7.1 | - | Compliance with Laws |
| Schedule 4.7.2 | - | Material Permits |
| Schedule 4.7.5 | - | Notices from Governmental Authority; Obligation to Mitigate |
| Schedule 4.8 | - | Transactions with Related Persons; Outside Interests |
| Schedule 4.10 | - | ERISA and Related Matters |
| Schedule 4.14 | - | Authorization |
| Schedule 4.15 | - | No Conflict with Other Instruments or Agreements |
| Schedule 4.16 | - | Brokers' or Finders' Fees |
| Schedule 4.17 | - | Taxes |
| Schedule 5.1 | - | Authorization |
| Schedule 6.6.2 | - | Active Business Employees to be Hired |
| Schedule 12 | - | Permitted Encumbrances |
| | | |
| Exhibit A | - | Form of NYNM Bid Order |

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** is made as of July 5, 2018, by and between HEALTHTEK SOLUTIONS, LLC, a Delaware limited liability company or an assignee acceptable to Seller (hereinafter referred to as the "**Purchaser**") and NEW YORK NETWORK MANAGEMENT, L.L.C., a New York limited liability company ("**Seller**").

## RECITALS

A.    Seller has commenced with certain of its Affiliates jointly administered cases (collectively, the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Bankruptcy Code, as amended (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of New York (the "**Bankruptcy Court**"), thereby creating the estates (the "**Bankruptcy Estates**") in accordance with Bankruptcy Code Section 541 et seq., and have continued in the possession of their assets and in the management of their business under Sections 1107 and 1108 of the Bankruptcy Code.

B.    Seller, subject to the receipt of any higher or better offer received by it for the NYNYM Assets, desires to sell to Purchaser the NYNYM Assets pursuant to the terms and conditions of this Agreement and Purchaser desires to so purchase and acquire such assets from Sellers (the "**Acquisition**") in accordance with Sections 105, 363 and 365 of the Bankruptcy Code, free and clear of all liens, interests, claims or encumbrances;

NOW THEREFORE, IN CONSIDERATION OF THE PROMISES MADE HEREIN, AND INTENDING TO BE LEGALLY BOUND HEREBY, THE PARTIES AGREE AS FOLLOWS:

## ARTICLE 1
## PURCHASE OF ASSIGNED ASSETS.

1.1    Purchase and Sale of NYNYM Assets.  Subject to the terms and conditions set forth in this Agreement, including without limitation the receipt of any higher or better offer received by it for the NYNYM Assets, at the Closing, Seller shall sell, convey, transfer, assign, and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, for the Purchase Price, all right, title and interest in and to the NYNYM Assets.  Subject to the terms and conditions of this Agreement, the NYNYM Assets shall be sold free and clear of all liens, interests, claims or encumbrances.

1.2    Assumption of Certain Liabilities.

1.2.1    Upon the terms and subject to the conditions of this Agreement, at the Closing, on the Closing Date, Purchaser shall assume only the following liabilities (the "**Assumed Liabilities**"):

1.2.1.1    the obligations of Seller under the Assigned Contracts to the extent such obligations are applicable to and accrue solely with respect to periods subsequent to the Effective Time; for the avoidance of doubt, Purchaser shall not be liable for any accounts

1

payable for goods or services due prior to the Effective Time and such payables shall be the responsibility of Seller;

      1.2.1.2  Taxes that relate to the ownership or operation of the NYNYM Assets or the NNNI Business with respect to any Tax period or portion thereof beginning after the Closing Date;

      1.2.1.3  all Assumed Cure Amounts with respect to the Assigned Contracts; and

      1.2.1.4  all Liabilities arising from the ownership of NYNYM Assets, or operation of the NNNI Business arising after the Closing Date.

  Purchaser shall not assume, incur, guarantee, or otherwise be obligated with respect to any liability whatsoever of Seller other than the Assumed Liabilities.  With respect to any of the Assumed Liabilities, such assumption by Purchaser is for the benefit only of Seller and shall not expand, increase, broaden, or enlarge the rights or remedies of any other party, nor create in any other party any right against Purchaser that such party would not have against Seller if this Agreement had not been consummated.

  1.2.2  Except as provided in <u>Section 1.2.1</u>, Purchaser does not hereby and will not assume or become liable for and shall not be obligated to pay or satisfy any obligation, debt or liability whatsoever, whether fixed, contingent or otherwise, of Seller or any other Person, including, without limitation any Cure Amounts (other than the Assumed Cure Amounts), Indebtedness or other claim, liability, obligation or Tax arising out of the ownership or operation of the NYNYM Assets and/or the NNNI Business or circumstances or occurrences or the operations of Seller or transactions contemplated by this Agreement or Seller or any other Person in each case prior to the Closing Date and whether or not disclosed on the Schedules attached hereto, and regardless of when or by whom asserted (collectively, the "**Excluded Liabilities**"). Without limiting the foregoing and for the avoidance of doubt, the Assumed Liabilities shall in no event include, and the Excluded Liabilities shall include (but not be limited to), the Specifically Excluded Liabilities.  The Excluded Liabilities shall remain the responsibility and obligation of Seller after Closing, and Seller shall pay and discharge all such liabilities as and when due.

  1.2.3  For purposes of this Agreement, "**Specifically Excluded Liabilities**" means (i) Seller's liabilities or obligations under this Agreement; (ii) Seller's liabilities or obligations for any fees and expenses incident to or arising out of the consummation of the transactions contemplated hereby (including all transaction related bonuses or benefits payable to any officer, director, manager, employee, shareholder, member or Affiliate of Seller); (iii) any liability or obligation of Seller for Taxes for any taxable period or year, except as otherwise specifically provided in <u>Section 9.4</u> or <u>Section 9.5</u>; (iv) Seller's liabilities or obligations with respect to Indebtedness; (v) liabilities or obligations of Seller arising by reason of any violation or alleged violation of any Law; (vi) Seller's liabilities or obligations arising out of or related to any breach or alleged breach by Seller of any Contract, in each case, regardless of when any such liability or obligation is asserted; (vii) Seller's liabilities or obligations for tort claims, known or unknown, and any related claims and litigation with respect to Seller's operation of the NYNNI

2

Business prior to the Closing Date; (viii) Seller's liabilities or obligations relating to any Action arising out of or in connection with Seller's conduct of the NNNI Business or otherwise (including the Actions set forth on **Schedule 4.4**), or any other conduct of Seller or Seller's respective officers, directors, managers, employees, consultants, agents or advisors prior to the Closing; (ix) except as otherwise provided in Section 1.2.1, Seller's liabilities or obligations relating to employees relating to the period prior to Closing, including, without limitation, any employees who are offered employment by Purchaser in accordance this Agreement but who decline to accept such offer (except for the obligations of Seller for any accrued and unused vacation or paid time off for the Hired Active Business); (x) any liabilities, obligations or responsibilities relating to or arising under any Benefit Plan, any "employee benefit plan" (as defined ERISA) or any other employee benefit plan, program or arrangement at any time maintained or contributed to by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has any liability or potential liability; (xi) any liabilities or obligations with respect to any of the Excluded Assets; (xii) any liability of Seller to any Affiliate of Seller (including any shareholder of such Affiliate); (xiii) any liability to indemnify, reimburse or advance amounts to any officer, director, manager, employee or agent of Seller; (xiv) any liability to distribute to any of member or other securityholder of Seller or otherwise apply all or any part of the consideration received hereunder, including any liability of Seller arising as a result of the exercise by any of its shareholders or members of such Person's right (if any) to dissent from the transactions contemplated hereby and seek appraisal rights; (xv) any liability under any Contract not included as an Assigned Contract, including any liability arising out of or relating to any employment or similar Contract to which Seller is a party or otherwise bound; (xvi) any liability of Seller not related to the ownership of the IPA Entities, the Assigned Contracts or the NYNM PPO Lockbox Cash; and (xvii) any other liability or obligation of Seller not expressly assumed by Purchaser pursuant to Section 1.2.

1.3     Assignment of Certain Contracts.  At the Closing, Purchaser shall succeed to the rights and privileges of Seller, and shall assume the express obligations of Seller to the extent such obligations (A) are applicable to and accrue with respect to periods subsequent to the Effective Time and (B) are accompanied by a correlated duty of performance or payment on the part of the other parties thereto, pursuant to those Contracts of Seller that are shown as "Assigned Contracts on **Schedule 1.3** hereto (the "**Assigned Contracts**"), as and in the form of the copies thereof (or, if oral, as and in the form of the written statements of the terms thereof) furnished or made available to Purchaser.  Purchaser, in its sole discretion, may amend **Schedule 1.3** prior to the hearing on the approval of the NYNM Sale Order.  Purchaser shall be responsible for the payment and satisfaction of all cure amounts as determined by the Bankruptcy Court pursuant to Section 365(b) of the Bankruptcy Code with respect to the Assigned Contracts (the "**Cure Amounts**"), but solely to the extent that a Cure Amount (i) is an Assumed Liability and (ii) does not exceed the corresponding Cure Amount set forth on **Schedule 1.3** with respect to each such Assigned Contract (the "**Assumed Cure Amounts**"). Seller shall be responsible for any other Cure Amounts.

1.4     Instruments of Conveyance, Assumption or Assignment.  The sale, conveyance, transfer, assignment and delivery of the NYNYM Assets, and the assumption of the Assigned Contracts and the Assumed Liabilities, as herein provided, shall be effected by bills of sale, assignments, deeds, consents, endorsements, drafts, stock powers or other instruments in such reasonable and customary form as shall be mutually agreed by Purchaser and Seller, and Seller

shall at any time and from time to time after the Closing, upon reasonable request, execute, acknowledge, and deliver such additional bills of sale, endorsements, assignments, deeds, drafts, checks, stock powers or other instruments and take such other actions as may be reasonably required to vest title to the NYNYM Assets in Purchaser and otherwise effectuate the transactions contemplated by this Agreement.

      1.5    "AS IS" TRANSACTION.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, SELLER MAKE NO (AND SELLER EXPRESSLY DISCLAIM AND NEGATE ANY) REPRESENTATIONS OR WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EXPRESS OR IMPLIED, WITH RESPECT TO THE ASSIGNED ASSETS OR ANY OTHER MATTER WHATSOEVER, INCLUDING, WITHOUT LIMITATION, INCOME TO BE DERIVED OR EXPENSES TO BE INCURRED IN CONNECTION WITH THE ASSIGNED ASSETS, THE PHYSICAL CONDITION OF ANY PART OF THE ASSIGNED ASSETS OR ANY OTHER ASSET WHICH IS THE SUBJECT OF ANY CONTRACT TO BE ASSUMED BY PURCHASER AT THE CLOSING, TO THE PHYSICAL CONDITION OF ANY REAL PROPERTY WHICH IS THE SUBJECT OF ANY REAL PROPERTY LEASE TO BE ASSUMED BY PURCHASER AT THE CLOSING, THE VALUE OF THE ASSIGNED ASSETS (OR ANY PORTION THEREOF), THE TRANSFERABILITY OF THE ASSIGNED ASSETS, THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE TITLE OF THE ASSIGNED ASSETS (OR ANY PORTION THEREOF), THE MERCHANTABILITY OR FITNESS OF THE ASSIGNED ASSETS OR ANY PORTION OF THE ASSIGNED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE ASSIGNED ASSETS OR ANY PORTION THEREOF. WITHOUT IN ANY WAY LIMITING THE FOREGOING, EXCEPT AS EXPRESSLY PROVIDED HEREIN, SELLER HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE ASSIGNED ASSETS.  PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE ASSIGNED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE ASSIGNED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE ASSIGNED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH HEREIN, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, SUBJECT TO THE TERMS AND CONDITIONS OF THIS AGREEMENT, PURCHASER WILL ACCEPT THE ASSIGNED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS." NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY (I) CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE, SPECULATIVE, EXEMPLARY, TREBLE DAMAGES OR DAMAGES FOR ANY LOST PROFITS OR BUSINESS, LOST BUSINESS OPPORTUNITY, DIMINUTION IN VALUE OR LOSS OF USE, (II) DAMAGES OR LOSSES BASED ON OR USING CALCULATION OF LOSS OF FUTURE REVENUE, INCOME OR PROFITS OR DIMINUTION OF VALUE OR (III) DAMAGES BASED ON A MULTIPLE OF EARNINGS OR OTHER METRIC OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY FOR ANY REASON WITH RESPECT TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER

BASED ON STATUTE, CONTRACT, TORT, OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT, OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT.

ARTICLE 2
PURCHASE PRICE.

2.1     Purchase Price.

2.1.1     Purchase Price.  In consideration for the sale, conveyance, transfer, and delivery of the NYNYM Assets, upon the terms and subject to the covenants and conditions set forth in this Agreement, including without limitation the receipt of any higher or better offer received by it for the NYNYM Assets, Purchaser shall assume the Assigned Contracts and the Assumed Liabilities related to the NYNYM Assets and Purchaser shall pay to Seller the Purchase Price.

2.1.2     Withholding.  Notwithstanding any provision hereof to the contrary, Purchaser and the Escrow Agent shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts they are required to deduct and withhold pursuant to any provision of Law, including those related to Taxes.  To the extent that amounts are so withheld by Purchaser under any provision of this Agreement, such withheld amounts (i) shall be remitted to the applicable Governmental Authority in accordance with applicable Law and (ii) shall be treated for all purposes of this Agreement as having been paid to the recipients in respect of which such deduction and withholding was made.  Assuming that Seller deliver all items described in Section 9.2, Purchaser acknowledges that as of the date hereof, Purchaser has no knowledge that withholding will be required pursuant to this Section 2.1.

2.2     Payment of the Purchase Price.

2.2.1     Purchaser has delivered to Fidelity National Title Company as designated escrow agent for Seller (the "Escrow Agent") an amount equal to Five Hundred Thousand U.S. Dollars ($500,000.00) in immediately available funds (the "**Cash Deposit**").

2.2.2     Within 48 hours of execution of this Agreement, Purchaser, Seller and the Escrow Agent will execute and deliver an escrow agreement (the "**Escrow Agreement**").  Any fees or costs payable to the Escrow Agent or in connection with the Escrow Agreement shall be divided evenly and payable one-half by Purchaser and one-half by Seller.  The Cash Deposit shall be held by the Escrow Agent in a non-interest-bearing account reasonably acceptable to Purchaser and Seller.  The Cash Deposit shall be held by the Escrow Agent and be released as follows:

2.2.2.1     If the Closing occurs, Seller and Purchaser shall jointly instruct the Escrow Agent to, on the Closing Date, deliver the Cash Deposit by wire transfer of immediately available funds, to Seller, as provided in Section 2.2.2.3 in accordance with the instructions provided to the Escrow Agent.  Such amount shall be applied as a credit toward payment of the Purchase Price, as set forth in Section 2.2.4.

5

2.2.2.2    If this Agreement is terminated by Seller pursuant to Section 10.1.6 and Seller is not then in breach of Seller's obligations pursuant to this Agreement, the Escrow Agent shall deliver the Cash Deposit in accordance with the terms of the Escrow Agreement and if such deposit is delivered to, or becomes deliverable to, anyone other than Purchaser such deposit will constitute liquidated damages. Because it would be impractical and extremely difficult to determine the extent of any damages that might result from a breach of, or default under, this Agreement by Purchaser prior to the Closing, it is understood and agreed that such liquidated damages (in an amount equal to the Cash Deposit) represent Purchaser's and Seller's reasonable estimate of actual damages, such liquidated damages do not constitute a penalty and such deposit will constitute Seller's sole and exclusive remedy for any breach of, or default under, this Agreement by Purchaser prior to the Closing.

2.2.2.3    If this Agreement is terminated for any reason other than as set forth in Section 2.2.2.2, the Escrow Agent shall deliver the Cash Deposit to Purchaser.

2.2.3    Reserved.

2.2.4    At the Closing, Purchaser shall make a cash payment, by wire transfer of immediately available funds to such account as Seller shall designate, of the "**Closing Payment**" which shall equal the Purchase Price, <u>minus</u> the Cash Deposit.

2.3    <u>Allocation of the Purchase Price</u>. Seller and Purchaser agree that the Purchase Price and the Assumed Liabilities as well as any other items constituting a portion of the amount realized with respect to the sale of the NYNYM Assets for Tax purposes (the "**Allocable Consideration**") will be allocated among the NYNYM Assets in a manner consistent with Section 1060 of the Tax Code and Treasury regulations promulgated thereunder. Purchaser will, no later than ninety (90) days following the Closing Date, prepare and deliver to Seller a schedule setting forth the allocation of the Allocable Consideration in accordance with the preceding sentence (the "**Allocation Schedule**"). Seller shall have fifteen (15) days to review and provide written comments to Purchaser with respect to the Allocation Schedule. If Seller provide written comments to Purchaser in accordance with the preceding sentence, Purchaser and Seller will endeavor for a period of not less than thirty (30) days to resolve any such comments. If Seller do not provide written comments within such fifteen (15) day period or if Purchaser and Seller resolve all such comments, (i) the Allocation Schedule, as revised, if applicable, shall be final and binding on the parties hereto, (ii) neither Purchaser nor Seller will take any position that is contrary to or inconsistent with the Allocation Schedule for any Tax purpose, including with respect to any Tax Return (including amended Tax Returns) and (iii) in the event that the Allocation Schedule is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other parties and the parties will consult in good faith as to how to resolve such dispute in a manner consistent with the agreed upon Allocation Schedule. Notwithstanding any provision of this <u>Section 2.3</u> to the contrary, if Purchaser and Seller are not able to resolve all written comments made by Seller within the applicable fifteen (15) day period, each party shall be allowed to use that party's own allocation of the Purchase Price and the Assumed Liabilities.

## ARTICLE 3
### EXCLUDED ASSETS.

3.1     <u>Excluded Assets</u>.  The NYNYM Assets to be acquired by Purchaser hereunder do not include the following (hereinafter referred to as the "**Excluded Assets**"):

3.1.1     any cash on hand, in banks, and any cash equivalents (other than the NYNM PPO Lockbox Cash);

3.1.2     all claims, rights and causes of action of Seller arising under or relating to Chapter 5 of the Bankruptcy Code (whether or not asserted as of the Closing Date) including, without limitation, any such claims and actions arising under Sections 544, 545, 547, 548, 549 or 551 of the Bankruptcy Code, and commercial tort claims;

3.1.3     Seller's rights under this Agreement (including the right to receive the Purchase Price) and under any of the ancillary agreements to be entered into in connection with the transactions contemplated hereby;

3.1.4     all shares of capital stock or other equity interests of Seller or any of its Affiliates, all securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of Seller or any of its Affiliates, and all securities owned and held by Seller, whether equity or debt or a combination thereof, other than the IPA Equity;

3.1.5     all Tax Returns and Tax records of Seller and its Affiliates;

3.1.6     all Tax refunds, credits, abatements or similar offsets against Taxes of Seller and its Affiliates that relate to Specifically Excluded Liabilities;

3.1.7     all Tax attributes of Seller and its Affiliates;

3.1.8     the organizational documents, qualifications to do business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, blank stock certificates, and other documents relating to the organization, maintenance and existence of Seller or any of its Affiliates, and all personnel records or other records of Seller that are required by Law to be retained;

3.1.9     all claims arising on or prior to the Closing Date under any directors and officers liability insurance policies owned by Seller;

3.1.10     all claims and causes of action arising on or before the Closing Date that Seller has against any current or former Affiliate, insider of Seller or any third party (and any recovery on account thereof), including claims for breaches of fiduciary duty, fraud or similar cause of action, rights of recoupment and avoidance, except to the extent that such claims or causes of action (i) may constitute a counterclaim, defense, offset, or recoupment right with respect to affirmative claims (if any) that such third party may assert against Purchaser or its Affiliates, (ii) arise under any rights under warranties (express or implied), representations and guarantees made by any third party to Seller in connection with the NYNYM Assets or the

NNNI Business, (iii) arise under the Assigned Contracts assumed and assigned to Purchaser, or (iv) relate to the NYNYM Assets; provided, however, nothing in this Section 3.1.10 shall in any event be deemed to eliminate from the Excluded Assets any other asset expressly designated as such pursuant to this Article 3;

      3.1.11     professional retainers paid by Seller;

      3.1.12     any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller;

      3.1.13     all customer deposits;

      3.1.14     all Benefit Plans, and any other "employee benefit plan" (as defined in ERISA) or any other employee benefit plan, program or arrangement, including, in each case, any underlying assets, agreements, policies and rights in connection therewith;

      3.1.15     all insurance policies (except to the extent relating to the NYNYM Assets), all directors and officers liability insurance policies and errors and omissions insurance policies and all rights to assert claims with respect to any such policies; all unearned insurance premiums and all accrued insurance refunds or rebates; all unearned insurance premiums and all accrued insurance refunds or rebates; all rights with respect to an occurrence under any insurance policy prior to the Closing Date;

      3.1.16     all Contracts that are not Assigned Contracts, and all Contracts that have terminated or expired prior to the Closing in the Ordinary Course of Business;

      3.1.17     any documents or communications of Seller that are subject to Seller's attorney-client privilege and/or the work-product immunity doctrine;

      3.1.18     those assets, if any, listed on **Schedule 3.1.18**; and

      3.1.19     all assets of Seller other than the IPA Equity, the Assigned Contracts and NYNM PPO Lockbox Cash.

      3.2     Purchaser Agreement.  Purchaser expressly agrees and understands that Seller shall not sell, assign, transfer, convey or deliver to Purchaser any of the Excluded Assets.

<div align="center">

ARTICLE 4
SELLER'S REPRESENTATIONS AND WARRANTIES.

</div>

      As a material inducement to Purchaser to enter into this Agreement and purchase the NYNYM Assets, Seller warrants and represents to Purchaser on the date hereof:

      4.1     Organization and Corporate Power.

      4.1.1     Seller is duly formed, validly existing and in good standing under the laws of the State of New York.  Seller is in good standing and qualified to do business in every jurisdiction in which its ownership of property or conduct of business requires it to qualify,

<div align="center">8</div>

except where the failure to do so has not had and would not cause a Material Adverse Effect. Except as a result of the commencement of the Bankruptcy Cases, Seller has all requisite power and authority and all material licenses, permits, and authorizations necessary to own and operate its properties and to carry on its business as now conducted.  Seller has made available to Purchaser true, complete and correct copies of the charters and governing documents of Seller and each of the IPA Entities, as currently in effect.  Each of the IPA Entities is duly formed, validly existing and in good standing under the laws of the State of New York.  Each of the IPA Entities is in good standing and qualified to do business in every jurisdiction in which t ownership of property or conduct of business requires it to qualify, except where the failure to do so has not had and would not cause a Material Adverse Effect

4.1.2    None of the IPA Entities is engaged in any business other than the NNNI Business.  None of the NNNI Business is conducted by any Person other than IPA Entities, and none of the NYNYM Assets is owned or held by any Person other than Seller.

4.2    <u>Title and Related Matters</u>.  Except as set forth on **Schedule 4.2**, Seller owns and has good and marketable title to all NYNYM Assets, free and clear of all Encumbrances, except for Permitted Encumbrances, and there exists no material restriction on the use or transfer of such property.

4.3    <u>Necessary Property</u>.

4.3.1    Upon the Closing, the NYNYM Assets shall be vested in Purchaser free and clear of all liens, interests, claims and encumbrances.

4.4    <u>Litigation</u>.  Except as set forth on **Schedule 4.4** and except for the Bankruptcy Cases, (a) there is no suit, claim, litigation, proceeding (administrative, judicial, or in arbitration, mediation or alternative dispute resolution), Governmental Authority or grand jury investigation, or other action (any of the foregoing, "**Action**") pending or, to the Knowledge of Seller, threatened against Seller, any of the IPA Entities, the NNNI Business, or any of the NYNYM Assets or Assumed Liabilities, that would cause a Material Adverse Effect, other than any Action that is stayed by operation of Section 362(a) of the Bankruptcy Code; (b) (i) as of the date hereof, there is no Action pending or, to the Knowledge of Seller, threatened against Seller, any of the IPA Entities, the NNNI Business, any of the NYNYM Assets or Assumed Liabilities, challenging, enjoining, or preventing this Agreement or the consummation of the transactions contemplated hereby, and, (ii) as of the Closing Date, there will be no Action pending or, to the Knowledge of Seller, threatened against Seller, the NNNI Business, any of the NYNYM Assets or Assumed Liabilities, challenging, enjoining, or preventing this Agreement or the consummation of the transactions contemplated hereby, other than any Action that is stayed by operation of Section 362(a) of the Bankruptcy Code; and (c) (i) as of the date hereof, Seller is not currently subject to any material judgment, order, writ, injunction, or decree of any court or other Governmental Authority ("**Order**") that would apply to Purchaser or Purchaser's operation of the NNNI Business or NYNYM Assets from and after the Closing, other than Orders of general applicability or any Order that is stayed by operation of Section 362(a) of the Bankruptcy Code, and, (ii) as of the Closing Date, Seller will not be subject to any material Order that would apply to Purchaser or Purchaser's operation of the NNNI Business or NYNYM Assets from and after

the Closing, other than Orders of general applicability or any Order that is stayed by operation of Section 362(a) of the Bankruptcy Code.

4.5     <u>Insurance</u>.  To the Knowledge of Seller and except as would not cause a Material Adverse Effect, (i) Seller's insurance policies covering or relating to the properties or operations of Seller and the IPA Entities are in full force and effect (with respect to the applicable coverage periods), and (ii) neither Seller nor any of the IPA Entities is in default with respect to any of its obligations under any of such insurance policies.

4.6     <u>Absence of Certain Changes</u>.

4.6.1     Except as set forth on **<u>Schedule 4.6.1</u>**, since the Petition Date, Seller has not taken or allowed to occur any of the following actions or events, or agreed or committed, in writing or otherwise, to do or allow to occur any of such actions or events and no such events have occurred:

4.6.1.1     To the Knowledge of Seller, the termination of any material Contract of (i) any IPA Entity or (ii) Seller that is related to the NNNI Business, except for any termination pursuant to the express terms of any such agreement permitting termination for convenience after a specified notice period (and, for clarification, not for cause or in connection with a breach or default by the other party thereto);

4.6.1.2     Any sale or other disposition of any material assets of Seller or an IPA Entity used in or related to the NNNI Business; or

4.6.1.3     The damage or destruction by fire or other casualty of any material asset of Seller or an IPA Entity used in or related to the NNNI Business, or any part thereof, if such asset has not been replaced or repaired.

4.6.2     Except as set forth on **<u>Schedule 4.6.2</u>**, Seller has not received written or verbal notice of breach or termination of any Assigned Contract, except for any termination pursuant to the express terms of any such agreement permitting termination for convenience after a specified notice period (and, for clarification, not for cause or in connection with a breach or default by the other party thereto).

4.7     <u>Compliance with Laws</u>.

4.7.1     Neither the execution of this Agreement nor the Closing will constitute or result in any default, breach or violation under or with respect to any (i) Applicable Laws, (ii) the provisions of any material permits, franchises, or licenses issued by any Governmental Authority, or (iii) the provisions of Seller's or any of the IPA Entities' organizational documents (collectively, clauses (i) through (iii), the "**<u>Legal Requirements</u>**"), except with respect to any default, breach or violation under or with respect to any Legal Requirements which would not, individually or in the aggregate, be material to Seller or the IP Entities, when taken as a whole. To the Knowledge of Seller, no event has occurred, and no condition or circumstance exists, that constitutes or result directly in a violation by Seller or any IP Entity of, or a failure on the part of Seller or any IP Entity to comply with, any Legal Requirement, except with respect to any violation or failure to comply with Legal Requirements which would not, individually or in the

aggregate, be material to Seller or any IP Entity, when taken as a whole. Except as set forth on **Schedule 4.7.1**, Seller has not received any written notice or other written communication from any Governmental Authority or any other Person regarding (i) any actual, alleged, or potential violation of, or failure to comply with, any Legal Requirement of Seller or any IP Entity, or (ii) any actual, alleged, or potential obligation on the part of Seller or any IP Entity to undertake, or to bear all or any portion of the cost of, any remedial, corrective or response action of any nature, except with respect to any actual, alleged or potential violation of, or failure to comply with, any Legal Requirements or obligations to undertake, or bear all or any portion of costs of any remedial, corrective or response action of any nature which would not, individually or in the aggregate, be material to Seller or the IP Entities, when taken as a whole.

4.7.2    To the Knowledge of Seller, each material authorization, license or permit required to conduct the NNNI Business as the same is presently conducted is listed on **Schedule 4.7.2** (the "**Material Permits**"), and is valid and in full force and effect.  Neither the execution of this Agreement nor the Closing do or will constitute or result in a default under or material violation of any such Material Permit.

4.7.3    To the Knowledge of Seller, none of Seller, any IP Entity or any officer, director, manager, member, agent, employee or independent contractor of Seller or any IP Entity, in the scope of its employment or engagement with Seller or an IP Entity, as applicable, has submitted any claims for reimbursement that are in material violation of, nor has engaged in any activity that is in material violation of (i) the federal Medicare or federal or state Medicaid statutes, the federal TRICARE statute (10 U.S.C. § 1071 et seq.), (ii) the civil False Claims Act of 1863 (31 U.S.C. § 3729 et seq.), (iii) criminal false claims statutes (e.g., 18 U.S.C. §§ 287 and 1001), (iv) the federal health care program Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)) (criminal penalties for acts involving Federal health care programs), commonly referred to as the "Federal Anti-Kickback Statute," or (v) the Program Fraud Civil Remedies Act of 1986 (31 U.S.C. § 3801 et seq.), Section 14 of Public Law 100-93, the anti-fraud and related provisions of the Health Insurance Portability and Accountability Act of 1996 (commonly referred to as "**HIPAA**") as amended by the Health Information Technology for Economic and Clinical Health Act (commonly referred to as the "**HITECH Act**"), or related regulations or other related or similar Applicable Laws (collectively, "**Healthcare Laws**"), including, without limitation, the following:

4.7.3.1    making or causing to be made a materially false statement or representation in any application for any benefit or payment;

4.7.3.2    making or causing to be made a materially false statement or representation for use in determining rights to any benefit or payment;

4.7.3.3    soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or kind (A) in return for referring an individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under any federal health care program, or (B) in return for purchasing, leasing or ordering, or arranging for or recommending purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part under any federal health care program;

4.7.3.4  offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such Person (A) to refer an individual to a person for the furnishing or arranging of any item or service for which payment may be made in whole or in part under a federal health care program, or (B) to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering of any good, facility, service or item for which payment may be made in whole or in part under a federal health care program; or

4.7.3.5  any other activity that materially violates any Legal Requirements, relating to prohibiting fraudulent, abusive or unlawful practices directly connected with the provision of health care items or services or the billing for such items or services provided to a beneficiary of any federal health care program.

  4.7.4  <u>Privacy Laws</u>.

  4.7.4.1  Reserved.

  4.7.4.2  To the Knowledge of Seller, Seller and each IPA Entity has complied in all material respects with all privacy policies and guidelines relating to Personal Information.  True and correct copies of any privacy and security policies and guidelines of Seller and each IPA Entity has been made available to Purchaser. To the Knowledge of Seller, Seller and each IPA Entity has made all notices and disclosures to customers required by applicable Orders and Laws, except with respect to any notice or disclosure that would not, individually or in the aggregate, be material to Seller or the IPA Entities when taken as a whole. To the extent applicable, Seller and each IPA Entity has taken steps reasonably necessary (including implementing and monitoring compliance with respect to technical, administrative and physical safeguards) to protect Personal Information and systems from which Personal Information can be created, viewed, displayed, accessed, retrieved, stored or transmitted, against loss or destruction, and against unauthorized access, use, transfer, modification, or disclosure or other misuse and to otherwise comply in all material respects with applicable Orders and Laws. There has been no unauthorized disclosure, access to or transfer of or other misuse of Personal Information required to be reported to any customer of Seller or any IPA Entity, affected individual or Governmental or Regulatory Authority and neither Seller nor any IPA Entity been required to provide any breach notification or report any security incidents to any customer of Seller or any IPA Entity, as appliable, affected individual or Governmental or Regulatory Authority as required under any applicable Order or Law.

  4.7.5  Except as set forth on **Schedule 4.7.5**, Seller has not received, in the past three (3) years, any written notice from any Governmental Authority or any other Person regarding any actual or suspected material violation by Seller or any IPA Entity of, or failure to materially comply by Seller or any IPA Entity with, HIPAA, the HITECH Act or applicable state privacy and data security Laws to the extent applicable as business associates.  To the Knowledge of Seller, no breach has occurred with respect to any unsecured Protected Health Information maintained by Seller or any IPA Entity that is subject to the notification requirements of 45 C.F.R. part 164, Subpart D, and no information security or privacy breach event has occurred that would require notification under any comparable state Laws applicable to Seller or any IPA Entity as business associates.  Except as set forth on **Schedule 4.7.5**, with

regard to compliance with HIPAA, the HITECH Act, or applicable state privacy and data security Laws, neither Seller nor any IPA Entity has any obligation to undertake, or to bear all or any portion of the cost of, any mitigation, notifications or any remedial, corrective or response action of any nature.  To the Knowledge of Seller, the services and products provided by Seller or any IPA Entity materially comply with HIPAA, the HITECH Act and applicable state privacy and data security Laws to the extent applicable.

4.8     <u>Transactions with Related Persons; Outside Interests</u>.  To the Knowledge of Seller, neither any Affiliate of Seller or any IPA Entity nor any director, manager, officer or employee of Seller or any IPA Entity is a party to any Assigned Contract, or has any interest in any of the NYNYM Assets, except as specifically disclosed on **Schedule 4.8**.

4.9     <u>No Liabilities</u>.  To the Knowledge of Sellers, none of the IPA Entities (i) has any Indebtedness or other Liabilities other than Indebtedness incurred pursuant to the Credit Agreement (which shall be released at Closing pursuant to the NYNM Sale Order) and payables to parties to the Payor Agreements, Provider Agreements or any management agreement pursuant to which NYNM or any of the IPA Entities receive fees, or (ii) is party to any contract that is not a Payor Agreement, Provider Agreement or any management agreement pursuant to which NYNM or any of the IPA Entities receives fees.

4.10     <u>ERISA and Related Matters</u>.  **Schedule 4.10** identifies each "employee benefit plan," as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), that is maintained or otherwise contributed to by Seller or any IPA Entity or with respect to which Seller or any IPA Entity otherwise has any liability and each material plan, arrangement, or policy, qualified or non-qualified, whether or not written or considered legally binding, not subject to ERISA maintained or otherwise contributed to by Seller or any IPA Entity or with respect to which Seller or any IPA Entity otherwise has any liability and providing for pension, thrift, savings, retirement, profit sharing, deferred compensation, bonuses, stock option, stock purchase, phantom stock, incentive compensation, equity compensation, "fringe" benefits, vacation, severance, disability, medical, hospitalization, dental, life, accidental death and dismemberment, tuition, company car, club dues, income tax preparation, sick leave, maternity, paternity, family leave, child care, education or cafeteria plan benefits, or employee insurance coverage or any similar compensation or welfare benefit arrangement including, without limitation, any voluntary employees' beneficiary associations or related trusts (each a "**Benefit Plan**" and, collectively, the "**Benefit Plans**").  **Schedule 4.10** identifies each (i) any employee benefit plan subject to Title IV of ERISA or Section 412 of the Tax Code, or (ii) a Multiemployer Plan, in each case that is currently maintained or contributed to by Seller or any IPA Entity, its Affiliates, or any members of Seller's or any IPA Entity's current or former "Controlled Group" (within the meaning of Sections 4 14(b), (c), (m) or (o) of the Tax Code) ("**ERISA Affiliates**"), or which could reasonably be expected to result in any Liability to the Purchaser as a result of the purchase of the Target Assets. Each Benefit Plan has been maintained, funded and administered at all times substantially in compliance with its terms and all Applicable Laws, including ERISA and the Tax Code, applicable to such Benefit Plan, except where the failure to do so would not cause a Material Adverse Effect.  Each Benefit Plan that is an employee pension benefit plan within the meaning of section 3(2) of ERISA that is intended to be a qualified plan under section 401(a) has received a favorable determination letter or opinion letter (a copy of which has been provided to Purchaser), each related trust has been

determined to be exempt from taxation under Section 501(a) of the Tax Code, and nothing has occurred that could reasonably be expected to cause the loss of such qualification or exemption. Other than as required by Applicable Laws, neither Seller nor any IPA Entity has any obligation to provide any benefits in the nature of severance pay or any post-retirement medical, health, life insurance or other post-retirement welfare benefits for retired or terminated employees, their spouses or their dependents. No representations have been made to any current or former employee of any Seller or any IPA Entity or its Affiliates with respect to benefits to be provided under a Benefit Plan that are materially inconsistent with the terms of such Benefit Plan. Except as disclosed on **Schedule 4.10**, the consummation of the transactions contemplated by this Agreement will not either alone or in connection with another event (i) entitle any current or former employee of the Seller or any IPA Entity to severance pay, or any other similar payment, except as expressly provided in this Agreement, (ii) accelerate the time of payment or vesting, or increase the amount of compensation due to any such employee or former employee, or (iii) give rise to the payment of any amount that could subject (whether alone or in connection with another payment) a current or former employee of the Seller or any IPA Entity to tax penalties under Section 4999 of the Tax Code.

4.11     <u>Real Property</u>.  The IPA Entities do not own, lease or occupy any Real Property.

4.12     <u>Reserved</u>.

4.13     <u>Reserved</u>.

4.14     <u>Authorization</u>.  Seller has, and on the Closing Date will have, full power, authority and legal right to execute and deliver this Agreement and all other agreements contemplated hereby to which Seller is a party, subject to the Bankruptcy Court's entry of the Bankruptcy Orders. Except as set forth on **Schedule 4.14** and subject to the Bankruptcy Court's entry of the Bankruptcy Orders, no approvals or consents of any other persons, entity or governmental authority having jurisdiction are necessary in connection with the execution, delivery, and performance of Seller's obligations under this Agreement. This Agreement and all other agreements contemplated hereby, when executed and delivered by Seller, and, subject to the Bankruptcy Court's entry of the Bankruptcy Orders, will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its and their terms, except as enforceability may be limited by applicable bankruptcy, insolvency, and similar statutes affecting creditors' rights generally and judicial limits on equitable remedies.

4.15     <u>No Conflict with Other Instruments or Agreements</u>.  Except as set forth on **Schedule 4.15**, the consummation by Seller of the transactions contemplated by this Agreement will not result in or constitute: (i) a default or an event that, with the giving of notice or lapse of time, or both, would constitute a default, breach, or violation of the organizational documents of Seller or any IPA Entity; (ii) to the Knowledge of Seller, a default or an event that, with the giving of notice or lapse of time, or both, would constitute a material default, breach, or violation of any Assigned Contract to which Seller or any IPA Entity is a party or by which Seller or any IPA Entity or any of its property is bound; (iii) to the Knowledge of Seller, the violation of any Law; (iv) to the Knowledge of Seller, an event that would permit any counter party to terminate any Assigned Contract or to accelerate the maturity of any Indebtedness or other obligation of Seller or any IPA Entity; or (v) to the Knowledge of Seller, the creation or imposition of any

14

Encumbrance on any of the assets of Seller or any IPA Entity (including the NYNYM Assets); except in the case of clauses (ii), (iii), (iv) and (v) for defaults, breaches, violations, terminations, accelerations, liens, charges or encumbrances that (x) are excused by the Bankruptcy Court or the applicability of any provision of the Bankruptcy Code or (y) are set forth on **Schedule 4.15**.

4.16    Brokers or Finders.  Except as set forth on **Schedule 4.16**, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Seller or any IPA Entity that are payable by Purchaser.

4.17    Taxes.  Except as set forth on **Schedule 4.17**, and in each case, with respect to the NNNI Business and the NYNYM Assets, there are no Encumbrances for Taxes (other than Permitted Encumbrances) upon any of the NYNYM Assets.

4.18    Financial Information.  Seller has provided Purchaser the financial books and records with respect to the IPA Entities and the NNNI Business to the extent available to Seller as of the date of this Agreement.


# ARTICLE 5
## PURCHASER'S REPRESENTATIONS AND WARRANTIES.

As a material inducement to Seller to enter into and perform its obligations under this Agreement, Purchaser represents and warrants to Seller on the date hereof:

5.1    Organization and Corporate Power.  Purchaser is duly formed, validly existing and in good standing under the laws of the state of its formation.  Purchaser is in good standing and qualified to do business in every jurisdiction in which its ownership of property or conduct of business requires it to qualify.  Purchaser has all requisite power and authority and all material licenses, permits, and authorizations necessary to own and operate its properties and to carry on its business as now conducted.  Purchaser has made available to Seller true, complete and correct copies of the charter and governing document of Purchaser, as currently in effect.

5.2    Authorization.  The execution, delivery, and performance by Purchaser of this Agreement and all other agreements contemplated hereby to which Purchaser is a party have been duly and validly authorized by all necessary company action of Purchaser, and except as set forth on **Schedule 5.2**, no approvals or consents of any other Person or Governmental Authority having jurisdiction are necessary in connection with it.  This Agreement and each such other agreement, when executed and delivered by Purchaser, will constitute the legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, and similar statutes affecting creditors' rights generally and judicial limits on equitable remedies.

5.3    No Conflict with Other Instruments or Agreements.  The consummation by Purchaser of the transactions contemplated by this Agreement will not result in or constitute a default or an event that, with the giving of notice or lapse of time, or both, would constitute a default, breach, or violation of the organizational documents of Purchaser or any Contract to

which Purchaser is a party or by which Purchaser or any of its property may be bound and which would be material to Purchaser's performance of this Agreement, or the violation of any Law.

      5.4    <u>Brokers or Finders</u>.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Purchaser.

      5.5    <u>Funding</u>.  Purchaser has sufficient liquid assets and available credit for Purchaser to pay the anticipated Purchase Price on the Closing Date and to pay and perform the Assumed Liabilities as they become due and to perform its obligations under this Agreement and the agreements contemplated by this Agreement, and has provided to Seller a copy of Purchaser's financial statements and such other financial information reasonably available to Purchaser requested by Seller to demonstrate its ability to do so.

      5.6    <u>Adequate Assurance</u>.  Purchaser shall take commercially reasonable steps to demonstrate to the Bankruptcy Court adequate assurance of future performance under the Assigned Contracts, and shall provide a copy of Purchaser's financial statements and such other financial information reasonably available to Purchaser that is required by the Bankruptcy Court to demonstrate Purchaser's ability to assume, or to take an assignment of, the Assigned Contracts; <u>provided</u>, <u>however</u>, that any such financial information and related testimony and exhibits, other than information that is otherwise publicly available or is ordinarily provided by Purchaser to potential contracting parties, shall be distributed subject to appropriate confidentiality arrangements and shall be filed or otherwise introduced in the Bankruptcy Court only under seal.

      5.7    <u>Governmental or Regulatory Approvals</u>.  Except as set forth in <u>Schedule 5.7</u>, no Governmental or Regulatory Approval on the part of Purchaser is required in connection with the execution and delivery by Purchaser of this Agreement, the agreements contemplated by this Agreement or the consummation of the transactions contemplated hereby and thereby.

      5.8    <u>Legal Proceedings</u>.  There are no Actions pending or, to the Knowledge of Purchaser, threatened in writing against Purchaser or any of its assets or properties that would reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting, delaying or making illegal the purchase of the NYNYM Assets or the assumption of the Assumed Liabilities by Purchaser under this Agreement or the performance by Purchaser of its obligations under this Agreement or the agreements contemplated by this Agreement.

      5.9    <u>Brokers</u>.  No broker, finder or agent acting on behalf of Purchaser or its Affiliates is entitled to any fee or commission with respect to the execution and delivery of this Agreement or the consummation of the transactions contemplated hereby that would be payable by Seller or its Subsidiaries.

      5.10    <u>Solvency</u>.  As of the Closing and immediately after consummating the transactions contemplated by this Agreement, Purchaser reasonably believes it will not (a) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the present fair value of its assets will be less than the amount required to pay its probable Liability on its debts as they become absolute and matured),

(b) have unreasonably small capital with which to engage in its business, including the NNNI Business and the NNNI Business (it being understood that nothing herein requires Purchaser to operate the NNNI Business for any specified period of time), or (c) have incurred or planned to incur debts beyond its ability to repay such debts as they become absolute and matured.

5.11     Affiliation with Parmjit Parmar.  Parmjit Parmar is not (i) affiliated, directly or indirectly, with Purchaser or any Affiliate of Purchaser, or a representative of Purchaser or any Affiliate of Purchaser, (ii) an officer, director, partner, member or beneficial owner of any equity of, Purchaser or any Affiliate of Purchaser, or (iii) a relative or spouse of any such Person.

ARTICLE 6
COVENANTS, AGREEMENTS PENDING CLOSING, AND OTHER AGREEMENTS.

6.1     Conduct of Seller's Business Pending the Closing.

6.1.1     From the date of this Agreement until the Closing, except as otherwise consented to or approved by Purchaser in writing or as may be limited or modified as a result of the filing of the Bankruptcy Cases and to the extent Purchaser is the Successful Bidder at the Auction, Seller covenants and agrees with Purchaser as follows:

6.1.1.1     Seller will carry on its operations and the operations of the IPA Entities and the NNNI Business only in the Ordinary Course of Business (subject to any limitations required by the Bankruptcy Cases) and in compliance with Law in all material respects and use commercially reasonable efforts to maintain its relationships with customers, suppliers and others having business dealings with Seller and the IPA Entities, and use commercially reasonable efforts to keep in full force and effect liability insurance comparable in amount and scope of coverage to that currently maintained and shall not terminate any employees and shall not place any employees on leave or suspension of any kind.

6.1.1.2     All NYNYM Assets now owned or used by Seller or any of the IPA Entities and will be used, preserved and maintained in the Ordinary Course of Business and in compliance with Laws in all material respects, to the same extent and in the same condition as said NYNYM Assets are on the date of this Agreement, ordinary wear and tear excepted.

6.1.1.3     Seller will keep or cause to be kept in effect and undiminished the insurance now in effect on its NYNYM Assets, and will purchase such additional insurance, at Purchaser's cost, as Purchaser may request.

6.1.1.4     Seller will pay all of its obligations, and cause to be paid all of the obligations of the IPA Entities, incurred on or after the Petition Date in the Ordinary Course of Business as they become due (subject to any limitations required by the Bankruptcy Cases) and will timely perform its obligations under Section 365(d)(3) of the Bankruptcy Code.

6.1.1.5     Seller will not cause or allow any Encumbrance to be placed on any NYNYM Asset (except for Permitted Encumbrances) or make any commitments or allow any IPA Entities to make any commitments relating to such NYNYM Asset beyond the Closing Date, including, without limitation: (i) incurring any material obligations or liabilities,

17

whether fixed or contingent that would constitute an Assumed Liability; (ii) entering into any material Contract that would constitute an Assigned Contract; (iii) modifying or terminating any Assigned Contract except in the Ordinary Course of Business; or (iv) waiving any rights in respect of an Assigned Contract of material value to Seller or any IPA Entity; (v) selling or otherwise disposing of any NYNYM Asset;

        6.1.1.6      Seller will not increase the compensation, severance or fringe benefits of any officer or employee of Seller or any IPA Entity, except for such increases in salary or wages of employees of Seller or any IPA Entity in the Ordinary Course of Business;

        6.1.1.7      Seller will not (a) terminate, sublet (or similar arrangement) or amend any Assigned Contract, or (b) enter into, terminate or amend any other Contract material to the NNNI Business, except, in each case, in the Ordinary Course of Business; and

        6.1.1.8      Seller will not authorize any of, or commit or agree to take any of the foregoing actions.

    6.2      <u>Additional Covenants and Agreements of Seller</u>.  From the date of this Agreement until the Closing, and except as otherwise consented to or approved by Purchaser in writing or as may be limited or modified as a result of the filing of the Bankruptcy Cases and to the extent Purchaser is the Successful Bidder at the Auction, Seller further covenants and agrees with Purchaser as follows:

        6.2.1      Seller will use its commercially reasonable efforts to obtain as promptly as practicable the satisfaction of the conditions to the Closing described in <u>Article 7</u> of this Agreement and shall facilitate the Acquisition pursuant to which the NYNYM Assets will be sold free and clear of all liens, interests, claims and encumbrances.

        6.2.2      The Seller will promptly supplement or amend the Schedules (i) with respect to any matter hereafter arising to the Knowledge of Seller that, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in any Schedule or (ii) that is necessary to correct any information in such Schedules that, to the Knowledge of Seller, is inaccurate on account of the occurrence of an event described in subpart (i).

        6.2.3      The Seller will promptly notify Purchaser of:

        6.2.3.1      Any Material Adverse Effect;

        6.2.3.2      Any fact, condition, change or event that, to the Knowledge of Seller, causes or constitutes a breach, in any material respect, of any of the representations or warranties or covenants of Seller hereunder made as of the date hereof; or

        6.2.3.3      The damage or destruction by fire or other casualty of any material NYNYM Asset or part thereof.

    The Seller hereby acknowledge that Purchaser does not and shall not waive any right it may have hereunder solely as a result of any Schedule update pursuant to <u>Section 6.2.2</u> or such

notifications, and any Schedule update or notification given pursuant to Section 6.2.2 or this Section 6.2.3 (including any supplement to the Schedules to this Agreement) shall (i) not have any effect for purposes of Purchaser's determining satisfaction of the conditions set forth in Article 7 of this Agreement, and (ii) not in any way limit Purchaser's exercise of its rights hereunder.

    6.2.4  Prior to the Closing, Purchaser and its counsel, accountants and other representatives in connection with this transaction shall have full access during normal business hours to all properties and other assets, books, accounts, records, contracts and other documentation of, or relating to, the IPA Entities, the NNNI Business and the NYNYM Assets. Prior to the Closing, Seller shall promptly furnish or cause to be furnished to Purchaser, or the representatives of Purchaser hereunder, all data, documentation, processes and other information concerning the business, finances and properties of the IPA Entities, the NNNI Business and the NYNYM Assets that may reasonably be requested related to the IPA Entities, the NNNI Business and/or the NYNYM Assets, including, on a weekly basis, updated reports covering the cash flows and disbursements of NYNM, and shall otherwise provide such support as is reasonably requested by Purchaser relative to its transition planning such as, without limitation, coordinating meetings with key personnel.

    6.2.5  Governmental Approvals.  Seller will cooperate with the reasonable requests of Purchaser and its representatives and at the expense of Purchaser (a) with respect to all filings and notifications that Purchaser elects to make or is required to make in connection with the transactions contemplated by this Agreement; (b) in identifying and obtaining any governmental authorizations required by Purchaser to own and operate the NNNI Business or the NYNYM Assets from and after the Closing Date, and (c) in obtaining all consents identified in **Schedule 4.14** and waivers of the conflicts or defaults identified in **Schedule 4.15**. Each of the parties hereto shall use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under Applicable Law and regulations to consummate and make effective the transactions contemplated by this Agreement, including all necessary or appropriate waivers, consents and approvals to effect all necessary registrations, filings and submissions and to lift any injunction or other legal bar to the consummation of the transactions contemplated by this Agreement (and, in such case, to proceed with the transactions contemplated by this Agreement as expeditiously as possible). Each party shall promptly inform the other parties hereto of any oral communication with, and provide to counsel for the other party copies of written communications with, any Governmental Authority regarding any filings made pursuant to this Section 6.2.5. Seller (or Purchaser, as the case may be) shall not agree to participate in any meeting with any Governmental Authority in respect of any such filings, investigation or other inquiry unless it consults with Purchaser (or Seller) in advance and, to the extent permitted by such Governmental Authority, gives Purchaser (or Seller) the opportunity to attend, direct and participate at such meeting.

   6.3  Covenants and Agreements of Purchaser.  From the date of this Agreement until the Closing, Purchaser covenants and agrees with Seller as follows:

    6.3.1  Purchaser will use its commercially reasonable efforts to execute and deliver any documents and instruments that may reasonably be required to assist Seller in obtaining any necessary consents or waivers under or amendments to agreements by which

Seller is bound and which are conditions to the Closing described in this Agreement; provided, however, that Purchaser shall not be obligated hereunder to incur any cost or expense relating thereto or to execute any guaranty, assumption of liability or other document or instrument requiring Purchaser to assume obligations not contemplated by this Agreement.

6.3.2    Promptly after the date of this Agreement, and in any event within the applicable time period prescribed by statute or regulations, Purchaser will use its commercially reasonable efforts to promptly make all filings and notifications required by Law to be made by it in connection with the transactions contemplated by this Agreement.  Purchaser will use its commercially reasonable efforts to cooperate with Seller and its representatives (a) with respect to all filings and notifications Seller elect to make or are required to make in connection with the transactions contemplated by this Agreement, (b) in identifying and obtaining any governmental authorizations required by Purchaser to own and operate the NNNI Business and/or the NYNYM Assets from and after the Closing Date, and (c) in obtaining all consents identified in **Schedule 5.1**.

6.4    Bankruptcy Actions.

6.4.1    NYNM Sale Order.

6.4.1.1    Within one (1) Business Day after the execution of this Agreement, Sellers shall serve and file a motion (the "**NYNM Sale Motion**") in the Bankruptcy Cases requesting that the Bankruptcy Court (i) schedule the a hearing on approval of the NYNM Bid Order on a date no later than fourteen (14) days following the filing of the Sale Motion, (ii) enter the Bidding Procedures Order no later than four (4) days following the filing of the Sale Motion and (iii) enter the NYNM Sale Order at the final hearing on the Sale Motion (the "**Sale Hearing**") on a date no later than twenty-one (21) days following the filing of the Sale Motion.

6.4.1.2    Purchaser and Seller acknowledge and agree that the entry of the NYNM Sale Order shall be required in order to consummate the Acquisition, and that the requirement that the NYNM Sale Order be entered is a condition to the Closing that cannot be waived by any party.

6.4.1.3    Seller will provide Purchaser with a reasonable opportunity to review and comment upon the NYNM Sale Order contemplated by this Agreement prepared by Seller prior to the filing thereof with the Bankruptcy Court, which shall be in a final form reasonably acceptable to Purchaser.

6.4.2    NYNM Bid Order.  Seller shall obtain the entry of an order in the Bankruptcy Cases approving procedures for solicitation and consideration by the Bankruptcy Court of bids from third parties for the NYNYM Assets, substantially in the form of Exhibit A, with such changes thereto as may be reasonably acceptable to Purchaser and Seller (the "**NYNM Bid Order**").  The NYNM Bid Order shall be entered by the Bankruptcy Court no later than July 11, 2018.  The NYNM Bid Order shall:

6.4.2.1    (i) schedule the hearing to approve the NYNM Sale Order for no later than July 23, 2018; (ii) schedule an auction (the "**Auction**") no later than July 20, 2018; (iii) require, as a precondition to participation in the Auction, the submission of a

competing bid for all of the NYNYM Assets no later than 4:00 p.m. Eastern Time on July 18, 2018; (iv) provide that Seller sale process be conducted consistent with the NYNM Bid Order; and (v) provide for procedures for the assignment of the Assigned Contracts substantially in the form of the Assignment Procedures; and

6.4.2.2    provide that (a) if this Agreement is terminated pursuant to Article 10, then, subject to and in accordance with Section 10.2, Purchaser shall be entitled to (i) the Expense Reimbursement, and (ii) in the event Seller consummates a NYNMA Alternative Transaction on or prior to the date that is twelve (12) months after the date of such termination, the Break-Up Fee, with such amount being payable upon the closing or consummation of such NYNM Alternative Transaction, and (b) that Seller is authorized without further Bankruptcy Court action to pay any amounts that become due and payable to Purchaser pursuant to this Agreement (including the Break-up Fee and Expense Reimbursement), and that such amounts shall have the priority specified in Section 10.2.3; provided that, for the avoidance of doubt, notwithstanding any provisions of this Agreement to the contrary, Seller shall not be obligated to pay, and Purchaser shall not be entitled to receive, the Break-Up Fee if Seller terminate this Agreement pursuant to Section 10.1.6 as a result of Purchaser's breach of this Agreement.

6.4.3    Assignment Motion and Order.  Consistent with the Assignment Procedures , Seller has notified or shall notify all parties to the Assigned Contracts of the proposed assignment of the Assigned Contract and that if they do not timely file an objection to the assumption and assignment of an Assigned Contract, or to the proposed Cure Amount associated therewith, such parties shall waive and be estopped from asserting any objection to such assumption and assignment or to the establishment of such Cure Amount.  If Purchaser is the Successful Bidder at the Auction, Seller shall file and serve on all parties to the Assigned Contracts the Auction Results Notice and the Further Assignments Notice (each as defined in the Assignment Procedures) in accordance with the Assignment Procedures.  Seller shall not file any motion seeking to assume or reject any Assigned Contract under Section 365 of the Bankruptcy Code without the prior written consent of Purchaser.  To the extent that the assignment to Purchaser of any Assigned Contract or transfer to Purchaser of any NYNYM Asset pursuant to this Agreement is not permitted without the consent of a third party and such restriction cannot be effectively overridden or canceled by the NYNM Sale Order, the Assignment Order or other related Order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Contract or NYNYM Asset or any right or interest therein unless and until such consent is obtained; provided, however, that the parties shall use their commercially reasonable efforts, before the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, Seller and Purchaser shall reasonably cooperate with each other in any lawful and commercially feasible arrangement designed to provide Purchaser with the benefits and obligations of any such Contract or NYNYM Asset, Purchaser shall be responsible for performing all obligations under such Contract required to be performed by Seller on or after the Closing Date to the extent set forth in this Agreement, and, unless reimbursed by Purchaser, Seller shall not be required to expend any monetary funds in connection with such efforts or arrangements.

6.4.4    Notice and Reasonable Efforts.  Seller shall provide appropriate notice of the hearings to approve the NYNM Bid Order and the Sale Motion and the Auction, as is required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure to all parties

entitled to notice, including, but not limited to, all parties to the Assigned Contracts and all taxing and environmental authorities in jurisdictions applicable to Seller and the IPA Entites. Thereafter, Seller shall undertake all reasonable efforts in support of the Sale Motion and the assignment of the Assign Contracts, and Purchaser agrees to cooperate in such efforts.

6.4.5    <u>Defense of Orders</u>.  If the NYNM Sale Order, the Assignment Order, or any other Order of the Bankruptcy Court relating to this Agreement (collectively, the "**Bankruptcy Orders**") shall be appealed (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller shall take all steps as may be appropriate to defend against such appeal, petition or motion, and Purchaser agrees to cooperate in such efforts, and each of Seller and Purchaser hereto shall endeavor to obtain an expedited resolution of such appeal.

6.4.6    <u>Books and Records</u>.  Purchaser shall make available to Seller copies of all books, files, documents and records included as part of the NYNYM Assets as Seller may reasonably request for a period of eighteen (18) months post-Closing.  If Seller desire copies of any of such documents or records, all copying costs shall be borne by Seller.

6.4.7    <u>Right to Market</u>.  Seller and Purchaser acknowledge and agree that until the termination of this Agreement in accordance with its terms, Seller and its Subsidiaries, officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives shall be permitted to solicit inquiries, proposals, offers or bids from, and negotiate with, any Person other than Purchaser relating to the direct or indirect sale, transfer or other disposition, in one or more transactions, of all or substantially all of the assets of Seller and may take any other affirmative action (including entering into any agreement or letter-of-intent with respect thereto) to cause, promote or assist with any Alternative Transaction.  Without limiting the foregoing, Seller and its Subsidiaries and their respective officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives shall be permitted to supply information relating to Seller, the NNNI Business, the NYNYM Assets and/or the Assumed Liabilities to prospective purchasers and their representatives that have executed a confidentiality agreement with Seller or its Subsidiaries.  None of Seller nor any of its respective Subsidiaries shall have any liability to Purchaser, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such definitive agreement for an Alternative Transaction pursuant to this <u>Section 6.4.7</u>; provided, that Purchaser is paid any amounts due Purchaser pursuant to <u>Section 10.2.1</u> and <u>10.2.2</u> at the time provided for therein.  Seller and Purchaser agree to comply in all material respects with the terms of the NYNM Bid Order or any Order of the Bankruptcy Court with respect to the Acquisition, as applicable, and agree that to the extent there is a conflict between this Agreement and the NYNM Bid Order or any Order of the Bankruptcy Court with respect to the Acquisition, the NYNM Bid Order or the Order of the Bankruptcy Court with respect to the Acquisition shall govern in all respects.

6.5    <u>Reserved</u>.

6.6    <u>Employment of Seller's Employees</u>.  Purchaser has no obligation to offer employment to any employee of Seller or the IPA Entities.  Purchaser shall have no wage, severance or other obligations with respect to anyone who is/was an employee of Seller on the

day immediately preceding the Closing Date but who does not become a employee of the Purchaser and all such obligations, if any, shall be the responsibility of Seller.  Purchaser shall not be liable to Seller or any of Seller or any of the IPA Entities employees with respect to any Benefit Plans, with respect to any accrued vacation or other paid time off or with respect to any other benefit obligations, whether accrued prior to or continuing after the Closing.

6.7     <u>Reserved</u>.

6.8     <u>ERISA</u>.  Purchaser shall not have any responsibility, liability or obligation, whether to active, former employees, their beneficiaries or to any other person, with respect to any Benefit Plans, practices, programs or arrangements maintained by Seller and shall have no fiduciary obligations or duties with respect to such Benefit Plans.

6.9     <u>Reasonable Access to Records and Certain Personnel</u>.  So long as the Bankruptcy Cases are pending, following the Closing, Purchaser shall provide Seller and Seller's counsel and other professionals employed in the Bankruptcy Cases with reasonable access to all documents and records relating to the NYNYM Assets for the purpose of the continuing administration of the Bankruptcy Cases (including the pursuit of any avoidance, preference or similar actions), which access shall include (a) the right of Seller's professionals to copy, at Seller's expense, such documents and records as Seller or Seller's may request in furtherance of the purposes described above, and (b) Purchaser's copying and delivering to Seller or Seller's professionals such documents or records as Seller or Seller's professionals may request, but only to the extent Seller or Seller's professionals furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied and Seller reimburse Purchaser for the reasonable costs and expenses thereof.

6.10    <u>Reserved.</u>

6.11    <u>Cure Amounts</u>.  On or prior to the Closing, pursuant to Section 365 of the Bankruptcy Code and the NYNM Sale Order, (i) Purchaser shall pay any and all Assumed Cure Amounts with respect to the Assigned Contracts and (ii) Seller shall pay any and all Cure Amounts (other than the Assumed Cure Amounts).

6.12    <u>NYNM PPO Lockbox</u>.   Following the Closing, Seller shall permit and facilitate Purchaser's access to the NYNM PPO Lockbox and shall, on the last business day of each month, transfer to Purchaser any NYNM PPO Lockbox Cash for a period of six (6) months (or such shorter period as Purchaser may require such access, as notified in writing by Purchaser to Seller).  Any and all costs associated with maintaining the NYNM PPO Lockbox during such period (including, if necessary, maintaining the limited liability existence of Seller) shall be at the sole cost and expense of Purchaser.

6.13    <u>Acquisition</u>.    The Closing shall occur no later than July 31, 2018.  Seller shall not commence bankruptcy proceedings for any of the IPA Entities at any time prior to the Closing.

6.14    <u>Seller Access</u>.    From the date hereof until the earlier of (x) the Closing and (y) any termination of this Agreement pursuant to <u>Article 10</u>, upon reasonable notice, Seller shall, and shall cause each of its officers, directors, employees, auditors and agents to, (i) afford the

officers, employees and representatives of Purchaser reasonable access, during normal business hours, to the offices, properties, books and records of Seller relating to the NYNYM Assets, and (ii) furnish to the officers, employees and representatives of Purchaser such additional financial and operating data and other information regarding the operations of Seller relevant to the NYNYM Assets as are then in existence and as Purchaser may from time to time reasonably request; provided, however, that such activities of Purchaser shall not unreasonably interfere with the operations of Seller.

6.15    Radnet Contracts.    On or prior to the date that is three (3) business days prior to the Sale Hearing, Seller shall provide to Purchaser a true and correct copy of each Radnet Contract that it has in its possession, provided that the Seller shall use reasonable efforts to obtain copies of all of the Radnet Contracts and provide copies of such contracts to Purchaser.

ARTICLE 7
CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS.

The obligation of Purchaser to consummate the Acquisition contemplated by this Agreement is subject to the satisfaction (or waiver by Purchaser), prior to or at the Closing of each of the following conditions:

7.1    Conditions Precedent.

7.1.1    Representations and Warranties.  Each of the representations and warranties made herein by Seller shall be true and correct in all material respects (except for those representations and warranties already qualified by materiality, which shall be true and correct in all respects) as of the Closing with the same effect as though made at that time except for changes contemplated, permitted or required by this Agreement.

7.1.2    Performance.  Seller will have performed and complied in all material respects with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by it prior to the Closing.

7.1.3    Certificate.  Purchaser will have received, at the Closing, a certificate of Seller, signed by an authorized officer of Seller, stating that the preconditions specified in Sections 7.1.1 and 7.1.2 above have been satisfied or waived.

7.1.4    No Material Adverse Effect.  Between the date hereof and the Closing Date, there shall not have occurred any Material Adverse Effect.

7.1.5    No Violation of Applicable Law.  No provision of any applicable Law shall prohibit the consummation of the Closing.

7.1.6    No Termination.  This Agreement shall not have been terminated pursuant to Article 10.

7.1.7    Seller's Deliveries.  The Purchaser shall have received the deliveries of Seller set forth in Section 9.2.

24

7.2      Court Approval Required.

7.2.1      NYNM Sale Order.  The Bankruptcy Court shall have entered the NYNM Sale Order and such Order shall have become a Final Order.  Notwithstanding the foregoing, nothing in this Agreement shall preclude the parties hereto from consummating the transactions contemplated herein if Purchaser, in its sole discretion, agrees to waive the requirement that the NYNM Sale Order shall have become a Final Order.  No notice of such waiver of this condition or any other condition to the Closing need be given except to Seller, it being the intention of the parties that Purchaser shall be entitled to, and is not waiving, the protection of section 363(m) of the Bankruptcy Code, the equitable mootness doctrine and any similar statute or body of Law if the Closing occurs in the absence of the NYNM Sale Order becoming a Final Order.

7.2.2      No Injunctions.  There shall be no effective injunction, writ or preliminary restraining Order or any Order of any nature issued or Applicable Law passed by a Governmental Authority to the effect that the Closing may not be consummated.

7.3      Consents to the Transactions.  All Licenses, consents and approvals set forth on **Schedule 7.3** will have been obtained by Seller and delivered to Purchaser; provided, however, that Seller shall not be required to obtain any consent, waiver, or agreement to the consummation of the Acquisition to the extent the NYNM Sale Order provides that such consent, waiver, or agreement is not required or otherwise as contemplated by Section 6.4.3.

ARTICLE 8
CONDITIONS PRECEDENT TO SELLER'S OBLIGATIONS.

Each and every obligation of Seller to consummate the Acquisition contemplated by this Agreement is subject to the satisfaction (or waiver by Seller), prior to or at the Closing of each of the following conditions:

8.1      Representations and Warranties; Performance.  Each of the representations and warranties made herein by Purchaser shall be true and correct in all material respects as of the Closing with the same effect as though made at that time except for changes contemplated, permitted or required by this Agreement; Purchaser will have materially performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by it prior to the Closing; and Seller will have received, at the Closing, a certificate of Purchaser, signed by an authorized officer of Purchaser, stating that each of the representations and warranties made herein by Purchaser is true and correct in all material respects as of the Closing except for changes contemplated, permitted, or required by this Agreement and that Purchaser has materially performed and complied with all agreements, covenants, and conditions required by this Agreement to be performed and complied with by it prior to the Closing.

8.2      Orders.  The Bankruptcy Court shall have entered the NYNM Sale Order, the NYNM Bid Order and the Assignment Order, and such Orders shall not have been reversed, modified, amended or stayed.

Case 8-18-71748-ast    Doc 366-2    Filed 07/05/18    Entered 07/05/18 23:24:49
Case 2:18-cv-09293-WCA-NDW    Document 21-27    Filed 08/25/18    Page 505 of 526 PageID: 700
Case 2:18-cv-09293-WCA-MRW    Document 21-27    Filed 08/25/18    Page 505 of 526 PageID: 504

8.3     Purchaser's Deliveries.  Seller shall have received the deliveries of Purchaser set forth in Section 9.3.

8.4     No Termination.  This Agreement shall not have been terminated pursuant to Article 10.

8.5     No Injunctions.  No Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Applicable Law that is in effect on the Closing Date and which prohibits consummation of the Closing.

ARTICLE 9
CLOSING.

9.1     Time, Place and Manner of Closing.  Unless this Agreement has been terminated according to Article 10 hereof, and provided that the conditions to the Closing set forth in Article 7 and Article 8 are satisfied or waived, the closing of the transactions contemplated in this Agreement shall occur as follows:

9.1.1     the closing of the transactions contemplated by this Agreement (the "**Closing**") will be held at the offices of Seller's counsel in New York, New York upon satisfaction or waiver of all the conditions set forth in Article 7 and Article 8 (or as soon thereafter as practicable after the satisfaction or waiver of all such conditions), other than conditions that, by their nature, will be satisfied at the Closing and completion of the Acquisition process as described in Section 6.13 and pursuant to the requirements of Applicable Law, but in any event not later than July 31, 2018, (the "**Closing Date**").

9.1.2     At the Closing, the parties to this Agreement will exchange certificates and other instruments and documents in order to determine whether the terms and conditions of this Agreement have been satisfied.  At the Closing, Seller will deliver to Purchaser such bills of sale, assignments, deeds, consents, endorsements, drafts or other instruments as are necessary or appropriate to vest in Purchaser title to the NYNYM Assets in accordance with the terms of this Agreement.  After the Closing, Seller will use commercially reasonable efforts to execute, deliver, and acknowledge all such further instruments of transfer and conveyance and will perform all such other acts as Purchaser may reasonably request to effectuate the transfer of the NYNYM Assets to Purchaser.

9.2     Closing Deliveries of Seller.  At the Closing, Seller shall deliver or cause to be delivered to Purchaser:

9.2.1     a bill of sale for the NYNYM Assets, duly executed by Seller;

9.2.2     an assignment and assumption agreement for the Assigned Contracts and the Assumed Liabilities, duly executed by Seller;

9.2.3     the Licenses, consents and approvals set forth on **Schedule 7.3**; provided, however, that Seller shall not be required to obtain any such License, consent or approval to the extent the NYNM Sale Order provides that such License, consent or approval is not required or as contemplated by Section 6.4.3;

9.2.4      a copy, certified by an authorized officer of Seller to be true, complete and correct as of the Closing Date, of the resolutions of Seller, authorizing and approving the transactions contemplated hereby;

9.2.5      the certificate required by <u>Section 7.1.3</u>, duly executed by officers of each of Seller;

9.2.6      a properly completed and executed Internal Revenue Service Form W-9 from Seller (provided Purchaser's sole remedy for failure to provide such forms shall be withholding the amounts required to be withheld in accordance with applicable Law);

9.2.7      a non-foreign affidavit with respect to Seller (or if Seller is classified as a disregarded entity for U.S. federal income tax purposes, from the regarded sole owner of Seller), dated as of the Closing Date, issued pursuant to Section 1445 of the Tax Code and the Treasury regulations promulgated thereunder, stating that Seller (or its owner, as applicable) is not a "foreign person" as defined in Section 1445 of the Tax Code (provided Purchaser's sole remedy for failure to provide such forms shall be withholding the amounts required to be withheld in accordance with applicable Law);

9.2.8      the written release of all Encumbrances (other than Permitted Encumbrances and Encumbrances otherwise eliminated by the Sale Order) on the assets of the IPA Entities, executed by the holder of or parties to each such Encumbrances, in form and substance satisfactory to Purchaser and its counsel;

9.2.9      Reserved;

9.2.10      Reserved; and

9.2.11      a certificate representing the shares of the IPA Equity, duly endorsed for transfer on Seller's books or accompanied by appropriate stock transfer powers duly executed in blank or an assignment in a form reasonably acceptable to Purchaser and Seller evidencing the transfer of the IPA Equity to Purchaser.

9.3      <u>Closing Deliveries of Purchaser</u>.  At the Closing, Purchaser shall deliver or cause to be delivered to Seller:

9.3.1      a bill of sale for the NYNYM Assets, duly executed by Purchaser and any other documents, instruments and writings (either executed counterparts or otherwise) required or reasonably requested by Seller to be delivered by Purchaser pursuant to this Agreement for Seller to transfer and assign the NYNYM Assets and Assumed Liabilities to Purchaser and for Purchaser to assume the NYNYM Assets and Assumed Liabilities, each in form and substance reasonably satisfactory to Seller and Purchaser;

9.3.2      a copy, certified by an authorized officer of Purchaser to be true, complete and correct as of the Closing Date, of the resolutions of Purchaser, authorizing and approving the transactions contemplated hereby;

        9.3.3      the certificate required by <u>Section 8.1</u>, duly executed by an officer of Purchaser; and

        9.3.4      the Closing Payment and, to the extent not already paid, the Assumed Cure Amounts.

    9.4    <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, stamp, registration and other similar Taxes and all conveyance fees, recording chargers and other fees and chargers (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement ("**Transfer Taxes**") shall be payable by Purchaser. Purchaser will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and if required by applicable Law, Seller will join in the execution of any such Tax Returns and other documentation.  Purchaser and Seller agree to use their best efforts to obtain any certificate, including a resale certificate, or other document from any Governmental Authority as may be necessary to mitigate, reduce or eliminate any Transfer Tax.

    9.5    <u>Proration of Taxes and Charges</u>.

        9.5.1      Any real or personal property Taxes or similar ad valorem Taxes attributable to the NYNYM Assets ("**Property Taxes**") with respect to a Tax period commencing on or prior to, and ending after, the Closing Date (a "**Straddle Period**") shall be prorated between Seller and Purchaser on a per diem basis.  Seller shall be responsible for the amount apportioned to periods prior to the Closing Date and Purchaser shall be responsible for the amount apportioned to periods on or after the Closing Date.  The party required by Law to pay any such Straddle Period Property Taxes (the "**Paying Party**"), to the extent such payment exceeds the obligation of the Paying Party hereunder, shall provide the other party (the "**Non-Paying Party**") with proof of payment, and the Non-Paying Party shall reimburse the Paying Party for the Non-Paying Party's share of such Straddle Period Property Taxes. The party required by Law to file a Tax Return with respect to Straddle Period Property Taxes shall do so within the time prescribed by Law.

        9.5.2      Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practical, such information (including reasonable access to books and records, Tax Returns and Tax filings) and assistance as is reasonably necessary for the filing of any Tax Return, the conduct of any Tax audit, and for the prosecution or defense of any claim, suit or proceeding relating to any Tax matter related to the NYNYM Assets. Purchaser and Seller shall cooperate with each other in the conduct of any Tax audit or other Tax proceedings and each shall execute and deliver such powers of attorney and other documents as are necessary to carry out the intent of this <u>Section 9.5</u>.

    9.6    <u>Consummation of Closing</u>.  All acts, deliveries, and confirmations comprising the Closing, regardless of chronological sequence, shall be deemed to occur contemporaneously and simultaneously upon the occurrence of the last act, delivery, or confirmation of the Closing and none of such acts, deliveries, or confirmations shall be effective unless and until the last of the same shall have occurred.  Regardless of when the last act, delivery, or confirmation of the Closing shall take place, however, the transfer of the NYNYM Assets shall be deemed to occur

as of the start of business at the principal office of Seller on the date of the Closing (the "**Effective Time**").

9.7     Payment of Cure Amounts.  After the Closing, Seller shall provide Purchaser with evidence reasonably satisfactory to Purchaser of the satisfaction of all Cure Amounts (other than the Assumed Cure Amounts).

9.8     Assignment of Additional Contracts.  After the Closing, Seller shall cooperate with Purchaser to assign any Provider Contracts to which Seller or any of its Subsidiaries is a Party or Payor Contracts to which Seller or any of its Subsidiaries is a Party that is not an Assigned Contract and transfer all rights thereunder the Purchaser in accordance with Applicable Law.

<div align="center">

ARTICLE 10
TERMINATION OF AGREEMENT.

</div>

10.1     Termination Events.  Subject to Section 10.2 of this Agreement, by notice given prior to or at the Closing, this Agreement may be terminated as follows:

10.1.1     by mutual consent of Purchaser and Seller;

10.1.2     by Seller, if Purchaser is not the Successful Bidder or Backup Bidder at the Auction;

10.1.3     by Purchaser, if the Bankruptcy Court does not approve the Breakup Fee and Expense Reimbursement in an Order from the Bankruptcy Court on or before July 11, 2018;

10.1.4     by Purchaser if Seller's bankruptcy case is dismissed or converted to one under Chapter 7 of the Bankruptcy Code, if a trustee or an examiner with expanded powers is appointed in such bankruptcy case, or if a motion for relief from the automatic stay is granted with respect to a material portion of the NYNYM Assets;

10.1.5     (a) by Purchaser if satisfaction of any condition in Article 7 hereof on or before July 31, 2018, or such later date as the parties may agree upon, becomes impossible (other than through the failure of Purchaser to comply with its obligations under this Agreement), or (b) by Seller if satisfaction of any condition in Article 8 hereof on or before July 31, 2018 becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement);

10.1.6     by the non-breaching party upon a material breach of any provision of this Agreement provided that such breach has not been waived by the non-breaching party and has continued after notice to the breaching party by the non-breaching party without cure for a period of ten (10) Business Days;

10.1.7     subject to Section 10.2, by Seller if, incident to the NYNM Bid Order, Seller accepts and closes on a competing bid for the purchase of all or part of the NYNYM Assets; or

<div align="center">29</div>

10.1.8      by Purchaser or Seller, if the Closing has not occurred on or before July 31, 2018 (other than through failure of any party seeking to terminate this Agreement to have complied fully with its obligations under this Agreement)

10.2      Break-Up Fee; Expense Reimbursement.

10.2.1      Break-Up Fee.  If this Agreement is terminated pursuant to Section 10.1.2, 10.1.4, 10.1.5(a), 10.1.6 (where Purchaser is the non-breaching party), 10.1.7 or 10.1.8 (other than through the failure of Purchaser to have complied fully with its obligations under this Agreement), in each case where Purchaser is not then in default under this Agreement and an Alternative Transaction is consummated within twelve (12) months of such termination, then Purchaser shall be entitled to receive a break-up fee in the amount equal to $495,000 (the "**Break-Up Fee**"), as provided in Section 6.4.2.2.

10.2.2      Expense Reimbursement.  If this Agreement is terminated pursuant to pursuant to Section 10.1.2, 10.1.4, 10.1.5(a), 10.1.6 (where Purchaser is the non-breaching party), 10.1.7, or 10.1.8 (other than through the failure of Purchaser to have complied fully with its obligations under this Agreement),  then Purchaser shall be entitled to Purchaser's reasonably documented actual out-of-pocket fees and expenses (including legal, accounting, escrow and other fees and expenses) not to exceed $450,000 (the "**Expense Reimbursement**"), with such amount being payable by Seller on or before the tenth (10th) Business Day after such termination.

10.2.3      Priority and Effect of Payment.  The Break-Up Fee and the Expense Reimbursement shall be entitled to administrative priority under Sections 503(b)(1)(A) and 507 of the Bankruptcy Code.  The obligation to pay in full in cash when due any amount owed by Seller to Purchaser under this Agreement, including the Break-Up Fee and the Expense Reimbursement, shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation for Seller or by any other Order of the Bankruptcy Court.  Notwithstanding anything to the contrary contained in this Agreement, upon payment of the Break-Up Fee and the Expense Reimbursement in accordance with this Agreement, Seller and its Affiliates shall be fully released and discharged from any liability under or resulting from this Agreement and, neither Purchaser nor any other Person shall have any other remedy or cause of action under or relating to this Agreement, including for reimbursement of expenses.

10.3      Effect of Termination.  Each party's right of termination according to Section 10.1 of this Agreement is in addition to any other right it may have under this Agreement or otherwise, and the exercise of a party's right of termination will not constitute an election of remedies.  If this Agreement is terminated according to Section 10.1, this Agreement will be no further force or effect; provided, however, that (i) Section 2.2 and this Section 10.3 will survive the termination of this Agreement and will remain in full force and effect, (ii) the obligation of Seller to pay the Break-Up Fee and Expense Reimbursement pursuant to Section 10.2 will survive the termination of this Agreement and will remain in full force and effect, and (iii) the termination of this Agreement will not relieve any party from any liability for any breach of this Agreement occurring prior to termination.

10.4    Termination Procedure.  Any party desiring to exercise its right to terminate this Agreement shall deliver to the other party notice of termination in accordance with Section 13.6, stating with a reasonable degree of specificity the reason relied upon for such termination.

<div align="center">

ARTICLE 11
RESERVED

ARTICLE 12
FURTHER ASSURANCES.

</div>

12.1    Separate Agreements Executed in Connection with Closing.  The parties shall abide by, and otherwise perform under the terms and conditions of each and every agreement deemed executed and delivered contemporaneously with the Closing.

12.2    Cooperation of the Parties After Closing.  Upon the request of any party hereto after the Closing, any other party will use commercially reasonable efforts to (i) take all action, (ii) execute all documents and instruments, and (iii) provide any supplemental information and further assurances necessary or desirable to consummate and give effect to the transactions contemplated by this Agreement.

12.3    Payroll.  Purchaser will furnish to Seller such payroll and employee information as Seller may reasonably require in connection with the preparation or examination of payroll Tax Returns, workers' compensation reports and audits, and qualified plan administration records.

<div align="center">

ARTICLE 13
DEFINITIONS.

</div>

"**Acquisition**" has the meaning set forth in the recitals of this Agreement.

"**Action**" has the meaning set forth in Section 4.4.

"**Administrative Agent**" means Bank of America, N.A., in its capacity as Administrative Agent (and any other capacity) under the Credit Agreement.

"**Affiliate**" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of more than fifty percent (50%) of the outstanding voting power of such Person or the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise.

"**Allocable Consideration**" has the meaning set forth in Section 2.3.

"**Allocation Schedule**" has the meaning set forth in Section 2.3.

<div align="center">31</div>

"**Applicable Law**" means, with respect to any Person, any Law applicable to such Person or its business, properties or assets.

"**Assigned Contracts**" has the meaning set forth in Section 1.3.

"**Assignment Order**" means an Order authorizing the assumption and assignment of the Assigned Contracts to Purchaser pursuant to section 365 of the Bankruptcy Code (which may be included in the NYNM Sale Order), which shall be in form and substance reasonably acceptable to Purchaser.

"**Assignment Procedures**" means the Assignment Procedures attached to the NYNM Bid Order.

"**Assumed Cure Amounts**" has the meaning set forth in Section 1.3.2 of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 1.2.1.

"**Auction**" shall have the meaning ascribed in Section 6.4.2.1.

"**Backup Bidder**" has the meaning set forth in the NYNM Bid Order.

"**Bankruptcy Cases**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Estates**" has the meaning set forth in the recitals of this Agreement.

"**Bankruptcy Orders**" has the meaning set forth in Section 6.4.5.

"**Benefit Plan(s)**" has the meaning set forth in Section 4.10.

"**Business Day**" any day of the year, excluding Saturday, Sunday and any other day on which national banks are required or authorized to close in Pennsylvania.

"**Cash Deposit**" has the meaning set forth in Section 2.2.1.

"**Claim Notice**" has the meaning set forth in Section 11.3.2.

"**Closing**" has the meaning set forth in Section 9.1.2.

"**Closing Date**" has the meaning set forth in Section 9.1.2.

"**Closing Payment**" has the meaning set forth in Section 2.2.2.

"**Contract**" means any written or oral contract, agreement, commitment, purchase order, license, lease, release, consent, indenture, or evidence of indebtedness.

"**Credit Agreement**" means that certain Credit Agreement, dated as of January 30, 2017 (as amended, modified, or supplemented from time to time), by and among Orion, the guarantors party and hereto, the lenders party thereto from time to time and Bank of America, N.A., as Administrative Agent, L/C Issuer and Swingline Lender.

"**Cure Amounts**" has the meaning set forth in Section 1.3.

"**Disclosure Statement of Private Information**" means the disclosure statement dated as of the date hereof, delivered by Seller to Purchaser.

"**Effective Time**" has the meaning set forth in Section 9.6.

"**Encumbrance**" means any lien, mortgage, deed of trust, deed to secure debt, pledge, restriction on transfer, proxy and voting or other agreement, claim, charge, security interest, easement, right of way, encroachment, servitude, right of first option, right of first refusal, preemptive right or similar restriction, use restriction, or other encumbrance, option or defect in title of every type and description, whether imposed by law, agreement, understanding or otherwise, including, without limitation, all liens, encumbrances, and interests in property as set forth in Section 363 of the Bankruptcy Code.

"**ERISA**" has the meaning set forth in Section 4.10.

"**ERISA Affiliate**" has the meaning set forth in Section 4.10.

"**Escrow Agreement**" has the meaning set forth in Section 2.2.2.

"**Escrow Agent**" has the meaning set forth in Section 2.2.1.

"**Excluded Assets**" has the meaning set forth in Section 3.1.

"**Excluded Liabilities**" has the meaning set forth in Section 1.2.2.

"**Final Order**" means an Order of the Bankruptcy Court, the operation or effect of which has not been stayed, and which is not subject to any pending appeal, request for leave to appeal or request for reconsideration and as to which the time for any such appeal, request for leave to appeal or request for reconsideration has expired.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Governmental Authority**" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any United States or foreign federal, state or local government, including any governmental authority (including any bilateral or multilateral governmental authority), agency, branch, department, board, commission or

instrumentality of such government or any political subdivision thereof, and any tribunal, court or arbitrator(s) of competent jurisdiction, and shall include the Bankruptcy Court.

"**Highest or Best Bid**" has the meaning set forth in Section 6.4.2.8.

 "**Indebtedness**" shall mean, without duplication (i) all indebtedness for borrowed money, whether current or funded, secured or unsecured including, without limitation, all indebtedness outstanding pursuant to the Credit Agreement, (ii) that portion of obligations with respect to capital leases that is properly classified (or should be properly classified) as a liability on a balance sheet in conformity with GAAP (as hereinafter defined); (iii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money (for the avoidance of doubt, excluding any trade accounts payable and checks payable to Seller, which have been endorsed by Seller for collection in the Ordinary Course of Business); (iv) all amounts drawn under outstanding letters of credit; (v) all interest rate swap, derivative or similar arrangements; (vi) all obligations for the deferred purchase price of any property or services (other than trade accounts payable and checks payable to Seller which have been endorsed by Seller for collection in the Ordinary Course of Business); (vii) guaranties securing indebtedness for borrowed money; (viii) all deferred compensation obligations, including (A) all payment obligations under any non-qualified deferred compensation plan of Seller and (B) any underfunded pension or post-retirement liabilities of Seller; (ix) all costs and obligations incurred in connection with a change of control of Seller or the sale of the NNNI Business; (x) all obligations created or arising under any conditional sale or other title retention agreement with respect to property acquired by Seller (even though the rights and remedies of the seller or lender under such agreement in the event of a default may be limited to repossession or sale of such property); (xi) all obligations secured by a purchase money mortgage or other Encumbrance to secure all or part of the purchase price of property subject to such mortgage or Encumbrance; (xii) all obligations secured by Encumbrances on property acquired by Seller, whether or not such obligations were assumed by Seller at the time of acquisition of such property; (xiii) all obligations in respect of dividends, distributions or similar payments payable to members; (xiv) all obligations of a type referred to in clauses (x) - (xiii) which is directly or indirectly guaranteed by Seller or which Seller has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a credit against loss, and (xv) any refinancings of the foregoing, including principal, interest, prepayment penalties and similar obligations thereto and Taxes associated with the payment of any such amount, all as the same may be payable upon the complete and final payoff thereof, regardless of whether such payoff occurs prior to, simultaneous with or following the Closing.

"**IPA Entity**" means each of New York Network IPA, Inc., New York Premier IPA, Inc., Brooklyn Medical Systems IPA 3, Brooklyn Medical Systems IPA 4 and Brooklyn Medical Systems IPA 5

"**IPA Equity**" means all shares of capital stock and other equity interests in each of the IPA Entities.

"**Knowledge of Seller**" means the actual or constructive knowledge of the following individuals (after due inquiry): Timothy Dragelin, Truc To, Arvind Walia, John Esposito and Mark Bellisimo.

"**Law**" means any federal, state or local law (including common law), statute, code, ordinance, rule, regulation, treaty, convention, decree, order, judgment, injunction, directive, technical standard or other requirement enacted, promulgated, issued, entered or enforced by a Governmental Authority.

"**Liability**" means any direct or indirect debt, liability, commitment or obligation (whether known or unknown, matured or not matured, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, incurred or consequential and due or to become due), including any liability for Taxes, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature (including, without limitation, all "claims" as defined in Bankruptcy Code section 101(5)), whether imposed by agreement, understanding, law, equity or otherwise.

"**Licenses**" means all licenses, permits, consents, registrations, certificates and other governmental or regulatory permits, authorizations, approvals or agreements issued by or with any Governmental Authority that regulates, licenses or otherwise has or asserts jurisdiction over the NNNI Business, the NYNYM Assets, or Seller and used in the operation of the NNNI Business as presently conducted.

"**Material Adverse Effect**" means (a) any event, change, or matter in respect of the NNNI Business that, individually or in the aggregate, results in or would be reasonably expected to result in a material adverse effect on the results of operations, revenues, assets or condition (financial or otherwise) or liabilities of the NNNI Business, any IPA Entity or Seller, excluding any such event, change or matter to the extent resulting from or arising in connection with the filing of the Bankruptcy Cases; (b) Radnet Contracts representing 50% or greater of the revenue of all revenue from the Radnet Contracts are terminated, become unenforceable as a whole or in any material respect (including, but not limited to, any restrictive covenant) or are materially breached or (c) any event, condition or matter that would have a material adverse effect on the legality, validity or enforceability of this Agreement and the agreements and instruments to be entered into in connection herewith, or prevents, materially delays or materially impedes the consummation of the transactions contemplated hereby, or the realization of the rights and remedies hereunder; provided, that, solely with respect to clause (a), a "Material Adverse Effect" shall not include circumstances, facts, developments, changes, events, effects or occurrences (individually or taken together) resulting from or arising out of (i) changes or conditions generally affecting the industries or markets in which Seller and any of its Subsidiaries operate; (ii) any change in the financial, banking or securities markets or any change in the general international, national or regional economic conditions, including as a result of terrorist activity, acts of war or acts of public enemies; (iii) the execution of this Agreement or announcement or pendency of the transactions contemplated hereby or any actions expressly required to be taken pursuant to or in accordance with this Agreement; (iv) the announcement of this Agreement or the transactions contemplated hereby; (v) changes after the date hereof in any industry standards, Law, GAAP or regulatory accounting requirements, or changes in the official interpretation thereof; (vi) earthquakes, hurricanes, floods, acts of God or other natural disasters, except to the extent any such occurrence causes physical damage to the NYNYM Assets; (vii) the failure or inability of Seller or any IPA Entity to meet any internal or public projections, forecasts or estimates of revenues or earnings with respect to the NNNI Business (it being understood that the facts or circumstances giving rise to or contributing to such failure may be deemed to

constitute, or be taken into account in determining whether there has been or will be, a Material Adverse Effect); or (viii) any action taken by Seller at the request of, or with the express written consent of, Purchaser; provided that the exceptions described in clauses (i), (ii), (iii) and (v) shall apply only to the extent that the changes described therein do not have a disproportionate impact on Seller and its Subsidiaries who operate the NNNI Business, as compared to other Persons in the same industry in which Seller and such Subsidiaries operate with respect to the NNNI Business.

"**Material Permits**" has the meaning set forth in Section 4.7.2.

"**Multiemployer Plan**" means a multiemployer plan as defined in ERISA section 3(37)(A).

"**Non-Paying Party**" has the meaning set forth in Section 9.5.

"**NYNM Alternative Transaction**" means the sale, transfer, lease or other disposition of, directly or indirectly (including through an asset sale, stock sale, merger, or other similar transaction or pursuant to a plan of reorganization in the Bankruptcy Cases) all or substantially all of the NNNI Business or the NYNYM Assets in a transaction or a series of transactions with one or more persons other than Purchaser in any circumstance, including in accordance with the Bidding Procedures Order on or prior to the date that is twelve (12) months after the date of termination of this Agreement; provided, however, that the closing or consummation of a transaction with one or more persons other than Purchaser evidenced by a Qualifying Bid shall constitute a NYNM Alternative Transaction, regardless of whether such Qualifying Bid involves all or substantially all of the NNNI Business or the NYNYM Assets.

"**NYNYM Assets**" means, collectively, the IPA Equity, the Assigned Contracts and NYNM PPO Lockbox Cash.

"**NYNM Bid Order**" shall have the meaning ascribed in Section 6.4.2.

"**NYNM PPO Lockbox**" means that certain bank account at JPMorgan Chase Bank, N.A. owned by Seller into which Preferred Provider Organization payments are made under the Added Contracts to which Seller is a party.

"**NYNM PPO Lockbox Cash**" means any cash in the NYNM PPO Lockbox on the date of the Closing and any cash received in the NYNM PPO Lockbox at any time after closing.

"**NYNM Sale Motion**" has the meaning set forth in Section 6.4.1.1.

"**NYNM Sale Order**" shall mean an Order of the Bankruptcy Court, acceptable to Seller and Purchaser, entered pursuant to sections 105, 363, and 365 of the Bankruptcy Code (i) approving this Agreement and the transactions contemplated hereby, (i) approving the sale and transfer of the NYNYM Assets to Purchaser free and clear of all liens, claims and interests, pursuant to section 363(f) of the Bankruptcy Code, (iii) approving the assumption and assignment to Purchaser of the Assigned Contracts and establishing the Cure Amounts; (iv) finding that Purchaser is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (v) finding that due and adequate notice of the approval of the NYNM

Sale Order and an opportunity to be heard were provided to all Persons entitled thereto, including but not limited to federal, state and local taxing and regulatory authorities; (vi) confirming that Purchaser is acquiring the NYNYM Assets free and clear of all liabilities, other than the Assumed Liabilities; and (vii) providing that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) are waived and there will be no stay of execution of the NYNM Sale Order under Rule 62(a) of the Federal Rules of Civil Procedure.

"**NNNI Business**" means the business of any of the IPA Entities.

"**Order**" has the meaning set forth in <u>Section 4.4</u>.

"**Ordinary Course of Business**" means, subject to any limitations imposed as a result of the filing of the Bankruptcy Cases, only the ordinary course of business engaged in by Seller, consistent with past practices.

"**Orion**" has the meaning set forth in the preamble of this Agreement.

"**Paying Party**" has the meaning set forth in <u>Section 9.5</u>.

"**Payor Contract**" means any contract with a physician or other medical professional or group of physicians or medical professionals, including any participating physician agreement or participating acknowledgement.

"**Permitted Encumbrances**" means (a) all Encumbrances that are disclosed on **Schedule 12** and not otherwise eliminated by the NYNM Sale Order, (b) liens relating to Taxes that are not yet due and payable as of the Closing or that are being contested in good faith and set forth on **Schedule 12(a)**, and (c) mechanic's, materialmen's, repairmen's and other statutory liens arising in the Ordinary Course of Business and securing obligations incurred prior to Closing for amounts owed but not yet delinquent, for which Seller is and will remain responsible for payment and removal of such liens at or after Closing.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations and Governmental Authorities, whether or not legal entities.

"**Petition Date**" means July 5, 2018.

"**Property Taxes**" has the meaning set forth in <u>Section 9.5.1</u>.

"**Provider Contract**" means any contract with a preferred provider network or organization.

"**Purchase Price**" means an amount equal to $16,500,000.

"**Purchaser**" has the meaning set forth in the preamble of this Agreement.

"**Radnet Contracts**" means the contracts between Seller and/or any IPA Entity, on the one hand, and any professional affiliated with Radnet Management, Inc. and/or any of its affiliates, on the other hand.

"**Real Property**" has the meaning set forth in Section 1.1.2.

"**Real Property Leases**" has the meaning set forth in Section 4.11.1.

"**Sale Hearing**" means the hearing before the Bankruptcy Court in respect of the NYNM Sale Order.

"**Seller**" has the meaning set forth in the preamble of this Agreement.

"**Specifically Excluded Liabilities**" has the meaning set forth in Section 1.2.3.

"**Straddle Period**" has the meaning set forth in Section 9.5.

"**Successful Bidder**" has the meaning set forth in the NYNM Bid Order.

"**Tax**" and "**Taxes**" means all taxes, charges, fees, levies, duties or other like assessments, including without limitation, all federal, state, local, or foreign (or any governmental unit, agency, or political subdivision of any of the foregoing) income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Tax Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, unclaimed property and escheat, ad valorem, value added, alternative or add-on minimum, estimated, or any other governmental charges of the same or similar nature, including any interest, penalty, or addition thereto.

"**Tax Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Tax Returns**" means all returns, reports, certificates, audit reports, estimates, claims for refund, information statements, elections, statements of foreign bank and financial accounts and other returns and documents relating to, filed or required to be filed in connection with any Taxes (whether or not a payment is required to be made with respect to such filing), including any schedule or attachment thereto, and including any amendment thereof. Any one of the foregoing Tax Returns shall be referred to sometimes as a "Tax Return."

"**Transfer Taxes**" has the meaning set forth in Section 9.4.

ARTICLE 14
MISCELLANEOUS PROVISIONS.

14.1    Nature and Survival of Representations and Warranties. The parties hereto agree that the representations and warranties of the parties contained in this Agreement and in any certificate delivered pursuant hereto by any party shall not survive the Closing.

14.2     Exhibits and Schedules.  The Exhibits and Schedules (and any supplements thereto) referred to in this Agreement are a part of this Agreement as if fully set forth herein.  All references to this Agreement shall be deemed to include such Exhibits and Schedules, unless the context otherwise requires.

14.3     Assignment.  Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties, provided that Purchaser may assign some or all of its rights hereunder to one or more subsidiaries formed by it prior to Closing, provided that Purchaser remains liable for its obligations hereunder.  Subject to the preceding sentences, this Agreement shall be binding upon, inure to the benefit of and be enforceable by the parties and their respective successors and assigns.

14.4     Governing Law and Jurisdiction.

14.4.1     The construction, interpretation and enforcement of this Agreement will be governed by the laws of the State of Delaware without regard to any conflicts of laws principles thereof.

14.4.2     The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof.

14.5     Severability.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

14.6     Notices.  All notices, requests, demands and other communications under this Agreement shall be made in writing and will be deemed to have been duly given (i) when hand delivered (with written confirmation of receipt); (ii) when sent by facsimile (with written confirmation of receipt), provided that a copy thereof is sent by another method provided hereunder; or (iii) when received by the addressee, if sent by United States Certified Mail, Return Receipt Requested, postage prepaid, or by nationally recognized express delivery service guaranteeing next Business Day delivery, in each case to the appropriate address(es) and/or facsimile number(s) set forth below (or to such other address and facsimile number as a party may hereafter designate by notice to the other parties):

If intended for Seller:

Orion Healthcorp, Inc.
3200 Wilcrest, Suite 600
Houston, Texas 77042
Attention: Chief Executive Officer and Chief Restructuring Officer

With a copy to:

Timothy J. Dragelin
FTI Consulting Group
214 N. Tryon Street
Suite 1900
Charlotte, NC 28202
Facsimile: (704) 972-4121
Email: tim.dragelin@fticonsulting.com

with a copy (that will not constitute notice) to:

DLA Piper LLP (US)
1251 Avenue of the Americas
27th Floor
New York, New York 10020
Attention: Thomas Califano, Esq. and Alec Fraser, Esq.
Facsimile: (212) 884-8526

If intended for Purchaser:

HealthTek Solutions, LLC
c/o TG Capital LLC
17895 Collins Avenue
Miami, Florida
Attention: Johnathan Robertson

with a copy (that will not constitute notice) to:

Baker Botts LLP
30 Rockefeller Plaza
New York, New York 10112
Attention:  Emanuel C. Grillo
Emanuel.grillo@bakerbotts.com

14.7    Public Announcements.  Any public announcement, including any press release, communication to employees, customers, suppliers, or others having dealings with Seller or Purchaser, or similar publicity with respect to this Agreement or any of the transactions contemplated hereby, will be issued at such time, in such manner, and containing such content as Seller and Purchaser mutually determine; provided however, that the parties acknowledge that Purchaser will, in its reasonable discretion and in consultation with its counsel, provide public notice as and when appropriate to satisfy its obligations under SEC regulations and otherwise communicate material matters to its investors.

14.8    Expenses.  Except as otherwise provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each of the parties hereto shall pay the fees and expenses of its respective counsel, accountants, and other professionals incident to the negotiation and preparation of this Agreement and the consummation of the transactions contemplated hereby.  All costs and obligations incurred upon a change of control of Seller will be borne by Seller.

14.9    <u>Third Parties</u>.  Nothing in this Agreement, whether express or implied, shall confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it and their respective successors and permitted assignees, nor shall any provision in this Agreement relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

14.10    <u>Time of the Essence</u>.  Time is of the essence in all dates and time periods set forth or referred to in this Agreement.

14.11    <u>Construction</u>.  The headings used in this Agreement are for convenience of reference only and are not a part of this Agreement and do not in any way control, define, limit, or add to the terms and conditions hereof.  In the construction of this Agreement, the singular shall include the plural and the plural, the singular, unless the context otherwise requires.  Further, the use of the masculine, feminine and/or neuter gender shall include each other gender where applicable.

14.12    <u>Counterparts; Electronic Signatures; Effectiveness of this Agreement</u>.

14.12.1    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

14.12.2    A manual signature on this Agreement or other documents to be delivered pursuant to this Agreement, or an image of which shall have been transmitted electronically, will constitute an original signature for all purposes.  The delivery of copies of this Agreement or other documents to be delivered pursuant to this Agreement, including executed signature pages where required, by electronic transmission will constitute effective delivery of this Agreement or such other document for all purposes.

14.13    <u>Remedies Cumulative</u>.  The rights and remedies of the parties are cumulative and not alternative.

14.14    <u>Entire Agreement; Amendment; Waiver</u>.

14.14.1    This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations and understandings of the parties, whether written or oral.  No supplement, modification, or amendment of this Agreement shall be binding unless executed in writing by all the parties.

14.14.2    No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provision, whether or not similar, nor shall any waiver constitute a continuing waiver.  No waiver shall be binding unless executed in writing by the party making the waiver.

14.15    <u>Disclaimer; Non-Recourse</u>.  (A) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE ASSIGNED ASSETS ARE BEING TRANSFERRED "AS IS,

41

WHERE IS, WITH ALL FAULTS," AND, WITHOUT LIMITING THE GENERALITY OF SECTION 1.5, SELLER EXPRESSLY DISCLAIM ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND OR NATURE, EXPRESS OR IMPLIED, AS TO THE CONDITION, VALUE OR QUALITY OF THE ASSIGNED ASSETS OR THE PROSPECTS (FINANCIAL OR OTHERWISE), RISKS AND OTHER INCIDENTS OF THE BUSINESS. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN OR IN THE SELLER TRANSACTION DOCUMENTS, PURCHASER WAIVES, RELEASES AND FOREVER DISCHARGES ALL CLAIMS AND RIGHTS OF ACTION, WHETHER AT LAW OR EQUITY, AGAINST SELLER OR ITS AFFILIATES TO THE EXTENT ARISING WITH RESPECT TO THE BUSINESS OR RELATING TO THE TRANSACTIONS UNDER THIS AGREEMENT, INCLUDING ANY CLAIMS OR RIGHTS OF ACTION UNDER THE COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION AND LIABILITY ACT OR ANY OTHER LAWS. NOTWITHSTANDING ANYTHING IN THIS AGREEMENT TO THE CONTRARY, NO PARTY SHALL BE LIABLE TO ANY OTHER PARTY FOR ANY (I) CONSEQUENTIAL, INDIRECT, SPECIAL, PUNITIVE, SPECULATIVE, EXEMPLARY, TREBLE DAMAGES OR DAMAGES FOR ANY LOST PROFITS OR BUSINESS, LOST BUSINESS OPPORTUNITY, DIMINUTION IN VALUE OR LOSS OF USE, (II) DAMAGES OR LOSSES BASED ON OR USING CALCULATION OF LOSS OF FUTURE REVENUE, INCOME OR PROFITS OR DIMINUTION OF VALUE OR (III) DAMAGES BASED ON A MULTIPLE OF EARNINGS OR OTHER METRIC OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY FOR ANY REASON WITH RESPECT TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER BASED ON STATUTE, CONTRACT, TORT, OR OTHERWISE AND WHETHER OR NOT ARISING FROM THE OTHER PARTY'S SOLE, JOINT, OR CONCURRENT NEGLIGENCE, STRICT LIABILITY, OR OTHER FAULT; PROVIDED, THAT, THE FOREGOING CLAUSES (I), (II) AND (III) SHALL NOT BE APPLICABLE TO THE EXTENT THAT ANY SUCH DAMAGES (INCLUDING, FOR THE AVOIDANCE OF DOUBT, LOST PROFITS) ARE THE REASONABLY FORESEEABLE RESULT OF A BREACH OF THIS AGREEMENT.

14.16   Bulk Sales Laws.  Each Party hereby waives compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any agreement contemplated by this Agreement.

14.17   No Right of Set-Off.  Except as set forth in this Agreement, Purchaser for itself and for its Affiliates, successors and assigns hereby unconditionally and, irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Purchaser or any of its respective Affiliates, successors and assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Purchaser pursuant to this Agreement or any other document or instrument delivered by Purchaser in connection herewith.

*Signature Page Follows*

Case 8-18-71748-ast   Doc 366-2   Filed 07/05/18   Entered 07/05/18 23:24:49

Case 2:18-cv-09293-WCA-LDW   Document 21-27   Filed 08/25/18   Page 524 of 526 PageID: 757
Case 2:18-cv-09293-WCA-MAH   Document 21-27   Filed 08/25/18   Page 540 of 541 PageID: 561

*IN WITNESS WHEREOF*, the parties hereto have duly executed this Agreement, as of the day and year first above written.

**PURCHASER:**

HEALTHTEK SOLUTIONS, LLC

By: _____
    Name:  Johnathan Robertson
    Title:  Authorized Signatory

*IN WITNESS WHEREOF,* the parties hereto have duly executed this Agreement, as of the day and year first above written.

**SELLER:**


NEW YORK NETWORK MANAGEMENT, L.L.C.


By: _____
    Name: Timothy Dragelin
    Title: Chief Restructuring Officer

# *State Of Delaware*

Entity Details

8/11/2018   5:41:40PM

| | | | |
|---|---|---|---|
| File Number: | 6938310 | Incorporation Date / Formation Date: | 6/19/2018 |
| Entity Name: | HEALTHTEK SOLUTIONS, LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |
| Status: | Good Standing | Status Date: | 6/19/2018 |

**Registered Agent Information**

| | | | |
|---|---|---|---|
| Name: | CAPITOL SERVICES, INC. | | |
| Address: | 1675 S STATE ST STE B | | |
| City: | DOVER | Country: | |
| State: | DE | Postal Code: | 19901 |
| Phone: | 800-316-6660 | | |

**Tax Information**

| | | | |
|---|---|---|---|
| Last AnnualReport Filed: | 0 | Tax Due: | $ 0 |
| Annual Tax Assessment: | $300 | Total Authorized Shares: | |

**Filing History (Last 5 Filings)**

| Seq | Description | No of Pages | Filing Date mm/dd/yyyy | Filing Time | Effective Date mm/dd/yyyy |
|---|---|---|---|---|---|
| 1 | LLC | 1 | 6/19/2018 | 12:08 PM | 6/19/2018 |

**From:** John Altorelli [mailto:john@aequumlaw.com]
**Sent:** Thursday, October 12, 2017 7:29 PM
**To:** Hoffman, Jeffrey C.
**Subject:** RE: Parmar Emails

Jeff,

Thanks for the information below. As you can imagine, it will be some time before we can verify the veracity of anything that Mr. Parmar tells you or anyone else. Until such time, I have asked that the domain remain in a "frozen" state until an appropriate determination can be made as to the history, ownership, custody and the like. If we can't unravel it, then we may need to seek judicial assistance, but let's leave that for another conversation.

On Paul's proposal, it needs much more clarity and substance before we can bring it to the stakeholders for consideration. I thought that Paul was going to send us a written offer with proof of funds to support the offer. As you well know, Paul has made numerous claims and proposals that have proven to be meritless. Given the situation, you can imagine that all of our efforts are focused on ensuring the survival of Constellation. I am happy to devote resources if Paul has a viable proposal that will assist our efforts on behalf of Constellation and its stakeholders.

I am available to discuss at your convenience. 917-664-6607.

Regards,
John

**From:** Hoffman, Jeffrey C. [mailto:jhoffman@windelsmarx.com]
**Sent:** Thursday, October 12, 2017 6:33 PM
**To:** John Altorelli <john@aequumlaw.com>
**Subject:** FW: Parmar Emails

John, See below. Also I am waiting to hear from you re: if there is interest in the offer. Thanks

**From:** Hoffman, Jeffrey C.
**Sent:** Thursday, October 12, 2017 5:53 PM
**To:** 'timothy.dragelin@fticonsulting.com'; 'john.west@troutman.com'
**Subject:** Parmar Emails

Pursuant to yesterday's conversation concerning Paul's emails, I thought it would be helpful to explain the genesis of the email domain and its ownership.

Constellation Health Investments ("CHI") registered the domain name "Constellation Health Group" in 2013; well before Constellation Healthcare Technologies, Inc. (CHT) was incorporated for the IPO in late 2014. CHI is a shareholder of Constellation Health, LLC (CH) and is totally separate entity from CHT. There are also two (2) other private Constellation

entities affiliated with Paul that were shareholders in Orion; Constellation Health Group LLC and Constellation Health LLC. All three (3) entities were created in May 2013 and were shareholders of Orion and that is when Paul set up the private Constellation domain. CHT did not exist in 2013 and was set up in late 2014 for the IPO. Before CHT HoldCo was set up for the go private transaction, CHT was the holding company, Orion the operating entity and all acquired businesses were subsidiaries of Orion.

Initially both Sarah Reinsch and Paul were the only individuals who used the Constellation email ID. Sarah was Paul's girlfriend at the time and assisted Paul from time to time on personal matters and at CHI. Paul also enlisted the assistance of Dan Dickens from Orion to help Paul manage some administrative functions with the private domain. As evidenced by attachment 1, it was clear that Dan was helping Paul in a personal capacity and that his help was not part of his official duties at Orion. Sarah and Paul were the only users of a Constellation email ID for the period May through July 2013.

Subsequently, in or about August 2013, Tomer Vardi, a personal friend of Paul's and an investor in CHI assisted Paul from time to time on shareholder and CHI matters. He is not an employee. Tomer was granted the email ID in August 2013.

The name "Constellation" is not a part of the operating entity in the United States. All clients deal with Orion and all employees are employees of Orion. Constellation does not appear on letterhead used by employees.

From August 2013 to July 2015, no one else was given a Constellation email ID until Sam Zaharis was given one. In July 2015, Sam was given an Orion email ID for work purposes so like Paul, he has both an Orion email ID and a Constellation email ID. Sam used his Constellation email ID for investor and shareholder matters and correspondence.

Likewise Ravi Chivukula also had two (2) email ID's. He used the email ID Constellation for shareholder and investor relation matters and Orion email ID for his day to day work activities.

Dana Lord, Paul's girlfriend who did not work at Orion, was also given a Constellation email ID in late 2015.

In June 2016, as part of the CC Capital transaction, Ted Brindamour and Salil Sharma, two (2) non-Orion employees were also given Constellation email ID's for the purposes of interacting with the overall deal team.

Arvind Walia and Melodie Kraljev employees of Orion Healthcorp also obtained Constellation email IDs in 2016 specifically for the purposes of corresponding with CC Capital for the transaction as Paul did not want Orion Healthcorp employees knowing about the transaction before it was finalized.

Other than having been a public company on the AIM exchange in London the Constellation domain is not located nor housed nor hosted on any Orion computer or server.

I hope the above description clearly shows that the domain name Constellation Health Group came into existence long before the companies went public and before the public company was taken private. It is clearly not owned by either Orion nor CC Capital. As Paul notified you some weeks ago, it is his private email domain and should be returned to him so that he may have access to it. Additionally, he never gave permission to anyone to change the codes so that anyone other than himself or the people to whom he gave email ID's could read any of the emails on the domain and/or send any emails from the domain.

Please review US Code 18 §2701 and NYS Penal Code Article 156 and specifically §§156.05, 156.10 and 156.35.

If you have any further questions on this issue, please feel free to inquire.

Jeffrey C. Hoffman
Windels Marx Lane &
Mittendorf, LLP
156 West 56th Street, New
York, New York 10019
Direct Dial: 212.237.1018 |
General Fax: 212.262.1215
jhoffman@windelsmarx.com |
www.windelsmarx.com

**WINDELS MARX** | Windels Marx Lane & Mittendorf, LLP

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, regardless of whether you are a named recipient, please notify the sender by reply e-mail and delete the message and any attachments.