UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-------------------------------------------------X
UNITED STATES OF AMERICA,

              Plaintiff,              **Docket No.: 18-CV-9293-MCA-MAH**

    -against-

THE REAL PROPERTIES KNOWN AS

50 RIVERSIDE BOULEVARD, UNIT 21B
NEW YORK, NEW YORK ;

2 RIVER TERRACE, UNIT 12J
NEW YORK, NEW YORK;

40 BROAD STREET, UNIT 20FG
NEW YORK, NEW YORK ; and

18 AND 19 COLTS GAIT LANE
COLTS NECK, NEW JERSEY

              Defendants *in rem*.
-------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITIONER'S MOTION TO DISMISS COMPLAINT
## FOR FORFEITURE *IN REM*

Timothy C. Parlatore, Esq.
Parlatore Law Group, LLP
*Counsel for Petitioners*
One World Trade Center, Suite 8500
New York, NY  10007
212-679-6312
timothy.parlatore@parlatorelawgroup.com

Table of Contents

**PRELIMINARY STATEMENT** ...............................................................................3

**STATEMENT OF FACTS** .....................................................................................5

**LEGAL STANDARD** ...........................................................................................12

**ARGUMENT** ........................................................................................................14

    **I. Plaintiff Has Failed to State a Cause of Action for the Two Pre – "Go Private" Properties.** ...........................................................................................14

        **a. The Allegations About Two of the Four Defendant Properties Predate Any Alleged Violations of U.S. Law** ...................................................14

        **b. Even if Plaintiff had Properly Alleged a Violation of U.S. Law, Plaintiff has Failed to Connect the Proceeds to the Properties** .................................18

        **c. Plaintiff has Failed to State a Claim Against the Colts Neck Property.** 21

    **II. Plaintiff Has Failed to State a Cause of Action to Forfeit the Third and Fourth Property** ..............................................................................................23

        **a. Plaintiff Has Failed to Allege a "Scheme or Artifice to Defraud."** ........23

        **b. Plaintiff Has Failed to Sufficiently Plead Fraudulent Misrepresentations** .......................................................................................................................25

    **III. Plaintiff Should Be Sanctioned with Dismissal or Disqualification for Their Brazenly Improper Use of Illegally Obtained Emails and Violations of the Attorney-Client Privilege.** .......................................................................27

    **CONCLUSION** ................................................................................................32

# Table of Authorities

*Am. Unites for Kids v. Lyon*, 2015 U.S. Dist. LEXIS 171614.................................30

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)...............................................13

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)....................................13, 14

*Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012)......................................13, 14

*DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990) ...............................26

*Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 324-27 (S.D.N.Y.1997)......30

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009) .......................13

*Glynn v. EDO Corp.*, 2010 U.S. Dist. LEXIS 86013, 2010 WL 3294347 (D.Md.2010) ...............................................................................30

*In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)........................25

*In re BP P.L.C., Sec. Litig.*, 843 F. Supp. 2d 712 (S.D.T.X. 2012)........................16

*In re Burlington*, 114 F.3d at 1417 .........................................................25

*In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010) ................13

*In re Nice Sys., Ltd. Secs. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001) .............26

*In re Rockefeller*, 311 F.3d at 216...........................................................26

*In re Royal Bank of Scot. Group PLC Sec. Litig.*, 765 F. Supp. 2d 327, 337 (S.D.N.Y. 2011) .........................................................................16

*Josephson v. Marshall*, 2001 U.S. Dist. LEXIS 10049, 2001 WL 815517, *2 (S.D.N.Y. July 19, 2001).............................................................31

*Lynn v. Gateway Unified Sch. Dist.*, 2011 U.S. Dist. LEXIS 143282, *14, 2011 WL 6182348 (E.D.C.A. 2011)..........................................................30

*Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247 (2010)..............................15, 17

*quoting Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997) ......................................................................................31

*United States v. $8,221,877.16 in United States Currency*, 330 F.3d 141, 158 (3d Cir. 2003)...............................................................................19

*United States v. Mandell*, 752 F.3d 544, 549 (2nd Cir. 2014) ...............................16

*United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2nd Cir. 1970)...25

*United States v. Shaffer Equip. Co.*, 11 F.3d 450, 461-62 (4th Cir.1993)..............30

*United States v. Starr*, 816 F.2d 94, 98, (2nd Cir. 1987) .........................................25

*United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999)............................................19

*United States v. Voigt*, 89 F.3d 1050 (3d Cir.1996) ...............................................19

## PRELIMINARY STATEMENT

Plaintiff has filed a complaint for *in rem* forfeiture of the Defendant properties on a theory that they represent the proceeds of illegal activity, to wit securities fraud and money laundering. However, these claims are based on a deeply flawed investigation and an assertion of claims which the Plaintiff lacks the jurisdiction to advance. Plaintiff has failed to properly state a cause of action that would permit it to forfeit any of the Defendant properties. Moreover, much of Plaintiff's complaint relies upon email communications that were obtained in violation of the law, many of which also constitute attorney-client privileged communications. Plaintiff's reliance upon these stolen emails and brazen quoting of attorney-client communications should be sanctioned by dismissal of this action or, at a minimum, disqualification of Plaintiff's counsel and the return of the stolen property.

Plaintiff alleges a pattern of misconduct by Paul Parmar ("Parmar") related to his conduct as CEO of Constellation Healthcare Technologies, LLC ("CHT"), a company that was being publicly traded on the foreign London Stock Exchange Alternative Investment Market ("AIM").[1] Specifically, Plaintiff alleges that Parmar, and his co-defendants, orchestrated several secondary offerings on the AIM that

---

[1] CHT was not, and has never been, registered with the United States Securities and Exchange Commission.

3

were intended to fund acquisitions of new subsidiaries, but that these subsidiaries either do not exist or were overstated in their revenue. Plaintiff then alleges that Parmar presented false information to Chinh Chu, Truc To, and other members of CC Capital, in order to induce them into entering into a transaction to take CHT private.

The factual basis alleged by Plaintiff, if true, clearly demonstrates that two out of these four properties were purchased or refinanced prior to any alleged violation of United States law. Plaintiff alleges that the funds from the secondary offerings on the AIM were used to purchase or refinance the mortgage of three of the four defendant properties. However, even if one were to accept Plaintiff's allegations as true (as one must in a Rule 12(b)(6) motion), Plaintiff has failed to state a legally cognizable claim against these three properties under the laws of the United States of America, as this activity related to a London stock exchange with investors in London, not the United States. The complaint therefore completely fails to state a cause of action against these three defendant properties and should be dismissed.

As to the remaining property, the complaint fails to state a plausible cause of action for two reasons:

1. It is implausible that, in a multi-million dollar securities transaction with sophisticated investors, attorneys, consultants and financial institutions, the due diligence on the project would have relied on any of the allegedly

false documents referenced by Plaintiff and, in any event, Plaintiff has failed to plead any specific false statement with particularity.

2. There is no plausible allegation that the purchase price was any lower than the actual value of the company. Fraud (and therefore proceeds of a fraud) require some monetary damage to the alleged victim.

## STATEMENT OF FACTS

### Background of CHT

Parmar and other investors acquired a medical billing, collections, and practice management service company, Orion Healthcorp, Inc. ("Orion") in June 2013. Orion became a subsidiary of CHT. As CEO of CHT, Parmar grew the company over the next several years through an aggressive growth strategy of acquiring smaller service providers and making them subsidiaries of Orion. The value of these acquisitions to CHT/Orion was primarily in their customer lists and relationships, as these medical practices would then be serviced by the main CHT/Orion platform. When first formed, CHT operated solely as a privately-owned company.

CHT grew through these acquisitions and went public on the London Stock Exchange's Alternative Investment Market ("AIM") to help raise money to fund similar acquisitions. At that time, Orion held eight subsidiary companies and continued with an aggressive acquisition and growth strategy. Most of the shares

were held by various entities which Parmar managed and controlled (the "Parmar entities").

By the time Parmar wanted to take CHT back private, it had grown to 14 operational subsidiaries, along with several holding companies or shells, which were formed for the purpose of being filled with new acquisitions.

### Secondary Offerings

One of the primary purposes of taking CHT public was to raise money to fund acquisitions, use for operations, working capital and as the business saw fit. One of the methods used by CHT was to make secondary offerings, usually accompanied by a forward-looking statement about a potential acquisition, to raise additional capital. Plaintiff wants to restate the purpose of the raises as exclusively for acquisitions but fails to highlight that the economic reality of any secondary raise up is to sell company shares at a discounted price. The money raised goes to the company for its needs, regardless of whether the intended acquisition closes or not. For example, in the last raise up, CHT was only seeking a raise of 16 - 20 million for acquisition of MDRX by selling shares but the investors purchased shares worth over 40 million dollars. The company was permitted to keep the proceeds even though there was no acquisition mentioned or even contemplated above and beyond the need of 16- 20 million dollars. Clearly the funds were CHT's property as the investors were given assets in return of greater value the shares of the company at a

discount to daily trading. None of the investors were US citizens and, by law, US citizens were prohibited from purchasing the shares, as the law only allows such shares to be specifically designated and only sold after they have been aged at least 1 year before a US citizen can acquire such shares.

Plaintiff is alleging that these were fraudulent because the potential acquisitions did not close as anticipated, however all of the allegedly fraudulent misrepresentations pleaded are from after the secondary offerings had closed.

As outlined in the complaint, three of the shells that were formed, but never filled, were Northstar First Health, LLC ("Northstar"), Phoenix Health, LLC ("Phoenix"), and MDRX Medical Billing, LLC ("MDRX").  All three had been formed for the purpose of acquiring new subsidiaries and used in the raise ups on the London AIM exchange.  While these raise ups were successful, the acquisitions did not go exactly according to plan and two of these shells, Phoenix and MDRX, remained empty shells.[2]

As with all investments into CHT, the funds raised from these secondary offerings went into the main operating accounts of CHT.  According to Plaintiff, approximately $50 million was deposited into the operating account from these

---

[2] Plaintiff has alleged that Parmar and his associates provided false information, in the form of press releases and financial statements, indicating that these empty shells were actual acquisitions.  For the limited purpose of this motion, these allegations are presumed to be true.

allegedly improper raise-ups.

### CHT's Operating Accounts

The complaint discusses CHT's two operating accounts, both of which were held at M&T Bank, ending in 5647 and 8132.  While Plaintiff vaguely describes how the proceeds of the secondary raise ups were deposited into these accounts and that money was later withdrawn from those accounts to purchase the Defendant Properties, the Complaint lacks the requisite detail to connect these two events or demonstrate that the money from the raise ups was used to purchase the properties. Rather, the complaint and the bank statements incorporated into the complaint by reference tell a different story.

CHT's M&T Bank account, ending in 5647, was used by CHT as the business operating account in its role as the parent company of Orion.  During the relevant period of time, the total amount of funds that came into this account were $74,927,045.50, of which $52,727,301.46 came from the two secondary fund raises in London where the investors bought CHT shares at a discount to market price to buy these shares in bulk.  Separately, $12,220,000.00 came in from First United Health, LLC ("FUH"), a company controlled by Parmar, which was one of the largest shareholders of CHT.   During this same period of time, $5,315,063.40 was transferred directly to Orion to fund operations, and $4,135,667.31 was paid directly to vendors of Orion and CHT as per contractual commitments.   Finally,

$4,039,000.00 was paid to any entities controlled or related to Parmar ("Parmar parties") on behalf of FUH as per its board approved contractual commitment and salaries and Bonuses due.  This includes funds used for the properties at issue in this lawsuit.

CHT's second M&T Bank account, ending in 8132, was also used by CHT as the business operating account as the parent company of Orion.  During the relevant time period, the total amount of funds that came into this account is $65,563,547.71. This includes $52,656,581.14, which was transferred from CHT account 5647, $12,097842.12, which was the IPO initial fund raise in London, and an additional $800,000.00 from FUH.  During this same period of time,  $4,159,137.03 was transferred directly to Orion for operations, $31,616,988.55 was paid directly to vendors of Orion and CHT as per contractual commitments and $3,015,442.04 was paid to any Parmar parties on behalf of FUH as per its board approved contractual commitment and salaries and Bonuses due.

In summary, these two accounts took in a total of over $75 million, of which approximately $50 million came from the secondary raise-ups, over $12 million from the IPO, and over $13 million from Parmar parties.  Almost $10 million was transferred to Orion for operations and over $35 million was paid directly to the expenses of Orion.

Plaintiff is alleging that approximately $9.4 million went to purchase or retain

two of the relevant Defendant properties (2 River Terrace and Colts Neck), but failed to outline in their pleadings how this amount is actually the proceeds of the secondary raise ups, rather than from the other sources listed above. Specifically, Plaintiff has failed to properly plead how Parmar parties could have withdrawn $9.4 million in proceeds of illegal activity from accounts into which they had deposited over $13 million.

### The Go Private Transaction

Over the many months of negotiations leading up to the go private transaction, Chinh Chu and his due diligence team on behalf of CC Capital were provided with significant access to all of the accurate information and data on CHT's financial condition and were fully aware of exactly what they were investing in.

CC Capital's due diligence began with a review of audited financials of CHT. Later, CC Capital hired Truc To of KPMG to head the due diligence efforts. Discovery in Parmar's related criminal case has revealed that, from the early stages of the due diligence process, Chinh Chu and Truc To were aware of the possible existence of the empty shells. Indeed, Truc To advised Chinh Chu to walk away from the deal if he had any suspicions of fraud, and Chu refused, claiming that to walk away would set CC Capital back "years." Instead, the due diligence process went forward, and Chinh Chu and Truc To were given access to all of CHT's data, including a proprietary software platform, Pegasus, to ensure that they were

reviewing accurate data.  This data, as well as the only independent valuation of CHT performed to date, showed that an accurate enterprise value for CHT was over $500 million, a price that Chinh Chu and CC Capital was unwilling to pay.

Chinh Chu and Truc To manipulated the process in an effort to purchase CHT for a significantly discounted rate of $290 million, of which Parmar parties funded $80 million of equity, CC Capital funded $81 million of equity and the remainder was funded by a bank loan taken by CHT, as well as cash from the company itself. As all of the normal safeguards, such as a fairness opinion and a legitimate go-shop period, were bypassed, Chinh Chu ultimately gave the members of the Special Committee of the Board of Directors of CHT indemnification agreements and additional compensation to ensure that they would approve his unreasonable terms. These manipulations were successful, and the Special Committee agreed to accept a price far lower than the actual enterprise value of CHT. On January 31, 2017, the going private transaction closed, with CC Capital gaining a 51% stake in CHT.

### After Closing[3]

After the fact, in an effort to get rid of Parmar and steal 100% ownership of the company, Chinh Chu pretended that information had been falsely presented during the due diligence phase and claimed that he had been unaware of the true

---

[3] The facts after the closing are relevant to the Court's determination of sanctions for the illegal use of Parmar's stolen emails and should not be misconstrued as presenting matters outside the pleadings on the Rule 12(b)(6) branch of this motion.

operating structure of CHT.  He used this pretext to force Parmar out, file a fraudulent bankruptcy for CHT, and to deceive the SEC and DOJ into filing charges against Parmar.

Essential to Chinh Chu's corrupt plan was to ensure that the KPMG due diligence team did not spill the beans about their findings.  Immediately after closing, Chinh Chu moved to hire Truc To as the CFO of CHT.  Chinh Chu rewarded Truc To's dishonest work as the head of KPMG's due diligence team by offering him a compensation package greater than that of the CEO.  At the same time, Chu instituted a search committee to find a new CEO so that Parmar could be forced out and replaced.

In furtherance of his scheme, Chinh Chu then illegally accessed and misappropriated Parmar's private emails, taken without permission or authority from Parmar's personal server.  He then provided these feloniously obtained emails, including emails covered by attorney-client privilege, to Plaintiff's counsel, who quotes from them liberally in the complaint.

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims and accept all the well-pleaded facts as true. *See Fowler v. UPMC Shadyside*,

578 F.3d 203, 210-11 (3d Cir. 2009). All reasonable inferences must be made in the plaintiff's favor. *See In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 314 (3d Cir. 2010).

To survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A complaint alleging violations of wire fraud and securities fraud must meet a heightened pleading standard of particularity, as required by the Private Securities Litigation Reform Act, 15 U.S.C. § 78u-4 and Federal Rule of Civil Procedure 9(b).

The Third Circuit requires a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*. First, the court should "outline the elements a plaintiff must plead to a state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth. *Id*.; *see also Iqbal,* 556 U.S. at 678-79 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (*quoting Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

## ARGUMENT

### I. Plaintiff Has Failed to State a Cause of Action for the Two Pre – "Go Private" Properties.

### a. The Allegations About Two of the Four Defendant Properties Predate Any Alleged Violations of U.S. Law

Plaintiff's case primarily revolves around deeply flawed claims regarding the alleged go-private "fraud." However, the timeline of this transaction could only conceivably relate to two of the Defendant Properties, 40 Broad Street and 50 Riverside.  Plaintiff has correctly alleged that the other two properties were purchased, or refinanced, prior to the closing of the go-private transaction on January 31, 2017, and therefore can't possibly represent the proceeds of illegal activity even if such were properly plead.

In paragraphs 90 through 120, Plaintiff outlines their theory as to how funds from the allegedly fraudulent secondary stock offerings were used to purchase and/or retain ownership over the Defendant Properties as 2 River Terrace and 18 Colts Gait Lane.   Yet, even if these allegations were true[4], Plaintiff has failed to plead what, if any, criminal statutes have been violated which would give Plaintiff standing or jurisdiction to commence a forfeiture proceeding.

As the Supreme Court made clear in *Morrison v. Nat'l Austl. Bank Ltd.,* 561 U.S. 247 (2010), charges of securities fraud may be brought "only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." *Id.* At 273.[5]

It is undisputed that these allegedly fraudulent secondary stock offerings were conducted on the *London* Stock Exchange, AIM (*Complaint* ¶10), an undisputable foreign stock exchange, with all of the sales occurring in the United Kingdom, not the United States, with the proceeds being deposited into Finncap Limited, a British

---

[4] Plaintiff's allegations regarding the transactions on the Mortgage at Colts Gait Lane are demonstrably false and clearly the product of false information provided to Plaintiff by Chinh Chu, rather than a thorough investigation.   However, for the limited purpose of this Rule 12(b) motion, these false allegations are presumed true.
[5] Although *Morrison*'s scope is limited when the proceeding is brought by the United States (*see* 15 U.S.C. § 77v(c)), Plaintiff here has utterly failed to invoke this section by alleging either significant steps in furtherance of the violation being taken within the United States or that the claimed conduct had a foreseeable "substantial effect" within U.S. borders.

investment banking firm. *Complaint* 83-84, 105.  Moreover, each of the press releases relied upon by Plaintiff was made on the Regulatory News Service (RNS) – a news service provided by and for residents of the United Kingdom.

Courts have previously considered whether activities on the London Stock Exchange are prosecutable in US Courts and have found that there must be some additional nexus to the United States that is not present here. *See, e.g. United States v. Mandell*, 752 F.3d 544, 549 (2nd Cir. 2014)(finding jurisdiction for transactions on the AIM where purchase applications and payments were made to a company in the United States, as opposed to Finncap); *In re Royal Bank of Scot. Group PLC Sec. Litig.*, 765 F. Supp. 2d 327, 337 (S.D.N.Y. 2011)(dismissing claims where the purchasers of stock traded on the London Stock Exchange were U.S. citizens who made the decision to trade while located in the United States.  In contrast, the purchasers in the case at bar were all in the United Kingdom); *In re BP P.L.C., Sec. Litig.*, 843 F. Supp. 2d 712 (S.D.T.X. 2012)(rejecting similar argument regarding citizenship and location of buyers in the United States).

Therefore, Plaintiff's First Claim for Forfeiture, which is grounded in violations of United States securities fraud statutes, can only be applied to the go-private transaction, not the secondary stock offerings.  Thus, it cannot possibly apply to three of the four Defendant Properties, and any claim by Plaintiff to those three properties must fail.

Similarly, Plaintiff's Second Claim for Forfeiture is based on the theory of money laundering, in violation of 18 U.S.C. §§1956, 1957.  However, as outlined by Plaintiff, these statutes require that the money be derived from "specified unlawful activity."  Plaintiff identifies this "specified unlawful activity" as being the same inapplicable statutes as in the First Claim for Forfeiture. *Complaint* ¶8. Plaintiff's claim becomes no more proper by virtue of being made in a more circular fashion.

Thus, pursuant to the Supreme Court's holding in *Morrison,* and Plaintiff's utter failure to properly plead the narrow exception to that holding carved out by 15 U.S.C. § 77v(c), Plaintiff's claims against the three Defendant Properties that were purchased or retained using funds from the secondary offerings must be dismissed.

Another notable omission by Plaintiff is any attempt to differentiate the wire transfers used to purchase these properties and any other expenses or financial obligations of CHT.  During the relevant time period, CHT took in over twelve million dollars from FUH into the same operating account into which the proceeds of the secondary offerings were deposited, and in excess of another twelve million dollars from FUH and the IPO into the second CHT operating account.  CHT also had financial obligations to Parmar, as CEO, as well as to the companies that he owned or controlled, which made up the majority shareholders of the corporation.

Plaintiff's overly simplistic attempt to trace the path of the proceeds

17

completely ignores both the actual revenues of CHT, as well as the legitimate financial obligations of CHT and of Orion.  Without even attempting to plead any detail regarding the financial obligations of CHT to Parmar, or to entities he owned or controlled, Plaintiff cannot show whether the payments alleged were in the ordinary course of business, were excessive, or were actually less than what was due and owing.  Plaintiff has therefore failed to make a plausible showing that the proceeds of any illegal activity, particularly any illegal activity within the jurisdiction of the United States, was used to purchase or retain ownership of any of the Defendant properties.

### b. Even if Plaintiff had Properly Alleged a Violation of U.S. Law, Plaintiff has Failed to Connect the Proceeds to the Properties

In order to forfeit property, Plaintiff must go well beyond simply alleging that proceeds were deposited into an account and then later withdrawn to purchase property.  Rather, Plaintiff must show a traceable connection, which is not present here.

Plaintiff mentions the accounts into which the secondary raises from the UK were deposited and also mentions that payments were made for purchase of apartments but fails to properly plead the requisite "traceable connection" between these funds, where additional substantial funds were also deposited into those same accounts during the relevant time period which are unrelated to any allegedly illegal activity.  This is not a situation where the account was solely used to deposit illegal

funds, nor has Plaintiff made that allegation.  To make out a sufficient cause of action, Plaintiff must therefore plead the traceable connection with a specificity that is not present here and is impossible to credibly plead under this fact pattern.

As the Third Circuit noted in *United States v. $8,221,877.16 in United States Currency*, 330 F.3d 141, 158 (3d Cir. 2003), "[i]n forfeitures under section 981, the government is required to trace the seized property directly to the offense giving rise to the forfeiture."   The Court went on to state that when allegedly tainted funds are commingled with untainted funds in an account, making that necessary traceable connection, although not impossible, places a difficult task upon the government. *See also United States v. Voigt*, 89 F.3d 1050 (3d Cir.1996), and *United States v. Stewart*, 185 F.3d 112 (3d Cir. 1999). In *Voigt*, that court held that "the government must prove by a preponderance of the evidence that the property it seeks under § 982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property `involved in' the money laundering offense." *Id*. at 1087. Commenting that this burden may be very difficult to meet where property "is commingled in an account with untainted property," the court rejected the government's effort to forfeit items of jewelry "purchased with funds from an account into which money laundering proceeds had been commingled with other funds, and after numerous intervening deposits and withdrawals." *Id*. at 1087-88. The court held that, in such a situation, funds cannot be traced as a matter of law.

Here, Plaintiff has made a weak effort at best to meet its burden to trace the path of the proceeds from the Secondary Offerings. Plaintiff does not even mention the additional funds deposited into the two CHT operating accounts referenced in the Complaint, nor does Plaintiff describe the withdrawals made from those accounts to cover CHT's operating expenses and obligations. Plaintiff never even attempts to address the interrelationship between CHT, Orion, CHT's shareholders, and Orion's financial obligations.

Plaintiff's minimal effort to plead a traceable connection is complicated even further by the fact that some of the funds for the purchase of two of the Defendant properties (2 River Terrace and 40 Broad Street) passed through the escrow account of one of Parmar's attorneys, designated in the complaint as "Law Firm 1".[6] Although Plaintiff acknowledges that funds were wired both to and from Law Firm 1's escrow accounts, and merely points out that some of these funds in this account as being from the Secondary Offerings or the Go Private transaction, nowhere does Plaintiff deal with the possibility of commingled funds. Plaintiff does not make any allegations regarding the balance of the funds held in escrow by Law Firm 1 for the Parmar parties prior to these transfers being made, nor does Plaintiff provide any

---

[6] The minimal allegations that Plaintiff does make regarding the use of escrowed funds rely almost entirely upon their use of privileged attorney-client communications, a topic dealt with in further detail *infra*, but which certainly should not be countenanced by this Court.

specificity regarding other possible transfers to or from the escrow balance during the several months in question.  Nor does (or can) Plaintiff allege that the ingoing and outgoing flow of funds between the escrow account and the CHT operating accounts involves identical amounts.  Plaintiff's utter failure to address the issue of legitimate funds being commingled with the allegedly illegitimate funds in not just the M&T Bank accounts held by CHT but in the escrow account maintained by Law Firm 1 on the Parmar parties behalf ensures that the Complaint before this Court falls far short of establishing the traceable connection required to justify the forfeiture of real property under Section 982(a)(1).

In short, Plaintiff's "skim the surface" approach of alleging that illicitly obtained funds entered the accounts and that funds from those accounts were then used to purchase or retain the Defendant properties is simply insufficient to meet their burden to properly connect ANY funds to the properties sought to be forfeited.

### c. Plaintiff has Failed to State a Claim Against the Colts Neck Property.

Even if this Court finds that Plaintiff has sufficiently pleaded violations of the law related to the Secondary Offerings, they still have failed to state a cause of action against the Colts Neck property.

The factual background presented by Plaintiff discusses the original purchase of the property in 2000, its development, and three prior mortgages that were taken out to develop the land. *Complaint* ¶99-100.  Plaintiff then discusses how these three

mortgages were consolidated into a single mortgage by Deutsche Bank and, although that mortgage did fall behind in 2011, it was brought current and the foreclosure did not go through. *Complaint* ¶101-103. There are no allegations that any unlawful funds were used in the purchase and development of the property, or to bring the Deutsche Bank mortgage current.

Plaintiff then alleges that in March 2016, $3.8 million from the secondary stock offerings were used to purchase the Deutsche Bank mortgage in the name of Aquila Alpha, LLC. *Complaint* ¶104-107. At the same time, as set forth in further detail *supra*, Plaintiff fails to properly plead the full picture of the bank account from which the 3.8 million was transferred. Specifically, Plaintiff completely omits the inconvenient fact that $13,020,000.00 came into these bank accounts from FUH, another of the Parmar Parties. These funds are not even mentioned by Plaintiff, much less alleged to have any impropriety in their source.

Although Plaintiff alleges generally that funds were used "either to purchase or to retain ownership" of the properties, Plaintiff alleges no facts to support this claim as it relates to the Colts Neck property. *Complaint* ¶60. As the mortgage with Deutsche Bank was current at the time it was purchased, there was no risk of losing the property that was averted through the use of any allegedly improper funds.

At best, Plaintiff has alleged that the funds were used by a third party, Aquila Alpha, LLC, to purchase a mortgage, not that the funds were used to purchase or

retain ownership of any real property.  Conceivably, the Plaintiff could file a forfeiture action to take possession of the mortgage from Aquila Alpha, LLC, but hasn't done so.  The scheme, as alleged, is too remote from the property itself to make it eligible for forfeiture. At best, if the Plaintiff properly alleged and can prove that the 3.8 million transfer was indeed from illegal proceeds rather than from legitimate sources, then they would arguably have the right to the asset that was acquired using those funds; a mortgage on the property, not the property itself. Furthermore, the amount in question is less than 7% of the total value of the property so it cannot be seized as a substitute asset up to the time a judgement is declared, nor has Plaintiff made any effort to claim that the real property in question (the Colts Neck address) should be considered a substitute asset.

## II. Plaintiff Has Failed to State a Cause of Action to Forfeit the Third and Fourth Property

### a. Plaintiff Has Failed to Allege a "Scheme or Artifice to Defraud."

Glaringly absent from the pleadings is any theory of a scheme or artifice to defraud related to the actual value of CHT.  It is axiomatic that a scheme to defraud must anticipate some intended harm to the victim, such as the purchase of an asset worth less than the victim was led to believe.  Conversely where, as here, the "victim" purchases an asset for *less* than its actual value, Plaintiff fails to properly plead a scheme to defraud.

While Plaintiff speaks generally about how Parmar allegedly employed "a

variety of fraudulent methods designed to grossly inflate the value of Company A and trick the Private Investment Firm and others into believing that Company A was worth substantially more than its actual value," (*Complaint* ¶11) Plaintiff fails to allege any facts to support this theory and conspicuously declines to make any attempt to plead with particularity what the "actual value" of CHT was.

Plaintiff alleges that "the co-conspirators caused the Private Investment Firm and others to value Company A at over $300 million." *Complaint* ¶13.  Not only does Plaintiff fail to allege what the actual value of CHT is, they incredibly don't even include a non-specific allegation that it is worth less than $300 million, or that the $300 million value was false or inflated.  Instead of addressing the total enterprise value, Plaintiff focuses on the value of three of CHT's many subsidiaries, which are alleged to have inflated values.  Plaintiff's failure to then connect these allegedly inflated subsidiaries to the total enterprise value, or to in any way address the value of the other uncontested subsidiaries, is fatal to their claim.

On information and belief, Plaintiff's failure to address the total enterprise value is not simply an oversight, but rather a recognition that there is absolutely zero evidence to support the notion that the total enterprise value is anything less than the $300 million that the Private Investment Firm valued it at.  On the contrary, the due diligence documents relied upon by both the SEC and Plaintiff here demonstrate that the actual total enterprise value of CHT was significantly greater than $300 million

at the time of the go-private transaction.  Discovery materials provided by Plaintiff in the course of the criminal proceeding support rather than contradict this value.[7]

As outlined in *United States v. Starr*, 816 F.2d 94, 98, (2nd Cir. 1987):

> Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim. Moreover, the harm contemplated must affect the very nature of the bargain itself. Such harm is apparent where there exists a "discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver."

*Id., quoting United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2nd Cir. 1970).

### b. Plaintiff Has Failed to Sufficiently Plead Fraudulent Misrepresentations

Independent of the standard applicable to Rule 12(b)(6) motions, and as noted above, Fed. R. Civ. P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." This particularity requirement has been rigorously applied in securities fraud cases. *In re Burlington*, 114 F.3d at 1417. As such, plaintiffs asserting securities fraud claims must specify "the who, what, when, where, and how: the first paragraph of any newspaper story." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir. 1999)

---

[7] In particular, FBI-0000000003-6, which records an interview with staff of Duff & Phelps on the specific issue of the valuation of CHT, reveals that CHT was independently evaluated as having a worth substantially greater than that paid by CC Capital.

(*quoting DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *In re Rockefeller*, 311 F.3d at 216 (*quoting In re Nice Sys., Ltd. Secs. Litig.*, 135 F. Supp. 2d 551, 577 (D.N.J. 2001)).

In addition to Rule 9(b), plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of 15 U.S.C. §§ 78u-4(b)(1), (b)(2), which "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller*, 311 F.3d at 217. It requires any securities fraud claim brought under the 1934 Act to:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1). If this requirement is not met, "the court shall . . . dismiss the complaint." 15 U.S.C. §78u-4(b)(3)(A).

Here, Plaintiff has utterly failed to allege any specific representations by Parmar and his alleged co-conspirators to the Private Investment Firm. Instead, Plaintiff generally states:

> During the due diligence phase of the Go-Private Transaction, the Private Investment Firm was interested in seeing revenue and

26

earnings data supporting Company A's organic growth rate. In this regard, during the due diligence, the co-conspirators sent the Private Investment Firm information concerning customer revenue for the Operating Company, among other entities.

*Complaint* ¶49.

Rather than outline any specific allegedly misleading statements communicated to the Private Investment Firm, Plaintiff instead chooses to quote from the illegally obtained emails between the alleged co-conspirators. None of these emails were sent to, or shared with, CC Capital or its representatives, either before or after the consummation of the go private transaction. They cannot therefore support Plaintiff's claim and certainly do not meet the heightened pleading requirements that Plaintiff must meet to prevail.

Plaintiff's failure to plead any specific fraudulent statements is fatal to Plaintiff's claims. Furthermore, this is not a simple drafting error that could be remedied through an amended pleading, as the evidence that Parmar in fact provided the Private Investment Firm with thousands of pages of true and accurate data during the due diligence process, and that the representatives of the firm were anything but misled, is overwhelming.

### III. Plaintiff Should Be Sanctioned with Dismissal or Disqualification for Their Brazenly Improper Use of Illegally Obtained Emails and Violations of the Attorney-Client Privilege.

Finally, Claimants move that this case be dismissed, or, in the alternative, for an evidentiary exclusion and disqualification of Plaintiff's counsel, for their patently

27

improper use of stolen emails and their review and subsequent publication of attorney-client privileged communications.

18 U.S.C. §2701 makes it a crime to either access without authorization, or exceed an authorization to access stored communications, such as emails. Here, Chinh Chu, Truc To, and others at CHT and CC Capital violated this provision by illegally accessing the email communications stored at the domain of constellationhealthgroup.com. This domain, and the associated email accounts, were registered to and owned by Parmar, not CHT or CC Capital. In fact, all CHT employees used email addresses at the domain name of orionhealthcorp.com, not constellationhealthgroup.com. The only mode of access to the electronic storage of constellationhealthgroup.com emails was through the use of login information and passwords belonging to Parmar, which permitted access to the storage facility of the service provider.

Chinh Chu and Truc To were fully aware that their access and use of these stored communications was unlawful. Even if it had not been patently obvious, this was communicated to them, through counsel, after it was discovered that they had misappropriated the domain for themselves. On October 12, 2017, John Altorelli, attorney for Chinh Chu and CC Capital responded to a cease and desist letter by stating that the domain and emails would "remain in a 'frozen' state until an appropriate determination can be made as to the history, ownership, custody and the

like."  Altorelli further promised that, if the parties couldn't agree on the legalities, they would "seek judicial assistance."

On information and belief, Altorelli's email was an intentional misrepresentation, designed to fraudulently prevent Parmar from filing any legal action to prevent Chinh Chu, Truc To and CC Capital from continuing their illegal conduct.  No judicial assistance was ever sought and Chinh Chu, Truc To and CC Capital continued to access, review and use the stolen emails in a flagrant and willful violation of both federal and state criminal statutes.

Stunningly, these parties then provided the stolen email communications to Plaintiff's counsel who chose to ignore the criminal conduct of Chinh Chu, Truc To and CC Capital and, instead, to use the criminally obtained emails for Plaintiff's benefit by publishing the contents in this complaint.

The complaint at bar quotes extensively and unapologetically from these emails including, shockingly, communications with counsel that are clearly protected by the attorney-client privilege.

Plaintiff's outrageous and unethical use and publication of criminally obtained emails and attorney-client privileged communications should not be permitted to stand unanswered and the Court should exercise its inherent authority to sanction this conduct.

As the Court in *Lynn v. Gateway Unified Sch. Dist.*, 2011 U.S. Dist. LEXIS

143282, *14, 2011 WL 6182348 (E.D.C.A. 2011) explained:

> When a party wrongfully obtains documents outside the normal discovery process, a number of different types of sanctions are available. These include dismissal of the action, the compelled return of all documents, restrictions regarding the use of the documents at trial, disqualification of counsel and monetary sanctions. Courts have considerable discretion in choosing the appropriate sanction under its inherent authority and may, for example, dismiss claims, enter default judgment, and award attorney's fees and costs.

*Id.* At *14, *citing United States v. Shaffer Equip. Co*., 11 F.3d 450, 461-62 (4th Cir.1993); *Fayemi v. Hambrecht & Quist, Inc*., 174 F.R.D. 319, 324-27 (S.D.N.Y.1997); *Glynn v. EDO Corp*., 2010 U.S. Dist. LEXIS 86013, 2010 WL 3294347 (D.Md.2010).

The Court in *Lynn* examined a very similar situation to the case at bar, where Plaintiff's counsel was in receipt of 39,312 emails, which were illegally stolen from the defendant.  The Court reasoned that Plaintiff's counsel was in possession of stolen property, in violation of California Penal Code 496 and 502, in disqualifying counsel and prohibiting Plaintiff from introducing "any evidence, including cross-examining any witnesses, about the contents of these emails."

"A court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the information in litigation before it, becomes complicit in the misconduct." *Am. Unites for Kids v. Lyon*, 2015 U.S. Dist. LEXIS 171614, *26, *quoting Fayemi v. Hambrecht*

& *Quist, Inc.*, 174 F.R.D. 319, 324 (S.D.N.Y. 1997).

In the case at bar, it is unquestionable that Plaintiff's counsel is in receipt of stolen property; Parmar's stored private electronic communications. It is unclear whether this conduct was willful and knowing, or if Chinh Chu, Truc To, and others made materially false representations to Plaintiff's counsel to falsely convince them that the emails were properly obtained. In determining the appropriate sanction, movants respectfully request that the Court conduct a hearing to take testimony on the circumstances under which Plaintiff came into possession of this stolen property. Under 18 U.S.C. §2315, the requisite mental state for receipt of stolen property can be proven by showing knowledge that the property is stolen or willful blindness to that fact.

Even in the unlikely event that this Court finds that Plaintiff's counsel's receipt and review of the stolen emails was not unlawful, sanctions are still appropriate because many of the emails quoted are clearly protected under the attorney-client privilege. *Josephson v. Marshall*, 2001 U.S. Dist. LEXIS 10049, 2001 WL 815517, *2 (S.D.N.Y. July 19, 2001) (holding that where documents were obtained outside the normal discovery process but not wrongfully, ordinary attorney-client privilege analysis applies).

Plaintiff's use of stolen emails and quotations from attorney-client privileged communications should not be countenanced by this Court. Dismissal, evidentiary

preclusion, or disqualification are appropriate.

## CONCLUSION

For all the reasons stated herein, Defendant respectfully requests that this Court issue an Order dismissing this case and disqualifying Plaintiff's Counsel, together with such other and further relief as the Court deems appropriate.

Respectfully submitted,

Timothy C. Parlatore, Esq.
*Attorney for the Claimants*
One World Trade Center, Suite 8500
New York, NY  10007
212-679-6312
212-202-4787 Facsimile
timothy.parlatore@parlatorelawgroup.com